UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAROSLAW WASKOWSKI,

      Plaintiff,

                              Case No. 11-CV-13036

v.

                              Honorable Sean Cox
STATE FARM MUTUAL AUTOMOBILE      Magistrate Judge Hluchaniuk
INSURANCE COMPANY,

      Defendant.

| Lee Roy H. Temrowski (P31967) | James F. Hewson (P27127) |
|---|---|
| Attorney for Plaintiff | Hewson & Van Hellemont, P.C. |
| 45109 Van Dyke Ave. | Attorneys for State Farm |
| Utica, MI 48317 | 25900 Greenfield, Suite 326 |
| (586) 254-5566 | Oak Park, MI 48237 |
| | (248) 968-5200 |

## DEFENDANT, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, TRIAL BRIEF

      Defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), through its attorneys, Hewson & Van Hellemont, PC, states as follows for its Trial Brief in the above-captioned matter:

## BACKGROUND

### (The Accident)

      This litigation involves a claim for first-party personal injury protection ("PIP") benefits because of injuries that Plaintiff, Jaroslaw Waskowski, allegedly sustained in an automobile accident that occurred on December 23, 2009.  Apparently, Plaintiff was waiting to make a left turn on to Maple Road from northbound Dequindre in Troy, Michigan.  The vehicle directly in front of him in the left-turn lane attempted to make the identical turn as intended by Plaintiff attempted; however, in doing so, it collided with

another vehicle travelling southbound on Dequindre.  The vehicle travelling southbound on Dequindre then lost control and proceeded to impact with Plaintiff's vehicle.  Plaintiff was noted to have "O" type injuries at the accident scene, which constitutes no injury.

**(Treatment)**

Sometime between December 25 and 31, 2009, Plaintiff presented to a Dr. Wietrzykowski.  He claims he went there because due to the spelling of his last name he felt that this doctor may be able to speak in Polish.  He discovered that he did not communicate in the polish language, and only saw him that one time.  According to Plaintiff, Dr. Wietrzykowski prescribed only medication for him.  Furthermore, it is significant to recognize that Dr. Wietrzykowski did not find that Plaintiff required any attendant care and/or disability as a result of his complaints.

Thereafter, on January 4, 2010, Plaintiff presented to Beaumont Hospital – Warren Medical Center.  Complete x-rays were obtained of his cervical spine, lumbar spine, and bilateral ribs.  The x-rays of the cervical spine demonstrated no fracture or subluxation.    As  to  the  lumbar  spine,  it  was  noted  that  neither spondylolysis/spondylolisthesis nor any no vertebral fracture and/or malalignment was observed.  Furthermore, no fractures were observed with any of Plaintiff's ribs. A subsequent bone scan also failed to reveal a fracture in any area of the body.

Nearly three weeks after the accident, Plaintiff presented to Dr. Stefan Glowacki with chief complaints of back pain, neck pain and lower back pain since the December 23, 2009 accident.   Notwithstanding  the  above-referenced  diagnostic  studies,  Dr. Glowacki promptly diagnosed Plaintiff with the following:  herniated disc L4-L5, ruptured disc, herniated disc C4-C5, fractured left ribs six to eight on the left side, possible

fractured sternum, head injury, contusion of the neck, back and chest.  It is curious, however, that even the fractured ribs and/or sternum diagnosed by Dr. Glowacki did not appear on Plaintiff's x-rays, which, at that time, were only a little over seven days' old.

Ultimately, Dr. Glowacki was confronted with the findings of Plaintiff's x-rays and bone scan and was forced to agree that there were no fractures.   However, he continued the diagnosis of rib and sternum fracture throughout the course of his treatment. Furthermore, he ordered physical therapy for Plaintiff three times per week, and disabled him from work and household chores.   He further prescribed attendant care for Plaintiff 12 hours per day, seven days per week.

Dr. Glowacki referred Plaintiff to Macomb MRI for diagnostic studies, and on March 18, 2010 an MRI of the cervical spine was conducted on Plaintiff.  In her March 19, 2010 report, radiologist, Michelle Keys, noted multi-level level disc herniations with mild central stenosis C4-5 and C5-6, with disc bulging at T2-3.  A subsequent MRI study of this area, conducted on August 4, 2010, noted multi-level herniations with mild central canal stenosis at C4-5 and C5-6 in addition to disc bulging at C2-3.  Dr. Keys could not determine, however, whether the disc herniations or bulging were of recent or remote etiology and that was age indeterminate.

On April 15, 2010, an MRI study was performed of Plaintiff's lumbar spine at Macomb MRI.  In her report, dated April 27, 2010, Dr. Keys stated that disc herniations were observed at L4-5 and L5-S1.  An addendum to this report, completed on August 3, 2010, noted that Dr. Keys could not determine whether or not whether or not these are new or old disc herniations.  They are age indeterminate disc herniations.

3

The ultimate inability to render a determination that these finding were traumatically induced is no surprise. Even another of Plaintiff's treaters, Dr. Donahue, believed that Plaintiff was actually suffering degenerative disc disease greatest seen at L5-S1 after reviewing the study images.

Plaintiff continued to treat with Dr. Glowacki up through January 20, 2012. Throughout the period of Dr. Glowacki's treatment, Plaintiff did not improve. As of January 20, 2012, Plaintiff claimed that he was still unable to return to work, and he still needed household assistance, as well as attendant care. Dr. Glowacki, of course, continued to prescribe replacement services and attendant care in spite of the fact that he had no idea of the nature of Mr. Waskowski's physical capabilities at home. Indeed, Dr. Glowacki made a very poor presentation as a witness during his recorded trial testimony, which included an abject inability to explain the basis for his prescription of attendant care, as well as hurling explicatives at defense counsel.

Notwithstanding the above, Plaintiff's daughter, Kamila, testified that he was able to shower and/or bath by himself for the first six months after the accident. She then claimed that he had deteriorated to the point that she and/or her sister, have to help him bathe for at least one hour every day.

### (Independent Medical Evaluation of Dr. Steven Geiringer)

On July 7, 2011, Plaintiff presented to Dr. Geiringer for an independent medical evaluation. According to the history supplied by Plaintiff during that event, he had continuing symptoms in multiple areas ever since the accident and, if anything, he was slowly worsening as time passes.

However, on his physical examination of Plaintiff, Dr. Geiringer observed that his spine and limbs showed no hint whatsoever of an objective impairment and that there were widespread inconsistent and/or non-physiologic findings.   While he did note a possible concern with regard to Plaintiff's left shoulder (which was not typical of a rotator cuff problem), Dr. Geiringer learned through reviewing Plaintiff's medical records that he had presented for emergency treatment following an accident that occurred on July 16, 2009 (five months before the subject accident) for left-sided neck pain and shoulder pain.

Dr. Geiringer opined that Dr. Glowacki's diagnoses included fractures that did not exist and radiculopathies that did not exist.   He also concluded that, based upon Plaintiff's presentation, treatment allegedly provided by other physicians and clinics, including Dr. Zamorano, was not warranted.

While Dr. Geiringer did note that the presence of a L5-S1 lumbar disc protrusion, he concluded that it did not correlate with any physical examination finding and was, therefore, clinically irrelevant.   In fact, Dr. Geiringer noted that there were only two physicians that examined the Plaintiff, before his visit to Dr. Geiringer's office, that were board-certified by ABMS.   Neither of those physicians found that Plaintiff suffered from any complaints consistent with an objective impairment, nor did he.   Indeed, the only explanation for Plaintiff's unsubstantiated complaints was malingering.

Consequently, as it relates to the PIP benefits that Plaintiff alleges are due and owing, Dr. Geiringer opined that, in the absence of any impairment, there is no need for any work restrictions either in terms of the number of hours worked or the content of his

job. Nor was there ever at any point the need for assistance with indoor or outdoor household activities or even attendant care.

It is State Farm's position that it has already paid Plaintiff for all PIP benefits that can even, charitably, be attributed to his care, recovery, or rehabilitation from the December 23, 2009 accident as contemplated by MCL 500.3107. Furthermore, it is State Farm's position that the household services and attendant care demanded by Plaintiff in this matter have not been incurred as that term is contemplated under Michigan's No-Fault Act and, as such, are not compensable.

### (Review of MRI Studies By Dr. Quint)

Dr. Quint is a board-certified neuroradiologist, whom is the head of the Department of Neuroradiology at the University of Michigan. He reviewed all the MRI studies in this case and concluded that there was no evidence of any traumatic incident involving Plaintiff's spine and nerves.

### ISSUES

### I. The Mere Fact That State Farm May Have Previously Paid PIP Benefits To And/or On Plaintiff's Behalf Does Not Obligate It Into The Future.

Michigan law is clear that previous payments do not bind an insurer, requiring it to continue to make such payments into the future. For example, the Michigan Court of Appeals considered a virtually identical issue in *Hammermeister v. Riverside Ins. Co.*, 116 Mich. App. 552; 323 N.W.2d 480 (1982). In that case, the plaintiff filed suit claiming that the defendant had improperly reduced wage loss benefits by offsetting the insured's social security benefits. The defendant contended that its actions were in accord with the No-Fault Act and that, additionally, it owed plaintiff no further benefits. The plaintiff then filed a dispositive motion, arguing that because the defendant had previously paid

him some wage loss benefits, it was estopped from claiming it did not owe any further benefits.  The plaintiff further argued that the defendant's previous payments of paying wage loss benefits, even at a reduced amount, constituted a waiver of its right to later claim no benefits were owed.

On review, the Court of Appeals disagreed.  It reversed the lower court's ruling and opined:

> **_The mere fact that the insurer paid some wage loss benefits is insufficient by itself for us to hold that, in the event the insured filed suit objecting to the amount of benefits paid, the insurer is precluded from asserting that it owes nothing at all…_**

*Id.* at pp. 555-5556 (emphasis added).

The United States Court of Appeals for the Sixth Circuit similarly determined that an insurer has the right to dispute all claims for benefits despite having paid similar claims in the past.  In *Golumbia v. The Prudential Ins. Co.*, 116 F.3d 1480 (6th Cir. 1997), the Sixth Circuit cited *Hammermeister, supra,* and *Calhoun v. Auto Club Ins. Ass'n*, 177 Mich. App. 85, 89; 441 N.W.2d 54 (1989), abrogated on other grounds *Tousignant v. Allstate Ins. Co.*, 444 Mich. 301; 506 N.W.2d 844 (1993), as the basis for its opinion that uninterrupted payment of benefits for four years did not require an insurer to pay benefits to the insured indefinitely.  *Id.* at 2

In *Golumbia*, the plaintiff had received long-term disability benefits from the defendant from 1990 through 1994 at which time the defendant, after reviewing the plaintiff's tax returns for the period of time that the benefits were paid, terminated plaintiff's benefits due to plaintiff's supplemental income which no longer qualified him to receive benefits.  *Id.* at p.1.   The plaintiff then filed a lawsuit for reinstatement of

benefits.  The Court affirmed the trial court's granting of summary judgment in favor of Prudential and wrote that "payment of insurance benefits for a specified period of time does not prevent an insurance company from later asserting that it owes no duty to pay those benefits." *Id.* at p.3 (citing *Hammermeister, supra* and *Calhoun, supra*).  *See also, Calhoun,* 187 Mich. App. at 87-88, 89 (payment of medical benefits for nearly two years does not preclude an insurer from asserting that it owes not duty to pay those benefits).

Moreover,  F.R.E.  409  specifically  provides  that  "[e]vidence  of furnishing…medical,  hospital,  or  similar  expenses  resulting  from  an  injury  is  not admissible to prove liability for the injury."  To the extent that Plaintiff seeks to address State Farm's previous payment of benefits, his purpose in doing so would be none other than to attempt to establish liability in the jury's mind.  Not only is that unfairly prejudicial as contemplated under F.R.E. 403, it is prohibited.  F.R.E. 409.  Plaintiff must meet his burden of proof establishing the requisite elements for a no-fault claim (*see,* M.C.L. 500.3107; *Nasser v. Auto Club Ins. Ass'n,* 435 Mich. 33; 457 N.W.2d 637 (1990)), with evidence independent of previous payments that State Farm has made to and/or on his behalf.  State Farm submits that given the factual background of this matter discussed in greater detail above, he will be unable to do so.

## II.  Plaintiff Has Provided Insufficient Documentation Of Alleged Household And Attendant Care Expenses As Required Under Michigan's No-Fault Act, Thereby Barring His Claim For Such Services.

MCL 500.3107(1) provides, in pertinent part:

Except as provided in subsection (2), personal protection insurance benefits are payable for the following:

(a) Allowable expenses consisting of all reasonable charges *incurred* for reasonably necessary products, services and

8

accommodations for an injured person's care, recovery, or rehabilitation. (Emphasis added.)

MCL 500.3110(4) provides that personal protection insurance benefits payable for accidental bodily injury accrue not when the injury occurs but as the allowable expense, work loss or survivor's loss is *incurred*. In *Nasser, supra*, the Michigan Supreme Court emphasized the requisite the elements of an "allowable expense" under the No-Fault Act:

> The statute requires that three factors be met before an item is an "allowable expense": 1) the charge must be reasonable, 2) the expense must be reasonably necessary, and 3) the expense must be incurred. These are the standard requirements for recovery of such expenses under all no-fault plans.... *Id.* at 50, quoting *Manley v. Detroit Auto. Inter-Insurance Exchange,* 425 Mich 140, 169 (1986) (Boyle, J., concurring in part and dissenting in part). (Emphasis added.)

State Farm submits that Plaintiff will fall woefully short in establishing these elements at the time of trial. Specifically, even if a claimant can show that services were for his care and were reasonably necessary, an insurer "is not obliged to pay any amount except upon submission of evidence that services were *actually rendered* and of the *actual cost expended.*" *Manley v. Detroit Automobile Inter-Ins. Exchg.,* 426 Mich. 140; 388 N.W.2d 216 (1986). (Emphasis added). *See also, Proudfoot v. State Farm Mut. Ins. Co.,* 469 Mich 476, 484; 673 N.W.2d 739 (2003). In *Douglas v Allstate Ins. Co.,* 492 Mich. 241, 268-269; 821 N.W.2d 472 (2012), the Michigan Supreme Court explained:

> The fact that charges have been incurred can be shown "by various means," including "a contract for products and services" or "a paid bill." The requirement of proof is not extinguished simply because a family member, rather than a commercial health care provider, acts as a claimant's

caregiver. Indeed, M..C.L. 500.3107(1)(a) does not distinguish a "charge[ ] incurred" when a family member provides care from one incurred when an unrelated medical professional provides care. As a result, there is only one evidentiary standard to determine whether expenses were incurred regardless of who provided the underlying services. ***Any insured who incurs charges for services must present proof of those charges in order to establish, by a preponderance of evidence, that he is entitled to PIP benefits.***

(Italics in original; bold and underline added).

The Court further explained:

> ***This evidentiary requirement is most easily satisfied when an insured or a caregiver submits itemized statements, bills, contracts, or logs listing the nature of services provided with sufficient detail for the insurer to determine whether they are compensable.*** Indeed, the best way of proving that a caregiver actually "expected compensation for [her] services" at the time the services were rendered is for the caregiver to document the incurred charges contemporaneously with providing them—whether in a formal bill or in another memorialized statement that logs with specificity the nature and amount of services rendered—and submit that documentation to the insurer within a reasonable amount of time after the services were rendered. While no statutory provision *requires* that this method be used to establish entitlement to allowable expenses—a caregiver's testimony can allow a fact-finder to conclude that expenses have been incurred—a claimant's failure to request reimbursement for allowable expenses in a timely fashion runs the risk that the one-year-back rule will limit the claimant's entitlement to benefits, as occurred here when plaintiff commenced a lawsuit to recover allowable expenses that were alleged to have been incurred more than one year earlier. Moreover, once a claimant seeks payment from the insurer for providing ongoing services, the insurer can request regular statements logging the nature and amount of those services to ensure that the claimed services are compensable.

*Id.* at 269-270. (Emphasis added).

Indeed, the Supreme Court recognized the evidentiary problems for a plaintiff in circumstances such as those that exist in the captioned action:

> The problem of a caregiver's failure to provide contemporaneous documentary evidence of allowable expenses is aptly illustrated in this case, in which Mrs. Douglas submitted documents constructed in one day as proof of services rendered over the course of approximately three years. The lack of contemporaneous documentation implicates her credibility regarding whether the services were actually rendered in the manner documented. Moreover, this failure to provide contemporaneous documentation may also be relevant to the fact-finder's determination whether Mrs. Douglas actually expected payment for providing those services….
>
> * * *
>
> We underscore the importance of the proofs necessary to establish entitlement to benefits. The circuit court issued a judgment in favor of plaintiff without finding that the expenses were *actually incurred* given that its determination of the number of hours to award plaintiff had no discernible basis in the evidence presented at trial and did not examine whether Mrs. Douglas had the expectation of payment for her services. While it awarded plaintiff benefits for 40 hours a week of attendant care services for the period beginning November 1, 2007, in accord with Dr. Rosenbaum's prescription, there is no basis for its findings that Mrs. Douglas *actually* provided 40 hours of care each week during that period. Indeed, because she was unavailable to provide services during her working hours, there is no basis for compensating her for any hours that she spent working outside the home. Similarly, the award for the period before November 1, 2007, was made with no discernible basis in the record. Therefore, the Court of Appeals properly recognized that that award could not be sustained…

*Id.* at p 270-271. (Emphasis in original). *See also, Pakenas v. State Farm Mut. Automobile Ins. Co.,* 2012 WL 2161633, *10 (6th Cir. 2012), wherein the United States

Court of Appeals determined that the attendant care expenses claimed by the plaintiff were not incurred, in part, because:

> …However, Pakenas and Mr. Rogers's records are devoid of detailed descriptions of what kind of care they provided or the actual times of care provided. Pakenas billed State Farm in monthly increments without breaking out the services provided at what times, or how long it took to provide them. There was no way to tell from testimony the times that Rogers was cared for. A jury would have to speculate as to what amount of care was actually provided, and a jury cannot decide a damages award based on speculation. *See, e.g., Melamed v. Lake Cnty. Nat. Bank,* 727 F.2d 1399, 1404 (6th Cir.1984); *Gadula v. Gen. Motors Corp.,* No. 213853, 2001 WL 792499, at *2 (Mich.Ct.App. Jan.5, 2001).

In this matter, Plaintiff's claim for household replacement services and attendant care are highly suspicious and unjustified.  Notwithstanding the fact that such services were not reasonably necessary for Plaintiff's care, recovery or rehabilitation from the December 23, 2009 accident, Plaintiff cannot present proper evidence showing that the benefits were incurred.  He has claimed that his daughters provided attendant care to him from the time of the accident up until present.  Significantly, however, the Affidavits provided contain the same repetitious rendition of the services performed, but do not delineate between who performed the services or when the services were performed. Pursuant to *Douglas, supra,* and *Pakenas, supra,* evidence must be presented to show that the benefit was incurred.  The affidavits of Plaintiff's daughters fail in this respect; therefore, Plaintiff cannot show that the benefits were incurred.

### III.    The Court May Be Called Upon To Conduct A *Daubert* Hearing Concerning A Device Allegedly Used During Plaintiff's Physical Therapy Sessions.

This Honorable Court acts as a "gatekeeper" that ensures that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Pluck v. BP Oil Pipeline Co.,* 640 F.3d 671, 677 (6th Cir. 2011).  *See also,* F.R.E. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

Apparently, a device known as an "electro-acuscope and myopulse" was used during Plaintiff's physical therapy.  While Plaintiff's therapist was allegedly certified in its use, that "certification" was supplied by the seller of the device.  However, it is not medically recognized nor has it achieved acceptance within the medical community.  Therefore, to the extent that Plaintiff seeks recovery of expenses associated with the use of an "electro-acuscope and myopulse", State Farm will request that Court conduct a *Daubert* hearing given its scientific invalidity and unreliability.

Respectfully submitted,

**HEWSON & VAN HELLEMONT, P.C.**

By:    s/JAMES F. HEWSON
         JAMES F. HEWSON
         Attorneys for Defendant
         25900 Greenfield Rd., Ste. 326
         Oak Park, MI  48237
         (248) 968-5200
         hewson@vanhewpc.com
Dated:  November 16, 2012          (P27127)

**PROOF OF SERVICE**

The Undersigned certifies that a copy of the foregoing instrument was served upon all counsel of record on November 16, 2012
I DECLARE THAT THE STATEMENT ABOVE IS TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF.
_____ U.S. Mail  _____ Fax  _____ Email
_____ Hand Delivery  _____ E-Filing  _____ Overnight

13

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2012, I electronically filed the foregoing papers with the Clerk of the Court using the ECF System which will send notification of such filing to the all counsel of record.

Dated:  November 16, 2012

s/James F. Hewson
**Hewson & Van Hellemont, P.C.**
Attorneys for Defendant
25900 Greenfield Rd., Ste. 326
Oak Park, MI  48237
(248) 968-5200
hewson@vanhewpc.com
(P27127)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAROSLAW WASKOWSKI,

    Plaintiff,

v.                                              Case No. 11-CV-13036

                                                Honorable Sean Cox
STATE FARM MUTUAL AUTOMOBILE                    Magistrate Judge Hluchaniuk
INSURANCE COMPANY,

    Defendant.

| | |
|---|---|
| Lee Roy H. Temrowski (P31967) | James F. Hewson (P27127) |
| Attorney for Plaintiff | Hewson & Van Hellemont, P.C. |
| 45109 Van Dyke Ave. | Attorneys for State Farm |
| Utica, MI 48317 | 25900 Greenfield, Suite 326 |
| (586) 254-5566 | Oak Park, MI 48237 |
| | (248) 968-5200 |

## INDEX OF ATTACHED AUTHORITY TO
## DEFENDANT, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, TRIAL BRIEF

*Hammermeister v. Riverside*                                    Exhibit 1

*Golumbia v. The Prudential Ins. Co.*                          Exhibit 2

F.R.E. 409 (with annotations)                                  Exhibit 3

*Douglas v. Allstate Ins. Co.*                                 Exhibit 4

*Pakenas v. State Farm Mut. Automobile Ins. Co.*               Exhibit 5

# EXHIBIT "1"

Westlaw

323 N.W.2d 480
116 Mich.App. 552, 323 N.W.2d 480
**(Cite as: 116 Mich.App. 552, 323 N.W.2d 480)**

Page 1

▷
Court of Appeals of Michigan.
Zetta **HAMMERMEISTER**, Plaintiff-Appellee,
and
Maxine Waugh, Plaintiff,
v.
**RIVERSIDE** INSURANCE COMPANY, Judith
M. Stone, and Toby G. Stone, jointly and severally,
Defendants,
and
Farmers Insurance Company, Defendant-Appellant.

Docket No. 56665.
Submitted March 16, 1982.
Decided May 21, 1982.
Released for Publication Sept. 1, 1982.

Insured alleged that no-fault insurer improperly offset her social security retirement benefits against wage loss benefits due her. The Oakland Circuit Court, William J. Beer, J., granted insured's motion for summary judgment, and insurer appealed. The Court of Appeals held that: (1) if period between time of insured's last work and time of accident could be deemed a term of "temporary" unemployment, no-fault insurer would be liable for wage loss benefits and, hence, could properly reduce those benefits by amount of social security retirement benefits received by insured, but if insured was fully retired as of time she last worked, insurer was not liable to her for wage loss benefits and could not, therefore, obtain a reduction, and (2) pleadings failed to establish that no-fault insurer either waived or was estopped from asserting any defenses relating to computation and proof of wage loss because it paid wage loss claims minus social security setoff.

Reversed and remanded.

West Headnotes

**[1] Insurance 217 ☞2849**

217 Insurance
  217XXII Coverage--Automobile Insurance
    217XXII(E) No-Fault Coverage; Medical Payments
      217k2844 Credits, Deductions, and Offsets
        217k2849 k. Social Security; Welfare Benefits. Most Cited Cases
      (Formerly 217k532.5(1))
  A no-fault insurer may reduce work loss benefits by social security retirement benefits to the extent that the social security benefits would have been reduced had the insured continued to work. M.C.L.A. §§ 500.3101 et seq., 500.3109(1).

