UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAROSLAW WASKOWSKI,

      Plaintiff,

                                Case No. 11-CV-13036

v.

                                Honorable Sean Cox

STATE FARM MUTUAL AUTOMOBILE      Magistrate Judge Majzoub
INSURANCE COMPANY,

      Defendant.

| Lee Roy H. Temrowski (P31967) | James F. Hewson (P27127) |
|---|---|
| Attorney for Plaintiff | Hewson & Van Hellemont, P.C. |
| 45109 Van Dyke Ave. | Attorneys for State Farm |
| Utica, MI 48317 | 25900 Greenfield, Suite 326 |
| (586) 254-5566 | Oak Park, MI 48237 |
| | (248) 968-5200 |

**DEFENDANT, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S,
MOTION IN LIMINE TO STRIKE THE *DE BENE ESSE* DEPOSITION TESTIMONY OF
DR. STEFAN GLOWACKI IN THIS MATTER AND PRECLUDE ITS PRESENTATION
TO THE JURY**

      Defendant, State Farm Mutual Automobile Insurance Company ("State Farm"),

moves this Honorable Court for the entry of an Order striking the *de bene esse*

deposition of Dr. Stefan Glowacki and precluding Plaintiff from presenting it to the jury

impaneled in this matter for the reason that, although it addresses the general subject

matter of the captioned litigation, it is, nevertheless, irrelevant because it does not assist

Plaintiff in meeting his requisite burden of proof to recover benefits from State Farm

under Michigan's No-Fault Act and, of even greater importance, Dr. Glowacki failed to

render any opinions within a reasonable degree of scientific certainty.  F.R.E. 401, 402,

and 702.  *See also,* M.C.L. 500.3107; *v Auto Club Ins Ass'n*, 435 Mich 33, 50; 457

NW2d 637 (1990).  Furthermore, even if potentially having some limited relevance, its

probative value is substantially outweighed by the consummate waste of time that would be expended, not only by the Court and the parties, but, more importantly, by the jury in having to consider the material.  F.R.E. 403.  In support of its Motion, State Farm relies upon the facts and law more particularly described in the attached Brief.[1]

Unfortunately, Defendant did not receive the transcript from which the testimony is drawn until November 20, 2012, and Plaintiff did not meet with Defendant to finalize the exhibit list and Joint Final Pre-trial Order until November 21, 2012.  Defendant suggests that jury selection be continued one day to allow this motion, and the other filed simultaneously with this, to be heard.

Pursuant to E.D. Local Rule 7.1, counsel for State Farm sought concurrence from counsel for Plaintiff concerning the relief requested in the instant Motion on November 21, 2012, but the request was denied.

WHEREFORE, Defendant, State Farm Mutual Automobile Insurance Company, respectfully requests that this Honorable Court enter an Order:

a.   Granting its Motion in its entirety;

b.   Striking the *de bene esse* deposition testimony of Dr. Sefan Glowacki and precluding Plaintiff from presenting it to the jury impaneled in the captioned action; and

c.   Granting it all other relief to which it is entitled.

---

[1] Notably, the deposition of Dr. Glowacki was taken on November 14, 2012, and counsel for State Farm only received the transcript of  his testimony on November 20, 2012. Consequently, this Motion could not have been filed any earlier.

Respectfully submitted,

**HEWSON & VAN HELLEMONT, P.C.**


By:   s/JAMES F. HEWSON
          JAMES F. HEWSON
          Attorneys for Defendant
          25900 Greenfield Rd., Ste. 326
          Oak Park, MI  48237
          (248) 968-5200
          hewson@vanhewpc.com
Dated:  November 26, 2012          (P27127)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAROSLAW WASKOWSKI,

     Plaintiff,

                                    Case No. 11-CV-13036

v.

