Steven Geiringer, MD
11/21/2012

Page 1

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JAROSLAW WASKOWSKI,

        Plaintiff,

vs.                   Civil Action

                     No. 11-CV-13036

                     HON. MARK A. GOLDSMITH

STATE FARM MUTUAL AUTOMOBILE   MAG. JUDGE HLUCHANIUK

INSURANCE COMPANY,

        Defendant,

_____/

PAGES 1 TO 111


      The Videotaped Deposition of

      STEVEN R. GEIRINGER, M.D.,

      Taken at 36301 Warren Road,

      Westland, Michigan,

      Commencing at 12:49 p.m.,

      Wednesday, November 21, 2012,

      Before Dale E. Rose, CSR-0087.



Steven Geiringer, MD
11/21/2012

```
 1   APPEARANCES:

 2

 3   MR. LEE ROY H. TEMROWSKI, JR.   (P31967)

 4   Temrowski & Temrowski

 5   45109 Van Dyke Avenue

 6   Utica, Michigan 48317

 7   (586) 254-5566

 8       Appearing on behalf of the Plaintiff

 9

10   MR. JAMES F. HEWSON   (P27127)

11   Hewson & Van Hellemont, P.C.

12   25900 Greenfield Road, Suite 328

13   Oak Park, Michigan 48237

14   (248) 968-5200

15   hewson@vanhewpc.com

16       Appearing on behalf of the Defendant

17

18   ALSO PRESENT:

19   MARC MEYERS, Videographer

20

21

22

23

24

25
```

Steven Geiringer, MD
11/21/2012

1                    INDEX TO EXAMINATIONS

2    Witness                                    Page

3    STEVEN R. GEIRINGER, M.D.

4

5    EXAMINATION BY MR. HEWSON:................... 6

6    EXAMINATION BY MR. TEMROWSKI:............... 58

7    RE-EXAMINATION BY MR. HEWSON:............... 94

8    RE-EXAMINATION BY MR. TEMROWSKI:........... 106

9    RE-EXAMINATION (CONTINUED) BY MR. HEWSON:... 110

10

11                    INDEX TO EXHIBITS

12

13   Exhibit                                    Page

14           (Exhibits attached to transcript)

15       NOTE:  Exhibits listed in order presented.

16

17   DEPOSITION EXHIBIT 1

18       curriculum vitae of deponent ............ 7

19   DEPOSITION EXHIBIT 2

20       reports dated 7-7-11 and 7-11-11 ....... 57

21   DEPOSITION EXHIBIT 3

22       copy of two photographs ................ 63

23   DEPOSITION EXHIBIT 4

24       reports dated 8-19-10 and 12-14-10 ...... 66

25



Steven Geiringer, MD
11/21/2012

Page 4

1                    INDEX TO EXHIBITS (CONTINUED)

2

3    DEPOSITION EXHIBIT 5

4         report dated 3-18-11 .................... 71

5    DEPOSITION EXHIBIT 6

6         reports dated 7-23-10 and 9-3-10......... 73

7    DEPOSITION EXHIBIT 7

8         addendum to report dated 2-18-11

9         and addendum to report dated 11-16-10 ... 77

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Steven Geiringer, MD
11/21/2012

Page 5

1    Westland, Michigan

2    Wednesday, November 21, 2012

3    About 12:49 p.m.

4              VIDEOGRAPHER:   We are now on the

5    record.  This is the videotaped deposition of

6    Dr. Steven Geiringer being taken in Westland,

7    Michigan.  Today is Wednesday, November 21, 2012,

8    the time is now 12:49 PM.

9              And at this time will the attorneys

10   please state your appearances for the record and

11   the court reporter please swear in the doctor.

12             MR. TEMROWSKI:  Lee Temrowski appearing

13   on behalf of Mr. Waskowski.

14             MR. HEWSON:   James Hewson appearing on

15   behalf of State Farm.

16             STEVEN R. GEIRINGER, M.D.,

17   having first been duly sworn, was examined and

18   testified on his oath as follows:

19             MR. HEWSON:  The record should reflect

20   that this is the day and date set for the taking

21   of the deposition of Dr. Steven Geiringer

22   pursuant to Notice and further pursuant to the

23   Federal Rules of Civil Procedure, and the

24   deposition is being taken in lieu of the doctor's

25   live appearance at the time of trial.



Steven Geiringer, MD
11/21/2012

Page 6

1                            EXAMINATION

2    BY MR. HEWSON:

3    Q.   Dr. Geiringer, for the record would you identify

4         yourself and give us your professional address?

5    A.   Steve Geiringer, 36301 Warren Road in Westland.

6    Q.   And what is your profession, sir?

7    A.   I'm a medical doctor.

8    Q.   And how long have you been a medical doctor?

9    A.   1979, so 33 years.

10   Q.   Do you have a specialty?

11   A.   I do, physical medicine and rehabilitation.

12   Q.   Could you tell the jury what the specialty of

13        physical medicine and rehabilitation entails?

14   A.   That field is pretty much split into two, the

15        physical medicine and then the rehab.

16             And the rehab side people might be more

17        familiar with if someone's had a stroke or spinal

18        cord injury, has MS, something like that.  The

19        rehab doctor will oversee all of the therapies

20        and medications and treatments and try to get the

21        person back hopefully as much as possible

22        function-wise.

23             I practice on the physical medicine

24        side which deals with musculoskeletal injuries,

25        sprains or strains, ruptured disks, pinched



Steven Geiringer, MD
11/21/2012

Page 7

1    nerves, making the diagnosis mostly by exam or

2    testing and then overseeing treatment, therapy,

3    medications, sending somebody for injections and

4    hopefully get them back to Square 1, if not as

5    much as possible.

6         DEPOSITION EXHIBIT 1

7         curriculum vitae of deponent

8    WAS MARKED BY THE REPORTER

9         FOR IDENTIFICATION.

10   Q.   Thank you.  I've marked as Exhibit 1 your

11        curriculum vitae and I'd ask you just to take a

12        quick look at that, tell me if it's accurate and

13        up to date as of today's date?

14   A.   Pretty much.  All the background information is

15        the same.  This is dated July, 2011 so there

16        would only be a few additional presentations and

17        things like that, but otherwise it's up to date.

18   Q.   Thank you.  So the record is clear, this is 33

19        pages long, am I correct?

20   A.   Yes.

21   Q.   Rather than taking you through all 33 pages let

22        me hit a few of the highlights.  Are you

23        presently affiliated with any hospitals?

24   A.   No.

25   Q.   And are you presently teaching anywhere?



Steven Geiringer, MD
11/21/2012

1   A.   I am a clinical professor at Wayne State

2        University.

3   Q.   What does being a clinical professor mean?

4   A.   In medicine it's different than being a professor

5        in some other fields where's there's classroom

6        teaching and things like that.

7             For me, for physicians it means when I

8        go around the country to make presentations I'm

9        there pretty much representing Wayne State as

10       part of their faculty.  So, an example, I just

11       came back Saturday from our national -- yearly

12       national meeting and had a couple presentations

13       in that forum and it's through Wayne State that

14       -- I've represented as through Wayne State.

15   Q.   You are board certified in your specialty, is

16       that correct?

17   A.   Yes.

18   Q.   And can you tell the jury how one becomes board

19       certified?

20   A.   Well, it's really a process starting with where

21       you do your training, your specialty training,

22       and my field of PM&R is one of the 24 major

23       specialties, so all these fields you have to go

24       to a program that itself is allowed to turn out

25       board certified people or potentially.



Steven Geiringer, MD
11/21/2012

Page 9

1          Every year along the way the person

2     supervising you has to say yep, ready to move on

3     to the next step.  At the end of training that

4     person has to say ready to sit for the exam.

5          In my field the initial certification

6     is a two-year process, that year and the year

7     after.  And nowadays it's not just a one-time

8     thing any more.  You have to what's called

9     maintain certification, so every year on an

10    ongoing basis there are things, continuing

11    education and all sorts of other things that has

12    to be done to maintain certification.

13  Q.   What does "board certification" mean?

14  A.   Well, it's the only measure we have that somebody

15       has attempted to take those steps and has

16       succeeded in taking those steps that are meant to

17       show that somebody is able to practice

18       competently.

19            There's really nothing else in the

20       field of medicine that one can turn to other than

21       board certification.

22  Q.   I know this is an obvious question, but you are

23       licensed in the state of Michigan to practice?

24  A.   Well, you have to be to be board certified, so

25       yes.



Steven Geiringer, MD
11/21/2012

Page 10

1   Q.   Thank you.   Now, in your curriculum on Page 3 you

2        mention affiliations with University of Michigan

3        Hospital, Rehab Institute of Michigan.

4             What do those affiliations mean?

5   A.   Those were hospital or medical center

6        affiliations when I was on the staff of those two

7        organizations.   After I finished my training in

8        '82 I joined the faculty at Michigan and the

9        staff of the medical center until '91 at which

10       point I moved to Wayne State's faculty and the

11       clinical staff of the Rehab Institute which is

12       part of the Detroit Medical Center.

13            In '99 I went into solo private

14       practice, so left the Rehab Institute DMC but

15       still maintained the academic professor

16       appointment at Wayne State.

17  Q.   Now, you mentioned that you went into private

18       practice in 1999.   How much of your time is taken

19       up with your private practice, not just the

20       examinations that -- such as you did with

21       Mr. Waskowski, how much of your time is taken up

22       with your private stuff?

23  A.   You mean treatment?

24  Q.   Yes, sir.

25  A.   Because it's all part of my private practice all



Steven Geiringer, MD
11/21/2012

Page 11

1        rolled in together, but the treatment side is

2        about 60 percent.

3    Q.  And in Mr. Waskowski's case, how did he come to

4        be seen by you, if you know?

5    A.  He apparently was sent to me by what I call like

6        a broker company that arranges for these

7        evaluations to be done called MES.

8    Q.  How long have you taken patients or gotten

9        individuals for examination from MES, if you

10       know?

11   A.  Oh, I think since soon after I went into

12       practice, so meaning '99.

13   Q.  Can you tell me what if any way your examination

14       would differ from one of the patients in your

15       private practice and one of the patients you

16       examine, for example, through an MES referral?

17   A.  Again, I assume you mean a treatment patient as

18       opposed to someone I'm seeing for evaluation

19       only?

20   Q.  Yes, sir.

21   A.  There's no actual difference in terms of

22       everything I do, the interview, asking them about

23       their situation and the examination is identical.

24            One typical logistical difference is

25       that folks I'm seeing for evaluation only often



Steven Geiringer, MD
11/21/2012

1     have a file of records that doesn't exist with

2     somebody I'm seeing for treatment simply because

3     when I treat somebody it's usually pretty quick,

4     a work injury or car accident within the past

5     short time, a few weeks or something.

6            So if there's any records, it might be

7     an x-ray or something as opposed to if someone --

8     for example, with Mr. Waskowski his car accident

9     was a year and a half before I saw him and there

10    were a couple of inches of records sent to me.

11  Q.  Now, as you said in patients that are here to be

12     treated by you, even if the prior medical history

13     or medical records were brief you would normally

14     get those as part of your treatment of that

15     patient?

16  A.  Well, it's always helpful for a physician to know

17     what has already happened, if there's been any

18     kind of imaging, x-rays or MRI scans, if they've

19     been through treatment, therapy, whatever, yeah,

20    it's always good to have those.

21            Do I always get them ahead of time, no.

22     Then I request them for afterwards, but it allows

23     you to focus your exam and your questions maybe a

24     bit more on certain areas than others when you

25     know what the main problem has been all along.



Steven Geiringer, MD
11/21/2012

1   Q.   Now, you also have, I believe, a specialty in

2        electrodiagnostic medicine, is that true?

3   A.   Right, that's sort of a sub-board certification,

4        right.

5   Q.   And was the process the same to obtain that board

6        certification as you described relative to your

7        specialty in physical medicine?

8   A.   It is what I would call a secondary board

9        certification so it's not one of the primary

10       fields of specialty.  My field, pediatric

11       surgery, that sort of thing, it is secondary and

12       electrodiagnostic medicine has to do with a test

13       called EMG and all the medicine that sort of

14       surrounds that.

15            EMG is used in my field mostly to

16       diagnose pinched nerves.  Other fields might be

17       muscle diseases or Lou Gehrig's disease, things

18       like that in neurology.

19            But in my field it's mostly to diagnose

20       pinched nerves like coming from the neck or back

21       or like carpal tunnel, things like that.

22   Q.  This may seem like a simplistic question, so

23       please forgive me, but is the EMG a recognized

24       diagnostic tool for physicians?

25   A.  Yes.  I mean there's an entire organization that



Steven Geiringer, MD
11/21/2012

Page 14

1   has to do all with the field of medicine that

2   surrounds EMG.  There's a board certification

3   examination about -- I think about 1,200 or 1,500

4   people in the country are certified in EMG.  It's

5   a very well recognized study.  It's been around

6   since about the '50s and it got into more

7   prevalence in the '60s and '70s and of course now

8   it's very well recognized.

9   Q.   And it wouldn't fall under the category of a test

10       that has no medical foundation and is only there

11       to line the pockets of the physicians that order

12       EMGs, right?

13   A.   Would EMG be considered that?

14   Q.   Yeah.

15   A.   No.  I mean, EMG is a very well known and very

16       well accepted and respected test when done

17       correctly.  Like every test, I suppose based on

18       your question could someone do unnecessary EMGs,

19       sure, like you can do unnecessary x-rays or

20       anything else.

21            But no, it's a very well recognized and

22       highly researched -- very highly researched

23       study, exam.

24   Q.   So I want you to assume for the sake of this next

25       question that Dr. Glowacki said this is a lousy



Steven Geiringer, MD
11/21/2012

1        test, an EMG, that has no real value clinically.

2              Would you agree with that statement?

3   A.   No, not at all.

4   Q.   What is the first thing you do when you examine a

5        patient?

6   A.   In the room the first thing after introduction is

7        to take a history which is basically an

8        interview.  On the typical symptom for people I

9        see whether I'm treating them or not the most

10      common symptom is pain, pain, numbness, tingling,

11      weakness.

12           So you ask them what happened.  In this

13      case it was a car accident, but you ask them what

14      they're feeling basically, do they have pain,

15      where is it, what makes it better, what makes it

16      worse, what treatments have you had, does it make

17      it better or worse, all those sorts of things.

18           Have you had prior such problems or is

19      this new since -- in this case it's the car

20      accident.

21   Q.   When was the first time that you saw Mr. -- I'm

22      sorry, I believe it was the only time that you

23      saw Mr. Waskowski?

24   A.   It was the only time, that was July 7 of 2011,

25      not quite the year and a half ago.



Steven Geiringer, MD
11/21/2012

Page 16

1   Q.   And what did he tell you relative to that

2        historical inquiry?

3   A.   He said he was operating his vehicle, was hit on

4        the driver's side.  He had symptoms in multiple

5        areas.  He was very clear that he was getting

6        slowly worse as time went by.  And then I ask

7        people was there ever a time that you got a whole

8        lot better but then something happened and you

9        went south again.

10            No, he was very clear he had never

11       improved even temporarily.  He had low back pain

12       that was in the middle and off to his left, not

13       on the right.  He had pain down the left thigh,

14       through the left thigh toward the knee.

15            He then had neck pain also more on the

16       left and all the way down the left arm to the

17       wrist, and either wrist would sometimes swell,

18       but more on the left.

19            So all of his sympt -- almost 100

20       percent of his symptoms were on the left.

21  Q.   Were you able to observe any swelling in his

22       wrists during your examination?

23  A.   When I examined him there was no swelling, no.

24  Q.   What history did he give you, if any, relative to

25       his treatment that he had received?



Steven Geiringer, MD
11/21/2012

1    A.    He said he was seeing -- you mentioned

2          Dr. Glowacki.  He was seen by Dr. Glowacki.  He

3          had been in physical therapy three times a week.

4          When I saw him it had been one and a half years

5          since the accident and he told me he had been in

6          therapy that entire time.

7                 He mentioned modalities, what we mean

8          like hot packs or things like that, ultrasound

9          and exercise.  Said he was doing exercises very

10         regularly at home and that he was taking Vicodin

11         for pain.

12   Q.    In that connection is Vicodin the drug of choice

13         I guess you would inartfully say for a person

14         with what would be soft tissue injuries?

15   A.    Well, Vicodin as it turns out is what is called

16         an opiate medication, an opiate narcotic.  And

17         opiates have shown over the years and

18         increasingly lately, more and more studies as

19         time goes by, that they absolutely should not be

20         used for chronic conditions because people do

21         actually worse function-wise, function day by

22         day, returning to work is worse with chronic

23         opiates, and there's more and more evidence now

24         that in fact they don't even make a noticeable

25         difference in pain levels.

Steven Geiringer, MD
11/21/2012

1          People tend -- and in my office too --

2     people tend to say well, you know, they helped

3     short term, but you really want to keep opiates

4     for more serious problems that are short term,

5     certainly not for long term.

6          And general consensus or standards of

7     practice would say that you don't use them for

8     soft tissue strains.

9   Q.   If medication is indicated on a person with soft

10     tissue injuries, what medication do you

11     recommend?

12   A.   Typically it would be just an over-the-counter

13     like Extra Strength Tylenol.  Tylenol has been

14     shown to be as effective as the

15     antiinflammatories, but without the GI

16     possibilities of GI distress.

17          An antiinflammatory like Motrin or

18     Advil, something like that, Naprosyn, typically

19     we're not talking about an actual inflammation

20     situation, not usually.

21          For an acute ruptured disk there might

22     be, so you might use antiinflammatories.  For a

23     soft tissue strain it's just the pain, so Tylenol

24     is really quite effective.  There's others like

25     Ultran.  By research studies if they're at all

Steven Geiringer, MD
11/21/2012

1       more effective than plain Tylenol or Extra

2       Strength Tylenol, not by much.

3   Q.  You mentioned that Mr. Waskowski gave you a

4       history of physical therapy?

5   A.  Yeah.

6   Q.  You order physical therapy I assume for your

7       patients?

8   A.  Sure.

9   Q.  When you're evaluating a patient for physical

10      therapy what kind of concerns -- I'm sorry --

11      what do you express to the physical therapist as

12      to what you're looking for if you're specific

13      when you're dealing with them?

14  A.  Well, physical therapy is done for people who

15      have an actual impairment or a condition that

16      explains their symptoms and I would tell the

17      therapist what the symptom is or what the

18      condition is, what the diagnosis is.

19              And it depends on the therapist.  There

20      are a few therapists who I've sent people to for

21      literally 20 years and I know that he or she

22      knows exactly what I ask for, so I ask for the

23      generalities, manual therapy, stretching,

24      mobilization, that sort of thing.

25              If it's a therapist at a facility I



Steven Geiringer, MD
11/21/2012

Page 20

1       don't know I give them much more detail than

2       that.

3    Q.  You mentioned diagnosis.  What is "diagnosis",

4       what is that?

5    A.  Well, it's an actual condition so if somebody

6       has, let's just say, back pain, that's a symptom.

7       That doesn't tell you what's causing the back

8       pain, but that will prompt the physician to look

9       for what's causing the back pain, a muscle strain

10      like muscle pull, ruptured disk, pinched nerve,

11      whatever it might be.

12              That's the diagnosis, the actual

13      condition that's causing your symptoms.

14   Q.  Pain you said is a symptom, am I correct?

15   A.  Yes.

16   Q.  I've heard the word "subjective" versus

17      "objective", objective signs or findings and

18      subjective symptoms.

19              Could you tell the jury what the

20      difference is between those things?

21   A.  Anything that is a symptom that someone tells me

22      they're feeling the pain, the numbness, the

23      tingling, that is subjective.  That is -- it goes

24      through their brain and they have to interpret

25      it.  It's not something I can measure.



Steven Geiringer, MD
11/21/2012

Page 21

1       So someone says their back hurts a
2  little or a lot, it hurts 9 out of 10 or 1 out of
3  10, there's no machine that can measure pain.
4  There's really no machine that can measure
5  numbness or other things either.  Those are all
6  subjective.
7       Then it's up to the physician to look
8  for something that correlates with that,
9  something objective.  So if I bend the person
10 forward and their back goes into a big twist or a
11 torque, that's objective.  That's not within
12 their control.
13      If I measure their calves because they
14 might have a pinched nerve and one calf is half
15 an inch smaller than the other and that goes
16 along with a reflex that's down on the same side,
17 the ankle, you know, tap with the reflex, those
18 things are not in the person's control.
19      Those are measurable, those should be
20 reproducible from one person to the next if the
21 test has been done correctly.  Those are
22 objective.
23 Q.  Was it your understanding from the history
24 Mr. Waskowski gave you that he had been in
25 physical therapy for the entire period of time

Steven Geiringer, MD
11/21/2012

1       from the accident up until the time he saw you?

2    A.  He did, he said one and a half years which was

3        pretty much exact amount of time -- I guess when

4        I saw him -- yeah, it was a couple of weeks more

5        than 1.5 years.

6    Q.  What if -- are there any standards for the

7        prescription of physical therapy that you deal

8        with in your specialty, that is as to length of

9        time and that sort of thing?

10   A.  Sure.  There are general sort of consensus

11       opinions and there is something called the ODG,

12       which stands for official disability guidelines.

13               For a strain, for a muscle pull, they

14       would allow 10 visits, the ODG would.  And then

15       you have to go from there.  If it's helping a lot

16       -- you know, in my mind if I see somebody back in

17       three weeks which is about eight or 10 visits and

18       it's helping a lot, yeah, I'll give them another

19       couple or three weeks maybe, a couple of weeks,

20       see them back.

21               I've seen some physicians who I respect

22       will say maybe two months even or something like

23       that and the ODG, as I mentioned, would be 10

24       visits.  Those are some guidelines for soft

25       tissue strains.



Steven Geiringer, MD
11/21/2012

1  Q.  What do you as a specialist in physical medicine

2      and rehabilitation do if the first 10 visits

3      aren't working or if the person is getting worse?

4      What do you do relative to physical therapy?

5  A.  Well, there's two possibilities.  One is that

6      perhaps the physical therapist, the person

7      they're seeing, there are certain techniques that

8      not all therapists are trained in and maybe that

9      person is the wrong therapist.

10         But typically therapists are -- you

11     know, if they're doing what they're supposed to

12     do and you've gone three weeks -- I allow three

13     -- that's why I see people back after three weeks

14     of therapy.  After three weeks which is eight or

15     nine visits, it's not going to suddenly change so

16     you have to pretty much think, well, you know,

17     maybe I have the wrong diagnosis or who knows

18     what.  So you got to change something.

19         In fact, there are physical therapy

20     standards of practice within their own field.

21     Their standards say that if therapy is

22     ineffective you, the therapist, must discuss this

23     with whoever ordered the therapy and alter

24     something, do something different.

25  Q.  And writing "pain" on a prescription form does



Steven Geiringer, MD
11/21/2012

1    not suggest any diagnosis if that's the only

2    "diagnosis" on that piece of paper, am I correct

3    in that?

4  A.  Pain from the standpoint of can you find a

5    diagnosis code in the book that -- you know, the

6    CPT code, you can find a diagnosis code for pain,

7    but medically it's not a diagnosis, it's a

8    symptom.

9         The diagnosis would be, for example,

10   lumbar strain in a muscle pull or herniated disk,

11   ruptured disk, so pain is not medically a

12   diagnosis.

13 Q.  After you conclude the history portion of your

14   examination did you -- what do you do next or

15   what did you do in regard to Mr. Waskowski?

16 A.  What I do in my office is leave the room, have

17   them change into a gown while I dictate the first

18   portion that we just talked about, the history.

19        Then I go back into the room and

20   examine the person, do the physical examination.

21 Q.  And could you tell the jury what your physical

22   examination of Mr. Waskowski included?

23 A.  Now, do you want to have me give you the general

24   exam and then --

25 Q.  If you wouldn't mind, if you can tell us the



Steven Geiringer, MD
11/21/2012

1    general exam and then I'll ask about specific

2    findings?

3   A.   Okay, all right.   The general exam is split into

4        two parts, what I call the musculoskeletal and

5        then the neurologic.   The musculoskeletal, for

6        example, would look mostly for muscle pulls or

7        muscle strains, so things like in the low back --

8        and these all translate kind of to the neck too.

9            But in the low back having the person

10       move around in six different directions, does it

11       hurt, where does it hurt, which motions make you

12       feel better, which make you feel -- the back feel

13       better or worse, that sort of thing.   Is the back

14       motion even and smooth or is there a torque or a

15       twist on the back like I kind of mentioned

16       before, which means the muscles are more tight on

17       the one side than the other.

18            Palpation which is basically pushing

19       over the muscles where the muscles attach, where

20       nerve runs through, that sort of thing, does it

21       hurt.   And if it does hurt, if the muscles are

22       tight for even a few weeks, certainly a month or

23       more, they feel abnormal.

24            People describe like a twine, a ropy

25       kind of feeling, orange peel, orange rind or



Steven Geiringer, MD
11/21/2012

Page 26

1    something, but they feel abnormal to the

2    experienced fingers; look for that.

3            The neurologic is basically looking for

4    -- the other half of the exam -- basically

5    looking for a pinched nerve, so running from the

6    back down the leg or from the neck down the arm.

7    Tapping on the reflexes with the hammer, testing

8    strength, push against me or squeeze my fingers,

9    is there a difference from side to side.

