1    IN THE DISTRICT COURT OF THE UNITED STATES

2       FOR THE EASTERN DISTRICT OF MICHIGAN

3                SOUTHERN DIVISION

4

5    JAROSLAW WASKOWSKI,

6                      Plaintiff,

7        -vs-                   Case No. 11-CV-13036

8

9    STATE FARM MUTUAL AUTOMOBILE

10   INSURANCE COMPANY,

11                      Defendant.

12   _____/

13           The Videotape deposition of STEFAN

14   GLOWACKI, M.D., a witness of lawful age, taken in

15   the above-entitled cause, wherein Jaroslaw

16   Waskowski is the Plaintiff, and State Farm, is the

17   Defendant, pending in the District Court of the

18   United States for the Eastern District of Michigan,

19   Southern Division, pursuant to the Federal Rules of

20   Civil Procedure, before Maureen M. McLaughlin,

21   Certified Shorthand Reporter, and Notary Public in

22   and for Oakland County, Michigan, at 40600 Van Dyke

23   Avenue, Sterling, Heights Michigan, on the 14th day

24   of November, 2012, commencing at 1:20 o'clock p.m.

25

```
 1   APPEARANCES:

 2   TEMROWSKI & TEMROWSKI

 3        45109 Van Dyke Avenue

 4        Utica, Michigan  48317-5579

 5        586-254-5566

 6        For the Plaintiff

 7        BY:  LEE ROY H. TEMROWSKI, ESQ.

 8   HEWSON & VAN HELLEMONT, P.C.

 9        25900 Greenfield Road, Suite 326

10        Oak Park, Michigan  48237

11        248-968-5200

12        For the Defendant

13        BY:  JAMES HEWSON, ESQ.

14

15   ALSO PRESENT:  Don Handyside, Videographer

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                                        PAGE

3   Examination by Mr. Temrowski           5

4   Examination by Mr. Hewson             48

5   Further Examination by Mr. Temrowski  108

6   Further Examination by Mr. Hewson     116

7   Further Examination by Mr. Temrowski  120

8   Further Examination by Mr. Hewson     121

9

10                E X H I B I T S

11                                    MARKED FOR

12  DESIGNATION                      IDENTIFICATION

13  Deposition Exhibit No. 1              4

14  Deposition Exhibit No. 2              4

15  Deposition Exhibit No. 3              4

16  Deposition Exhibit No. 4              4

17  Deposition Exhibit No. 5              4

18  Deposition Exhibit No. 6              4

19  Deposition Exhibit No. 7              4

20  Deposition Exhibit No. 8              4

21  Deposition Exhibit No. 9              4

22  Deposition Exhibit No. 10             4

23  Deposition Exhibit A                101

24

25

```
 1                          Sterling Heights, Michigan
 2                          11-14-12
 3                          At or about 1:20 p.m.
 4                          (Deposition Exhibits Nos.
 5                          1-10 were marked for
 6                          identification)
 7                    -    -    -
 8        THE VIDEO OPERATOR:  We are on the record.
 9   This is the videotape deposition of Doctor Glowacki
10   being taken in Sterling Heights, Michigan.  Today
11   is Wednesday, November 14, 2012.  The time is two
12   (sic) twenty twenty.  My name is Don Handyside,
13   Notary Public for the County of Oakland.  This case
14   is -- this deposition is being taken in the matter
15   of Waskowski v State Farm.  USDC case number
16   11-CV-13036.
17        Would Counsel please state their appearances.
18        MR. TEMROWSKI:  Lee Temrowski appearing on
19   behalf of Mr. Waskowski, the Plaintiff.
20        MR. HEWSON:  James Hewson appearing on behalf
21   of State Farm.
22        THE VIDEO OPERATOR:  Doctor, would you raise
23   your right hand, please.
24     S T E F A N   G L O W A C K I,   M. D.,
25   having first been duly sworn, was examined and
```

1        testified on his oath as follows:

2              THE VIDEO OPERATOR:  Please proceed.

3              MR. TEMROWSKI:  Let the record reflect that

4        this is the de bene esse trial deposition of Doctor

5        Stefan Glowacki, M.D., orthopedic surgeon, being

6        taken pursuant to notice and to be used for all

7        purposes intended under the Federal Rules of Civil

8        Procedure.

9                           EXAMINATION

10   BY MR. TEMROWSKI:

11   Q.   Doctor, good afternoon.  Would you please tell the

12        Ladies and Gentlemen of the Jury what your name is.

13   A.   Stefan Glowacki, S-t-e-f-a-n G-l-o-w-a-c-k-i.

14   Q.   And, Doctor, could you tell us where this

15        deposition is being taken today?

16   A.   In my office on Van Dyke in Sterling Heights.

17   Q.   And, Doctor, what is your occupation?

18   A.   Physician, M.D.

19   Q.   And do you have a specialty, Doctor?

20   A.   Yes, sir.

21   Q.   And would you tell the members of the Jury what

22        that is?

23   A.   Orthopedic surgery.

24   Q.   Now, Doctor, briefly, would you please explain to

25        the Ladies and Gentlemen of the Jury -- tell us

```
 1       something about the field of orthopedic surgery.
 2       What -- what does it encompass?
 3   A.  Orthopedic surgery involve treatment of
 4       musculoskeletal system, muscle, joints, ligaments,
 5       bone and the nerve involve in the area of the bone
 6       and joints, disease of the bone joints and the
 7       spine, tumor, malformation, congenital malformation
 8       and a fracture.
 9   Q.  And, Doctor, for how many years have you been
10       practicing in the field of orthopedics?
11   A.  Since 1960.
12   Q.  And are you in private practice?
13   A.  Yes, I am in a private practice.
14   Q.  And, Doctor, during those years of performing
15       orthopedics, have you, in the past, performed
16       surgeries on individuals?
17   A.  Yes.  I stopped doing surgery when I reached
18       sixty-five years of age.
19   Q.  And, Doctor, could you just tell the members of the
20       Jury when you were performing surgery, what type of
21       surgeries would you perform?
22   A.  Artificial hip, artificial knee, artificial
23       shoulder, elbow, neck surgery, back surgery, broken
24       bone, tumor of the bone, tumor of the muscle,
25       repair of ligaments, removal of the broken pieces.
```

| 1 | Q. | Doctor, I've had marked today as Plaintiff's |
|---|---|---|
| 2 | | Deposition Exhibit Number 1, and I'll just show |
| 3 | | that to you, which is your -- your resume. |
| 4 | A. | It's my resume. |
| 5 | Q. | Okay.  You have a copy there.  Is this resume |
| 6 | | current and up-to-date? |
| 7 | A. | Yes, sir. |
| 8 | Q. | And it indicates where you went to school and your |
| 9 | | license, correct? |
| 10 | A. | Yes, sir. |
| 11 | Q. | Okay.  Doctor, I would like to now ask you some |
| 12 | | questions about my client and your patient, |
| 13 | | Jaroslaw Waskowski, and I'll begin by asking, do |
| 14 | | you have with you here today at this deposition, |
| 15 | | Mr. -- your complete file on Mr. Waskowski? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And, Doctor, if at all during today's deposition if |
| 18 | | you need to refer to your file, please do so, okay? |
| 19 | A. | Thank you. |
| 20 | Q. | Okay.  Now, Doctor, could you begin, please, by |
| 21 | | telling us when and where did you first see Mr. |
| 22 | | Waskowski as your patient? |
| 23 | A. | Probably January after the accident, which he have |
| 24 | | in December.  To be exact, I saw him in January |
| 25 | | 2010. |

1   Q.   Okay.  Was that January 13th?

2   A.   Yes, sir.

3   Q.   Okay.

4   A.   January 13, 2010.

5   Q.   Doctor, in a moment --

6   A.   Accident happened December 23, 2009.

7   Q.   Okay.  In a moment I'm going to hand you another

8        package of documents, Plaintiff's Exhibit Number 2,

9        which are reports that you wrote on Mr. Waskowski,

10       but if you could find your report dated January

11       13th, 2010, I'd like to go through that with you.

12       Actually, if you want to look at mine, I can let

13       you look at it.

14  A.   Okay.  Because it's -- it's too thick.  It's three

15       years of treatment.

16  Q.   Why don't you take a look at the report I've had

17       marked here.

18  A.   Yes, sir.

19  Q.   Okay.  What were the complaints that Mr. Waskowski

20       had the very first time that you saw him as your

21       patient?

22  A.   Back pain, leg pain, lower back pain since the

23       accident on December 23, 2009.

24  Q.   Okay.  And did Mr. Waskowski tell you something

25       about how that accident happened?

1   A.   He was restrained driver, stationary at the red

2        light when another car hit him going different

3        direction in front left of the car in which he was

4        sitting.  He was turned around few times, and

5        pushed across two driving lanes and end up on the

6        opposite side of the street.

7            At the accident he has lost consciousness.  He

8        does not remember what exactly happened.

9            After accident EMS pick him up and he did not

10       want to go to hospital.  His daughter came, pick

11       him up and took him home.

12  Q.   Doctor, you are from Poland and Mr. Waskowski is

13       Polish, correct?

14  A.   That's correct.

15  Q.   When you would communicate with him, would you do

16       that in Polish or in English?

17  A.   Both languages is okay.

18  Q.   Okay.  Did he have a preference, though, that he

19       was more comfortable with talking to you in Polish?

20  A.   Yes, sir.

21  Q.   Now after listening to what his complaints were and

22       taking that history that you did from him, did you

23       then, on that occasion, have an opportunity to

24       perform a physical examination on him?

25  A.   Yes, sir.

1   Q.  And what did that consist of and what were your

2       findings?

3   A.  He has problem moving his neck. He has difficulty

4       look up to the ceiling, down to the floor, over the

5       right and left shoulder. Means that his neck was

6       completely stiff. There was tenderness over

7       posterior neck and there was a scar after

8       torticollis, which he has as a small baby.

9           Shoulders show okay.

10          Elbow, wrist, diminished sensation in ulnar

11      nerve distribution on the left side, weakness of

12      the left hand.

13         Tenderness over the left sciatic nerve,

14      sciatic notch. Straight leg raising, sixty degree,

15      Lasegue is positive, L-a-s-e-q-u-e (sic). Hip

16      range of motion, restricted by back pain.

17         Diminished sensation L4-L5 on the left side,

18      absent left ankle reflex.

19         Diminished foot evertors extensor hallucis

20      longus on the left side.

21         Tenderness over the left ribs in mid axillary

22      posterior axillary line over six to eight ribs,

23      tenderness over the sternum.

24   Q.  After performing that physical examination on Mr.

25      Waskowski, did you arrive at an impression as to

1    what his condition was?

2  A.  Yes, sir.

3  Q.  And would you tell the members of the Jury what

4      that was?

5  A.  Status post motor vehicle accident, herniated disc

6      L4-L5, ruptured disc, cervical spine, probably

7      C4-C5.  Fracture left ribs six to eight on the left

8      side.  Possible fractured sternum.  Head injury,

9      Contusion of the neck, back and chest.

10 Q.  Okay.  Now, Doctor, before moving on, the documents

11     that you're holding in your hand, which I've had

12     marked as Deposition Exhibit Number 2, are those

13     copies of reports that you have been writing since

14     the first time that you saw Mr. Waskowski?

15 A.  This was a letter sent to the chart, insurance

16     company and family physician, State Farm Insurance

17     Company on January 13, 2010.

18 Q.  Okay.  So State Farm would have received copies of

19     those documents that you authored, correct?

20         MR. HEWSON:  Objection, foundation.

21         THE WITNESS:  State Farm Insurance Company,

22     claim number 22B0777749.

23 BY MR. TEMROWSKI:

24 Q.  Okay.  I'll take that back.  Thank you.

25         Now, Doctor, after seeing Mr. Waskowski on

1      that first occasion, did you write any

2      prescriptions for him to attend physical therapy?

3  A.  Yes, sir.

4  Q.  Okay.  I have had what is marked as Deposition

5      Exhibit Number 3 a document that I'll show you and

6      ask if you could identify what that is?

7  A.  Waskowski, and this was continue -- continue

8      physical therapy for six weeks, neck, back,

9      shoulder.  Diagnosis, pain.  My signature.

10  Q.  Okay.  And, Doctor, you authored numerous

11      prescriptions like that for physical therapy, is

12      that correct?

13  A.  That's correct.

14  Q.  And could you just tell the members of the Jury why

15      -- why did you recommend that Mr. Waskowski undergo

16      physical therapy?

17  A.  Physical therapy's one of the modality to treat a

18      patient.  Patient who suffer injury have

19      irreversible changes which are going to stay with

20      him to the rest of his life.  Physical therapy keep

21      a mobility which prevent stiffness, as stiffness

22      produce increased pain.

23          If we have physical therapy, at least we keep

24      mobility and hope that diminish pain.

25  Q.  Okay.  Now, Doctor, in addition to writing a

1      prescription for physical therapy, did you also

2      write a prescription for Mr. Waskowski to undergo

3      MRI testing?

4  A.  Yes, sir.

5  Q.  And, first of all, could you please tell all of us

6      what exactly is an MRI?

7  A.  Medicine devolve as the medicine about 1860, 1870

8      in England.  At the time treatment consist of good

9      advice, some medication, usually opium and alcohol,

10     some vegetable drops, because we didn't know much,

11     and we didn't know how to open the body.

12        Then we get the Second -- First World War when

13     we start doing the surgery for fracture and we find

14     out that we can open the human body and start

15     getting -- fixing it.  This was a big progress of

16     forward.

17        Then came a Second World War, more surgery,

18     and after Second World War in United States came

19     into the power was the scientic (phonetic)

20     development, and this was at first x-ray, then

21     there CAT scan, and after CAT scan came a

22     investigation which is not producing any side

23     effect.

24        X-ray -- to obtain x-ray of the spine, chest

25     or x-ray after accident give radiation almost as

1    much as you can get from the atom bomb, and then we

2    try to find out something less.

3       CAT scan was more precise but still more

4    radiation, which if you take few chest radiation --

5    few chest x-ray, you equal almost to twenty to

6    forty units of radiation.  If you take a regular

7    spine x-ray, which demand more radiation, you get

8    up to hundred units, which is almost what people

9    get in Hiroshima, and then get in England guy who

10   say why don't we try with a magnetic resonance

11   going to the human body devolving angulating at the

12   separate atom of the human body and get pick up by

13   another electromagnet through the computer on the

14   screen which produce absolutely exact image on the

15   human body, which did not produce any radiation, no

16   side effect, and this investigation came into full

17   blown about fifteen, twelve years ago, and we are

18   using this as the diagnostic tool to verify our

19   suspicion based on our discussion with the patient

20   and manual examination.

21 Q.  Now, Doctor, when you write a prescription like you

22   did for Mr. Waskowski to undergo MRI testing, you

23   don't do MRIs at your office?

24 A.  No.

25 Q.  Okay.  And they're done at either a hospital or an

```
1         MRI facility, is that right?

2    A.   Yes.

3    Q.   And when you wrote the prescription for Mr.

4         Waskowski to undergo MRI testing, did you recommend

5         any particular facility, or did you simply give him

6         the script to have the MRI done and have him take

7         it where he wanted to have it done?

8    A.   Whenever he live, patient usually go close to his

9         house or place which is reputable, but I don't

10        care.

11   Q.   Okay.

12   A.   And I am not involved in this.

13   Q.   Okay.  Now, I'm going to show you now what I've had

14        marked as Plaintiff's Deposition Exhibit Number 4,

15        hand this to you, and ask if you could please tell

16        the Jury what that package of documents is?

17   A.   Macomb MRI, Kirkwood Professional Building,

18        Schoenherr, Suite, Sterling Heights, Michigan,

19        Jaroslaw Waskowski, March 18, 2010.  Referring

20        physician, Stefan Glowacki.  MRI of the cervical

21        spine.  Diagnosis, pain.