**[2] Insurance 217 ☞2829**

217 Insurance
  217XXII Coverage--Automobile Insurance
    217XXII(E) No-Fault Coverage; Medical Payments
      217k2827 Losses Covered
        217k2829 k. Loss of Work, Income, or Profits. Most Cited Cases
      (Formerly 217k531.4(3))

**Insurance 217 ☞2849**

217 Insurance
  217XXII Coverage--Automobile Insurance
    217XXII(E) No-Fault Coverage; Medical Payments
      217k2844 Credits, Deductions, and Offsets
        217k2849 k. Social Security; Welfare Benefits. Most Cited Cases
      (Formerly 217k532.5(1))
  If period between time of insured's last work and time of accident could be deemed a term of "temporary" unemployment, no-fault insurer would be liable for wage loss benefits and, hence, could properly reduce those benefits by amount of social security retirement benefits received by insured, but if insured was fully retired as of time she last

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 N.W.2d 480
116 Mich.App. 552, 323 N.W.2d 480
**(Cite as: 116 Mich.App. 552, 323 N.W.2d 480)**

Page 2

worked, insurer was not liable to her for wage loss benefits and could not, therefore, obtain a reduction. M.C.L.A. §§ 500.3101 et seq., 500.3109(1).

**[3] Insurance 217 ☞3114**

217 Insurance
   217XXVI Estoppel and Waiver of Insurer's Defenses
      217k3105 Claims Process and Settlement
         217k3114 k. Payment of Loss. Most Cited Cases
     (Formerly 217k399)
   Mere fact that no-fault insurer paid some wage loss benefits was insufficient by itself to establish that, in event insured filed suit objecting to amount of benefits paid, insurer was precluded from asserting that it owed insured nothing at all. M.C.L.A. §§ 500.3101 et seq., 500.3109(1).

**[4] Insurance 217 ☞3571**

217 Insurance
   217XXXI Civil Practice and Procedure
      217k3571 k. Pleading. Most Cited Cases
     (Formerly 217k639)
   Pleadings failed to establish that no-fault insurer either waived or was estopped from asserting any defenses relating to computation and proof of wage loss because it paid wage loss claims minus social security setoff. M.C.L.A. §§ 500.3101 et seq., 500.3109(1).

**\*\*481 \*553** Charfoos, Christensen, Gilbert & Archer, P. C. by John N. Marwick, Detroit, for plaintiffs.

Harvey, Kruse, Westen & Milan, P. C. by Gary A. Maximiuk, Detroit, for defendants.

Before BRONSON, P. J., and MAHER, and ERNST,[FN*] JJ.

     FN* J. Richard Ernst, 23rd Judicial Circuit Judge, sitting on Court of Appeals by assignment pursuant to Const.1963, Art. 6,

Sec. 23, as amended 1968.

PER CURIAM.
   Appellant appeals by leave granted from an order entered in the Oakland County Circuit Court granting appellee's motion for summary judgment on the basis that appellant had improperly offset appellee's Social Security retirement benefits from wage-loss benefits due her under M.C.L. § 500.3107; M.S.A. § 24.13107. The trial court found that there existed no genuine issue as to any material fact. GCR 1963, 117.2(3).

   This suit arose out of a March 25, 1979, automobile accident. At the time of the accident, appellee was 65 years of age and was collecting old-age Social Security benefits.

   When appellant refused to discontinue setting off Social Security benefits from the wage-loss benefits it was paying, appellee instituted this suit. **\*554** Count II, the only one relevant to this dispute, averred that appellant had wrongfully refused to pay appellee certain no-fault insurance benefits. Appellant apparently filed an answer to this complaint, although it does not appear in the lower court file. Appellant contends that in respect to Count II, it asserted the following defenses (appellee does not contest the accuracy of appellant's claim):

   "1. The failure of the plaintiff to provide reasonable proof of the fact and of the amount of the loss sustained as required by M.C.L.A. § 500.3124;

   "2. The failure of the plaintiff to make any showing that the wage loss she seeks to recover is for work that she 'would have performed during the first three years after the date of the accident' as required by M.C.L.A. § 500.3107;

   "3. The failure of the plaintiff to provide any proof to support her claim for wage losses required by the contract of insurance;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"4. The wording of M.C.L.A. § 500.3109 which provides for a setoff of any benefit provided under the laws of any state of the Federal Government." [FN1]

> FN1. This case was transferred from Wayne to Oakland County on June 17, 1980. It is possible that when the transfer occurred, certain relevant documents were misplaced. For purposes of this appeal, we assume the accuracy of appellant's claim that it filed an answer and the substance of this answer.

[1] We agree with appellant that summary judgment was improperly granted in this case. Considering first the propriety of an insurer setting off old-age Social Security benefits against wage-loss benefits, we agree with the panel of this Court which decided *Jarosz v. Detroit Automobile Inter-Ins. Exchange,* 109 Mich.App. 86, 310 N.W.2d 903 (1981). There, this Court stressed that the purpose behind M.C.L. § 500.3109(1); M.S.A. § 24.13109(1) was the **555 complete and effective coordination of benefits under Michigan's no-fault act with benefits provided under all other laws of the state and federal government. The *Jarosz* holding stands for the proposition that a no-fault insurer may reduce work-loss benefits by Social Security retirement benefits to the extent that the Social Security benefits would have been reduced had the insured continued to work.

[2] On the facts before us, we cannot resolve the question of whether appellant is entitled to set off Social Security benefits against wage-loss benefits payable under the no-fault act. Indeed, we cannot even determine if appellant is liable to appellee for wage-loss benefits. By her own admission, appellee last worked on December 24, 1978. If the period between December 24th and the time of the accident can be deemed a term of "temporary" unemployment pursuant to M.C.L. § 500.3107a; M.S.A. § 24.13107(1),**482 then appellant would be liable for wage-loss benefits. However, if ap-

pellee was fully retired as of December 24, 1978, appellant is not liable to her for wage-loss benefits. Assuming appellee was not fully retired, appellant might be entitled to a set-off in accordance with *Jarosz* (footnote 1 in *Jarosz* gives an illustrative example as to how the set-off should be computed).

Apart from the set-off defense raised by appellant, other defenses were asserted which might well relieve it of any liability to appellee.[FN2] Neither the pleadings nor the factual posture of the case was such that appellee was entitled to judgment as *556 a matter of law or because no genuine issue existed as to any material fact.

> FN2. Our opinion proceeds on the assumption that appellant really did answer appellee's complaint in the manner alleged in its brief on appeal. Given that this is only an assumption, we do not foreclose appellee from establshing on remand that no answer was ever filed or that the defenses asserted were not those claimed to have been raised by appellee.

Appellee asserts, however, that appellant either waived or is estopped from asserting any defenses relating to the computation and proof of wage loss because it paid the wage-loss claims minus the Social Security set-off. As authority, plaintiff cites *Johnston v. Manhattan Fire & Marine Ins. Co.,* 294 Mich. 550, 556, 293 N.W. 747 (1940), which states:

> "As we have previously held, the insurer may waive its right to have proof of loss furnished within the time limited 'by acts and conduct manifesting an intent and purpose not to claim the supposed advantage, or by so neglecting and failing to act as to induce a belief that it was the intention and purpose to waive.' *Struble v. National Liberty Ins. Co.,* 252 Mich. 566 [ 233 N.W. 417]."

[3][4] Given the current factual posture of this case, we believe plaintiff's reliance on *Johnston* is misplaced. In *Johnston,* following a bench trial, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

323 N.W.2d 480
116 Mich.App. 552, 323 N.W.2d 480
**(Cite as: 116 Mich.App. 552, 323 N.W.2d 480)**

Page 4

insurer was found to have waived its rights to re-
quire a proper proof of loss. This determination
came only after a consideration of the circum-
stances which related to the belated proof of loss.
Such a determination of the intent and conduct of
the insurer cannot be made by reference to the
pleadings in this case. The mere fact that the insurer
paid some wage-loss benefits is insufficient by it-
self for us to hold that, in the event the insured filed
suit objecting to the amount of benefits paid, the in-
surer is precluded from asserting that it owes the in-
sured nothing at all. An insurer might rationally
conclude it is better to pay something on a suspect
claim than to litigate the matter in the hope of pay-
ing nothing at all yet to *557 take the position that
it has no liability to the insured, where the insured
files suit.

There may be more to appellee's waiver and es-
toppel arguments than appears on the current re-
cord. If so, appellee may present such evidence as it
has on these claims to establish the same at trial.

Reversed and remanded. Costs to abide the fi-
nal outcome of this case.

Mich.App.,1982.
Hammermeister v. Riverside Ins. Co.
116 Mich.App. 552, 323 N.W.2d 480

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT "2"

Westlaw

116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.)))**

**C**
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
Arthur **GOLUMBIA**, Plaintiff-Appellant,
v.
THE PRUDENTIAL INSURANCE COMPANY,
Defendant-Appellee.

No. 96-1521.
June 20, 1997.

On Appeal from the United States District Court for the Eastern District of Michigan.

BEFORE: JONES, SUHRHEINRICH, and SILER, Circuit Judges.

**\*1** PER CURIAM. Plaintiff-Appellant Arthur Golumbia (" Golumbia ") appeals the grant of summary judgment in favor of Defendant-Appellee The Prudential Insurance Company ("Prudential") in this diversity case for reinstatement of insurance disability benefits. For the following reasons, we AFFIRM.

Golumbia is a CPA insured under a long-term disability policy with Prudential entitling him to $1,000 per month in benefits if he becomes "totally disabled". [FN1] In May of 1989, responding to a solicitation by Prudential, Golumbia requested an increase in his coverage from $1,000 to $1,500 per month. Although his request was granted, Prudential reserved the right to contest this coverage increase for two years.

> FN1. The policy defines total disability as

the combination of both of the provisions below:

> (1) Due to sickness or accidental bodily injury, he cannot perform, for wage or profit, the material and substantial duties of his occupation.

> (2) He is not engaged in any gainful occupation and is not confined in a prison or other house of correction due to a conviction in any court of law.

Joint Appendix at 112.

A year later, **Golumbia** suffered torn retinas in both of his eyes. As a result, **Golumbia** applied for benefits under his disability policy, alleging that he was totally disabled due to this injury. Prudential initially denied **Golumbia's** claim on the ground that he was still engaged in the gainful occupation of accounting.[FN2] **Golumbia** asked Prudential to reconsider and, in November of 1990, Prudential responded by notifying **Golumbia** that he did in fact qualify for benefits under the Rehabilitation Status provision of his policy.[FN3] At the same time, however, Prudential revoked its acceptance of **Golumbia's** request for the $500 coverage increase, citing a material misrepresentation in **Golumbia's** application for this coverage increase.[FN4] **Golumbia** did not appeal this revocation.

> FN2. **Golumbia** indicated that he still spent about 30 hours per week at his accounting practice in an administrative capacity.

> FN3. The Rehabilitation Status provision entitles **Golumbia** to receive benefits up to his amount of coverage ($1,000) as long as these benefits are not supplemented by income from his accounting practice to exceed a combined total of $1,250 in income per month.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.)))**

FN4. **Golumbia** stated in his application that he had received no prior medical treatment for his eyes. To the contrary, **Golumbia** had been treated for vitreous hemorrhage with retinal tears and detachments.

Effective May of 1990, Prudential began paying **Golumbia** $1,000 per month in benefits under the Rehabilitation Status provision. From 1990 to 1994, Prudential periodically requested statements from **Golumbia** summarizing his income from his accounting practice. In 1994, Prudential for the first time requested copies of **Golumbia's** federal tax returns from 1990 to 1992. These returns indicated that **Golumbia** had, in addition to his accounting practice, been involved in the management of real estate, resulting in annual income to **Golumbia** of $30,000 to $50,000. Based upon this information, Prudential terminated **Golumbia's** receipt of benefits in June of 1994, concluding that he no longer qualified under the Rehabilitation Status provision due to this large supplemental income, nor did he qualify under the terms of the policy generally because his federal tax returns indicated that he was engaged in the gainful occupation of real estate management. **Golumbia** appealed this termination of benefits to Prudential to no avail. He then filed the instant lawsuit for reinstatement of his $1,000 in benefits as well as the requested $500 increase.

The district court granted summary judgment in favor of Prudential, concluding that **Golumbia's** involvement in the management of real estate constituted a gainful occupation within the plain meaning of the policy. **Golumbia** appeals.

We review the district court's grant of summary judgment de novo. *National Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio,* 15 F.3d 559, 561 (6th Cir.1994). Viewing all possible inferences in the light most favorable to the non-moving party, summary judgment is appropriate when there is no genuine issue of material fact for trial, entitling the moving party to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 585-87 (1986) (citing Fed.R.Civ.P. 56(e) ). The decision of the lower court "must be affirmed if correct for any reason, including a reason not considered by the lower court." *Russ' Kwik Car Wash. Inc. v. Marathon Petroleum Co.,* 772 F.2d 214, 216 (6th Cir.1985) (citing *J.E. Riley Inv. Co. v. Commissioner,* 311 U.S. 55, 59 (1940)).

A. APPLICABLE LAW
  ***2** Michigan law applies in this diversity case. Although the disability policy explicitly states that New York law should apply,[FN5] **Golumbia's** trial counsel represented to the district court that Michigan law controls. **Golumbia's** failure to raise the contractual choice of law provision at trial precludes him from raising it on appeal. *See Whirlpool Fin. Corp. v. Sevaux,* 96 F.3d 216, 220-21 (7th Cir.1996) (failure to raise application of Venezuelan law at trial results in waiver of challenge on appeal); *Muslin v. Frelinghuysen Livestock Managers, Inc.,* 777 F.2d 1230, 1231 n. 1 (7th Cir.1985) (acquiescence in trial court's application of New York law results in waiver of any objection to such application).

FN5. The contract provides that it is governed by the laws of the State of New York.

B. WAIVER AND ESTOPPEL
  **Golumbia** presents two alternative theories as to why Prudential cannot terminate his benefits based upon their contention that he is engaged in the gainful occupation of real estate management. First, **Golumbia** asserts that Prudential either waived or is estopped from asserting its right to terminate benefits because it paid uninterrupted benefits to **Golumbia** for four years with knowledge of **Golumbia's** real estate ventures.[FN6] Second, **Golumbia** alleges that Prudential, by oral agreement, either waived or is estopped from asserting any right to terminate his receipt of $1,000 per month in benefits. The district court did not address either of these arguments in its order granting summary judgment in favor of Prudential.[FN7]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.)))**

FN6. Although **Golumbia** acknowledges that Prudential did not view his federal tax returns prior to 1994, he alleges that Prudential knew of his involvement in the management of real estate as far back as 1990 and failed to act upon this know-ledge.

FN7. Although **Golumbia** did not mention the waiver and estoppel arguments in his Memorandum in Opposition to Defendant's Motion for Summary Judgment, a review of **Golumbia's** complaint reveals that Prudential was on notice of these issues and that they were adequately presented before the district court. *Marohnic v. Walker,* 800 F.2d 613, 615 (6th Cir.1986) (where claim was presented in complaint, failure to mention claim in response to defendant's motion for summary judgment is irrelevant; claim was still adequately presented to the district court). *See also Swinney v. General Motors Corp.,* 46 F.3d 512, 522 (6th Cir.1995) ("[A] party has presented an issue in the trial court if that party has raised it either in the pleadings or the pretrial order.... The raising party must present the issue so that it places the opposing party and the court on notice that a new issue is being raised.").

I. PAYMENT OF BENEFITS

In Michigan, "[e]quitable estoppel arises where a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, the other party justifiably relies and acts on that belief, and the other party will be prejudiced if the first party is allowed to deny the existence of those facts." *Soltis v. First of America Bank-Muskegon,* 513 N.W.2d 148, 152 (Mich.Ct.App.1994). "The fact that an insurer has paid some benefits to an insured party does not preclude it from later asserting that it owes nothing when the insured party files suit." *Calhoun v. Auto Club Ins. Ass'n,* 441 N.W.2d 54, 56

(Mich.Ct.App.1989) (citing *Hammermeister v. Riverside Ins. Co.,* 323 N.W.2d 480, 482 (Mich.Ct.App.1982), *modified,* 347 N.W.2d 696 (Mich.1984)), *abrogated on other grounds, Tousignant v. Allstate Ins. Co.,* 506 N.W.2d 844 (Mich.1993). Under *Calhoun,* Prudential's payment of uninterrupted benefits from 1990 to 1994 does not require Prudential to pay benefits to **Golumbia** indefinitely. *See id.* at 56 (payment of medical benefits for nearly two years does not preclude insurer from asserting that it owes no duty to pay those benefits). Furthermore, **Golumbia** has failed to establish that an injustice will result from Prudential's decision to terminate his receipt of benefits. *See Public Health Dep't v. Rivergate Manor,* 550 N.W.2d 515, 521 (Mich.1996) ("[E]quitable estoppel ... requires a showing of prejudice...."). To the contrary, **Golumbia** obtained a windfall from Prudential, receiving benefits for four years to which he was not entitled.

*3 For similar reasons, we reject **Golumbia's** argument that Prudential's uninterrupted payment of benefits from 1990 to 1994 constitutes a waiver of Prudential's right to terminate those benefits in 1994. " '[W]aiver is a voluntary relinquishment of a known right.' " *Dellar v. Frankenmuth Mut. Ins. Co.,* 433 N.W.2d 380, 383 (Mich.Ct.App.1988) (quoting *Dahrooge v. Rochester-German Ins. Co.,* 143 N.W. 608, 611 (Mich.1913)). In the insurance context, waiver may be established "either from affirmative acts of the insurer or its authorized representatives, or its nonaction with knowledge of the facts." 16b John Alan Appleman and Jean Appleman, *Insurance Law and Practice,* § 9081 (1981). Under Michigan law, waiver does not require an "affirmative showing of prejudice to the insured." *Jones v. Jackson Nat'l Life Ins. Co.,* Nos 93-1053, 93-1528, 1994 WL 276660, at *4 (6th Cir. June 20, 1994) (applying Michigan law). As noted previously, however, payment of insurance benefits for a specified period of time does not prevent an insurance company from later asserting that it owes no duty to pay those benefits. *Calhoun,* 441 N.W.2d at 56. *See also Hammermeister,* 323 N.W.2d at 482

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.)))**

(Under both waiver and estoppel, "[t]he mere fact that the insurer paid some wage-loss benefits is insufficient by itself for us to hold that, in the event the insured filed suit objecting to the amount of benefits paid, the insurer is precluded from asserting that it owes the insured nothing at all."). Therefore, we hold that Prudential's payment of benefits from 1990 to 1994 does not constitute a waiver nor estops Prudential from asserting its right to terminate those benefits in 1994.

### 2. ALLEGED ORAL AGREEMENT

**Golumbia** also alleges that during a telephone conversation in late 1990 with Prudential Claim Approver Ellen Prescott, Prescott "explicitly represented that Prudential would grant him benefits of $1,000 per month if [ **Golumbia** ] would agree not to contest the decision to rescind the 1989 approval [of **Golumbia's** request for increased benefits] on the grounds that his application contained an alleged misrepresentation." Appellant's Brief at 19. According to **Golumbia**, by virtue of this alleged oral agreement Prudential either waived or is estopped from asserting its right to terminate his receipt of $1000 per month in benefits based upon **Golumbia's** income from his real estate management.

The Group Insurance Policy states that:

No agent or other person, except the President, a Vice President, the Secretary, an Actuary, an Associate Actuary, an Assistant Secretary or an Assistant Actuary of Prudential, has authority *to waive any conditions or restrictions* of the Group Policy; to extend the time for paying a premium; *to make or modify a contract;* or to bind Prudential by making any promise or representation or by giving or receiving any information. *No change in the Group Policy shall be valid unless evidenced by an endorsement on it signed by one of the aforesaid officers or by an amendment to it signed by the Policyholder and by one of the aforesaid officers.*

**\*4** J.A. at 108 (emphasis added)

Under this contractual provision, any statements attributed to Ellen Prescott, "Claim Approver," cannot constitute a waiver of the Group Policy conditions or restrictions nor a modification of the Group Policy because she lacked the authority to make such a waiver or modification. Furthermore, **Golumbia** has failed to present any signed endorsement or amendment reflecting the alleged oral agreement struck between **Golumbia** and Prescott. As a result, the alleged oral agreement between Prescott and **Golumbia** neither constitutes a valid waiver nor estops Prudential from asserting its right to terminate **Golumbia's** receipt of benefits.

### C. GAINFUL OCCUPATION

Finally, **Golumbia** contends that the district court erred by holding as a matter of law that **Golumbia** was engaged in the gainful occupation of real estate management within the meaning of the disability policy.

After reviewing the record, we are convinced that the district court committed no error in this regard. In reaching its conclusion that **Golumbia** was engaged in the gainful occupation of real estate management, the district court properly relied upon **Golumbia's** federal tax returns and **Golumbia's** own deposition testimony regarding his personal involvement in the management of real estate. For the reasons set forth in the district court's order of April 3, 1996, we agree that **Golumbia** was engaged in the gainful occupation of real estate management.

For the foregoing reasons, the decision of the district court is AFFIRMED.

C.A.6 (Mich.),1997.
Golumbia v. Prudential Ins. Co.
116 F.3d 1480, 1997 WL 345728 (C.A.6 (Mich.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT "3"

Westlaw

Federal Rules of Evidence Rule 409, 28 U.S.C.A.

Page 1

**C**

United States Code Annotated Currentness
Federal Rules of Evidence (Refs & Annos)
  Article IV. Relevance and Its Limits
    → → **Rule 409. Offers to Pay Medical and Similar Expenses**

Evidence of furnishing, promising to pay, or offering to pay medical, hospital, or similar expenses resulting from an injury is not admissible to prove liability for the injury.

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1933; Apr. 26, 2011, eff. Dec. 1, 2011.)

ADVISORY COMMITTEE NOTES

**1972 Proposed Rules**

The considerations underlying this rule parallel those underlying Rules 407 and 408, which deal respectively with subsequent remedial measures and offers of compromise. As stated in Annot., 20 A.L.R.2d 291, 293:

"[G]enerally, evidence of payment of medical, hospital, or similar expenses of an injured party by the opposing party, is not admissible, the reason often given being that such payment or offer is usually made from humane impulses and not from an admission of liability, and that to hold otherwise would tend to discourage assistance to the injured person."

Contrary to Rule 408, dealing with offers of compromise, the present rule does not extend to conduct or statements not a part of the act of furnishing or offering or promising to pay. This difference in treatment arises from fundamental differences in nature. Communication is essential if compromises are to be effected, and consequently broad protection of statements is needed. This is not so in cases of payments or offers or promises to pay medical expenses, where factual statements may be expected to be incidental in nature.

For rules on the same subject, but phrased in terms of "humanitarian motives," see Uniform Rule 52; California Evidence Code § 1152; Kansas Code of Civil Procedure § 60-452; New Jersey Evidence Rule 52.

**2011 Amendments**

The language of Rule 409 has been amended as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility.

LIBRARY REFERENCES

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Federal Rules of Evidence Rule 409, 28 U.S.C.A.                                    Page 2

American Digest System

  Evidence⚷ 219(1).

  Key Number System Topic No. 157.

Corpus Juris Secundum

  CJS Evidence § 531, Voluntary Offer of Assistance.

RESEARCH REFERENCES

ALR Library

89 ALR 3rd 1012, Admissibility in Personal Injury Action of Hospital or Other Medical Bill Which Includes Expenses for Treatment of Condition Unrelated to Injury.

Encyclopedias

Am. Jur. 2d Evidence § 493, Inadmissibility to Establish Negligence.

Am. Jur. 2d Evidence § 494, Admissibility for Other Purposes.

Am. Jur. 2d Products Liability § 1668, Evidence of Payment of Medical and Similar Expenses.

32 Am. Jur. Proof of Facts 2d 253, Admission by Conduct or Silence.

25 Am. Jur. Trials 495, Dental Malpractice Litigation.

Treatises and Practice Aids

Federal Evidence § 4:61, Background and Purpose.