                                      Honorable Sean Cox

STATE FARM MUTUAL AUTOMOBILE        Magistrate Judge Hluchaniuk
INSURANCE COMPANY,

     Defendant.

| Lee Roy H. Temrowski (P31967) | James F. Hewson (P27127) |
|---|---|
| Attorney for Plaintiff | Hewson & Van Hellemont, P.C. |
| 45109 Van Dyke Ave. | Attorneys for State Farm |
| Utica, MI 48317 | 25900 Greenfield, Suite 326 |
| (586) 254-5566 | Oak Park, MI 48237 |
| | (248) 968-5200 |

**DEFENDANT, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S,
MOTION IN LIMINE TO STRIKE THE _DE BENE ESSE_ DEPOSITION TESTIMONY OF
DR. STEFAN GLOWACKI IN THIS MATTER AND PRECLUDE ITS PRESENTATION
TO THE JURY**

### FACTUAL BACKGROUND

     Frankly, never has there been a case where the testimony of the plaintiff's only

medical doctor has been so dismal that even the defendant saw no purpose in

presenting it to the jury because, at best, it possessed only entertainment value.[2]

     In this matter, Plaintiff seeks payment for a panoply of no-fault benefits from

State Farm, including benefits for medical bills, wage loss, prescriptions/medication,

household/replacement services, and attendant care.  (_See,_ Joint Final Pre-Trial Order).

In support of his claims, he relies upon the testimony of Dr. Stefan Glowacki, who is a

---

[2] The only other expert identified by Plaintiff to testify at trial is Antoni Lodzinki, who is a licensed physical therapist that also holds a Ph.D. in connection with how to treat the human shoulder using a device called an "Electro-Acuscope".  (A.Lodzinski Dep. Tr., pp. 7-8, **_Exhibit 1_**).

non-board certified orthopedic surgeon and last possessed any hospital privileges in 2002 when he "stopped doing surgery".  (S.Glowacki Dep., pp. 5-6, 38-40, 49, 108-109, **Exhibit 2**).

Dr. Glowacki's *de bene esse* deposition testimony is startling, however, both in terms of his rhetoric and candid admissions.  For example, as demonstrated by the colloquy below, he admitted that he will continue to write prescriptions for treatment which is neither medically necessary nor efficacious so long as the patient requests it:

> Q.  Sir, --
>
> A.  Sorry.
>
> Q.    -- is it your practice as an orthopedist to continue treatments that don't work?
>
> A.  As long as the patient want to come to see me, yes.
>
> Q.   So you'll treat them even if the patient -- even if the -- the treatment doesn't work, you'll continue to write –
>
> A.  That's correct.

*Id.* at 107-108.

Indeed, he agreed:

> Q. ….Your follow-up re-evaluations essentially were for the purpose of writing a prescription to continue the physical therapy and to justify attendant care and household services.  That's really what you were doing, isn't it?
>
> A.  Talk to the patient.
>
> Q.  And you talked to the patient?
>
> A.  Yeah.
>
> Q.  And then you would write him these prescriptions, right?
>
> A.  That's correct.

*Id.* at 105.

In so doing, Dr. Glowacki shockingly admitted that he even invents ("makes up") the specifics of prescriptions, which were supposedly generated and authored so that Plaintiff could receive benefits to assist him with his care, recovery, or rehabilitation from the subject accident.  According to Dr. Glowacki:

> Q.    You say on that form that Mr. Waskowski needs four hours a day to change his clothes.
>
> A.  Four hours a day?
>
> Q.  Yes.
>
> A.  Where is this at?
>
> Q.  The first four entries at the top, dressing and undressing, sixty minutes, that's four hours per day to dress him and undress him?
>
> A.  This is sixty minutes for –
>
> Q.  Did you write down –
>
> A.  Yes, I did.
>
> Q.   -- four hours?
>
>
> A.  Yes, I did.
>
> Q.    **I need you to tell me and tell the Jury how you arrived at four hours a day to change his clothes?**
>
> A.  **I don't know.**
>
> Q.   ***You just made it up?***
>
> A.  ***I made it up.***
>
> Q.    **All right.  Now, there are other entries on that form that you made up as well?**

3

> A.  **Yes, sir.**
>
> Q.   ***You don't know whether any of those forms or any of those suggested times is accurate, do you?***
>
> A.  ***I made it up.  I didn't –***
>
> Q.   ***And you made it up so that the family members could get paid for attendant care, didn't you?***
>
> A.  ***That's correct.***
>
> Q.   ***Whether or not Mr. Waskowski needs it, you don't know because you're not in his house, is that right?***
>
> A.  ***That's correct.***

*Id.* at 102-103.  (Emphasis added).