10            Atrophy meaning if there's been a

11   pinched nerve -- nerve damage to a muscle that

12   calf might be smaller, the thigh might be smaller

13   depending on which nerve.  Sensation, can you

14   feel the touch or the pin, whatever you use, the

15   same on one side or the other and if you can't,

16   if it's different on one side, is it pretty close

17   to a typical what we know as a nerve

18   distribution, a nerve pattern, or not.

19   Q.  Thank you.  You went through all of that physical

20       examination with Mr. Waskowski, am I correct?

21   A.  Yes.

22   Q.  Can you tell the jury what if any findings you

23       made that you considered significant in regard to

24       Mr. Waskowski after that -- or during that

25       physical exam?



Steven Geiringer, MD
11/21/2012

1   A.   Okay.  The first thing I mention in my report --

2        and I'm using my report to refresh my memory

3        since this was a year and a half ago -- was that

4        there was great deal of what I call pain

5        behavior.

6   Q.   What is that?

7   A.   Pain behavior is something that we all exhibit at

8        some point.  You know, if you're not feeling well

9        and you tell your wife to get you a glass of

10       orange juice, you could do it yourself, but it's

11       easier for someone else to do it.  That's pain

12       behavior technically, but that doesn't interfere

13       with your life or dictate how you really act all

14       the time.

15            Pain behavior during an examination is

16       -- and again some is perfectly normal -- is what

17       I mentioned here, a great deal of pain behavior,

18       grunting, panting, pulling away, things like

19       that, a lot of verbalization, things like that.

20            The other thing I mention was as soon

21       as I told him that go ahead and change into a

22       gown, I was leaving the room as I mentioned, his

23       wife jumped up out of her chair and came to his

24       assistance.  He's a big muscular guy, but came to

25       his assistance to get changed.



Steven Geiringer, MD
11/21/2012

Page 28

1           And she did the same several times

2    during the physical examination when he was

3    trying to get onto the table, turning over, she

4    jumped to his assistance several times.

5           So that's sort of a correlate to pain

6    behavior.

7    Q.   Why is that significant?

8    A.   Well, I talk later about the disability mentality

9    and when you -- I mentioned before have somebody

10   else go get you the glass of orange juice.  If

11   that turns into day by day, month by month and

12   year by year, and this was a year and a half

13   later, that obviously has a huge effect on your

14   level of functioning secondarily and just how you

15   view yourself.

16          So the disability mentality is Mr. --

17   in this case Mr. Waskowski thinking that he's

18   disabled and his wife sort of going along with

19   that and helping him, you know, helping him move,

20   turn over for example.

21   Q.   Were there any physical findings after that

22   observation that were significant to you?

23   A.   Well, the first thing was having him move in six

24   different directions of the low back.

25   Q.   Could he do that?



1    A.    Huh?

2    Q.    Could he do that?

3    A.    Well, he -- what I said he had about 5 percent of

4          flexion, 5 percent of what I would expect to be

5          normal for someone his age.  He had about 5

6          percent of that.

7                   He had zero extension.  He could not

8          tilt backward at all in any of the three

9          directions.  All of those he said caused severe

10         pain or when he did move, he anticipated severe

11         pain with any of those motions.

12                  Significance is that there is nothing

13         short of cancer eating away at your spine that

14         allows essentially zero motion in any direction.

15         In fact, actual conditions like a ruptured disk

16         or even strains, some motions feel better.

17         That's just -- that's the pattern I look for.

18                  If this is a ruptured disk, certain

19         patterns that sort of turn that light bulb on in

20         my head, but this pattern, there's really nothing

21         that causes that.

22   Q.    Can you tell me what your understanding is of why

23         some of those motions would actually make you

24         feel better if you have a real ruptured disk?

25                  Why would that occur?



Steven Geiringer, MD
11/21/2012

1   A.    Well, to take the example of a ruptured disk,

2         there is typically swelling around the disk or

3         even if there's not, if you're past that acute

4         stage there's a physical thing there, there's a

5         gumba there, there's disk material there.

6               If you tilt backwards -- and it's off

7         to the back and the side if you look at the

8         spine.  So if you tilt backwards and to that

9         direction you're going to literally crunch that

10        area or the swelling around it which itself can

11        then crunch the disk and cause pain.

12              But just the opposite is true.  If you

13        bend forward on the opposite side or even forward

14        to the same side, but especially opposite that at

15        a diagonal opposite, it takes the pressure off

16        the area and it feels better, and the other

17        motions are kind of in-between.  So that's just

18        an example of that.

19              The next thing I look for is I

20        mentioned if there's a twist or a torque on the

21        spine.  Is the motion symmetric or is it

22        asymmetric and he had very little flexion, very

23        little bending forward, but whatever there was

24        was normal.  But you can also test that when

25        they're lying down by looking at their different

Steven Geiringer, MD
11/21/2012

1       anatomic areas, ankles and the hips, and there

2       was no asymmetry, in other words, he was lined up

3       okay.

4   Q.  Let me ask you this too and I don't mean to

5       interrupt you, but you mentioned that he was a

6       big muscular guy?

7   A.  Well, what I said was he was well muscled.

8   Q.  And is that significant in your observation of

9       the patient who claims to have had this kind of

10      problem for 18 months?

11  A.  I would say overall no.  I mean, just because

12      he's more heavily muscled does not mean he could

13      not have a ruptured disk that is just as painful

14      as somebody thinner or -- not necessarily.

15  Q.  Very good.  After the observation relative to his

16      back, what if anything next did you find?

17  A.  Next thing I talked about was what's called

18      straight leg raise, so that's done in two ways.

19              First the person is lying flat out face

20      up and without their help I take one leg at a

21      time and slowly move it up, ask him though to

22      tell me what he's feeling.  And on the right side

23      he had low back pain at about 5 or 10 degrees,

24      meaning the leg was barely off the table a couple

25      of inches.

Steven Geiringer, MD
11/21/2012

1           On the left side there was severe low

2     back pain at -- what I said zero to 5 degrees,

3     so, you know, maybe an inch off the table.  Now,

4     that is done later in a different way.  The

5     person sitting over the side of the table and I'm

6     testing their strength in their foot and

7     something like that, but I'm also lifting their

8     leg up to basically cause also a straight leg

9     raise.

10           And in that part of the test he had no

11    pain whatsoever and I got him to 80 degrees.

12    Now, that's a big difference.  Those two are not

13    exactly equivalent lying out flat and then

14    sitting, and if there were a 20 degree

15    difference, if somebody said oh, yeah, that hurts

16    at 40 degrees and I could do it to 60 sitting,

17    that's fine.

18           Zero to 5 degrees versus 80 degrees is

19    a huge difference, meaning that if there were an

20    actual structural problem -- and what you're

21    looking for is tension on the nerve causing the

22    first, it should -- it would have to be there at

23    the second.

24           So what this tells me it's a big

25    discrepancy and there really is actually no



Steven Geiringer, MD
11/21/2012

1      structural problem causing that first severe pain

2      at zero to 5 degrees.

3   Q.  What does straight leg raising supine or laying

4      down, what does that test for?

5   A.  It's meant to look primarily for tension on a

6      nerve root so you have a pinched nerve.  It will

7      be irritated and if you stretch it by doing the

8      straight leg raise, it causes more pain.

9            It also might bring out muscle

10      tightness in a back or the hamstrings or anyplace

11      else, but the same holds true.  The two done in

12      two different ways should be about the same.

13  Q.  Is there any known musculoskeletal condition that

14      would explain the difference between his

15      presentation for straight leg raising while he

16      was laying down and sitting on the side of the

17      table, basically at a 90 degree angle?

18  A.  There's no condition that would explain that, no.

19  Q.  What, if anything else, did you notice relative

20      to his presentation on the physical examination?

21  A.  The next part of the musculoskeletal exam was

22      palpation, pushing over not just the back muscles

23      but where they attach and other areas.

24            He had tenderness pretty much

25      everywhere on the left side more than the right,



Steven Geiringer, MD
11/21/2012

Page 34

1    but all through the muscles of his back for

2    example.  And I mentioned earlier that muscles

3    will have a different feel to them if they've

4    been tight for a few weeks, certainly a month or

5    more.  This had been a year and a half.  Even

6    though he was saying there was severe pain and

7    there was also tenderness when I pushed over him,

8    the muscles had completely normal feel to them,

9    so it's another discrepancy.

10   Q.   What did you examine next?

11   A.   Then came the neurologic and all the parts I

12        mentioned before, the reflexes, the strength,

13        atrophy meaning measuring if there was any loss

14        of the muscle mass, sensation, all that were

15        completely normal in the legs.

16   Q.   Did you find any evidence of diminished sensation

17        in the L4-L5 nerve root distribution?

18   A.   There was none.

19   Q.   Could you tell the jury and me when we talk about

20        nerve root distribution what that means?

21   A.   Well, there's the major nerves that run down the

22        arm or run down the leg.  For the leg, for the

23        low back, lumbar area the ones that supply the

24        leg muscles mostly are L4 and L5, lumber 4 and 5

25        and S1, sacral 1.



Steven Geiringer, MD
11/21/2012

 1               And so each of those has a -- you know,

 2       from the anatomy textbook we're all different a

 3       little bit, but they pretty -- we're pretty

 4       consistent and each of those has a pattern of

 5       muscles that it supplies and a pattern of skin

 6       that supplies the sensation to.

 7               And so I mentioned before touching or

 8       people use a pin, if they're numb or feel less in

 9       a certain distribution does that match or pretty

10       closely match one of these major nerves.

11   Q.   And there were no findings relative to L4-L5?

12   A.   They were not, either sensation-wise or

13       strength-wise or reflex-wise.

14   Q.   Can you tell me what extensor hallucis longus is,

15       please?

16   A.   EHL, extensor hallucis longus, is the muscle that

17       pulls up the big toe.

18   Q.   Did you find any neurological compromise to that

19       in your examination?

20   A.   No, it was fully strong.

21   Q.   What if any finding did you make relative to

22       Mr. Waskowski's ability to raise and lower his

23       foot?  Did you check that?

24   A.   Yeah, it's called ankle dorsiflexion,

25       plantarflexion, all that was normal


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313-567-8100

Steven Geiringer, MD
11/21/2012

1      strength-wise.  He was very strong.

2  Q.  Now, did that conclude your examination of his

3      legs or was there more that you had done?

4  A.  Other than watching him walk, and I said that his

5      -- how he walked was mechanically normal meaning

6      all the aspects of how you actually walk, putting

7      it all together, but he was holding his -- or he

8      was on his wife's arm for support, but his

9      walking was otherwise normal.

10        And then I went on to the neck and

11      arms.

12  Q.  Before we move on to those, if you have -- what

13      if any balance difficulties did Mr. Waskowski

14      describe to you?

15  A.  I don't believe he told me about balance, he

16      didn't mention any balance issues at all.

17  Q.  And he did not appear at your office with a cane

18      or a walker or wheelchair or anything like that?

19  A.  No, and his balance -- you know, when I have

20      people move around, he didn't move much, but when

21      I have them move around, if they have balance

22      problems they usually grab a table or something

23      and that didn't happen.

24  Q.  When you moved on to the neck and arms, you

25      conducted a physical examination of those areas



Steven Geiringer, MD
11/21/2012

Page 37

1    as well?

2    A.    All the same components we mentioned before.

3    Q.    Could you tell the jury what your findings were

4          relative to the neck and arms?

5    A.    Well, in the neck -- and I put people through,

6          again, six different motions and there was in

7          this case zero.  He did not move his neck in any

8          of the six directions at all.

9                And, again, I mention that maybe short

10         of, again, cancer eating away at your spine or

11         something like that, there's no musculoskeletal

12         condition, there's no strain or ruptured disk or

13         pinched nerve that causes that.

14               All of those he said he would have

15         severe pain, but he didn't move at all.  He was

16         just anticipating severe pain.  There's a

17         maneuver called a Spurling where you position the

18         head backwards and off to the side and put a

19         little pressure down, see if it irritates a nerve

20         root.  Couldn't do that because he had to move

21         the neck and he didn't move the neck at all.

22               Despite his severe pain, when I

23         palpated, when I pushed firmly over his neck and

24         shoulder muscles there was no tenderness

25         whatsoever with pretty deep palpation, and like



Steven Geiringer, MD
11/21/2012

Page 38

1      the low back, those muscles had normal tone,

2      normal texture, meaning they hadn't been tight at

3      all recently.

4              Otherwise, I would have felt something

5      there.

6   Q.   What if any findings did you make in the arms?

7   A.   I then did the neurologic, all the same things we

8      talked about.  Everything was normal strength and

9      all that, reflexes except that he -- in the

10     entire left arm he said it felt more numb to him

11     than the right.  The right felt normal, the whole

12     right arm and the left arm, the entire left arm

13     didn't feel the same.

14              I mentioned earlier that we look for

15     numbness or decreased sensation in a certain

16     nerve pattern, and that would mean something if

17     it went along with other things.  The entire arm

18     being numb again is not from any -- there's no

19     known condition not musculoskeletal -- I mean a

20     stroke, something like that, but in what I'm

21     looking for in Mr. Waskowski there's no known

22     condition that would possibly cause that.

23  Q.   While we're talking about the arm, could you tell

24     the jury where the carpal tunnel is in the body?

25  A.   The carpal tunnel is at the front of the wrist



Steven Geiringer, MD
11/21/2012

Page 39

1      and it goes from like the farther wrist line to

2      about an inch or so where the palm sort of dives

3      down.  It's an area, a tunnel created by bones on

4      the bottom and a ligament over the top.

5    Q.   You noted in your report that there was no focal

6          atrophy in the arms, is that correct?

7    A.   Yes.

8    Q.   Why is that significant?

9    A.   I mentioned earlier that a pinched nerve if it's

10         there long enough and bad enough can cause the

11         muscle fibers to lose their nerve supply and they

12         can shrink, that's atrophy.

13   Q.   Now, at the time of your initial --

14   A.   Can I add one more thing?

15   Q.   I'm sorry, please.

16   A.   There was just one more thing I did in the arm

17         and that was on the left to test his rotator

18         cuff.

19   Q.   And could you tell the jury what the rotator cuff

20         is?

21   A.   Sure.  It's a group of four muscles that comes

22         from the shoulder blade up to the upper arm bone,

23         the humerus, and just like it sounds it rotates

24         the upper arm, very important for quarterbacks

25         and pitchers, and we all do some motions that



Steven Geiringer, MD
11/21/2012

1    involve the rotator cuff.

2           There are certain maneuvers that are

3    specific for the rotator cuff and cause pain in a

4    certain distribution and when I tested him he

5    didn't have that pattern of pain.

6    Q.   Did he or the person that was with him ever

7    suggest to you or tell you that he had a history

8    of post-traumatic stress disorder?

9    A.   No.  His wife was there, but also an interpreter

10   was there, but I mentioned earlier in this report

11   that I was able to get a full history, do a full

12   exam even with an interpreter present, but no, no

13   mention of PTSD.

14   Q.   Now, your initial report you deferred your

15   discussion.  Why did you do that?

16   A.   I had been sent a file of records a couple of

17   inches I had mentioned before, but apparently it

18   must have gotten to my office that day, day

19   before, hadn't had a chance to look at them yet.

20          So I was going to defer final opinions

21   until I did have a chance to look at those

22   records, which I guess I did four days later.

23   Q.   Now, what part does reviewing medical records

24   play in your examination and evaluation of the

25   patient?



Steven Geiringer, MD
11/21/2012

Page 41

1   A.   I talked about earlier that it might help focus

2        what you examine, but more importantly it just

3        gives me insight into what others have found,

4        what have they documented on examination, what

5        the symptoms were, what the physical examination

6        findings were.

7             I'm often asked in these kinds of

8        evaluations, "Was the treatment medically

9        necessary?" so that gives me some insight into

10       that as well, all those kind of questions.

11  Q.   Now, when you receive records such as were

12       presented to you in this case, you don't

13       investigate whether or not the findings are

14       accurate or whether they're authored by the

15       person or authentic or any of that I assume, is

16       that correct?

17  A.   That's correct in terms of being authentic.  When

18       you say "accurate", I'm not sure what you mean.

19       I mean, I can look at the content of the notes

20       medically, but in terms of whether Dr. X, Y or Z

21       actually authored the notes, I don't get into

22       that.

23  Q.   Did you have a chance to review these records

24       that were presented to you?

25  A.   Yes, I did.



Steven Geiringer, MD
11/21/2012

Page 42

1   Q.   And can you tell the jury what, if anything, you

2        found significant in your record review?

3   A.   Well, the early notes mentioned spine and

4        left-sided pain.  He did not lose consciousness.

5        Most medical notes were from the person you

6        mentioned before, Dr. Glowacki, and he first saw

7        Mr. Waskowski three weeks later.  Neck and low

8        back pain, there was no mention of the shoulder,

9        the arm or the leg anywhere.

10            However, Mr. Waskowski told him he

11       couldn't dress himself, he couldn't take a shower

12       himself, he couldn't do virtually anything for

13       himself.  There was tenderness in the spine and

14       reduced motion.  The left ankle reflex was said

15       to be gone, said to be zero.

16            Dr. Glowacki mentioned rib and

17       breastbone, sternum, fractures because of

18       tenderness there and later in the records the

19       imaging for that, for both those areas, was

20       completely normal.  There were no fractures

21       there.

22            He then recommended MRI scans, physical

23       therapy, what we call household assistance and

24       attendant care, someone to basically take care of

25       the house and Mr. Waskowski's personal care,



Steven Geiringer, MD
11/21/2012

Page 43

1       personal needs.

2   Q.  I'm sorry if I --

3   A.  All right.

4   Q.  The issue of the bone scan and the x-rays, you've

5       had a chance to look at those reports, am I

6       correct?

7   A.  The reports.  I don't think I saw those actual

8       images.  I know I didn't see the bone scan.  I

9       don't think I saw the rib x-rays either.

10  Q.  You saw the reports of those studies?

11  A.  Yes.

12  Q.  And will x-rays show fractures of the sternum and

13      the ribs?

14  A.  Yes.

15  Q.  Is it true that 90 percent of the time x-rays

16      will miss fractures of the ribs or the sternum?

17  A.  90 percent you say will miss them, will not show

18      them?

19  Q.  Yes.

20  A.  No.  Now, I will say that there are occasional

21      rib fractures non-displaced so they're not out of

22      place early on where the calcium -- what we call

23      the callus, hasn't formed yet, but within a

24      couple of days that will show up.

25  Q.  How about with the bone scan, if there's a bone



Steven Geiringer, MD
11/21/2012

Page 44

```
 1          scan that's done as you saw in this particular
 2          case, would that pick up fractured sternum and
 3          fractured ribs?
 4     A.   Yeah, right away.  I was just looking for --
 5          yeah, immediately for the bone scan.  I was just
 6          looking for the date of the rib x-rays showing no
 7          fractures.  That was on 1-4-10 meaning it was 9
 8          plus 4, 13 days, about two weeks later, so
 9          there's no question that calcium would have
10          clearly formed by then.
11                    So while an x-ray immediately might not
12          show a rib fracture, by 13 days there's no
13          question it would if it were there.
14     Q.   If you had suspected fractures of the ribs or the
15          sternum and received those x-ray and bone scan
16          reports would you have continued a diagnosis of
17          fracture of the ribs and sternum?
18     A.   Well, in my report, in the second report I made
19          that point that Dr. Glowacki did continue listing
20          that as -- both of those as diagnoses obviously
21          incorrectly.
22     Q.   What was the date on your second report?
23     A.   July 11, 2011.
24     Q.   Thank you.  What if anything else did you find
25          significant from your review of the records?
```



Steven Geiringer, MD
11/21/2012

Page 45

1   A.   Well, I mention that he, Dr. Glowacki's, next

2        three notes January, February, March one each

3        2010 were completely illegible.

4             That reason alone means they didn't

5        rise to what we consider minimal standards of

6        medical practice.  You have to create legible and

7        reproducible reports.

8   Q.   Why is that?

9   A.   Well, for the sake of medical documentation.  If

10       somebody else -- if Dr. Glowacki somehow weren't

11       available and someone else were trying to treat

12       Mr. Waskowski for something that was there you

13       have to create legible notes.  It's basic for the

14       sake of the patient's medical care.

15            It seems pretty obvious.  And I'm

16       pretty good at deciphering physicians

17       chicken-scrawls.  I couldn't read a thing in any

18       of those three notes.

19  Q.   Very good.  What if anything else did you find?

20  A.   Well, the next note was in April of 2010.  There

21       was no examination.  Dr. Glowacki did not think

22       that PT would help, which I found interesting.  I

23       didn't comment it here, but that was after

24       probably three months of therapy, but the therapy

25       went on for another year plus after that.



Steven Geiringer, MD
11/21/2012

Page 46

1           He did think though that Mr. Waskowski

2      might need an operation for his neck or his back.

3      He later reports he listed MRI results.  A note

4      in June of 2010 said he was going to try to push

5      him back to work.  The next month though, July of

6      2010, there was zero motion in the neck or the

7      low back, essentially what I found one year

8      later.

9           His diagnoses continued to include

10      fractured sternum, fractured ribs incorrectly.

11      On December 10 of 2010 we were now six months --

12      oh, no, a year, I'm sorry, we were a year after

13      the accident.  There was a new finding of reduced

14      sensation down the left arm in a certain nerve

15      distribution a year later.

16           There were 12 more visits after that

17      date, nine were completely unreadable.  I could

18      not decipher any physical examination.

19           Dr. Glowacki's note of -- in March of

20      2011 showed no change in his pain.  He called the

21      pain bitter.  He mentioned -- that's a word he

22      used.  And then toward the end of his notes which

23      was ending in June of 2011 because I was seeing

24      him the next month he put in his note that

25      Mr. Waskowski will have pain the rest of his



Steven Geiringer, MD
11/21/2012

1        life, even if he has an operation from these

2        issues.

3   Q.   What if any evidence did you find as a result of

4        your review of those records and your examination

5        to indicate that that statement was true, that is

6        that there would be pain there for the rest of

7        his life?

8   A.   We talked earlier about pain being a subjective

9        symptom.  There's no way to measure it, so if

10       someone just tells me, "I have pain" and they

11       tell me 20 years from now, "I still have pain and

12       I've had pain since I saw you the first time 20

13       years ago," there's no way to say, "No, you don't

14       have pain" or, "You didn't have pain" or, "Yeah,

15       you did have pain."

16              All a physician can do, mostly by exam

17       but also with some other tests, is to find a

18       cause of that pain.  Is there anything that

19       explains this pain?  Is there a reason for that

20       pain to be there or is it what we call

21       non-organic, no explainable reason for the pain?

22              So there's no organic reason in the big

23       picture after having all the records and having

24       examined Mr. Waskowski, there was no hint of an

25       organic reason, an actual condition, what we call

Steven Geiringer, MD
11/21/2012

Page 48

```
 1            impairment, to explain any pain at the moment or

 2            certainly the rest of his life which that

 3            statement by Dr. Glowacki, it doesn't make any

 4            medical sense either.

 5                      There are few conditions in my field,

 6            again cancer and whatnot, but very few conditions

 7            -- well, there's none that I can think of, zero,

 8            that cause pain the rest of your life.

 9                      That just isn't the way the body works.

10      Q.    What other records did you review?

11      A.    There was an orthopedic person who recommended

12            spine injections, but later also said maybe he

13            needs a neck or a back fusion.

14                      There was one note from Dr. Zamorano,

15            also not board certified, who recommended EMGs or

16            I think she did EMG in all four limbs.

17                      I talked about how much she billed for

18            that and for other -- for like a lumbar corset

19            and a cervical collar.  There was an orthopedic

20            evaluation in July of 2010 that concluded there

21            was amplification of symptoms, meaning

22            Mr. Waskowski was expressing a lot more symptoms

23            than could be explained.  And then there were a

24            bunch of imaging studies, x-rays and MRI scans.

25            The bone scan we talked about.
```



Steven Geiringer, MD
11/21/2012

1   Q.   Those imaging studies that you reviewed, did you

2        ever have a chance to review the report from

3        Dr. Quinn?  I don't know if you did or not, but

4        --

5   A.   No, I did not.

6   Q.   As a result of your review of all these records

7        and your physical examination of Mr. Waskowski,

8        were you able to come to a diagnosis -- or let me

9        ask you that question first -- come to a

10       diagnosis relative to his condition?

11  A.   Well, there was no musculoskeletal or neurologic

12       diagnosis because there was -- not only was there

13       no impairment, no actual condition found, but the

14       only findings if you will were inconsistent or

15       non-organic.  Things like the straight leg raise

16       we talked about before 5 degrees versus 80

17       degrees, numbness in the entire left arm is not

18       organic, that doesn't happen.  Stroke, yeah, but

19       not in this setting.

20            The huge amount of pain behavior,

21       palpating the muscles that were very tender with

22       minimal pressure even though they felt perfectly

23       normal, so there was no musculoskeletal or

24       neurologic diagnosis.

25  Q.   What if any finding did you make regarding the

Steven Geiringer, MD
11/21/2012

Page 50

1          necessity of a repeat series of MRIs at Oakland

2          MRI?

3                    Did you make a conclusion relative to

4          that?

5     A.   I had concluded that there was reasonable -- a

6          medical reason I should say to do one set of MRI

7          scans, no reason to do any more than that, not as

8          relates to the accident we're talking about.

9                    Things don't change that quickly in the

10         spine, they change over years as a natural

11         process of aging and there was also nothing on

12         examination when I examined Mr. Waskowski and

13         apparently the other person too, but my exam

14         hinting of anything related to the disk.