22   Q.   And, Doctor, did that facility perform an MRI of

23        Mr. Waskowski's neck and back?

24   A.   Yes, sir.

25   Q.   And did you, as Mr. Waskowski's orthopedic doctor,
```

1        have an opportunity to review those reports that

2        you're holding right now?

3    A.  Yes, sir.

4    Q.  And could you please tell the Ladies and Gentlemen

5        of the Jury what the findings were after the MRI

6        was performed on Mr. Waskowski's neck and back?

7    A.  C4-C5 --

8            MR. HEWSON:  I'm going to object.  The

9        exhibits speak for themselves.  To the extent

10       they're being quoted from, they have to be quoted

11       from accurately.  Subject to that, Doctor, we'll

12       take your answer.  Thank you.

13           THE WITNESS:  C4-C5, diffuse posterior bulging

14       with more permanent disc material involving the

15       right paracentral foraminal distribution with

16       degree of uncovertebral, u-n-c-o-v-e-r-t-e-b-r-a-l,

17       joint spurring and right foraminal encroachment

18       with central canal stenosis.

19           C5-C6, broad-based disc herniation with

20       bilateral degree encroachment.

21           C6-C7, small posterior disc herniation.

22           Cervical spinal cord demonstrate normal signal

23       and caliber.  The craniovertebral junction is not

24       remarkable, without any evidence of cerebellar

25       tonsillar ectopia.

```
 1              Impression, multiple disc herniation, disc

 2         bulging.

 3    BY MR. TEMROWSKI:

 4    Q.   Now, Doctor, that was for the neck, correct?

 5    A.   That's correct.

 6    Q.   Could you please tell us what the findings were

 7         regarding Mr. Waskowski's lumbar spine, his back?

 8    A.   Normal cervical lordosis is present.  There's a

 9         degree of curvature, apparent levocurvature versus

10         torticollis of the cervical spine.

11              Waskowski exam date, April 15, 2010, referring

12         physician, Stefan Glowacki, MRI of lumbosacral

13         spine.

14              I see there is five lumbar vertebra, axial

15         image through assume L1 through L5.  Levocurvature

16         with sclerosis of the lumbar spine and there's

17         normal lumbar lordosis.

18              Desiccation and loss of a disc L4-L5,

19         L5-S1.  Small fatty infiltration.

20              L4-L5, small posterior disc herniation.

21              L5-S1, small broad-based disc herniation.

22              Disc herniation, L4-L5, L5-S1.

23    Q.   Now, Doctor, those MRI reports that you're holding,

24         were they signed by a doctor?

25              MR. HEWSON:  Objection, foundation.  Go ahead.
```

1          THE WITNESS:  Michele M. Keyes, K-e-y-e-s,

2      D.O., radiologist.

3  BY MR. TEMROWSKI:

4  Q.  Doctor, those are the written reports of the MRI on

5      Mr. Waskowski of his neck and back, correct?

6  A.  That's correct.

7  Q.  Now, in addition to those reports, there are also

8      imaging studies, correct, films?

9  A.  Yes, sir.

10  Q.  And in the case of Mr. Waskowski, in addition to

11      you reviewing those written reports, did you also

12      have an opportunity to personally review the MRI

13      films?

14  A.  Yes, I did.

15  Q.  And do you have them with you here today?

16  A.  Yes, I do.

17  Q.  And --

18          MR. HEWSON:  I'm going to object as to

19      foundation.  Doctor Glowacki did not produce those

20      documents at his discovery dep.  Subject to that,

21      Doctor, we'll take your answer.

22  BY MR. TEMROWSKI:

23  Q.  And, Doctor, you have those films with you here

24      today?

25  A.  Yes, I do.

1   Q.   And would you be able to use the shadow box that we

2        have here and show to all of us what those films

3        reveal to you?

4   A.   Yes, sir.

5   Q.   Okay.  Why don't we put those films up.

6             MR. HEWSON:  Which films, just for

7        identification?

8             MR. TEMROWSKI:  Well, let's start with --

9        let's start -- let's start with the ones of the

10       neck from Macomb MRI, and then we'll move on to the

11       ones of the back.  How's that.

12            THE WITNESS:  Okay.

13   BY MR. TEMROWSKI:

14   Q.   Do we need to go off the record while you get this

15       together?

16            MR. TEMROWSKI:  Why don't we go off and let

17       him...

18            THE VIDEO OPERATOR:  Time is two (sic)

19       fifty-three twenty-three.  We're off the record.

20                         (Discussion off the record)

21            THE VIDEO OPERATOR:  We are on the record.

22       The corrected time now is one fifty-eight oh seven.

23   BY MR. TEMROWSKI:

24   Q.   Okay, Doctor, you've now located the Macomb MRI of

25       the cervical spine in Mr. Waskowski's neck from

1     March 18, 2010, is that correct?

2   A.   That's correct.

3   Q.   And you've had an opportunity to personally review

4        that film?

5   A.   Yes, sir.

6   Q.   And, Doctor, could you please show to all of us,

7        what -- what -- what do you see when you look at

8        that film?

9   A.   Number one, the spinal cord is round, not flat, and

10       if you look here, there's compression of the spinal

11       cord because it's look more like a triangle.  Then

12       you can see instead of round, you have the

13       protrusion of the disc.  Less on this side, more on

14       this side, and very little on this side.  You can

15       see there is no compression.  You see how is it

16       beautiful round, and this is absolutely different

17       is number one.

18            Number two, you have, a -- one, two, three,

19       four, five -- six disc here visible and you don't

20       see any osteophyte formation.  You don't see any

21       changes of the bone.  You don't see any arthritis

22       of the bone.  Why?  Because he's seventy years old?

23       No.  He's young guy.  He doesn't have arthritis.

24       Look, there is not any osteophyte formation, not

25       any sticky bone.  This is one actually.  One film.

1           This another film.  The same.  If you look
2      here, look, look, it's flat.  Look how the disc is
3      sticking out, and how is good one.  I'll show you
4      good one.  Look, this is a good one, but look at
5      this one.  Look at this one.  All of this --
6      (Indicating)
7           MR. HEWSON:  I'm going to object as to
8      foundation because the Doctor isn't identifying
9      what level or what structure within that level.
10     Subject to that --
11          THE WITNESS:  On transverse film you cannot
12     identify with absolutely certainty level of the
13     disc.  You can only identify changes.
14          MR. HEWSON:  I'm sorry.  You can't identify --
15          THE WITNESS:  If you look on -- on your face I
16     can see your eyes, your nose, your -- but I don't
17     know if your nose is crooked or not because I see
18     all -- if I see from a side, I see different.
19          MR. HEWSON:  My objection is foundation --
20          THE VIDEO OPERATOR:  Doctor, --
21          MR. HEWSON:  -- because you're not and can't
22     identify the level at which you are reading the
23     MRI.  That's my objection.
24          THE WITNESS:  No.  I am reading different MRI
25     which is transverse, not longitudinal.  On the

```
 1          transverse MRI, if you don't cave on the side,

 2          longitudinal micro, you don't know for sure.

 3               THE VIDEO OPERATOR:  Doctor, your microphone

 4          has come off.

 5               MR. HEWSON:  And that's my objection.

 6               THE WITNESS:  I will try to make you happy.

 7               THE VIDEO OPERATOR:  Doctor, --

 8               MR. TEMROWSKI:  Your -- your microphone you

 9          dropped.

10     BY MR. TEMROWSKI:

11     Q.   Now, -- now, Doctor, we're still talking about the

12          neck, correct?

13     A.   Cervical spine, which is called name neck.

14     Q.   Okay.

15     A.   And this neck, it's a lateral view, and you start

16          -- because MRI, it's cut every three to five

17          millimeter thickness and going through the human

18          body from right to left or left to right, it all

19          depends, and if you see this is a beginning, you

20          don't see much.  You don't see much.  You don't see

21          much, and, look, this is in a center and you can

22          see the first, second, third, fourth, fifth, sixth,

23          and you can see the disc sticking here.  The normal

24          disc is like this, flat, and if you look here, the

25          disc is thick, a bulging disc, disc, disc.
```

1           If you look here, you can see the sticking

2       like a finger over there.  This is a normal disc.

3       Look, it's flat, congenital, beautiful and there is

4       white, and if you look here, there is no disc

5       material.  It's flat.  And, look, and this happen

6       one, two, three, four, five, six vertebra, and this

7       I can tell you the level of the changes.

8           This is the same, different electromagnetic

9       field on the same human body from the beginning to

10      the end.  You start from one left side, you see the

11      muscle, you see the beginning of the bone,

12      beginning of the bone, building up, and you can see

13      the bone, you can see the bone, you can see the

14      bone, you can see the bone.

15          And on this one, you don't see any osteophyte

16      formation.  You don't see any bony changes in the

17      structure secondary to the fracture congenital

18      abnormality or distraction due to the aging

19      process, which we call degenerative process, and

20      you can see the disc, one, two, three, on three

21      level.  You wan't level exactly the name, one, two,

22      three, four five, five six, three four, four five,

23      five six.

24  Q.  Okay.  And after, Doctor, you reviewed those films

25      and the reports that were prepared at Macomb MRI,

1        were they consistent?

2                MR. HEWSON:  I'm going to object as to

3        foundation.  Go ahead, sir.

4                THE WITNESS:  Sir, I don't --

5                MR. TEMROWSKI:  Here.  I got the...

6    BY MR. TEMROWSKI:

7    Q.   Are we moving now to the lumbar?

8    A.   Excuse me, sir.

9    Q.   Okay.

10   A.   Yes, sir.

11   Q.   They were consistent?

12               MR. HEWSON:  Objection, leading.

13               THE WITNESS:  This is lumbar films but date

14       March 15, 2010.

15   BY MR. TEMROWSKI:

16   Q.   Okay.  So now we're talking about the lumbar spine?

17   A.   That's correct.

18   Q.   Okay.  And what did you observe after you reviewed

19       the M --

20   A.   And if you look in the lateral view, which

21       facilitate transverse view, which was count and

22       numbered here, and if you look this, L5-S1, there's

23       a large disc and there is L4-L5 a smaller disc.

24       You can see it sticking out.  You don't see the

25       bony protrusion on any level, none, zero.  There is

1       no osteophyte formation, not any arthritic changes.

2       Why?  He's young.  He's well bred, good general

3       condition.  Of course he's Polish, immigrant.

4           And on the lateral view you can see how the

5       nerve is visible.  This is spinal cord to nerve

6       going down.  There's no arthritic changes, and look

7       what has happened here, that you see the age of the

8       bone and you see the small stuff below the age of

9       the bone.  It's not a bony structure.  It's soft

10      structure, and it means that this is a disc, and

11      you can see disc here, you can see disc here.  Look

12      at disc here.  The spinal cord almost disappeared.

13      (Indicating)

14          MR. HEWSON:  I'm going to object for the same

15      reason that there's no foundation for the

16      identification of the levels on those alleged MRIs.

17      Subject to that, we have your answer, sir.

18  BY MR. TEMROWSKI:

19  Q.  Doctor, after you --

20  A.  This is -- wait, wait, wait.

21  Q.  After you reviewed the written reports from Macomb

22      MRI and reviewed the actual films of the neck and

23      back, were the two consistent?

24          MR. HEWSON:  I'm going to object to

25      foundation. Go ahead.

1    BY MR. TEMROWSKI:

2    Q.    Were the reports and the findings as indicated on

3          this the same as what you found when you reviewed

4          the MRI films?

5    A.    Yes, sir.

6    Q.    Okay.  Now, Doctor, I'm now going to hand you what

7          I've had marked as Deposition Exhibit Number 6, and

8          I'll show it to you, which is another set of MRI

9          reports, but this time from Oakland MRI, and ask if

10         you could identify those documents.

11   A.    Rochester Road, Troy, Michigan, by Doctor Zamorano,

12         ordered on the date of March 24, 2011.

13   Q.    And, again, is that an MRI that was done of Mr.

14         Waskowski's neck and back but at a different MRI

15         facility?

16   A.    Different doctor, different MRI, different doctor

17         read it.  Completely different establishment.

18   Q.    And --

19   A.    This is University establishment, this other one

20         was a small hospital, South Macomb.  This is

21         probably William Beaumont Hospital.

22   Q.    And, Doctor, could you please tell us after

23         reviewing those MRIs, what were the findings?

24   A.    C3-C4 midline herniation of a disc effacing --

25         effac -- e-f-f-a-c-i-n-g, the ventral subarachnoid

 1      space, without cord compression.

 2          C4-C5, midline bilateral herniation of the

 3      disc with narrowing of C5 neural foramina

 4      bilaterally.

 5          C5-C6 --

 6          MR. HEWSON:  I'm going to object --

 7          THE WITNESS:  -- demonstrate mild --

 8          MR. HEWSON:  I'm going to object because the

 9      Doctor is not reading the entire finding on the

10      MRI.  He's taking it out of context.  I object to

11      the foundation.  Subject to that, Doctor, we'll

12      continue to take your answer.

13          THE WITNESS:  MRI of cervical spine without

14      contrast.  History, patient complain severe neck

15      pain, left shoulder pain, headaches since motor

16      vehicle accident.

17          Comment, routine MRI examination of the

18      cervical spine was performed without contrast in

19      saggital and axial plane using T1, T2 and

20      S-t-i-r imaging sequences including MRI myelography

21      of the cervical spine.

22          Current examination is compared with previous

23      report of MRI from Macomb MRI Center performed on

24      March 18, 2020 -- 2010.

25          There's normal height of vertebral body with

1       preservation of normal alignment, no arthritis.

2           There is straightening of normal cervical

3       lordosis and mild narrowing disc space C4-C5,

4       C3-C4 to C6-C7.

5           Diffuse dehydration of disc material, no

6       arthritis.

7           Cerebral craniovertebral junction,

8       atlantoaxial junction, cervicomedullary junction

9       normal.  No arthritis.  No degenerative changes.

10          C2-C3 normal, demonstrate no abnormality.

11          Bilateral C3 neural foramina widely patent, no

12      arthritis.

13          C3-C4 level demonstrate mild midline

14      herniation of a disc, the ventral sub --

15      subarachnoid space without cord compression.

16          Bilateral C4 neural -- neural foramina widely

17      patent, no arthritis.

18          C4-C5 level demonstrate diffuse midline,

19      bilateral herniation of a disc with narrowing of C5

20      neural foramina bilaterally.  There is only

21      effacement of ventral subarachnoid space by the

22      herniated disc without obvious cord compression.

23      No degenerative changes, no arthritis.

24          C5-C6 demonstrate mild midline herniation of

25      the disc, bilateral C6 neural foramina are widely

```
1      patent.  There's ventral subarachnoid space without
2      cord compression.
3           C6-C7 demonstrate mild disc herniations, no
4      disc compression.  Level demonstrate no
5      abnormality.
6           Myelographic demonstrate mild ventral
7      extradural impression, C4-5, disc space level due
8      to disc herniation without cord compression,
9      without ventral subarachnoid space.
10          Spinal cord morphology normal.
11          Facet joint are well aligned bilaterally.
12          Impression, midline disc herniation C3-C4 to
13     C6-C7 without cord compression with only ventral
14     subarachnoid space.
15          Bilateral narrowing, C5.
16          This -- this report of a current MRI of
17     cervical spine significantly different when
18     compared with the previous.  There is no bulging of
19     the disc C2-C3 level or spinal cord stenosis C4-C5
20     level in the previous report reported.
21          Previously described bilateral foraminal
22     stenosis, narrowing is not confirm in current exam
23     except bilateral C5 neural foramina.
24          Plain film of cervical spine.
25          There's normal height of the vertebral body
```

 1          with preservation, normal alignment and essentially

 2          normal cervical lordosis.

 3               Posterior elements are intact.  Spinal canal

 4          adequate.  Prevertebral tissue unremarkable.  No

 5          cervical rib.

 6               Oblique view demonstrate narrowing L5 -- no --

 7          C5 neural foramen.  Narrowing C5.  Remaining neural

 8          foraminal are widely patent.

 9               Essentially normal -- oh, no.  This is lumbar

10          spine.

11     BY MR. TEMROWSKI:

12     Q.   Does that cover the cervical spine?

13     A.   Yes, sir.

14     Q.   Okay.  Now, regarding the lumbar spine, the back,

15          could you --

16     A.   Yes, sir.

17     Q.   -- please tell us what the findings were of the MRI

18          that was performed at Oakland MRI.

19     A.   In Oakland MRI on request of Doctor Zamorano, study

20          March 24, 2011.

21               L5-S1 demonstrated midline herniation of the

22          disc slightly more eccentric to left than to the

23          right.  Anterorinferior aspect of the left L5

24          neural foramen.  Herniated disc thirty-three

25          millimeters.  It's three centimeters big.

```
 1            Thirty-three millimeter, three centimeter big.