Federal Evidence § 4:62, Paying Medical and Similar Expenses--Inadmissible to Prove Liability.

Federal Evidence § 4:63, Paying Medical and Similar Expenses--Admissible for Other Purposes.

Federal Evidence § 11:4, Privilege Rules.

Federal Procedure, Lawyers Edition § 33:103, Federal Rules of Evidence.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Federal Rules of Evidence Rule 409, 28 U.S.C.A.                                      Page 3

Federal Procedure, Lawyers Edition § 33:244, Introduction to Fed. R. Evid. 409.

Handbook of Federal Evidence § 409:1, Offer to Pay Medical and Similar Expenses.

Section 1983 Litigation Federal Evidence § 1.01, Introduction.

Section 1983 Litigation Federal Evidence § 3.01, Fed. R. Evid. 407-411: in General.

Section 1983 Litigation Federal Evidence § 3.03, Payments of Medical Expenses.

Wright & Miller: Federal Prac. & Proc. § 5321, Statutory History.

Wright & Miller: Federal Prac. & Proc. § 5322, Policy of Rule 409.

Wright & Miller: Federal Prac. & Proc. § 5323, Scope of Rule 409--"Furnishing".

Wright & Miller: Federal Prac. & Proc. § 5324, Scope of Rule 409--Motivation.

Wright & Miller: Federal Prac. & Proc. § 5325, Scope of Rule 409--Factual Statements.

Wright & Miller: Federal Prac. & Proc. § 5326, Scope of Rule 409--"Medical Expenses".

Wright & Miller: Federal Prac. & Proc. § 5327, Scope of Rule 409--"Occasioned by Injury".

Wright & Miller: Federal Prac. & Proc. § 5328, Prohibited Uses--"Liability for Injury".

Wright & Miller: Federal Prac. & Proc. § 5329, Permissible Uses.

Wright & Miller: Federal Prac. & Proc. § 5330, Procedure.

NOTES OF DECISIONS

  Medical bills 1

  1. Medical bills

Medical payments made to injured Amtrak employee under group policy obtained by Amtrak were not from collateral source and, therefore, employee could not offer evidence of medical bills in support of his claim for med-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Federal Rules of Evidence Rule 409, 28 U.S.C.A.                                     Page 4

ical damages under Federal Employers' Liability Act; medical bills containing information, other than dollar amounts, that were relevant to nature or extent of injury or its treatment would be allowed if dollar amounts were deleted. Ford v. National R.R. Passenger Corp., D.Md.1990, 734 F.Supp. 215. Damages ☞ 182

Offers by hotel and its insurance carrier to pay guest's medical expenses arising from fall in hotel bathroom did not constitute admission of liability, where offers were accompanied by expressions of regret and dismay, and speakers had no personal knowledge of facts pertinent to liability. Galarnyk v. Hostmark Management, Inc., C.A.7 (Ill.) 2003, 55 Fed.Appx. 763, 2003 WL 137565, Unreported. Evidence ☞ 219(1)

Fed. Rules Evid. Rule 409, 28 U.S.C.A., FRE Rule 409

Amendments received to 7-1-12

Westlaw. (C) 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT "4"

Westlaw

821 N.W.2d 472                                                              Page 1
492 Mich. 241, 821 N.W.2d 472
(Cite as: 492 Mich. 241, 821 N.W.2d 472)

**H**

Supreme Court of Michigan.
**DOUGLAS**
v.
**ALLSTATE** INSURANCE COMPANY.

Docket No. 143503.
Calendar No. 1.
Argued April 4, 2012.
Decided July 30, 2012.

**Background:** Bicyclist who sustained brain injury when struck by car brought action to recover personal injury protection (PIP) benefits from insurer assigned to administer bicyclist's claim by Assigned Claims Facility. Following bench trial, the Circuit Court, Washtenaw County, awarded bicyclist $1,163.395.40, which included PIP benefits, attorney fees, no-fault interest, costs, and judgment interest. Insurer appealed. The Court of Appeals, 2011 WL 2519082, affirmed in part, reversed in part, and remanded. Insurer sought further review.

**Holdings:** The Supreme Court, Young, C.J., held that:
(1) one-year-back rule precluded bicyclist from recovering benefits for otherwise allowable expenses incurred more than one year before the filing of his lawsuit;
(2) the fact that wife of bicyclist performed some replacement services did not preclude recovery for allowable expenses under the no-fault act that were actually incurred on bicyclist's behalf;
(3) genuine issues of material fact regarding whether the services wife provided to bicyclist were reasonably necessary for the period of time after the accident, but before there was a medical prescription for attendant care services, precluded summary disposition;
(4) finding that attendant care services were necessary for bicyclist for the period of time after the date of the accident, but before there was a medical prescription for such services, did not constitute

clear error;
(5) evidence was insufficient to support finding that attendant care services provided by wife were actually incurred; and
(6) finding that bicyclist was entitled to an award of attendant care benefits at a $40 hourly rate, was clearly erroneous.

Affirmed in part, reversed in part, vacated in part, and remanded.

Cavanagh, J. filed dissenting opinion, in which Kelly and Hathaway, JJ. concurred.

West Headnotes

**[1] Appeal and Error 30 ⟨⟨⟩⟩893(1)**

30 Appeal and Error
    30XVI Review
        30XVI(F) Trial De Novo
            30k892 Trial De Novo
                30k893 Cases Triable in Appellate Court
                    30k893(1) k. In general. Most Cited Cases
    Issues of statutory interpretation are questions of law that the Supreme Court reviews de novo.

**[2] Statutes 361 ⟨⟨⟩⟩185**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k180 Intention of Legislature
                361k185 k. Implications and inferences. Most Cited Cases

**Statutes 361 ⟨⟨⟩⟩188**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k187 Meaning of Language

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 2

361k188  k.  In  general.  Most  Cited

**Statutes 361 ⟳208**

361 Statutes
    361VI Construction and Operation
       361VI(A) General Rules of Construction
         361k204 Statute as a Whole, and Intrinsic
Aids to Construction
           361k208  k.  Context  and  related
clauses. Most Cited Cases
      When interpreting a statute, Supreme Court
must ascertain legislative intent that may reason-
ably be inferred from words expressed in statute;
this requires courts to consider plain meaning of
critical word or phrase as well as its placement and
purpose in statutory scheme.

**[3] Statutes 361 ⟳190**

361 Statutes
    361VI Construction and Operation
       361VI(A) General Rules of Construction
         361k187 Meaning of Language
           361k190  k.  Existence  of  ambiguity.
Most Cited Cases
      If statutory language is unambiguous, Legis-
lature's intent is clear and judicial construction is
neither necessary nor permitted.

**[4] Appeal and Error 30 ⟳893(1)**

30 Appeal and Error
    30XVI Review
       30XVI(F) Trial De Novo
         30k892 Trial De Novo
           30k893 Cases Triable in Appellate
Court
             30k893(1) k. In general. Most Cited
Cases
      Supreme Court reviews de novo denial of mo-
tion for summary disposition.

**[5] Appeal and Error 30 ⟳934(1)**

30 Appeal and Error

30XVI Review
    30XVI(G) Presumptions
       30k934 Judgment
         30k934(1) k.  In general.  Most Cited
Cases

**Judgment 228 ⟳185(2)**

228 Judgment
    228V On Motion or Summary Proceeding
       228k182 Motion or Other Application
         228k185 Evidence in General
           228k185(2) k. Presumptions and bur-
den of proof. Most Cited Cases
      A motion for summary disposition on grounds
that, except as to amount of damages, there is no
genuine issue as to any material fact, and moving
party is entitled to judgment or partial judgment as
a matter of law, requires reviewing court to con-
sider pleadings, admissions, and other evidence
submitted by parties in light most favorable to non-
moving party. MCR 2.116(C)(10).

**[6] Judgment 228 ⟳181(2)**

228 Judgment
    228V On Motion or Summary Proceeding
       228k181 Grounds for Summary Judgment
         228k181(2) k. Absence of issue of fact.
Most Cited Cases
      Summary disposition is appropriate if there is
no genuine issue regarding any material fact, and
moving party is entitled to judgment as a matter of
law. MCR 2.116.

**[7] Appeal and Error 30 ⟳1008.1(5)**

30 Appeal and Error
    30XVI Review
       30XVI(I) Questions of Fact, Verdicts, and
Findings
         30XVI(I)3 Findings of Court
           30k1008 Conclusiveness in General
             30k1008.1 In General
               30k1008.1(5)  k.  Clearly  erro-
neous findings. Most Cited Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 3

Upon review of a court-tried case, Supreme Court reviews trial court's findings of fact for "clear error," which occurs when reviewing court is left with a definite and firm conviction that a mistake has been made. MCR 2.517(A)(1).

**[8] Insurance 217 ☜2673**

217 Insurance
    217XXII Coverage—Automobile Insurance
        217XXII(A) In General
            217k2672 Nature and Cause of Injury or Damage
                217k2673 k. In general. Most Cited Cases

A no-fault insurer is liable to pay benefits only to the extent that claimed benefits are causally connected to the accidental bodily injury arising out of an automobile accident. M.C.L.A. § 500.3105(1).

**[9] Insurance 217 ☜2680**

217 Insurance
    217XXII Coverage—Automobile Insurance
        217XXII(A) In General
            217k2676 Ownership, Maintenance, Operation, or Use
                217k2680 k. No-fault coverage. Most Cited Cases

An automobile insurer is liable to pay benefits for accidental bodily injury only if those injuries "arise out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle"; it is not any bodily injury that triggers an insurer's liability under the no-fault act, rather, it is only those injuries that are caused by the insured's use of a motor vehicle. M.C.L.A. § 500.3105(1).

**[10] Limitation of Actions 241 ☜46(6)**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(A) Accrual of Right of Action or Defense
            241k46 Contracts in General
                241k46(6) k. Breach of contract in

general. Most Cited Cases

One-year-back rule, which limits right to recover no-fault benefits for losses occurring more than one year before filing of action, precluded bicyclist who sustained a brain injury in hit-and-run accident from recovering benefits for otherwise allowable expenses under personal protection insurance benefits, allowable benefits statute, incurred more than one year before filing of his lawsuit against insurer assigned to administer bicyclist's claim by Assigned Claims Facility. M.C.L.A. § 500.3145(1).

**[11] Insurance 217 ☜2831(1)**

217 Insurance
    217XXII Coverage—Automobile Insurance
        217XXII(E) No–Fault Coverage; Medical Payments
            217k2827 Losses Covered
                217k2831 Health Care Expenses or Services Provided
                    217k2831(1) k. In general. Most Cited Cases

**Insurance 217 ☜2831(3)**

217 Insurance
    217XXII Coverage—Automobile Insurance
        217XXII(E) No–Fault Coverage; Medical Payments
            217k2827 Losses Covered
                217k2831 Health Care Expenses or Services Provided
                    217k2831(3) k. Rehabilitation. Most Cited Cases

"Expenses for recovery or rehabilitation," under statute governing personal protection insurance benefits and allowable expenses, are costs expended to bring insured to a condition of health or ability sufficient to resume his preinjury life. M.C.L.A. § 500.3107(1)(a).

**[12] Insurance 217 ☜2831(1)**

217 Insurance

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 4

217XXII Coverage—Automobile Insurance
   217XXII(E) No–Fault Coverage; Medical Payments
      217k2827 Losses Covered
        217k2831 Health Care Expenses or Services Provided
          217k2831(1) k. In general. Most Cited Cases

Although services for an insured's care need not restore a person to his preinjury state for recovery of those caregiving expenses under no-fault act, the services must be related to insured's injuries to be considered allowable expenses. M.C.L.A. § 500.3107(1)(a).

**[13] Insurance 217 ⟲2831(1)**

217 Insurance
   217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
      217k2827 Losses Covered
        217k2831 Health Care Expenses or Services Provided
          217k2831(1) k. In general. Most Cited Cases

While no-fault act specifies and limits what types of expenses for services for injured insured's care are compensable, it places no limitation on who may perform what is otherwise an allowable expense. M.C.L.A. § 500.3107.

**[14] Insurance 217 ⟲2830**

217 Insurance
   217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
      217k2827 Losses Covered
        217k2830 k. Survivors' benefits; loss of services. Most Cited Cases

"Replacement services," which benefit entire household of injured insured, and replace services that injured person would have performed for benefit of himself or herself, or of his or her dependent, as described in no-fault act, are distinct from allowable expenses for an injured insured's care, recovery, or rehabilitation. M.C.L.A. § 500.3107(1)(a)(c) .

**[15] Insurance 217 ⟲2831(1)**

217 Insurance
   217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
      217k2827 Losses Covered
        217k2831 Health Care Expenses or Services Provided
          217k2831(1) k. In general. Most Cited Cases

Fact that wife of insured bicyclist, who sustained brain injury in hit-and-run accident, performed some replacement services, including daily organization of family life, preparation of family meals, and daily chores, did not preclude recovery for allowable expenses under no-fault act that were actually incurred on insured's behalf, including attendant care services by wife, such as traveling to and communicating with bicyclist's medical providers and managing bicyclist's medication; wife was bicyclist's caretaker, and spent her free time making sure bicyclist was cared for, and that he did not harm himself as he had tried to do in a suicide attempt. M.C.L.A. § 500.3107(1)(a)(c).

**[16] Judgment 228 ⟲181(23)**

228 Judgment
   228V On Motion or Summary Proceeding
      228k181 Grounds for Summary Judgment
        228k181(15) Particular Cases
          228k181(23) k. Insurance cases. Most Cited Cases

Genuine issues of material fact existed as to whether services wife provided to bicyclist who suffered a brain injury when struck by a hit-and-run driver were reasonably necessary for period of time after accident but before there was a medical prescription for attendant care services, precluding summary disposition on bicyclist's claim against insurer to recover personal injury protection (PIP) be-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 5

nefits. M.C.L.A. § 500.3107(1)(a).

**[17] Insurance 217 ☞2855**

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E)  No–Fault  Coverage;  Medical
Payments
        217k2850 Evidence
          217k2855 k. Weight and sufficiency.
Most Cited Cases
    Trial court's finding that attendant care services
were necessary for insured bicyclist who suffered a
brain injury when struck by a hit and run driver, for
period of time after date of accident but before
there was a medical prescription for such services,
was not clear error; bicyclist's treating psychologist
testified at trial that bicyclist's doctors had recom-
mended that he receive 24-hour supervision, and
defendant insurer's claims adjuster agreed that if bi-
cyclist needed attendant care services at the time of
trial, he would have needed those services when the
lawsuit first began. M.C.L.A. § 500.3107(1)(a).

**[18] Appeal and Error 30 ☞1073(1)**

30 Appeal and Error
    30XVI Review
      30XVI(J) Harmless Error
        30XVI(J)23 Judgment or Order
          30k1073 Judgment or Order
            30k1073(1) k. In general. Most
Cited Cases
    Any error by trial court in referring to insured's
treating psychologist's affidavit in its opinion fol-
lowing trial, rather than psychologist's live testi-
mony, was harmless in action to caregiver ex-
penses, even though during trial, court had sus-
tained insurer's objection to admission of affidavit,
where reason for granting objection was that court
had heard live testimony, which supported court's
finding that attendant care for insured was reason-
ably necessary for period of time before a prescrip-
tion was issued for such services. M.C.L.A. §
500.3107(1)(a).

**[19] Insurance 217 ☞2855**

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E)  No–Fault  Coverage;  Medical
Payments
        217k2850 Evidence
          217k2855 k. Weight and sufficiency.
Most Cited Cases
    Evidence was insufficient to support the trial
court's finding that attendant care services provided
by wife of bicyclist who sustained a brain injury
when struck by a hit-and-run driver were "incurred"
under the no-fault act, absent a showing of what ex-
penses were actually incurred, or that wife had an
expectation of payment for her services, in action
by bicyclist seeking personal injury protection
(PIP) benefits; wife submitted documents construc-
ted in one day of services rendered over a course of
approximately three years, and her lack of contem-
poraneous documentation implicated her credibility
regarding  whether  the  services  were  actually
rendered in the manner documented. M.C.L.A. §
500.3107(1)(a).

**[20] Insurance 217 ☞3146**

217 Insurance
    217XXVII Claims and Settlement Practices
      217XXVII(B) Claim Procedures
        217XXVII(B)2 Notice and Proof of Loss
          217k3143 Necessity
            217k3146 k. Of proof of loss. Most
Cited Cases
    Under statute governing personal protection in-
surance benefits and allowable expenses, even if an
insured can show that services were for his care and
were reasonably necessary, insurer is not obliged to
pay any amount except upon submission of evid-
ence that services were actually rendered and of ac-
tual cost expended. M.C.L.A. § 500.3107(1)(a).

**[21] Insurance 217 ☞2831(1)**

217 Insurance
    217XXII Coverage—Automobile Insurance

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

217XXII(E) No–Fault Coverage; Medical Payments
    217k2827 Losses Covered
       217k2831 Health Care Expenses or Services Provided
          217k2831(1) k. In general. Most Cited Cases

## Insurance 217 ⇐2855

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
         217k2850 Evidence
            217k2855 k. Weight and sufficiency. Most Cited Cases

A caregiver who provides services to a family member need not present a formal bill to family member or enter into a formal contract with that family member to satisfy requirement for recovery of personal injury protection benefits for caregiver services that caregiver have an expectation of payment from insurer. M.C.L.A. § 500.3107(1)(a).

## [22] Insurance 217 ⇐2831(1)

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
         217k2827 Losses Covered
           217k2831 Health Care Expenses or Services Provided
            217k2831(1) k. In general. Most Cited Cases

Even in absence of a formal bill or contract for family member providing caregiver services to injured insured, there must be some evidence that family member expected compensation for providing services and of actual services rendered for recovery of expenses for those services under statute governing personal injury protection benefits. M.C.L.A. § 500.3107(1)(a).

## [23] Insurance 217 ⇐2855

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
         217k2850 Evidence
            217k2855 k. Weight and sufficiency. Most Cited Cases

Any insured who incurs charges for caregiver services must present proof of those charges in order to establish, by a preponderance of evidence, that he is entitled to personal injury protection (PIP) benefits. M.C.L.A. § 500.3107(1)(a).

## [24] Insurance 217 ⇐2837

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
         217k2837 k. Amounts payable in general. Most Cited Cases

What health care agencies charged their patients for attendant care services was too attenuated from appropriate hourly rate for a family member's caregiving services to be controlling, and thus, trial court's finding that bicyclist who suffered a brain injury in a hit-and-run accident, and subsequently received attendant care from his wife, was entitled to an award of attendant care benefits under no-fault act at a $40 hourly rate based on what health care agencies charged, was clearly erroneous, given that wife was only paid $10 an hour by a commercial agency for providing same services to bicyclist. M.C.L.A. § 500.3107(1)(a).

## [25] Insurance 217 ⇐2854

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
         217k2850 Evidence
            217k2854 k. Admissibility. Most Cited Cases

When determining what constitutes a reasonable charge by a family member for allowable ex-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
(Cite as: 492 Mich. 241, 821 N.W.2d 472)

Page 7

penses in receiving care under no-fault act, compensation actually paid to commercial caregivers who provide similar attendant care services is necessarily relevant to fact-finder's determination of a reasonable charge for a family member's provision of these services because it helps fact-finder to determine what caregivers could receive on open market. M.C.L.A. § 500.3107(1)(a).

**[26] Insurance 217 ☞2837**

217 Insurance
    217XXII Coverage—Automobile Insurance
      217XXII(E) No–Fault Coverage; Medical Payments
        217k2837 k. Amounts payable in general. Most Cited Cases
    A fact-finder may base hourly rate for a family member's provision of attendant care services under no-fault statute on what health care agencies compensate their employees, but what health care agencies charge their patients is too attenuated from appropriate hourly rate for a family member's services to be controlling; rather, fact-finder must determine what is a reasonable charge for an individual's provision of services, not an agency's, and while agency rate might bear some relation to an individual's rate, it cannot be uncritically adopted as an individual's rate in absence of specific circumstances that warrant such a rate, for instance, when individual caregiver has overhead and administrative costs similar to those of a commercial agency. M.C.L.A. § 500.3107(1)(a).

**476 Bredell & Bredell (by John H. Bredell) for plaintiff.

Potter, DeAgostino, O'Dea & Patterson[i] (by P. Kelly O'Dea) for defendant.

Miller Johnson (by Richard E. Hillary, II, and Stephen R. Ryan) for the Coalition Protecting Auto No–Fault.

Gross & Nemeth, P.L.C. (by Mary T. Nemeth), for the Insurance Institute of Michigan.

YOUNG, C.J.
   *247 Under the terms of the no-fault act,[FN1] a person injured in a motor vehicle accident**477 is entitled to recover personal protection insurance (PIP) benefits for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." [FN2] This case requires this Court to consider whether the services provided by plaintiff's wife constituted services "for an injured person's care," whether the Court of Appeals properly remanded this case to the circuit court for findings of fact regarding the extent to which expenses for services for plaintiff's care were actually incurred, and whether the circuit court erred by awarding an hourly rate that corporate agencies charge for rendering services, rather than an hourly rate that individual caregivers receive for those services.

    FN1. MCL 500.3101 *et seq.*

    FN2. MCL 500.3107(1)(a).

   We hold that "allowable expenses" must be " *for* an injured person's care, recovery, or rehabilitation." [FN3] Accordingly, a fact-finder must examine whether attendant care services are "necessitated by the injury sustained in the motor vehicle accident" before compensating an injured person for them. [FN4] However, the services cannot simply be " '[o]rdinary household tasks,' " which are not *for* the injured person's care.[FN5] Moreover, because an allowable expense consists of a "charge[ ]" [FN6] that " 'must be incurred,' " [FN7] an injured *248 person who seeks reimbursement for any attendant care services must prove by a preponderance of the evidence not only the amount and nature of the services rendered, but also the caregiver's expectation of compensation or reimbursement for providing the attendant care. Because the no-fault act does not create different standards depending on who provides the services, this requirement applies equally to services that a family member provides and services that an unrelated caregiver provides.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. *Id.* (emphasis added).

FN4. *Griffith v. State Farm Mut. Auto. Ins. Co.,* 472 Mich. 521, 535, 697 N.W.2d 895 (2005).

FN5. *Visconti v. DAIIE,* 90 Mich.App. 477, 481, 282 N.W.2d 360 (1979), quoting *Kushay v. Sexton Dairy Co.,* 394 Mich. 69, 74, 228 N.W.2d 205 (1975).

FN6. MCL 500.3107(1)(a).

FN7. *Griffith,* 472 Mich. at 532 n. 8, 697 N.W.2d 895, quoting *Manley v. DAIIE,* 425 Mich. 140, 169, 388 N.W.2d 216 (1986) (BOYLE, J., concurring in part).

If the fact-finder concludes that a plaintiff incurred allowable expenses in receiving care from a family member, the fact-finder must also determine to what extent any claimed expense is a "reasonable charge[ ]." [FN8] While it is appropriate for the fact-finder to consider hourly rates charged by individual caregivers when selling their services (whether to their employers that commercially provide those services or directly to injured persons), comparison of hourly rates charged by commercial caregiving agencies is far too attenuated from an individual's charge for the fact-finder simply to adopt that agency charge as an individual's reasonable charge.

FN8. MCL 500.3107(1)(a).