He similarly testified as follows:

> Q.   My brother counsel showed you a prescription for home modifications, and subject to the objection, depending on what the Court has to say about that, I want to know did you hire or did somebody hire an architect to tell you what home modifications are needed –
>
> A.  No.
>
> Q.   -- for Mr. Waskowski?
>
> A.  Nothing to do with architect.
>
> Q.   Did you have someone, a physical therapist or someone else go out there and say this is what he needs in his home and therefore he needs accommodations?
>
> A.  No, sir.
>
> Q.  ***So you made that up?***
>
> A.  ***That's correct.***

*Id.* at 103-104.  (Emphasis added).

4

Dr. Glowacki later attempted to assert that "I'm trying to pull your leg and you didn't understand this."   *Id.* at 120.   Notwithstanding the abject impropriety of such gamesmanship during such a proceeding, this cover was not even offered until after being prompted by Plaintiff's counsel during re-cross examination.

During his testimony, Dr. Glowacki further expounded his beliefs upon the William Beaumont Hospital physician who conducted a bone scan of Plaintiff:

Q.   Sir, let me ask you this.   Read the rest of it.

A.    That's correct.   There is mild tracer activity in the left sternoclavicular joint –

Q.   Superior –

A.    -- superior aspect of the sternomanubrium.   It's in the middle of the chest, far away from this.

Q.   No, no, no.   It's in the middle of the chest by the clavicle, in the middle under the neck.   Isn't that where it's anatomically located?   Sternomanu -- sternomanubrium, sternal angle.

A.   Read it.   Read it.   Read it.   Read it.

Q.   I just did.

A.   And the sternal angle, --

Q.   **Let me ask you this.**

A.    -- which is about four inches below.

Q.    **Which may represent a normal variant versus minimal arthritic changes?**

A.   ***In his head.   He's stupid.***

Q.   ***The doctor's stupid?***

A.   ***Yes, absolutely.***

5

> Q. ***The doctor?  Okay.  That's all right.  Now, let me just
> make sure I understand that.***
>
> A.  No, no.
>
> Q.  ***Wait.  No, no.  You just said that this doctor who
> read this report is stupid.***
>
> A.  ***Yeah.***

*Id.* at 62-63. (Emphasis added).  *See also, Id.* at 64.

Significantly, however, it was Dr. Glowacki who referred Plaintiff for the bone scan.

Dr. Glowacki further failed to order a functional capacity evaluation of Plaintiff either before or in conjunction with ordering physical therapy and prescribing attendant care services.  Instead, he testified:

> Q.   Do you know what a functional capacity evaluation is?
> Do you know?  Yes or no?
>
> A.  It's bullsh[**].
>
> Q.   Oh, okay.  Well, thank you.  I'm sure that those people
> that perform functional capacity evaluations –
>
> A.  Okay.
>
> Q.   -- are not going to be happy with that assessment by
> you.  In any event, --
>
> A.   Listen, when I graduate there was only surgery and they
> call it trauma surgery, orthopedic surgery, and suddenly you
> have  physical  therapy,  occupational  therapy,  speech
> therapy,  psychiatry  therapy,  all  sucking  you,  insurance
> company, because they don't suck anybody else.

*Id.* at 99-100.

While not as guttural, Dr. Glowacki, maintained a similar opinion of the EMG test that was performed of Plaintiff by another physician (and was otherwise normal, except for a finding of carpel tunnel syndrome in Plaintiff's left hand):

Q.   You ordered an MR -- or a E -- or somebody ordered an EMG that's in your file, didn't they?

A.   EMG, probably Doctor -- the neurosurgeon.

Q.   Did you get a copy of the EMG?

A.   Probably I had.

Q.   And do you remember that the only finding on the EMG from Doctor Broder was carpal tunnel syndrome on the left hand?

A.   EMG's positive six months to a year after injury. And if the EMG is done before one year, not always is positive.

Q.   It's got to be a year out, right?

A.   Six month to one year.

Q.   So December of 2000 –

A.   It all depends how much damage, how much long.

Q.   So December of 2010 would have been a year out from the accident, correct?

A.   Not necessary.  It's positive.

Q.   Well, the EMG that I have in my hand, which is in your file, is March 24, 2011, so it's outside the year.

A.   Yeah.

Q.   So it should be diagnostic?

A.   Not necessarily.

Q.   Okay.  So, now, let me make sure I understand –

7

A.   EMG is positive -- it's negative in forty to fifty percent.

Q.   Okay.

A.   MRI is positive in about ninety percent.

Q.   Let me make –

A.   X-ray positive in seventy percent.

Q.   ***Let me make sure –***

A.   ***EMG is lousy examination.***

Q.   ***Okay.***

A.   ***It's good for a doctor who do it.  Excellent.***

Q.   ***EMG –***

A.   ***Five hundred to one thousand dollars.***

*Id.* at 91-92.  (Emphasis added).