15                   I mentioned earlier the patterns of the

16         way the back moves and the disk.  If there's a

17         disk problem might feel better in certain -- none

18         of that was present at all, not even a hint of

19         that, so there would have been -- in fact one

20         could argue whether the first set of MRI scans

21         was even necessary because of that.

22                   There are radiology guidelines that say

23         there should be worrisome symptoms, progressive

24         neurologic deficit, not just back pain, and those

25         weren't present.



Steven Geiringer, MD
11/21/2012

1              So one could argue about even the first

2       set, but I would say okay, it's standard of

3       practice to get the first set of MRI scans.

4       There's no need for anything beyond that.

5    Q.  This 18 months of physical therapy, did you have

6       an opinion as to whether or not that was

7       reasonable in these circumstances?

8    A.  We touched on that before.  If one says there

9       might have been strains to begin with, muscle

10      pulls, muscle strains in the neck and low back.

11      Those weren't documented by Dr. Glowacki's input,

12      but if they were there, a month of PT is what's

13      considered justified.

14              We talked before, the ODG says 10

15      visits, that's about three weeks if it's three

16      times a week.  I would say a month.

17              If the person is doing a whole lot

18      better when I see him back I might give him

19      another couple, three weeks, some people say two

20      months.  But at that point, you know, the way I

21      word it is it makes not only no medical sense,

22      but it makes no just general common sense to keep

23      up with a year and a half of treatment that

24      Mr. Waskowski basically says is worthless.  He

25      was no better at any time, not even temporarily.

Steven Geiringer, MD
11/21/2012

Page 52

1              In fact, he was slowly worsening over

2         time.  So to provide that such therapy, there's

3         no possible justification for it, no explanation

4         for it.

5    Q.   Is it normal for a person of -- I believe

6         Mr. Waskowski was 46 years old when he came to

7         see you or close to 46?

8    A.   He was 48 when I saw him, but it had been a year

9         and a half, so maybe he was 46 at the time of the

10        accident.

11   Q.   Do you expect degenerative changes in the spine

12        of a person of that age?

13   A.   Yeah, those are there if you look for them by --

14        in many people by 35, a lot of people by 40, all

15        of us by 45 or 50.  Certainly 100 of us to some

16        extent.

17             Choosing your grandparents or

18        great-grandparents will tell you if there's a

19        little bit or a lot.  So make sure you choose

20        wisely, but it's going to be there.

21   Q.   So if the suggestion was made by Dr. Glowacki

22        that there would be no reason to believe that

23        there was degenerative changes in the spine of

24        Mr. Waskowski, would you agree or disagree with

25        that proposition?

Steven Geiringer, MD
11/21/2012

1  A.  You mean because of his age at 46?

2  Q.  Because of his age at 46?

3  A.  Well, 100 percent of people have changes in their

4      spine, so that's fully incorrect.

5  Q.  I'm trying to phrase this question eloquently,

6      but I don't know how to do it.  If you don't find

7      that there's any organic reason to explain pain

8      and there's no impairment, is there any way to

9      say that he was injured in this accident from

10     your examination?

11  A.  Well, remember we have to separate symptoms from

12      an actual condition.

13  Q.  Yes, sir.

14  A.  So when someone tells me they hurt, they hurt.

15      My job, whether I'm treating them or whether I'm

16      seeing them for evaluation only, is to look for

17      the injury, look for the actual condition that is

18      causing the ongoing pain.

19          A lot of people have -- whether it's a

20      small or a large accident and to me the amount of

21      damage doesn't make much difference, I've seen it

22      all different ways.  You have an impact to the

23      spine, you can get -- the muscles are jarred,

24      what we call the soft tissues, ligaments and

25      connective tissues, and people hurt for a few



Steven Geiringer, MD
11/21/2012

Page 54

1     days to a few weeks or something like that.

2              Beyond that, you get contusions,

3     bruises basically of the muscles of the bone and

4     that can hurt for a few weeks to a month or so

5     and then you get into other things like ruptured

6     disks or pinched nerves, or full-blown strains

7     and those can hurt anywhere from a few weeks to a

8     few months, several months if it's a ruptured

9     disk, and that's where you need actual treatment.

10             There is nothing in this file from

11    Dr. Glowacki or the imaging studies or from when

12    I examined him a year and a half later to show

13    that there was any actual condition that occurred

14    on December 23 of '09.

15             Did he get bounced around?  He

16    certainly could have gotten bounced around, so

17    the initial aches and pains could certainly --

18    were probably undoubtedly there, but in terms of

19    ongoing for a year and a half, you know -- the

20    other point too is that a year and a half of

21    therapy, we talked about it doesn't make sense to

22    keep going with what is essentially worthless

23    therapy, but actual medical conditions get

24    better, not only with time, but also with

25    treatment.



Steven Geiringer, MD
11/21/2012

1        So there's virtually nothing anybody

2        can think of that lasts for a year and a half

3        without getting better.  Now, add in if there was

4        something real and you're getting therapy aimed

5        at it, you know, he was getting worse over time.

6            There's really no known condition that

7        fits that pattern.

8    Q.   Could you tell me if you were going to determine

9        in a particular patient that they needed

10       attendant care, what types of things would you

11       evaluate or look for if you were going to make

12       that decision for one of your patients?

13   A.   The most common reason for attendant care in my

14       field but that I don't deal with is head injury,

15       an actual brain concussion, long-lasting

16       concussion, brain injury, TBI.

17           From the musculoskeletal standpoint

18       there is virtually nothing, virtually nothing

19       that requires attendant care.  Now, that's not

20       household assistance or replacement services.

21       You're asking only about attendant care.

22   Q.   Yes, sir.

23   A.   So that's personal, you know, bathing and

24       dressing and brushing one's teeth and washing

25       one's hair and showering, that sort of thing.

Steven Geiringer, MD
11/21/2012

1              There is almost nothing you can think

2        of.  Now, if one has just had an operation, you

3        just had a back fusion or neck fusion or a

4        shoulder operated on for the rotator cuff, sure,

5        in the postoperative area a few weeks or

6        something before you get back on your feet.

7              But from ongoing conditions, I do

8        request attendant care in other settings, but for

9        a simple straightforward musculoskeletal

10       condition, even if there were a ruptured disk,

11       even if there were pinched nerves, certainly

12       strains, those do not require attendant care

13       medically.

14   Q.  There are devices also to assist persons who are

15       physically disabled, am I correct?

16   A.  You mean like reachers and things?

17   Q.  Reachers and long-handled sponges and that sort

18       of thing.

19   A.  Right.

20   Q.  Did Mr. Waskowski ever mention to you or the

21       person who was there with him or his interpreter

22       tell you that anyone had ever prescribed any type

23       of assistive devices for him when you saw

24       Mr. Waskowski?

25   A.  He didn't offer that, but to be fair I didn't ask



Steven Geiringer, MD
11/21/2012

Page 57

1         him.

2    Q.   Would you have prescribed any for him?

3    A.   No, there is no medical need for that.

4    Q.   Last thing I want to ask you is, what is

5         malingering?

6    A.   Malingering has a specific diagnosis -- or a

7         specific definition.  In fact, that's the only

8         possible diagnosis I raised here.  That is a

9         conscious effort on the part of somebody to

10        appear disabled or when they act disabled when

11        there is no medical reason for that disability.

12   Q.   Was that part of your diagnosis for

13        Mr. Waskowski?

14   A.   In the end that was really the only diagnosis.

15             DEPOSITION EXHIBIT 2

16             reports dated 7-7-11 and 7-11-11

17             WAS MARKED BY THE REPORTER

18             FOR IDENTIFICATION.

19   Q.   Sir, I'm going to show you what I've marked as

20        Exhibit 2.  I believe I've stapled together both

21        of your reports.  If you could take a look and

22        make sure those are accurate copies of your

23        reports?

24   A.   Yes, they are.

25             MR. HEWSON:  I will move the admission



Steven Geiringer, MD
11/21/2012

Page 58

1      of my two exhibits and I have nothing further of

2      the doctor at this time.   Thank you, sir.

3                    THE WITNESS:   Okay.

4                          EXAMINATION

5    BY MR. TEMROWSKI:

6    Q.   Doctor, before the deposition began you allowed

7         me to look at your file which I'm now going to

8         hand back to you --

9    A.   Okay.

10   Q.   -- and I have taken some documents out of that

11        file that I'm going to have marked as exhibits

12        and then ask you about.

13                    But could you just hold that file up

14        and let the jury see your file on Mr. Waskowski

15        and who provided that file to you?

16   A.   I assume it was the same group that sent him to

17        me, MES.   That's who my letters are addressed to.

18                    MR. TEMROWSKI:   So we don't have to

19        waste time, why don't we go off the record and

20        I'll have the court reporter mark the documents

21        that I took out and then we'll go back on and

22        I'll ask you the questions.

23                    THE WITNESS:   Okay.

24                    VIDEOGRAPHER:   Going off the record at

25        1:47 PM.



Steven Geiringer, MD
11/21/2012

Page 59

1                    (A recess was taken).

2                    VIDEOGRAPHER:  We're back on the record

3           at 1:51 PM.

4    BY MR. TEMROWSKI:

5    Q.   Doctor, since Mr. Hewson began by questioning you

6         about your credentials, your qualifications, I

7         guess I'll begin there also.

8                    You indicated that you're a clinical

9         professor at Wayne State Medical School, correct?

10   A.   Yes.

11   Q.   Is that what you do full time?

12   A.   No, not at all.

13   Q.   You have no hospital affiliations?

14   A.   Correct.

15   Q.   Do you actually treat individuals who have been

16        injured in automobile accidents?

17   A.   Yes.

18   Q.   And your specialty is physical medicine and

19        rehabilitation, correct?

20   A.   Yes.

21   Q.   You are not an orthopedic surgeon?

22   A.   Right.

23   Q.   And do you perform surgery on individuals at all?

24   A.   No.

25   Q.   Have you ever performed a neck or a back surgery?



Steven Geiringer, MD
11/21/2012

Page 60

```
 1   A.   No.

 2   Q.   Now, we've established that you've authored two

 3        reports?

 4   A.   Correct.

 5   Q.   And the first report was July 7, 2011 that you

 6        sent to MES?

 7   A.   Right.

 8   Q.   And that was prepared and sent to you -- sent by

 9        you to them on the day that you examined

10        Mr. Waskowski?

11   A.   Well, it was prepared the same day.  We will --

12        I'll have it typed out, but the next day I'm in

13        the office, whatever that turned out to be, is

14        when I -- I review them at home online, edit it

15        and then the next business day, next time I'm in

16        the office, it gets mailed out that day.

17   Q.   Do you have that report in front of you?

18   A.   Yes, I do.

19   Q.   Take a look on the first page towards the bottom,

20        you indicate that before this automobile

21        collision occurred Mr. Waskowski didn't have

22        these type of problems, correct?

23   A.   Correct.

24   Q.   And that before the automobile collision of

25        December 23, 2009 he wasn't treating with any
```



Steven Geiringer, MD
11/21/2012

Page 61

1       doctors, correct?

2   A.  Right.

3   Q.  Didn't undergo or need any medical testing or

4       treatment?

5   A.  Right.

6   Q.  Was able to work?

7   A.  Yes.

8   Q.  And was under no limitations at all?

9   A.  Correct.

10  Q.  And in fact he was very healthy in general and

11      took no medications at all before the automobile

12      collision, correct?

13  A.  Right.

14  Q.  And Mr. Waskowski, if you now turn to Page 2, you

15      indicated that he was employed as a road truck

16      driver?

17  A.  Right, over the road.

18  Q.  And he'd drive up to a thousand miles a day?

19  A.  Right.

20  Q.  And that Mr. Waskowski has not worked since the

21      automobile collision of 12-23-09?

22  A.  Correct.

23  Q.  You then performed your exam on Mr. Waskowski?

24  A.  Right.

25  Q.  But -- and authored this report?



Steven Geiringer, MD
11/21/2012

Page 62

1    A.    Right.

2    Q.    But as you state two times in this report, you're

3          not going to give an opinion on Mr. Waskowski's

4          medical condition until you review the records?

5    A.    Right.

6    Q.    And as I understand it after this examination you

7          were provided records which you have in front of

8          you?

9    A.    They were actually provided before.  As I

10         mentioned, I didn't have a chance to look at

11         them, but yeah, they were provided concurrent.

12   Q.    And that's what's in your file in front of you,

13         correct?

14   A.    Yes.

15   Q.    And, as you've testified, you've reviewed all

16         those records?

17   A.    That's right.

18   Q.    Because it was important to do so?

19   A.    Right.

20   Q.    Now, your second report, if you take a look at

21         that because it's the report I'm going to go

22         through now with you is dated July 11, 2011.

23               And again this report is sent to MES,

24         correct?

25   A.    Right.



HANSON RENAISSANCE   hansonreporting.com
COURT REPORTERS & VIDEO   313-567-8100

Steven Geiringer, MD
11/21/2012

```
 1   Q.   In the second paragraph entitled "Record Review",
 2        you indicate -- and I'm going to quote it and
 3        read it, you wrote,
 4             "Photographs presumably from this event
 5             show moderate damage to the front
 6             driver's side and mild damage to the
 7             rear driver's side of a small sedan."
 8             Correct?
 9   A.   Right.
10             DEPOSITION EXHIBIT 3
11             copy of two photographs
12             WAS MARKED BY THE REPORTER
13             FOR IDENTIFICATION.
14   Q.   And in your file, and I'm going to now hand you
15        what I've had marked as Deposition Exhibit 3, are
16        those the photos that you reviewed and referred
17        to?
18   A.   Well, if you pulled them from here, then yes.
19   Q.   Yes.
20   A.   I mean, a year and a half later I don't have
21        recollection, but if they were pulled from there,
22        then yes, these are the ones I saw.
23   Q.   And in your opinion is that moderate damage to a
24        motor vehicle?
25             MR. HEWSON:  Objection, foundation.
```



Steven Geiringer, MD
11/21/2012

Page 64

```
 1        Doctor, to the extent you have an answer, go
 2        ahead.
 3              MR. TEMROWSKI:  Well, that's the
 4        doctor's own words.
 5              MR. HEWSON:  I understand, but I'm
 6        saying foundation.  I don't think it's relevant;
 7        go ahead.
 8   A.   I said there was moderate to the front end, front
 9        driver's side, and yeah, I would call that
10        moderate.  I've certainly seen a whole lot more
11        and a lot less and quite mild on the back.
12   BY MR. TEMROWSKI:
13   Q.   Then if you look on Page 2 of your report you
14        indicate that you reviewed records from a
15        Dr. Donahue, correct?
16   A.   Yes.
17   Q.   And you indicated in your report that
18        Dr. Donahue's name does not appear on an ABMS
19        website?
20   A.   Correct.
21   Q.   What does that mean?
22   A.   I mentioned earlier that there was 24 major
23        specialties.  They all sit under the umbrella
24        organization called the ABMS, the American Board
25        of Medical Specialties.
```

1              They have a website that you can put

2         someone's name in and see if they're board

3         certified in anything.  Dr. Donahue -- at the

4         time -- this is only a year and a half ago, but

5         at the time I didn't know there was a way to do

6         the same thing, to look up for a D.O.  He's an

7         osteopath, so I mention there he's not on the

8         ABMS website, but a lot of osteopaths are not

9         because they get certified through the

10        osteopathic boards.  I said he though is a D.O.

11        I have since, probably soon after that because

12        it's been a while, I since have found there is a

13        way to look for the same thing.

14              So if you were to tell me he's board

15        certified in orthopedic surgery, I consider those

16        equivalent, you know, the D.O. boards and the

17        ABMS boards.

18    Q.    Do you know Dr. Donahue?

19    A.    No.

20    Q.    Do you know what hospitals he's on staff at?

21    A.    No.

22    Q.    But you did review two reports that he authored,

23        correct?

24    A.    Yes.

25    Q.    And those reports are dated August 19, 2010 and



Steven Geiringer, MD
11/21/2012

Page 66

1        December 14, 2010, correct?

2   A.   Right.

3            DEPOSITION EXHIBIT 4

4            reports dated 8-19-10 and 12-14-10

5            WAS MARKED BY THE REPORTER

6            FOR IDENTIFICATION.

7   Q.   And they're in your file and I've had those

8        pulled out and marked as Exhibit 4.  I'm going to

9        hand them to you.

10  A.   Okay.

11  Q.   And I'd like to start with the August 19, 2010

12       report.

13            MR. HEWSON:  I will object to both of

14       these in that they are hearsay and if they're

15       being admitted for the truth of the matter

16       contained therein, there is no foundation.

17            Subject to that of course we'll take

18       your answers.

19  BY MR. TEMROWSKI:

20  Q.   Dr. Donahue in his report indicates that

21       Mr. Waskowski was seen for a second opinion,

22       correct, very top of the report, first sentence

23       the 8-19-2010 --

24  A.   Oh, I'm sorry I had the wrong one in my hand.

25       Yes, second opinion, right.


HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO    313-567-8100

```
 1   Q.   And it talks about the motor vehicle accident of

 2        December 23, 2009, correct?

 3   A.   Yes.

 4   Q.   And it indicates that Mr. Waskowski was

 5        complaining to [sic] pain to various parts of his

 6        body, correct?

 7   A.   Right.

 8   Q.   Including his shoulder and his back?

 9   A.   Ah, let's see.  Cervical spine, lumbar spine,

10        left shoulder and left leg.

11   Q.   And Dr. Donahue in his report that you have, he

12        performed a physical examination upon

13        Mr. Waskowski, didn't he?

14   A.   Yes.

15                  MR. HEWSON:  Objection, foundation; go

16        ahead.

17   BY MR. TEMROWSKI:

18   Q.   And that physical examination is -- the findings

19        were different than what you found, aren't

20        they --

21   A.   Yes.

22   Q.   -- when you examined Mr. Waskowski?

23   A.   They are.

24   Q.   And in fact there are several -- what would you

25        call them -- abnormalities that he found when he
```



Steven Geiringer, MD
11/21/2012

Page 68

1      examined Mr. Waskowski?

2   A.   Abnormal physical findings.

3   Q.   And there's -- at the bottom of the page it

4        discusses the MRI, correct?

5   A.   Yes.

6   Q.   And would you just read from that report what the

7        MRI indicates?

8   A.   He writes that the MRI of the cervical spine

9        demonstrates basically ruptured disc, herniated

10       nucleus pulposus greatest at C4-5 and C5-6.

11             Further he says there is another

12       ruptured disc in the low back between L5 and S1.

13   Q.   And he arrives at an impression, doesn't he?

14   A.   Yes.

15   Q.   And would you read what that states?

16             MR. HEWSON:   Objection, same thing.  Go

17       ahead, doctor.

18   A.   He has -- the impression was involved in the

19       accident, suffering to the cervical and lumbar

20       spine, but then more specifically the same three

21       disks he just mentioned from the MRI scan.

22   BY MR. TEMROWSKI:

23   Q.   And then Dr. Donahue arrived at a plan for

24       treatment, correct?

25   A.   Yes.



Steven Geiringer, MD
11/21/2012

1    Q.    And in fact his plan for treatment was to have

2          Mr. Waskowski follow up with Dr. Glowacki for

3          injections of the said areas with epidural

4          steroid, is that true?

5    A.    That's what he wrote.

6    Q.    Then, doctor, if you could look at the other

7          report that Dr. Donahue authored, the report

8          dated December 14, 2010, in the very last

9          paragraph Dr. Donahue discusses --

10   A.    Sorry, of the second page?

11   Q.    Of the second page?

12   A.    Okay, yep.

13   Q.    And Dr. Donahue discusses a possible surgical

14         intervention, isn't that true?

15   A.    He does.

16   Q.    And would you please read to the jury what

17         Dr. Donahue wrote regarding a possible surgical

18         intervention?

19               MR. HEWSON:  Objection, hearsay.  Go

20         ahead.

21   A.    He once again talked about these injections that

22         we mentioned from the first visit, but then he

23         said if he does not have significant improvement

24         from those injections we may discuss some

25         surgical intervention which would include



Steven Geiringer, MD
11/21/2012

Page 70

```
 1        possible disk removal versus fusion in the low

 2        back and a fusion in the neck.

 3                    I mean, technically other words, but

 4        that's what he meant.

 5   BY MR. TEMROWSKI:

 6   Q.   And again, doctor, Dr. Donahue is an orthopedic

 7        surgeon and you are not, correct?

 8                    MR. HEWSON:  Objection, foundation.  Go

 9        ahead.

10   A.   Well, I'll assume he's board certified.  If you

11        know that or not, but I assume he's board

12        certified, so I'll say yes, he's an orthopedic

13        surgeon and I am not.

14   BY MR. TEMROWSKI:

15   Q.   Okay.  Now, I've already pulled from your records

16        Dr. Zamorano's report that you and Mr  Hewson

17        talked about here.

18   A.   Briefly.

19                    MR. HEWSON:  Same objection regarding

20        hearsay and foundation.  Go ahead.

21   BY MR. TEMROWSKI:

22   Q.   And, again, just so I'm clear, doctor, you did

23        review these reports, didn't you?

24   A.   Yes.

25   Q.   And they're in your file?
```



Steven Geiringer, MD
11/21/2012

Page 71

1    A.    Yes.

2    Q.    And you indicated that -- I'm quoting you and if

3          it's inaccurate, please let me know -- but I

4          believe you testified that these reports and

5          records give you insight as to what others have

6          found?

7    A.    Right.

8              DEPOSITION EXHIBIT 5

9              report dated 3-18-11

10             WAS MARKED BY THE REPORTER

11             FOR IDENTIFICATION.

12   Q.    So now we have Dr. Zamorano's report which I've

13         had marked and handing you as Exhibit 5.  And if

14         you could please look on Page 3 of her report

15         regarding Mr. Waskowski --

16   A.    Okay.

17   Q.    -- there is a heading entitled "Medical

18         Diagnosis", do you see that?

19   A.    Diagnostics, yeah, testing.

20   Q.    And would you please read to the jury what that

21         states?

22   A.    The whole paragraph?

23   Q.    That paragraph.

24   A.    MRI of the left shoulder on September 28, 2010

25         reports a degree of rotator cuff strain and small



Steven Geiringer, MD
11/21/2012

Page 72

1    tears in the cartilage of the shoulder.  There

2    are some arthritis claims as well.

3                MRI of the low back, the lumbar spine,

4    shows disk herniations at two levels, L4-5, L5-S1

5    and then MRI of the neck shows multiple disk

6    herniations, she mentions two levels, C4 through

7    C6 and then that was really it for significant

8    findings.

9  Q.   Okay, and then right below that there is a

10      section entitled "Assessment"?

11  A.   Yes.

12  Q.   And would you please read what Dr. Zamorano wrote

13      there regarding Mr. Waskowski?

14  A.   She said he was involved in an MV -- a car

15      accident which resulted in neck pain from disk

16      herniations, low back pain from two disk

17      herniations and left shoulder pain from these

18      cartilage tears.

19                She also mentioned dizziness which I

20      didn't really deal with.

21  Q.   And then right below that on her report is a

22      section entitled "Medical Decision Making",

23      correct?

24  A.   Yes.

25  Q.   And isn't it true, doctor, that in that section



Steven Geiringer, MD
11/21/2012

Page 73

1       of her report Dr. Zamorano wanted Mr. Waskowski

2       to undergo additional MRI testing?

3                    MR. HEWSON:   Objection, foundation.   Go

4       ahead.

5   A.  For the brain, for the dizziness, but yeah.

6   BY MR. TEMROWSKI:

7   Q.  And she also recommended that he be fitted for a

8       neck brace and a back brace?

9   A.  Correct.

10  Q.  Now, going back to your second report on Page 2,

11      you evidently have in your file and you reviewed

12      other medical reports that were performed by

13      other physicians who did independent medical

14      examinations on Mr. Waskowski, correct?

15  A.  I think there was just one.  That second from

16      last paragraph says orthopedic IME.  I think that

17      was the only other one, only one.

18  Q.  Okay, well, we'll get --

19  A.  Is there another?

20          DEPOSITION EXHIBIT 6

21          reports dated 7-23-10 and 9-3-10

22          WAS MARKED BY THE REPORTER

23          FOR IDENTIFICATION.

24  Q.  Well, yes, and we'll get to that in one second.

25      Again, I pulled these documents from your file.



Steven Geiringer, MD
11/21/2012

Page 74

1    They've been marked as Exhibit 6.

2              I'm going to hand those to you and

3    those are reports from a Dr. Higginbotham,

4    correct?

5  A.  Yeah, that's right.

6  Q.  And they were in your file?

7  A.  Yes.

8  Q.  And you looked at them?

9  A.  Yes.

10  Q.  And Dr. Higginbotham is an orthopedic surgeon,

11    correct?

12  A.  Yes.

13  Q.  And he performed an independent medical

14    examination on Mr. Waskowski, correct?

15  A.  Yes.

16  Q.  And Dr. Higginbotham authored two different

17    reports, one is dated July 23, 2010 and the other

18    September 3, 2010, correct?

19  A.  Yes.

20  Q.  If you would look at the July 23, 2010 report on

21    Page 4 at the bottom there's a heading called

22    "Diagnostic Impression", correct?

23  A.  Yes.

24  Q.  And then if you flip the page to Page 5 the

25    second paragraph, would you read to the jury the



Steven Geiringer, MD
11/21/2012

Page 75

         1          first sentence of the second paragraph what

         2          Dr. Higginbotham wrote after he examined

         3          Mr. Waskowski?

         4                   MR. HEWSON:  Objection, hearsay.  Go

         5          ahead.