 2                 In transverse shows five millimeters, five

 3            millimeters thirty-three is big.  It's half

 4            centimeter thick.

 5                 There's no spinal stenosis.  There's no

 6            abutment.  There is not any obvious other changes.

 7                 There's present disc herniation L5-S1.  MRI

 8            myelography shows minimal extradural impression

 9            L5-S1.  Rest of the disc spine is unremarkable.

10   Q.  Now, Doctor, in addition to the written reports

11            from the MRIs that were done at Oakland MRI, do you

12            also have the films from Oakland MRI?

13   A.  Yes, sir, I do.

14   Q.  And you have them with you here today?

15   A.  Yes, I do.

16   Q.  And did you, Doctor, personally have an opportunity

17            to review those?

18   A.  Yes, I do.

19   Q.  And after reviewing the films -- and I don't think

20            we'll put them up because we've seen the other

21            ones, but I'll just ask you, after reviewing the

22            films from Oakland MRI personally, and after

23            reviewing the report, did they show the same thing?

24   A.  Yes, sir.

25   Q.  Now, Doctor, you're an orthopedic doctor?
```

1    A.    We have MRI of the shoulder.

2    Q.    Okay.  Let's talk about that.

3    A.    Partial thickness tear of the distal rotator cuff

4          tendon detailed on prior.  Demonstrate in the

5          series five and nine image with rotator cuff tendon

6          tear.

7    Q.    And would you please explain to us as an orthopedic

8          doctor what is a rotator cuff tear?

9    A.    Human body is made of very complicated pieces.  If

10         you believe like your eye in the God, which means

11         God did excellent job, if you are Atheist, nature

12         make this.  The pieces which are connect end of the

13         bone, in this case clav -- scapular with the

14         humerus is surround by the muscle which each have

15         different function.

16              One of the small muscle which they think is

17         not important is absolutely important because it

18         prevent sliding of the head of the humerus over the

19         scapula, and if the muscle big, which we call

20         deltoid, start lifting, the first thing which they

21         do, they lift the shoulder up, not angulate but

22         lift it up and by lifting up, produce that shoulder

23         is unable to lift about forty-five, sixty degree.

24   Q.    So --

25   A.    And we call it torn rotator cuff.

1    Q.    So, Doctor, is that a normal or an abnormal finding

2          on that MRI?

3    A.    Abnormal.

4                MR. HEWSON:  Objection, relevance.  Go ahead.

5                THE WITNESS:  Abnormal.

6    BY MR. TEMROWSKI:

7    Q.    Okay.  Now, Doctor, you have testified that

8          regarding Mr. Waskowski you have reviewed the MRIs

9          of his neck and back from Macomb MRI, you've

10         testified that you reviewed the films from Macomb

11         MRI of the neck and back.

12   A.    Yeah.

13   Q.    You also reviewed the reports from Oakland MRI of

14         the neck and back, and you reviewed the films from

15         Oakland MRI of the neck and back, and now you've

16         talked also about his left shoulder.

17               Here's my question to you.  After doing all of

18         that, Doctor, personally reviewing the films, in

19         your professional medical opinion, are the findings

20         that you saw when you reviewed the films traumatic

21         in nature and caused by trauma or are they

22         degenerative?

23               MR. HEWSON:  Objection, foundation.  Go ahead,

24         please.

25               THE WITNESS:  Absolutely traumatic.

1   BY MR. TEMROWSKI:

2   Q.   Okay.  And explain, please, to the Ladies and

3        Gentlemen of the Jury, Doctor, why they are not, in

4        your opinion, degenerative?

5   A.   Number one, whoever made the human being made it

6        lasting.  If we take good care and don't have any

7        accident, we can last to eighty, ninety years, some

8        of them to hundred years.  It means that the pieces

9        which join bones and pieces of the body hold

10       together in spite of the passing time.

11            If we have an amount of trauma, which we call

12       injury, applied to the particular piece of the

13       human body, this force apply to the soft tissue

14       produce damage.  Small damage, you have bleeding,

15       you have hematoma, you have blue discoloration of

16       the skin, but the skin and the tissue regenerate.

17       You apply more force, you rupture it.  Some of the

18       tissue if you break the bone, a bone regenerate,

19       you don't see that bone was broken, but if you

20       rupture the ligament of the ankle, ligament of the

21       knee, it will never heal.  You will have certain

22       stability, but it will never heal.

23            The same happened to the connection between

24       vertebra, what we call it, a disc surrounded by the

25       capsule and the capsule is made of about five to

1     ten million layers of protein which are interwoven

2     to be elastic and strong enough from pushing the

3     disc, which is made ninety-eight to ninety-nine

4     percent of water and one to two percent of protein.

5     And if it's ruptured, it never regenerate because

6     there's no possible scar tissue to make it two

7     million layers.

8          Because of this, the hole is staying with you.

9     The disc is made of water, practically speaking,

10    and water, with the passing time, if you don't do

11    movement, dry out.  When the water dry out, one

12    percent of the protein do not compromise the nerve

13    root.  You start moving because you feel better,

14    you (indicating) absorb water from surrounding

15    tissue from the physiologic fluid and disc start

16    swelling, swelling, swelling, swelling, swelling,

17    and is using the hole which was done by the injury

18    and pinching nerve again, and this is repeating and

19    repeating and repeating and repeating.

20         We try to find a better solution by doing the

21    surgery.  We start with simple surgery, removing

22    the disc, but it -- they didn't do good because the

23    scar tissue to cover and compromise nerve again.

24         Then we say, oh, we will do the fusion.  It

25    means they will use rods, we will use some other

 1          material to stabilize that the spine will not move.

 2               MR. HEWSON:  I'm going to need to object to

 3          the narrative.  I'd like question and answer so I

 4          can object, if we could do that, please.  I think

 5          that the narrative has gone beyond the scope of the

 6          question.  I'd like questions and answers.  Thank

 7          you very much.

 8               MR. TEMROWSKI:  Well, he was giving an answer

 9          to the question that I asked.

10               MR. HEWSON:  Then I apologize.  I got lost.

11          If we could do just questions and answers, then I

12          think, you know, we have a better opportunity of

13          explaining what's going on.

14     BY MR. TEMROWSKI:

15     Q.   Doctor, --

16               MR. HEWSON:  Thank you.

17     BY MR. TEMROWSKI:

18     Q.   -- very briefly, you've got a model.  Could you

19          just show to the Ladies and Gentlemen of the Jury

20          using that model what a herniated disc is?

21     A.   If you look here on the right side is round.  On

22          the left side is bulging, and this is what is disc.

23          It start from bulging and to the pure herniation.

24          This is all only degree of damage which was done by

25          apply force to the spine.

```
 1   Q.   Doctor, it's my understanding that you also wrote a

 2        prescription for Mr. Waskowski to undergo a bone

 3        scan, is that correct?

 4   A.   That's correct.

 5   Q.   And I'm going to show you what I've had marked as

 6        Deposition Exhibit Number 6, ask you to look at it

 7        and tell the Jury what that is.

 8   A.   Beaumont Hospital, outpatient services, Waskowski,

 9        Jaroslaw, age forty-six, outpatient, date of bone

10        scan, January 25, 2010.  Do I have to read all?

11            MR. HEWSON:  I haven't objected.  Go ahead.

12   BY MR. TEMROWSKI:

13   Q.   Well, --

14   A.   The patient is forty-six years old male who is

15        complain of pain in the left shoulder, left lateral

16        ribs and also low back pain since motor vehicle

17        accident, December 23, 2009.

18            Follow intravenous administration of a

19        radioactive material, anterior, posterior whole

20        body scan were performed with oblique, ribs, lumbar

21        spine, blah, blah, blah.

22            Findings on the whole body view, there's

23        subtle, s-u-b-t-l-e, punctured -- punctured -- no

24        -- p-u-n-c-t-a-t-e focus in the area slightly

25        superior to TMJ, temporomandibular joint.  There is
```

1        mild tracer activity in the left sternoclavicular

2        joint, it's clavicle, collarbone, superior aspect

3        of the sternomanubrium, which is sternum, which is

4        the front of the chest and sternal angle.  That's

5        below, which may represent normal variation versus

6        arthritic changes.  The subtle trace activity of

7        patellar region of bilateral knee may represent

8        minimal arthritic changes.  Subtle focus, L4-L5,

9        represent normal variation.  Focal strain spinous

10      process of L4.  Mild uptake in the cervical spine

11      likely represent degenerative changes.

12          That's it.

13  Q.  In layperson's terms, after you reviewed that, what

14      does that indicate to you?

15  A.  Indicate that some force was applied to the

16      particular part of human body producing

17      regeneration by increasing vascularity and blood

18      supply.

19  Q.  Okay.  Doctor, today's date is November 14th, 2012.

20      Are you still treating Mr. Waskowski for injuries

21      from the automobile accident of December 23rd,

22      2009?

23  A.  Yes, sir.

24  Q.  And it's my understanding that since you began

25      treating Mr. Waskowski, that you have been

1       disabling him, is that correct?

2    A.  That's correct.

3    Q.  And have you, since you started treating Mr.

4        Waskowski, signed and authored disability

5        certificates?

6    A.  Yes, sir.

7    Q.  I'm going to now show you what I've had marked as

8        Deposition Exhibit Number 7, hand that to you, and

9        please tell the Jury what that is.

10   A.  My name, address, date, name of a patient, which

11       was under my care from a date, what for, and it was

12       my professional care and was totally

13       incapacitated, not able to work, continue off work,

14       partially incapacitate from April 2012 to May 18,

15       '12.  Needs domestic help, attendant care care,

16       with case management as before.

17           Signature.  Sent to State Farm, claim number 1

18       -- 22B0777749, fax, 888-845-8680 Terri Page.

19       Deposition exhibit.

20   Q.  And, Doctor, since you began treating Mr.

21       Waskowski, have you been preparing and signing

22       disability certificates such as that?

23   A.  That's correct, sir.

24   Q.  Have you disabled Mr. Waskowski from work?

25   A.  Yes, sir.

1    Q.   Have you prescribed for Mr. Waskowski household
2         assistance?
3    A.   Yes, sir.
4    Q.   Have you prescribed for Mr. Waskowski attendant
5         care?
6    A.   Yes, sir.
7    Q.   And did you prescribe twelve hours a day attendant
8         care?
9             MR. HEWSON:  Objection, leading.  Go ahead.
10   BY MR. TEMROWSKI:
11   Q.   Okay.  Doctor, how many hours a day attendant care
12        did you prescribe for Mr. Waskowski?
13   A.   Sorry.  I don't remember, because I didn't -- no.
14        No.  No.  I did not wrote it here, and I don't
15        remember.
16   Q.   Well, could you take a look at your file.  Let's
17        see.
18   A.   This is yours.  Excuse me, sir.
19   Q.   Okay.  Here.  I'll actually show you the other
20        exhibit, the first report that you authored.
21   A.   I suggested treatment would like to see x-ray with
22        body performed William Beaumont.  X-ray did not
23        show anything.  Condition will not improve.  I
24        would like to order MRI.  I will order physical
25        therapy three times a week and will see how he

1           will do.  He should continue pain medication, but

2           he's not able to work.  He need domestic

3           help/attendant care, twelve hours a day, seven

4           days a week.

5    Q.    Okay.  And you've continued that prescription?

6    A.    That's correct, sir.

7    Q.    Doctor, I'm now going to show you what I've had

8           marked as Exhibit Number 8, and ask if you could

9           identify that document?

10   A.    Rochester Knee and Sports Medicine, P.C., December

11          14, 2010.

12              MR. HEWSON:  Objection, hearsay.  Go ahead.

13              THE WITNESS:  Jaroslaw Waskowski, automobile

14          collision December 23, 2009.

15              Review documentation.  Rochester Knee, spine,

16          MRI, chief complaint cervical, lumbar pain, left

17          shoulder pain, left lower extremity pain.

18   BY MR. TEMROWSKI:

19   Q.    Okay.  And who signed that report, Doctor?

20              MR. HEWSON:  Objection, foundation.  Go ahead.

21              THE WITNESS:  Michael Donahue, D-o-n-a-h-u-e.

22   BY MR. TEMROWSKI:

23   Q.    And he's a physician?

24              MR. HEWSON:  Objection, foundation.

25              THE WITNESS:  He is D.O.

1              MR. HEWSON:  Go ahead.

2     BY MR. TEMROWSKI:

3     Q.   And have you had an opportunity to review that

4          report?

5     A.   I probably, yes.

6     Q.   Okay.  And do you agree with the conclusions and

7          findings that Doctor Donahue reached?

8     A.   Yes, sir.

9              MR. HEWSON:  Objection -- objection,

10         foundation, relevance.  Go ahead.

11    BY MR. TEMROWSKI:

12    Q.   Okay.  Thank you.  And, Doctor, I'm now going to

13         show you what I've had marked as Exhibit Number 9,

14         hand you that and ask if you could tell the Jury

15         what that is.

16    A.   Accommodation of home modification.  Sign

17         10-15-2012.

18             MR. HEWSON:  I'm going to object.  That isn't

19         listed on the final pretrial report as an element

20         of damage in this case.  Subject to that, Doctor,

21         we'll take your answer.  Thank you.

22    BY MR. TEMROWSKI:

23    Q.   And, Doctor, is that a prescription that you

24         recently wrote for Mr. Waskowski for home

25         modifications?

1    A.    Yes, sir.

2    Q.    And given the nature and extent of his injuries, is

3          it your professional opinion that because of those

4          injuries, he would need home modifications?

5                MR. HEWSON:  Objection, leading.

6                THE WITNESS:  Yes, sir.

7                MR. HEWSON:  Foundation.  Go ahead.

8    BY MR. TEMROWSKI:

9    Q.    Okay.  Thank you.

10               And I'm happy to say, Doctor, the last exhibit

11         I have is number ten, which I will hand you, and

12         ask if you could identify what that is.

13   A.    I am crazy because I do charity job for three

14         years.

15               MR. HEWSON:  I'm going to move to strike that

16         comment as not responsive to any question before

17         the Doctor.  Thank you, sir.  Go ahead.

18   BY MR. TEMROWSKI:

19   Q.    What -- what is that document, Doctor?

20   A.    Unpaid bills.

21   Q.    Okay.  And you indicated previously that you are

22         still treating Mr. Waskowski for his injuries from

23         the automobile collision, correct?

24               MR. HEWSON:  Objection, leading.  Go ahead.

25               THE WITNESS:  I should stop long time ago.

```
 1   BY MR. TEMROWSKI:

 2   Q.   Okay.  And does Mr. Waskowski have an outstanding

 3        bill with you?

 4   A.   Yes, three and a half thousand dollars.

 5   Q.   Okay.  And have your bills, since you've been

 6        treating Mr. Waskowski, been submitted for payment

 7        to State Farm?

 8   A.   Yes, sir.

 9   Q.   And your most recent bill, which is the top one on

10        that stack of bills, --

11   A.   Yes.

12   Q.   -- has that bill been submitted for payment to

13        State Farm?

14   A.   Yes, sir.

15   Q.   And has it been paid?

16   A.   No.

17   Q.   Okay.  And just so we're clear, the amount is three

18        thousand four hundred and fifty dollars, is that

19        correct?

20   A.   That's correct.

21   Q.   Okay.

22   A.   I wish to know any lawyer who will do it for

23        free.