In applying these principles of law to the facts of this case, we hold that the Court of Appeals correctly determined that plaintiff may recover "allowable expenses" to the extent that they encompass services that are reasonably necessary for plaintiff's care when the care is "related to [plaintiff's] injuries." [FN9] However, because the circuit court erred by awarding damages for allowable expenses without requiring **478 proof that the underlying charges were actually incurred, we agree with the decision of the Court of Appeals to *249 remand this case to the circuit court for a determination whether charges for allowable expenses

were actually incurred. Nevertheless, we also conclude that the Court of Appeals erred to the extent that its decision limited the scope of the determination on remand to the period after November 7, 2006. Instead, the circuit court must reexamine on remand the evidentiary proofs supporting the entire award. While we reject defendant's request for a verdict of no cause of action because there remain unresolved questions of fact, we caution the circuit court that a fact-finder can only award benefits that are proved to have been incurred. Finally, in determining the hourly rate for attendant care services, the circuit court clearly erred by ruling that plaintiff is entitled to an hourly rate of $40 for attendant care services because that rate is entirely inconsistent with the evidence of an individual's rate of compensation, including the compensation that Katherine **Douglas,** plaintiff's wife, actually received as an employee hired to care for plaintiff. We reverse the judgment of the Court of Appeals on this issue. Therefore, we affirm in part, reverse in part, vacate the award of attendant care benefits, and remand this case to the circuit court for further proceedings consistent with this opinion.

FN9. *Griffith,* 472 Mich. at 534, 697 N.W.2d 895.

I. FACTS AND PROCEDURAL HISTORY

In 1996, plaintiff, James **Douglas,** sustained a severe closed-head brain injury when a hit-and-run motorist struck the bicycle he was riding. Plaintiff was hospitalized for approximately one month after the accident and received therapy and rehabilitation after his discharge. Because the driver of the motor vehicle that struck plaintiff could not be identified, plaintiff sought *250 assignment of a first-party insurance provider through the Michigan Assigned Claims Facility.[FN10] The facility assigned defendant, **Allstate** Insurance Company, to plaintiff's claim. In the three years after the accident, defendant paid plaintiff PIP benefits for his hospitalization, medical expenses, wage loss, and attendant care, as well as for replacement services, in accordance with the no-fault act. Defendant claims that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 9

plaintiff did not seek additional PIP benefits after 1999 until he filed the instant lawsuit in 2005.

> FN10. MCL 500.3172(1) provides that
>
> > [a] person entitled to claim because of accidental bodily injury arising out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle in this state may obtain personal protection insurance benefits through an assigned claims plan if no personal protection insurance is applicable to the injury, [or] no personal protection insurance applicable to the injury can be identified....

In 1999, plaintiff began the first of a series of full-time jobs. However, he was unable to hold a job for very long, and he eventually stopped working. During this time, he twice attempted suicide. After the second suicide attempt, a 2005 letter written by plaintiff's psychiatrist indicated that plaintiff "requires further treatment" because he "continues to suffer from ill-effects as a result of his closed-head injury...." In particular, the psychiatrist emphasized that plaintiff suffered from short-term memory problems and impulsivity as a result of the accident and explained that plaintiff "should have the opportunity to obtain the care that will most likely restore him to a good level of functioning." Defendant claims that it did not receive this letter before plaintiff initiated this lawsuit.

**479** Plaintiff filed the instant lawsuit on May 31, 2005, in the Washtenaw Circuit Court seeking compensation for *251 unspecified PIP benefits that defendant "has refused or is expected to refuse to pay...." [FN11] Defendant filed three successive dispositive motions, only the first of which was granted.[FN12] Relevant here, the second motion for summary disposition claimed that attendant care was not reasonably necessary because none of plaintiff's medical providers had prescribed attendant care for plaintiff. The circuit court denied the motion without prejudice in advance of further discovery. The third motion for partial summary disposition claimed that plaintiff could not recover for attendant care services provided before November 7, 2006, because plaintiff's treating psychologist, Dr. Thomas Rosenbaum, neither authorized nor prescribed attendant care services before that date. In opposing the motion, plaintiff offered an affidavit from Dr. Rosenbaum, which stated that plaintiff "is in need of aide care during all waking hours" and that Katherine **Douglas** "has been providing her husband with aide care, while the two of them are together, since the motor vehicle accident." After hearing oral argument, the circuit court denied defendant's third motion, ruling that Dr. Rosenbaum's affidavit created a question of fact that precluded partial summary disposition.

> FN11. Because defendant paid PIP benefits for medical bills during the pendency of the suit, the only potential PIP benefits at issue were the services that plaintiff's wife provided.

> FN12. The first motion for partial summary disposition claimed that MCL 500.3145(1) barred any portion of plaintiff's claim that accrued more than one year before plaintiff commenced the suit, that is, before May 31, 2004. The circuit court granted defendant's motion for partial summary disposition with the consent of the parties. See MCL 500.3145(1), which states, in relevant part, that a claimant "may not recover [PIP] benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

The parties proceeded to a bench trial on the claim for attendant care services that Mrs. **Douglas** allegedly provided. Defendant's claims adjuster testified during *252 plaintiff's case-in-chief as an adverse witness. This witness agreed with plaintiff's counsel that plaintiff "would have needed [attendant care] back when the lawsuit first began" in 2005 and that "it would be appropriate to pay

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
(Cite as: 492 Mich. 241, 821 N.W.2d 472)

Mrs. **Douglas** for some of [the] care that she provides ... at home[.]" However, on direct examination by defendant's counsel, the claims adjuster testified that there was no evidence that any compensable care had actually been provided to plaintiff.

Katherine **Douglas** testified that when she was at home, her entire time was spent "babysitting" and "watching James," even while she was performing other household chores. She believed that her presence in the house kept plaintiff from being hospitalized or incarcerated. She also testified about a series of forms, each labeled "AFFIDAVIT OF ATTENDANT CARE SERVICES," all dated June 25, 2007, covering each month between November 2004 and June 2007. These forms totaled up the number of hours during which she claimed to have provided services and outlined the various tasks that she performed, including organizing her family's day-to-day life, cooking meals, undertaking daily chores, maintaining the family's house and yard, ordering and monitoring plaintiff's medications, communicating with health care providers and Social Security Administration officials, calling plaintiff from work to ensure plaintiff's safety, monitoring plaintiff's safety, and cueing or prompting various tasks for plaintiff to undertake. However, she admitted **480** that the forms were all completed in June 2007, that she did not contemporaneously itemize the amount of time she spent on any particular item, and that in completing the forms, she went through household bills to reconstruct what had occurred in her life during the relevant period.

**\*253** Dr. Rosenbaum testified that he began treating plaintiff on November 7, 2006, and recommended that Mrs. **Douglas** provide attendant care for all of plaintiff's waking hours,[FN13] although in November 2007 he revised his recommendation to 40 hours of attendant care a week. Dr. Rosenbaum also testified that *his* company, TheraSupport, L.L.C., served as plaintiff's attendant care provider and that TheraSupport had employed Mrs. **Douglas**

to provide her husband's attendant care. Although TheraSupport paid Mrs. **Douglas** $10 an hour for providing services to plaintiff, it billed plaintiff $40 an hour for those very services. Dr. Rosenbaum averred that defendant eventually paid all of TheraSupport's bills.

> FN13. Dr. Rosenbaum also noted that another of plaintiff's medical providers had recommended in 1997 that plaintiff receive 24-hour supervisory care.

Defendant's medical expert, Dr. Charles Seigerman, testified that he conducted a battery of cognitive tests on plaintiff and concluded that two hours of attendant care services a day are needed to help plaintiff organize the logistics of his treatment and ensure that he takes his medicine. Dr. Seigerman also testified that an appropriate hourly rate for these services was "around $10.00 an hour," or "[p]erhaps a little higher," although he acknowledged on cross-examination that he was not an expert on the appropriate rate of compensation for this service.

The circuit court awarded PIP benefits to plaintiff, explaining that he "needs aide care for all of his waking hours." The circuit court calculated that plaintiff was entitled to a total of 67 hours a week of attendant care for the period between May 31, 2004, and November 1, 2007, and 40 hours a week after November 1, 2007.[FN14] **\*254** The court established a $40 hourly rate for those services. The judgment entered on November 18, 2009, and totaled $1,163,395.40, which included attorney fees, no-fault interest, costs, and judgment interest.

> FN14. The 67-hour week corresponded to 7 hours each weekday and 32 hours during the weekend (16 hours each on Saturday and Sunday), while the 40-hour week corresponded to Dr. Rosenbaum's subsequent recommendation.

The Court of Appeals affirmed in part, reversed in part, and remanded for further proceedings. First,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

the panel rejected defendant's claim that the circuit court had erred by denying its final two motions for summary disposition. In particular, the panel concluded that Dr. Rosenbaum's affidavit created a question of fact regarding whether attendant care services were "reasonably necessary" for the period before Dr. Rosenbaum began treating plaintiff on November 7, 2006.[FN15] The panel also rejected defendant's claim that the circuit court had erred by awarding plaintiff benefits for replacement services because the award "was not intended to compensate Katherine for her mere presence in the home," but instead was intended to compensate for "plaintiff['s] required supervision," and "Katherine was the appropriate person to provide it."[FN16]

FN15. MCL 500.3107(1)(a).

FN16. *Douglas v. Allstate Ins. Co.,* unpublished opinion per curiam of the Court of Appeals, issued June 23, 2011 (Docket No. 295484), p. 5, 2011 WL 2519082.

**\*\*481** The Court of Appeals reversed the circuit court's award, however, because "the trial evidence in this case did not reflect that Katherine maintained records of her claimed attendant care."[FN17] Although Mrs. **Douglas** had submitted several forms, each labeled "AFFIDAVIT OF ATTENDANT CARE SERVICES," the panel concluded that when the descriptions on the forms had not been "left blank," they were "vague" and only constituted "an effort to reconstruct her time."[FN18] Thus, the panel remanded for further proceedings "regarding the **\*255** amount of incurred expenses for attendant care from November 7, 2006, to November 18, 2009," and to determine "whether Katherine reasonably expected compensation at the time of performance."[FN19] Finally, the panel upheld the circuit court's $40 hourly rate because that rate "is supported by Rosenbaum's testimony regarding the rate charged by his TheraSupport program for attendant care and also the testimony of defendant's adjuster regarding rates charged by commercial agencies for home attendant care."[FN20]

FN17. *Id.* at 6.

FN18. *Id.* at 6–7.

FN19. *Id.* at 7.

FN20. *Id.*

This Court granted defendant's application for leave to appeal and ordered the parties to brief the following issues:

(1) whether the Court of Appeals erred in remanding this case to the trial court for further proceedings regarding the amount of incurred expenses for attendant care from November 7, 2006, to November 18, 2009, after finding that the trial court clearly erred in awarding attendant care benefits to the plaintiff without requiring sufficient documentation to support the daily and weekly hours underlying the award; (2) whether the plaintiff presented sufficient proofs at trial to support the trial court's award of attendant care benefits for the period before November 7, 2006; (3) whether activities performed by Katherine **Douglas** constituted attendant care under MCL 500.3107(1)(a) or replacement services under MCL 500.3107(1)(c); and (4) whether the trial court clearly erred in awarding attendant care benefits at the rate of $40 per hour.[FN21]

FN21. *Douglas v. Allstate Ins. Co.,* 490 Mich. 927, 805 N.W.2d 500 (2011).

II. STANDARD OF REVIEW

[1][2][3] This case involves the interpretation of the no-fault act. "Issues of statutory interpretation are questions of **\*256** law that this Court reviews de novo."[FN22] When interpreting a statute, we must "ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute."[FN23] This requires courts to consider "the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.' "[FN24] If the statutory language is unambiguous, "the Legislature's intent is clear and judi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 12

cial construction is neither necessary nor permitted." FN25

> FN22. *Griffith,* 472 Mich. at 525–526, 697 N.W.2d 895.

> FN23. *Koontz v. Ameritech Services, Inc.,* 466 Mich. 304, 312, 645 N.W.2d 34 (2002).

> FN24. *Sun Valley Foods Co. v. Ward,* 460 Mich. 230, 237, 596 N.W.2d 119 (1999), quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

> FN25. *Griffith,* 472 Mich. at 526, 697 N.W.2d 895, citing *Koontz,* 466 Mich. at 312, 645 N.W.2d 34.

**\*\*482** [4][5][6] We review de novo the denial of a motion for summary disposition.FN26 A motion for summary disposition under MCR 2.116(C)(10) requires the reviewing court to consider "the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party. Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." FN27

> FN26. *Saffian v. Simmons,* 477 Mich. 8, 12, 727 N.W.2d 132 (2007).

> FN27. *Brown v. Brown,* 478 Mich. 545, 551–552, 739 N.W.2d 313 (2007).

[7] In civil actions tried without a jury, MCR 2.517(A)(1) requires the court to "find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment." We review these findings of fact for clear error,FN28 which occurs when " 'the reviewing court is left with a definite and firm conviction that a **\*257** mistake has been made.' " FN29

> FN28. MCR 2.613(C); *Adams Outdoor Ad-*

*vertising, Inc. v. City of Holland,* 463 Mich. 675, 681, 625 N.W.2d 377 (2001).

> FN29. *Ross v. Auto Club Group,* 481 Mich. 1, 7, 748 N.W.2d 552 (2008), quoting *Kitchen v. Kitchen,* 465 Mich. 654, 661–662, 641 N.W.2d 245 (2002).

III. ANALYSIS
A. LEGAL BACKGROUND OF THE NO–FAULT ACT

[8][9] MCL 500.3105(1) establishes that a personal protection insurance provider is liable under the no-fault act "to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter." Accordingly, MCL 500.3105(1) imposes two threshold causation requirements for PIP benefits:

> First, an insurer is liable only if benefits are " *for* accidental bodily injury...." "[F]or" implies a causal connection. "[A]ccidental bodily injury" therefore triggers an insurer's liability and defines the scope of that liability. Accordingly, a no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are causally connected to the accidental bodily injury arising out of an automobile accident.

> Second, an insurer is liable to pay benefits for accidental bodily injury only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle...." It is not *any* bodily injury that triggers an insurer's liability under the no-fault act. Rather, it is only those injuries that are caused by the insured's use of a motor vehicle. FN30

> FN30. *Griffith,* 472 Mich. at 531, 697 N.W.2d 895 (alterations in original).

MCL 500.3107(1) further limits what benefits are compensable as PIP benefits, allowing unlimited lifetime benefits for "allowable expenses" but limiting "ordinary and necessary services" to a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

three-year period after the accident and to a $20 daily limit:

*258 Except as provided in subsection (2), personal protection insurance benefits are payable for the following:

(a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation....

* * *

(c) Expenses not exceeding $20.00 per day, reasonably incurred in obtaining ordinary**483 and necessary services in lieu of those that, if he or she had not been injured, an injured person would have performed during the first 3 years after the date of the accident, not for income but for the benefit of himself or herself or of his or her dependent.

This Court's decision in *Johnson v. Recca* clarified that the "ordinary and necessary services" contemplated in subsection (1)(c)—commonly referred to as "replacement services"—constitute a category of expenses distinct from the "allowable expenses" contemplated in subsection (1)(a).[FN31]

FN31. *Johnson v. Recca,* 492 Mich. 169, 176, 821 N.W.2d 520 (2012).

[10] This case requires this Court to consider whether the specific services at issue here were "allowable expenses" [FN32] or whether they were replacement services.[FN33] The distinction between allowable expenses and replacement services is important in this case because the operation of the one-year-back rule, MCL 500.3145(1), prevents plaintiff from recovering benefits for otherwise allowable expenses incurred more than one year before the filing of the lawsuit. Thus, plaintiff cannot recover benefits for otherwise allowable expenses incurred before May 31, 2004, which was nearly eight *259 years after plaintiff's July 1996 accident. Because recovery for replacement services is lim-

ited to those services provided in the first three years after the accident, plaintiff cannot recover any benefits for replacement services. Accordingly, in this case, plaintiff can only recover benefits for services to the extent that the services were allowable expenses within the meaning of MCL 500.3107(1)(a) and incurred after May 31, 2004. It is to the definition of "allowable expenses" that we now turn.

FN32. MCL 500.3107(1)(a).

FN33. MCL 500.3107(1)(c).

### B. ALLOWABLE EXPENSES

MCL 500.3107(1)(a) defines "allowable expenses" as "all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." We have recognized that the plain language of this provision imposes four requirements that a PIP claimant must prove before recovering benefits for allowable expenses: (1) the expense must be for an injured person's care, recovery, or rehabilitation, (2) the expense must be reasonably necessary, (3) the expense must be incurred, and (4) the charge must be reasonable.[FN34] We will address these requirements seriatim as we apply them to the facts of this case.

FN34. See *Griffith,* 472 Mich. at 532 n. 8, 697 N.W.2d 895.

### 1. SERVICES "FOR" AN INSURED'S CARE, RECOVERY, OR REHABILITATION

[11][12] MCL 500.3107(1)(a) requires that allowable expenses must be "for an injured person's care, recovery, or rehabilitation." As we explained in *Griffith v. State Farm Mutual Automobile Insurance Co.,* "expenses for 'recovery' or 'rehabilitation' are costs expended in order *260 to bring an insured to a condition of health or ability sufficient to resume his preinjury life," while expenses for "care" "may not restore a person to his preinjury state." [FN35] While the dictionary definition of "care" "can be broadly construed to encom-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
(Cite as: 492 Mich. 241, 821 N.W.2d 472)

pass *anything* that is reasonably necessary to the provision of a person's protection or **484 charge," [FN36] because MCL 500.3107(1)(a) "specifically limits compensation to charges for products or services that are reasonably necessary for an *injured person's* care, recovery, or rehabilitation[,] ... [t]his context suggests that 'care' must be related to the insured's injuries." [FN37] In comparing the definition of "care" to the definitions of "recovery" and "rehabilitation," we concluded that

    FN35. *Id.* at 535, 697 N.W.2d 895.

    FN36. *Id.* at 533, 697 N.W.2d 895.

    FN37. *Id.* at 534, 697 N.W.2d 895 (quotation marks omitted).

"[c]are" must have a meaning that is broader than "recovery" and "rehabilitation" but is not so broad as to render those terms nugatory.... "[R]ecovery" and "rehabilitation" refer to an underlying injury; likewise, the statute as a whole applies only to "an injured person." It follows that the Legislature intended to limit the scope of the term "care" to expenses for those products, services, or accommodations whose provision is necessitated by the injury sustained in the motor vehicle accident. "Care" is broader than "recovery" and "rehabilitation" because it may encompass expenses for products, services, and accommodations that are necessary because of the accident but that may not restore a person to his preinjury state. [FN38]

    FN38. *Id.* at 535, 697 N.W.2d 895.

We reaffirm here *Griffith's* definition of "care" as it relates to the scope of allowable expenses: although services for an insured's care need not restore a person to his preinjury state, the services must be related to the insured's injuries to be considered allowable expenses.

*261 In analyzing this requirement as applied to the particular services claimed in this case, we note that prior panels of the Court of Appeals ex-

amined the extent to which a family member's services can be considered allowable expenses under the no-fault act. In *Visconti v. Detroit Automobile Inter–Insurance Exchange,* the panel analogized no-fault benefits to worker's compensation benefits and ruled that " '[o]rdinary household tasks' " that a family member performs are not allowable expenses, but " '[s]erving meals in bed and bathing, dressing, and escorting a disabled person are not ordinary household tasks' " [FN39] and can therefore be considered allowable expenses pursuant to MCL 500.3107.

    FN39. *Visconti,* 90 Mich.App. at 481, 282 N.W.2d 360, quoting *Kushay,* 394 Mich. at 74, 228 N.W.2d 205.

[13] A subsequent Court of Appeals panel applied *Visconti* and allowed the plaintiff to recover no-fault benefits when a family member was "required to serve his meals in bed, bathe him, escort him to the doctor's office, exercise him in conformity with his doctor's instructions, assist in formulating his diet, administer medication, and assist him with speech and associational therapy." [FN40] The Court also held that, even though the family member who provided these services was not a licensed medical care provider, "[t]he statute does not require that these services be supplied by 'trained medical personnel.' " [FN41] In other words, while the no-fault act specifies and limits what types of expenses are compensable, it places no limitation on *who* may perform what is otherwise an allowable expense.

    FN40. *Van Marter v. American Fidelity Fire Ins. Co.,* 114 Mich.App. 171, 180, 318 N.W.2d 679 (1982).

    FN41. *Id.*

**485 [14] *262 The statutory language of MCL 500.3107 confirms the distinction between a family member providing attendant care to an injured person—which is "for an injured person's care" [FN42] —and a family member providing re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 15

placement services to benefit the entire house-hold—which are "ordinary and necessary services" that replace services that the injured person would have performed "for the benefit of himself or herself or of his or her dependent." [FN43] Accordingly, we reiterate this Court's recent holding in *Johnson* that replacement services as described in MCL 500.3107(1)(c) are distinct from allowable expenses under MCL 500.3107(1)(a). [FN44] Allowable expenses cannot be for "ordinary and necessary services" because ordinary and necessary services are not "for an injured person's care, recovery, or rehabilitation."

FN42. MCL 500.3107(1)(a).

FN43. MCL 500.3107(1)(c).

FN44. *Johnson,* 492 Mich. at 176, 821 N.W.2d 520.

[15] In this case, defendant claims that a judgment of no cause of action should be entered because Mrs. **Douglas** did not perform any compensable allowable expenses, only replacement services, which are not compensable in this case because of the three-year time limit of MCL 500.3107(1)(c). We disagree with defendant's claim and conclude that defendant is not entitled to relief on this issue.

Defendant is correct that Mrs. **Douglas's** testimony and attendant care forms indicate that she provided many services that are properly considered replacement services, including daily organization of family life; preparation of family meals; yard, house, and car maintenance; and daily chores. These services are prototypical "ordinary and necessary" services that every Michigan ***263** household must undertake. [FN45] While replacement services for the household might be necessitated by the injury if the injured person otherwise would have performed them himself, they are not *for* his care and therefore do not fall within the definition of allowable expenses. Nevertheless, the fact that Mrs. **Douglas** performed *some* replacement services does not preclude recovery for the allowable ex-

penses that *actually were incurred,* including attendant care services. The fact that her attendant care forms list certain replacement services is not dispositive on this issue, especially given that other services listed on those forms can reasonably be considered attendant care services, including traveling to and communicating with plaintiff's medical providers and managing plaintiff's medication.

> FN45. Plaintiff also argues that while some of Mrs. **Douglas's** tasks might be considered replacement services, there is therapeutic value in ensuring that plaintiff is involved with these activities, although they require Mrs. **Douglas's** supervision. However, the testimony adduced at trial undermines this rationale because Mrs. **Douglas** explained that during the week, when she spent time cooking, washing dishes, cleaning the house, and caring for her children, plaintiff did "[v]ery little" to assist her in these chores, but instead often watched television.

The circuit court ruled that Mrs. **Douglas** "is Plaintiff's caretaker and basically spends her free time making sure that Plaintiff is cared for, and does not harm himself as he tried to do in a suicide attempt." This factual finding is not clearly erroneous because it is consistent with Mrs. **Douglas's** testimony that she was "watching James" even while she was performing household chores by herself. Furthermore, it suggests that the circuit court adopted plaintiff's argument that Mrs. **Douglas's** supervision constituted attendant care services.

The Court of Appeals rejected defendant's claim that Mrs. **Douglas** only provided ***486** replacement services and ***264** compared the claimed supervision with this state's workers' compensation caselaw that allows "on-call" supervision, [FN46] even when the care provider is pursuing other tasks while on call. [FN47] We affirm the result of the Court of Appeals on this issue and hold that defendant is not entitled to a verdict of no cause of action on the basis of its claim that Mrs. **Douglas** *only*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472                                                                              Page 16
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

provided replacement services because there was testimony given at trial that at least some of the services she said she had provided were consistent with the requirement of MCL 500.3107(1)(a) that allowable expenses be for an injured person's care as necessitated by the injury sustained in the motor vehicle accident. [FN48] For instance, even if Mrs. **Douglas's** claimed supervision of plaintiff does not restore plaintiff to his preinjury state, testimony given at trial indicates that arguably at least some of this claimed supervision was for plaintiff's care as necessitated by the injury sustained in the motor vehicle accident and not for ordinary and necessary services that every Michigan household must undertake. Accordingly, defendant is not entitled to relief on the claim that *none* of Mrs. **Douglas's** claimed services could be considered attendant care services within the meaning of MCL 500.3107(1)(a).

FN46. *Morris v. Detroit Bd. of Ed.,* 243 Mich.App. 189, 197, 622 N.W.2d 66 (2000) ("[O]n-call care is compensable under the [workers' compensation] statute.").