Finally, when counsel for State Farm sought to question him about his billings,

Dr. Glowacki volunteered:

Q.   Have you reviewed any of the forms filed by the family that show what the attendant care was?

A.   I may but I don't remember.

**Q.   State Farm paid you for a while, right?  Did they pay you or not?**

**A.   *State Farm stopped paying me on the -- I'm going to get drunk today.***

*Id.* at p. 104.  (Emphasis added).

Significantly, however, what is missing from Dr. Glowacki's testimony includes

the following:

• The  assertion  that  he  has  rendered  any  of  his

"professional opinions" within a reasonable degree of medical and scientific certainty; and

• Testimony concerning the reasonableness and customariness of the charges that he seeks.

## LAW AND ARGUMENT

### I.   Payment Of Benefits Under Michigan's No-Fault Act.

MCL 500.3105 generally provides that "an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle…".   However, pursuant to MCL 500.3107(1), an insurer is responsible for only reasonable charges incurred for reasonably necessary products and services.   Specifically, MCL 500.3107(1) provides in relevant part:

> … personal protection insurance benefits are payable for the following:
>
> (a) Allowable expenses consisting of all **_reasonable charges_** incurred for **_reasonably necessary_** products, **services** and **accommodations for an injured person's care, recovery, or rehabilitation**.

(Emphasis added).

Therefore, to be reimbursed for an "allowable expense" under MCL 500.3107(1)(a), (1) the charge for the service must be reasonable, (2) the service must have been reasonably necessary as a result of the injuries sustained in the accident, and (3) the charge/expense for the service must have been incurred.   *Owens v Auto Club Ins Ass'n*, 444 Mich 314, 323-324; 506 NW2d 850 (1993); *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 50; 457 NW2d 637 (1990); *Shanafelt v Allstate Ins Co*, 217 Mich App 625, 637; 552 NW2d 671 (1996); *Davis v Citizens Ins Co of America*, 195

Mich App 323, 326-327; 489 NW2d 214 (1993);  *Moghis v Citizens Ins Co. of America,*

187 Mich App 245, 247; 466 NW2d 290 (1991).  The claimant/plaintiff bears the burden

of establishing the above-referenced elements necessary to recover benefits under the

Michigan No-Fault Act, including reasonableness and necessity.  *Id.* at 49-50.

   In *Nasser*, *supra*, the Michigan Supreme Court emphasized that an insurer

cannot be held liable for reimbursement of expenses under § 3107 unless ***each***

particular expense is proved by the plaintiff to be reasonable and necessary.

Specifically, the Court wrote:

> ***It is each particular expense that must be both
> reasonable and necessary***. The concept of liability cannot
> be detached from the specific payments involved, or
> expenses incurred .…  ***Where a plaintiff is unable to show
> that a particular expense has been incurred for a
> reasonably necessary product and service, there can be
> no finding of a breach of the insurer's duty to pay that
> expense, and thus no finding of liability with regard to
> that expense***.

*Id.* at 50. (Emphasis added.)

   Most recently, in *Krohn v Home-Owners Ins Co*, 490 Mich 145, 158; 802 NW2d

281 (2011), the Supreme Court reiterated that "[t]he plain and unambiguous language of

MCL 500.3107 makes both reasonableness and necessity elements of a claimant's

recovery, and thus renders their absence a defense to the insurer's liability."  *Id.* at 157,

quoting *Nasser, supra*.  However, it explained:

> To provide guidance along these lines, we observe that the
> no-fault act does not require coverage for *all* treatments.
> Obviously, treatments such as apricot pit therapy, coning
> (ear candling), homeopathy, magnet therapy and psychic
> surgery are patently unreasonable. **Even if administered by
> licensed health-care providers, these so-called
> treatments not only lack a scientific basis to conclude
> that they are generally accepted by the medical**

10

> **community, <u>but there is simply no basis to conclude that they are at all efficacious</u>**.

*Id.*at 158.  (Italics in original; bold and underline added).