         6    A.    It would be appropriate for him, the patient, to

         7          have a course of an epidural steroid injection to

         8          see if this would be beneficial for him.

         9    BY MR. TEMROWSKI:

        10    Q.    And then if you would please look at --

        11    A.    Now, you know, let me just be fair here and you

        12          asked me to read the first sentence, but there's

        13          a pretty important point in the next sentence

        14          which he says this could be useful as a

        15          diagnostic test as well as a therapeutic one,

        16          meaning diagnostic if his pain were taken care of

        17          that might be a useful procedure.

        18                   So he wasn't saying that he had a

        19          definite reason for the epidural, possibly to see

        20          if there was an actual condition.

        21    Q.    Okay, and then if you would look at

        22          Dr. Higginbotham's second report that he wrote,

        23          and -- you've got that in front of you, correct?

        24    A.    Yes.

        25    Q.    And the very first sentence in Dr. Higginbotham's



Steven Geiringer, MD
11/21/2012

Page 76

1       independent IME report of September 3, 2010

2       states, and I'm quoting, "I had an opportunity to

3       review actual images of the MRI of the cervical

4       spine on Jaroslaw Waskowski", correct?

5  A.   Yes.

6  Q.   And Dr. Higginbotham is an orthopedic surgeon,

7       correct?

8  A.   He is.

9  Q.   And in the second paragraph down from that would

10      you please read to the jury what Dr. Higginbotham

11      wrote in his report after he personally reviewed

12      the actual MRIs?

13          ~~MR. HEWSON:   Objection, foundation,~~

14  ~~hearsay.  Go ahead.~~

15  A.   He said that he shows multiple level disk

16      herniation at three levels in the neck and two

17      levels in the low back.

18          Was that all from that report you were

19      going to ask me about?

20  BY MR. TEMROWSKI:

21  Q.   That's all I was going to ask you.

22  A.   Because, again, there's context here and there's

23      a lot more in that report that plays into this.

24          MR. HEWSON:  I'll ask you about it.

25          THE WITNESS:  Oh, okay.



Steven Geiringer, MD
11/21/2012

1   BY MR. TEMROWSKI:

2   Q.   But that is what he wrote?

3   A.   That's what he wrote, that's part of what he

4        wrote.

5            DEPOSITION EXHIBIT 7

6            addendum to report dated 2-18-11

7            and addendum to report dated 11-16-10

8            WAS MARKED BY THE REPORTER

9            FOR IDENTIFICATION.

10  Q.   Now, when you were kind enough to let me look at

11       your file, on the very top of your file that I

12       pulled out I've had marked as Exhibit 7 is

13       actually two reports from another doctor who

14       performed an independent medical examination on

15       Mr. Waskowski and that is a Dr. Zachary Endress

16       who again is an orthopedic surgeon.

17            MR. HEWSON:  Objection, foundation.  Go

18       ahead.

19  A.   You know what, I did -- the last sentence of the

20       paragraph in my report says another orthopedic

21       evaluation agreed with ESI.  This may shorten

22       that line of  -- agreed with ESI.

23  BY MR. TEMROWSKI:

24  Q.   Well, doctor, again I've had Dr. Endress' two

25       reports that were in your file marked as Exhibit



Steven Geiringer, MD
11/21/2012

Page 78

1     7, I'm going to hand those to you.

2           Do you have any reason to doubt that

3     Dr. Endress is an orthopedic surgeon?

4  A.  No.

5  Q.  Please take a look at Dr. Endress' independent

6     IME report dated October 25, 2010.

7  A.  The only two you handed me -- the actual

8     evaluation was done on November 16 of 2010 -- oh,

9     no, that was an addendum, so I guess I'm missing

10    one.

11 Q.  No, no, that's the one I want to ask you about.

12 A.  Okay.

13 Q.  The addendum and that is what date?

14 A.  November 16, 2010.

15 Q.  Okay, could I just see that a minute?  Okay, this

16    is the one I wanted to ask you about.

17          For starters, could you please tell the

18    ladies and gentlemen of the jury who did

19    Dr. Endress write that report to?

20 A.  State Farm Insurance.

21 Q.  And is there a particular adjuster?

22 A.  Terri Page.

23 Q.  And in this report that Dr. Endress wrote on

24    November 16, 2010 he is responding to several

25    questions that the adjuster Terri Page asked



Steven Geiringer, MD
11/21/2012

1      Dr. Endress, correct?  Take a look at it.

2  A.  I assume so, yes.

3  Q.  Would you please, doctor, read for the jury the

4      first question that was asked by the claims

5      adjuster and what Dr. Endress' answer was to the

6      first question?

7               MR. HEWSON:  Objection, foundation,

8      hearsay.  Go ahead.

9  A.  They basically asked what's the diagnosis.  His

10     answer was herniated cervical and lumbar disks.

11  BY MR. TEMROWSKI:

12  Q.  And please read the second question that was

13     asked and what his answer was?

14              MR. HEWSON:  Same objection.

15  A.  It says what are your diagnoses of Mr. Waskowski.

16     He gave the same answer, disk herniation both the

17     neck and low back and then he goes on to say he

18     agrees with trying these epidurals.

19  BY MR. TEMROWSKI:

20  Q.  And what is the third question that was asked him

21     and what was his answer?

22  A.  Has he reached pre-injury status, answer was no.

23  Q.  And what was the fifth question that was asked

24     and what was his answer?

25  A.  Is he yet able to return to pre-accident activity



Steven Geiringer, MD
11/21/2012

Page 80

```
 1        levels including at work, and he said no, not
 2        yet.
 3   Q.   And last but not least would you read to the jury
 4        what was the sixth question that was asked and
 5        what was his answer?
 6   A.   They asked about replacement services, household
 7        assistance, chores.  He said I think he does need
 8        help with laundry, meal preparation and
 9        landscaping, outdoor activities.
10   Q.   And then you have another letter there?
11   A.   Oh, yeah.
12   Q.   Correct?
13   A.   Yes.
14   Q.   And, again, that is a letter dated February 18,
15        2011?
16   A.   Right.
17   Q.   And, again, that report is signed by Dr. Endress
18        who did the IME on Mr. Waskowski?
19                 MR. HEWSON:  Objection same, same
20             objection, hearsay.  Go ahead.
21   A.   It's not signed by him, but authorized signature
22        by him, yes.  There's some initials below who
23        signed it, but that's all right.  He generated
24        the report.
25   BY MR. TEMROWSKI:
```



Steven Geiringer, MD
11/21/2012

1    Q.    And you don't doubt that, do you?

2    A.    Correct.

3    Q.    And, again, would you tell the ladies and

4          gentlemen of the jury who was this report sent

5          to?

6    A.    Same, State Farm and Terri Page.

7    Q.    And Dr. Endress writes to Ms. Page -- and correct

8          me if I'm not reading it right -- "I have

9          reviewed the additional records that you provided

10          to me regarding Mr. Waskowski," correct?

11   A.    Yes.

12   Q.    "As I mentioned in my original report, I think

13          that he does have loss of some services including

14          laundry, meal preparation and yard work as well

15          as landscaping activities"?

16   A.    That's what he wrote.

17   Q.    And that was on February 18, 2011?

18   A.    Yes.

19   Q.    Just a few follow-up questions and I'm almost

20          done.

21   A.    Sure.

22   Q.    But I believe that you testified to Mr. Hewson

23          and indicated that in your experience that

24          physical therapy should only be given to an

25          individual for eight or nine visits for about



Steven Geiringer, MD
11/21/2012

Page 82

1          three weeks, is that true?

2     A.   That was for a strain.

3     Q.   For a strain?

4     A.   Ten, up to 10 visits, 10 or 12.

5     Q.   What about through for a herniated disk?

6     A.   Herniated disk without radiculopathy, without a

7          pinched nerve, would be possibly six or even

8          eight weeks.

9     Q.   At most?

10    A.   Typically at most if all goes well.

11    Q.   And you indicated when Mr. Hewson asked you a

12         question about an injury -- I guess he was asking

13         about what Dr. Glowacki said about Mr. Waskowski

14         that Dr. Glowacki believed that because of his

15         injuries Mr. Waskowski would have pain for the

16         rest of his life?

17    A.   Right.

18    Q.   And you don't agree with that?

19    A.   Correct.

20    Q.   Well, have you ever, doctor, in your experience

21         of dealing with people who have neck and back

22         injuries and specifically herniated disks, have

23         you ever heard of someone having problems for the

24         rest of their life because of a herniated disk?

25    A.   What I actually said before to Mr. Hewson was



Steven Geiringer, MD
11/21/2012

1    there's no known musculoskeletal condition, again

2    not cancer or something, that explains pain for

3    the rest of your life.

4              I mention that if someone told me 20

5    years from now I've had pain since I met you 20

6    years ago, there's no way to say yes or no to

7    that because it can't be measured.

8              There's no way to refute or confirm

9    that somebody actually has pain.  The question is

10   what is the cause of that pain, is there

11   something explainable causing that pain in the

12   organic world as opposed to something

13   non-organic.

14   Q.   Now, if I understand your testimony correctly

15        when you were asked about your diagnosis for

16        Mr. Waskowski you indicated that there was no

17        condition found and that he was a malingerer?

18   A.   When I examined him --

19   Q.   Is that your diagnosis of him?

20   A.   That is my -- and remains my diagnosis even with

21        the other records I just looked at, yes.

22   Q.   And is it your opinion that if a person did have

23        herniated disks in their neck and back in your

24        opinion that that individual would not need

25        attendant care?



Steven Geiringer, MD
11/21/2012

Page 84

1   A.   From herniated disks they would not, no,

2        absolutely not.  If that person went through a

3        fusion I mentioned earlier that post-op they

4        would need temporary attendant care, but not for

5        the condition itself.

6   Q.   So absent a surgery, no fusion, they don't need

7        attendant care at all?

8   A.   For a herniated disk?

9   Q.   For a herniated disk.

10  A.   No.  You're asking for attendant care, not

11       household assistance?

12  Q.   No, I'm asking only about attendant care.

13  A.   Correct, that's my opinion.

14  Q.   Now, doctor, what injuries do you believe

15       Mr. Waskowski suffered in the automobile

16       collision of December 23, 2009?

17                 MR. HEWSON:  Objection, foundation.  Go

18       ahead, please.

19  A.   Well, what I can say is I examined him a year and

20       a half later, so when I was asked about looking

21       at records, that's when I mentioned I see what

22       other people were looking at and what their

23       conclusions they came to.

24                 I look for things that would

25       objectively document, let's say, exacerbation of



1     pre-existing cervical and lumbar spine
2     degeneration as a possibility, or herniated disk.
3     These were degenerative disks, but they can be
4     exacerbated.
5                There was nothing in any of
6     Dr. Glowacki's notes, many of which were
7     illegible, and nothing in the independent
8     evaluations you mentioned from the two different
9     physicians that to me documents the pattern of
10    findings that I expect to find with those
11    conditions.
12               So that's why my conclusion was there's
13    nothing to suggest an impairment, nothing to
14    suggest an actual condition.
15    BY MR. TEMROWSKI:
16    Q.   And now, doctor, you're aware that Mr. Waskowski
17         underwent MRI testing not once but two times?
18    A.   Right.
19    Q.   First time at Macomb MRI and then quite a while
20         later at Oakland MRI, correct?
21    A.   Right.
22    Q.   And you've got those reports in your file?
23    A.   Right.  I also looked at some of those images,
24         not all of them.
25    Q.   And would you agree with me, doctor, that the



1    written reports from both of the facilities that

2    performed the MRI testing on Mr. Waskowski's neck

3    and back clearly wrote down by the radiologists

4    that read them herniated disks?

5                MR. HEWSON:  I'm going to object to the

6        foundation, it's a compound question.  To the

7        extent you can, please answer.

8    A.    The reports said herniated disks, yes, both

9         reports both times -- I mean both places.

10   BY MR. TEMROWSKI:

11   Q.    We agree that that's what they say?

12   A.    That's what they say.

13   Q.    And in the case of Mr. Waskowski you commented to

14         Mr. Hewson again about Dr. Glowacki's diagnosis

15         of fractures, but as I understand it you yourself

16         never actually saw the actual bone scan, only the

17         written report?

18   A.    Right.

19   Q.    And you never actually reviewed with your own

20         eyes the x-rays, you only looked at the report?

21   A.    Right.

22   Q.    As opposed to these other doctors that we talked

23         about who are treating doctors of Mr. Waskowski,

24         you performed a one-time exam, correct?

25   A.    Correct.



Steven Geiringer, MD
11/21/2012

Page 87

1    Q.    And that exam was done on July 7, 2011?

2    A.    Right.

3    Q.    And is it true that all of the opinions that

4          you're giving this jury today are based upon that

5          one-time exam and your review of the records?

6    A.    Right, along with my experience and general

7          knowledge, but yes, for Mr. Waskowski only those.

8    Q.    You don't agree with Dr. Glowacki?

9    A.    In general, correct.

10   Q.    You don't agree with Dr. Zamorano?

11              MR. HEWSON:  I'm going to object.

12         There's no foundation for that, but go ahead.

13              MR. TEMROWSKI:  Well, let me rephrase

14         it then.

15   BY MR. TEMROWSKI:

16   Q.    Do you agree with Dr. Zamorano's assessment of

17         Mr. Waskowski?

18              MR. HEWSON:  Object, there's no

19         foundation that she made such an assessment, but

20         subject to that you can answer.

21   A.    I think the only comment I made about her input

22         was the EMG testing.

23   BY MR. TEMROWSKI:

24   Q.    Do you agree with Dr. Donahue's assessment of

25         Mr. Waskowski?



1   A.   If he is saying that his exam found symptomatic

2        clinically relevant disk herniations, I disagree

3        with that.

4   Q.   Do you believe that Mr. Waskowski ever needed

5        household assistance?

6                 MR. HEWSON:  Objection, foundation,

7        relevance.  Go ahead.

8   A.   Well, when I examined him certainly not.  Based

9        on the records I reviewed no, I do not think so.

10  BY MR. TEMROWSKI:

11  Q.   So you don't agree with Dr. Endress who performed

12       an independent medical examination on him?

13  A.   I do not.

14  Q.   And I take it you don't agree or don't believe

15       that Mr. Waskowski needed or ever needed

16       attendant care?

17  A.   Not attendant care, certainly not.

18  Q.   Is your opinions that you're giving to this jury

19       today limited to the date of your examination of

20       Mr. Waskowski?

21                In other words, you didn't see him

22       before July 11, 2011?

23  A.   July 7, but correct.

24  Q.   And you don't know what his condition was like

25       then, correct?



Steven Geiringer, MD
11/21/2012

1  A.  Well, what I can give opinions about is from

2      direct observation of him that one date, but of

3      course the file is where I got the rest of my

4      information.

5  Q.  Now, I'd like to finish up by just asking you

6      we've established that you performed a one-time

7      independent exam and that was done at whose

8      request?

9  A.  MES, secondarily State Farm apparently.

10 Q.  And would you please tell the ladies and

11     gentlemen of the jury who exactly is this MES?

12 A.  I consider them kind of an outfit that brokers

13     these exams.  They will have physicians go into

14     their own offices to perform these exams and I

15     believe in the case of MES it's all defense side.

16          I did that for a very short time when I

17     went into my own private practice in '99 for

18     about a year, but otherwise they would send

19     people to me, again sort of brokering them

20     through -- I don't know if it's State Farm -- in

21     this case State Farm.  I'm not sure who else they

22     might deal with.

23 Q.  And you've been working with MES for how long?

24 A.  I've believe since '99 at least to some extent.

25 Q.  And what exactly is your legal relationship to



1           MES?

2    A.     None.

3    Q.     Are you an independent contractor?

4    A.     Yes, there's none of these companies that I go

5           into their office or have any agreement with

6           other than I'm happy to take patients from them

7           and -- or, you know, referrals from them and I

8           assume they -- well, I think they're the ones,

9           for example, it doesn't come straight from State

10          Farm.

11                  I think MES or people like them will

12          copy the records and do things like that.

13   Q.     And in the case of Mr. Waskowski did you generate

14          a fee that was charged for your exam of him and

15          your review of the records?

16   A.     Sure.

17   Q.     And would you please tell us what was your fee?

18   A.     The fee last year was $740 for the exam which

19          includes up to 15 minutes of record review and

20          the exam and the report.

21                  And then the record review I can

22          probably tell you, because I charge that at the

23          same rate, hourly rate, but in 15-minute

24          increments, and this was an hour and

25          three-quarters, so an hour and three-quarters,



Steven Geiringer, MD
11/21/2012

Page 91

```
 1          one and three-quarters times $740, what is that,

 2          another $1,300 and something maybe on top of

 3          that, so a little over $2,000 total.

 4    Q.    And who paid you that fee?

 5    A.    It usually would come from MES itself.

 6    Q.    And in addition to that fee did MES charge a fee?

 7                    MR. HEWSON:  Objection, foundation.  Go

 8          ahead.

 9    A.    I have no idea, but I assume they're in business

10          to also -- they can't stay in business without

11          charging a fee, so I don't know what they might

12          charge on top of that.

13                    It wouldn't make good business sense

14          for them to just pay me whatever State Farm pays

15          them, so I assume they get a fee for what they

16          do.

17    BY MR. TEMROWSKI:

18    Q.    And what about for today's deposition, what is

19          your fee to that?

20    A.    A new year, so I went up $20, so it's $760 per

21          hour now.

22    Q.    $760 per hour?

23    A.    Right, for the deposition.

24    Q.    And is MES paying that fee?

25    A.    I don't know, I don't think so, I'm not sure.
```



Steven Geiringer, MD
11/21/2012

Page 92

```
 1          I'm not sure where the request for the deposition
 2          came from, if Mr. Hewson -- I just don't know.
 3          Ultimately I would assume it gets paid by the
 4          insurance company.
 5     Q.   State Farm?
 6     A.   By State Farm.
 7     Q.   And this examination that you actually performed
 8          -- I'm not talking about the record review -- the
 9          exam of Mr. Waskowski, how long did that last?
10     A.   Face to face, about 30 minutes.
11     Q.   And, doctor, what percent of your -- what shall
12          we call it -- your livelihood is devoted to doing
13          these types of examinations?
14               MR. HEWSON:  I'm going to object to the
15          foundation unless you're asking just about State
16          Farm.  Any other inquiries are irrelevant, but
17          subject to that you can answer.
18     A.   I mentioned earlier that about 60 percent of my
19          practice is treatment and the other remainder are
20          evaluations, evaluation only.
21     BY MR. TEMROWSKI:
22     Q.   And have you ever done these types of evaluations
23          in the past for State Farm?
24     A.   Oh, yeah.
25     Q.   How many?
```



```
 1   A.   I don't keep track of numbers by provider or by

 2        insurance company.  My sense is that State Farm,

 3        of all the people who send folks to me is the

 4        single biggest sender of these evaluations, not

 5        majority but the plurality.

 6                  Again, I don't have a way of actually

 7        counting them.

 8   Q.   And on this last question, I want to make it

 9        perfectly clear that I'm not inquiring about your

10        income from your private practice, but what was

11        your income last year for performing these

12        one-time examinations.

13                  MR. HEWSON:  Objection, foundation and

14        if it doesn't relate to State Farm it's

15        irrelevant.  Subject to that you can answer.

16   A.   Well, I've been asked that many times and the

17        problem is I can't really tell and I don't have a

18        good way of keeping track other than going

19        through my records one person by one person which

20        I'm not going to do.

21                  The reason is because when I get people

22        from State Farm for these evaluations or from

23        other insurance companies I also get people from

24        them for treatment, and so when I get a statement

25        at the end of the year, you know, the 1099 at the
```



Steven Geiringer, MD
11/21/2012

Page 94

1           end of the year, it includes all of those.

2                       And so -- and they don't separate them

3           out, so there's really no good way for me to

4           separate it, there's no possible way for me to

5           separate that out, so I really don't know.

6      BY MR. TEMROWSKI:

7      Q.   How many of these exams would you estimate that

8           you performed this year?

9      A.   Oh, boy.  Again, I don't keep -- I know I'm

10          usually asked what percent of my practice is

11          this.  That's why I know ballpark in the 40

12          percent, 35, 40 percent.  Actual number-wise I

13          really haven't been asked -- or not asked that

14          very often so I don't have that number.

15                      I know it's about 40 percent.

16     Q.   Well, if you had to give it your best shot, how

17          many individuals would you say in the year 2012

18          you examined like you did Mr. Waskowski?

19     A.   Again, I don't have a good way to even estimate

20          that.  Ballpark, a few hundred, I don't know,

21          yeah.

22                      MR. TEMROWSKI:  Okay, thank you, I have

23          no other questions.

24                      MR. HEWSON: I have some to follow up.

25                            RE-EXAMINATION



1   BY MR. HEWSON:

2   Q.   Is there anything on Exhibit 4 that indicates

3        that Dr. Donahue is board certified?  Does that

4        show up anywhere in any of his reports that

5        indicates he's board certified in any specialty?

6   A.   No, but not everyone who is board certified says

7        so on their letterhead, but again if I were at my

8        home computer I could check in one minute, but

9        there's nothing on these files that says so.

10  Q.   My point is, you were just asking to look at the

11       records.

12  A.   Yeah.

13  Q.   And there's nothing in here whether he was or not

14       that indicates to you that Dr. Donahue is board

15       certified?

16  A.   That's correct.

17  Q.   And when you checked the American Board of

18       Medical Specialties website you found that he's

19       not board -- or he's not listed on the board for

20       that particular area, am I correct in that?

21  A.   He's not listed on ABMS.  Now, keep in mind

22       that's the umbrella organization for M.D.s.  Some

23       D.O.s will get board certified on the M.D. side

24       for various political and other reasons.

25            The D.O. universe has its own set of



Steven Geiringer, MD
11/21/2012

Page 96

1   board certifications, so it's the American Board

2   of -- oh, of osteopathic PM&R, of osteopathic

3   orthopedic medicine, and again I could check now

4   if he's board certified.

5             And if he is, from the osteopathic side

6   I take that as full scale as if it were on the

7   ABMS side for an M.D. or a D.O. on the M.D. side.

8   Q.  Sure.

9   A.  But I just don't know.

10  Q.  I understand.  My point is, apparently we're not

11      going to hear from Dr. Donahue himself so my

12      question is from the documents you have there is

13      no way of determining that, even when you did

14      your own investigation, is that a correct

15      statement?

16  A.  Well, I don't know.  There might have been a way

17      back a year and a half ago for me to check the

18      D.O. website, but I didn't know about it then.

19             I've done it routinely for at least a

20      year now, but -- so I just don't know.

21  Q.  Okay.  The reports -- the report of August 19,

22      2010 from Dr. Donahue is not authored to any

23      particular individual, is it?

24  A.  It's not authored, it just says that it's a

25      second opinion from Dr. Glowacki.



Steven Geiringer, MD
11/21/2012

Page 97

1    Q.    From Dr. Glowacki.  The report of December 14,

2          2010, who's that one sent to?

3    A.    A Mr. Temrowski.

4    Q.    And, sir, on Page 2 of your report of July 11,

5          you found something particular in relationship to

6          Dr. Donahue's report, did you not?

7    A.    On July 11, sorry.

8    Q.    Yes.  On the third line of your report.

9    A.    I said the exam recorded -- is that what you

10         mean?

11   Q.    Yes, sir.

12   A.    The exam recorded the second date was identical,

13         the physical examination, pertinent findings, was

14         identical in verbatim fashion to the only other

15         visit -- oh, that was the first day.

16              The history -- the exam on 8-19-10 was

17         identical to 12-14-10.

18   Q.    Identical, is that significant?

19   A.    Well, these were done four months apart and every

20         pertinent finding, again was word for word the

21         same.  What I said was that's a medical

22         impossibility.

23              Even if someone has a ruptured disk or

24         a pinched nerve or something, it just doesn't

25         happen that the exam is identical even a week



Steven Geiringer, MD
11/21/2012

Page 98

1      apart or a couple of days apart necessarily.

2                   So, yeah, to me that's relevant in that

3      it's hard to lay much credibility on that

4      examination when findings are exactly the same.

5      Q.   Now, Dr. Zamorano, you were asked about

6           Dr. Zamorano.  Did she make a diagnosis?

7      A.   I didn't see an actual diagnosis in her report,

8           no.

9      Q.   So really there's no diagnosis for you to

10          disagree with?

11     A.   Right.

12     Q.   And there were some interesting issues that arose

13          from her report relative to her charges, correct?

14     A.   Yes.

15     Q.   And what was your concern there?

16     A.   Well, I just listed what she charged, for example

17          for the EMG --

18     Q.   Yes, sir.

19     A.   -- she did it for the arms and legs, and her bill

20          was $8,000.  When I -- it's rarely necessary to

21          do all four limbs for an EMG, but when I do that,

22          and when I use the State of Michigan Work Comp

23          Guidelines, they have a pay schedule, it's about

24          -- if I remember right -- about $1,250, $1,250

25          reimbursement.



Steven Geiringer, MD
11/21/2012

Page 99

1    Q.    For all four limbs?

2    A.    For all four limbs, so I said it's about six or

3          seven times what the State of Michigan would

4          allow, you know, etc.

5    Q.    Now, you also note that she claims there's 4 out

6          of 5 strength throughout all four limbs.  Could

7          you tell the jury in ranking strength what 4 out

8          of 5 means or what the general ranking system is?

9    A.    It's 0 through 5, 5 is normal.  4 is mild to

10         moderate weakness so just what it sounds like.