24            MR. HEWSON:  Move to strike.  Wait for a

25        question, please, sir.
```

1   BY MR. TEMROWSKI:

2   Q.   Doctor, in your professional medical opinion as a

3        medical doctor and as an orthopedic doctor, was Mr.

4        Waskowski injured in the automobile collision of

5        December 23rd, 2009?

6             MR. HEWSON:  Objection, foundation.  Go ahead.

7             THE WITNESS:  Yes.

8   BY MR. TEMROWSKI:

9   Q.   And would you please tell the members of the Jury

10       what injuries, in your opinion, Mr. Waskowski

11       suffered in that automobile collision?

12  A.   The most important, post traumatic stress syndrome.

13       He's not the same.  He's getting depression.  He

14       cannot sleep.  He cannot function.  He change

15       personality.  He has problem with memory.  He has

16       problem with relation with people.

17            On top of that, he has physical damage to his

18       neck and his back, his left shoulder.

19       Unfortunately, we tried to help him as much as we

20       can with physical therapy, medication, which not

21       doing too much.  He doesn't want the surgery, then

22       he's going to stay like this to the rest of his

23       life.

24            MR. HEWSON:  Move to strike, foundation.

25            THE WITNESS:  There is only one thing good

1    that human brain get adapted to the distressful

2    situation. This is when people survive Auschwitz

3    Concentration Camp because they get adapted. The

4    same, the human body get adapted to the pain and to

5    the damage to his body

6         MR. HEWSON:   I'm going to move to strike any

7    reference to concentration camps in comparing it to

8    this accident.   It has no foundation.   Subject to

9    that, Doctor, we have your answer.   Thank you, sir.

10   BY MR. TEMROWSKI:

11   Q.   Doctor, in your professional medical opinion, were

12        the medical services that you provided to Mr.

13        Waskowski reasonably necessary for his care,

14        recovery and rehabilitation from injuries that he

15        sustained in the automobile accident of December

16        23rd, 2009?

17        MR. HEWSON:   Objection, calls for a legal

18        conclusion.

19        THE WITNESS:   Yes, sir.

20   BY MR. TEMROWSKI:

21   Q.   Doctor, in your professional medical opinion as an

22        orthopedic doctor, and given the fact that you

23        prescribed physical therapy for Mr. Waskowski, was

24        physical therapy reasonably necessary for his care,

25        recovery and rehabilitation from injuries from the

1        automobile accident of December 23rd, 2009?

2            MR. HEWSON:  Objection, foundation.  Go ahead,

3        please.

4            THE WITNESS:  Yes, I do.

5    BY MR. TEMROWSKI:

6    Q.  Doctor, in your professional medical opinion as an

7        orthopedic doctor, you prescribed household

8        assistance for Mr. Waskowski.  Was that service

9        reasonably necessary for Mr. Waskowski's care,

10       recovery and rehabilitation because of injuries

11       that he sustained in the automobile collision of

12       December 23rd, 2009?

13           MR. HEWSON:  Objection, foundation.  Go ahead,

14       please.

15           THE WITNESS:  Yes, I do.

16   BY MR. TEMROWSKI:

17   Q.  Doctor, in your professional medical opinion as an

18       orthopedic doctor, you prescribed attendant care

19       for Mr. Waskowski.  Was attendant care reasonably

20       necessary for Mr. Waskowski's care, recovery and

21       rehabilitation because of injuries that he

22       sustained in the automobile collision of December

23       23rd, 2009?

24           MR. HEWSON:  Objection, foundation.  Go ahead.

25           THE WITNESS:  Yes, I do.

1    BY MR. TEMROWSKI:

2    Q.   Doctor, in your professional opinion, will Mr.

3         Waskowski, because of the injuries that he suffered

4         in the December 23rd, 2009 motor vehicle collision,

5         will he recover -- will he require future medical

6         care and treatment for those injuries?

7              MR. HEWSON:  Objection, relevance.  Future

8         benefits are not part of this case.  Subject to

9         that, Doctor, we'll take your answer.

10             THE WITNESS:  Unfortunately he's going to

11        suffer to the rest of his life.

12             MR. TEMROWSKI:  Doctor, I'd like to thank you

13        for your time.  I have no other questions.

14             MR. HEWSON:  Let's take a break and then I'll

15        Cross-Examine.  Thank you.

16             THE VIDEO OPERATOR:  Time is two forty

17        fifty-three.  We're off the record.

18                              (Recess taken at 2:40 p.m.

19                               until 2:48 p.m.)

20             THE VIDEO OPERATOR:  We are beginning disc

21        two.  Time is two forty-eight fifty.

22             MR. HEWSON:  Thank you.

23                         EXAMINATION

24   BY MR. HEWSON:

25   Q.   Doctor, I wanted to ask you some questions about

1          your Curriculum Vitae, which I believe is Exhibit 1

2          from the deposition?

3     A.   Yes, sir.

4     Q.   Do you have that there with you?

5     A.   Yes, sir.

6     Q.   Now, if I understand correctly, the last time that

7          you had hospital privileges was in 2000, is that

8          correct?

9     A.   Around 2002.

10    Q.   And the last time -- you couldn't remember when we

11         spoke last time of the last place that you did an

12         orthopedic surgery, am I correct?

13    A.   Excuse me?

14    Q.   You couldn't remember the last hospital you did an

15         orthopedic surgery?

16    A.   Long time ago.

17    Q.   Long time ago.  And you understand what Board

18         certification is?

19    A.   Yes, sir.

20    Q.   You are not Board certified in orthopedic

21         surgery, --

22    A.   Yes, sir, I am not.

23    Q.   -- is that right?  And as a matter of fact, on your

24         Curriculum Vitae, you do not list any publications?

25    A.   Yes, sir, I did not.

1    Q.   And you also on your Curriculum Vitae do not list

2         any of the hospitals you've been affiliated with in

3         Michigan at any time, is that correct?

4    A.   That's correct.

5    Q.   Now --

6    A.   Because I am not, and this is current Curriculum

7         Vitae.

8    Q.   Okay.  How did Mr. Waskowski come to your practice?

9    A.   I'm Polish, he's Polish, probably somebody sent

10        him.

11   Q.   Do you know?

12   A.   I didn't --

13   Q.   Did you ever inquire?

14   A.   I never inquire about this.

15   Q.   Have you gotten referrals from Mr. Temrowski in the

16        past?

17   A.   I wish.

18   Q.   You've never gotten -- is it your testimony you've

19        never gotten a referral --

20   A.   Maybe I get some, but unfortunately, no.

21   Q.   Do you remember Mr. Temrowski ever being involved

22        in depositions with you in the past?

23   A.   Oh, probably one or twice a year.

24   Q.   Once or twice a year for how many years?  For how

25        many years?

1   A.   I don't know.

2   Q.   More than ten?

3   A.   I don't know.

4   Q.   More than five?

5   A.   Not enough.

6   Q.   Not enough.  Okay.

7   A.   Anyhow, before I charge three hundred dollars, it

8        was not important.

9   Q.   Now, I look at your residency on your Curriculum

10       Vitae, and I do not see any residency in

11       neuroradiology or radiology.

12  A.   I used to have a neuroradi -- neuro -- neurology in

13       London for a one year, and this was University of

14       London.

15  Q.   University of London was -- let's see -- back in

16       1970?

17  A.   That's correct.

18  Q.   And you did a neurology residency --

19  A.   St. Bartholomeus Medical School.

20  Q.   You did a --

21  A.   And the time the teacher was Mr. O'Connor who was a

22       sir nominated by the queen for his achievement in

23       neurosurgery.

24  Q.   You didn't become a neurosurgeon, did you?

25  A.   They want me, but I didn't like it.

1  Q.  Okay.  My question was whether or not you have any

2      training in neuroradiology?

3  A.  About thirty or forty meetings in the Academy of

4      Orthopedic Surgery when I attend all, everything

5      about the radiology, because MRI came into the new

6      view, I want to learn how to do it, what to do it.

7      I even went to England to see how it worked, but

8      this is not a passion.  This was my, I would say

9      hobby.

10  Q.  Nothing -- none of those seminars or any of that

11      training is listed on your Curriculum Vitae, is it?

12  A.  No.

13  Q.  Now, what is a diagnosis?

14  A.  This is what you suspect that is wrong with another

15      human being.

16  Q.  And am I correct that you use the history that's

17      given to you combined with the physical findings

18      and any objective testing to arrive at a diagnosis,

19      correct?

20  A.  That's correct.

21  Q.  And you would not arrive at a diagnosis without a

22      physical finding that supported that diagnosis, am

23      I correct in that?

24  A.  Not always.  You have all physical findings which

25      can support, but base on the behavior, complaints

```
 1              and the history, you build in your mind suspicion

 2              in this or this direction.  There are usually two

 3              or three, but usually you have to exclude by doing

 4              some of the test to verify or throw it out.

 5    Q.        Your report of January --

 6    A.        There is no professor or genius in medicine who

 7              make a diagnosis by putting the hand.  There are

 8              of, course, people with golden glass and they look

 9              into the glass and they say what is wrong with you,

10              but I don't believe in it.

11    Q.        So you want to have physical findings that

12              correlate clinically to some sort of objective

13              basis for a complaint, is that true?

14    A.        Yes, sir.  I wish.  I wish, but not always work

15              this way.

16    Q.        All right.  Well, let's talk about Mr. Waskowski.

17    A.        This is likely to seem like with the low.  It's not

18              always the same what you want to have.

19    Q.        Well, I'm going to move to strike that as not

20              responsive.

21                   Sir, take a look at your report of January the

22              13th, 2010, please.

23    A.        Excuse me?

24    Q.        January 13th, 2010, your first visit.

25    A.        January 13th, 2010.
```

1    Q.    Yes.

2                MR. TEMROWSKI:   No.   The exhibits are --

3                THE WITNESS:   Give me a second.

4                MR. HEWSON:   The exhibits are right up there

5          as my brother counsel was pointing out to you.

6    BY MR. HEWSON:

7    Q.    You're not suggesting that the exhibits are not

8          accurate, are you, sir?

9    A.    Yes, sir.

10   Q.    Let me ask you that question again.   Are you

11         suggesting that the exhibits that Mr. Temrowski

12         presented to you are not the same as the exhibit --

13   A.    No.

14   Q.    -- in your lap?

15   A.    But I like to look into my papers.

16   Q.    All right.

17   A.    I'm old guy.   I have my old copies.

18   Q.    Okay.

19   A.    I practice medicine since 1960, before you start

20         practicing law.

21   Q.    Yes, sir.   Now, did you take a history from Mr.

22         Waskowski as to what his treatment was between

23         December 23rd, 2009, and January the 13th, 2010?

24         Did you take that history?

25   A.    In a second, sir.   Okay.   What is your question?

1  Q.  My question is did you take a history from Mr.

2      Waskowski as to what his treatment -- course of

3      treatment was from the date of the accident until

4      the time he first saw you?

5  A.  Okay.  On January 13, 2009, his weight was full two

6      hundred pounds, two eight, height, six point two,

7      weight -- blood pressure, hundred forty -- hundred

8      fifty over eighty.  Forty-six years old, male,

9      complaining of back pain since injury in the car

10     accident on December 13th (sic), 2009.

11 Q.  My question is very specific.  Did you ask him what

12     treatment he had between the 23rd of December,

13     2009, and the first treatment on January 13th with

14     you?

15 A.  If you will be patient enough, I will tell you, but

16     you don't want me, then I cannot answer.

17 Q.  You can't answer that?  Look at past medical

18     history on the second page of your report, please.

19 A.  You ask me a question.  If you are gentleman, let

20     me finish.

21 Q.  No, sir.  Actually --

22 A.  Okay.

23 Q.  -- I am a gentleman, but it's a yes or no --

24 A.  If you are not a gentleman --

25 Q.  -- it's a yes or no question.

1   A.   Okay.

2   Q.   The yes or no question is did you ask Mr. Waskowski

3        for his treatment history from the 23rd of December

4        2009 to January 13th, 2010?  Did you ask him that,

5        yes or no?

6   A.   I don't remember, sir.

7   Q.   If you had asked him that, would you record that in

8        your report?

9   A.   I am trying to find out.

10  Q.   All right.  Then please read it to yourself --

11  A.   Thank you very much.

12  Q.   -- and then tell us what's in there.  Thank you.

13  A.   Forty-six years, complaining back pain since injury

14       in the car accident December.  Restrained driver

15       stationary on the red light, hit by a car, look

16       front, push, out, blah, blah, blah, lost conscious

17       after accident, next, pick up by daughter home.

18       Next.  That's correct, he went to see his doctor,

19       Doctor Nietrzykowski.

20  Q.   Yes, sir.  Did you ever get Doctor Nietrzykowski's

21       records?

22  A.   No, sir.

23  Q.   Did you ever ask Doctor Nietrzykowski or William

24       Beaumont Hospital to provide you with the records

25       from the first treatments?

```
 1   A.   I ask William Beaumont for x-rays and whatever I
 2        can get.  I didn't care to ask Doctor
 3        Nietrzykowski.
 4   Q.   Do you know when Doctor Nietrzykowski saw Mr.
 5        Waskowski?
 6   A.   Him -- according to him, his daughter took him to
 7        Doctor Nietrzykowski.  This is my direct question
 8        and his direct answer.
 9   Q.   My question --
10   A.   I didn't ask what time, and I didn't time how many
11        minutes he was over there, and this what I know.
12   Q.   Is it --
13   A.   Doctor Nietrzykowski, to answer your question, send
14        him for x-ray in William Beaumont Hospital, Twelve
15        Mile and Mound, cervical spine, lumbosacral spine,
16        chest, eighteen x-ray, and he get medication,
17        Vicodin, Robaxin, on medication, less pain, two or
18        four hours.
19   Q.   Very good.
20   A.   I ask him what Doctor Nietrzykowski -- where did he
21        go, to answer your question, sir.
22   Q.   That was my question.  Thank you.
23            Do you have the x-rays from William Beaumont
24        Hospital --
25   A.   I don't have it.
```

```
 1   Q.   -- in your file?

 2   A.   Probably I have in one of this, but I don't

 3        remember and I don't know.

 4   Q.   Did you -- you said you asked for those x-rays.

 5        Didn't you just say that to me?

 6   A.   Yes.  I probably ask and I think that I asked.

 7   Q.   Do you remember that those x-rays were normal?

 8   A.   No, I do not remember what was three years ago,

 9        sir.

10   Q.   Wouldn't the presence of normal chest x-rays be

11        important to you as a treating physician?

12   A.   Not necessarily, because chest x-ray will not show

13        in ninety percent broken ribs and broken sternum.

14   Q.   It won't?

15   A.   It will not.

16   Q.   So if a radiologist from William Beaumont Hospital

17        said that the chest x-rays, films were normal, that

18        doesn't make any difference to you as the treater.

19        Am I right?

20   A.   That's correct.

21   Q.   Okay.  So you send him in for a bone scan?

22   A.   That's correct.

23   Q.   All right.  Now the bone scan comes back and it's

24        normal, right?