FN47. *Brown v. Eller Outdoor Advertising Co.,* 111 Mich.App. 538, 543, 314 N.W.2d 685 (1981) ("The fact that Mrs. Brown might use her 'on call' time to perform household tasks does not alter the 'nature of the service provided' or the 'need' for the service.").

FN48. See *Griffith,* 472 Mich. at 535, 697 N.W.2d 895.

**2. REASONABLY NECESSARY EXPENSES**
    [16] MCL 500.3107(1)(a) also requires allowable expenses to be "reasonably necessary." In *265Krohn v. Home–Owners Insurance Co.,* this Court clarified that this requirement "must be assessed by using an objective standard." [FN49] Defendant questions the reasonable necessity of attendant care services for the period before November 7, 2006, because there was no medical prescription for attendant care services before that date.

FN49. *Krohn v. Home–Owners Ins. Co.,* 490 Mich. 145, 163, 802 N.W.2d 281 (2011).

    Before the circuit court's ruling on defendant's third motion for summary disposition, plaintiff offered the affidavit of Dr. Rosenbaum, who explained that plaintiff "is in need of [attendant] care during all waking hours" and that Mrs. **Douglas** had provided that care "since [the time of] the motor vehicle accident." The circuit court based its denial of defendant's motion in part on Dr. Rosenbaum's affidavit. In reviewing that decision, the Court of Appeals determined that "the affiant relied on the statements of the parties to determine what activity plaintiff's wife engaged in during the subject period and subsequently evaluated those activities and found them to meet the definition of attendant care." [FN50] Thus, the panel held that the circuit court did not err by concluding that there were questions of fact sufficient to defeat defendant's motion for partial summary disposition. We agree with the Court of Appeals that questions of fact precluded summary disposition on this issue.

FN50. **Douglas,** unpub. op. at 4.

    [17][18] Moreover, we conclude that it was not clear error for the circuit court as fact-finder to conclude that attendant care **487 services were, in fact, reasonably necessary for the period before November 7, 2006. There is a factual basis in the record to support the circuit court's conclusion: Dr. Rosenbaum testified at trial that, as early as 1997, plaintiff's doctors had *266 recommended that plaintiff receive 24–hour supervision.[FN51] Furthermore, defendant's claims adjuster agreed with the statement of plaintiff's counsel that, if plaintiff needed attendant care services at the time of trial, "he would have needed [those services] back when the lawsuit first began[.]" This evidence was sufficient for the circuit court to conclude that because attendant care services were reasonably necessary after November 7, 2006 (a point that defendant does not dispute), they were also reasonably necessary before that date. As a result, defendant has not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
(Cite as: 492 Mich. 241, 821 N.W.2d 472)

Page 17

established that the circuit court clearly erred by concluding that plaintiff proved this element of the allowable expenses analysis.

FN51. Although the circuit court's opinion following the trial referred to Dr. Rosenbaum's affidavit in its conclusion that attendant care services were reasonably necessary, during trial the court had sustained defendant's objection to the admission of that affidavit. However, its reason for granting defendant's objection was that the court had "heard [Dr. Rosenbaum's] live testimony." Because that live testimony clearly supports the circuit court's factual finding, and because the circuit court specifically concluded that Dr. Rosenbaum's "opinion as to the reasonable attendant care needs of [p]laintiff is both appropriate and convincing," the circuit court's error in referring to Dr. Rosenbaum's affidavit, rather than his live testimony, is harmless. See MCR 2.613(A) ("[A]n error in a ruling or order ... is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice.").

3. INCURRED EXPENSES

[19][20] MCL 500.3107(1)(a) also limits allowable expenses to "charges incurred." That is, even if a claimant can show that services were for his care and were reasonably necessary, an insurer "is not obliged to pay any amount except upon submission of evidence that services were *267 actually rendered and of the actual cost expended." FN52 Because an insurer's liability

FN52. Manley, 425 Mich. at 159, 388 N.W.2d 216 (emphasis added); see also Proudfoot v. State Farm Mut. Ins. Co., 469 Mich. 476, 484, 673 N.W.2d 739 (2003) (holding that "[b]ecause the expenses in question were not yet 'incurred,' the Court

of Appeals erred in ordering defendant to pay the total amount to the trial court" for disbursal to plaintiff as expenses are incurred).

cannot be detached from the specific payments involved, or expenses incurred, ... [w]here a plaintiff is unable to show that a particular, reasonable expense has been incurred for a reasonably necessary product and service, there can be no finding of a breach of the insurer's duty to pay that expense, and thus no finding of liability with regard to that expense. FN53

FN53. Nasser v. Auto Club Ins. Ass'n, 435 Mich. 33, 50, 457 N.W.2d 637 (1990).

[21][22] This Court has defined "incur" as it appears in MCL 500.3107(1)(a) as " '[t]o become liable or subject to, [especially] because of one's own actions.' " FN54 Similarly, a "charge" is a "[p]ecuniary burden, cost" or "[a] price required or demanded for service rendered or goods supplied." FN55 Thus, the statutory requirement **488 that "charges" be "incurred" requires some degree of liability that exists as a result of the insured's actually having received the underlying goods or services. Put differently, because a charge is something "required or demanded," the caregiver must have an expectation that she be compensated because there is no "charge[ ] incurred" when a good or service is provided with no expectation of compensation from the insurer. FN56 Accordingly, *268 this Court noted in Burris v. Allstate Insurance Co. that caregivers must have "expected compensation for their services." FN57 Without such an expectation of compensation, "the evidence fail[s] to establish that the plaintiff 'incurred' attendant-care expenses." FN58

FN54. Proudfoot, 469 Mich. at 484, 673 N.W.2d 739, quoting Webster's II New College Dictionary (2001) (alterations in original).

FN55. 1 Shorter Oxford English Diction-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*ary* (6th ed.), p. 385.

FN56. Of course, a caregiver who provides services to a family member need not present a formal bill to the family member or enter into a formal contract with that family member in order to satisfy the requirement that the caregiver have an expectation of payment from the *insurer* (although those arrangements will, of course, satisfy the evidentiary requirements). However, even in the absence of a formal bill or contract, there must be some evidence that the family member expected compensation for providing the services and of the actual services rendered. In other words, there must be some basis for a fact-finder to conclude that the caregiver had *some* expectation of compensation from the insurer, even if the expectation of compensation was not the primary motivation for providing the care. Contrary to the dissent's suggestion, a family member's determination to provide care even in the absence of an insurer's payment is not inconsistent with expecting compensation from the insurer, but the expectation must nevertheless be present for a charge to be incurred within the meaning of MCL 500.3107(1)(a). This expectation of compensation at the time the services were provided simply applies the dictionary definitions of the statutory phrase "charges incurred."

FN57. *Burris v. Allstate Ins. Co.,* 480 Mich. 1081, 745 N.W.2d 101 (2008).

FN58. *Id.* The dissent reintroduces the *Burris* dissent's claim that the interpretation of the word "incur" in *Proudfoot* "was limited to the facts of that case, in which the plaintiff sought advance payment for *future* expenses." *Post* at 495, citing *Burris,* 480 Mich. at 1088, 745 N.W.2d 101 (WEAVER, J., dissenting). However,

the *Burris* concurrence correctly explained that "[t]his factual distinction ... is irrelevant to the *Proudfoot* Court's discussion of the meaning of the term 'incur.' " *Burris,* 480 Mich. at 1084, 745 N.W.2d 101 (CORRIGAN, J., concurring). *Proudfoot* adopted the dictionary definition of the word "incur," which requires "a legal or equitable obligation to pay." *Id.* Because "there is no basis to treat family members differently than hired attendant-care-service workers ...., the insured's family members and friends, just like any other provider, must perform the services with a reasonable expectation of payment." *Id.* at 1085, 745 N.W.2d 101. For these reasons, we reject the dissent's characterization of *Proudfoot.*

[23] The fact that charges have been incurred can be shown "by various means," including "a contract for products and services" or "a paid bill." [FN59] The requirement of proof is not extinguished simply because a family member, rather than a commercial health care *269 provider, acts as a claimant's caregiver. Indeed, MCL 500.3107(1)(a) does not distinguish a "charge[ ] incurred" when a family member provides care from one incurred when an unrelated medical professional provides care.[FN60] As a result, there is only one evidentiary **489 standard to determine whether expenses were incurred regardless of who provided the underlying services. *Any* insured who incurs charges for services must present proof of those charges in order to establish, by a preponderance of evidence, that he is entitled to PIP benefits.[FN61]

FN59. *Proudfoot,* 469 Mich. at 484 n. 4, 673 N.W.2d 739.

FN60. Because MCL 500.3107(1)(a) does not distinguish "charges incurred" for a family member's services from "charges incurred" for a professional healthcare provider's services, it is the dissent's position that lacks support in the statutory lan-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472

Page 19

492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

guage. Put simply, "charges" must be "incurred" in order to be compensable under the no-fault act. It is this statutory language that we must consider as the expression of legislative intent because "a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Roberts v. Mecosta Co. Gen. Hosp.,* 466 Mich. 57, 63, 642 N.W.2d 663 (2002).

FN61. See *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 257 Mich.App. 365, 380, 670 N.W.2d 569 (2003) (noting the preponderance of the evidence standard for proof that an allowable expense is reasonable and necessary), aff'd, 472 Mich. 91, 693 N.W.2d 358 (2005).

This evidentiary requirement is most easily satisfied when an insured or a caregiver submits itemized statements, bills, contracts, or logs listing the nature of services provided with sufficient detail for the insurer to determine whether they are compensable.[FN62] Indeed, the best way of proving that a caregiver actually "expected compensation for [her] services" at the time the *270 services were rendered[FN63] is for the caregiver to document the incurred charges contemporaneously with providing them—whether in a formal bill or in another memorialized statement that logs with specificity the nature and amount of services rendered—and submit that documentation to the insurer within a reasonable amount of time after the services were rendered. While no statutory provision *requires* that this method be used to establish entitlement to allowable expenses—a caregiver's testimony can allow a fact-finder to conclude that expenses have been incurred—a claimant's failure to request reimbursement for allowable expenses in a timely fashion runs the risk that the one-year-back rule will limit the claimant's entitlement to benefits, as occurred here when plaintiff commenced a lawsuit to

recover allowable expenses that were alleged to have been incurred more than one year earlier.[FN64] Moreover, once a claimant seeks payment from the insurer for providing ongoing services, the insurer can request regular statements logging the nature and amount of those services to ensure that the claimed services are compensable.

FN62. In *Proudfoot,* we reiterated that payments for *future* services and products are not due until the expenses are actually incurred. For instance, we explained that while "[a] trial court may enter 'a declaratory judgment determining that an expense is both necessary and allowable and the amount that will be allowed[,] ... [s]uch a declaration does not oblige a no-fault insurer to pay for an expense until it is actually incurred.' " *Proudfoot,* 469 Mich. at 484, 673 N.W.2d 739, quoting *Manley,* 425 Mich. at 157, 388 N.W.2d 216.

FN63. *Burris,* 480 Mich. at 1081, 745 N.W.2d 101.

FN64. As noted previously, it would seem to be inherent in the notion of expectation of compensation that there is some requirement for the caregiver to give notice to the insurer that payment is being sought for particular compensable services. However, MCL 500.3107(1)(a) does not require a claim for allowable expenses to occur within any particular time. Nevertheless, the one-year-back rule may preclude recovery for a claimant who sits on his or her entitlement to benefits without doing *anything* to attempt recovery (including commencing a lawsuit). Thus, MCL 500.3145(1) states that a claimant "may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."

The problem of a caregiver's failure to provide contemporaneous documentary evidence of allow-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

able expenses is aptly illustrated in this case, in which Mrs. *271 **Douglas** submitted documents constructed in one day as proof of services rendered over the course of approximately three years. The lack of contemporaneous **490 documentation implicates her credibility regarding whether the services were actually rendered in the manner documented.[FN65] Moreover, this failure to provide contemporaneous documentation may also be relevant to the fact-finder's determination whether Mrs. **Douglas** actually expected payment for providing those services. In this case, the circuit court failed to make a finding regarding whether the charges were actually incurred, including whether Mrs. **Douglas** expected compensation or reimbursement at the time she provided the services. Nevertheless, the circuit court awarded plaintiff attendant care benefits for 67 hours a week for the period between May 31, 2004, and November 1, 2007, and 40 hours a week for the period between November 1, 2007, and November 18, 2009. The Court of Appeals remanded this case to the circuit court and allowed the circuit court to "take additional testimony, if necessary, and amend its findings or render new findings, and amend the judgment accordingly."[FN66] The panel identified three problems with the circuit court's award of attendant care benefits: the circuit court "clearly erred in awarding attendant care benefits to plaintiff without requiring sufficient documentation to support the daily or weekly hours underlying the award";[FN67] it erred by failing to consider "whether [Mrs. **Douglas**] reasonably expected compensation at the time of performance";[FN68] *272 and it erred by failing to account for payments made to Dr. Rosenbaum's agency, TheraSupport, which employed Mrs. **Douglas** as plaintiff's attendant care provider.[FN69]

> FN65. Contrary to the dissent's suggestion, this observation does not in any way invade the province of the fact-finder, who remains in the best position to weigh the credibility of all the evidence that a claimant presents to support a claim of entitlement to benefits.

FN66. *Douglas,* unpub. op. at 7.

FN67. *Id.*

FN68. *Id.*

FN69. *Id.* Plaintiff did not cross-appeal the Court of Appeals' determination that the circuit court clearly erred by awarding PIP benefits for allowable expenses without sufficient proof to support the underlying award.

We underscore the importance of the proofs necessary to establish entitlement to benefits. The circuit court issued a judgment in favor of plaintiff without finding that the expenses were *actually incurred* given that its determination of the number of hours to award plaintiff had no discernible basis in the evidence presented at trial and did not examine whether Mrs. **Douglas** had the expectation of payment for her services. While it awarded plaintiff benefits for 40 hours a week of attendant care services for the period beginning November 1, 2007, in accord with Dr. Rosenbaum's prescription, there is no basis for its findings that Mrs. **Douglas** *actually* provided 40 hours of care each week during that period. Indeed, because she was unavailable to provide services during her working hours, there is no basis for compensating her for any hours that she spent working outside the home.[FN70] Similarly, the award for the period before November 1, 2007, was made with no discernible basis in the record. Therefore, the Court of Appeals properly recognized that that award could not be sustained and appropriately remanded this case for findings of fact based on the evidence.[FN71]

> FN70. The court explained, for instance, that "Katherine is the person to [provide care], but she cannot because she is employed full-time outside of the home and because [d]efendant will not pay the appropriate care rate for any hours of her care for [p]laintiff."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 21

FN71. Defendant claims that the Court of Appeals' decision to remand was improper because plaintiff already had an opportunity to present proofs regarding the attendant care services that Mrs. **Douglas** provided. Instead, defendant claims that since the Court of Appeals' ruling that the circuit court did not "requir[e] sufficient documentation to support the daily or weekly hours underlying the award" is uncontested, a verdict of no cause of action should be entered. *Douglas*, unpub. op. at 7. We disagree. The Court of Appeals acknowledged that "the trial evidence in this case did not reflect that Katherine maintained records of her claimed attendant care" and that, "[a]t most, there was evidence that Katherine completed 'affidavit of attendant care services' forms on June 25, 2007, for certain past months in an effort to reconstruct her time." *Id.* at 6–7. The holding of the Court of Appeals emphasized the fact that the circuit court's findings were legally insufficient, and the Court of Appeals' decision, while highly critical of some of the proofs provided, did not indicate that the circuit court could not sustain *any* award for attendant care services. Accordingly, we affirm the Court of Appeals' decision to remand for findings of fact regarding whether, and to what extent, allowable expenses were actually incurred in this case, and we do not disturb the Court of Appeals' ruling that the circuit court may take additional testimony on remand. See MCR 7.216(A)(5).

**\*\*491 \*273** Although the Court of Appeals established the scope of the determination of remand to the period after November 7, 2006, we direct the circuit court to make findings of fact as they pertain to the entire period of the lawsuit. The Court of Appeals did not explain how it decided that only the period after November 7, 2006, should be considered on remand, and more important, there is

nothing in the Court of Appeals' opinion or in the circuit court record that indicates that the circuit court's award for the period between May 31, 2006, and November 7, 2006, falls outside the ruling of the Court of Appeals that the circuit court "award[ed] attendant care benefits to plaintiff without requiring sufficient documentation to support the daily or weekly hours underlying the award." FN72 Accordingly, we vacate the **\*274** entire award of attendant care benefits and clarify that on remand the circuit court must examine the entire period to determine whether plaintiff submitted sufficient proofs that allowable expenses were incurred but not reimbursed.FN73

FN72. *Douglas*, unpub. op. at 7. The only discernable significance of that date in the record is that November 7, 2006, represents the date plaintiff began treatment with Dr. Rosenbaum. While we considered the significance of this date in determining whether services were "reasonably necessary" in the absence of a specific prescription for attendant care, this date has no independent significance in determining whether services were actually incurred.

FN73. We also note the observation of the Court of Appeals that the circuit court failed to consider the extent to which defendant had already paid benefits for the attendant care services that Mrs. **Douglas** performed while serving as Dr. Rosenbaum's employee. Any award issued on remand must not include services that have already been reimbursed.

### 4. REASONABLE CHARGE FOR EXPENSES

[24] Once a fact-finder has concluded that a plaintiff incurred allowable expenses in receiving care from a family member, the fact-finder must determine whether the charge is "reasonable." FN74 In this case, the circuit court awarded attendant care benefits to plaintiff at a $40 hourly rate. Although the circuit court did not explicitly state the basis of its hourly rate, the Court of Appeals identified two

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 22

pieces of evidence adduced at trial as justification for the circuit court's ruling: Dr. Rosenbaum's testimony that his company charges $40 an hour for attendant care and the testimony of defendant's adjuster regarding the rates that commercial agencies charge for attendant care services. We conclude that this testimony regarding the rates that **492 commercial agencies charge is based on factors too attenuated from those underlying the rate charged for an individual's provision of attendant care services to be adopted as an individual's reasonable charge for attendant care services. This is a particularly erroneous circuit court finding given that Mrs. **Douglas** was actually paid $10 an hour by Dr. Rosenbaum's company for providing attendant care services to her husband. Why *275 the circuit court believed that the commercial rate Dr. Rosenbaum charged was more relevant than what he paid Mrs. **Douglas** is unstated and unjustified on this record. Accordingly, the circuit court's $40 hourly rate is clearly erroneous.

FN74. MCL 500.3107(1)(a).

Although this Court has not ruled on the issue, the Court of Appeals in *Bonkowski v. Allstate Insurance Co.* stated that a commercial agency's rate for attendant care services is irrelevant to the fact-finder's determination of what constitutes a reasonable rate for a family member's provision of those services. Then Judge ZAHRA, writing for the court, noted that "[i]n determining reasonable compensation for an unlicensed person who provides health care services, a fact-finder may consider the compensation paid to licensed health care professionals who provide similar services." FN75 The opinion went on to state that the fact-finder's "focus should be on the compensation provided to the person providing the services, not the charge associated by an agency that hires health care professionals to provide such services." FN76

FN75. *Bonkowski v. Allstate Ins. Co.*, 281 Mich.App. 154, 164, 761 N.W.2d 784 (2008), citing *Van Marter*, 114 Mich.App. at 180–181, 318 N.W.2d 679.

FN76. *Bonkowski*, 281 Mich.App. at 165, 761 N.W.2d 784.

[25] The compensation actually paid to caregivers who provide similar services is necessarily relevant to the fact-finder's determination of a reasonable charge for a family member's provision of these services because it helps the fact-finder to determine what the caregivers could receive on the open market. While a commercial agency's fee incorporates this relevant piece of data—the compensation it pays to its caregivers—it also incorporates additional costs into its charge that family members who provide services do not incur, particularly the overhead costs inherent in the agency's provision of *276 services. Thus, the total agency rate is too attenuated from the particular component of the agency rate that the fact-finder must determine in the instant case—"the compensation provided to the person providing the services...." FN77

FN77. *Id.*

[26] While we do not adopt the reasoning in *Bonkowski* in its entirety, we agree with *Bonkowski* that the fact-finder's focus must be on an *individual's* compensation. Accordingly, we hold that a fact-finder may base the hourly rate for a family member's provision of attendant care services on what health care agencies compensate their employees, but what health care agencies charge their patients is too attenuated from the appropriate hourly rate for a family member's services to be controlling. FN78 Rather, the fact-finder must determine what is a reasonable charge for an *individual's* provision of services, not **493 an agency's. While an agency rate might bear some relation to an individual's rate, it cannot be uncritically adopted as an individual's rate in the absence of specific circumstances that warrant such a rate-for instance, when the individual caregiver has overhead and administrative costs similar to those of a commercial agency. FN79

FN78. Contrary to the dissent's suggestion, we believe that in appropriate circum-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 23

stances the fact-finder should consider be-nefits that a full-time attendant care ser-vices employee would receive as part of her total compensation package. Indeed, *Bonkowski's* use of the term "compensation," rather than "wage," fur-ther supports this conclusion. *Bonkowski,* 281 Mich.App. at 165, 761 N.W.2d 784.

FN79. While this case is not about the *ad-missibility* of the agency rates, which may in fact be helpful to the fact-finder as a point of comparison in determining a reas-onable charge for an individual's provision of attendant care services, in this instance, we conclude that the fact-finder clearly erred by adopting that rate as the appropri-ate hourly rate for Mrs. **Douglas's** provi-sion of attendant care services.

**\*277** This case does not reflect such circum-stances. Rather, there is undisputed testimony that Mrs. **Douglas** actually received $10 an hour in providing attendant care services to plaintiff during the time she served as Dr. Rosenbaum's employee. Because this figure is the rate she *actually* received for providing attendant care services, it is highly probative of what constitutes a reasonable charge for her services. Therefore, we agree with defend-ant that the circuit court clearly erred by ruling that plaintiff is entitled to a $40 hourly rate for Mrs. **Douglas's** attendant care services. The only eviden-tiary basis for that figure is the rate that commercial agencies charge for attendant care services, and that rate is far too attenuated from an individual care-giver's actual rate of compensation to serve as the sole basis for the award of benefits in these circum-stances.[FN80] Therefore, if the circuit court con-cludes on remand that plaintiff has proved his enti-tlement to benefits for Mrs. **Douglas's** services, the circuit court, as fact-finder, must establish a new hourly rate based on an individual caregiver's hourly rate.

FN80. The dissent's claim that "the trial court heard testimony from which it could

conclude that Mrs. **Douglas** would need to quit her job outside the home in order to provide plaintiff with the attendant care his doctor prescribed" is simply irrelevant to determining the reasonable charge for at-tendant care services that were provided *while* Mrs. **Douglas** was employed outside the home. *Post* at 502.

IV. CONCLUSION

Today, we reaffirm that MCL 500.3107(1)(a) imposes four requirements that an insured must prove before recovering PIP benefits for allowable expenses: (1) the expense must be for an injured person's care, recovery, or rehabilitation, (2) the ex-pense must be reasonably necessary, (3) the ex-pense must be incurred, and (4) the **\*278** charge must be reasonable.[FN81] Allowable expenses are distinguished from replacement services in that al-lowable expenses are *for* the insured's care as it "relate[s] to the insured's injuries."[FN82]

FN81. See *Griffith,* 472 Mich. at 532 n. 8, 697 N.W.2d 895.

FN82. *Id.* at 534, 697 N.W.2d 895.

Defendant is not entitled to relief on its claim that Mrs. **Douglas** provided only replacement ser-vices, not allowable expenses, because the circuit court did not clearly err by ruling that Mrs. **Douglas** is plaintiff's caretaker. Defendant is also not entitled to relief on its claim that plaintiff's at-tendant care was not reasonably necessary in the absence of a specific prescription for attendant care services because the testimony of Dr. Rosenbaum and defendant's claims adjuster provided a factual basis for the reasonable necessity of those services at all times relevant in this case.