Consequently, according to the Court, in order to be compensable under the No-Fault Act, treatment must be efficacious, which is determined by objective and verifiable medical evidence.  *Id.* at 148, 179.  Specifically, the Court wrote:

> ***<u>A treatment or procedure that has not been shown to be efficacious cannot be reasonable or necessary under the no-fault act.</u>*** An insured's subjective belief that medical treatment is efficacious, reasonable, and necessary is not enough to create a question of fact. Viewed in the light most favorable to plaintiff, the objective and verifiable medical evidence presented at trial failed to establish that the experimental surgical procedure at issue was in any way efficacious in plaintiff's care, recovery, or rehabilitation.

*Id.* (Emphasis added). *See also, Id.* at 165.

The Court further emphasized that efficacy is a ***<u>minimum</u>*** threshold standard, writing:

> We emphasize that evidence of efficacy is not, by itself, sufficient in every case to establish reasonable necessity or no-fault liability; instead, ***<u>our opinion makes clear that efficacy is a minimum threshold standard that, if demonstrated by a plaintiff, precludes judgment as a matter of law on this particular issue</u>***. As with threshold standards generally, ***<u>efficacy as demonstrated through objective and verifiable medical evidence is merely the first step to proving liability when considering the unique facts and circumstances of each case</u>***.

*Id.* at 167, n 56. (Emphasis added).[3]

---

[3] While Plaintiff may try to distinguish *Krohn, supra,* claiming that it dealt solely with experimental procedures and, as such, is inapplicable to this action, its efforts to do so would be wholly futile.  Indeed, the Supreme Court explicitly wrote:

> The ultimate question whether the surgical procedure at issue here is a covered expense under the no-fault act ***does not*** turn on its status as experimental. Rather, like all claims for allowable expenses, the question

Furthermore, in addition to establishing that a particular fee for a service is reasonable, M.C.L. 500.3157 interjects the issue of "customariness" as a secondary consideration.  Specifically, the Statute provides as follows:

> ***A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person*** for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, ***may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance.***

(Emphasis added).

The No-Fault Act is silent as to what constitutes a reasonable charge for a product, accommodation, or service, as well as a method which may be used to make that determination.  The Michigan Appellate Courts have provided some guidance in this area.  Specifically, they have determined that reasonableness and customariness are separate concepts, and the fact that a provider charged its customary rate for a particular service ***does not*** compel the conclusion that the charge is, in fact, reasonable.  *See, e.g., Advocacy Organization for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365; 670 NW2d 569 (2003), aff'd 472 Mich 91 (2005), wherein the Michigan Court of Appeals wrote:

> Thus, the "customary charge" limitation in § 3157 and the "reasonableness" language in § 3107 constitute separate and distinct limitations on the amount health-care providers may charge and what insurers must pay with respect to

---

turns on whether the procedure was reasonably necessary for plaintiff's care, recovery, or rehabilitation.

*Id.* at 158-159.  (Emphasis added).

12

victims of automobile accidents who are covered by no-fault insurance. *AOPP, supra* at 320; *Munson Medical Ctr. v. Auto Club Ins. Ass'n,* 218 Mich.App. 375, 385, 554 N.W.2d 49 (1996) (Indicating that a plaintiff "bears the burden of proving *both* the reasonableness *and* the customariness of its charges ...." [emphasis added] ); *Hofmann, supra* at 114, 535 N.W.2d 529 ("*In addition* to the 'customary charge' limitation ..., §§ 3107 and 3157 also impose a statutory qualification of reasonableness, such that a no-fault carrier is liable only for those medical expenses that constitute a reasonable charge for the product or service." [emphasis added] ). Contrary to plaintiffs' argument, we hold that the "customary" fee a particular provider charges under § 3157 does not define what constitutes a "reasonable charge" under § 3107. See *AOPP, supra* at 320 ("the 'customary fee' charged by a particular provider does not define what a 'reasonable fee' is"). Rather, the "customary fee" is simply the cap on what health-care providers can charge, and is not, automatically, a "reasonable" charge requiring full reimbursement under § 3107.

*Id.* at 376-377.

Moreover, as acknowledged by the Michigan Court of Appeals "the 'customary fee' is simply the cap on what health-care providers can charge, and is not, automatically, a "reasonable" charge requiring full reimbursement under § 3107." *Id.* at 377.