11               You know, I can resist -- the person

12         can resist against me, but I can overcome them,

13         you know, somewhat.  She listed the exact same

14         strength or weakness 4 in every muscle she

15         tested, arms, legs.

16               Once again, that's a medical

17         impossibility.  That's just not the way things

18         work and, you know, I'm not sure why she listed

19         4.  Either -- there's a lot of possible reasons,

20         but it's not possible what she listed.

21   Q.    And you had a concern relative to the charges she

22         was attempting to impose for a lumber corset, is

23         that correct?

24   A.    Well, yeah.  She apparently dispensed a corset

25         from her office.



1   Q.   What did she charge for that?

2   A.   $2,000.

3   Q.   How does that factor in in your knowledge of what

4        those things are supposed to be charged at?

5   A.   From what I've seen, both off the shelf and for

6        other invoices about 20 times, $100 or in that

7        ballpark, a little less, a little more, but about

8        20 times to give somebody a corset out of your

9        office.

10  Q.   Are you supposed to do that?  Are you supposed to

11       provide DME out of your own office?

12  A.   Well, people who do so would argue it's legal and

13       it is legal in certain settings, but it's also

14       illegal in other settings because of the

15       potential conflict of interest in dispensing

16       medications from your office, dispensing DME from

17       your office or doing PT out of your office.

18            Any federally-funded patient, have

19       addressed very much the medical and ethical

20       conflict that that potentially leads to.  And so

21       it's illegal in those settings.

22  Q.   Now, my brother counsel showed you

23       Dr. Higginbotham's reports from July 23, 2010 and

24       I believe his follow-up report from September 3,

25       2010, correct?



1    A.    Right.

2    Q.    There were things that you were asked basically

3          to ignore in the findings from Dr. Higginbotham,

4          isn't that true?

5    A.    No, he didn't ask me to ignore them.  He just

6          didn't ask me about it.

7    Q.    All right.  Well, let me ask you about this

8          symptom amplification issue.  Do you remember

9          discussing that?  Let me show you Exhibit 6.

10                  Do you remember discussing that in your

11         report of July 11, 2011?

12   A.    I believe I did, yes.  Did I?

13   Q.    Second to the last paragraph.

14   A.    Yes.

15   Q.    Could you take a look at the report and share

16         with the jury what Dr. Higginbotham's concerns

17         apparently were relative to symptom

18         magnification?

19   A.    Can you give me a hint where?

20   Q.    I think -- I believe it's in the --

21   A.    Oh, here we go.  So Page 5, last paragraph, "I

22         believe his presentation of being incapacitated

23         to the point of requiring attendant care is

24         symptom amplification" he says.

25                  He appears to be capable of caring for



1    himself, etc.

2  Q.  Does Dr. Higginbotham say that any attendant care

3      should be ordered for Mr. Waskowski?

4  A.  No, he says no.

5  Q.  How does symptom magnification defined by

6      Dr. Higginbotham interact, if it does, with your

7      finding of malingering?

8              How do those two things correlate, if

9      they do?

10 A.  Well, symptom magnification is a -- if you will,

11     a manifestation of malingering.  It's one of

12     those things where like I mentioned before, I'm

13     going to magnify my symptom of aching because I

14     have a cold so somebody else gets me the glass of

15     orange juice.

16             But when that becomes the primary

17     behavior and it's done in the conscious way,

18     which my examination clearly pointed out was very

19     conscious, that becomes a diagnosis of

20     malingering.

21 Q.  Now, there was discussion of epidural steroid

22     injections as a possible diagnostic or

23     therapeutic approach to Mr. Waskowski's

24     complaints, is that correct?

25 A.  That was.



Steven Geiringer, MD
11/21/2012

Page 103

1   Q.   Could you explain to the jury what a diagnostic

2        epidural steroid injection is as opposed to a

3        therapeutic one, if you know the difference?

4   A.   Well, I do and one would have a hard time finding

5        support for the idea of a diagnostic epidural.

6        It's an invasive procedure that carries potential

7        risks.  I mean, overall they're fairly safe.

8        Unfortunately we're hearing about dozens of

9        deaths from -- you know, it's not the typical

10       epidurals with this fungus, but nonetheless

11       potential complications or side effects.

12            And it really should be done, if you

13       look at organizations that oversee or deal with

14       this, they talk about you have to have actual

15       radiculopathy.

16            Just symptoms is not enough and -- we

17       haven't talked about this so far, but in terms of

18       epidurals, they were never indicated in

19       Mr. Waskowski for any stretch -- by any stretch

20       of the medical imagination if you go by the

21       guidelines that these organizations print, which

22       is it has to be pinched nerve kind of pain.

23            At no pain -- and not just pain, not

24       just symptoms, but there has to be some support

25       for an actual radiculopathy, reflex or something



1        that's dropped or atrophy or something.

2                   None of that ever occurred in

3        Mr. Waskowski.  Nobody ever documented an

4        abnormal neurologic exam.  So as another point,

5        not just me but guidelines, nationally published

6        guidelines, would disagree that epidurals were

7        warranted.

8    Q.  Dr. Higginbotham also suggested in that

9        diagnostic impression that there's no evidence of

10       acute osseous fractures or disruptions related to

11       the accident.

12                  Did I read that correctly?

13   A.  Yes.

14   Q.  Now, Dr. Higginbotham never said any of these

15       conditions that were found were related to the

16       automobile accident in his reports, did he?

17   A.  Let me see the rest of it.  Well, he goes on to

18       say at the top of Page 5 he talks about the MRI

19       findings we discussed.

20   Q.  Yes, sir.

21   A.  He says, "From a medical perspective, however, it

22       does not appear to be likely or probable that

23       these changes are related to the auto [sic]

24       accident" so from his standpoint maybe he was

25       saying the epidurals -- I would disagree -- but



Steven Geiringer, MD
11/21/2012

Page 105

1    the epidurals could be tried just because

2    because, but he did not think those changes were

3    related.

4  Q.  To the automobile accident?

5  A.  Right.

6  Q.  Thank you.  Lastly, I want to show you Exhibit 7

7    and ask you if Dr. Endress -- I'm sorry.

8         In the last paragraph on the third

9    report from Dr. Endress, what if any findings did

10   Dr. Endress suggest relative to the bone scan

11   that indicated fractures?

12 A.  He said it showed no evidence of acute fracture

13   shoulders, ribs or spine.

14 Q.  Was there any designation by Dr. Endress in his

15   report that any of these conditions arose from

16   the automobile accident?

17 A.  Let's see if they ask about causation.  I don't

18   see -- well, you can infer from his answer to

19   Question 3 that I was asked about before that he

20   thinks at least something was related because

21   Answer 3 was has he reached -- has he,

22   Mr. Waskowski, reached pre-injury status and his

23   answer was no, he doesn't think he has, so that

24   tells me he was thinking that something did

25   happen and he hadn't yet come back to baseline.



Steven Geiringer, MD
11/21/2012

1  Q.  Does that report tell you what it was that he

2      thought had happened?

3  A.  No -- well, I'm sorry, in terms of what he meant

4      by Number 3 --

5  Q.  Right.

6  A.  -- Number 2 said -- Dr. Endress' answer was about

7      the disk herniations in the neck and low back.

8  Q.  Having reviewed those reports again with

9      Mr. Temrowski, with myself and in your initial

10     view, does that -- does any of this change any of

11     your opinions relative to your ultimate diagnosis

12     of malingering for Mr. Waskowski?

13 A.  No, primarily because the main line of

14     questioning was about disk herniation and, again,

15     disk herniation takes on a very specific clinical

16     pattern and there's nothing in any of --

17     certainly my exam or any other documentation by

18     anybody else that would suggest disk herniation

19     and those charges are chronic degenerative

20     changes found on MRI, they're not acute.

21          MR. HEWSON:  Thank you, sir.  I have

22     nothing else.

23                    RE-EXAMINATION

24 BY MR. TEMROWSKI:

25 Q.  I just want to clarify one thing, doctor.  These



**Steven Geiringer, MD**
**11/21/2012**

1    reports from Dr. Donahue that we've talked about

2    and had marked as Exhibit 4, if my client is

3    Mr. Waskowski and Mr. Waskowski treated with a

4    doctor such as Dr. Donahue, would you find it

5    unusual for me as the attorney to write to the

6    doctor to get a report from the doctor?

7         MR. HEWSON:    Objection, relevance.    Go

8    ahead.

9    A.   Oh, you're asking about that it was addressed to

10        you?

11   BY MR. TEMROWSKI:

12   Q.   Right.

13   A.   No.

14   Q.   You don't see anything unusual about that, do

15        you?

16   A.   We're in the system obviously and so -- no, I

17        don't see anything unusual.

18   Q.   And I just want to clarify one other little thing

19        here.  Dr. Donahue's first report on

20        Mr. Waskowski was dated August 19, 2010, right?

21   A.   Yes.

22   Q.   And he clearly states that on that particular day

23        he saw Mr. Waskowski as a patient in his office?

24   A.   Yes.

25   Q.   When you look at the December 14 report that



Steven Geiringer, MD
11/21/2012

Page 108

1      Dr. Donahue wrote to me, does he -- does the
2      doctor indicate anywhere in there that he
3      actually saw Mr. Waskowski on December 14?
4   A.  So you think this might just be a summary of
5      his --
6   Q.  Correct.
7   A.  -- of his input so far to that date?  Which would
8      explain why the report was identical from one to
9      the other.
10  Q.  Exactly.
11  A.  Yeah, it could be.  He doesn't say so though and
12     usually -- I mean, I've seen a lot of reports
13     like this and usually it would be that this is a
14     summary of my exam from this and such date.  He
15     didn't mention the 8-19-10 date whatsoever in
16     here.
17          He says spine questionnaire 8-19-10,
18     so if that's the case, if it was only the one
19     examination, then -- and he's just recounting
20     what happened before, then I'll take back my
21     concern about the reports being verbatim from one
22     to the other.
23  Q.  And last but not least regarding whether or not
24     Dr. Donahue is board certified, would we -- since
25     we're at your office here today -- would we be



Steven Geiringer, MD
11/21/2012

Page 109

1       able -- because you said it would only take a

2       second -- could we go off the record and you

3       check that?

4    A.  I'm not online here in the office, believe it or

5       not.

6    Q.  Well, let me ask you this then, doctor.  If

7       Dr. Donahue performed surgery at William Beaumont

8       Hospital, would you expect him to be board

9       certified?

10               MR. HEWSON:  Objection, foundation.

11      We're not going to hear from Dr. Donahue.

12      Subject to that, you can answer, please.

13   A.  Not necessarily.  I mean most medical centers

14      have standards of, you know, what they want

15      someone to be.  Some will say you have to be

16      board certified, but I don't know what Beaumont

17      standards are for privileges.

18   BY MR. TEMROWSKI:

19   Q.  So when Mr. Hewson asked you questions about

20      whether or not Dr. Donahue is board certified or

21      Dr. Glowacki or Dr. Zamorano, you don't need to

22      be, do you?

23   A.  No, you don't need to --

24   Q.  In order to practice.

25   A.  You don't need to be board certified to practice



Steven Geiringer, MD
11/21/2012

Page 110

1      medicine, no.  You need to be licensed, but not

2      board certified.

3  Q.  Right, and as you just stated, you don't -- some

4      hospitals don't require that you be board

5      certified to do surgery there, correct?

6  A.  Right.

7             MR. TEMROWSKI:  Thank you, I have

8      nothing else.

9             RE-EXAMINATION (CONTINUED)

10  BY MR. HEWSON:

11  Q.  Without board certification, there's no

12      evaluation of the doctor by their peers as to

13      their skill level, is that true?

14  A.  That's correct.

15             MR. HEWSON:  Thank you.  I have nothing

16      else.

17             MR. TEMROWSKI:  No questions.

18             VIDEOGRAPHER:  This concludes the

19      deposition and we're going off the record at

20      2:47 PM.

21        (The deposition was concluded at 2:47 p.m.,

22      signature of the witness was not requested by

23      counsel for the respective parties hereto)

24

25



Steven Geiringer, MD
11/21/2012

Page 111

1                        CERTIFICATE OF NOTARY

2

3       STATE OF MICHIGAN     )

4                            ) SS

5       COUNTY OF  WAYNE      )

6            I, DALE E. ROSE, Certified Shorthand

7       Reporter, a Notary Public in and for the above

8       county and state, do hereby certify that the

9       above deposition was taken before me at the time

10      and place hereinbefore set forth; that the

11      witness was by me first duly sworn to testify to

12      the truth, and nothing but the truth, that the

13      foregoing questions asked and answers made by the

14      witness were duly recorded by me stenographically

15      and reduced to computer transcription; that this

16      is a true, full and correct transcript of my

17      stenographic notes so taken; and that I am not

18      related to, nor of counsel to either party nor

19      interested in the event of this cause.

20

21

22      DALE E. ROSE  CSR-0087

23      Notary Public,

24      Wayne County, Michigan

25  My Commission expires:  7-15-18



**Steven Geiringer, MD**
11/21/2012

**A**

ability 35:22
able 9:17 16:21
  40:11 49:8
  61:6 79:25
  109:1
ABMS 64:18,24
  65:8,17 95:21
  96:7
abnormal 25:23
  26:1 68:2
  104:4
abnormalities
  67:25
absent 84:6
absolutely 17:19
  84:2
academic 10:15
accepted 14:16
accident 12:4,8
  15:13,20 17:5
  22:1 46:13
  50:8 52:10
  53:9,20 67:1
  68:19 72:15
  104:11,16,24
  105:4,16
accidents 59:16
accurate 7:12
  41:14,18 57:22
aches 54:17
aching 102:13
act 27:13 57:10
Action 1:7
activities 80:9
  81:15
activity 79:25
actual 11:21
  18:19 19:15
  20:5,12 29:15
  32:20 43:7
  47:25 49:13
  53:12,17 54:9
  54:13,23 55:15
  75:20 76:3,12
  78:7 85:14
  86:16 94:12
  98:7 103:14,25
acute 18:21 30:3
  104:10 105:12

  106:20
add 39:14 55:3
addendum 4:8,9
  77:6,7 78:9,13
addition 91:6
additional 7:16
  73:2 81:9
address 6:4
addressed 58:17
  100:19 107:9
adjuster 78:21
  78:25 79:5
admission 57:25
admitted 66:15
Advil 18:18
affiliated 7:23
affiliations
  10:2,4,6 59:13
age 29:5 52:12
  53:1,2
aging 50:11
ago 15:25 27:3
  47:13 65:4
  83:6 96:17
agree 15:2 52:24
  82:18 85:25
  86:11 87:8,10
  87:16,24 88:11
  88:14
agreed 77:21,22
agreement 90:5
agrees 79:18
Ah 67:9
ahead 12:21
  27:21 64:2,7
  67:16 68:17
  69:20 70:9,20
  73:4 75:5
  76:14 77:18
  79:8 80:20
  84:18 87:12
  88:7 91:8
  107:8
aimed 55:4
allow 22:14
  23:12 99:4
allowed 8:24
  58:6
allows 12:22
  29:14
alter 23:23

American 64:24
  95:17 96:1
amount 22:3
  49:20 53:20
amplification
  48:21 101:8,24
anatomic 31:1
anatomy 35:2
angle 33:17
ankle 21:17
  35:24 42:14
ankles 31:1
answer 64:1 79:5
  79:10,13,16,21
  79:22,24 80:5
  86:7 87:20
  92:17 93:15
  105:18,21,23
  106:6 109:12
answers 66:18
  111:13
anticipated
  29:10
anticipating
  37:16
antiinflammat...
  18:15,22
antiinflammatory
  18:17
anybody 55:1
  106:18
anyplace 33:10
apart 97:19 98:1
  98:1
apparently 11:5
  40:17 50:13
  89:9 96:10
  99:24 101:17
appear 36:17
  57:10 64:18
  104:22
appearance 5:25
appearances 2:1
  5:10
appearing 2:8,16
  5:12,14
appears 101:25
appointment
  10:16
approach 102:23
appropriate 75:6

April 45:20
area 30:10,16
  34:23 39:3
  56:5 95:20
areas 12:24 16:5
  31:1 33:23
  36:25 42:19
  69:3
argue 50:20 51:1
  100:12
arm 16:16 26:6
  34:22 36:8
  38:10,12,12,12
  38:17,23 39:16
  39:22,24 42:9
  46:14 49:17
arms 36:11,24
  37:4 38:6 39:6
  98:19 99:15
arose 98:12
  105:15
arranges 11:6
arrived 68:23
arrives 68:13
arthritis 72:2
asked 41:7 75:12
  78:25 79:4,9
  79:13,20,23
  80:4,6 82:11
  83:15 84:20
  93:16 94:10,13
  94:13 98:5
  101:2 105:19
  109:19 111:13
asking 11:22
  55:21 82:12
  84:10,12 89:5
  92:15 95:10
  107:9
aspects 36:6
assessment 72:10
  87:16,19,24
assist 56:14
assistance 27:24
  27:25 28:4
  42:23 55:20
  80:7 84:11
  88:5
assistive 56:23
assume 11:17
  14:24 19:6

**Steven Geiringer, MD**
**11/21/2012**

41:15 58:16
70:10,11 79:2
90:8 91:9,15
92:3
**asymmetric** 30:22
**asymmetry** 31:2
**atrophy** 26:10
34:13 39:6,12
104:1
**attach** 25:19
33:23
**attached** 3:14
**attempted** 9:15
**attempting** 99:22
**attendant** 42:24
55:10,13,19,21
56:8,12 83:25
84:4,7,10,12
88:16,17
101:23 102:2
**attorney** 107:5
**attorneys** 5:9
**August** 65:25
66:11 96:21
107:20
**authentic** 41:15
41:17
**authored** 41:14
41:21 60:2
61:25 65:22
69:7 74:16
96:22,24
**authorized** 80:21
**auto** 104:23
**automobile** 1:10
59:16 60:20,24
61:11,21 84:15
104:16 105:4
105:16
**available** 45:11
**Avenue** 2:5
**aware** 85:16

_____
**B**
**back** 6:21 7:4
8:11 13:20
16:11 20:6,7,9
21:1,10 22:16
22:20 23:13
24:19 25:7,9
25:12,13,15

26:6 28:24
30:7 31:16,23
32:2 33:10,22
34:1,23 38:1
42:8 46:2,5,7
48:13 50:16,24
51:10,18 56:3
56:6 58:8,21
59:2,25 64:11
67:8 68:12
70:2 72:3,16
73:8,10 76:17
79:17 82:21
83:23 86:3
96:17 105:25
106:7 108:20
**background** 7:14
**backward** 29:8
**backwards** 30:6,8
37:18
**bad** 39:10
**balance** 36:13,15
36:16,19,21
**ballpark** 94:11
94:20 100:7
**barely** 31:24
**based** 14:17 87:4
88:8
**baseline** 105:25
**basic** 45:13
**basically** 15:7
15:14 25:18
26:3,4 32:8
33:17 42:24
51:24 54:3
68:9 79:9
101:2
**basis** 9:10
**bathing** 55:23
**Beaumont** 109:7
109:16
**began** 58:6 59:5
**behalf** 2:8,16
5:13,15
**behavior** 27:5,7
27:12,15,17
28:6 49:20
102:17
**believe** 13:1
15:22 36:15
52:5,22 57:20

71:4 81:22
84:14 88:4,14
89:15,24
100:24 101:12
101:20,22
109:4
**believed** 82:14
**bend** 21:9 30:13
**bending** 30:23
**beneficial** 75:8
**best** 94:16
**better** 15:15,17
16:8 25:12,13
29:16,24 30:16
50:17 51:18,25
54:24 55:3
**beyond** 51:4 54:2
**big** 21:10 27:24
31:6 32:12,24
35:17 47:22
**biggest** 93:4
**bill** 98:19
**billed** 48:17
**bit** 12:24 35:3
52:19
**bitter** 46:21
**blade** 39:22
**board** 8:15,18,25
9:13,21,24
13:5,8 14:2
48:15 64:24
65:2,14 70:10
70:11 95:3,5,6
95:14,17,19,19
95:23 96:1,1,4
108:24 109:8
109:16,20,25
110:2,4,11
**boards** 65:10,16
65:17
**body** 38:24 48:9
67:6
**bone** 39:22 43:4
43:8,25,25
44:5,15 48:25
54:3 86:16
105:10
**bones** 39:3
**book** 24:5
**bottom** 39:4
60:19 68:3

74:21
**bounced** 54:15,16
**boy** 94:9
**brace** 73:8,8
**brain** 20:24
55:15,16 73:5
**breastbone** 42:17
**brief** 12:13
**Briefly** 70:18
**bring** 33:9
**broker** 11:6
**brokering** 89:19
**brokers** 89:12
**brother** 100:22
**bruises** 54:3
**brushing** 55:24
**bulb** 29:19
**bunch** 48:24
**business** 60:15
91:9,10,13

_____
**C**
**calcium** 43:22
44:9
**calf** 21:14 26:12
**call** 11:5 13:8
25:4 27:4
42:23 43:22
47:20,25 53:24
64:9 67:25
92:12
**called** 9:8 11:7
13:13 17:15
22:11 31:17
35:24 37:17
46:20 64:24
74:21
**callus** 43:23
**calves** 21:13
**cancer** 29:13
37:10 48:6
83:2
**cane** 36:17
**capable** 101:25
**car** 12:4,8 15:13
15:19 72:14
**care** 42:24,24,25
45:14 55:10,13
55:19,21 56:8
56:12 75:16
83:25 84:4,7

Steven Geiringer, MD
11/21/2012

Page 3

84:10,12 88:16
88:17 101:23
102:2
caring 101:25
carpal 13:21
38:24,25
carries 103:6
cartilage 72:1
72:18
case 11:3 15:13
15:19 28:17
37:7 41:12
44:2 86:13
89:15,21 90:13
108:18
category 14:9
causation 105:17
cause 30:11 32:8
38:22 39:10
40:3 47:18
48:8 83:10
111:19
caused 29:9
causes 29:21
33:8 37:13
causing 20:7,9
20:13 32:21
33:1 53:18
83:11
center 10:5,9,12
centers 109:13
certain 12:24
23:7 29:18
35:9 38:15
40:2,4 46:14
50:17 100:13
certainly 18:5
25:22 34:4
48:2 52:15
54:16,17 56:11
64:10 88:8,17
106:17
CERTIFICATE
111:1
certification
9:5,9,12,13,21
13:3,6,9 14:2
110:11
certifications
96:1
certified 8:15

8:19,25 9:24
14:4 48:15
65:3,9,15
70:10,12 95:3
95:5,6,15,23
96:4 108:24
109:9,16,20,25
110:2,5 111:6
certify 111:11
cervical 48:19
67:9 68:8,19
76:3 79:10
85:1
chair 27:23
chance 40:19,21
41:23 43:5
49:2 62:10
change 23:15,18
24:17 27:21
46:20 50:9,10
106:10
changed 27:25
changes 52:11,23
53:3 104:23
105:2 106:20
charge 90:22
91:6,12 100:1
charged 90:14
98:16 100:4
charges 98:13
99:21 106:19
charging 91:11
check 35:23 95:8
96:3,17 109:3
checked 95:17
chicken-scrawls
45:17
choice 17:12
choose 52:19
Choosing 52:17
chores 80:7
chronic 17:20,22
106:19
circumstances
51:7
Civil 1:7 5:23
claims 31:9 72:2
79:4 99:5
clarify 106:25
107:18
classroom 8:5

clear 7:18 16:5
16:10 70:22
93:9
clearly 44:10
86:3 102:18
107:22
client 107:2
clinical 8:1,3
10:11 59:8
106:15
clinically 15:1
88:2
close 26:16 52:7
closely 35:10
code 24:5,6,6
cold 102:14
collar 48:19
collision 60:21
60:24 61:12,21
84:16
come 11:3 49:8,9
90:9 91:5
105:25
comes 39:21
coming 13:20
Commencing 1:20
comment 45:23
87:21
commented 86:13
Commission
111:25
common 15:10
51:22 55:13
Comp 98:22
companies 90:4
93:23
company 1:11
11:6 92:4 93:2
competently 9:18
complaining 67:5
complaints
102:24
completely 34:8
34:15 42:20
45:3 46:17
complications
103:11
components 37:2
compound 86:6
compromise 35:18
computer 95:8

111:15
concern 98:15
99:21 108:21
concerns 19:10
101:16
conclude 24:13
36:2
concluded 48:20
50:5 110:21
concludes 110:18
conclusion 50:3
85:12
conclusions
84:23
concurrent 62:11
concussion 55:15
55:16
condition 19:15
19:18 20:5,13
33:13,18 37:12
38:19,22 47:25
49:10,13 53:12
53:17 54:13
55:6 56:10
62:4 75:20
83:1,17 84:5
85:14 88:24
conditions 17:20
29:15 48:5,6
54:23 56:7
85:11 104:15
105:15
conducted 36:25
confirm 83:8
conflict 100:15
100:20
connection 17:12
connective 53:25
conscious 57:9
102:17,19
consciousness
42:4
consensus 18:6
22:10
consider 45:5
65:15 89:12
considered 14:13
26:23 51:13
consistent 35:4
contained 66:16
content 41:19