25   A.   No, it's not.
```

```
1   Q.   It's not.  All right.  Well, let's talk about that
2        for a minute.
3   A.   Show me the bone scan.
4            MR. TEMROWSKI:  You've got the exhibits right
5        there.
6            MR. HEWSON:  They're right there.
7   BY MR. HEWSON:
8   Q.   Now, you didn't bother --
9   A.   Wait a second.
10           MR. TEMROWSKI:  Here.  I'll pull it out.
11           MR. HEWSON:  Thank you.
12           MR. TEMROWSKI:  Okay.  Here's the bone scan.
13           THE WITNESS:  Yes, sir.
14  BY MR. HEWSON:
15  Q.   First of all, sir, let me ask you specifics.  This
16       bone scan was taken January 25th, 2010, at your
17       request?
18  A.   Right after my first visit.
19  Q.   Right -- well, actually twelve days after your
20       first visit, right?
21  A.   Yes, sir.
22  Q.   Okay.  Now, this -- the impression that was given
23       by Doctor Feng -- I'm sorry -- Doctor Qing,
24       Q-u-i-n-g (sic) --
25  A.   Who?
```

1   Q.   Doctor Qing.

2   A.   Yeah, Qing.

3   Q.   Okay.

4   A.   Yes, Doctor Feng.  Qing is his first name.  Last

5        name is Feng.

6   Q.   Are you sure?  Do you know him?

7   A.   You know Chinese, right.

8   Q.   Sir, I just asked do you know him?

9   A.   He's Chinese.

10  Q.   Okay.

11  A.   Okay.

12  Q.   In any event, --

13  A.   And in Polish, like in Chinese, first is your first

14       name and second is your last name.

15  Q.   Okay.  Well, they got a comma in there, but it

16       doesn't matter.

17  A.   Okay.  Forget it.

18  Q.   The impression was there was no evidence of acute

19       fractures involving the left shoulder, ribs or

20       spine, right?

21  A.   There is no evidence of acute fracture --

22  Q.   Involving the left shoulder --

23  A.   -- left shoulder, ribs or spine, yes.

24  Q.   Correct.  So a bone scan is -- is very sensitive.

25       It's not specific, but it's very sensitive, --

1   A.   Yes, sir.

2   Q.   -- is that correct?  And if there was a fracture,

3        it would show up?

4   A.   No.

5   Q.   It wouldn't?

6   A.   No.  It all depends how this guy see about three

7        hundred to five hundred bone scan a day.

8   Q.   So you're saying --

9   A.   He looks -- looks like this.  He doesn't know the

10       patient.  He doesn't do anything, and if he's not

11       really big lad, he doesn't show, but in his report

12       -- sorry to interrupt you -- he wrote it that are

13       increased uptake and this for Qing is absolutely

14       normal.  It's normal.

15  Q.   It's normal for that?

16  A.   Absolutely, no.

17  Q.   Oh, it's not.  Let me just --

18  A.   I am bald, I am bald.  I am not bald and I am not

19       bald.

20  Q.   What you're talking about is there's a line here

21       that says there's mild tracer activity in the left

22       sternoclavicular joint?

23  A.   That's correct.

24  Q.   And that will be -- that could be from an --

25  A.   Injury.

1  Q.  -- arthritic -- an arthritic condition?

2  A.  No, sir.

3  Q.  Wait, wait, wait.  You let me finish my question.

4      That very well can be from an arthritic change

5      because that particular joint has been operated for

6      forty-six years during his lifetime, isn't that

7      true?

8  A.  He's right-handed.

9  Q.  Okay.

10 A.  If he's right-handed, if this is arthritic,

11     degenerative changes, it should be in the right

12     joint, not in the left.  In the left, he doesn't

13     use left hand.  Why he has in the left hand.

14 Q.  Sir, let me ask you this.  Read the rest of it.

15 A.  That's correct.  There is mild tracer activity in

16     the left sternoclavicular joint --

17 Q.  Superior --

18 A.  -- superior aspect of the sternomanubrium.  It's in

19     the middle of the chest, far away from this.

20 Q.  No, no, no.  It's in the middle of the chest by the

21     clavicle, in the middle under the neck.  Isn't that

22     where it's anatomically located?  Sternomanu --

23     sternomanubrium, sternal angle.

24 A.  Read it.  Read it.  Read it.  Read it.

25 Q.  I just did.

1   A.   And the sternal angle, --

2   Q.   Let me ask you this.

3   A.   -- which is about four inches below.

4   Q.   Which may represent a normal variant versus minimal

5        arthritic changes?

6   A.   In his head.  He's stupid.

7   Q.   The doctor's stupid?

8   A.   Yes, absolutely.

9   Q.   The doctor?  Okay.  That's all right.  Now, let me

10       just make sure I understand that.

11  A.   No, no.

12  Q.   Wait.  No, no.  You just said that this doctor who

13       read this report is stupid.

14  A.   Yeah.

15  Q.   I want to know, if you believe that he is stupid,

16       when you reported him to William Beaumont Hospital

17       as incompetent?

18  A.   Listen --

19  Q.   Did you do that?  Yes or no?

20  A.   No, no.  Completely different story.

21  Q.   Did do you it, yes or no?

22  A.   No.  Completely different story.

23  Q.   That's all I need to hear.

24  A.   No.  The problem is if you write on one side that

25       he has uptake on the other side, he writes that is

1        normal.  He's stupid.

2   Q.   Okay.  You just said that.  Thank you very much.

3            Now, apparently I would -- let me ask you

4        this.  When did you get those films that you looked

5        at today for the Jury?

6   A.   What films?

7   Q.   The films that you looked at today for the Jury.

8   A.   I don't know when I got them.  My secretary know.

9        I don't know.  Probably when the patient -- I don't

10       know.

11  Q.   Do you remember -- do you remember when I deposed

12       you?

13  A.   No, I don't remember.  You're a nice guy, but --

14  Q.   In February of 2012?

15  A.   -- unfortunately I don't remember you, sir.

16  Q.   Okay.  You indicated on page twelve and thirteen

17       when I asked you do you have those films or the

18       discs showing the digital reproductions in your

19       file, and you said no, sir.

20           And I said where would they be.

21           You said it's not my program.  It could be the

22       patient has or in a place where the MRI is done.  I

23       do not keep films or discs.

24  A.   That's correct.

25  Q.   That's what you told me.  When did you get these?

1    A.    I don't know.  What do you want?  Do you kill me if

2          I don't know.

3    Q.    Okay.  When was the first time you read them?

4    A.    Probably the first time when I saw the patient with

5          -- after the x-ray, after the MRI.

6    Q.    And -- and, so, the first time you would have read

7          them if the MRI was March 18th --

8    A.    And I gave it back to the patient.

9    Q.    And the first MRI was March the 18th, 2010?

10   A.    Probably after March, April.  I don't know.

11   Q.    And can you tell me when the next date was that you

12         saw Mr. Waskowski after March the 18th, 2010?

13   A.    I don't know, sir.

14   Q.    Pardon?

15   A.    I don't remember, sir.  I don't know.

16   Q.    Can you look in your file and tell me what the next

17         visit was after March 18, 2010?

18   A.    Okay.  Yes, sir.  March 29, April 12.

19   Q.    Just March 29 will be the next visit, correct?

20   A.    March -- you ask me about a visit, to look in my

21         chart, and I'm reading from my chart.

22   Q.    Let me --

23   A.    And I saw him March 15, I saw him March 29, I saw

24         him April 12, and I saw him May 10, and June 16,

25         July 16.

| 1 | Q. | And the question was when was the next time you saw |
| 2 | | him after March the 18th, 2010, and your answer -- |
| 3 | A. | After March 18th, I saw him March 29. |
| 4 | Q. | That's right.  Eleven days later, correct? |
| 5 | A. | That's correct. |
| 6 | Q. | And that would have been the time that you read the |
| 7 | | films? |
| 8 | A. | Probably. |
| 9 | Q. | Would -- is there any note in your file that tells |
| 10 | | you that you read them before March -- |
| 11 | A. | No.  I wrote it dictated.  It means that I have to |
| 12 | | find the report, which I dictate of this date and |
| 13 | | look for this.  March -- January 13.  What date you |
| 14 | | want to see? |
| 15 | Q. | What I'm asking is -- |
| 16 | A. | What the date? |
| 17 | Q. | -- March 29th.  Do you have a report from March |
| 18 | | 29th? |
| 19 | A. | May 10, May 10, April 12.  Thank you very much for |
| 20 | | your letter regarding Mr. Waskowski.  Diagnosis |
| 21 | | verified by MRI shows three herniated disc, |
| 22 | | cervical spine C4-C5, C5-C6, C6-C7.  Anterior |
| 23 | | diagnose injury are secondary to injury in the car |
| 24 | | accident as reported on December 23, 2009. |
| 25 | | Time expectation, it is very difficult to |

```
 1         predict.  It is too many injuries that it would be
 2         called by itself.  Herniated disc could hurt two,
 3         sometimes three years.  If conservative treatment
 4         will not help, then he will -- may need a neck
 5         surgery at -- he is at the moment.  I will
 6         eventually order MRI of lumbosacral spine and
 7         continue physical therapy.
 8    Q.   That's your report of March 29th, right?
 9    A.   That's correct, sir.
10    Q.   That's the first reference to the MRI.  Am I
11         correct?
12    A.   That's correct, sir.
13    Q.   Would you take a look at your report of January the
14         13th, 2010?
15    A.   January?
16    Q.   13th, 2010, your first report.
17    A.   Okay.
18    Q.   You got it?
19    A.   Yes.
20    Q.   You list diagnosis.  The first one is status post
21         motor vehicle accident.  That's not a diagnosis, is
22         it?
23    A.   Yes, to me it is.
24    Q.   What -- is there a -- an ICD-9 diagnostic code that
25         goes with status post motor vehicle accident?
```

1    A.    I don't remember, sir.

2    Q.    Herniated disc L4-L5.

3    A.    Yes, sir.

4    Q.    You did not have the MRI findings at that time?

5    A.    No.

6    Q.    You did not have any objective testing to justify

7          that determination at that time, did you?

8    A.    It all depends what you want.

9    Q.    Well, no.  Did you have any object --

10   A.    You mean on disc?

11   Q.    Sir, --

12   A.    Lumbar spine, restricted range of motion,

13         tenderness over left sciatic nerve and sciatic

14         notch.  Straight leg raising sixty degree, Lesegue

15         test positive.  His range of motion restricted by

16         pain.  Knees on both sides right and equal.  Ankles

17         right equally.  Diminished sensation L4-L5.  L4-L5

18         nerve distribution on the left side.

19   Q.    And so that --

20   A.    Knee reflexes equal on both sides, absent left

21         ankle reflex.  Diminished foot evertors, extensor

22         halllucis longus on the left side.  Tenderness over

23         the left ribs, blah, blah, blah.

24   Q.    We'll get there in a minute.  You're telling --

25         your testimony to the Jury is that because he had

1           tenderness over the left sciatic nerve and left

2           sciatic notch and straight leg raising at sixty

3           degrees and Lesegue's test was positive, that

4           there's a herniated disc at L4-L5?

5    A.     No, it's not all.  No, it's not all.

6    Q.     Fine.

7    A.     You are taking part of my sentence.

8    Q.     The diminished sensation at L4-L5 nerve

9           distribution on the left side --

10   A.     That's correct.

11   Q.     And how many --

12   A.     Radially -- continue reading.  Continue reading.

13   Q.     We're going to take things one thing at a time,

14          sir.

15   A.     Absent left ankle reflex, diminished foot evertors,

16          extensor hallucis longus on the left side.

17   Q.     So why did you -- why did you need a lumbar X --

18          MRI?

19   A.     Because I want to verify this.

20   Q.     Why?  You were certain as of January 2010 --

21   A.     I was not certain.  I suspect.

22   Q.     That's exactly my point.  When you made this

23          diagnosis you didn't know, --

24   A.     No, no.  I knew.

25   Q.     -- that's why you ordered an MRI?

1    A.    No.   I knew -- I knew based on the examination

2          interview that there is something wrong, and my

3          experience, my training indicate that this most

4          likely is a diagnosis herniated disc, and this I

5          have to verify or rule out.

6    Q.    How did you treat that herniated disc?

7    A.    By pray first.

8    Q.    All right.

9    A.    Second, antiinflammatory medication, pain

10         medication, physical therapy.

11   Q.    What physical therapy is appropriate to treat a

12         herniated disc at L4-L5?

13   A.    Whatever it will do.

14   Q.    Do you know?

15   A.    Active/passive range of motion, ultrasound,

16         diatheramy, there is just now sort of acupuncture

17         when they stick the electrodes to the muscle and

18         they try to stimulate all of them to diminish

19         inflammation.   Not always work.   Sometimes increase

20         the range of motion.

21   Q.    What --

22   A.    Problem is that chiropractor, by pulling, hoping

23         that (indicating) disc suck itself in.   Sometime

24         work, sometime doesn't.

25   Q.    Did Mr. Waskowski get chiropractic treatment?

1   A.   I don't remember.

2   Q.   What physical therapy was actually performed for

3        him?

4   A.   I don't know.  I have the report that I can read it

5        if you want.

6   Q.   Well, what I'm asking was --

7   A.   Would you like to read it?

8   Q.   No, sir.  Just wait until you hear my question.  I

9        want to know what physical therapy you as the

10       orthopedic doctor for Mr. Waskowski wanted

11       performed for this diagnosis of herniated disc

12       L4-L5.  What did you want done?

13  A.   A EMS of fifteen minutes to back, neck, shoulder

14       and arm.  US to LB, one-third centimeters, fifteen

15       minutes.  Manual therapy, neck, shoulder, back,

16       including soft tissue mobilization times fifteen

17       minutes.  Therapeutic stretching, strengthening,

18       P-R-E bicycle isotonic isometric, MacKenzie two,

19       twice, fifteen minutes, lumbar traction, fifteen

20       minutes, CP to above area.

21  Q.   What are you reading from?

22  A.   A physical therapy evaluation.

23  Q.   Did you ever write down for the physical therapist

24       the therapy you wanted performed for the herniated

25       disc at L4-L5, yes or no?

```
 1   A.   Since my graduation and since I start practicing in
 2        1960, I never wrote what they supposed to do.
 3   Q.   What --
 4   A.   My prescription is examination, evaluation and
 5        treatment.
 6   Q.   Your third diagnosis is ruptured disc, herniated
 7        disc C4-C5, as of January of 2010.  You didn't have
 8        an MRI --
 9   A.   January 13, 2010.
10   Q.   You did not have an MRI to refer to until March the
11        29th of 2010, according to your testimony.
12   A.   That's correct.
13   Q.   Am I right?  Tell me what symptomatology you looked
14        at to tell you there was a herniated disc at C4-C5?
15   A.   MRI verify my suspicion.
16   Q.   Tell me what you looked at -- what you wrote in
17        your report that led you to the suspicion of
18        herniated disc?
19   A.   Tenderness of posterior neck.
20   Q.   Tenderness?
21   A.   Shoulder abduction, blah, blah, blah, difficult to
22        pull behind, elbow is with -- absent reflexes,
23        absent, a-b-s-e-e-n-t (sic) --
24                         (Interruption)
25            THE WITNESS:   -- reflexes, bicep, tricep,
```

1       brachioradialis on the left side.  Dimished

2       sensation ulnar nerve distribution on the left

3       side.  Weakness of the left hand.

4    BY MR. HEWSON:

5    Q.   And that is what convinced you that there was a

6         ruptured disc at C4-C5 causing that problem?

7    A.   The possibility of ruptured disc exists.

8    Q.   Very good.  You didn't diagnose any other herniated

9         or ruptured discs?

10   A.   I suspected one is enough.

11   Q.   Did you diagnose any more?

12   A.   No, I --

13   Q.   Thank you.

14   A.   -- did not.

15   Q.   You diagnosed a fracture left ribs, six to eight on

16        the left side.  Am I right?

17   A.   That's correct, sir.

18   Q.   And you had no bone scan at the time to refer to?

19   A.   No bone, no x-ray, no nothing.

20   Q.   And how did you arrive at the conclusion that the

21        fracture on the left --

22   A.   By physical examination.

23   Q.   So you can determine that -- whether there's a

24        fracture by physically examining the patient, is

25        that correct?

1    A.   That's correct, sir.

2    Q.   And possible fractured sternum.  What part of your

3         examination indicated to you that he --

4    A.   Tenderness.

5    Q.   -- had a fractured sternum?

6    A.   Tenderness over the sternum.

7    Q.   Is there any other cause for tenderness over the

8         sternum besides a fracture?

9    A.   No.

10   Q.   None.  Okay.

11        Now, you indicated that there was shoulder

12        abduction of ninety, which I assume is ninety

13        degrees, and forward flexion of ninety degrees --

14   A.   Yes.

15   Q.   -- in the shoulders, correct?

16   A.   That's correct.

17   Q.   And that meant that Mr. Waskowski could move his

18        shoulder to ninety degrees in relationship to his

19        trunk, both abducting and flexing, correct?

20   A.   Yes, sir.

21   Q.   Abduction is what?

22   A.   Abduction is abduction.

23   Q.   Would you tell the Jury, please, what abduction is,

24        what kind of maneuver that is.

25   A.   Moving the arm away from the body.

1    Q.   Moving the -- if you have the elbow next to the
2         body, you move it up to the shoulder of the elbow,
3         is that correct -- or the --
4    A.   Moving the arm away from the body we call in the
5         Latin abduction.
6    Q.   Could you show me abduction, please?
7    A.   (Indicating).
8    Q.   Thank you.  Flexion is what?
9    A.   (Indicating)
10   Q.   Into the front, correct?
11   A.   Yes, sir.
12   Q.   And he was able to do that to ninety degrees?
13   A.   Yes, sir.
14   Q.   Did you ever see the -- well, let me ask you this.
15        Abduction and flexion are active ranges of motion
16        for Mr. Waskowski, correct?
17   A.   Yes, sir.
18   Q.   You asked him to show you how far he could go?
19   A.   Yes, sir.
20   Q.   And he only went to those degrees when you saw him,
21        correct?
22   A.   Yes, sir.
23   Q.   Did you ever look at the first physical therapy
24        treatment records in this matter?
25   A.   I don't remember, sir.

1   Q.   If the first physical therapy treatment was -- was

2        just days before your treatment and there was a

3        hundred and fifty degrees of abduction -- or a

4        hundred and thirty degrees of abduction and a

5        hundred and fifty degrees of flexion, that would be

6        inconsistent with what Mr. Waskowski demonstrated

7        to you, is that right?

8   A.   That's correct, sir.

9   Q.   And assuming for the sake of this question that

10       there was a traumatic decrease, forty degrees

11       abduction and sixty degrees flexion, that would

12       raise the spector that perhaps Mr. Waskowski was

13       not fully attempting to demonstrate for you his

14       abduction and his flexion.  Is that true?

15  A.   No.

16  Q.   No.  Okay.  So he would have gotten worse in the

17       period of time between the physical therapy

18       evaluation and his visit with you.  Am I correct?

19  A.   Yeah, correct.

20  Q.   Pardon?

21  A.   It's possible.

22  Q.   And to what would you attribute that problem?  Why

23       would you -- why would you believe that to be true?

24  A.   Because they did not look the scapula, and scapula

25       moving over the chest moves the shoulder, and if it