We affirm the Court of Appeals' decision to re-mand this case for further proceedings, but we hold that the consideration on remand must encompass the entire period **\*\*494** for which charges are claimed. We also emphasize the necessity that the circuit court, as the fact-finder, must base its ruling

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472                                              Page 24
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

on proofs that show the extent to which Mrs. Douglas *actually provided* compensable attendant care services. Therefore, on remand, the circuit court must apply the standard of proof outlined in this opinion to determine whether plaintiff has proved that "charges" were "incurred" for his care. In particular, the circuit court must determine the extent to which plaintiff has proved the number of hours that Mrs. **Douglas** actually provided attendant care services and whether she actually expected compensation for those services. Finally, we reverse the Court of Appeals' decision regarding the circuit court's assessment of an hourly rate of $40 and conclude that *279 that hourly rate is clearly erroneous because it is unrelated to an individual caregiver's hourly rate. While we do not establish an hourly rate in this case, the circuit court must establish a rate that is consistent with an individual caregiver's rate for services, rather than a commercial agency's rate.

Affirmed in part, reversed in part, award of attendant care benefits vacated and case remanded for further proceedings consistent with this opinion.

MARKMAN, and MARY BETH KELLY, and ZAHRA, JJ., concurred with YOUNG, C.J.

CAVANAGH, J. (dissenting).

I dissent from the majority's erroneous interpretation of the phrase "charges incurred" in MCL 500.3107(1)(a) and the resulting creation of evidentiary requirements that lack any basis in the statutory language. Likewise, I dissent from the majority's misguided limitation on the scope of evidence that may be considered when determining whether a charge is "reasonable" under MCL 500.3107(1)(a).[FN1]

> FN1. Additionally, I continue to believe that the interpretation of MCL 500.3105 and MCL 500.3107 from the majority opinion in *Griffith v. State Farm Mut. Auto. Ins. Co.,* 472 Mich. 521, 697 N.W.2d 895 (2005), which the majority applies in this case, is incorrect for the reasons

provided in Justice MARILYN KELLY's *Griffith* dissent. See *id.* at 542–554, 697 N.W.2d 895 (MARILYN KELLY, J., dissenting).

Although the rules of statutory interpretation are well established, a brief review is warranted, given the majority's failure to adhere to these principles. This Court's primary goal is to "discern and give effect to the intent of the Legislature." *Sun Valley Foods Co. v. Ward,* 460 Mich. 230, 236, 596 N.W.2d 119 (1999). "The words of a statute provide the most reliable evidence of its intent...." *Id.* (quotation marks and citation omitted). When the language of a statute is unambiguous, the *280 Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Id.* Accordingly, "[n]o further judicial construction is required or permitted." *Id.*

I. "CHARGES INCURRED"
Under MCL 500.3107(1)(a), personal protection insurance (PIP) benefits include "allowable expenses." The statute goes on to explain that an "allowable expense" consists of, among other things, "charges incurred" for certain qualifying products or services. From the words "charges incurred," the majority mysteriously divines new evidentiary requirements that an insured must satisfy in order to obtain PIP benefits. Specifically, the majority determines that, in order to show that charges were incurred, an insured must establish (1) that the caregiver expected compensation for the services rendered, see *ante* at 490, and (2) that the caregiver's expectation of payment arose "at the time [the **495 caregiver] provided the services," see *ante* at 490.[FN2] Neither of the majority's newly created requirements are supported by the statutory language at issue.

> FN2. Included within the majority's conclusion that a caregiver must expect payment is an additional preference that documentation of the charges be provided in a "memorialized statement" because the majority considers such documentation to be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
(Cite as: 492 Mich. 241, 821 N.W.2d 472)

the "best way of proving" entitlement to PIP benefits. *Ante* at 489. For the reasons discussed in part I(A), I disagree.

## A. CAREGIVER'S EXPECTATION OF COMPENSATION

I disagree with the majority's conclusion that MCL 500.3107(1)(a) requires a showing that the caregiver expected compensation. Rather, I continue to believe that the caregiver's expectation of payment is irrelevant because the obligation to pay "charges incurred" **\*281** under MCL 500.3107(1)(a) lies with the *insurer* rather than the insured. *Burris v. Allstate Ins. Co.,* 480 Mich. 1081, 1088–1089, 745 N.W.2d 101 (2008) (WEAVER, J., dissenting). I also disagree with the majority's reliance on the definition of "incur" that was adopted in *Proudfoot v. State Farm Mut. Ins. Co.,* 469 Mich. 476, 673 N.W.2d 739 (2003), because, as Justice WEAVER explained in her *Burris* dissent, *Proudfoot's* definition of "incur" was limited to the facts of that case, in which the plaintiff sought advance payment for *future* expenses. *Burris,* 480 Mich. at 1088, 745 N.W.2d 101 (WEAVER, J., dissenting). Accordingly, in *Proudfoot,* no one had incurred an expense because no service had been provided, and an insurer "is not obligated to pay any amount except upon submission of evidence that services were actually rendered...." *Manley v. Detroit Auto. Inter–Ins. Exch.,* 425 Mich. 140, 159, 388 N.W.2d 216 (1986). In this case, however, plaintiff seeks benefits for *past* expenses resulting from services that *have already been provided.* Accordingly, as long as the services were actually rendered and reasonably necessary and the amount of the charges was reasonable, defendant, as the insurer, has incurred the charges because of its statutory obligation to provide PIP benefits under MCL 500.3107(1). Unlike the majority's interpretation, Justice WEAVER's approach in *Burris* is consistent with the Legislature's intent that the no-fault act be construed liberally in favor of the insured. *Turner v. Auto Club Ins. Ass'n,* 448 Mich. 22, 28, 528 N.W.2d 681 (1995).

In addition, I disagree with the majority's effort to further hamstring insureds' ability to recover PIP benefits to which they are entitled by imposing burdensome and statutorily unsupported preferences for specific documentary evidence. See *ante* at 489 (stating that the "best way of proving" that a caregiver expected payment is a "formal bill" or "memorialized statement").**\*282** [FN3] To begin with, the majority's determination that certain forms of evidence are always more persuasive than others is faulty because it is premised on the majority's conclusion that the caregiver must expect compensation. However, even accepting arguendo that compensation must be expected in order for a charge to be incurred for purposes of MCL 500.3107(1)(a), nothing in the statutory**\*496** language supports the majority's gradation of the persuasiveness of various forms of evidence or the majority's resulting preference for a formal bill or memorialized statement. Particularly telling is the majority's failure to cite any authority in support of this preference for certain types of evidence. Indeed, the majority flatly admits that "no statutory provision *requires* " what the majority considers to be the "best" evidence. *Ante* at 489. Accordingly, although I agree that "itemized statements, bills, contracts, or logs listing the nature of services provided," *ante* at 489, would be more than enough to establish entitlement to PIP benefits, simple testimony or any other form of admissible evidence should also be sufficient. [FN4] See, generally, MRE 402 (providing that "[a]ll relevant evidence\*283 is admissible ...") and MRE 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

FN3. As the majority opinion states, a formal bill or memorialized statement is not the *only* method sufficient to show that an insured is entitled to PIP benefits. See *ante* at 489 (acknowledging that "a caregiver's testimony can allow a fact-finder to conclude that expenses have been in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

curred"). Accordingly, despite the majority's unsupported conclusion that documentary evidence is "best," *any form of admissible evidence* could be equally sufficient to meet an insured's burden to prove that services were actually rendered.

FN4. The majority apparently interprets my dissent as asserting that when a family member provides care, the insured need not provide any evidence that attendant care was actually rendered. See *ante* at 488–89 n. 60. This is not an accurate characterization of my dissent, however, because I agree that an insurer "is not obligated to pay any amount except upon submission of evidence that services were actually rendered...." *Manley,* 425 Mich. at 159, 388 N.W.2d 216. Rather, as I previously stated, I disagree with the majority's unsupported preference for *specific documentary evidence* because, in my view, *any form of admissible evidence* could be equally sufficient to meet an insured's burden to prove that services were actually rendered.

Although the majority may be correct that certain types of evidence may be more persuasive under the specific circumstances of a particular case, by discussing the persuasiveness of various forms of evidence in absolutes, the majority invades the province of the fact-finder. See *People v. Wolfe,* 440 Mich. 508, 514, 489 N.W.2d 748 (1992) ("[A]ppellate courts are not juries, and ... they must not interfere with the jury's role[.]"). Indeed, this error in the majority's approach is exposed in its discussion of the specific facts of this case, particularly the majority's statement that failure to provide certain documents "implicates [the caregiver's] credibility...." *Ante* at 490. However, contrary to the majority's willingness to weigh in on witness credibility, this Court has frequently stated that appellate courts

must remember that the jury is the sole judge of

the facts. It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact.... Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. [ *Wolfe,* 440 Mich. at 514–515, 489 N.W.2d 748 (quotation marks and citation omitted).]

In summary, I disagree with the majority's conclusion that an insured must prove that a family caregiver expected compensation in order to prove that charges were incurred for purposes of MCL 500.3107(1)(a). In my view, the insurer incurs the charge by way of its **284 statutory obligation to provide PIP benefits under MCL 500.3107(1)(a) when the insured proves that the services were reasonably necessary and actually rendered and that the amount of the charge is reasonable. Furthermore, accepting arguendo the majority's declaration that an insured must prove that his or her caregiver expected compensation, I disagree with the majority's implication that certain forms of evidence will always be the "best **497 way" to establish entitlement to PIP benefits. Not only does the majority admit that there is no statutory support for its conclusion, see *ante* at 496, the idea that an appellate court can determine the best evidence in a case has been consistently rejected as an improper invasion of the fact-finder's role as "the *sole judge of the facts.*" *Wolfe,* 440 Mich. at 514, 489 N.W.2d 748 (quotation marks and citation omitted; emphasis added).

B. TIMING OF EXPECTATION AND REQUEST FOR PAYMENT

The majority creates another unsupported and previously nonexistent requirement when it states that a caregiver must expect compensation "at the time the services were rendered." *Ante* at 489; see, also, *ante* at 490 (stating that the "circuit court failed to make a finding regarding ... whether Mrs. **Douglas** expected compensation or reimbursement *at the time she provided the services* ") (emphasis added). Again, the majority fails to identify any

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 27

support for this new timing requirement in either the caselaw or the statutory language of MCL 500.3107(1)(a). The reason for the majority's failure to do so is obvious: there simply is no support for the majority's judicially created requirement. This is particularly notable given that members of the majority have often railed against extratextual requirements. See, e.g., **\*285**People v. Schaefer, 473 Mich. 418, 432, 703 N.W.2d 774 (2005). [FN5] Indeed, in People v. Wager, 460 Mich. 118, 123–124, 594 N.W.2d 487 (1999), the majority opinion expressly overruled a previous Court of Appeals opinion that had inserted a "reasonable time" requirement into the statute at issue in that case, stating "[N]o sound reason exists to engraft the 'reasonable time' element onto the clear language of the statute." Accordingly, I am at a loss about why the majority believes it is appropriate to engraft a time requirement onto MCL 500.3107(1)(a) despite the lack of any such requirement in the actual language of the statute.[FN6]

> FN5. See, also, Johnson v. Recca, 492 Mich. 169, 196–197, 821 N.W.2d 520 (2012), stating that
>
>> it must be assumed that the language and organization of the statute better embody the "obvious intent" of the Legislature than does some broad characterization surmised or divined by judges.... It is not for this Court to "enhance" or to "improve upon" the work of the lawmakers where we believe this can be done, for it will always be easier for 7 judges on this Court to reach agreement on the merits of a law than 110 state representatives and 38 state senators representing highly diverse and disparate constituencies. Therefore, this Court must ... rest its analysis on the language and organization of the statute.

> FN6. The majority also expresses its belief that an insured should submit evidence "to the insurer within a reasonable amount of time after the services were rendered," ante at 489 (emphasis added). See, also, ante at 489 (discussing the "risk" of "fail[ing] to request reimbursement for allowable expenses in a timely fashion ....") (emphasis added). However, the majority admits that " MCL 500.3107(1)(a) does not require a claim for allowable expenses to occur within any particular time." Ante at 489 n. 64. Thus, it is unclear to me why the majority chooses to create potential confusion by injecting the statutorily unsupported phrases "within a reasonable amount of time" and "in a timely fashion" into its application of MCL 500.3107(1)(a).

Although the lack of support in the statutory language is reason enough to reject the majority's analysis, the practical implications of the majority's burdensome **\*286** new requirement is also worth consideration. Specifically, by requiring that a family caregiver expect compensation, not only does the majority punish a family member who nobly acts to provide care to a loved one in a time of need, the majority also rewards the insurer, rather than the **\*\*498** caregiver, for this act of kindness by allowing the insurer to avoid providing PIP benefits that it would otherwise be required to provide. This result is not only ethically troubling, but it also turns on its head the Legislature's intent that the no-fault act be construed liberally in favor of the insured. Turner, 448 Mich. at 28, 528 N.W.2d 681.

Additionally, by requiring that the caregiver expect compensation at the time the services are provided, the majority fails to recognize the reality of situations in which attendant-care services are needed. Specifically, claims for PIP benefits arise out of automobile-related accidents, which were typically sudden, unexpected events. Accordingly, family members may unexpectedly be called upon to immediately provide care to a loved one. Given the nature of most families, I believe that in the vast majority of situations, the family member would be willing to provide the care, at least initially, without

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 28

any contemporaneous expectation of compensation from anyone. Thus, I believe that it may be fairly common that the caregiver is initially not even aware of the possibility of compensation and the process that must be completed in order to recover that compensation. Indeed, not every citizen is an attorney well versed in the intricacies of the no-fault act. As a result, *at the time the services were provided,* the caregiver would have no expectation that *anyone* will provide compensation. Yet under the majority's analysis, if a family member did not expect compensation *at the time the services were provided,* despite the sudden and chaotic circumstances of the situation, he or she is not entitled **287 to retroactively expect compensation for services provided in the past after discovering that compensation is a realistic possibility. This approach rewards the insurer by allowing it to avoid providing PIP benefits that it would otherwise be obligated to provide under MCL 500.3107(1)(a) merely because the caregiver does not immediately demand compensation.FN7

FN7. The majority dismisses as unfounded my concerns regarding the practicalities of the majority's new requirements, stating that "[c]ontrary to the dissent's suggestion, a family member's determination to provide care even in the absence of an insurer's payment is not inconsistent with expecting compensation from the insurer, but the expectation must nevertheless be present for a charge to be incurred within the meaning of MCL 500.3107(1)(a)." *Ante* at 488 n. 56. However, this statement only addresses the *source* of the compensation, not the *timing* of when the caregiver developed the expectation of payment, regardless of the source. Under the circumstances that I discuss, the family caregiver does not expect compensation "at the time the services were rendered," *ante* at 489, which is an express requirement of the majority's erroneous interpretation of MCL 500.3107(1)(a). The majority claims that

its requirement that compensation be expected at the time the services were provided "simply applies the dictionary definitions of the statutory phrase 'charges incurred.' " *Ante* at 488 n. 56. However, even accepting the dictionary definitions that the majority selects, there is clearly no time component to those definitions. See *ante* at 487 (defining "incur" as "[t]o become liable or subject to, [especially] because of one's own actions," and "charge" as a "[p]ecuniary burden, cost" or "[a] price required or demanded for service rendered or goods supplied") (quotation marks and citations omitted). Indeed, applying these definitions, it is clear that a person could "become liable" for "a price demanded for services" *after* the services are rendered.

## II. DETERMINING WHAT IS A "REASONABLE CHARGE"

Under MCL 500.3107(1)(a), PIP benefits are payable for "allowable expenses" as long as the charge is "reasonable." FN8 In **499 this case, the trial court, acting as the *288 fact-finder in a bench trial, heard testimony from two sources regarding the rate typically charged by an agency to provide the care that Katherine **Douglas** provided. Additionally, the trial court heard testimony that while Dr. Thomas Rosenbaum's company employed Mrs. **Douglas**, she was paid at a rate of $10 an hour. Furthermore, the trial court heard testimony that Mrs. **Douglas** was unable to provide the hours of attendant care that plaintiff's doctor prescribed because she worked outside the home. After considering that testimony, the trial court awarded plaintiff PIP benefits at the rate of $40 an hour. In my view, agency rates are relevant to determining the proper rate of compensation for PIP benefits, and the trial court in this case properly considered the agency rates along with the other evidence submitted by the parties. Accordingly, I disagree with the majority that the trial court clearly erred in this case, and I would affirm the Court of Appeals on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. The majority incorrectly states that "the fact-finder must determine what is a reasonable charge for an *individual's* provision of services...." *Ante* at 492. Rather, the plain language of MCL 500.3107(1)(a) simply requires that the charge be "reasonable." Accordingly, although what an individual on the open market may be able to obtain as compensation is relevant, it is but one factor in a multifactor analysis to determine what is a "reasonable charge" under the circumstances of a particular case.

Although the majority concludes that agency rates are both relevant and admissible in determining a "reasonable charge" under MCL 500.3107(1)(a), see *ante* at 493 n. 79 (stating that "this case is not about the *admissibility* of the agency rates" because agency rates "may in fact be helpful to the fact-finder as a point of comparison in determining a reasonable charge for an individual's provision of attendant care services"); and *ante* at 492 (stating that "an agency rate might bear some relation to an individual's rate"), the majority nevertheless relies exclusively on the Court of Appeals' opinion in *Bonkowski v. Allstate Ins. Co.,* 281 Mich.App. 154, 165, 761 N.W.2d 784 (2008), which expressly stated *289 that agency rates are "not relevant." I disagree with the majority's reliance on *Bonkowski* for several reasons.

To begin with, *Bonkowski* readily admitted that its entire discussion of the rate of compensation was dictum, stating that issue was not "squarely before" the Court. *Id.* at 164, 761 N.W.2d 784. Moreover, without justification, *Bonkowski* admittedly ignored caselaw that found agency rates relevant to determining the proper rate of compensation for a family member's provision of care. *Id.* (acknowledging that the Court of Appeals had "previously embraced the notion that 'comparison to rates charged by institutions provides a valid method for determining whether the amount of an expense was reasonable and for placing a value on

comparable services performed [by family members]' "), quoting *Manley v. Detroit Auto. Inter–Ins. Exch.,* 127 Mich.App. 444, 455, 339 N.W.2d 205 (1983) (alteration in original). Further, *Bonkowski* cited no authority in support of its preferred approach to determining the proper rate of compensation for attendant care provided by unlicensed family members.

Most importantly, however, *Bonkowski* is poorly reasoned and, as a result, unpersuasive. Particularly unpersuasive is the notion that only the hourly rate paid to an attendant-care-services provider by an agency is relevant. Indeed, even the majority rejects this perspective. See *ante* at 493 n. 79 (acknowledging that agency rates "may in fact be helpful to the fact-finder"). [FN9] Accordingly, the majority is unwise **500 to rely on *Bonkowski*'s *290 analysis of this issue. Rather, I would adopt the reasoning from Judge GLEICHER's majority opinion in *Hardrick v. Auto Club Ins. Ass'n,* 294 Mich.App. 651, 819 N.W.2d 28 (2011).

FN9. The majority, however, also risks creating confusion when it states that the amount Mrs. **Douglas** was paid while employed by Dr. Rosenbaum "is highly probative of what constitutes a reasonable charge for her services" because "this figure is the rate she *actually* received for providing attendant care services...." *Ante* at 493. This statement could be misinterpreted and lead lower courts to conclude that a professional caregiver's hourly rate is the *only* relevant evidence. Thus, to clarify, I agree with the majority that agency rates may be considered by the fact-finder in determining what constitutes a "reasonable charge" under MCL 500.3107(1)(a).

*Hardrick,* 294 Mich.App. at 678–679, 819 N.W.2d 28, first noted that the question whether expenses are reasonable is generally a question for the fact-finder, as this Court stated in *Nasser,* 435 Mich. at 55, 457 N.W.2d 637. Second, *Hardrick*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

agreed with *Bonkowski* that "the rates charged by an agency to provide attendant-care services are not dispositive of the reasonable rate chargeable by a relative caregiver," but the opinion also concluded that "this does not detract from the relevance of such evidence." *Hardrick,* 294 Mich.App. at 666, 819 N.W.2d 28. Accordingly, I find persuasive *Hardrick*'s decision to review the issue through the lens of the admissibility of evidence. *Hardrick* explained that evidence is "relevant" and thus "material" when it helps prove a proposition that is a "material fact at issue." *Id.* at 667-668, 819 N.W.2d 28. Because the "material fact at issue" is the reasonable rate for attendant-care services for an insured, and insurers routinely pay agency rates for attendant-care services, *Hardrick* concluded that agency rates are relevant to determining the proper compensation for relative caregivers. *Hardrick* emphasized that the issue "is not whether an agency rate is reasonable per se under the circumstances, but whether evidence of an agency rate may assist a jury in determining a reasonable charge for family-provided attendant-care services." *Id.* at 669, 819 N.W.2d 28. Accordingly, because an agency rate commonly paid by insurers " 'throws some light, however faint,' on the reasonableness of a charge for attendant-care services," it is admissible. *Id,* citing *Beaubien v. Cicotte,* 12 Mich. 459, 484 (1864).

**\*291** Moreover, *Hardrick* explained that the fact-finder "may ultimately decide that an agency rate carries less weight than the rate charged by an independent contractor, or no weight at all. But the fact that different charges for the same service exist in the marketplace hardly renders one charge irrelevant as a matter of law." *Hardrick,* 294 Mich.App. at 669, 819 N.W.2d 28. Indeed, the insurer would be free to introduce evidence showing the actual pay received by professional attendant-care-services providers and the overhead costs incurred by agencies that provide the care along with any other relevant evidence. In fact, in this case, defendant was permitted to counter plaintiff's evidence of the agency rate paid by Dr. Rosenbaum's

company by showing that Mrs. **Douglas** was paid $10 an hour and with testimony from both defendant's medical expert and its claims adjuster. This is the critical error in the majority's reasoning: it fails to recognize that evidence of agency rates is only one of the various types of evidence that the fact-finder may consider in determining what constitutes a "reasonable charge," and the decision of which evidence is most relevant should be left to the fact-finder. Accordingly, I disagree with the majority's decision to opine regarding the weight that the fact-finder should give agency rates relative to other types of evidence **\*501** when determining what constitutes a "reasonable charge." By doing so, the majority again forgets that "appellate courts are not juries, and ... they must not interfere with the jury's role[.]" See *Wolfe,* 440 Mich. at 514, 489 N.W.2d 748 (1992).

Indeed, by adopting *Bonkowski*'s emphasis on an individual caregiver's hourly rate, the majority's approach ignores other relevant considerations. For example, the family member might be forced to abandon a more lucrative career or move a great distance in order to be able to provide long hours of care to a loved one over an extended period. Additionally, the majority's **\*292** approach marginalizes the fact that a family member who provides attendant-care services may be left without an array of benefits that a professional attendant-care-services provider would ordinarily receive. For example, a professional attendant-care-services provider who is employed by an agency might receive health insurance benefits, vacation and sick leave, and retirement benefits, among other things. None of these benefits are represented in the professional attendant-care-services provider's hourly wage. [FN10] Thus, by singularly focusing on the rate paid to an attendant-care-services professional in order to determine what is a "reasonable charge" for family-provided care under MCL 500.3107(1)(a), the majority fails to recognize the complexity of the inquiry at hand and reduces the determination to a purely economic decision when that is simply not the reality of the situation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN10. I recognize that the majority briefly considers the issue of fringe benefits, see *ante* at 490 n. 69, but the majority relegates the issue to a mere secondary consideration by repeatedly emphasizing that "Mrs. **Douglas** actually received $10 an hour in providing attendant care services to plaintiff," *ante* at 493. See, also, *ante* at 493 (stating that the $10 an hour rate is "highly probative" of what is a reasonable charge under MCL 500.3107(1)(a) because it was "the rate [Mrs. **Douglas**] *actually* received for providing attendant care services").