## II.  Dr. Glowacki's Testimony Fails To Assist Plaintiff In Meeting His Burden Of Proof In This Matter And, As Such, It Is Irrelevant.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to ... determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

13

It is the district court's duty to ensure that all expert evidence "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597; 113 S.Ct. 2786; 125 L.Ed.2d 469 (1993). Rule 702 gives district courts a "gatekeeping role" in screening the reliability of expert testimony. *Id.; Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). District courts are given "broad latitude" in making this assessment. *Kumho Tire,* 526 U .S. at 139 (citing *Gen. Elec.,* 522 U.S. at 143).

In this matter, Dr. Glowacki's testimony falls woefully short of the requisite standard.  As set forth above, and as evidenced by the transcript of his *de bene esse* deposition testimony, Dr. Glowacki never rendered any conclusion that he may have reached within a reasonable degree of scientific certainty.  While he attempts to supply some conclusions couched as medical opinions, he fails to supply that necessary foundation to render them reliable so that they may be presented to the jury. Regardless of what opinions Dr. Glowacki may hold, they are inconsequential unless they are reached pursuant to a reasonable degree of scientific certainty.

Furthermore, as evidenced by the above-quoted testimony, Dr. Glowacki has demonstrated, himself, that his opinions are unreliable.  For example, he admits that he will continue to author prescriptions and order treatment even if the treatment is not working, and, as such is not medically necessary for the patient.  (S.Glowacki Dep. Tr., pp. 105, 107-108, ***Exhibit 2***).   He also prescribes attendant care and home modifications, not knowing whether Plaintiff, in this case, truly needs such services or not, and invents prescriptions just so that attendant care providers and others get paid. *Id.* at pp. 102-105.  Even as it pertains to the benefits which he demands (i.e., payment

14

for medical services), Dr. Glowacki failed to supply any testimony concerning the purported reasonableness of his fees and where they fall within others that he customarily charges.

In short, because Dr. Glowacki's testimony is unreliable, it fails to assist Plaintiff in meeting any element of his burden of proof as set forth in M.C.L. 500.3107 and *Nasser, supra.*  It simply does not have "any tendency to make a fact more or less probable than it would be without the evidence".  F.R.E. 401.  Consequently, it must be excluded.  F.R.E. 402 and 702.

III.    **Dr. Glowacki's Testimony Is Further Barred By F.R.E. 403 As Any Probative Value Is Marginal, At Best, And Substantially Outweighed By The Waste Of Time Expended To Consider The Material.**

F.R.E. 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

In this matter, it is, frankly, a waste of time for the jury to consider Dr. Glowacki's testimony, particularly when he calls other doctors (upon whom he has ostensibly relied to perform testing) "stupid", disagrees with diagnostic tests and results when they do not substantiate the concocted conclusions that he espouses,  and, then, in the middle of relevant questioning concerning his billing, states that he is going to go get drunk. (S.Glowacki Dep. Tr., pp. 32-36, 91-92, 99-100, 104, ***Exhibit 2***).

State Farm disputes that Dr. Glowacki's testimony has any relevance.  However, even if this Honorable Court were to disagree, any marginal relevance that it possesses is substantially outweighed by this concern.

15

## RELIEF REQUESTED

Therefore, based upon the foregoing argument and analysis, Defendant, State Farm Mutual Automobile Insurance Company, respectfully requests that this Honorable Court enter an Order:

a.     Granting its Motion in its entirety;

b.     Striking the *de bene esse* deposition testimony of Dr. Sefan Glowacki and precluding Plaintiff from presenting it to the jury impaneled in the captioned action; and

c.     Granting it all other relief to which it is entitled.

Respectfully submitted,

**HEWSON & VAN HELLEMONT, P.C.**

By:   s/JAMES F. HEWSON
       JAMES F. HEWSON
       Attorneys for Defendant
       25900 Greenfield Rd., Ste. 326
       Oak Park, MI  48237
       (248) 968-5200
       hewson@vanhewpc.com

Dated:  November 26, 2012     (P27127)

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2012, I electronically filed the foregoing papers with the Clerk of the Court using the ECF System which will send notification of such filing to the all counsel of record.

Dated:  November 26, 2012

s/James F. Hewson
**Hewson & Van Hellemont, P.C.**
Attorneys for Defendant
25900 Greenfield Rd., Ste. 326
Oak Park, MI  48237
(248) 968-5200
hewson@vanhewpc.com
(P27127)

17