Steven Geiringer, MD
11/21/2012

context 76:22
continue 44:19
continued 3:9
  4:1 44:16 46:9
  110:9
continuing 9:10
contractor 90:3
control 21:12,18
contusions 54:2
copies 57:22
copy 3:22 63:11
  90:12
cord 6:18
correct 7:19
  8:16 20:14
  24:2 26:20
  39:6 41:16,17
  43:6 56:15
  59:9,14,19
  60:4,22,23
  61:1,9,12,22
  62:13,24 63:8
  64:15,20 65:23
  66:1,22 67:2,6
  68:4,24 70:7
  72:23 73:9,14
  74:4,11,14,18
  74:22 75:23
  76:4,7 79:1
  80:12 81:2,7
  81:10 82:19
  84:13 85:20
  86:24,25 87:9
  88:23,25 95:16
  95:20 96:14
  98:13 99:23
  100:25 102:24
  108:6 110:5,14
  111:16
correctly 14:17
  21:21 83:14
  104:12
correlate 28:5
  102:8
correlates 21:8
corset 48:18
  99:22,24 100:8
counsel 100:22
  110:23 111:18
counting 93:7
country 8:8 14:4

county 111:5,8
  111:24
couple 8:12
  12:10 22:4,19
  22:19 31:24
  40:16 43:24
  51:19 98:1
course 14:7
  66:17 75:7
  89:3
court 1:1 5:11
  58:20
CPT 24:6
create 45:6,13
created 39:3
credentials 59:6
credibility 98:3
crunch 30:9,11
CSR-0087 1:22
  111:22
cuff 39:18,19
  40:1,3 56:4
  71:25
curriculum 3:18
  7:7,11 10:1
C4 72:6
C4-5 68:10
C5-6 68:10
C6 72:7

_____

        D
Dale 1:22 111:6
  111:22
damage 26:11
  53:21 63:5,6
  63:23
date 5:20 7:13
  7:13,17 44:6
  44:22 46:17
  78:13 88:19
  89:2 97:12
  108:7,14,15
dated 3:20,24
  4:4,6,8,9 7:15
  57:16 62:22
  65:25 66:4
  69:8 71:9
  73:21 74:17
  77:6,7 78:6
  80:14 107:20
day 5:20 17:21

17:22 28:11,11
  40:18,18 60:9
  60:11,12,15,16
  61:18 97:15
  107:22
days 40:22 43:24
  44:8,12 54:1
  98:1
deal 22:7 27:4
  27:17 55:14
  72:20 89:22
  103:13
dealing 19:13
  82:21
deals 6:24
deaths 103:9
December 46:11
  54:14 60:25
  66:1 67:2 69:8
  84:16 97:1
  107:25 108:3
decipher 46:18
deciphering
  45:16
decision 55:12
  72:22
decreased 38:15
deep 37:25
Defendant 1:12
  2:16
defense 89:15
defer 40:20
deferred 40:14
deficit 50:24
defined 102:5
definite 75:19
definition 57:7
degeneration
  85:2
degenerative
  52:11,23 85:3
  106:19
degree 32:14
  33:17 71:25
degrees 31:23
  32:2,11,16,18
  32:18 33:2
  49:16,17
demonstrates
  68:9
depending 26:13

depends 19:19
deponent 3:18
  7:7
deposition 1:16
  3:17,19,21,23
  4:3,5,7 5:5,21
  5:24 7:6 57:15
  58:6 63:10,15
  66:3 71:8
  73:20 77:5
  91:18,23 92:1
  110:19,21
  111:9
describe 25:24
  36:14
described 13:6
designation
  105:14
Despite 37:22
detail 20:1
determine 55:8
determining
  96:13
Detroit 10:12
devices 56:14,23
devoted 92:12
diagnose 13:16
  13:19
diagnoses 44:20
  46:9 79:15
diagnosis 7:1
  19:18 20:3,3
  20:12 23:17
  24:1,2,5,6,7,9
  24:12 44:16
  49:8,10,12,24
  57:6,8,12,14
  71:18 79:9
  83:15,19,20
  86:14 98:6,7,9
  102:19 106:11
diagnostic 13:24
  74:22 75:15,16
  102:22 103:1,5
  104:9
Diagnostics
  71:19
diagonal 30:15
dictate 24:17
  27:13
differ 11:14

difference 11:21
11:24 17:25
20:20 26:9
32:12,15,19
33:14 53:21
103:3
different 8:4
23:24 25:10
26:16 28:24
30:25 32:4
33:12 34:3
35:2 37:6
53:22 67:19
74:16 85:8
difficulties
36:13
diminished 34:16
direct 89:2
direction 29:14
30:9
directions 25:10
28:24 29:9
37:8
disability 22:12
28:8,16 57:11
disabled 28:18
56:15 57:10,10
disagree 52:24
88:2 98:10
104:6,25
disc 68:9,12
discrepancy
32:25 34:9
discuss 23:22
69:24
discussed 104:19
discusses 68:4
69:9,13
discussing 101:9
101:10
discussion 40:15
102:21
disease 13:17
diseases 13:17
disk 18:21 20:10
24:10,11 29:15
29:18,24 30:1
30:2,5,11
31:13 37:12
50:14,16,17
54:9 56:10

70:1 72:4,5,15
72:16 76:15
79:16 82:5,6
82:24 84:8,9
85:2 88:2
97:23 106:7,14
106:15,18
disks 6:25 54:6
68:21 79:10
82:22 83:23
84:1 85:3 86:4
86:8
disorder 40:8
dispensed 99:24
dispensing
100:15,16
disruptions
104:10
distress 18:16
distribution
26:18 34:17,20
35:9 40:4
46:15
DISTRICT 1:1,2
dives 39:2
DIVISION 1:3
dizziness 72:19
73:5
DMC 10:14
DME 100:11,16
doctor 5:11 6:7
6:8,19 58:2,6
59:5 64:1
68:17 69:6
70:6,22 72:25
77:13,24 79:3
82:20 84:14
85:16,25 92:11
106:25 107:4,6
107:6 108:2
109:6 110:12
doctors 61:1
86:22,23
doctor's 5:24
64:4
document 84:25
documentation
45:9 106:17
documented 41:4
51:11 104:3
documents 58:10

58:20 73:25
85:9 96:12
doing 17:9 23:11
33:7 51:17
92:12 100:17
Donahue 64:15
65:3,18 66:20
67:11 68:23
69:7,9,13,17
70:6 95:3,14
96:11,22 107:1
107:4 108:1,24
109:7,11,20
Donahue's 64:18
87:24 97:6
107:19
dorsiflexion
35:24
doubt 78:2 81:1
dozens 103:8
Dr 5:6,21 6:3
14:25 17:2,2
41:20 42:6,16
44:19 45:1,10
45:21 46:19
48:3,14 49:3
51:11 52:21
54:11 64:15,18
65:3,18 66:20
67:11 68:23
69:2,7,9,13,17
70:6,16 71:12
72:12 73:1
74:3,10,16
75:2,22,25
76:6,10 77:15
77:24 78:3,5
78:19,23 79:1
79:5 80:17
81:7 82:13,14
85:6 86:14
87:8,10,16,24
88:11 95:3,14
96:11,22,25
97:1,6 98:5,6
100:23 101:3
101:16 102:2,6
104:8,14 105:7
105:9,10,14
106:6 107:1,4
107:19 108:1

108:24 109:7
109:11,20,21
109:21
dress 42:11
dressing 55:24
drive 61:18
driver 61:16
driver's 16:4
63:6,7 64:9
dropped 104:1
drug 17:12
duly 5:17 111:11
111:14
Dyke 2:5
D.O 65:6,10,16
95:25 96:7,18
D.O.s 95:23

_____
E
_____

E 1:22 111:6,22
earlier 34:2
38:14 39:9
40:10 41:1
47:8 50:15
64:22 84:3
92:18
early 42:3 43:22
easier 27:11
EASTERN 1:2
eating 29:13
37:10
edit 60:14
education 9:11
effect 28:13
effective 18:14
18:24 19:1
effects 103:11
effort 57:9
EHL 35:16
eight 22:17
23:14 81:25
82:8
either 16:17
21:5 35:12
43:9 48:4
99:19 111:18
electrodiagno...
13:2,12
eloquently 53:5
EMG 13:13,15,23
14:2,4,13,15

15:1 48:16
87:22 98:17,21
**EMGs** 14:12,18
48:15
**employed** 61:15
**Endress** 77:15,24
78:3,5,19,23
79:1,5 80:17
81:7 88:11
105:7,9,10,14
106:6
**entails** 6:13
**entire** 13:25
17:6 21:25
38:10,12,17
49:17
**entitled** 63:1
71:17 72:10,22
**epidural** 69:3
75:7,19 102:21
103:2,5
**epidurals** 79:18
103:10,18
104:6,25 105:1
**equivalent** 32:13
65:16
**ESI** 77:21,22
**especially** 30:14
**essentially**
29:14 46:7
54:22
**established** 60:2
89:6
**estimate** 94:7,19
**ethical** 100:19
**evaluate** 55:11
**evaluating** 19:9
**evaluation** 11:18
11:25 40:24
48:20 53:16
77:21 78:8
92:20 110:12
**evaluations** 11:7
41:8 85:8
92:20,22 93:4
93:22
**event** 63:4
111:19
**evidence** 17:23
34:16 47:3
104:9 105:12

**evidently** 73:11
**exacerbated** 85:4
**exacerbation**
84:25
**exact** 22:3 99:13
**exactly** 19:22
32:13 89:11,25
98:4 108:10
**exam** 7:1 9:4
12:23 14:23
24:24 25:1,3
26:4,25 33:21
40:12 47:16
50:13 61:23
86:24 87:1,5
88:1 89:7
90:14,18,20
92:9 97:9,12
97:16,25 104:4
107:16 108:14
**examination** 3:5
3:6 6:1 11:9
11:13,23 14:3
16:22 24:14,20
24:22 26:20
27:15 28:2
33:20 35:19
36:2,25 40:24
41:4,5 45:21
46:18 47:4
49:7 50:12
53:10 58:4
62:6 67:12,18
74:14 77:14
88:12,19 92:7
97:13 98:4
102:18 108:19
**examinations** 3:1
10:20 73:14
92:13 93:12
**examine** 11:16
15:4 24:20
34:10 41:2
**examined** 5:17
16:23 47:24
50:12 54:12
60:9 67:22
68:1 75:2
83:18 84:19
88:8 94:18
**example** 8:10

11:16 12:8
24:9 25:6
28:20 30:1,18
34:2 90:9
98:16
**exams** 89:13,14
94:7
**exercise** 17:9
**exercises** 17:9
**exhibit** 3:13,17
3:19,21,23 4:3
4:5,7 7:6,10
27:7 57:15,20
63:10,15 66:3
66:8 71:8,13
73:20 74:1
77:5,12,25
95:2 101:9
105:6 107:2
**exhibits** 3:11,14
3:15 4:1 58:1
58:11
**exist** 12:1
**expect** 29:4
52:11 85:10
109:8
**experience** 81:23
82:20 87:6
**experienced** 26:2
**expires** 111:25
**explain** 33:14,18
48:1 53:7
103:1 108:8
**explainable**
47:21 83:11
**explained** 48:23
**explains** 19:16
47:19 83:2
**explanation** 52:3
**express** 19:11
**expressing** 48:22
**extension** 29:7
**extensor** 35:14
35:16
**extent** 52:16
64:1 86:7
89:24
**Extra** 18:13 19:1
**eyes** 86:20

_____
**F**
_____

**F** 2:10
**face** 31:19 92:10
92:10
**facilities** 86:1
**facility** 19:25
**fact** 17:24 23:19
29:15 50:19
52:1 57:7
61:10 67:24
69:1
**factor** 100:3
**faculty** 8:10
10:8,10
**fair** 56:25 75:11
**fairly** 103:7
**fall** 14:9
**familiar** 6:17
**far** 103:17 108:7
**Farm** 1:10 5:15
78:20 81:6
89:9,20,21
90:10 91:14
92:5,6,16,23
93:2,14,22
**farther** 39:1
**fashion** 97:14
**February** 45:2
80:14 81:17
**Federal** 5:23
**federally-funded**
100:18
**fee** 90:14,17,18
91:4,6,6,11,15
91:19,24
**feel** 25:12,12,12
25:23 26:1,14
29:16,24 34:3
34:8 35:8
38:13 50:17
**feeling** 15:14
20:22 25:25
27:8 31:22
**feels** 30:16
**feet** 56:6
**felt** 38:4,10,11
49:22
**fibers** 39:11
**field** 6:14 8:22
9:5,20 13:10
13:15,19 14:1
23:20 48:5

55:14
**fields** 8:5,23
  13:10,16
**fifth** 79:23
**file** 12:1 40:16
  54:10 58:7,11
  58:13,14,15
  62:12 63:14
  66:7 70:25
  73:11,25 74:6
  77:11,11,25
  85:22 89:3
**files** 95:9
**final** 40:20
**find** 24:4,6
  31:16 34:16
  35:18 44:24
  45:19 47:3,17
  53:6 85:10
  107:4
**finding** 35:21
  46:13 49:25
  97:20 102:7
  103:4
**findings** 20:17
  25:2 26:22
  28:21 35:11
  37:3 38:6 41:6
  41:13 49:14
  67:18 68:2
  72:8 85:10
  97:13 98:4
  101:3 104:19
  105:9
**fine** 32:17
**fingers** 26:2,8
**finish** 89:5
**finished** 10:7
**firmly** 37:23
**first** 5:17 15:4
  15:6,21 23:2
  24:17 27:1
  28:23 31:19
  32:22 33:1
  42:6 47:12
  49:9 50:20
  51:1,3 60:5,19
  66:22 69:22
  75:1,12,25
  79:4,6 85:19
  97:15 107:19

111:11
**fits** 55:7
**fitted** 73:7
**flat** 31:19 32:13
**flexion** 29:4
  30:22
**flip** 74:24
**focal** 39:5
**focus** 12:23 41:1
**folks** 11:25 93:3
**follow** 69:2
  94:24
**follows** 5:18
**follow-up** 81:19
  100:24
**foot** 32:6 35:23
**foregoing** 111:13
**forgive** 13:23
**form** 23:25
**formed** 43:23
  44:10
**forth** 111:10
**forum** 8:13
**forward** 21:10
  30:13,13,23
**found** 41:3 42:2
  45:22 46:7
  49:13 65:12
  67:19,25 71:6
  83:17 88:1
  95:18 97:5
  104:15 106:20
**foundation** 14:10
  63:25 64:6
  66:16 67:15
  70:8,20 73:3
  76:13 77:17
  79:7 84:17
  86:6 87:12,19
  88:6 91:7
  92:15 93:13
  109:10
**four** 39:21 40:22
  48:16 97:19
  98:21 99:1,2,6
**fracture** 44:12
  44:17 105:12
**fractured** 44:2,3
  46:10,10
**fractures** 42:17
  42:20 43:12,16

43:21 44:7,14
  86:15 104:10
  105:11
**front** 38:25
  60:17 62:7,12
  63:5 64:8,8
  75:23
**full** 40:11,11
  59:11 96:6
  111:16
**fully** 35:20 53:4
**full-blown** 54:6
**function** 17:21
**functioning**
  28:14
**function-wise**
  6:22 17:21
**fungus** 103:10
**further** 5:22
  58:1 68:11
**fusion** 48:13
  56:3,3 70:1,2
  84:3,6

―――――――――――
              G
―――――――――――
**Gehrig's** 13:17
**Geiringer** 1:17
  3:3 5:6,16,21
  6:3,5
**general** 18:6
  22:10 24:23
  25:1,3 51:22
  61:10 87:6,9
  99:8
**generalities**
  19:23
**generate** 90:13
**generated** 80:23
**gentlemen** 78:18
  81:4 89:11
**getting** 16:5
  23:3 55:3,4,5
**GI** 18:15,16
**give** 6:4 16:24
  20:1 22:18
  24:23 51:18
  62:3 71:5 89:1
  94:16 100:8
  101:19
**given** 81:24
**gives** 41:3,9

**giving** 87:4
  88:18
**glass** 27:9 28:10
  102:14
**Glowacki** 14:25
  17:2,2 42:6,16
  44:19 45:10,21
  48:3 52:21
  54:11 69:2
  82:13,14 87:8
  96:25 97:1
  109:21
**Glowacki's** 45:1
  46:19 51:11
  85:6 86:14
**go** 8:8,23 22:15
  24:19 27:21
  28:10 58:19,21
  62:21 64:1,7
  67:15 68:16
  69:19 70:8,20
  73:3 75:4
  76:14 77:17
  79:8 80:20
  84:17 87:12
  88:7 89:13
  90:4 91:7
  101:21 103:20
  107:7 109:2
**goes** 17:19 20:23
  21:10,15 39:1
  79:17 82:10
  104:17
**going** 23:15
  28:18 30:9
  40:20 46:4
  52:20 54:22
  55:8,11 57:9
  58:7,11,24
  62:3,21 63:2
  63:14 66:8
  73:10 74:2
  76:19,21 78:1
  86:5 87:11
  92:14 93:18,20
  96:11 102:13
  109:11 110:19
**GOLDSMITH** 1:9
**good** 12:20 31:15
  45:16,19 91:13
  93:18 94:3,19

Steven Geiringer, MD
11/21/2012

gotten 11:8
    40:18 54:16
gown 24:17 27:22
grab 36:22
grandparents
    52:17
great 27:4,17
greatest 68:10
great-grandpa...
    52:18
Greenfield 2:12
group 39:21
    58:16
grunting 27:18
guess 17:13 22:3
    40:22 59:7
    78:9 82:12
guidelines 22:12
    22:24 50:22
    98:23 103:21
    104:5,6
gumba 30:5
guy 27:24 31:6

_____ H _____

H 2:3
hair 55:25
half 12:9 15:25
    17:4 21:14
    22:2 26:4 27:3
    28:12 34:5
    51:23 52:9
    54:12,19,20
    55:2 63:20
    65:4 84:20
    96:17
hallucis 35:14
    35:16
hammer 26:7
hamstrings 33:10
hand 58:8 63:14
    66:9,24 74:2
    78:1
handed 78:7
handing 71:13
happen 36:23
    49:18 97:25
    105:25
happened 12:17
    15:12 16:8
    106:2 108:20

happy 90:6
hard 98:3 103:4
head 29:20 37:18
    55:14
heading 71:17
    74:21
healthy 61:10
hear 96:11
    109:11
heard 20:16
    82:23
hearing 103:8
hearsay 66:14
    69:19 70:20
    75:4 76:14
    79:8 80:20
heavily 31:12
Hellemont 2:11
help 31:20 41:1
    45:22 80:8
helped 18:2
helpful 12:16
helping 22:15,18
    28:19,19
hereinbefore
    111:10
hereto 110:23
herniated 24:10
    68:9 79:10
    82:5,6,22,24
    83:23 84:1,8,9
    85:2 86:4,8
herniation 76:16
    79:16 106:14
    106:15,18
herniations 72:4
    72:6,16,17
    88:2 106:7
Hewson 2:10,11
    3:5,7,9 5:14
    5:14,19 6:2
    57:25 59:5
    63:25 64:5
    66:13 67:15
    68:16 69:19
    70:8,16,19
    73:3 75:4
    76:13,24 77:17
    79:7,14 80:19
    81:22 82:11,25
    84:17 86:5,14

87:11,18 88:6
    91:7 92:2,14
    93:13 94:24
    95:1 106:21
    107:7 109:10
    109:19 110:10
    110:15
hewson@vanhew...
    2:15
Higginbotham
    74:3,10,16
    75:2 76:6,10
    101:3 102:2,6
    104:8,14
Higginbotham's
    75:22,25
    100:23 101:16
highlights 7:22
highly 14:22,22
hint 47:24 50:18
    101:19
hinting 50:14
hips 31:1
historical 16:2
history 12:12
    15:7 16:24
    19:4 21:23
    24:13,18 40:7
    40:11 97:16
hit 7:22 16:3
HLUCHANIUK 1:10
hold 58:13
holding 36:7
holds 33:11
home 17:10 60:14
    95:8
HON 1:9
hopefully 6:21
    7:4
hospital 10:3,5
    59:13 109:8
hospitals 7:23
    65:20 110:4
hot 17:8
hour 90:24,25
    91:21,22
hourly 90:23
house 42:25
household 42:23
    55:20 80:6
    84:11 88:5

huge 28:13 32:19
    49:20
Huh 29:1
humerus 39:23
hundred 94:20
hurt 25:11,11,21
    25:21 53:14,14
    53:25 54:4,7
hurts 21:1,2
    32:15

_____ I _____

idea 91:9 103:5
identical 11:23
    97:12,14,17,18
    97:25 108:8
IDENTIFICATION
    7:9 57:18
    63:13 66:6
    71:11 73:23
    77:9
identify 6:3
ignore 101:3,5
illegal 100:14
    100:21
illegible 45:3
    85:7
images 43:8 76:3
    85:23
imagination
    103:20
imaging 12:18
    42:19 48:24
    49:1 54:11
IME 73:16 76:1
    78:6 80:18
immediately 44:5
    44:11
impact 53:22
impairment 19:15
    48:1 49:13
    53:8 85:13
important 39:24
    62:18 75:13
importantly 41:2
impose 99:22
impossibility
    97:22 99:17
impression 68:13
    68:18 74:22
    104:9

improved 16:11
improvement 69:23
inaccurate 71:3
inartfully 17:13
incapacitated 101:22
inch 21:15 32:3 39:2
inches 12:10 31:25 40:17
include 46:9 69:25
included 24:22
includes 90:19 94:1
including 67:8 80:1 81:13
income 93:10,11
inconsistent 49:14
incorrect 53:4
incorrectly 44:21 46:10
increasingly 17:18
increments 90:24
independent 73:13 74:13 76:1 77:14 78:5 85:7 88:12 89:7 90:3
INDEX 3:1,11 4:1
indicate 47:5 60:20 63:2 64:14 108:2
indicated 18:9 59:8 61:15 64:17 71:2 81:23 82:11 83:16 103:18 105:11
indicates 66:20 67:4 68:7 95:2 95:5,14
individual 81:25 83:24 96:23
individuals 11:9 59:15,23 94:17
ineffective

23:22
infer 105:18
inflammation 18:19
information 7:14 89:4
initial 9:5 39:13 40:14 54:17 106:9
initials 80:22
injection 75:7 103:2
injections 7:3 48:12 69:3,21 69:24 102:22
injured 53:9 59:16
injuries 6:24 17:14 18:10 82:15,22 84:14
injury 6:18 12:4 53:17 55:14,16 82:12
input 51:11 87:21 108:7
inquiries 92:16
inquiring 93:9
inquiry 16:2
insight 41:3,9 71:5
Institute 10:3 10:11,14
insurance 1:11 78:20 92:4 93:2,23
interact 102:6
interest 100:15
interested 111:19
interesting 45:22 98:12
interfere 27:12
interpret 20:24
interpreter 40:9 40:12 56:21
interrupt 31:5
intervention 69:14,18,25
interview 11:22 15:8
introduction

15:6
invasive 103:6
investigate 41:13
investigation 96:14
invoices 100:6
involve 40:1
involved 68:18 72:14
in-between 30:17
irrelevant 92:16 93:15
irritated 33:7
irritates 37:19
issue 43:4 101:8
issues 36:16 47:2 98:12

J

James 2:10 5:14
January 45:2
Jaroslaw 1:5 76:4
jarred 53:23
job 53:15
joined 10:8
JR 2:3
JUDGE 1:10
juice 27:10 28:10 102:15
July 7:15 15:24 44:23 46:5 48:20 60:5 62:22 74:17,20 87:1 88:22,23 97:4,7 100:23 101:11
jumped 27:23 28:4
June 46:4,23
jury 6:12 8:18 20:19 24:21 26:22 34:19 37:3 38:24 39:19 42:1 58:14 69:16 71:20 74:25 76:10 78:18 79:3 80:3 81:4 87:4 88:18

89:11 99:7 101:16 103:1
justification 52:3
justified 51:13

K

keep 18:3 51:22 54:22 93:1 94:9 95:21
keeping 93:18
kind 12:18 19:10 25:8,15,25 30:17 31:9 41:10 77:10 89:12 103:22
kinds 41:7
knee 16:14
know 9:22 11:4 11:10 12:16,25 18:2 19:21 20:1 21:17 22:16 23:11,16 24:5 26:17 27:8 28:19 32:3 35:1 36:19 43:8 49:3 51:20 53:6 54:19 55:5,23 65:5 65:16,18,20 70:11 71:3 75:11 77:19 88:24 89:20 90:7 91:11,25 92:2 93:25 94:5,9,11,15 94:20 96:9,16 96:18,20 99:4 99:11,13,18 103:3,9 109:14 109:16
knowledge 87:7 100:3
known 14:15 33:13 38:19,21 55:6 83:1
knows 19:22 23:17

L

ladies 78:18
81:3 89:10
landscaping 80:9
81:15
large 53:20
Lastly 105:6
lasts 55:2
lately 17:18
laundry 80:8
81:14
lay 98:3
laying 33:3,16
leads 100:20
leave 24:16
leaving 27:22
Lee 2:3 5:12
left 10:14 16:12
16:13,14,16,16
16:18,20 32:1
33:25 38:10,12
38:12 39:17
42:14 46:14
49:17 67:10,10
71:24 72:17
left-sided 42:4
leg 26:6 31:18
31:20,24 32:8
32:8 33:3,8,15
34:22,22,24
42:9 49:15
67:10
legal 89:25
100:12,13
legible 45:6,13
legs 34:15 36:3
98:19 99:15
length 22:8
letter 80:10,14
letterhead 95:7
letters 58:17
let's 20:6 67:9
84:25 105:17
level 28:14
76:15 110:13
levels 17:25
72:4,6 76:16
76:17 80:1
licensed 9:23
110:1
lieu 5:24
life 27:13 47:1