```
 1          can move with a frozen shoulder, with not frozen
 2          shoulder, because it's scapula moving over the
 3          chest by the muscle
 4    Q.    Did you ever diagnose frozen shoulder?
 5    A.    Excuse me, sir?
 6    Q.    Did you diagnose frozen shoulder?
 7    A.    I didn't diagnose -- don't pick up on the word.
 8          Don't be a smart ass.
 9    Q.    Really?
10    A.    Yes.
11    Q.    Well, let me ask you this.  You're the doctor who's
12          telling me that these things are -- are happening
13          and that you're observing them.  You write them
14          down because they're important, do you not?
15    A.    I write it down because I was teached to write it
16          down.
17    Q.    And you write it down so that you can tell from one
18          visit to the next whether the patient is improving
19          or getting worse.  Is that a fair statement?
20    A.    No, because the law demands.
21    Q.    The law demands it?
22    A.    That's right.
23    Q.    So you don't write these things down for the
24          purposes of maintaining a continuity of treatment;
25          you do it because lawyers are going to look at the
```

1       documents, is that right?

2   A.  I didn't know that there is going to be a case and

3       the lawyer will come and make my life miserable.

4   Q.  Well, you knew that there was going to be a case

5       here, didn't you?

6   A.  No.

7   Q.  Oh.

8   A.  I say -- I saw today fifteen patient, and I don't

9       think that all of them have the law cases.  Few of

10      them, smart asses, yes, but very few.  Sorry.

11  Q.  That's all right.

12  A.  No, because --

13  Q.  That's all right.

14  A.  -- because I -- I try to help.  I am not a god.  I

15      cannot make a miracle, and that's all, and the

16      problem is that the --

17  Q.  You read --

18  A.  -- word of "frozen" was used because I was trying

19      to tell you that if you have even frozen shoulder,

20      scapula can move your arm to any level.

21  Q.  So the finding from Antonio Lasinski (phonetic) of

22      one hundred and thirty degrees of abduction and a

23      hundred and fifty degrees of flexion is suspect in

24      your opinion?

25  A.  No.

1  Q.  He didn't do the test right?

2  A.  He -- he -- I am not a witness to anybody

3      character.

4  Q.  All right.

5  A.  I am not a right to criticize or tell anything

6      about the lawyer who examine me.

7  Q.  Okay.

8  A.  I can say what I think.  This is United States of

9      North America, and I'm entitled to wrong or not to

10     have my opinion.  And that's all.

11 Q.  Well, you would agree with me that -- though, that

12     in order to have a medical opinion, you should have

13     a foundation for it.  Would you agree with that?

14 A.  No, not necessarily.

15 Q.  You can just kind of pull it out of the air and say

16     whatever you want, right?

17 A.  Yeah.  I look at you and I know that you are a

18     little bit above sixty years of age.  I know that

19     you're a little bit overweight.  I know that your

20     heart is not doing too hot.  And I know this only

21     by looking at you.

22 Q.  Well, very good.

23 A.  If I look for sixty years, I saw maybe three

24     hundred thousand patients.

25 Q.  Well, but, then, of course, you don't --

1   A.   This is to answer your question.

2   Q.   You're not answering my question.

3   A.   So I'm not going to fight with you.

4   Q.   That's all right.  And I'm not going to fight with

5        you.

6             Would you get the Macomb MRI --

7   A.   Thank you.  Thank you very much.  Thank you.

8   Q.   Would you get the Macomb MRI from March the 18th,

9        2010.

10  A.   Excuse me?

11  Q.   The Macomb MRI, --

12  A.   Yeah.

13  Q.   -- which is an exhibit in this matter from March

14       18th, 2010.

15            MR. TEMROWSKI:  Okay.  They're on the floor,

16       because we didn't open up the --

17            MR. HEWSON:  I don't want you to look at the

18       films.

19            MR. TEMROWSKI:  Oh.

20            MR. HEWSON:  I want you to look at the

21       reports.

22            MR. TEMROWSKI:  Oh, the report.

23            MR. HEWSON:  Yeah, yeah.

24            MR. TEMROWSKI:  Okay.

25            THE WITNESS:  You have over there.  Show me.

```
 1              MR. TEMROWSKI:  Okay.

 2              MR. HEWSON:  If you would grab --

 3              THE WITNESS:  I have a book here of five

 4         hundred pages.  It's too much to find.  Sorry.

 5         Give me a break.

 6    BY MR. HEWSON:

 7    Q.   I -- I was just asking you to use the exhibits that

 8         have been --

 9    A.   Okay.

10    Q.   -- proffered.

11              MR. TEMROWSKI:  Here we go.

12              MR. HEWSON:  And could you hand him the MRI

13         from Oakland MRI of the cervical spine as well,

14         please.

15              MR. TEMROWSKI:  Yes.

16              MR. HEWSON:  Or are they all together?

17              MR. TEMROWSKI:  No.

18              MR. HEWSON:  Okay.

19              MR. TEMROWSKI:  Two different exhibits.

20              MR. HEWSON:  All right.

21    BY MR. HEWSON:

22    Q.   The Macomb MRI from March the 18th, 2010, says --

23         and we're going to go through these one at time --

24         at C2-3 there was left foraminal encroachment.  Is

25         that right?
```

1   A.   Yes, sir.

2   Q.   And you sat here and put those films up and showed

3        the Jury that there was left foraminal

4        encroachment.  Is that what you intended to show?

5   A.   No.  You cannot show this exactly.  The problem is

6        that you have some shadow, but you don't have a

7        bone.  And the shadow is coming with the bulging or

8        herniated disc.

9   Q.   Well, let me ask you this.  When you read those

10       films just now, --

11  A.   Yeah.

12  Q.   -- did you see C2-3 left foraminal encroachment?

13  A.   Yes, sir.  I showed.

14  Q.   It was there?

15  A.   You wanted me to show you?

16  Q.   Hang on.  We're going to get there in just a

17       second.  The foramina is the little hole in the

18       side of the vertebrae that the nerve exits through?

19  A.   No.  There's no hole.  The vertebra have -- is

20       built without any holes.

21  Q.   Okay.

22  A.   They have a transverse processes, and transverse

23       process on the other one produce what we call a

24       hole.

25  Q.   Okay.  What we call a hole --

1   A.   And there is not a hole.

2   Q.   Okay.  Very good.

3   A.   Look at this.

4   Q.   I understand.  And I was just using a term that I

5        understood.  The vertebrae are together and

6        separated by the discs, am I right?

7   A.   That's correct.

8   Q.   And as those bones are there, there is a bony

9        process above and below through which the nerve

10       root exits, and that is called the foramen, am I

11       correct?

12  A.   That's correct.

13  Q.   And foramen is a latin word for window, am I right

14       about that?

15  A.   That's correct.

16  Q.   So it's like a hole that the nerve root exits from.

17       You agree with that?

18  A.   That's correct.

19  Q.   Now, take a look at the Oakland MRI from March

20       24th, 2011.

21  A.   March 20 -- yes, I got it.

22  Q.   Okay.  The Oakland MRI, which you told Mr.

23       Temrowski you had read as well and said were

24       consistent between the two, says C2-C3 level

25       demonstrate no abnormality, bilateral C3 neural

1       foraminal, which is the plural for foramen are

2       widely patent, which means there is no foraminal

3       encroachment?

4   A.  No.  Because swelling subside and is normal.

5   Q.  So --

6   A.  There was no ruptured disc and the swelling from

7       trauma subside.  If I hit you in your eyes, you

8       have black and blue eyes.  If I see you one month

9       later, it's nothing.

10  Q.  So, what you're telling me is is that he got

11      better?

12  A.  That's correct.

13  Q.  Okay.  C3-C4, Macomb MRI says there's diffuse

14      posterior disc bulging with left foraminal

15      encroachment.

16  A.  That's correct.

17  Q.  That's what it says.  C2, C3, C4 in Oakland MRI

18      says mild midline herniation effacing the ventral

19      subarachnoid space without cord compression.  The

20      cord was not compressed.

21  A.  The problem is the disc was ruptured and disc

22      didn't (indicating) suck out.

23  Q.  Bilateral C4 neural foramina are widely patent in

24      the Oakland MRI?

25  A.  It's good.

```
 1   Q.   Correct?

 2   A.   Yeah.

 3   Q.   So he doesn't have anything pushing on his cord --

 4   A.   Oh, --

 5   Q.   -- at C3-4?

 6   A.   -- he has pain.

 7   Q.   Well, no, no.  Wait a second.

 8   A.   C3-4 demonstrate midline herniation.  It mean that

 9        herniation is not when you want to the side.  It's

10        exactly in midline.

11   Q.   But it says --

12   A.   Midline is -- look at me -- is just here in

13        midline --

14   Q.   But it says there's no --

15   A.   -- and to the back.

16   Q.   -- cord compression.

17   A.   Because you don't have to have a cord compression.

18        It's enough that it will touch dura.  The spinal

19        cord is surround by the liquid which we call spinal

20        fluid.  Around the spinal fluid there are three

21        layers, arachnoid, soft and dura, and touching one

22        of them is enough to cause the pain.

23   Q.   Okay.

24   A.   Listen, if I touch your skin for a long time with

25        my finger, after twenty-four hours, you will kill
```

```
 1        me.

 2   Q.   There's no cord compression, correct?

 3   A.   That's correct.

 4   Q.   There's no foraminal compression, nothing's pushing

 5        on the nerve --

 6   A.   That's correct.

 7   Q.   -- as it exits the vertebral body.  Correct?

 8   A.   That's correct.

 9   Q.   And if you look at the next one, C4-C5, there's a

10        finding in the Macomb MRI that there's joint

11        spurring and right foraminal encroachment, right?

12   A.   C -- which one?

13   Q.   C4-C5 --

14   A.   C4-C5.

15   Q.   -- from Macomb MRI.  Joint spurring --

16   A.   Posterior -- posterior disc bulging with more

17        prominent disc material involving the right

18        paracentral foraminal degree and joint -- joint

19        spurring in right foramina encroachment.

20   Q.   Joint spurring is a degenerative change?

21   A.   Yeah.

22   Q.   You said there were no degenerative changes.

23   A.   No --

24   Q.   You were wrong.

25   A.   No degenerative changes.
```

1    Q.    So joint spurring --

2    A.    This is not --

3    Q.    Is joint spurring degenerative change or not?

4    A.    No.

5    Q.    It's not.  Okay.  Fair enough.

6          The Oakland MRI says there's no obvious cord

7          compression --

8    A.    That's correct.

9    Q.    -- at that level.

10   A.    Where is the spurring?  Where is the spurring?

11         It's a different doctor, so -- and by accident he

12         agree with me?

13   Q.    No.  Nobody agreed with you.

14   A.    Thank you.

15   Q.    Nobody agreed with you.

16   A.    Thank you.

17   Q.    As a matter of fact, you sat there and put your

18         finger on what you claimed to be the spinal cord

19         and said it practically couldn't be seen.  That's

20         what you said.  Do you remember that?

21   A.    No.  I never -- no.  I say there is a disc material

22         which is obliterating.  Instead of a round is

23         making almost triangle of the spinal cord tissue.

24   Q.    Sir, the Oakland MRI of March 24th, 2010 directly

25         criticizes the Macomb MRI, doesn't it?

1   A.   Well, yes.

2   Q.   And says that the findings in the Macomb MRI of the

3        cervical spine don't exist?

4   A.   What what?

5   Q.   Look at the --

6   A.   What -- what -- what -- what did you say?  I did

7        not --

8   Q.   They don't exist?

9   A.   What don't exist.

10  Q.   Sir, take a look at impression number three --

11  A.   Impression number --

12  Q.   -- on the Oakland -- three on the Oakland MRI.

13       There was no --

14  A.   Yeah.  This report of current MRI of the cervical

15       -- significant different when --

16                          (Interruption)

17  BY MR. HEWSON:

18  Q.   No, no, no.  This report of the current MRI of the

19       cervical spine is significantly different when

20       compared with the previous report of 3-18-2010.

21  A.   Yes, sir.

22  Q.   Isn't that what it says?  There is no bulging of

23       the disc at C2-3 -- C3 level?

24  A.   Yes, sir.

25  Q.   Or spinal canal stenosis at C4 and C5 levels as

1       described in the previous report?

2   A.  Yes, sir.

3   Q.  Previously described bilateral foraminal stenosis

4       -- stenosis being the narrowing, am I right? -- is

5       not confirmed in that -- in the current exam except

6       that bilateral C5 neural foramina due to disc

7       herniations at C4-C5.  Is that -- did I read that

8       correctly?

9   A.  Yes, sir.  Perfect.

10  Q.  This particular report says that there are material

11      misreadings in the Macomb MRI, --

12  A.  No.

13  Q.  -- doesn't it?  It doesn't.  Okay.

14  A.  Simply mean that swelling subside.

15  Q.  Okay.  So when you told Mr. Temrowski moments ago

16      that when you read the films for Oakland MRI and

17      Macomb MRI, they were exactly the same?

18  A.  Similar, not exactly the same.  Similar.

19  Q.  So what was written in the Oakland MRI report, the

20      cervical spine --

21  A.  It's less than what is written on Macomb.

22  Q.  You didn't note that, did you?

23  A.  Why not?

24  Q.  Okay.  Fair enough.

25          Now, how old are the disc herniations that

```
 1        you're claiming Mr. Waskowski has?  How old are
 2        they?
 3   A.   Young.  Because the swelling subside within a
 4        month.
 5   Q.   Well, did you rely on Michele Keys' radiology
 6        reports?
 7   A.   No.  I rely on the patient.
 8   Q.   Okay.  So what the patient told you is how you'd
 9        arrive that these came from this accident,
10        correct?
11   A.   That's correct.
12   Q.   There's really nothing about the individual discs
13        themselves that tells you what the age is, is
14        there?
15   A.   If the swelling subside and the next radiologist
16        didn't see it, it means that the swelling subside
17        because somebody have good tissue which try to
18        recuperate.
19   Q.   So he should have been a lot better because the
20        swelling and the pressure were gone?
21   A.   It was good enough.
22   Q.   It's good enough for what?
23   A.   It's a little bit better.
24   Q.   You didn't change your prescription, though, at any
25        time, did you?
```

1    A.    Because he has pain.

2    Q.    So he tells you he has pain?

3    A.    Yes, sir.

4    Q.    What clinical correlation, if you can identify one

5          for me, relates the C4-C5 finding from Oakland MRI

6          with no effacement of the spinal cord?  What

7          clinical correlation do you have?

8    A.    Absent reflexes, diminished sensation.

9    Q.    You ordered an MR -- or a E -- or somebody ordered

10         an EMG that's in your file, didn't they?

11   A.    EMG, probably Doctor -- the neurosurgeon.

12   Q.    Did you get a copy of the EMG?

13   A.    Probably I had.

14   Q.    And do you remember that the only finding on the

15         EMG from Doctor Broder was carpal tunnel syndrome

16         on the left hand?

17   A.    EMG's positive six months to a year after injury.

18         And if the EMG is done before one year, not always

19         is positive.

20   Q.    It's got to be a year out, right?

21   A.    Six month to one year.

22   Q.    So December of 2000 --

23   A.    It all depends how much damage, how much long.

24   Q.    So December of 2010 would have been a year out from

25         the accident, correct?

1    A.    Not necessary.  It's positive.

2    Q.    Well, the EMG that I have in my hand, which is in

3          your file, is March 24, 2011, so it's outside the

4          year.

5    A.    Yeah.

6    Q.    So it should be diagnostic?

7    A.    Not necessarily.

8    Q.    Okay.  So, now, let me make sure I understand --

9    A.    EMG is positive -- it's negative in forty to fifty

10         percent.

11   Q.    Okay.

12   A.    MRI is positive in about ninety percent.

13   Q.    Let me make --

14   A.    X-ray positive in seventy percent.

15   Q.    Let me make sure --

16   A.    EMG is lousy examination.

17   Q.    Okay.

18   A.    It's good for a doctor who do it.  Excellent.

19   Q.    EMG --

20   A.    Five hundred to one thousand dollars.

21   Q.    Let me make --

22   A.    Excellent.

23   Q.    EMG is a lousy --

24                         (Interruption)

25              MR. HEWSON:  I'm sorry.  I apologize.