Furthermore, by implying that certain evidence is deserving of greater consideration when determining a "reasonable charge," the majority risks making the possibility of family-provided attendant care unattainable for a large number of no-fault *293 insureds because their family members simply cannot afford to suffer the financial ramifications of that decision. This result not only potentially places families in the unenviable position of being forced to institutionalize a family member in order to make a fair living, but it also runs counter to one of the goals of the no-fault act: to keep no-fault insurance affordable. See *Shavers v. Attorney General,* 402 Mich. 554, 627–628, 267 N.W.2d 72 (1978). Specifically, if a family member cannot afford to provide attendant care at the lower rate that the majority opinion essentially mandates, the insured may be forced into an institution, which will potentially increase the cost of attendant care and, therefore, the amount of PIP benefits that insurers must pay.

Finally, although the majority is correct that this Court has not previously considered this exact issue, the Court of Appeals' approach in *Hardrick* is more consistent with this Court's opinion in *Manley,* 425 Mich. at 154, 388 N.W.2d 216, which considered the "reasonable charge" aspect of MCL 500.3107(1)(a) and held that evidence of a daily charge *by facilities* for "room and board" is admissible to determine a parent's costs for room and

board of a disabled child *in the parent-caregiver's home.* See, also, *Manley,* 425 Mich. at 169, 388 N.W.2d 216 (BOYLE, J., concurring in part and dissenting in part) (stating that "comparison to rates charged by institutions provides a valid method for determining**502 whether the amount of an expense was reasonable and for placing a value on comparable services performed by [a family member]") (quotation marks and citation omitted). Thus, given this Court's guidance on the issue in *Manley,* and because I believe that *Hardrick*'s analysis is more thorough and well reasoned than *Bonkowski*'s, I would adopt *Hardrick*'s analysis.

Applying *Hardrick*'s approach to this case, I would affirm the trial court's conclusion that $40 an hour is a "reasonable charge." The majority claims that the trial court's finding is "unjustified on this record"; however, the majority fails to consider a variety of factors that were before the fact-finder in this case. Specifically, the trial court heard testimony from which it could conclude that *294 Mrs. **Douglas** would need to quit her job outside the home in order to provide plaintiff with the attendant care his doctor prescribed. Moreover, the trial court heard testimony regarding both the agency rate and individual rate of pay for the type of care that Mrs. **Douglas** was providing. Notably, defendant could have submitted additional evidence in support of its claim for a lower hourly rate, but it chose not to do so. Thus, while the majority is correct that it is "undisputed" that "Mrs. **Douglas** actually received $10 an hour in providing attendant care services to plaintiff," *ante* at 493, it is also undisputed that agencies receive a higher rate of compensation for the same services, and it is also undisputed that Mrs. **Douglas** could not provide the attendant care that plaintiff needed while maintaining her employment outside the home. Thus, the rate paid to an individual caregiver fails to encompass all the ramifications of Mrs. **Douglas's** provision of attendant care to plaintiff. Accordingly, because "[t]he trier of facts is permitted to draw natural inferences from all the evidence and testimony," *Kostamo v. Marquette Iron Mining Co.,* 405 Mich. 105, 120–121,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

821 N.W.2d 472
492 Mich. 241, 821 N.W.2d 472
**(Cite as: 492 Mich. 241, 821 N.W.2d 472)**

Page 32

274 N.W.2d 411 (1979), I cannot agree with the majority's conclusion that the trial court in this case "uncritically adopted" the agency rates or that agency rates were "the sole basis for the award of benefits in these circumstances." *Ante* at 493. As a result, I am not "left with the definite and firm conviction that a mistake has been made," *Detroit v. Ambassador Bridge Co.,* 481 Mich. 29, 35, 748 N.W.2d 221 (2008) (quotation marks and citation omitted), and, thus, in my view, the trial court did not clearly err on this issue.

### III. CONCLUSION

In summary, I dissent from the majority's effort to extend the erroneous interpretation of MCL 500.3107 from *Griffith.* Specifically, I disagree with the majority's *295 judicially created requirements regarding what is necessary to show that a charge was incurred because those requirements are unsupported by the statutory language at issue and, thus, contrary to the Legislature's intent with regard to MCL 500.3107(1)(a). Moreover, the majority's decision to rely, at least in part, on the reasoning from *Bonkowski,* 281 Mich.App. 154, 761 N.W.2d 784, is ill conceived because *Bonkowski* is poorly reasoned, particularly in comparison to the persuasive analysis in *Hardrick,* 294 Mich.App. 651, 819 N.W.2d 28. Furthermore, *Bonkowski* is contrary to this Court's opinion in *Manley,* 425 Mich. 140, 388 N.W.2d 216. Accordingly, I dissent.

MARILYN KELLY and HATHAWAY, JJ., concurred with CAVANAGH, J.

Mich.,2012.
Douglas v. Allstate Ins. Co.
492 Mich. 241, 821 N.W.2d 472

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT "5"

Westlaw

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

Page 1

**H**
Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Sixth Circuit Rule 28. (Find CTA6 Rule 28)

United States Court of Appeals,
Sixth Circuit.
Elizabeth **PAKENAS**, Plaintiff–Appellant,
v.
**STATE FARM** INSURANCE COMPANY, Defendant–Appellee.

No. 09–2305.
June 15, 2012.

**Background:** Insured's guardian brought action against insurer to recover attendant-care benefits under automobile insurance policy. After entry of judgment as matter of law in insurer's favor, the United States District Court for the Eastern District of Michigan directed verdict in insurer's favor, denied guardian's motion for new trial, 2009 WL 2923042, and awarded attorney fees to insurer, 2009 WL 2923046.

**Holdings:** The Court of Appeals, Boggs, Circuit Judge, held that:
(1) guardian had been fully heard when district court entered judgment as matter of law;
(2) guardian failed to establish that insured had incurred attendant-care expenses for 24/7 care;
(3) district court did not abuse its discretion by denying guard's motion for new trial;
(4) refusal to grant mistrial was not abuse of discretion; and
(5) district court did not abuse its discretion in awarding attorney fees to insurer.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ⟨⟩2126.1**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from Jury
            170AXV(F)1 In General
                170Ak2126 Determination
                    170Ak2126.1 k. In General. Most Cited Cases
    Plaintiff had been fully heard when district court entered judgment as matter of law for defendant, even though court had not yet ruled on plaintiff's motion for admission of exhibit, where plaintiff had presented evidence from exhibit to jury, and had rested her case before court entered judgment. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[2] Insurance 217 ⟨⟩2831(1)**

217 Insurance
    217XXII Coverage—Automobile Insurance
        217XXII(E) No–Fault Coverage; Medical Payments
            217k2827 Losses Covered
                217k2831 Health Care Expenses or Services Provided
                    217k2831(1) k. In General. Most Cited Cases
    Under Michigan law, insured's guardian failed to establish that insured had incurred attendant-care expenses for 24/7 care, and thus could not recover for such expenses pursuant to No–Fault Act, even if guardian and insured's husband were on-call at all times, where guardian and husband admitted that they did not provide 24/7 care, insured stayed by herself regularly, worked sometimes, and went to doctor's appointments by herself, and guardian did not present evidence as to type or amount of care that was actually provided. M.C.L.A. §§ 500.3105, 500.3107(1).

**[3] Federal Civil Procedure 170A ⟨⟩2123**

170A Federal Civil Procedure

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

170AXV Trial
  170AXV(F) Taking Case or Question from Jury
    170AXV(F)1 In General
      170Ak2121 Motion and Proceedings
Thereon
        170Ak2123 k. Sufficiency. Most Cited
Cases
  Defendant was not required to make motion for
judgment as matter of law in writing; rather, its oral mo-
tion was sufficient. Fed.Rules Civ.Proc.Rule 50(a)(2),
28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⛛2126.1**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(F) Taking Case or Question from Jury
      170AXV(F)1 In General
        170Ak2126 Determination
          170Ak2126.1 k. In General. Most Cited
Cases
  Nothing prevented district court from granting de-
fendant's motion for judgment as matter of law while
plaintiff's counsel was absent from court due to serious
illness. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⛛2331**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2331 k. In General. Most Cited Cases
  District court did not abuse its discretion by deny-
ing plaintiff's motion for new trial due to bias against
her, where court had reasonable basis, other than per-
sonal bias, for his decision.

**[6] Federal Civil Procedure 170A ⛛1969**

170A Federal Civil Procedure
  170AXV Trial
    170AXV(A) In General
      170Ak1969 k. Judge's Remarks and Conduct.
Most Cited Cases
  District court's refusal to grant mistrial in action to
recover benefits under insurance policy based on its

statements in presence of juror's wife that plaintiff
might have committed fraud was not abuse of discre-
tion, where juror was stricken from jury, court had ad-
monished jurors not to discuss case with family mem-
bers or fellow jurors, and there was no evidence that re-
maining jurors had learned of or been influenced by his
statements.

**[7] Insurance 217 ⛛3585**

217 Insurance
  217XXXI Civil Practice and Procedure
    217k3584 Costs and Attorney Fees
      217k3585 k. In General. Most Cited Cases
  Under Michigan law, district court did not abuse its
discretion in awarding attorney fees to insurer after
entry of judgment as matter of law in its favor in action
by insured's guardian to recover attendant-care benefits
under automobile policy, where guardian and insured's
husband admitted that they had not provided amount of
care for which they sought benefits, and failed to
provide evidence as to amount or type of care actually
provided. M.C.L.A. § 500.3148(2).

On Appeal from the United States District Court for the
Eastern District of Michigan.

Before BOGGS and GIBBONS, Circuit Judges; and
RUSSELL, District Judge.[FN*]

BOGGS, Circuit Judge.
  *1 Elizabeth Ann **Pakenas**, legal guardian of the
insured, Patti Rogers, her sister, sued **State Farm** Insur-
ance Company for unpaid attendant-care benefits.
**Pakenas** had billed **State Farm** for attendant care,
provided 24 hours a day, 365 days per year, for four-
and-ahalf years. The United States District Court for the
Eastern District of Michigan entered a directed verdict
in favor of **State Farm**. The court also granted **State
Farm's** post-trial motion for attorney's fees. **Pakenas**
appealed, arguing that the district court erred when it
denied her motion for a mistrial, when it entered a dir-
ected verdict, when it denied her motion for a new trial,
and when it awarded attorney's fees to **State Farm**.
After careful consideration of the issues, this panel af-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

firms the district court's judgment and award of attorney's fees.

### I

*Factual History*

This case originated when Patti Rogers (Rogers), the sister of Elizabeth Ann **Pakenas**, was injured in an automobile accident in 1976. Rogers suffered a closed head injury in the accident. Shortly after the accident, Rogers developed a seizure disorder that **Pakenas** claims still continues today. Taking the facts in the light most favorable to **Pakenas**, after the accident, Rogers "suffered a drop in IQ" from "extremely high"—she had been valedictorian of her high-school class—to "normal"—estimated at 100—or, in some areas, "below normal." She was not able to go to college, she has never been able to drive again, and, for the most part, she has been unable to work. At the time of trial, she saw a neurologist who treated her for seizures and had been taking anti-seizure medication for 30 years.

**Pakenas**, who has been Rogers's legal guardian since 2002, after she was declared legally incompetent, has been a primary care-provider for Rogers since the accident. Rogers's other primary care-provider has been John Rogers, her husband. According to trial testimony, "[ **Pakenas**] and John flip, take turns caring for [Rogers] ." **Pakenas** claims that Rogers was allowed to be unsupervised after the accident, but that after Rogers "became confused" and "would be found, lost," she was no longer allowed to travel alone. The work **Pakenas** and Mr. Rogers do for Rogers was described as "orient[ing] ... help [ing] ... counsel[ing]." **Pakenas** "functions really as a case manager." Their care does not include feeding, bathing, toileting—Rogers is capable of doing these things herself. At the time of trial and "over the years," Rogers had a job, sort of a "make work" job, according to plaintiffs, at a pharmacy, "for simple jobs and she's closely supervised."

Since 1976, the year of Rogers's accident, **State Farm** has paid medical expenses relating to Rogers's treatment, including all pharmaceutical bills, doctor bills, and health insurance. However, **Pakenas** did not know that she and Mr. Rogers were eligible to receive attendant-care benefits until 2000 or 2001. [FN1] Until

that time, she claims, she and Mr. Rogers cared for Rogers without reimbursement.

**\*2** As a result of discovering that **Pakenas** and Mr. Rogers were eligible for attendant-care benefits, Rogers filed a suit against **State Farm** under the Michigan No–Fault Act,[FN2] seeking attendant-care benefits that had been unpaid for 28 years. The attendant care at issue was 24–hour–per–day care that Rogers claimed she required due to seizures, plus 12% statutory interest for payments overdue by 30 days. This claim was settled in 2004 for $5.8 million dollars.[FN3] The settlement agreement "in no way preclude[d]" the recovery of future attendant-care benefits.

After the settlement was reached, **Pakenas** —now the guardian of Rogers—and Mr. Rogers established Pattico, described by **Pakenas** during her deposition as "a health-assistance company set up to take care of [Rogers]." [FN4] **Pakenas**, Mr. Rogers, and **Pakenas's** daughter were all employed by Pattico during this period. **Pakenas**, though employed by Pattico, has not been otherwise employed since the 1990s. **Pakenas** claimed that she was "on call" for Rogers, and that if she was not on call then she was with her. She stated in deposition that she was in contact with Rogers "several times a day or [Rogers] was over at my house or she's with me running errands or I'm taking her on errands." Further, **Pakenas** claimed that she deals with all of Rogers's legal issues. She stated that she paid herself $3,000 every month in pre-tax income from Pattico. [FN5] Pattico paid Mr. Rogers $5,000 every month in pre-tax income. **Pakenas** stated that her daughter, Tracey Priska, sometimes provided attendant-care services for Rogers, but that **Pakenas** did not keep track of the times. She further stated that her daughter was paid by Pattico a "general base salary for whatever is required of her." This amount included health insurance for Priska and her husband.

Between 2004, when the settlement was reached, and 2005, when the instant suit was filed, **Pakenas** claims that Rogers required 24/7 care.[FN6] During the period of July 1, 2004 until March 13, 2009, **Pakenas** submitted invoices to **State Farm** for attendant-care expenses. The invoices claimed that 24–hour–per–day

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))

Page 4

care [FN7] had been provided at a rate of $22/hour,[FN8] which **Pakenas** claimed represented the "constant coverage and supervision of Mrs. Rogers by Mrs. **Pakenas** and Mr. Rogers and sometimes, other family members." The care claimed included not only physical care of Rogers, but also administrative services such as arranging for medical care or paying bills.

**State Farm** stopped paying the invoices **Pakenas** submitted, and **Pakenas** filed suit. She specifically sought to recover around the clock care, 24/7, for 53 months. She also sought the statutory interest of 12% for payments that are 30 days overdue.

*Procedural History*

Elizabeth **Pakenas** filed a one-count suit in diversity in the district court against **State Farm** on June 29, 2005. She claimed that **State Farm** breached its contract with Rogers when it failed to pay attendant-care benefits. **State Farm** responded by admitting that the policy described in the complaint existed and that it fell under the Michigan No–Fault Act, but refused to admit that there were any outstanding unpaid benefits for or on behalf of Rogers.

**\*3** A number of pretrial motions were filed, as **State Farm** struggled to compel discovery from the pharmacy where Rogers had worked, had to compel **Pakenas** to produce her and Mr. Rogers's cell-phone records (necessary because **Pakenas** had said that they were "on call" by phone for much of the 24/7 supervision), their tax returns, deposition testimony from **Pakenas** and Mr. Rogers, and an independent medical exam of Patti Rogers.

On July 2, 2008, Thomas Biscup and Paul Zebrowski, **Pakenas's** attorneys, moved to withdraw, citing a "breakdown in the attorney/client relationship." In an order dated August 22, the motion was granted, and Anthony Malizia was substituted as plaintiff's counsel.

A seven-day jury trial began on March 3, 2009. **Pakenas** specifically sought to recover for "around the clock care, 24/7, for 53 months;" however, she also stated that she was willing to accept "whatever this jury

decides is an appropriate amount of money ... for [the] attendant care claim ...."

At trial, the two sides presented dramatically different versions of the facts. According to **Pakenas**, Rogers is unable to work, has a seizure disorder, is easily lost or confused, requires more or less constant care, and has been severely debilitated by the accident. According to **State Farm**, Rogers was only mildly injured by the accident; she has held a steady job in a pharmacy since two years after the accident, which the owner of the pharmacy attempted to hide; her doctor ignores facts in continuing to prescribe treatment as though Rogers has a seizure disorder, which she does not have; and Rogers basically lives unsupervised while **Pakenas** and Mr. Rogers bill **State Farm** for care she does not actually receive.

**Pakenas** admitted at trial that between 1976 and 2004 she had not provided Rogers with 24/7 care. She stated that she cared for Rogers, but also took care of her own family and her father. She testified that in the 1990s Rogers began to make "sudden changes" that led to an increase in her care, but admitted that there had still been "very short periods of time" when Rogers had been left alone.

On cross-examination, **State Farm** elicited testimony from **Pakenas** that Rogers did not have "actual physical seizures," but that "various medical providers ... have said that [Rogers] is not having real seizures [but] she may be having pseudo seizures." These seizures were deemed "psychosomatic" or "psychogenic." **Pakenas** admitted that Rogers sometimes went to doctor's appointments by herself, and that "there would be some days where ... she was by herself, but for the majority, and this is a big majority, either John, myself or she's been at the pharmacy, one of the kids, you know, whatever, somebody has managed to be with Patti." **Pakenas** equivocated on the number of hours a day that care was provided to Patti, testifying that it might have been "23 and a half [hours]. It might be 20. It might be 21...."

Mr. Rogers's testimony at trial portrayed Rogers as distracted and foolish, a potential danger to herself. He

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

testified that her condition had deteriorated over the years. However, he admitted on cross-examination that he had not begun providing 24–hour–a–day care to Rogers until after his first deposition in 2006, stating as follows:

**\*4** Q: Okay. And we had your deposition testimony, which said, yeah, we never provided her 24 hour care and I'd leave her alone?

A: Yes.

Q: You remember that?

A: Yes.

* * *

Q: Would it help you to look at our deposition testimony?

A: It may or may not. You have to remember I'm trying to remember 33 years and pull it all together.

Q: No sir. This isn't 33 years ago. This was your testimony to me in 2006 that you left her alone all day, and that's the first time you realized it was dangerous to do so because she climbed up on a ladder and she fell down, remember that?

A: Yes, I did. Yes, I remember that.

Q: Do you remember testifying that even after that you would leave her for four hours at a time?

A: There were times when I had to, yes.

Q: Sure. You had to so you could go work out at the gym, remember?

A: (Witness nods head)

Q: Is that a yes?

A: Yes, absolutely.

* * *

Q: Well, it's 24/7. Whoever wrote it down, that's

when it's for, 24/7, and you acknowledge there's times when she's by herself?

A: She was by herself.

When he was shown an invoice billed to **State Farm**, he stated that he had not known that **State Farm** was being billed for 24–hour–a–day care. He said he had never stated that Rogers was getting 24–hour–a–day care, but rather "the best I was capable of giving her." He testified that during times when **State Farm** was billed for 24–hour–a–day care he would go to the gym or for walks without her, for up to four hours at a time. He stated that he had worked until 2004 outside the home, so that the $5.8 million in settlement money from **State Farm** had not actually paid for services provided, but for services that *would have been* provided had he been able to pay someone.

**State Farm** argued that because he admitted that he had not provided 24–hour–a–day care, while simultaneously not providing any record of what care was actually provided, that there was no way for a jury to determine what care should be billed to **State Farm**.

Paula Couch, the **State Farm** claim representative responsible for Rogers's case, testified that being "on call" was not compensable attendant care. She testified that she had never received documentation that Rogers required attendant care due to pseudo seizures, but that she had received documents stating that Rogers required supervision due to seizures.

After Ms. Couch's testimony, Judge O'Meara sent the jury out for a 15–minute break. He then made a statement to the attorneys in open court, stating that he believed "there [was] emerging evidence that the Plaintiffs have engaged in fraud." He further stated that "it's not impossible that somebody could characterize this testimony and this evidence as supporting an accusation of fraudulent activity on the part of the Plaintiff or Plaintiffs." He made clear that his statement "was just my observations" and that he was "certainly not going to say anything to the jury, and it isn't going to prejudice the jury." The plaintiff's attorney tried to discuss these statements with the judge, but the judge told him

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

that he did not wish to discuss it further.

**\*5** The next court day after Judge O'Meara's statement, **Pakenas** moved for a mistrial. She argued that Judge O'Meara had made gratuitous prejudicial statements during trial and in open court stating that he thought the plaintiff might be guilty of fraud. **Pakenas** alleged that, in addition to plaintiff and defense counsel, their clients, and courtroom personnel, the wife of a juror was present during these remarks. **Pakenas** argued that it was a "virtual certainty" that the wife relayed these comments to her husband, a juror. **Pakenas** argued that the juror, Mr. Harvey, must be removed from the jury, but that a mistrial should also be granted since no curative instruction could remedy the possibility of "inadvertent jury tampering." Judge O'Meara orally denied the motion without prejudice during trial. He also dismissed Mr. Harvey. The judge stated that he thought plaintiff's objections might have merit, but could be "dealt with with a curative instruction." Trial resumed.

Dr. Verma, Rogers's current treating physician, who had been her physician since 2003, testified by video deposition. He stated that though he had never witnessed any seizures from Rogers that Rogers's EEGs from 1997 were abnormal and indicated "underlying convulsive tendency." He testified that Rogers did not need daily caregiving with regard to feeding herself, but that she did require caregiving for "general observation of her needs, and her driving.... For seeing if she's having any seizures or any alteration of her medical condition."

**Pakenas's** last witness, Dr. Guidice, also testified by videotaped deposition. Guidice's deposition stated that she had been caring for Rogers since 1981. She testified that she had not treated Rogers since Guidice's last visit in Michigan, in 2001 or 2002—when Guidice left Michigan, she referred Rogers to Dr. Verma. She testified that Rogers began to experience seizures about one year after her accident, and that these were related to traumatic brain injury from the accident. She testified that she had observed seizure activity on EEGs of Rogers, and that 55 of 57 of Rogers's EEGs were abnormal. She testified that Rogers might be able to work in a

part-time, supported position, but that she required supervision because she did "dumb stuff," "doesn't have good judgment," "gets herself in trouble," by, for example, "locking herself out when it's cold," and requires supervision to prevent her from doing these things. She replied affirmatively that "somebody should be with [Rogers] all the time."

After Dr. Guidice's deposition was played, **Pakenas** rested.

On Tuesday, March 10, 2009, **State Farm** made an oral Rule 50 motion for a directed verdict. **State Farm** stated, in relevant part, that Mr. Rogers's testimony had shown that Rogers had not received the attendant care **Pakenas** had claimed. **State Farm** claimed that "to establish the need for attendant care 30 years subsequent to the accident, [plaintiff] would have to show a deterioration in [Rogers's] condition that was in fact connected to her automobile accident." The only such evidence plaintiff had shown, **State Farm** claimed, was the testimony of Dr. Guidice, who had testified that she was not sure whether any deterioration in Rogers's condition had been caused by the accident or by "medication tox- icity."

**\*6** On Friday, March 13, Judge O'Meara orally granted **State Farm's** Rule 50 motion for a directed verdict. Neither **Pakenas** nor her attorney were present in court on that day—Mr. Malizia, according to the district judge, "apparently was very ill last night and went to the hospital, and while he's back home, [he] can't be here today." The judge stated:

[Plaintiff's absence] puts to the Court a question what I should do. There are a couple of things at least that I should do that I'm not going to do. One is to declare a mistrial.... The other thing is I could say well, maybe [plaintiff's attorney will] be all right on Monday or maybe Tuesday ... and we'll get you back in here and we'll go on with the trial. And I'm not going to do that either, for a number of reasons. The principal of which ... is that there is ... a Rule 50 motion....

...