47:7 48:2,8
82:16,24 83:3
lifting 32:7
ligament 39:4
ligaments 53:24
light 29:19
limbs 48:16
98:21 99:1,2,6
limitations 61:8
limited 88:19
line 14:11 39:1
77:22 97:8
106:13
lined 31:2
listed 3:15 46:3
95:19,21 98:16
99:13,18,20
listing 44:19
literally 19:21
30:9
little 21:2
30:22,23 35:3
37:19 52:19
91:3 100:7,7
107:18
live 5:25
livelihood 92:12
logistical 11:24
long 6:8 7:19
11:8 18:5
39:10 89:23
92:9
longus 35:14,16
long-handled
56:17
long-lasting
55:15
look 7:12 20:8
21:7 25:6 26:2
29:17 30:7,19
33:5 38:14
40:19,21 41:19
43:5 52:13
53:16,17 55:11
57:21 58:7
60:19 62:10,20
64:13 65:6,13
69:6 71:14
74:20 75:10,21
77:10 78:5
79:1 84:24

95:10 101:15
103:13 107:25
looked 74:8
83:21 85:23
86:20
looking 19:12
26:3,5 30:25
32:21 38:21
44:4,6 84:20
84:22
lose 39:11 42:4
loss 34:13 81:13
lot 16:8 21:2
22:15,18 27:19
48:22 51:17
52:14,19 53:19
64:10,11 65:8
76:23 99:19
108:12
Lou 13:17
lousy 14:25
low 16:11 25:7,9
28:24 31:23
32:1 34:23
38:1 42:7 46:7
51:10 68:12
70:1 72:3,16
76:17 79:17
106:7
lower 35:22
lumbar 24:10
34:23 48:18
67:9 68:19
72:3 79:10
85:1
lumber 34:24
99:22
lying 30:25
31:19 32:13
L4 34:24
L4-L5 34:17
35:11
L4-5 72:4
L5 34:24 68:12
L5-S1 72:4

———————————
M
———————————
machine 21:3,4
Macomb 85:19
MAG 1:10
magnification

101:18 102:5
102:10
magnify 102:13
mailed 60:16
main 12:25
106:13
maintain 9:9,12
maintained 10:15
major 8:22 34:21
35:10 64:22
majority 93:5
making 7:1 72:22
malingerer 83:17
malingering 97:5
57:6 102:7,11
102:20 106:12
maneuver 37:17
maneuvers 40:2
manifestation
102:11
manual 19:23
MARC 2:19
March 45:2 46:19
mark 1:9 58:20
marked 7:8,10
57:17,19 58:11
63:12,15 66:5
66:8 71:10,13
73:22 74:1
77:8,12,25
107:2
mass 34:14
match 35:9,10
material 30:5
matter 66:15
meal 80:8 81:14
mean 8:3 9:13
10:4,23 11:17
13:25 14:15
17:7 31:4,11
31:12 38:16,19
41:18,19 53:1
56:16 63:20
64:21 70:3
86:9 97:10
103:7 108:12
109:13
meaning 11:12
26:10 31:24
32:19 34:13
36:5 38:2 44:7



48:21 75:16
means 8:7 25:16
  34:20 45:4
  99:8
meant 9:16 33:5
  70:4 106:3
measurable 21:19
measure 9:14
  20:25 21:3,4
  21:13 47:9
measured 83:7
measuring 34:13
mechanically
  36:5
medical 6:7,8
  10:5,9,12
  12:12,13 14:10
  40:23 42:5
  45:6,9,14 48:4
  50:6 51:21
  54:23 57:3,11
  59:9 61:3 62:4
  64:25 71:17
  72:22 73:12,13
  74:13 77:14
  88:12 95:18
  97:21 99:16
  100:19 103:20
  104:21 109:13
medically 24:7
  24:11 41:8,20
  56:13
medication 17:16
  18:9,10
medications 6:20
  7:3 61:11
  100:16
medicine 6:11,13
  6:15,23 8:4
  9:20 13:2,7,12
  13:13 14:1
  23:1 59:18
  96:3 110:1
meeting 8:12
memory 27:2
mentality 28:8
  28:16
mention 10:2
  27:1,20 36:16
  37:9 40:13
  42:8 45:1

56:20 65:7
  83:4 108:15
mentioned 10:17
  17:1,7 19:3
  20:3 22:23
  25:15 27:17,22
  28:9 30:20
  31:5 34:2,12
  35:7 37:2
  38:14 39:9
  40:10,17 42:3
  42:6,16 46:21
  50:15 62:10
  64:22 68:21
  69:22 72:19
  81:12 84:3,21
  85:8 92:18
  102:12
mentions 72:6
MES 11:7,9,16
  58:17 60:6
  62:23 89:9,11
  89:15,23 90:1
  90:11 91:5,6
  91:24
met 83:5
MEYERS 2:19
Michigan 1:2,19
  2:6,13 5:1,7
  9:23 10:2,3,8
  98:22 99:3
  111:3,24
middle 16:12
mild 63:6 64:11
  99:9
miles 61:18
mind 22:16 24:25
  95:21
minimal 45:5
  49:22
minute 78:15
  95:8
minutes 90:19
  92:10
missing 78:9
mobilization
  19:24
modalities 17:7
moderate 63:5,23
  64:8,10 99:10
moment 48:1

month 25:22
  28:11,11 34:4
  46:5,24 51:12
  51:16 54:4
months 22:22
  31:10 45:24
  46:11 51:5,20
  54:8,8 97:19
motion 25:14
  29:14 30:21
  42:14 46:6
motions 25:11
  29:11,16,23
  30:17 37:6
  39:25
motor 63:24 67:1
Motrin 18:17
move 9:2 25:10
  28:19,23 29:10
  31:21 36:12,20
  36:20,21 37:7
  37:15,20,21
  57:25
moved 10:10
  36:24
moves 50:16
MRI 12:18 42:22
  46:3 48:24
  50:2,6,20 51:3
  68:4,7,8,21
  71:24 72:3,5
  73:2 76:3
  85:17,19,20
  86:2 104:18
  106:20
MRIs 50:1 76:12
multiple 16:4
  72:5 76:15
muscle 13:17
  20:9,10 22:13
  24:10 25:6,7
  26:11 33:9
  34:14 35:16
  39:11 51:9,10
  99:14
muscled 31:7,12
muscles 25:16,19
  25:19,21 33:22
  34:1,2,8,24
  35:5 37:24
  38:1 39:21

49:21 53:23
  54:3
muscular 27:24
  31:6
musculoskeletal
  6:24 25:4,5
  33:13,21 37:11
  38:19 49:11,23
  55:17 56:9
  83:1
MUTUAL 1:10
MV 72:14
M.D 1:17 3:3
  5:16 95:23
  96:7,7
M.D.s 95:22

──────────────
         N
──────────────

name 64:18 65:2
Naprosyn 18:18
narcotic 17:16
national 8:11,12
nationally 104:5
natural 50:10
necessarily
  31:14 98:1
  109:13
necessary 41:9
  50:21 98:20
necessity 50:1
neck 13:20 16:15
  25:8 26:6
  36:10,24 37:4
  37:5,7,21,21
  37:23 42:7
  46:2,6 48:13
  51:10 56:3
  59:25 70:2
  72:5,15 73:8
  76:16 79:17
  82:21 83:23
  86:2 106:7
need 46:2 51:4
  54:9 57:3 61:3
  80:7 83:24
  84:4,6 109:21
  109:23,25
  110:1
needed 55:9 88:4
  88:15,15
needs 43:1 48:13

nerve 20:10
21:14 25:20
26:5,11,11,13
26:17,18 32:21
33:6,6 34:17
34:20 37:13,19
38:16 39:9,11
46:14 82:7
97:24 103:22
nerves 7:1 13:16
13:20 34:21
35:10 54:6
56:11
neurologic 25:5
26:3 34:11
38:7 49:11,24
50:24 104:4
neurological
35:18
neurology 13:18
never 16:10
86:16,19
103:18 104:14
new 15:19 46:13
91:20
nine 23:15 46:17
81:25
non-displaced
43:21
non-organic
47:21 49:15
83:13
normal 27:16
29:5 30:24
34:8,15 35:25
36:5,9 38:1,2
38:8,11 42:20
49:23 52:5
99:9
normally 12:13
Notary 111:1,7
111:23
note 3:15 45:20
46:3,19,24
48:14 99:5
noted 39:5
notes 41:19,21
42:3,5 45:2,13
45:18 46:22
85:6 111:17
notice 5:22

33:19
noticeable 17:24
November 1:21
5:2,7 78:8,14
78:9
nowadays 9:7
nucleus 68:10
numb 35:8 38:10
38:18
number 94:14
106:4,6
numbers 93:1
number-wise
94:12
numbness 15:10
20:22 21:5
38:15 49:17

_____ O _____

Oak 2:13
Oakland 50:1
85:20
oath 5:18
object 66:13
86:5 87:11,18
92:14
objection 63:25
67:15 68:16
69:19 70:8,19
73:3 75:4
76:13 77:17
79:7,14 80:19
80:20 84:17
88:6 91:7
93:13 107:7
109:10
objective 20:17
20:17 21:9,11
21:22
objectively
84:25
observation
28:22 31:8,15
89:2
observe 16:21
obtain 13:5
obvious 9:22
45:15
obviously 28:13
44:20 107:16
occasional 43:20

occur 29:25
occurred 54:13
60:21 104:2
October 78:6
ODG 22:11,14,23
51:14
offer 56:25
office 18:1
24:16 36:17
40:18 60:13,16
90:5 99:25
100:9,11,16,17
100:17 107:23
108:25 109:4
offices 89:14
official 22:12
oh 11:11 32:15
46:12 66:24
76:25 78:8
80:11 92:24
94:9 96:2
97:15 101:21
107:9
okay 25:3 27:1
31:3 51:2 58:3
58:9,23 66:10
69:12 70:15
71:16 72:9
73:18 75:21
76:25 78:12,15
78:15 94:22
96:21
old 52:6
once 69:21 85:17
99:16
ones 34:23 63:22
90:8
one's 55:24,25
one-time 9:7
86:24 87:5
89:6 93:12
ongoing 9:10
53:18 54:19
56:7
online 60:14
109:4
operated 56:4
operating 16:3
operation 46:2
47:1 56:2
opiate 17:16,16

opiates 17:17,23
18:3
opinion 51:6
62:3 63:23
66:21,25 83:22
83:24 84:13
96:25
opinions 22:11
40:20 87:3
88:18 89:1
106:11
opportunity 76:2
opposed 11:18
12:7 83:12
86:22 103:2
opposite 30:12
30:13,14,15
orange 25:25,25
27:10 28:10
102:15
order 3:15 14:11
19:6 109:24
ordered 23:23
102:3
organic 47:22,25
49:18 53:7
83:12
organization
13:25 64:24
95:22
organizations
10:7 103:13,21
original 81:12
orthopedic 48:11
48:19 59:21
65:15 70:6,12
73:16 74:10
76:6 77:16,20
78:3 96:3
osseous 104:10
osteopath 65:7
osteopathic
65:10 66:2,2,5
osteopaths 65:8
outdoor 80:9
outfit 89:12
overall 31:11
103:7
overcome 99:12
oversee 6:19
103:13



Steven Geiringer, MD
11/21/2012

Page 13

overseeing 7:2
over-the-counter
  18:12

_____
         P
packs 17:8
page 3:2,13 10:1
  60:19 61:14
  64:13 68:3
  69:10,11 71:14
  73:10 74:21,24
  74:24 78:22,25
  81:6,7 97:4
  101:21 104:18
pages 1:14 7:19
  7:21
paid 91:4 92:3
pain 15:10,10,14
  16:11,13,15
  17:11,25 18:23
  20:6,8,9,14,22
  21:3 23:25
  24:4,6,11 27:4
  27:7,11,15,17
  28:5 29:10,11
  30:11 31:23
  32:2,11 33:1,8
  34:6 37:15,16
  37:22 40:3,5
  42:4,8 46:20
  46:21,25 47:6
  47:8,10,11,12
  47:14,14,15,18
  47:19,20,21
  48:1,8 49:20
  50:24 53:7,18
  67:5 72:15,16
  72:17 75:16
  82:15 83:2,5,9
  83:10,11
  103:22,23,23
painful 31:13
pains 54:17
palm 39:2
palpated 37:23
palpating 49:21
palpation 25:18
  33:22 37:25
panting 27:18
paper 24:2
paragraph 63:1

69:9 71:22,23
73:16 74:25
75:1 76:9
77:20 101:13
101:21 105:8
Park 2:13
part 8:10 10:12
  10:25 12:14
  32:10 33:21
  40:23 57:9,12
  77:3
particular 44:1
  55:9 78:21
  95:20 96:23
  97:5 107:22
parties 110:23
parts 25:4 34:11
  67:5
party 111:18
patient 11:17
  12:15 15:5
  19:9 31:9
  40:25 55:9
  75:6 100:18
  107:23
patients 11:8,14
  11:15 12:11
  19:7 55:12
  90:6
patient's 45:14
pattern 26:18
  29:17,20 35:4
  35:5 38:16
  40:5 55:7 85:9
  106:16
patterns 29:19
  50:15
pay 91:14 98:23
paying 91:24
pays 91:14
pediatric 13:10
peel 25:25
peers 110:12
people 6:16 8:25
  14:4 15:8 16:7
  17:20 18:1,2
  19:14,20 23:13
  25:24 35:8
  36:20 37:5
  51:19 52:14,14
  53:3,19,25

82:21 84:22
89:19 90:11
93:3,21,23
100:12
percent 11:2
  16:20 29:3,4,6
  43:15,17 53:3
  92:11,18 94:10
  94:12,12,15
perfectly 27:16
  49:22 93:9
perform 59:23
  89:14
performed 59:25
  61:23 67:12
  73:12 74:13
  77:14 86:2,24
  88:11 89:6
  92:7 94:4
  109:7
performing 93:11
period 21:25
person 6:21 9:1
  9:4 17:13 18:9
  21:9,20 23:3,6
  23:9 24:20
  25:9 31:19
  32:5 40:6
  41:15 42:5
  48:11 50:13
  51:17 52:5,12
  56:21 83:22
  84:2 93:19,19
  99:11
personal 42:25
  43:1 55:23
personally 76:11
persons 56:14
person's 21:18
perspective
  104:21
pertinent 97:13
  97:20
photographs 3:22
  63:4,11
photos 63:16
phrase 53:5
physical 6:11,13
  6:15,23 13:7
  17:3 19:4,6,9
  19:11,14 21:25

22:7 23:1,4,6
23:19 24:20,21
26:19,25 28:2
28:21 30:4
33:20 36:25
41:5 42:22
46:18 49:7
51:5 59:18
67:12,18 68:2
81:24 97:13
physically 56:15
physician 12:16
  20:8 21:7
  47:16
physicians 8:7
  13:24 14:11
  22:21 45:16
  73:13 85:9
  89:13
pick 44:2
picture 47:23
piece 24:2
pin 26:14 35:8
pinched 6:25
  13:16,20 20:10
  21:14 26:5,11
  33:6 37:13
  39:9 54:6
  56:11 82:7
  97:24 103:22
pitchers 39:25
place 43:22
  111:10
places 86:9
plain 19:1
Plaintiff 1:6
  2:8
plan 68:23 69:1
plantarflexion
  35:25
play 40:24
plays 76:23
please 5:10,11
  13:23 35:15
  39:15 69:16
  71:3,14,20
  72:12 75:10
  76:10 78:5,17
  79:3,12 84:18
  86:7 89:10
  90:17 109:12

plurality 93:5
plus 44:8 45:25
PM 5:8 58:25
  59:3 110:20
PM&R 8:22 96:2
pockets 14:11
point 10:10 27:8
  44:19 51:20
  54:20 75:13
  95:10 96:10
  101:23 104:4
pointed 102:18
political 95:24
portion 24:13,18
position 37:17
possibilities
  18:16 23:5
possibility 85:2
possible 6:21
  7:5 52:3 57:8
  69:13,17 70:1
  94:4 99:19,20
  102:22
possibly 38:22
  75:19 82:7
postoperative
  56:5
post-op 84:3
post-traumatic
  40:8
potential 100:15
  103:6,11
potentially 8:25
  100:20
practice 6:23
  9:17,23 10:14
  10:18,19,25
  11:12,15 18:7
  23:20 45:6
  51:3 89:17
  92:19 93:10
  94:10 109:24
  109:25
preparation 80:8
  81:14
prepared 60:8,11
prescribed 56:22
  57:2
prescription
  22:7 23:25
present 2:18

40:12 50:18,25
presentation
  33:15,20
  101:22
presentations
  7:16 8:8,12
presented 3:15
  41:12,24
presently 7:23
  7:25
pressure 30:15
  37:19 49:22
presumably 63:4
pretty 6:14 7:14
  8:9 12:3 22:3
  23:16 26:16
  33:24 35:3,3,9
  37:25 45:15,16
  75:13
prevalence 14:7
pre-accident
  79:25
pre-existing
  85:1
pre-injury 79:22
  105:22
primarily 33:5
  106:13
primary 13:9
  102:16
print 103:21
prior 12:12
  15:18
private 10:13,17
  10:19,22,25
  11:15 89:17
  93:10
privileges
  109:17
probable 104:22
probably 45:24
  54:18 65:11
  90:22
problem 12:25
  31:10 32:20
  33:1 50:17
  93:17
problems 15:18
  18:4 36:22
  60:22 82:23
procedure 5:23

75:17 103:6
process 8:20 9:6
  13:5 50:11
profession 6:6
professional 6:4
professor 8:1,3
  8:4 10:15 59:9
program 8:24
progressive
  50:23
prompt 20:8
proposition
  52:25
provide 52:2
  100:11
provided 58:15
  62:7,9,11 81:9
provider 93:1
PT 45:22 51:12
  100:17
PTSD 40:13
Public 111:7,23
published 104:5
pull 20:10 22:13
  24:10
pulled 63:18,21
  66:8 70:15
  73:25 77:12
pulling 27:18
pulls 25:6 35:17
  51:10
pulposus 68:10
pursuant 5:22,22
push 26:8 46:4
pushed 34:7
  37:23
pushing 25:18
  33:22
put 37:5,18
  46:24 65:1
putting 36:6
P.C 2:11
p.m 1:20 5:3
  110:21
P27127 2:10
P31967 2:3

_____
        Q
_____
qualifications
  59:6
quarterbacks

39:24
question 9:22
  13:22 14:18,25
  44:9,13 49:9
  53:5 79:4,6,12
  79:20,23 80:4
  82:12 83:9
  86:6 93:8
  96:12 105:19
questioning 59:5
  106:14
questionnaire
  108:17
questions 12:23
  41:10 58:22
  78:25 81:19
  94:23 109:19
  110:17 111:13
quick 7:12 12:3
quickly 50:9
Quinn 49:3
quite 15:25
  18:24 64:11
  85:19
quote 63:2
quoting 71:2
  76:2

_____
        R
_____
R 1:17 3:3 5:16
radiculopathy
  82:6 103:15,25
radiologists
  86:3
radiology 50:22
raise 31:18 32:9
  33:8 35:22
  49:15
raised 57:8
raising 33:3,15
ranking 99:7,8
rarely 98:20
rate 90:23,23
reached 79:22
  105:21,22
reachers 56:16
  56:17
read 45:17 63:3
  68:6,15 69:16
  71:20 72:12
  74:25 75:12

**Steven Geiringer, MD**
11/21/2012

Page 15

76:10 79:3,12
80:3 86:4
104:12
**reading** 81:8
**ready** 9:2,4
**real** 15:1 29:24
55:4
**really** 8:20 9:19
18:3,24 21:4
27:13 29:20
32:25 55:6
57:14 72:7,20
93:17 94:3,5
94:13 98:9
103:12
**rear** 63:7
**reason** 45:4
47:19,21,22,25
50:6,7 52:22
53:7 55:13
57:11 75:19
78:2 93:21
**reasonable** 50:5
51:7
**reasons** 95:24
99:19
**receive** 41:11
**received** 16:25
44:15
**recess** 59:1
**recognized** 13:23
14:5,8,21
**recollection**
63:21
**recommend** 18:11
**recommended**
42:22 48:11,15
73:7
**record** 5:5,10,19
6:3 7:18 42:2
58:19,24 59:2
63:1 90:19,21
92:8 109:2
110:19
**recorded** 97:9,12
111:14
**records** 12:1,6
12:10,13 40:16
40:22,23 41:11
41:23 42:18
44:25 47:4,23

48:10 49:6
62:4,7,16
64:14 70:15
71:5 81:9
83:21 84:21
87:5 88:9
90:12,15 93:19
95:11
**recounting**
108:19
**reduced** 42:14
46:13 111:15
**referral** 11:16
**referrals** 90:7
**referred** 63:16
**reflect** 5:19
**reflex** 21:16,17
42:14 103:25
**reflexes** 26:7
34:12 38:9
**reflex-wise**
35:13
**refresh** 27:2
**refute** 83:8
**regard** 24:15
26:23
**regarding** 49:25
69:17 70:19
71:15 72:13
81:10 108:23
**regularly** 17:10
**rehab** 6:15,16,19
10:3,11,14
**rehabilitation**
6:11,13 23:2
59:19
**reimbursement**
98:25
**relate** 93:14
**related** 50:14
104:10,15,23
105:3,20
111:18
**relates** 50:8
**relationship**
89:25 97:5
**relative** 13:6
16:1,24 23:4
31:15 33:19
35:11,21 37:4
49:10 50:3

98:13 99:21
101:17 105:10
106:11
**relevance** 88:7
107:7
**relevant** 64:6
88:2 98:2
**remainder** 92:19
**remains** 83:20
**remember** 53:11
98:24 101:8,10
**removal** 70:1
**repeat** 50:1
**rephrase** 87:13
**replacement**
55:20 80:6
**report** 4:8,8,9
27:1,2 39:5
40:10,14 44:18
44:18,22 49:2
60:5,17 61:25
62:2,20,21,23
64:13,17 66:12
66:20,22 67:11
68:6 69:7,7
70:16 71:9,12
71:14 72:21
73:1,10 74:20
75:22 76:1,11
76:18,23 77:6
77:7,20 78:6
78:19,23 80:17
80:24 81:4,12
86:17,20 90:20
96:21 97:1,4,6
97:8 98:7,13
100:24 101:11
101:15 105:9
105:15 106:1
107:6,19,25
108:8
**reporter** 5:11
7:8 57:17
58:20 63:12
66:5 71:10
73:22 77:8
111:7
**reports** 3:20,24
4:6 43:5,7,10
44:16 45:7
46:3 57:16,21

57:23 60:3
65:22,25 66:4
70:23 71:4,25
73:12,21 74:3
74:17 77:13,25
85:22 86:1,8,9
95:4 96:21
100:23 104:16
106:8 107:1
108:12,21
**represented** 8:14
**representing** 8:9
**reproducible**
21:20 45:7
**request** 12:22
56:8 89:8 92:1
**requested** 110:22
**require** 56:12
110:4
**requires** 55:19
**requiring** 101:23
**research** 18:25
**researched** 14:22
14:22
**resist** 99:11,12
**respect** 22:21
**respected** 14:16
**respective**
110:23
**responding** 78:24
**rest** 46:25 47:6
48:2,8 82:16
82:24 83:3
89:3 104:17
**result** 47:3 49:6
**resulted** 72:15
**results** 46:3
**return** 79:25
**returning** 17:22
**review** 41:23
42:2 44:25
47:4 48:10
49:2,6 60:14
62:4 63:1
65:22 70:23
76:3 87:5
90:15,19,21
92:8
**reviewed** 49:1
62:15 63:16
64:14 73:11

76:11 81:9
86:19 88:9
106:8
reviewing 40:23
RE-EXAMINATION
3:7,8,9 94:25
106:23 110:9
rib 42:16 43:9
43:21 44:6,12
ribs 43:13,16
44:3,14,17
46:10 105:13
right 13:3,4
14:12 16:13
25:3 31:22
33:25 38:11,11
38:12 43:3
44:4 56:19
59:22 60:7
61:2,5,13,17
61:19,24 62:1
62:5,17,19,25
63:9 66:2,25
67:7 71:7 72:9
72:21 74:5
80:16,23 81:8
82:17 85:18,21
85:23 86:18,21
87:2,6 91:23
98:11,24 101:1
101:7 105:5
106:5 107:12
107:20 110:3,6
rind 25:25
rise 45:5
risks 103:7
road 1:18 2:12
6:5 61:15,17
rolled 11:1
room 15:6 24:16
24:19 27:22
root 33:6 34:17
34:20 37:20
ropy 25:24
Rose 1:22 111:6
111:22
rotates 39:23
rotator 39:17,19
40:1,3 56:4
71:25
routinely 96:19

ROY 2:3
Rules 5:23
run 34:21,22
running 26:5
runs 25:20
ruptured 6:25
18:21 20:10
24:11 29:15,18
29:24 30:1
31:13 37:12
54:5,8 56:10
68:9,12 97:23