```
 1   BY MR. HEWSON:

 2   Q.   Doctor, try answering just the question for me.

 3        Did you say that an EMG is a lousy examination?

 4   A.   Yes.

 5   Q.   Okay.  Now, just so we're clear, the MRI from

 6        Oakland MRI is -- contradicts your original reading

 7        of the films from Macomb MRI, doesn't it?

 8   A.   Not at all.

 9   Q.   Okay.  The bone scan, the doctor is stupid, and

10        that test didn't agree with your findings, am I

11        right?

12   A.   Absolutely right.

13   Q.   And the EMG that doesn't show any neuropathies or

14        flexopathies in the leg or in the arm, other than

15        the carpal tunnel, is also wrong and that is a

16        stupid exam --

17   A.   No, no.  I didn't say --

18   Q.   Is that right?

19   A.   -- I didn't say wrong.  I didn't say stupid.  I

20        said that positive in fifty percent.

21   Q.   I think you said lousy.

22   A.   Lousy, that's right.

23   Q.   Lousy.  Okay.

24   A.   But it's nothing stupid.

25   Q.   So the objective testing -- the objective testing
```

 1          in your opinion is all suspect, except for the

 2          original Macomb MRIs which you claim to have read

 3          and support your diagnosis.  That's the only ones

 4          you're agreeing with?

 5    A.    No.  It's wrong, because MRI -- both MRI shows

 6          herniated disc, both of them.

 7    Q.    Okay.  What is attendant care, sir?

 8    A.    Try to help dress.  He couldn't abduct his arm.  He

 9          has difficult to dress, difficult to wash himself,

10          difficult to go to bed, difficult to do anything.

11    Q.    He couldn't abduct his arm at all?

12    A.    We usually -- we are usually two handed people.

13    Q.    Couldn't abduct his arm at all?

14    A.    Excuse me, sir?

15    Q.    He couldn't abduct his arm at all?

16    A.    Because he's painful if he move his arm.

17                          (Interrpution)

18              THE VIDEO OPERATOR:  We're off the record at

19          three thirty-five twenty-one p.m.

20                          (Discussion off the record)

21              THE VIDEO OPERATOR:  Time is three thirty-six

22          oh three.  We are on the record.

23    BY MR. HEWSON:

24    Q.    Sir, did you say, at least as of your first visit

25          with Mr. Waskowski, that he could abduct his

1       shoulder to ninety degrees and he could flex his

2       shoulder to ninety degrees?

3   A.  That's correct.

4   Q.  Did that ever improve in the course of your

5       treatment of him?

6   A.  Quite reverse, decrease.

7   Q.  It got worse.  To what do you attribute the

8       worsening?

9   A.  Rupture of more sub -- subtalar -- more rotator

10      cuff.

11  Q.  More rotator cuff.  Did you ever diagnose a rotator

12      cuff tear?

13  A.  Oh, later on I diagnose most likely.

14  Q.  Did you ever see that written in any of your

15      reports?  I found it if you want to know what date

16      it is, just so we don't have to sit here too long.

17  A.  Which one?

18  Q.  June 6th, 2011.

19  A.  Twenty-six.  Which month?

20  Q.  June 6th, 2011.

21  A.  June 6.  That's right.

22  Q.  That's the first --

23  A.  Contusion of the neck, back and check, torn rotor

24      cuff, left shoulder.

25  Q.  That's the first time you made that diagnosis?

1   A.   Yes, sir, but we have MRI of the left shoulder

2        which was done long time ago.

3   Q.   But it's eighteen months post accident, correct?

4   A.   It's my fault that I didn't wrote it down in the

5        proper time.

6   Q.   And, in fact, in your physical examinations of Mr.

7        Waskowski, in that eighteen-month period, you never

8        found evidence of a torn rotator cuff, did you?

9   A.   How -- I didn't wrote it down, yes, sir.

10  Q.   Well, now, wait a minute.  You're an orthopedic

11       specialist; that's what you've told us, am I right?

12  A.   Yes.

13  Q.   And examination of the shoulder and the rotator

14       cuff, there are maneuvers to test that.  Am I

15       correct?

16  A.   Yes, sir.

17  Q.   And you must have done those maneuvers --

18  A.   Yes, sir.

19  Q.   -- in that eighteen-month period of time?

20  A.   Yes, sir.

21  Q.   And you never for eighteen months after the

22       accident made a diagnosis of torn rotator cuff?

23  A.   Could you imagine, sir, that he has scan, MRI of

24       left shoulder perform on March 24, 2011, which

25       shows partial thickness tear of distal rotator

```
 1        cuff.
 2   Q.   Sir, my question for you was you've examined him
 3        for eighteen months, the first time you make that
 4        diagnosis is June of 2011.  Am I right?
 5   A.   No.  I first wrote it down.
 6   Q.   First time you wrote it down?
 7   A.   That's correct.
 8   Q.   So you made a diagnosis and you didn't write it in
 9        the report?
10   A.   This what I suspect, yes, sir.
11   Q.   So for eighteen months you didn't diagnose this.
12        That means you didn't treat it?
13   A.   No, no.  I didn't wrote it.  It's completely
14        different story.
15   Q.   Okay.  So when did you first tell the physical
16        therapist that there was a torn rotator cuff?
17   A.   I didn't talk to physical therapist.
18   Q.   You didn't tell him.
19   A.   I don't know where he go for physical therapy.
20   Q.   Okay.
21   A.   And I don't plan to never ask where they go.
22   Q.   You never got a report from the physical therapist?
23   A.   I read the report, but I didn't ask.
24   Q.   Did you read the reports?
25   A.   Yes, I hope so.
```

1  Q.  So, then, you knew where he was going for physical

2      therapy?

3  A.  Yeah.

4  Q.  Did you ever communicate with the physical

5      therapist --

6  A.  No, sir.

7  Q.  -- and say he's got a -- and he's got a torn

8      rotator cuff?

9  A.  And I'm not going to plan to communicate because

10     another lawyer will come to take away business to

11     refer to this or this other.

12 Q.  All right.

13 A.  Oh, of course not you, but there will be some other

14     lawyer.

15 Q.  Yeah.

16 A.  The same with x-ray, the same with MRI.

17 Q.  How did you arrive at twelve hours of attendant

18     care?

19 A.  You know, there is some minimum which you supposed

20     to help another human being.  Twenty-four hours is

21     too much because you have to sleep eight hours, you

22     have to do something.  It means that twelve hours,

23     it's moderation.

24 Q.  How did you arrive at the conclusion that it would

25     take two hours per -- or four hours per day for Mr.

```
 1          Waskowski to dress and undress?  How did you arrive
 2          at that conclusion?
 3    A.    I didn't arrive at.  I don't remember to arrive
 4          conclusion four hours.
 5    Q.    You don't?
 6    A.    I do gave him twelve hours.  What he do with this
 7          twelve hours is what he needs.  How do I know if he
 8          need four hours for this or for this.  I am not in
 9          his house, and I don't send a spy like a lawyer to
10          check what is going on at home.
11    Q.    Well, did you -- forget the spy piece, did you ask
12          -- do you know what an occupational therapist is?
13    A.    Yes.
14    Q.    Do you know what a functional capacity evaluation
15          is?  Do you know?  Yes or no?
16    A.    It's bullshit.
17    Q.    Oh, okay.  Well, thank you.  I'm sure that those
18          people that perform functional capacity
19          evaluations --
20    A.    Okay.
21    Q.    -- are not going to be happy with that assessment
22          by you.  In any event, --
23    A.    Listen, when I graduate there was only surgery and
24          they call it trauma surgery, orthopedic surgery,
25          and suddenly you have physical therapy,
```

```
 1          occupational therapy, speech therapy, psychiatry
 2          therapy, all sucking you, insurance company,
 3          because they don't suck anybody else.
 4    Q.    Okay.
 5    A.    And this is -- sorry for my upset.
 6    Q.    So --
 7    A.    And this is good United States of America which
 8          allowed idiots to do the job.
 9    Q.    Okay.  Can you tell me, sir, when you referred Mr.
10          Waskowski to a psychiatrist or a psychologist for
11          review?
12    A.    I don't remember.  Did I or did somebody else?
13    Q.    I don't think you did.
14    A.    He has too many doctors anyhow.
15    Q.    Well, I thought that you said he had a
16          psychological condition, post tramatic stress
17          disorder?
18    A.    I diagnose this.  I don't need --
19    Q.    Is that your specialty?
20    A.    -- anybody -- no, it's not my specialty.
21    Q.    Who did you send him to to get treatment for that?
22    A.    But if I see the broken people from the car
23          accident.  I was six years in Europe.  I saw daily
24          three or four people shot down.
25    Q.    Who did you send him to for his psychological --
```

| | | |
|---|---|---|
| 1 | A. | Nobody. |
| 2 | Q. | -- or psycho -- so you left him be with that? |
| 3 | A. | That's correct. |
| 4 | Q. | Okay.  Now, -- |
| 5 | A. | Who send this veteran administration guy -- |
| 6 | Q. | I move to strike. |
| 7 | A. | -- without the legs from Vietnam. |
| 8 | Q. | There's no question before you.  There's no |
| 9 | | question before you. |
| 10 | A. | Nobody send.  And suddenly after Afghanistan there |
| 11 | | are plenty of guy who milking the system. |
| 12 | Q. | Okay.  Well, -- |
| 13 | A. | No, no, it's not okay.  No, it's not okay. |
| 14 | Q. | Did that occur to you relative to Mr. Waskowski? |
| 15 | A. | No. |
| 16 | Q. | It didn't? |
| 17 | A. | No.  It occur regarding the guy from An -- |
| 18 | | Afghanistan. |
| 19 | | (Deposition Exhibit A was |
| 20 | | marked for identification) |
| 21 | BY MR. HEWSON: | |
| 22 | Q. | I'm going to show you what I've marked as Exhibit |
| 23 | | A.  Do you have a copy of that in your file? |
| 24 | A. | Physician assessment attendant care/personal care. |
| 25 | | Am I -- |

1   Q.   Take a look at the last page and tell me whether or

2        not --

3   A.   Upper body --

4   Q.   Sir?

5   A.   -- minutes.

6   Q.   Sir?

7   A.   Yes, sir.

8   Q.   Take a look at the last page and tell me if that's

9        your signature on there?

10  A.   Yes, sir.

11  Q.   It is?

12  A.   Yes, sir.

13  Q.   Is that in your handwriting?

14  A.   Yes, sir.

15  Q.   You say on that form that Mr. Waskowski needs four

16       hours a day to change his clothes.

17  A.   Four hours a day?

18  Q.   Yes.

19  A.   Where is this at?

20  Q.   The first four entries at the top, dressing and

21       undressing, sixty minutes, that's four hours per

22       day to dress him and undress him?

23  A.   This is sixty minutes for --

24  Q.   Did you write down --

25  A.   Yes, I did.

1  Q.  -- four hours?

2  A.  Yes, I did.

3  Q.  I need you to tell me and tell the Jury how you

4      arrived at four hours a day to change his clothes?

5  A.  I don't know.

6  Q.  You just made it up?

7  A.  I made it up.

8  Q.  All right.  Now, there are other entries on that

9      form that you made up as well?

10  A.  Yes, sir.

11  Q.  You don't know whether any of those forms or any of

12      those suggested times is accurate, do you?

13  A.  I made it up.  I didn't --

14  Q.  And you made it up so that the family members could

15      get paid for attendant care, didn't you?

16  A.  That's correct.

17  Q.  Whether or not Mr. Waskowski needs it, you don't

18      know because you're not in his house, is that

19      right?

20  A.  That's correct.

21          MR. TEMROWSKI:  Can I see that?

22          MR. HEWSON:  Sure.

23  BY MR. HEWSON:

24  Q.  My brother counsel showed you a prescription for

25      home modifications, and subject to the objection,

1          depending on what the Court has to say about that,

2          I want to know did you hire or did somebody hire an

3          architect to tell you what home modifications are

4          needed --

5     A.   No.

6     Q.   -- for Mr. Waskowski?

7     A.   Nothing to do with architect.

8     Q.   Did you have someone, a physical therapist or

9          someone else go out there and say this is what he

10         needs in his home and therefore he needs

11         accommodations?

12    A.   No, sir.

13    Q.   So you made that up?

14    A.   That's correct.

15    Q.   Have you reviewed any of the forms filed by the

16         family that show what the attendant care was?

17    A.   I may but I don't remember.

18    Q.   State Farm paid you for a while, right?  Did they

19         pay you or not?

20    A.   State Farm stopped paying me on the -- I'm going to

21         get drunk today.

22    Q.   Let me ask you this.  State Farm paid --

23    A.   Wait a -- wait a second, sir.

24    Q.   Sir, --

25              THE WITNESS:  Margaret, --

```
1    BY MR. HEWSON:
2    Q.   No, sir.  We can't do that right now.
3    A.   Can I call my secretary to show me when they were
4         -- where is the bill.
5    Q.   So as you sit here right now, you can't identify
6         that, right?  We would need to have somebody else?
7    A.   I cannot find it.  Doesn't mean I cannot identify.
8    Q.   Okay.
9    A.   I have to find it out.  That's all.
10   Q.   Fine.  That's fine.  Let me ask you this.  Forget
11        that for just a moment.  Your follow-up
12        re-evaluations essentially were for the purpose of
13        writing a prescription to continue the physical
14        therapy and to justify attendant care and household
15        services.  That's really what you were doing, isn't
16        it?
17   A.   Talk to the patient.
18   Q.   And you talked to the patient?
19   A.   Yeah.
20   Q.   And then you would write him these prescriptions,
21        right?
22   A.   That's correct.
23   Q.   How long would you talk to him when he would stop
24        by to see you for those follow-ups?
25   A.   Half an hour, forty minutes.
```

1   Q.   Half an hour, forty minutes, and all of those

2        conversations are recorded in your file?

3   A.   Not only.  I have to examine him.  I have to check

4        his motion.

5   Q.   So you would examine him every time?

6   A.   Yeah.

7   Q.   Did you write down the ranges of motion every time?

8   A.   No.

9   Q.   And ranges --

10  A.   I wrote that it's change or didn't change.  I wrote

11       it what is going on with him.

12  Q.   And you were charging two hundred and fifty to

13       three hundred and fifty dollars --

14  A.   Too little.  Not enough.

15  Q.   -- per visit to write those prescriptions for Mr.

16       Waskowski?

17  A.   Yes, sir.

18  Q.   That's what you did?

19  A.   And you paid me hundred forty dollars, and the last

20       time you paid me, dear, sir, on January 2011.

21  Q.   And have you --

22  A.   Which means that I was treating him for free from

23       January to January, one year -- two years.

24  Q.   Did you ever ask him to pay?

25  A.   I'm stupid.

1   Q.   Did you ever ask him to pay you?

2   A.   I don't know if my girl ask or not.

3   Q.   Well, --

4   A.   This I don't know, because --

5   Q.   -- I'm asking -- no, sir.

6   A.   Unfortunately I have the office which have the

7        office manager, and I take care of medical as good

8        as I can, as stupid as I am, and she's taking care

9        of a business.  I don't look of check.  I don't

10       open the mail and I don't send the bill.  I see the

11       patient, vaguely she knows how much it's charge and

12       she's charging writing it down and writing it here.

13       I don't know that she sends a letter to the

14       insurance company.  It's her job.  I cannot

15       influence and I don't want to.  I don't plan and I

16       don't have because this is inhuman to check.  You

17       trust the secretary or you don't trust.  If I would

18       start checking what she's doing, I have to find

19       somebody else.

20   Q.   Sir, --

21   A.   Sorry.

22   Q.   -- is it your practice as an orthopedist to

23       continue treatments that don't work?

24   A.   As long as the patient want to come to see me, yes.

25   Q.   So you'll treat them even if the patient -- even if

```
1          the -- the treatment doesn't work, you'll continue

2          to write --

3    A.    That's correct.

4    Q.    Very good.

5              MR. HEWSON:  I don't have anything else.

6          Thank you, sir.

7              THE WITNESS:  Thank you.

8              MR. TEMROWSKI:  Well, I -- I have just a very

9          few --

10             THE WITNESS:  Don't give him a hand.

11             MR. TEMROWSKI:  -- a very few follow-up

12         questions.