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))

I will enter judgment as a matter of law for Defendant ... and do that on the basis that—there are two or three ways that I could do this but I'm not going to spend a whole lot of time explaining all of them.

The principal basis upon which I think Plaintiff did not make out their case ... is that they did not prove—offer any proof as far as the Court believes ... that there were expenses incurred in attendant care of Mrs. Rogers.

.... I was prepared, if the jury came back with an award for the Plaintiff, I was pretty much resolved ... that if you'd awarded something, that I would have set it aside as a matter of law....

In any event, I'm doing that now preliminarily. And I'm doing it for one further reason.... It's not one that led to my conclusion.

And that is that you have been patient, you've been a very, very good jury. And my conclusion is that you have been patient in a case that has not been tried efficiently on either side, and it's taken a whole lot longer than ... it should have taken, and I'm not going to keep you here any longer.

*Id.* at 6–9.

On March 17, 2009, the district judge issued an order granting **State Farm's** Rule 50 motion. The judge held that "no reasonable jury could find that Plaintiff set forth evidence of attendant care expenses incurred as a result of Plaintiff's 1976 automobile accident."

On April 13, 2009, **Pakenas** moved for a new trial. She argued that Judge O'Meara's grant of **State Farm's** Rule 50 motion was premature because **State Farm** had not based its motion on whether or not **Pakenas** had "incurred" attendant care expenses. She argued that, had plaintiff's counsel been in court, he would have successfully objected to the motion on this basis. She further argued that she had made out a prima facie case sufficient to defeat a directed verdict, including evidence that expenses had been incurred. She also argued that Judge O'Meara was biased against **Pakenas** and that he should have recused himself, and that only a new trial

would rectify the harm done.

The district court denied the motion. The court determined that plaintiff's admissions at trial demonstrated that 24–hour care was not needed for Rogers, but that **Pakenas** had only submitted claims for 24–hour attendant care to **State Farm**. "Given the evidence," the court reasoned, "the jury had no reasonable basis to award 24–hour–per–day care and no reasonable basis to estimate how much care, if any, was actually provided." The court stated that the decision to grant the Rule 50 motion was the result of its view of the merits and not personal bias. The court also stated that "[p]laintiff's counsel did not provide the court sufficient notice of his illness to enable the court to reschedule court proceedings and notify the jury."

*7 On April 14, 2009, **State Farm** moved for attorney's fees pursuant to Michigan Compiled Laws (M.C.L.) § 500.3148(2), which states, "An insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer in defense against a claim that was in some sense fraudulent or so excessive as to have no reasonable foundation...." **State Farm** emphasized in its motion that it was predicating its claim on **Pakenas's** claim having been "so excessive as to have no reasonable foundation." **State Farm** claimed it had incurred attorney's fees of $212,380 and paralegal fees of $13,387.50, as well as costs of $21,758.73 and requested that these be awarded also.

**Pakenas** responded, denying that her claims were unreasonably excessive or fraudulent. She also complained that paralegal fees are not separately recoverable under Michigan law, and that the $21,758.73 in costs that **State Farm** claimed were inappropriate.

On September 10, 2009, the district court issued an order granting **State Farm's** motion in part and denying it in part. The court noted that, though there were no published cases applying M.C.L. § 500.3148(2), the "Michigan Court of Appeals has upheld attorney's fee awards to defendant insurers in unpublished decisions ." (citing *Robinson v. Allstate Ins. Co.,* 2004 WL 1057811 (Mich.App. May 11, 2004) and *Stoops v. Farm Bureau*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

*Ins. Co.,* 2006 WL 751404 (Mich.App. Mar.23, 2006)). The court agreed with **Pakenas** that Michigan law did not provide for the recovery of paralegal fees and that **State Farm's** costs were not all taxable to **Pakenas,** and that it was too difficult for the court to determine which costs were taxable to her and which were not. Thus, the court granted **State Farm's** motion for $212,380 only.

This timely appeal followed.

II

**Pakenas** makes six arguments on appeal. Three of these deal with the motion for directed verdict, and the others contest the outcome of the motion for a new trial, the motion for a mistrial, and the grant of attorney's fees. **Pakenas** argues that the district court erred in three ways when it granted **State Farm's** motion for a directed verdict: first, exhibits had not yet been admitted into evidence and thus **Pakenas** had not been fully heard; second, **Pakenas** had established a prima facie case for attendant-care benefits and thus the case should have gone to the jury; and third, **State Farm** was not entitled to a directed verdict because its motion did not comply with Federal Rule of Civil Procedure 50, it was granted on grounds that **State Farm** never raised, and plaintiff's attorney was absent from court when the directed verdict was granted. **Pakenas's** fourth argument is that the district court erred when it denied her motion for a new trial, and her fifth is that the court abused its discretion in denying her earlier motion for a mistrial. Finally, **Pakenas** argues that the court abused its discretion when it awarded attorney's fees for **State Farm.**

*Directed Verdict*
**\*8** We review the trial court's decision to grant a motion for a directed verdict/judgment as a matter of law de novo. *Snyder v. Ag Trucking, Inc.,* 57 F.3d 484, 490 (6th Cir.1995). However, under Michigan law, which governs this diversity case, the trial court's decision cannot be disturbed unless there has been a clear abuse of discretion. *Ibid.* (citing *Howard v. Canteen Corp.,* 192 Mich.App. 427, 481 N.W.2d 718 (Mich.App.1992), *overruled on other grounds by Rafferty v. Markovitz,* 602 N.W.2d 367, 273 n. 6 (Mich.1999)). Under Michigan law, a directed verdict is appropriate where the plaintiff has failed to establish a

prima facie case. *Morrow v. Bolt,* 203 Mich.App. 324, 512 N.W.2d 83, 85 (Mich.App.1994). We review the evidence presented up to the time of the motion in the light most favorable to the nonmoving party, grant that party every reasonable inference, and resolve any conflict in the evidence in that party's favor to decide whether a question of fact existed. *Hatfield v. St. Mary's Med. Ctr.,* 211 Mich.App. 321, 535 N.W.2d 272, 274 (1995).

**Pakenas** makes three arguments with respect to the directed verdict. First, she argues that when the district court granted **State Farm's** motion for directed verdict, exhibits had not yet been admitted into evidence and thus **Pakenas** had not been "fully heard."

Federal Rule of Civil Procedure 50 states:

*If a party has been fully heard* on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may ... resolve the issue against that party; and ... grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(emphasis added). Rule 50 does not explain what it is to be "fully heard." The Advisory Committee note states, though, that "[i]n no event ... should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact." This court has stated that a party is not fully heard "if he is precluded from presenting the evidence he considers relevant." *Jackson v. Quanex Corp.,* 191 F.3d 647, 657 (6th Cir.1999). At least one other court phrases what may ultimately be the same standard more tersely: "[A] party has been fully heard when he rests his case." *Echeverria v. Chevron USA Inc.,* 391 F.3d 607, 611 (5th Cir.2004).

Though **Pakenas** had undisputedly rested her case when the judge entered a directed verdict for **State Farm,** she argues that she was not fully heard at that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

time because "much evidence had yet to be admitted and/or considered by Judge O'Meara." Specifically, her proposed Exhibit 2 had not yet been admitted. FN9 **Pakenas** had moved to admit the exhibit during trial, but Judge O'Meara had not yet ruled on the motion when he granted the directed verdict. FN10

**\*9** [1] Though Exhibit 2 had not been officially entered into evidence when Judge O'Meara granted **State Farm's** motion for a directed verdict, **Pakenas** does not argue that she was prevented from presenting evidence from Exhibit 2 to the jury. **Pakenas** cites no law in support of her argument that a plaintiff has not been fully heard when evidence has been presented to the jury but has not been officially admitted into evidence. Review of the record shows that **Pakenas** fully presented her case and all of her evidence before she rested. The substance of Rule 50 was met. Thus, we decline to hold that she was not fully heard when the judge entered a directed verdict for **State Farm**.

**Pakenas** next argues that Judge O'Meara erred in granting the directed verdict because she had established a prima facie case for attendant-care benefits. To establish a prima facie case for breach of contract of Rogers's policy with **State Farm**, under the Michigan No Fault Act, the claims she presented in her complaint, **Pakenas** was required to prove that she had incurred allowable expenses. The No–Fault Act provides that "an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle...." MICH. COMP. LAWS § 500.3105. Complementary to this provision is M.C.L. § 500.3107(1), which states that "personal protection insurance benefits are payable for the following: ... (a) Allowable expenses consisting of all *reasonable charges incurred for reasonably ne-cessary* products, *services* and accommodations for an injured person's *care*, recovery, or rehabilitation." *Id.* (emphasis added). **Pakenas** bore the burden of proving that her expenses were (1) reasonable, (2) reasonably necessary, and (3) actually incurred. *Burris v. Allstate Ins. Co.,* 480 Mich. 1081, 745 N.W.2d 101, 103–04 (Mich.2008). Michigan courts have made it clear that an insurer does not become liable for a payment "except on

submission of evidence that services were actually rendered and of the actual cost expended." *Moghis v. Citizens Ins. Co. of America,* 187 Mich.App. 245, 466 N.W.2d 290, 292 (Mich.App.1990) (citing *Manley v. Detroit Auto. Inter–Insurance Exch.,* 425 Mich. 140, 388 N.W.2d 216, 224 (Mich.1986)).

[2] **Pakenas** clearly failed to show that she incurred attendant-care expenses for 24/7 care. She and Rogers both admitted that they did not provide 24/7 care, and that Rogers in fact stayed by herself regularly, worked sometimes, and went to doctor's appointments by herself. **Pakenas** and Rogers were often just "on call," i.e., available by phone, in case Rogers needed something. Being available to provide attendant care (as is the case when a person is "on call") is not the same as *providing* attendant care. *See, e.g., AT & T Wireless Servs., Inc. v. Castro,* 896 So.2d 828, 831 (Fla.App.2005) ( "[A] caretaker cannot be compensated for time spent employed outside the claimant's presence, even if the caretaker is considered 'on call.' ... [The] award of twelve hours of daily attendant care benefits improperly included this 'on call' care."); *cf.* 12 COUCH ON INSURANCE § 174:23 (3d ed. 2011) ( [R]ecovery is not permitted for those periods when the injured worker's relative is employed out of the home but 'on call' if needed by the employee.").

**\*10** Further, though she and Mr. Rogers did present evidence that they sometimes provided care for Rogers, they did not provide a basis for the jury to come to any reasoned estimate of what the amount of care was. They testified that they scheduled her appointments, supervised her, provided companionship, and prevented her from wandering, among other services. However, **Pakenas** and Mr. Rogers's records are devoid of detailed descriptions of what kind of care they provided or the actual times of care provided. **Pakenas** billed **State Farm** in monthly increments without breaking out the services provided at what times, or how long it took to provide them. There was no way to tell from testimony the times that Rogers was cared for. A jury would have to speculate as to what amount of care was actually provided, and a jury cannot decide a damages award based on speculation. *See, e.g., Melamed v. Lake Cnty.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

*Nat. Bank,* 727 F.2d 1399, 1404 (6th Cir.1984); *Gadula v. Gen. Motors Corp.,* No. 213853, 2001 WL 792499, at *2 (Mich.Ct.App. Jan.5, 2001).

Because **Pakenas** failed to show that she incurred attendant-care expenses for 24/7 care, and failed to establish the amount of expense she actually did incur, the district court did not abuse its discretion when it determined **Pakenas** had not established her prima facie case, and that the case should not go before the jury.

[3] **Pakenas** makes several other arguments in support of her claim that the district court erred in entering the directed verdict against her. She argues that **State Farm's** Rule 50(a) motion should not have been granted because **State Farm** made the motion verbally, with no brief in support. **Pakenas** did not object to **State Farm's** Rule 50(a) motion when it was made, and has failed to preserve the issue for appellate review. *See, e.g., Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1172 (6th Cir.1996). However, her argument is meritless. An oral 50(a) motion is not prohibited, and **State Farm's** motion stated sufficient grounds to satisfy the rule. 9B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 2353 (3d ed.) (Rule 50(a)(2) "does not require technical precision in stating the grounds of the motion.... Although it is said that the better practice is for the motion to be in writing, the rule contains no such requirement and an oral motion based on the record will suffice.").

**Pakenas** also argues that the district court erred because it granted the directed verdict on the "expenses not incurred" ground, which **State Farm** had not argued in its motion. **Pakenas** provides no legal authority for this argument. Because the district court possesses inherent power to direct a verdict on its own authority, this argument has no merit. *See, e.g., Aetna Cas. & Sur. Co. v. Leahy Const. Co.,* 219 F.3d 519, 545–46 (6th Cir.2000) ("[W]e find nothing improper about the district court rendering judgment on the issue of punitive damages sua sponte. Although judgment as a matter of law is normally entered by a district court following a meritorious motion, it is clearly within the court's power to do so on its own initiative.") (internal quotation marks omitted); FED.R.CIV.P. § 50(a)(1).

*11 [4] Finally, **Pakenas** argues that the district court erred when it granted **State Farm's** 50(a) motion while plaintiff's counsel was absent from the court due to serious illness. **Pakenas** does not cite to any legal authority to support her claim, nor has any such authority been found. The fact that the district court acted in absence of plaintiff's counsel, though not a commendable practice, does not mean that the district court could not grant an otherwise legitimate directed verdict.

*Motion for a New Trial*

We review the grant or denial of a motion for a new trial for an abuse of discretion—the court "should deny the motion if the verdict is one that could reasonably be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Wayne v. Village of Sebring,* 36 F.3d 517, 525 (6th Cir.1994).

**Pakenas** provides a number of bases for her argument that the district court abused its discretion. The only argument relevant here is that the district court abused its discretion because Judge O'Meara was personally biased against **Pakenas**, and that she was denied a fair trial before an impartial decision-maker.

[5] However, this argument is belied by Judge O'Meara's own reasoning for granting the motion for directed verdict—he believed that the "jury had no reasonable basis to award 24–hour–per–day attendant care and no reasonable basis to estimate how much care, if any, was actually provided." The evidence, in fact, supports Judge O'Meara's stated reason. He clearly had a reasonable basis, other than personal bias, for his decision. Therefore, it is impossible to say that he abused his discretion by denying **Pakenas's** motion for a new trial due to bias against her.

*Motion for a Mistrial*

We review the decision not to grant a mistrial for an abuse-of-discretion standard. *United States v. Wheaton,* 517 F.3d 350, 361 (6th Cir.2008).

**Pakenas** argues that the district court erred in denying her motion for a mistrial. She based her motion on the fact that juror Mr. Harvey's wife was present in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

courtroom when Judge O'Meara stated that he thought the plaintiff might have committed fraud. Though the jury was not in the courtroom when Judge O'Meara said this, **Pakenas** argues that Mrs. Harvey undoubtedly told Mr. Harvey what she had heard. **Pakenas** argued in her motion of a mistrial that Harvey must be stricken from the jury, but also that no curative instructions could "obviate the possibility of ... inadvertent jury tampering," and grant of a mistrial was necessary. **Pakenas** does not provide legal authority for her argument, nor does she provide further information to suggest that Judge O'Meara's comments were heard or learned of by the jury.

[6] At the beginning of trial and a number of times thereafter, Judge O'Meara admonished the jury not to discuss the case "with anyone, including your family, neighbors, friends, business associates, *fellow jurors,* at any time during the trial." (emphasis added). Though **Pakenas's** argument that the juror's wife could have told Mr. Harvey what Judge O'Meara said about **Pakenas,** and that Mr. Harvey could have then told other jurors, is within the realm of possibility, it is highly speculative. Judge O'Meara had admonished the jury not to speak to each other about the trial. Further, he dismissed Mr. Harvey from the jury. His subsequent refusal to grant a mistrial was not an abuse of discretion, absent further evidence that jurors had learned of or been influenced by his statements. We affirm the district court's denial of **Pakenas's** motion for a mistrial.

*Attorney's Fees*

**\*12 Pakenas's** final argument on appeal is that the district court erred in awarding **State Farm** $212,380 in attorney's fees. She argues that **State Farm** cannot satisfy M.C.L. § 500.3148(2)'s requirement that there was "no reasonable foundation" for her claims.[FN11] She argues that the evidence presented at trial was too substantial and meritorious to allow such a conclusion to be drawn.

In general, a party cannot recover attorney's fees unless a statute, court rule, or judicial exception specifically allow it. *Shanafelt v. Allstate Ins. Co.,* 217 Mich.App. 625, 552 N.W.2d 671 (1996). Michigan's no-fault automobile-insurance act, the act under which this

suit was brought, contains a provision allowing the award of attorney's fees to an insurer for defending against a claim that was in some respect fraudulent or so excessive that it had no reasonable foundation. M.C.L. 500.3148(2). We review a lower court's decision to grant or deny attorney's fees for an abuse of discretion. However, the court's findings regarding the fraudulent, excessive, or unreasonable nature of a claim under M.C.L. 500.3148(2) are reviewed for clear error. *Beach v. State Farm Mut. Auto. Ins. Co.,* 216 Mich.App. 612, 550 N.W.2d 580, 587 (1996).

[7] The district court did not abuse its discretion in awarding attorney's fees to **State Farm.** The court relied on cases in which attorney's fees were awarded after plaintiffs were awarded "vastly compromised sums." In one, the plaintiff demanded $158,000, later waived all but $82,000 in medical expenses, and was awarded only $5,920—$4,000 in medical expenses and $1,920 in interest. The Michigan Court of Appeals reversed the trial court's decision not to award defendant attorney's fees, stating that, "[A] $4,000 verdict on an $82,000 claim is evidence that the jury found that plaintiff's claim was in some respect fraudulent or so excessive as to have no reasonable foundation, and remand for the award of a reasonable sum." *Robinson v. Allstate Ins. Co.,* No. 244824, 245363, 2004 WL 1057811, at \* 1–2 (Mich.Ct.App. May 11, 2004). In another case, the jury awarded $34,000 rather than the $164,000 plaintiff had demanded. *Stoops v. Farm Bur. Ins. Co.,* No. 260454, 261917, 2006 WL 751404, at \*5 (Mich.Ct.App. Mar.23, 2006). The jury also marked on a special verdict "yes" to the question of whether plaintiff's attendant-care claim was excessive. *Ibid.* **State Farm** argues that, similar to the situation in these cases, the fact that **Pakenas** received a "vastly compromised" sum—in fact, zero—demonstrates that her claims were in "some respect fraudulent or so excessive as to have no reasonable foundation." M.C.L. 500.3148(2).

**Pakenas's** case differs from the persuasive authority cited by **State Farm** because there is no case considering a court awarding a defendant attorney's fees under M.C.L. 500.3418(2) after the court granted a directed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

Page 12

verdict for the defendant. However, the record is replete with evidence that **Pakenas's** claims were excessive or in some way fraudulent. She and Mr. Rogers did not actually provide 24–hour care to Rogers. The fact that **State Farm** had to file numerous pretrial motions to compel depositions, discovery, and an independent medical exam suggest that **Pakenas** might be making an excessive or fraudulent claim. Judge O'Meara's statements in court made clear that he believed **Pakenas** had perpetrated fraud. Further, though **Pakenas** and Mr. Rogers may have received advice from treating physicians that they provide 24–hour care, and though they did provide some care, they were fully aware that they left Rogers alone for significant periods of time. Finally, though, unlike in *Robinson* or *Stoops,* there was not a jury verdict that was far less than what **Pakenas** demanded, a directed verdict, along with the judge's statement to the jury that he would have set aside a judgment for the plaintiff, is perhaps stronger evidence that **Pakenas's** claims were excessive or fraudulent. A directed verdict is a clear sign that the proper award is not just small—it is zero.

**\*13** Based on the weight of evidence, the district court's determination that **Pakenas's** claims were excessive or in some way fraudulent was not clearly erroneous. We affirm the district court's award of attorney's fees under M.C.L. 500.3148(2).

III

For the foregoing reasons, we AFFIRM the district court's entry of directed verdict for **State Farm,** we AFFIRM the district court's denial of **Pakenas's** motions for a mistrial and for a new trial, and AFFIRM the district court's grant of attorney's fees.

FN\* Hon. Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

FN1. Attendant-care benefits are separate from medical bills, health insurance, or mileage going to and from medical visits. **State Farm** has undisputedly provided the latter three for Ro-

gers; only attendant care is at issue in this case.

FN2. The act states, in relevant part: "Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter." MICH. COMP. L. § 500.3105(1). "[P]ersonal protection insurance benefits are payable for the following: ... (a) Allowable expenses consisting of all *reasonable charges incurred for reasonably necessary* products, *services* and accommodations for an injured person's *care,* recovery, or rehabilitation." MICH. COMP. L. § 500.3107(1)(a) (emphasis added). A prescription is not necessary to secure benefits; an insured only needs to show medical supporting documentation as to need.

FN3. **State Farm** stated in the instant case that only Rogers, not **Pakenas** or Mr. Rogers, was deposed in relation to the settlement, that "[n]obody went through the medicals," "[n]obody talked to the doctors." **State Farm's** position is that Rogers was never grievously injured in the accident, that she only "banged her knee up, had a cut on her cheek, had a bump on her forehead and that was it," and that Rogers does not and has never suffered from a seizure disorder.

FN4. Mr. Rogers and **Pakenas** are the president and vice-president of Pattico.

FN5. Payments out of Pattico were derived from the $5.8 million settlement. They were not paid from the attendant-care benefits billed to **State Farm** after the settlement because **State Farm** never paid any of these bills.

FN6. Samples of the invoices **Pakenas** submitted are provided in Appellee's Appendix. These invoices charged **State Farm** for attendant care, mileage, Rogers's health insurance, room and board, and miscellaneous doctor bills. An

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2012 WL 2161633 (C.A.6 (Mich.)))**

"attendant care" sample portion of an invoice
reads as follows:

Attendant Care for Patti Rogers

| | | |
|---|---|---|
| October 2004 | 31 days @ $528 (24 hours X $22/hr) | $16,368.00 |
| November 2004 | 30 days @ $528 | $15,840.00 |
| December 2004 | 31 days @ $528 (24 hours X $22/hr) | $16,368.00 |

Provided services: supervision, transportation,
housework, handling personal matters, com-
panionship and miscellaneous.

This invoice included a separate page on
which doctor's appointments were listed. For
example, for March 2005, there are six doc-
tor's appointments listed: one on the 2nd, one
on the 3rd, one on the 18th, one on the 21st,
one on the 24th, and one on the 29th. No oth-
er "attendant care" activities are broken out
on these sheets. Further, the doctor's appoint-
ments state what time the appointment star-
ted, but do not say when the appointment
ended or if anyone accompanied Rogers to
the appointment.

FN7. **Pakenas** did not bill herself and Mr. Ro-
gers separately—she claims that the two of
them together amount to one 24–hour–a–day
caretaker.

FN8. **Pakenas** set this rate based on research
into the prices of home care for Rogers. She
got an average rate of "$14 to $30 an hour."

FN9. Exhibit 2 is a 171–page file of documents
that includes letters from Drs. Guidice and
Verma, Rogers's doctors, both of whom testi-
fied at trial; the settlement papers from Ro-
gers's previous lawsuit against **State Farm**;
and invoices sent to **State Farm**, samples of
which are reproduced *supra* note 6.

FN10. **Pakenas** also argues that she had not
been fully heard because defendant's Exhibit N
had been admitted, but had not been reviewed
by Judge O'Meara. This argument is very

weak-not only can we not determine that Judge
O'Meara had not "reviewed" the Exhibit, there
is also no authority to suggest that a judge not
having "reviewed" a piece of the defense's
evidence prevents the plaintiff from being fully
heard.

FN11. The statute provides: "An insurer may
be allowed by a court an award of a reasonable
sum against a claimant as an attorney's fee for
the insurer in defense against a claim that was
in some sense fraudulent or so excessive as to
have no reasonable foundation...." **State Farm**
requested attorney's fees based on the "so ex-
cessive as to have no reasonable foundation"
ground.

C.A.6 (Mich.),2012.
Pakenas v. State Farm Ins. Co.
Slip Copy, 2012 WL 2161633 (C.A.6 (Mich.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.