_____

S

sacral 34:25
safe 103:7
sake 14:24 45:9
45:14
Saturday 8:11
saw 12:9 15:21
15:23 17:4
22:1,4 42:6
43:7,9,10 44:1
47:12 52:8
56:23 63:22
86:16 107:23
108:3
saying 34:6 64:6
75:18 88:1
104:25
says 21:1 51:8
51:14,24 68:11
73:16 75:14
77:20 79:15
95:6,9 96:24
101:24 102:4
104:21 108:17
scale 96:6
scan 43:4,8,25
44:1,5,15
48:25 68:21
86:16 105:10
scans 12:18
42:22 48:24
50:7,20 51:3
schedule 98:23
School 59:9
second 32:23
44:18,22 62:20
63:1 66:21,25
69:10,11 73:10

73:15,24 74:25
75:1,22 76:9
79:12 96:25
97:12 101:13
109:2
secondarily
28:14 89:9
secondary 13:8
13:11
section 72:10,22
72:25
sedan 63:7
see 15:9 22:16
22:20 23:13
37:19 43:8
51:18 52:7
58:14 65:2
67:9 71:18
75:8,19 78:15
84:21 88:21
98:7 104:17
105:17,18
107:14,17
seeing 11:18,25
12:2 17:1 23:7
46:23 53:16
seen 11:4 17:2
22:21 53:21
64:10 66:21
100:5 108:12
send 89:18 93:3
sender 93:4
sending 7:3
sensation 26:13
34:14,16 35:6
38:15 46:14
sensation-wise
35:12
sense 48:4 51:21
51:22 54:21
91:13 93:2
sent 11:5 12:10
19:20 40:16
58:16 60:6,8,8
62:23 81:4
97:2
sentence 66:22
75:1,12,13,25
77:19
separate 53:11
94:2,4,5

September 71:24
74:18 76:1
100:24
series 50:1
serious 18:4
services 55:20
80:6 81:13
set 5:20 50:6,20
51:2,3 95:25
111:10
setting 49:19
settings 56:8
100:13,14,21
seven 99:3
severe 29:9,10
32:1 33:1 34:6
37:15,16,22
share 101:15
shelf 100:5
short 12:5 18:3
18:4 29:13
37:9 89:16
shorten 77:21
Shorthand 111:6
shot 94:16
shoulder 37:24
39:22 42:8
56:4 67:8,10
71:24 72:1,17
shoulders 105:13
show 9:17 43:12
43:17,24 44:12
54:12 57:19
63:5 95:4
101:9 105:6
showed 46:20
100:22 105:12
shower 42:11
showering 55:25
showing 44:6
shown 17:17
18:14
shows 72:4,5
76:15
shrink 39:12
sic 67:5 104:23
side 6:16,24
11:1 16:4
21:16 25:17
26:9,9,15,16
30:7,13,14

Steven Geiringer, MD
11/21/2012

Page 17

31:22 32:1,5
33:16,25 37:18
63:6,7 64:9
89:15 95:23
96:5,7,7
103:11
**signature** 80:21
110:22
**signed** 80:17,21
80:23
**Significance**
29:12
**significant**
26:23 28:7,22
31:8 39:8 42:2
44:25 69:23
72:7 97:18
**signs** 20:17
**simple** 56:9
**simplistic** 13:22
**simply** 12:2
**single** 93:4
**sir** 6:6 10:24
11:20 53:13
55:22 57:19
58:2 97:4,11
98:18 104:20
106:21
**sit** 9:4 64:23
**sitting** 32:5,14
32:16 33:16
**situation** 11:23
18:20
**six** 25:10 28:23
37:6,8 46:11
82:7 99:2
**sixth** 80:4
**skill** 110:13
**skin** 35:5
**slowly** 16:6
31:21 52:1
**small** 53:20 63:7
71:25
**smaller** 21:15
26:12,12
**smooth** 25:14
**soft** 17:14 18:8
18:9,23 22:24
53:24
**solo** 10:13
**somebody** 7:3

9:14,17 12:2,3
20:5 22:16
28:9 31:14
32:15 45:10
57:9 83:9
100:8 102:14
**someone's** 6:17
65:2
**somewhat** 99:13
**soon** 11:11 27:20
65:11
**sorry** 15:22
19:10 39:15
43:2 46:12
66:24 69:10
97:7 105:7
106:3
**sort** 13:3,11,13
19:24 22:9,10
25:13,20 28:5
28:18 29:19
39:2 55:25
56:17 89:19
**sorts** 9:11 15:17
**sounds** 39:23
99:10
**south** 16:9
**SOUTHERN** 1:3
**specialist** 23:1
**specialties** 8:23
64:23,25 95:18
**specialty** 6:10
6:12 8:15,21
13:1,7,10 22:8
59:18 95:5
**specific** 19:12
25:1 40:3 57:6
57:7 106:15
**specifically**
68:20 82:22
**spinal** 6:17
**spine** 29:13 30:8
30:21 37:10
42:3,13 48:12
50:10 52:11,23
53:4,23 67:9,9
68:8,20 72:3
76:4 85:1
105:13 108:17
**split** 6:14 25:3
**sponges** 56:17

**sprains** 6:25
**Spurling** 37:17
**Square** 7:4
**squeeze** 26:8
**SS** 111:4
**staff** 10:6,9,11
65:20
**stage** 30:4
**standard** 51:2
**standards** 18:6
22:6 23:20,21
45:5 109:14,17
**standpoint** 24:4
55:17 104:24
**stands** 22:12
**stapled** 57:20
**start** 66:11
**starters** 78:17
**starting** 8:20
**state** 1:10 5:10
5:15 8:1,9,13
8:14 9:23
10:16 59:9
62:2 78:20
81:6 89:9,20
89:21 90:9
91:14 92:5,6
92:15,23 93:2
93:14,22 98:22
99:3 111:3,8
**stated** 110:3
**statement** 15:2
47:5 48:3
93:24 96:15
**states** 1:1 68:15
71:21 76:2
107:22
**State's** 10:10
**status** 79:22
105:22
**stay** 91:10
**stenographic**
111:17
**stenographically**
111:14
**step** 9:3
**steps** 9:15,16
**sternum** 42:17
43:12,16 44:2
44:15,17 46:10
**steroid** 69:4

75:7 102:21
103:2
**Steve** 6:5
**Steven** 1:17 3:3
5:6,16,21
**straight** 31:18
32:8 33:3,8,15
49:15 90:9
**straightforward**
56:9
**strain** 18:23
20:9 22:13
24:10 37:12
71:25 82:2,3
**strains** 6:25
18:8 22:25
25:7 29:16
51:9,10 54:6
56:12
**strength** 18:13
19:2 26:8 32:6
34:12 38:8
99:6,7,14
**strength-wise**
35:13 36:1
**stress** 40:8
**stretch** 33:7
103:19,19
**stretching** 19:23
**stroke** 6:17
38:20 49:18
**strong** 35:20
36:1
**structural** 32:20
33:1
**studies** 17:18
18:25 43:10
48:24 49:1
54:11
**study** 14:5,23
**stuff** 10:22
**subject** 66:17
87:20 92:17
93:15 109:12
**subjective** 20:16
20:18,23 21:6
47:8
**sub-board** 13:3
**succeeded** 9:16
**suddenly** 23:15
**suffered** 84:15

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313-567-8100

**Steven Geiringer, MD**
**11/21/2012**

Page 18

suffering 68:19
suggest 24:1
   40:7 85:13,14
   105:10 106:18
suggested 104:8
suggestion 52:21
Suite 2:12
summary 108:4,14
supervising 9:2
supine 33:3
supplies 35:5,6
supply 34:23
   39:11
support 36:8
   103:5,24
suppose 14:17
supposed 23:11
   100:4,10,10
sure 14:19 19:8
   22:10 39:21
   41:18 52:19
   56:4 57:22
   81:21 89:21
   90:16 91:25
   92:1 96:8
   99:18
surgeon 59:21
   70:7,13 74:10
   76:6 77:16
   78:3
surgery 13:11
   59:23,25 65:15
   84:6 109:7
   110:5
surgical 69:13
   69:17,25
surrounds 13:14
   14:2
suspected 44:14
swear 5:11
swell 16:17
swelling 16:21
   16:23 30:2,10
sworn 5:17
   111:11
symmetric 30:21
sympt 16:19
symptom 15:8,10
   19:17 20:6,14
   20:21 24:8
   47:9 101:8,17

101:24 102:5
   102:10,13
symptomatic 88:1
symptoms 16:4,20
   19:16 20:13,18
   41:5 48:21,22
   50:23 53:11
   103:16,24
system 99:8
   107:16
S1 34:25 68:12

---
**T**
---

table 28:3 31:24
   32:3,5 33:17
   36:22
take 7:11 9:15
   15:7 30:1
   31:20 42:11,24
   57:21 60:19
   62:20 66:17
   78:5 79:1
   88:14 90:6
   96:6 101:15
   108:20 109:1
taken 1:18 5:6
   5:24 10:18,21
   11:8 58:10
   59:1 75:16
   111:9,17
takes 30:15
   106:15
talk 28:8 34:19
   103:14
talked 24:18
   31:17 38:8
   41:1 47:8
   48:17,25 49:16
   51:14 54:21
   69:21 70:17
   86:22 103:17
   107:1
talking 18:19
   38:23 50:8
   92:8
talks 67:1
   104:18
tap 21:17
Tapping 26:7
TBI 55:16
teaching 7:25

8:6
tears 72:1,18
technically
   27:12 70:3
techniques 23:7
teeth 55:24
tell 6:12 7:12
   8:18 11:13
   16:1 19:16
   20:7,19 24:21
   24:25 26:22
   27:9 29:22
   31:22 34:19
   35:14 37:3
   38:23 39:19
   40:7 42:1
   47:11 52:18
   55:8 56:22
   65:14 78:17
   81:3 89:10
   90:17,22 93:17
   99:7 106:1
tells 20:21
   32:24 47:10
   53:14 105:24
temporarily
   16:11 51:25
temporary 84:4
Temrowski 2:3,4
   2:4 3:6,8 5:12
   5:12 58:5,18
   59:4 64:3,12
   66:19 67:17
   68:22 70:5,14
   70:21 73:6
   75:9 76:20
   77:1,23 79:11
   79:19 80:25
   85:15 86:10
   87:13,15,23
   88:10 91:17
   92:21 94:6,22
   97:3 106:9,24
   107:11 109:18
   110:7,17
Ten 82:4
tend 18:1,2
tender 49:21
tenderness 33:24
   34:7 37:24
   42:13,18

tension 32:21
   33:5
term 18:3,4,5
terms 11:21
   41:17,20 54:18
   103:17 106:3
Terri 78:22,25
   81:6
test 13:12 14:9
   14:16,17 15:1
   21:21 30:24
   32:10 33:4
   39:17 75:15
tested 40:4
   99:15
testified 5:18
   62:15 71:4
   81:22
testify 111:11
testimony 83:14
testing 7:2 26:7
   32:6 61:3
   71:19 73:2
   85:17 86:2
   87:22
tests 47:17
textbook 35:2
texture 38:2
thank 7:10,18
   10:1 26:19
   44:24 58:2
   94:22 105:6
   106:21 110:7
   110:15
therapeutic
   75:15 102:23
   103:3
therapies 6:19
therapist 19:11
   19:17,19,25
   23:6,9,22
therapists 19:20
   23:8,10
therapy 7:2
   12:19 17:3,6
   19:4,6,10,14
   19:23 21:25
   22:7 23:4,14
   23:19,21,23
   42:23 45:24,24
   51:5 52:2

**Steven Geiringer, MD**
11/21/2012

54:21,23 55:4
81:24
**thigh** 16:13,14
26:12
**thing** 9:8 13:11
15:4,6 19:24
22:9 25:13,20
27:1,20 28:23
30:4,19 31:17
39:14,16 45:17
55:25 56:18
57:4 65:6,13
68:16 106:25
107:18
**things** 7:17 8:6
9:10,11 13:17
13:21 15:17
17:8 20:20
21:5,18 25:7
27:18,19 38:7
38:17 49:15
50:9 54:5
55:10 56:16
84:24 90:12
99:17 100:4
101:2 102:8,12
**think** 11:11 14:3
23:16 43:7,9
45:21 46:1
48:7,16 55:2
56:1 64:6
73:15,16 80:7
81:12 87:21
88:9 90:8,11
91:25 101:20
105:2,23 108:4
**thinking** 28:17
105:24
**thinks** 105:20
**thinner** 31:14
**third** 79:20 97:8
105:8
**thought** 106:2
**thousand** 61:18
**three** 17:3 22:17
22:19 23:12,12
23:13,14 29:8
42:7 45:2,18
45:24 51:15,15
51:19 68:20
76:16 82:1

**three-quarters**
90:25,25 91:1
**tight** 25:16,22
34:4 38:2
**tightness** 33:10
**tilt** 29:8 30:6,8
**time** 5:8,9,25
10:18,21 12:5
12:21 15:21,22
15:24 16:6,7
17:6,19 21:25
22:1,3,9 27:14
31:21 39:13
43:15 47:12
51:25 52:2,9
54:24 55:5
58:2,19 59:11
60:15 65:4,5
85:19 89:16
103:4 111:9
**times** 17:3 28:1
28:4 51:16
62:2 85:17
86:9 91:1
93:16 99:3
106:8
**tingling** 15:10
20:23
**tissue** 17:14
18:8,10,23
22:25
**tissues** 53:24,25
**today** 5:7 87:4
88:19 108:25
**today's** 7:13
91:18
**toe** 35:17
**told** 17:5 27:21
36:15 42:10
83:4
**tone** 38:1
**tool** 13:24
**top** 39:4 66:22
77:11 91:2,12
104:18
**torque** 21:11
25:14 30:20
**total** 91:3
**touch** 26:14
**touched** 51:8
**touching** 35:7

**track** 93:1,18
**trained** 23:8
**training** 8:21,21
9:3 10:7
**transcript** 3:14
111:16
**transcription**
111:15
**translate** 25:8
**treat** 12:3 45:11
59:15
**treated** 12:12
107:3
**treating** 15:9
53:15 60:25
86:23
**treatment** 7:2
10:23 11:1,17
12:2,14,19
16:25 41:8
51:23 54:9,25
61:4 68:24
69:1 92:19
93:24
**treatments** 6:20
15:16
**trial** 5:25
**tried** 105:1
**truck** 61:15
**true** 13:2 30:12
33:11 43:15
47:5 69:4,14
72:25 82:1
87:3 101:4
110:13 111:16
**truth** 66:15
111:12,12
**try** 6:20 46:4
**trying** 28:3
45:11 53:5
79:18
**tunnel** 13:21
38:24,25 39:3
**turn** 8:24 9:20
28:20 29:19
61:14
**turned** 60:13
**turning** 28:3
**turns** 17:15
28:11
**twine** 25:24

**twist** 21:10
25:15 30:20
**two** 3:22 6:14
10:6 22:22
23:5 25:4
31:18 32:12
33:11,12 44:8
51:19 58:1
60:2 62:2
63:11 65:22
72:4,6,16
74:16 76:16
77:13,24 78:7
85:8,17 102:8
**two-year** 9:6
**Tylenol** 18:13,13
18:23 19:1,2
**type** 56:22 60:22
**typed** 60:12
**types** 55:10
92:13,22
**typical** 11:24
15:8 26:17
103:9
**typically** 18:12
18:18 23:10
30:2 82:10

---
**U**

**ultimate** 106:11
**Ultimately** 92:3
**Ultran** 18:25
**ultrasound** 17:8
**umbrella** 64:23
95:22
**undergo** 61:3
73:2
**understand** 62:6
64:5 83:14
86:15 96:10
**understanding**
21:23 29:22
**underwent** 85:17
**undoubtedly**
54:18
**Unfortunately**
103:8
**UNITED** 1:1
**universe** 95:25
**University** 8:2
10:2

Steven Geiringer, MD
11/21/2012

unnecessary
  14:18,19
unreadable 46:17
unusual 107:5,14
  107:17
upper 39:22,24
use 18:7,22
  26:14 35:8
  98:22
useful 75:14,17
usually 12:3
  18:20 36:22
  91:5 94:10
  108:12,13
Utica 2:6

V

value 15:1
Van 2:5,11
various 67:5
  95:24
vehicle 16:3
  63:24 67:1
verbalization
  27:19
verbatim 97:14
  108:21
versus 20:16
  32:18 49:16
  70:1
Vicodin 17:10,12
  17:15
Videographer
  2:19 5:4 58:24
  59:2 110:18
videotaped 1:16
  5:5
view 28:15
  106:10
virtually 42:12
  55:1,18,18
visit 69:22
  97:15
visits 22:14,17
  22:24 23:2,15
  46:16 51:15
  81:25 82:4
vitae 3:18 7:7
  7:11
vs 1:7

W

walk 36:4,6
walked 36:5
walker 36:18
walking 36:9
want 14:24 18:3
  24:23 57:4
  78:11 93:8
  105:6 106:25
  107:18 109:14
wanted 73:1
  78:16
warranted 104:7
Warren 1:18 6:5
washing 55:24
Waskowski 1:5
  5:13 10:21
  12:8 15:23
  19:3 21:24
  24:15,22 26:20
  26:24 28:17
  36:13 38:21
  42:7,10 45:12
  46:1,25 47:24
  48:22 49:7
  50:12 51:24
  52:6,24 56:20
  56:24 57:13
  58:14 60:10,21
  61:14,20,23
  66:21 67:4,13
  67:22 68:1
  69:2 71:15
  72:13 73:1,14
  74:14 75:3
  76:4 77:15
  79:15 80:18
  81:10 82:13,15
  83:16 84:15
  85:16 86:13,23
  87:7,17,25
  88:4,15,20
  90:13 92:9
  94:18 102:3
  103:19 104:3
  105:22 106:12
  107:3,20,23
  108:3
Waskowski's 11:3
  35:22 42:25

62:3 86:2
  102:23
wasn't 60:25
  75:18
waste 58:19
watching 36:4
way 9:1 11:13
  16:16 32:4
  47:9,13 48:9
  50:16 51:20
  53:8 65:5,13
  83:6,8 93:6,18
  94:3,4,19
  96:13,16 99:17
  102:17
Wayne 8:1,9,13
  8:14 10:10,16
  59:9 111:5,24
ways 31:18 33:12
  53:22
weakness 15:11
  99:10,14
website 64:19
  65:1,8 95:18
  96:18
Wednesday 1:21
  5:2,7
week 17:3 51:16
  97:25
weeks 12:5 22:4
  22:17,19,19
  23:12,13,14
  25:22 34:4
  42:7 44:8
  51:15,19 54:1
  54:4,7 56:5
  82:1,8
went 10:13,17
  11:11 16:6,9
  26:19 36:10
  38:17 45:25
  84:2 89:17
  91:20
weren't 45:10
  50:25 51:11
Westland 1:19
  5:1,6 6:5
we'll 58:21
  66:17 73:18,24
we're 18:19 35:2
  35:3 38:23

50:8 59:2
  96:10 103:8
  107:16 108:25
  109:11 110:19
we've 60:2 89:6
  107:1
whatnot 48:6
whatsoever 32:11
  37:25 108:15
wheelchair 36:18
wife 27:9,23
  28:18 40:9
wife's 36:8
William 109:7
wisely 52:20
witness 3:2 58:3
  58:23 76:25
  110:22 111:11
  111:14
word 20:16 46:21
  51:21 97:20,20
words 31:2 64:4
  70:3 88:21
work 12:4 17:22
  46:5 61:6 80:1
  81:14 98:22
  99:18
worked 61:20
working 23:3
  89:23
works 48:9
world 83:12
worrisome 50:23
worse 15:16,17
  16:6 17:21,22
  23:3 25:13
  55:5
worsening 52:1
worthless 51:24
  54:22
wouldn't 14:9
  24:25 91:13
wrist 16:17,17
  38:25 39:1
wrists 16:22
write 78:19
  107:5
writes 68:8 81:7
writing 23:25
written 86:1,17
wrong 23:9,17

Steven Geiringer, MD
11/21/2012

Page 21

66:24
**wrote** 63:3 69:5
  69:17 72:12
  75:2,22 76:11
  77:2,3,4 78:23
  81:16 86:3
  108:1

---

**X**

X 41:20
**x-ray** 12:7 44:11
  44:15
**x-rays** 12:18
  14:19 43:4,9
  43:12,15 44:6
  48:24 86:20

---

**Y**

Y 41:20
**yard** 81:14
**yeah** 12:19 14:14
  19:5 22:4,18
  32:15 35:24
  44:4,5 47:14
  49:18 52:13
  62:11 64:9
  71:19 73:5
  74:5 80:11
  92:24 94:21
  95:12 98:2
  99:24 108:11
**year** 9:1,6,6,9
  12:9 15:25
  27:3 28:12,12
  28:12 34:5
  45:25 46:7,12
  46:12,15 51:23
  52:8 54:12,19
  54:20 55:2
  63:20 65:4
  84:19 89:18
  90:18 91:20
  93:11,25 94:1
  94:8,17 96:17
  96:20
**yearly** 8:11
**years** 6:9 17:4
  17:17 19:21
  22:2,5 47:11
  47:13 50:10
  52:6 83:5,6

**yep** 9:2 69:12

---

**Z**

Z 41:20
**Zachary** 77:15
**Zamorano** 48:14
  72:12 73:1
  87:10 98:5,6
  109:21
**Zamorano's** 70:16
  71:12 87:16
**zero** 29:7,14
  32:2,18 33:2
  37:7 42:15
  46:6 48:7

---

**$**

$1,250 98:24,24
$1,300 91:2
$100 100:6
$2,000 91:3
  100:2
$20 91:20
$740 90:18 91:1
$760 91:20,22
$8,000 98:20

---

**0**

0 99:9
09 54:14

---

**1**

1 1:14 3:17 7:4
  7:6,10 21:2
  34:25
1,200 14:3
1,500 14:3
1-4-10 44:7
1.5 22:5
1:47 58:25
1:51 59:3
10 21:2,3 22:14
  22:17,23 23:2
  31:23 46:11
  51:14 82:4,4
100 16:19 52:15
  53:3
106 3:8
1099 93:25
11 44:23 62:22
  88:22 97:4,7

101:11
11-CV-13036 1:8
11-16-10 4:9
  77:7
110 3:9
111 1:14
12 46:16 82:4
12-14-10 3:24
  66:4 97:17
12-23-09 61:21
12:49 1:20 5:3,8
13 44:8,12
14 66:1 69:8
  97:1 107:25
  108:3
15 90:19
15-minute 90:23
16 78:8,14,24
18 31:10 51:5
  80:14 81:17
19 65:25 66:11
  96:21 107:20
1979 6:9
1999 10:18

---

**2**

2 3:19 57:15,20
  61:14 64:13
  73:10 97:4
  106:6
2-18-11 4:8 77:6
2:47 110:20,21
20 19:21 32:14
  47:11,12 83:4
  83:5 100:6,8
2009 60:25 67:2
  84:16
2010 45:3,20
  46:4,6,11
  48:20 65:25
  66:1,11 69:8
  71:24 74:17,18
  74:20 76:1
  78:6,8,14,24
  96:22 97:2
  100:23,25
  107:20
2011 7:15 15:24
  44:23 46:20,23
  60:5 62:22
  80:15 81:17

87:1 88:22
  101:11
2012 1:21 5:2,7
  94:17
21 1:21 5:2,7
23 54:14 60:25
  67:2 74:17,20
  84:16 100:23
24 8:22 64:22
248 2:14
25 78:6
254-5566 2:7
25900 2:12
28 71:24

---

**3**

3 3:21 10:1
  63:10,15 71:14
  74:18 76:1
  100:24 105:19
  105:21 106:4
3-18-11 4:4 71:9
30 92:10
328 2:12
33 6:9 7:18,21
35 52:14 94:12
36301 1:18 6:5

---

**4**

4 3:23 34:24
  44:8 66:3,8
  74:21 95:2
  99:5,7,9,14,19
  107:2
40 32:16 52:14
  94:11,12,15
45 52:15
45109 2:5
46 52:6,7,9 53:1
  53:2
48 52:8
48237 2:13
48317 2:6

---

**5**

5 4:3 29:3,4,5
  31:23 32:2,18
  33:2 34:24
  49:16 71:8,13
  74:24 99:6,8,9
  99:9 101:21

| | |
|---|---|
| 104:18 | 89:17,24 |
| **50** 52:15 | |
| **50s** 14:6 | |
| **57** 3:20 | |
| **58** 3:6 | |
| **586** 2:7 | |

| **6** |
|---|
| **6** 3:5 4:5 73:20 |
| 74:1 101:9 |
| **60** 11:2 32:16 |
| 92:18 |
| **60s** 14:7 |
| **63** 3:22 |
| **66** 3:24 |

| **7** |
|---|
| **7** 3:18 4:7 15:24 |
| 60:5 77:5,12 |
| 78:1 87:1 |
| 88:23 105:6 |
| **7-11-11** 3:20 |
| 57:16 |
| **7-15-18** 111:25 |
| **7-23-10** 4:6 |
| 73:21 |
| **7-7-11** 3:20 |
| 57:16 |
| **70s** 14:7 |
| **71** 4:4 |
| **73** 4:6 |
| **77** 4:9 |

| **8** |
|---|
| **8-19-10** 3:24 |
| 66:4 97:16 |
| 108:15,17 |
| **8-19-2010** 66:23 |
| **80** 32:11,18 |
| 49:16 |
| **82** 10:8 |

| **9** |
|---|
| **9** 21:2 44:7 |
| **9-3-10** 4:6 73:21 |
| **90** 33:17 43:15 |
| 43:17 |
| **91** 10:9 |
| **94** 3:7 |
| **968-5200** 2:14 |
| **99** 10:13 11:12 |