13             THE WITNESS:  You give him a hand.

14                    FURTHER EXAMINATION

15   BY MR. TEMROWSKI:

16   Q.    Let's start this way, Doctor Glowacki.  You've

17         indicated that you are not Board certified?

18   A.    That's correct.

19   Q.    Is it a legal requirement in Michigan for a

20         physician to practice medicine that they be Board

21         certified?

22   A.    No.

23             MR. HEWSON:  I'm going to object as to

24         foundation.  Go ahead.

25             MR. TEMROWSKI:  Okay.
```

1              THE WITNESS:  No.

2    BY MR. TEMROWSKI:

3    Q.   Is there a reason in your case, Doctor, why you are

4         not Board certified?

5    A.   Because I failed twice.  I applied and my English

6         was not good enough.  I didn't know how to write

7         the essay and this was at the beginning of my

8         career.  I came to United States.  I didn't speak

9         English.  I didn't speak English.  I learn English

10        working in a residency, and then when I get --

11        because I was so smart -- so stupid that I am so

12        smart I will pass the test.  It didn't work.  They

13        ask me a question, sometimes I didn't understand.

14   Q.   Next question, Doctor.

15   A.   You know, immigrants are different stock and they

16        are more ambitious than they knew at the beginning.

17        Right -- right now I know a little bit more.  I

18        could be different, but it's too late.

19   Q.   Okay.  Doctor, next question.

20   A.   Sorry.

21   Q.   Regarding your bill, is it true that the last time

22        you were paid anything from State Farm for treating

23        Mr. Waskowski was in January of 2011?

24   A.   That's correct.

25   Q.   Okay.  Next question.  And that is regarding these

```
 1          MRI films that we have in your office here today.

 2          Is it --

 3                              (Interruption)

 4             MR. TEMROWSKI:  You need to change that?

 5   BY MR. TEMROWSKI:

 6   Q.   Is it your practice, Doctor, as an orthopedic

 7        doctor, do you keep patients' MRI films here?

 8   A.   No, sir.

 9   Q.   And you were asked by Mr. Hewson if you had, before

10        today, reviewed these MRI films.  Remember that

11        question?

12   A.   No, sir.

13   Q.   Well, he asked you that.  I'm going to hand back to

14        you Exhibit Number 2, which is your reports that

15        you've been authoring, and I want you to look at

16        the report that you signed dated May 2010.

17   A.   I saw blah, blah, blah...  Blood pressure...  He

18        brought with him -- we brought -- he brought with

19        him MRI films of lumbosacral spine, done on April

20        15, 2010, which shows herniated disc L4-L5, L5-S1.

21   Q.   So Mr. Waskowski brought the films in 2010 to you,

22        according to that, correct?

23   A.   Yes, sir.

24   Q.   And you reviewed them?

25   A.   Yes, sir.
```

1    Q.   And you wrote that report, didn't you?

2    A.   Yes, sir.

3    Q.   And tell the Ladies and Gentlemen of the Jury,

4         Doctor, who was that report sent to?

5    A.   Letter to insurance company, State Farm Insurance

6         Company, P.O. Box 231, Bloomfield, Illinois

7         61702-9738.

8    Q.   Okay.

9    A.   State Farm Insurance Company, claim 22B077749.

10   Q.   And who's the claims adjuster?  Is there a name on

11        there?

12   A.   Terri Page.

13   Q.   Okay.  Doctor, Mr. Hewson then asked you a question

14        about the MRI of the left shoulder and your

15        diagnosis of a torn rotator cuff.  Do you remember

16        that?

17   A.   Yes, sir.

18   Q.   And Mr. Hewson was stating that it was eighteen

19        months that went by before you wrote it down.

20        Remember that question?

21   A.   Yes, sir.

22   Q.   I'm going to hand you back Exhibit Number 2, your

23        report, December 10th, 2010, and I want you to read

24        to the Jury starting with that word "MRI" to the

25        end of the page.  What does that say?

1  A.   MRI done on 10-4-2010, lumbosacral spine, shows

2       herniated disc L4-L5, L5-S1.

3            MRI of cervical spine done on March 18, 2010,

4       shows herniated disc C4-C5, C5-C6 with spinal

5       stenosis compression and spinal -- of spinal cord.

6            MRI of left shoulder done 9-28-10 shows torn

7       rotator cuff with torn anterior posterior labrum

8       glenoid.

9  Q.   Who was that report sent to?

10 A.   Letter to chart, insurance company, State Farm

11      Insurance, P.O. Box 231, Bloomfield, Illinois

12      61702-9738.

13 Q.   Okay.  And who's the adjuster that it was sent to?

14 A.   Terri Page.

15 Q.   Okay.

16           MR. HEWSON:  Can I see that, please.  Thank

17      you.

18 BY MR. TEMROWSKI:

19 Q.   And last but not least, Mr. Hewson handed you

20      Defendant's Deposition Exhibit A.  Remember that?

21 A.   Yes, sir.

22 Q.   Well, just so we're all clear on this matter,

23      Doctor, that is a form -- can I see that? -- that

24      is a form that was prepared by who?  Take a look at

25      that symbol up at the top.

1   A.   AAA.

2   Q.   No, not --

3   A.   No.   State Farm Insurance Company.

4   Q.   Okay.  So, Doctor, that form that Mr. Hewson asked

5        you about came from State Farm, is that right?

6   A.   That's correct.

7   Q.   And State Farm sent you, as Mr. Waskowski's doctor,

8        that form for you to complete, didn't they?

9   A.   That's correct.

10  Q.   And on this form you were asked to complete the

11       applicable sections of the form only, and it says

12       that right at the top, doesn't it?

13  A.   That's correct.

14  Q.   About the attendant care.  And there's a whole

15       bunch of different categories, and isn't it true,

16       Doctor, and I don't want to put words in your

17       mouth, take it back and look at it, that a lot of

18       those categories on that form don't pertain to Mr.

19       Waskowski?

20            MR. HEWSON:  Objection, leading.

21            THE WITNESS:  Yes.  Applies cream, lotion,

22       paste, none.  Bath -- bed, bath, oral hygiene,

23       assisting dressing applicant, using prescribe

24       orthotics, braces, apply super fluid, limp, a lot.

25       About twenty different.

1    BY MR. TEMROWSKI:

2    Q.    Okay.   In some of these --

3    A.    Absent.

4    Q.    And -- and -- let me see.   Some of these questions

5          ask about orthotics, prosthetics, bowel care,

6          tracheotomy care.   Did any of that apply to Mr.

7          Waskowski?

8    A.    No.

9    Q.    But certain categories did apply to Mr. Waskowski,

10         didn't they?

11   A.    Yes.

12   Q.    And didn't you complete and fill out the State Farm

13         form for the sections that applied to Mr.

14         Waskowski?

15              MR. HEWSON:   Objection, leading,  Go ahead.

16   BY MR. TEMROWSKI:

17   Q.    Did you complete the applicable sections of the

18         form that you felt pertained to Mr. Waskowski?

19   A.    Yes, sir.

20              MR. HEWSON:   Same objection.

21   BY MR. TEMROWSKI:

22   Q.    So how is it that you made anything up, Doctor,

23         when you completed a form that you were asked to by

24         State Farm?

25              MR. HEWSON:   Objection, leading,

1    argumentative. Go ahead.

2        THE WITNESS: I wrote how I expect that he

3    need for assistant and the help.

4  BY MR. TEMROWSKI:

5  Q.  Okay. You didn't make anything up?

6        MR. HEWSON: Objection, leading.

7        THE WITNESS: Of course not.

8        MR. HEWSON: Objection. I have it.

9  BY MR. TEMROWSKI:

10  Q.  Take a look at the last page of that exhibit, and

11      that asks about household help, doesn't it?

12  A.  Yes, sir.

13  Q.  And didn't you also at the request of State Farm

14      complete that form?

15  A.  Yes, sir.

16  Q.  And did you indicate on that form, Doctor, the

17      household chores that you felt Mr. Waskowski

18      couldn't do?

19  A.  That's right.

20  Q.  Okay. And on this exhibit, for both the attendant

21      care and the household help, it asks for how many

22      days or times per week, and what did you put?

23      The last column. The last column here.

24  A.  Seven --

25  Q.  Seven days a week?

1   A.   -- days a week.

2   Q.   Okay.

3          MR. TEMROWSKI:  Thank you.

4          THE WITNESS:  Seven days a week.

5          MR. TEMROWSKI:  Okay.  I have nothing else.

6          MR. HEWSON:  Can I have that exhibit back,

7     please.

8          MR. TEMROWSKI:  Yep.

9          MR. HEWSON:  Thank you.

10            FURTHER EXAMINATION

11  BY MR. HEWSON:

12   Q.   Sir, the December 10th, 2000 (sic) report that my

13     brother counsel showed you just a moment ago --

14   A.   Excuse me.

15   Q.   The December 10th, 2010 report, where you reported

16     the MRI of the left shoulder showing a torn rotator

17     cuff?

18   A.   Yes, sir.

19   Q.   He asked you whether or not that MRI interpretation

20     was rendered on your report of December 10th.  You

21     remember being asked that?  See it?

22   A.   MRI --

23         MR. TEMROWSKI:  Wait a minute.  You need a

24     microphone.

25         THE WITNESS:  -- left shoulder done 9-28.

1    BY MR. HEWSON:

2    Q.    Right.

3    A.    December 10, 2010.

4    Q.    That's what I asked you.  Have a seat.  Tell the

5          Jury when -- where that is on your diagnosis for

6          that date.  Is it on there?  Torn left rotator

7          cuff?

8    A.    No.

9    Q.    It's not.  And that set of diagnoses are what you

10         claim is related to the auto accident.  That's why

11         you have status post motor vehicle accident at the

12         top, --

13   A.    Yes, sir.

14   Q.    -- isn't that right?  You didn't tell State Farm

15         about the torn rotator cuff in that report as being

16         related to this auto accident, did you?

17   A.    I didn't wrote it.

18   Q.    Now, Mr. Temrowski asked you about filling in this

19         form, and I asked you before how you came up with

20         four hours for changing his clothes.

21   A.    Seven days a week.

22   Q.    Four hours a day, seven days a week?

23   A.    Four hours, seven days a week.  Forty minutes,

24         seven days a week.

25   Q.    Forty minutes seven days a week?

1   A.   Yeah.

2   Q.   That's what you meant?

3   A.   That's correct.

4   Q.   So if I take these as being forty minutes, and I

5        add up the numbers that you gave, I'm supposed to

6        spread that over seven days?

7   A.   That's correct.

8   Q.   Okay.  So we're talking about eight minutes a day?

9   A.   Ten to fifteen.

10  Q.   Eight minutes -- all right.  Ten to fifteen minutes

11       a day.

12  A.   Yeah.

13  Q.   And if I add all of these up, it comes to about an

14       hour and a half?

15  A.   You're joking.

16  Q.   I am not.

17  A.   You are.

18  Q.   If I do what you just suggested in order to justify

19       your prior testimony, if I divide the number of

20       days into the number of minutes --

21  A.   Come on.  I will add it.

22  Q.   Absolutely.

23  A.   No, no.  Come on, let me add it.

24  Q.   No.  We're going -- we're going to do it my way.

25       Seven into sixty is approximately eight minutes a

1         day.  You agree?

2    A.   What -- what do you mean?

3    Q.   Seven times a week times sixty minutes is eight

4         minutes a day?

5    A.   No.  Sixty by seven.

6    Q.   Eight times seven is fifty-six.

7    A.   Around ten minutes.

8    Q.   Ten minutes a day.  Four.  So that's forty minutes

9         for the first category.  About fifteen minutes for

10        the second sets of categories, you've got on here

11        justification, if that's what you meant to do, for

12        about an hour of attendant care a day?

13   A.   No.

14   Q.   No.  Okay.  Very good.  The Jury can do the math.

15   A.   I could be wrong because I gave a patient twelve

16        hours.  I gave what supposed to be divided, and

17        that's all what I did.  And whatever you want to

18        put into my mouth, you are welcome.

19   Q.   I just want --

20   A.   You are a lawyer.

21   Q.   I want the Jury to understand what you're saying.

22   A.   No, no, don't twist the Jury.  You're twisting the

23        Jury, because you're twisting my report.

24   Q.   Yeah.  Okay.  Then I want you to tell me how you

25        justify twelve hours a day of attendant care in

1       your report.  Just tell me how you did that.

2   A.  Because he cannot do many things.

3   Q.  Okay.  Right.  You said before you made it up.

4       Yes?  Did you say that?

5   A.  I'm trying to pull your leg and you didn't

6       understand this.

7   Q.  Oh, you were just kidding around?

8   A.  You're a smart guy.

9   Q.  Okay.

10  A.  Whatever.

11          MR. HEWSON:  Fair enough.  I have nothing

12      else.

13                    FURTHER EXAMINATION

14  BY MR. TEMROWSKI:

15  Q.  Doctor, there's --

16          MR. HEWSON:  I'm going to object.  There's no

17      Recross, but go ahead.

18  BY MR. TEMROWSKI:

19  Q.  When it comes to attendant care, isn't it true that

20      there's no book that a doctor can go to to look up

21      what is the correct answer for the number of hours

22      a day attendant care?

23          MR. HEWSON:  Objection, leading.

24          THE WITNESS:  Absolutely true.

25          MR. HEWSON:  Objection, leading.

 1   BY MR. TEMROWSKI:

 2   Q.   And you, Doctor, prescribed for Mr. Waskowski and

 3        you wrote it down a hundred times, twelve hours a

 4        day attendant care.  Is that right?

 5   A.   That's correct, sir.

 6   Q.   And that's on your disability certificates and your

 7        letters?

 8   A.   That's correct, sir.

 9            MR. TEMROWSKI:  Thank you.  I have nothing

10        else.

11                      FURTHER EXAMINATION

12   BY MR. HEWSON:

13   Q.   And you don't know how you came up with twelve

14        hours?

15   A.   Because he need it.

16   Q.   Oh, okay.  Very good.

17            MR. HEWSON:  I have nothing else.  Thanks.

18            MR. TEMROWSKI:  No other questions.

19            THE VIDEO OPERATOR:  Deposition is concluded.

20        The time is four oh five oh seven.

21        (Videotape deposition concluded at 4:05 p.m.)

22                      -   -   -

23

24

25

1                          CERTIFICATE

2       STATE OF MICHIGAN

3       COUNTY OF OAKLAND

4                       I, Maureen M. McLaughlin, C.S.R. and Notary Public in

5       and for the County of Oakland, State of Michigan, do hereby certify

6       that the witness whose attached deposition was taken before me on the

7       date hereinbefore stated, was first duly sworn by the Notary Public

8       to testify the truth, the whole truth and nothing but the truth in

9       the cause aforesaid; that the testimony contained in said deposition

10      then given by said witness was by me reduced to writing in the

11      presence of said witness by means of shorthand and afterwards

12      transcribed upon a computer by myself.  The said deposition is a true

13      and correct transcript of the testimony given by said witness as

14      aforesaid.

15                      I do further certify that the deposition herein

16      attached was taken at the time and place mentioned and described in the

17      caption of said deposition.

18                      I do further certify that no request was made by

19      any party for the witness' signature to be attached to said deposition.

20

21                      I do further certify that the parties were

22      represented by counsel as hereinbefore designated.

23                      I do further certify that I am not connected by

24      blood or marriage with any of the parties or their attorneys or agents

25      and that I am not an employee of either of them, nor interested

1    directly or indirectly in the matters of controversy either as counsel,

2    agent or otherwise.

3               I do further certify that my certificate annexed

4    hereto implies to the original and typewritten copies only, signed

5    and certified transcripts only.  The undersigned assumes no

6    responsibility for the accuracy of any reproduced copies not made

7    under my control or direction.

8

9

10                              Maureen M. McLaughlin, CSR - 4400
                                Notary Public, Oakland County
11                              My Commission Expires: 05-12-2017

12

13

14

15

16

17

18

19

20

21

22

23

24

25