1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3    JAROSLAW WASKOWSKI,

4                         Plaintiff,

5        –v–                        Case No. 11–13036

6    STATE FARM MUTUAL AUTOMOBILE
     INSURANCE COMPANY,
7
                         Defendant./
     _____
8
                       **JURY TRIAL – DAY ONE**
9                      **BEFORE HON. SEAN F. COX**
                     United States District Judge
10                        257 U.S. Courthouse
                    231 West Lafayette Boulevard
11                     Detroit, Michigan 48226

12                 **(Wednesday, November 28, 2012)**

13   APPEARANCES:          LEE ROY H. TEMROWSKI, ESQUIRE
                           Appearing on behalf of the Plaintiff.
14
                           JAMES F. HEWSON, ESQUIRE
15                         Appearing on behalf of the Defendant.

16   INTERPRETER:          TINA FILARSKA

17   COURT REPORTER:       MARIE METCALF, CVR, CM
                           Federal Official Court Reporter
18                         257 U.S. Courthouse
                           231 W. Lafayette Boulevard
19                         Detroit, Michigan 48226
                           metcalf_court@msn.com
20

21

22

23

24

25

1 **TABLE OF CONTENTS**                                    **PAGE:**

2 **PLAINTIFF'S OPENING STATEMENT**..........................   5

3 **DEFENDANT'S OPENING STATEMENT**..........................  15

4 **WITNESSES CALLED BY PLAINTIFF:**

5 **DR. ANTONI LODZINSKI**

6 DIRECT EXAMINATION BY MR. TEMROWSKI....................  28

7 CROSS-EXAMINATION BY MR. HEWSON........................  49

8 REDIRECT EXAMINATION BY MR. TEMROWSKI..................  74

9 **VICTORIA ANN GILL**

10 DIRECT EXAMINATION BY MR. TEMROWSKI....................  87

11 CROSS-EXAMINATION BY MR. HEWSON........................  94

12 REDIRECT EXAMINATION BY MR. TEMROWSKI..................  97

13 **MARGARET A. JEZIOROWSKI**

14 DIRECT EXAMINATION BY MR. TEMROWSKI....................  99

15 CROSS-EXAMINATION BY MR. HEWSON........................ 122

16 REDIRECT EXAMINATION BY MR. TEMROWSKI.................. 141

17 RECROSS-EXAMINATION BY MR. HEWSON...................... 144

18 **EXHIBITS:**                                          **REC'D:**

19 PLAINTIFF'S EXHIBITS E, O..............................  50

20 DEFENDANT'S EXHIBIT NO. 7..............................  57

21 PLAINTIFF'S EXHIBIT P..................................  94

22 JOINT EXHIBIT NO. 4....................................  98

23 DEFENDANT'S EXHIBIT NO. 1.............................. 122

24 PLAINTIFF'S EXHIBITS L, M.............................. 131

25 DEFENDANT'S EXHIBITS 1, 3.............................. 142

*Waskowski v. State Farm*

1          Detroit, Michigan

2          Wednesday, November 28, 2012

3          At about 8:35 a.m.

4                    *    *    *

5          DEPUTY COURT CLERK:  United States District Court for

6   the Eastern District of Michigan is in session, the Honorable

7   Sean Cox presiding.  Please be seated.

8          The Court calls case number 11-13036, Jaroslaw

9   Waskowski versus State Farm Mutual Automobile Insurance

10  Company.

11         Counsel, your appearances for the record, please?

12         MR. TEMROWSKI:  Good morning.  Lee Temrowski

13  appearing on behalf of the plaintiff.

14         MR. HEWSON:  May it please the Court, James Hewson

15  appearing on behalf of State Farm.

16         THE COURT:  Good morning.  Are we ready to proceed

17  with opening statements?

18         MR. TEMROWSKI:  Yes.

19         MR. HEWSON:  Yes, Your Honor.

20         THE COURT:  All right.  Let's bring the jury out.

21         I've got a question for you.  Are both of you in

22  agreement as to the verdict form?

23         MR. HEWSON:  I submitted the verdict form.  I didn't

24  get any objections, so I don't know, Judge.

25         MR. TEMROWSKI:  Well, I submitted one, too.  I think

*Waskowski v. State Farm*

1    we'll probably need to talk about it.

2          THE COURT:  Have you looked at Mr. Hewson's verdict

3    form?  It's not a big deal.  I just --

4          MR. TEMROWSKI:  Yes, sir.

5          THE COURT:  Don't sweat it.  Forget about it.  We'll

6    talk about it later on.

7          MR. TEMROWSKI:  Okay.

8          DEPUTY COURT CLERK:  All rise for the jury.

9          (Jury in at 8:36 a.m.)

10         DEPUTY COURT CLERK:  Please be seated.

11         THE COURT:  Members of the jury, good morning.

12         THE JURY:  Good morning.

13         THE COURT:  We're going to start with opening

14   statements right now.  And as you may recall from yesterday, in

15   the opening statements, the attorneys tell you what they

16   believe the evidence in the case is going to show to you, okay?

17         And then after we conclude with the opening

18   statements, Mr. Temrowski will call his first witness on behalf

19   of the plaintiff.  And that's going to be?

20         MR. TEMROWSKI:  Dr. Lodzinski.

21         THE COURT:  Okay, very good.

22         Mr. Temrowski, you may start with your opening

23   statement when you're ready.

24         MR. TEMROWSKI:  Good morning, ladies and gentlemen.

25         THE JURY:  Good morning.

4

*Plaintiff's Opening Statement*

1          MR. TEMROWSKI:  As we talked about yesterday, this is

2    a civil case as opposed to a criminal case.  And in this case,

3    my client, the plaintiff, Mr. Waskowski, has brought this

4    lawsuit against State Farm, his own car insurance company, for

5    what is called his first-party no-fault benefits for injuries

6    arising out of an automobile collision that occurred on

7    December 23, 2009.

8          Now, I know the term "first-party no-fault benefits"

9    could be a strange term, so I would like to explain to you

10   exactly what that means.  In Michigan, all of us -- this is a

11   no-fault state, and all of us are obligated, if we drive a car,

12   to have insurance on it.  And in this case, Mr. Waskowski had

13   car insurance on his vehicle with State Farm on the date of

14   this automobile collision.

15         I believe that the testimony is going to show, and

16   you're going to hear from Mr. Waskowski, he's going to testify

17   as to the severity of this collision and the injuries that he

18   sustained as a result of it.  And I believe that the evidence

19   is going to show that he suffered multiple herniated discs in

20   his neck and in his back, a torn left rotator cuff on his left

21   shoulder, a fractured sternum and multiple fractured ribs.

22         Those injuries are all verified by the objective

23   diagnostic testing that was performed on Mr. Waskowski, bone

24   scans, MRIs and x-rays.

25         Now, following this automobile collision, Mr.

*Plaintiff's Opening Statement*

1    Waskowski made a claim to State Farm advising them that he had

2    been injured in this collision and he was assigned a claim

3    number.  And Mr. Waskowski, without the assistance of an

4    attorney, made these claims against his own car insurance

5    company, which we call his first-party no-fault benefits.  I'll

6    now explain to you what those consist of.  Medical bills,

7    prescription expenses, wage loss, $20 a day household help and

8    $15 per hour attendant care.

9         Those are the five no-fault benefits that Mr.

10   Waskowski requested from State Farm because of the injuries

11   that he sustained in that automobile collision.  Those are the

12   no-fault benefits that a person is entitled to collect from

13   their own automobile insurance company if they are injured in

14   an automobile collision.  Now, of those benefits, under the

15   Michigan no-fault law, the medical benefits are a lifetime

16   benefit that Mr. Waskowski is entitled to.  If he was injured

17   in that automobile collision on December 23, 2009, he is

18   entitled to lifetime medical care from his own car insurance

19   company for those injuries.

20        The second benefit that he's claiming in this case

21   are prescriptions.  And again, under the Michigan No-Fault Act,

22   like the medical benefits, those are a lifetime benefit that

23   Mr. Waskowski is entitled to collect.

24        The third benefit is called attendant care.  If a

25   person is injured in an automobile collision, as he was, and if

*Plaintiff's Opening Statement*

1    he needs assistance with things of a personal nature, such as

2    helping him with his exercises, massages, helping him dress and

3    undress, supervision, that's called attendant care.  And again,

4    like the first two, like the medical bills and like the

5    prescriptions, the attendant care is a lifetime benefit that an

6    injured person is entitled to collect from their own automobile

7    insurance company.

8           The next benefit that Mr. Waskowski requested from

9    State Farm is wage loss.  You're going to hear testimony that

10   Mr. Waskowski was gainfully employed at the time of this

11   collision as a truck driver at Yes Express.  And if you are

12   injured in an automobile collision and are unable to work, your

13   insurance company is required by law to pay you your wage loss.

14          However, unlike the first three benefits, the

15   medicals, the prescriptions and the attendant care, there is a

16   three-year cap on the wage loss benefit.  The insurance company

17   only has to pay that for three years from the date of the

18   automobile collision.

19          And the last benefit that Mr. Waskowski requested

20   from State Farm and that we're claiming in this lawsuit is --

21   well, the technical term is called "replacement services

22   benefits," but it's more commonly referred to as "household

23   assistance."  If you're injured and if you cannot do the things

24   around the house, the chores that you used to do before you got

25   injured in the automobile collision, an insurance company is

*Plaintiff's Opening Statement*

1    required to pay up to $20 per day for someone to perform those

2    services for you.

3           And that is the final claim that Mr. Waskowski is

4    making in this case.  And again, just like with the wage loss

5    benefit, household help has a three-year cap on it.  The

6    insurance company only has to pay that for three years from the

7    date of the collision forward.  So the first three benefits are

8    lifetime, the last two have a three-year cap.

9           Now, because of Mr. Waskowski's injuries from this

10   automobile collision, Mr. Waskowski made a claim with State

11   Farm.  He requested all five of these benefits.  And in support

12   of every single one of those benefits that Mr. Waskowski

13   requested that be paid, and this is very important to mention

14   at this point, and I believe the testimony is clearly going to

15   show this, Mr. Waskowski carefully documented every single

16   claim that he was making.  He meticulously documented every

17   claim that he was making and verified every claim that he was

18   making with State Farm.

19          In support of Mr. Waskowski's claims -- and the

20   evidence I believe is going to show this, in support of his

21   claims for his wage loss, his attendant care, and his $20 a day

22   household help, Mr. Waskowski did two things that I'll tell you

23   right at the beginning of this trial are extremely important.

24          He documented every type of care that was given to

25   him, every form that State Farm wanted to be completed was done

*Plaintiff's Opening Statement*

1    by his daughters, who were his care providers.  His employer

2    completed a wage and salary verification form that was given to

3    State Farm to confirm what his wages were, and very

4    importantly, in support of his claims for wage loss benefits,

5    the $20 a day household help and the attendant care, Mr.

6    Waskowski confirmed and verified those claims with doctor

7    disability certificates that were all sent to State Farm.

8            Now, I would like to tell you at the very onset of

9    this trial that State Farm did indeed pay some no-fault

10   benefits.  We acknowledge that.  They certainly did.  And I'll

11   stand before you and tell you that at the very beginning.

12           However, State Farm stopped paying Mr. Waskowski's

13   $20 a day household help and his $15 per hour attendant care.

14   And remember, they're supposed to be a lifetime benefit, the

15   attendant care is.  State Farm stopped paying those two

16   benefits in November of 2010.

17           Regarding Mr. Waskowski's wage loss claim, which

18   under the law should have been paid for three years from the

19   date of the accident, because Mr. Waskowski never went back to

20   work.  He continues to the present time to be disabled by his

21   treating orthopedic doctor, Stefan Glowacki.  State Farm only

22   paid that wage loss benefit until March of 2011.

23           It is our position, and I truly believe that the

24   evidence that you're going to hear from the witness stand in

25   this case is going to clearly and unequivocally show that State

*Plaintiff's Opening Statement*

1    Farm had absolutely no basis whatsoever to terminate those

2    benefits of Mr. Waskowski.

3            And I believe the testimony is going to show that

4    there were many different adjusters handling Mr. Waskowski's

5    claims at State Farm.  And the testimony is going to show that

6    State Farm had Mr. Waskowski examined by one of their own

7    doctors in October of 2010, a Dr. Endress, who is an orthopedic

8    doctor.  And State Farm asked Mr. Waskowski to go to -- it's

9    called an independent medical examination with Dr. Endress.

10           And Dr. Endress examined him and Dr. Endress authored

11   a report back to Terri Page, the claims adjuster at State Farm

12   in October of 2010, and a second report in November of 2010 and

13   a third report in February of 2011, and reported back to Terri

14   Page, the claims adjuster, that based upon State Farm's own

15   doctor exam of Mr. Waskowski, he couldn't work, the injury was

16   from that accident and that he needed the household assistance.

17           It wasn't then until July of 2011 that State Farm

18   decided to have Mr. Waskowski examined by a different IME

19   doctor, a Dr. Geiringer.  And in July of 2011, Dr. Geiringer,

20   who only examines Mr. Waskowski for about 15 minutes, a

21   one-time examination, and Dr. Geiringer says, "There's nothing

22   wrong with him.  These MRIs don't show anything.  There's not a

23   thing wrong with this gentleman," which, of course, we don't

24   agree with.  The point I'm trying to make is that there was no

25   basis whatsoever to terminate his benefits.  And in my opinion,

*Plaintiff's Opening Statement*

1    Dr. Geiringer, whose testimony you're going to hear, has no

2    credibility at all.

3            I believe the testimony at this trial is going to

4    show that regarding the five claims that Mr. Waskowski is

5    making against State Farm for injuries that he sustained in the

6    December 23, 2009 automobile collision, that there are

7    presently outstanding medical bills that are owed that he has

8    incurred because of these injuries that total $40,641.

9            As to the prescription claim that we're making, he

10   has an outstanding balance of $108.

11           Regarding Mr. Waskowski's wage loss claim that we are

12   presenting in this case, we acknowledge that defendant did pay,

13   State Farm did pay through March 7, 2011, but if you use the

14   same calculations that they were paying Mr. Waskowski at when

15   they were paying the benefit, there is a wage loss balance that

16   is owed Mr. Waskowski in the amount of $61,084.80.

17           Regarding the fourth claim, the $20 a day household

18   help, again we acknowledge that benefits were paid by State

19   Farm until November 20, 2010, but there is a balance owed on

20   that claim in the amount of $13,900.  And then, in addition to

21   that, State Farm didn't pay the $20 a day for certain payments

22   that were made, which amounts to another $1900.  So the total

23   $20 a day household claim that is owed Mr. Waskowski is

24   $15,800.

25           And last but not least, the fifth claim that he is

*Plaintiff's Opening Statement*

1   making is for the attendant care, the personal care that he

2   received from his care providers, which are his two daughters,

3   which under Michigan law there is nothing wrong with that,

4   again, plaintiff acknowledges that State Farm paid through

5   November 20, 2010.  We are claiming for the attendant care,

6   based upon doctor disability certificates at 12 hours per day,

7   which is what the doctor prescribed, $125,100.

8         But again, just like with the $20 a day household

9   help, when State Farm was paying they were short and the

10  shortage is $7,896.  So if you add that to what is owed, the

11  total attendant care claim is $132,996.

12        If you add those five figures together, the medical

13  bills, the prescriptions, the wage loss, the attendant care and

14  the household help, the total amount that we'll be claiming and

15  I believe that the evidence is going to confirm at this trial,

16  is $250,629.80.

17        Yesterday, I thought that Judge Cox did a very nice

18  job of explaining to you the trial procedure.  And because

19  again we recognize that this is a new experience for you, I

20  would just like to highlight on what Judge Cox told you about

21  three things, if I could.

22        I notice that you all have pens and papers and you're

23  allowed to take notes, and I'm very thankful for that.  And the

24  reason that I'm thankful for it is because in this case, again,

25  this is not a case for pain and suffering against the other car

*Plaintiff's Opening Statement*

1   that hit Mr. Waskowski.  This is a claim that he's making with

2   his own automobile insurance company for his five no-fault

3   benefits.  That's all this case is for.  And because of that,

4   we're talking numbers, dollars, and figures, so I think it will

5   be beneficial if you could utilize your notes to write these

6   things down because you may forget it towards the end.

7          The last two -- and then I'm done.  The last two

8   topics, just to talk a little more about what Judge Cox told

9   you, the trial procedure, two things I'd like to say.  You were

10  told many times yesterday by the Court and reminded by Mr.

11  Hewson that in this case the defendant doesn't have to prove

12  one thing.  I think the term that was used yesterday is, Mr.

13  Hewson can sit there and twiddle this thumbs.  It is the

14  plaintiff in this case who has the burden of proof.

15         Having said that, I therefore, beg your indulgence at

16  this trial when I do put witnesses up on the witness stand,

17  that I have to ask them certain questions, because if I don't,

18  I can promise you, I can promise you that at the conclusion of

19  this trial, all I will hear from the defendant is "Mr.

20  Temrowski didn't prove his case.  He didn't meet his burden of

21  proof."

22         So I ask your indulgence that when I do put a witness

23  on, because I know that the plaintiff has the burden of proof,

24  I'm going to ask the questions that do satisfy and meet that

25  burden.

*Plaintiff's Opening Statement*

1            And last, but not least, at the conclusion of this

2    trial, when the very last word in this courtroom has been

3    spoken, when the dust has settled and everything is done and

4    the Judge has read you your instructions and how you're to

5    decide this case, the last thing that's going to happen is you

6    are going to be handed a piece of paper called a verdict form.

7    This is how a trial ends.  And you are going to be asked

8    certain questions on this form, that you're going to take this

9    back with you into the jury room and answer these questions and

10   decide this case.

11           Now, I'm telling you at the very outset of the trial,

12   that I recognize that and I acknowledge that.  And I intend,

13   through the evidence that's going to be presented, that I will,

14   to your satisfaction, answer all of these questions and we will

15   establish that Mr. Waskowski did suffer an injury in the

16   automobile collision of December 23, 2009.

17           We will establish and satisfy that as a result of the

18   automobile collision of December 23, 2009 that Mr. Waskowski's

19   injuries arose from that because he certainly didn't have any

20   of these problems before and had no medical care or treatment

21   for a torn rotator cuff or herniated discs in his neck and

22   back.

23           And last but not least, we will establish from the

24   testimony and the evidence that you're going to hear at trial,

25   is that all of the expenses and all of the charges incurred by

*Defendant's Opening Statement*

1    Mr. Waskowski because of the injuries from the automobile

2    collision were -- and here's the key word, ladies and

3    gentlemen, here it comes -- reasonably necessary for Mr.

4    Waskowski's care, recovery or rehabilitation from those

5    injuries.

6           Because that is what the law in Michigan requires,

7    that if he was injured in this automobile collision, which he

8    was, and he incurred expenses and charges that were reasonably

9    necessary, then he prevails and he wins.

10          And again, at the very onset of the trial, I know

11   that this is how the trial ends and that this is what you're

12   going to be given, and I am going to, through the witnesses,

13   establish and meet this burden of proof.  Thank you very much.

14          THE COURT:  Thank you, Mr. Temrowski.

15          Mr. Hewson, do you wish to give an opening statement

16   on behalf of State Farm?

17          MR. HEWSON:  With the Court's permission, I would.

18          THE COURT:  You may proceed when you're ready.

19          MR. HEWSON:  Thank you.  May it please the Court,

20   brother counsel, ladies and gentlemen, good morning.

21          THE JURY:  Good morning.

22          MR. HEWSON:  I noticed everybody was on time this

23   morning.

24          The purpose of an opening statement is for me to

25   describe to you what I think the proofs are going to be in this

*Defendant's Opening Statement*

1    case, not just what the law is.  The Judge is the giver of the

2    law and the Judge will tell the lawyers and you what we're

3    supposed to do here from a legal standpoint.

4         But from the point of view of what I'm going to try

5    and do for you, is outline what the facts are.  Because it is

6    true that the Michigan No-Fault Act provides for all these

7    various benefits that the Judge will tell you about.

8         And it is true that the injuries have to arise from

9    an automobile accident and that the treatments for them have to

10   be reasonable and necessary and the charges have to be

11   reasonable and customary in order to be compensated.

12        All that having been said, I don't know that you

13   heard in opening statement yet how they intend to prove this.

14   And it is the matter of the evidence and the matter of the

15   proof that I'm supposed to describe to you and I want to try

16   and give you that.  Not just from my perspective, but from what

17   I know you're going to hear.

18        Before we come into trial, there's a discovery

19   period, and that period is exactly what it sounds like.  We're

20   supposed to discover each other's case so we know what we're

21   talking about.  I took the deposition of Mr. Waskowski, both of

22   his daughters, Mr. Lodzinski, the physical therapist, and Dr.

23   Glowacki.  I know what they're going to say.

24        Now, they may come in here and say something

25   different, but that testimony that they've sworn to in front of

*Defendant's Opening Statement*

1    a court reporter is already recorded.  And if they don't say

2    the same thing, I'm going to ask them about it.  That's called

3    impeachment.  And I will ask them about that sort of thing.

4            So my question then becomes, how do you establish all

5    of these things?  How you establish the injury?  You're going

6    to hear, and I believe you're going to see the police report,

7    there was clearly an accident; State Farm agrees.  There was a

8    policy of insurance; State Farm agrees.  That's not an issue.

9            But what happened at the scene of the accident was,

10   Mr. Waskowski got out of the car, an ambulance was there

11   available for him.  He didn't take an ambulance, he didn't go

12   into an emergency room.  He didn't report any injuries at the

13   scene.  And on the police report, there's a little box and it

14   says "injuries."  And it's a zero.

15           Neither of his daughters thought he was injured at

16   the scene.  They never went to a hospital.  In fact, they

17   didn't see a doctor for six days and they went to see Dr.

18   Wietrzykowski who you're not going to hear from in this case.

19   Dr. Wietrzykowski, however, indicated that he thought this

20   gentleman had a sprain of his neck, and a sprain of his low

21   back and sprain of his shoulder and ordered physical therapy,

22   but wrote a note that said he should go back to work January

23   23rd of 2010.

24           Instead of continuing to treat with Dr.

25   Wietrzykowski, the evidence will show that they ended up at Dr.

*Defendant's Opening Statement*

1   Glowacki's office.  Dr. Glowacki claims to be an orthopedic

2   surgeon.  He is not board certified.  He failed the board

3   certification examination twice.  He has not practiced surgery

4   in a hospital in over ten years and the evidence will show that

5   Dr. Glowacki is the only medical witness they have to rely on

6   proving these injuries from this accident.  Dr. Glowacki -- I

7   heard my brother counsel tell you that they're going to

8   establish rib fractures at 7 and 8 and a fracture of the

9   sternum.

10           I ask you to remember that, because Dr. Glowacki, in

11  what I consider to be one of most obnoxious pieces of testimony

12  I have seen in my career, is going to tell you a number of

13  things.  He is going to tell you that he ordered a bone scan at

14  Beaumont Hospital.  He orders a bone scan.  The bone scan comes

15  back normal, no fractures of the ribs, no fractures of the

16  sternum.  There's a little piece of arthritic condition at the

17  sternomanubrial joint, and I managed to say that rather

18  trippingly, but the sternomanubrial joint, all of this is up

19  here (indicating).  But there's no fractures.

20           And Dr. Glowacki is going to tell you that Dr. King,

21  who read the bone scan at Beaumont Hospital, is stupid.  That's

22  his word.  There were x-rays taken at Beaumont Hospital in

23  January of 2010 of the chest.  Those x-rays are normal.  Dr.

24  Glowacki says 90 percent of the time chest and rib fractures

25  don't show up on x-ray.

*Defendant's Opening Statement*

1    In response to -- and of course, Dr. Glowacki is

2  going to, on the videotape, use a shadowbox, and I don't know

3  if you've ever seen one of those, but it's a box that has a

4  light and you put x-rays up on it to review.  You've all seen

5  those on TV.

6    He puts these x-rays up -- or these MRIs up because

7  he claims that he read them and could interpret them, and they

8  showed all these discs and there was no degenerative changes,

9  and he goes on and on.

10    But he's going to sit there and he's going to point

11  at these pictures and he's going to tell you that the spinal

12  cord is compressed, it's compressed.  You can't even see it.

13  It's squished.  It's in a triangular shape.

14    There's no finding of spinal cord compression by any

15  competent radiologist or neuroradiologist in this case, none.

16  He's making it up.

17    State Farm hired Dr. Douglas Quint from the

18  University of Michigan.  He is the Chief of Neuroradiology at U

19  of M.  He reviewed all these films.  You're going to see his

20  testimony.  He reviewed them all.  There is no traumatic injury

21  to the spine.  There are degenerative changes that are normal

22  for people his age at the time, and I suppose my age now, that

23  you would normally find, but there are no traumatic injuries to

24  the spine, the spinal column or the nerves.

25    He also read the bone scan and he said the bone scan

*Defendant's Opening Statement*

1    doesn't show any fractures of the chest or the ribs.  Dr.

2    Glowacki asserts that these things are there, because if he

3    doesn't say that, then he can't support his alleged diagnosis.

4         Dr. Glowacki says -- actually, he cursed at me.  And

5    I'm not that sensitive, but he actually cursed at me and called

6    me a smart ass.  I asked him about functional capacity

7    evaluations, which are used to determine whether or not a

8    person needs services in the home, and he said -- and I hope

9    you'll excuse my mouth, but you're going to hear it anyway, he

10   said, "These are bullshit."

11        I asked him about the attendant care that my brother

12   counsel described to you that the daughters are supposedly

13   providing, and he said that he makes those hours up, so that

14   people can get paid from insurance companies.  He actually said

15   that in his testimony.  You're going to hear that.

16        He was also asked, and he will tell you out of his

17   own mouth, that he will continue to prescribe treatments for

18   people even if they're not working, as long as they continue to

19   come and see him.  This isn't stuff that my client made up,

20   this is what the witness is going to tell you.  And if he

21   doesn't, then you hold me accountable for it.  But you're going

22   to see him and that's what he's going to say.

23        The reason all this becomes very pertinent is because

24   this gentleman has had three years' worth of physical therapy

25   and gotten nothing but worse the whole time.  For example, the

*Defendant's Opening Statement*

1   evidence will show you that at the beginning of this, when Mr.

2   Lodzinski, and I'm not referring to him as doctor yet, because

3   I'm not sure he has a Ph.D. or not, Mr. Lodzinski, the physical

4   therapist, wrote down in his report that this gentleman had 135

5   degrees of abduction in the arm, doing this (indicating) and

6   150 degrees of flexion, doing this (indicating) in his

7   shoulder.

8         Nobody diagnosed a rotator cuff tear for over 14

9   months.  Nobody treated him for it for 14 months.  He didn't

10  have any burning pain or anything running down his arm that he

11  reported to anybody until 14 months later when they needed a

12  new diagnosis.

13        He has all of this range of motion, not complete,

14  according to their records, if you believe them, but the

15  records will show that he could do this.  In his testimony he

16  told us under oath that he couldn't move his left arm at all

17  for the first six months and had to be bathed by his daughters.

18        His daughter Kamila testified in her deposition, and

19  you will hear her testify, that he bathed himself for the first

20  six months and she and her sister have been bathing him from

21  that point forward.  Perhaps you'll be able to reconcile those

22  things.  I suggest it was difficult for me to do so.

23        So when the Judge talked to you about credibility,

24  who do you believe, how much of what they tell you do you

25  believe?  This is how the -- this is how it starts to shape up.

*Defendant's Opening Statement*

1   What do you do?  What do you look at?  How do these things

2   flesh themselves out?

3           State Farm paid.  State Farm paid in this case.  They

4   paid and they paid.  And they did, they paid a lot.  That's

5   their job.  My client agrees.  If you're injured in an

6   automobile accident, you're entitled to your PIP benefits.  And

7   they went the extra mile on this case.  And they paid and they

8   paid until it became apparent that they couldn't pay anymore.

9           These conflicts that have arisen since the litigation

10  started were not known to my client at the time the claim was

11  being handled.  They didn't know that people were going to

12  testify like this.  They didn't have testimony.

13          But they went to Steve Geiringer.  Steve Geiringer is

14  a physical medicine rehabilitation specialist.  He's got a

15  private practice that is substantial.  He's a clinical

16  professor of physical medicine and rehabilitation at Wayne

17  State University Medical School.  He's got a huge curriculum,

18  as does Dr. Quint, and you will see their accomplishments.

19          Dr. Geiringer is going to tell you that this man was

20  malingering, that he was faking.  And he's going to tell you

21  one of the reasons why he believes that is because this

22  gentleman suddenly developed a condition where he couldn't move

23  his head at all and there's no musculoskeletal reason for that

24  to have occurred.

25          The other thing that he's going to tell you, which I

*Defendant's Opening Statement*

 1   found very peculiar, and I would ask that you listen to it,

 2   because it took me a minute to figure it out myself, there's a

 3   thing called the straight-leg raising examination you're going

 4   to hear about.  And the patient gets supine, they lay the

 5   patient down on their back.  And they raise their leg until

 6   they report pain.  Obviously, pain can't be proven, but when

 7   you say "ouch," they stop.

 8           When Dr. Geiringer had this gentleman laying on the

 9   table, he lifted his leg and at five degrees -- and I don't

10   even know -- it's not very much -- at five degrees, he reports

11   pain.  That's pretty bad.  And he's there and if that's not

12   consistent with the physical therapy records, you'll see that.

13   But be that as it may, what's surprising is that if you're

14   flat, your spine, and your hips and your legs are all on the

15   same plane.  You raise it little bit, just like that, and you

16   get a report of pain.

17           So how is it when you sit on the side of the table at

18   a 90 degree angle, you don't have the same pain?  Laying down

19   and raising your legs is the same as sitting up with your legs

20   sticking out this way and your knees bent over the side of the

21   table.  And Dr. Geiringer was able to lift his leg to 80

22   degrees in that same position.  Dr. Geiringer was unable to

23   explain it, other than the fact that this gentleman was faking,

24   that's it.  It's a serious thing for Dr. Geiringer to say

25   somebody is malingering, but that's what he said unequivocally.

*Defendant's Opening Statement*

1          So State Farm is not in a position in this case to

2    ask for the money back that it paid.  That money is gone for a

3    variety of reasons.  But I believe that the Judge is going to

4    tell you at the end of this case that the fact that it was paid

5    in the past, doesn't mean that they have to continue to pay,

6    that what was paid before doesn't justify saying this is what

7    you're supposed to pay.

8          They've got to prove their case, including the injury

9    arising from this accident in this case, to your satisfaction,

10   in order to get a penny.

11         The last thing I want to comment on at this

12   particular point are these forms.  There are tons of forms.

13   There's a very peculiar set of circumstances here, however.  I

14   told you I deposed the daughters, Kamila and Margaret, who did

15   the attendant care.  I was troubled by the fact that they were

16   bathing their father and that no one had given any

17   recommendation to them, nor did they ever ask for any of the

18   assistive devices assuming he couldn't bend over and wash his

19   legs, like a long-handled sponge or that.  They never did that.

20         What was very peculiar, though, is they have listed

21   all these times, and you'll see these forms, and on there it

22   says it takes an hour to bathe him.  Now, Kamila testified that

23   before the accident it took him ten minutes to take a shower,

24   and for the first six months after the accident, Kamila said it

25   took him 20 minutes.

*Defendant's Opening Statement*

1          I don't know how that translates into later on when

2     they are bathing him and I asked -- I know it was indelicate,

3     but I said, "Was he wearing anything when you were bathing him?

4     I mean, you ladies are 20 and 23 and he's 50."

5          And they said, "Well, he's wearing his underwear."

6          And I honestly commented, "I don't know that that

7     makes it any better, to be quite honest with you."

8          But this situation of how does 20 minutes turn into

9     an hour, nobody has an explanation for that.  That's what

10    they're claiming benefits for.  They're claiming benefits for a

11    half an hour taking the garbage out.  You will see these on

12    these forms.

13         But I suppose the most distressing thing about it to

14    me was, as an advocate and as an attorney who is presenting a

15    case to you, last night, yesterday actually, after we were

16    done, I took Margaret's deposition, because lo and behold, six

17    days ago a new stack of records showed up, from May the 22nd,

18    2011 to October of 2012.  I got a new set of forms that I have

19    never seen before.  I also got a new set of records that showed

20    the household help that I've never seen before on behalf of my

21    client.

22         So I take her deposition.  She says that these were

23    in the computer at home for the entire period time of this

24    case, and they just never bothered to produce them.  But when

25    you look at them, you will see that they've been signed on the

*Defendant's Opening Statement*

1    bottom by both of these young ladies and there's a date there

2    that says they signed them in May, they signed them in June,

3    they signed them in July, they signed them in August.

4              It's completely false.  Those documents do not relate

5    to anything that actually happened in this case.  But they

6    presented them, and apparently they're going to present those

7    to you and ask you for compensation on the basis of these forms

8    that were not produced until approximately seven business days

9    ago.

10             I believe that when you see what the evidence is in

11   this case, and when you evaluate the documents we're going to

12   present to you, that you will be distressed.  I believe that

13   the testimony of Dr. Glowacki will prove to you that he is not

14   worthy of your belief and he will not have earned the right to

15   be believed by you.  His testimony is, in fact, incredible.

16             I believe that when you hear Mr. Lodzinski testify

17   regarding his physical therapy treatment, and apparently he's

18   going to be the first one that you're going to hear from, I

19   believe that I'm going to be able to establish from him that he

20   consistently lied in his records, if you believe his records,

21   because he said that this man got better with every physical

22   therapy examination, every single one.  And yet, by the time he

23   gets to Dr. Geiringer, he can't move his head.

24             When you evaluate credibility, I know you will take a

25   look at these things.  I know you will give us your best.  And

*Defendant's Opening Statement*

1   that's all we can ask you.

2          I want to thank you for being here.  Not only are you

3   here, and that allows me to practice a profession that I love

4   dearly, but this is probably the most -- the purest form of

5   chasing justice and chasing the truth.  What you're going to

6   bring here is your common sense and everyday experience of the

7   ordinary affairs of life.

8          You're going to apply those to the facts, you're

9   going to follow the law as Judge Cox gives it to you and you're

10  going to come up with what the truth is here.

11         Hold me to what I've suggested to you.  Hold me to

12  it.  And if I'm wrong, don't believe me.  But if I'm right,

13  believe the facts that I'll show to you and render the verdict.

14  When you fill out the verdict form, render the verdict that

15  says that State Farm doesn't have to pay for this stuff

16  anymore, that Mr. Waskowski, it's time for him to move on and

17  quit this nonsense, and to render the just verdict, which I

18  know you will do.  Thank you for your time.

19         Thank you for your time, Your Honor.

20         THE COURT:  All right.  Thank you, Mr. Hewson.

21         All right, Mr. Temrowski, are you ready with your

22  first witness?

23         MR. TEMROWSKI:  Yes, Your Honor.

24         THE COURT:  And that is?

25         MR. TEMROWSKI:  Dr. Lodzinski.

27

*Lodzinski – Direct*

1        THE COURT:  Sir, could you come on up?  And could you

2   give us your full name, please?

3        THE WITNESS:  Antoni Lodzinski.

4        **DR. ANTONI LODZINSKI, PLAINTIFF'S WITNESS, SWORN**

5                    **DIRECT EXAMINATION**

6   BY MR. TEMROWSKI:

7   Q    Dr. Lodzinski, good morning.

8   A    Good morning.

9   Q    Thank you for coming.  Could I begin, please, by asking

10  you to tell the ladies and gentleman of the jury what your name

11  is?

12  A    Antoni Lodzinski.

13  Q    And what is your occupation?

14  A    Physical therapist.

15  Q    And what is Euro Rehab?

16  A    Euro Rehab is my clinic since four years.

17  Q    Okay.  And could you please tell the jury where this

18  clinic is located at?

19  A    I have basically two clinics.  One in Hamtramck, one is in

20  Troy.  So I am working three days here, three days here.

21  Q    And are you licensed?

22  A    Yes, I've been licensed since '94.

23  Q    Could you please tell us something about your educational

24  background?

25  A    I finished my study in Poland, working in Poland, working

*Lodzinski – Direct*

1    in a children's hospital, working with the sports, sports man.

2    I was in Olympics games in Montreal, staff of chief.

3            What else?  In '90s I came to the United States.  I

4    had a fellowship in Children's Hospital working with Dr.

5    Dombrowski.  Did club foot in my own clinic for small kids.

6    The smallest, the youngest was a five weeks' old baby.  Oh,

7    instead of losing time, I can give you my, briefly --

8            MR. HEWSON:  Mr. Temrowski, Mr. Lodzinski's

9    curriculum vitae was marked as Exhibit One at his deposition if

10   that's of any assistance.

11           THE WITNESS:  This is my -- can I give to the -- you

12   know, so we don't lose time?  It's my little story.

13   BY MR. TEMROWSKI:

14   Q    It's your pamphlet about your rehab and your educational

15   background?

16   A    Yeah, yes.  This is, you know, when I was born, when I was

17   dead, you know, what is this.

18   Q    Well, let me just ask you a couple questions.

19   A    Okay.

20   Q    You have a Master's Degree; is that correct?

21   A    No, I am Ph.D.

22   Q    Okay.  And when and where did you get your Ph.D.?

23   A    I did in 2002 in Poland in Wrocar.

24           THE COURT:  In Poland where?

25           THE WITNESS:  Wrocar, W-r-o-c-a-r.

*Lodzinski – Direct*

1            THE COURT:  Okay.  W-o-r --

2            THE WITNESS:  W-r-o-c-a-r.

3            THE COURT:  Now, is that a city?

4            THE WITNESS:  Yeah, it's a city -- c-l-a-r.

5    BY MR. TEMROWSKI:

6    Q    Okay.  Therefore, would it be appropriate for me to

7    address you as Dr. Lodzinski?

8            MR. HEWSON:  Your Honor, can I voir dire the witness

9    on this point --

10           THE COURT:  No.

11           MR. HEWSON:  -- before we continue, relevant to his

12   qualifications?

13           THE COURT:  I don't think it would be appropriate at

14   this time.

15           MR. HEWSON:  Thank you.

16   BY MR. TEMROWSKI:

17   Q    Since you have a doctorate degree, would it be appropriate

18   for me to refer to you as Dr. Lodzinski?

19   A    Yes.

20   Q    Dr. Lodzinski, let's talk about Mr. Waskowski.  It's my

21   understanding that your office performed physical therapy

22   services for Mr. Waskowski; is that true?

23   A    Yes.

24   Q    And do you have your file with you here today?

25   A    Yes.

30

*Lodzinski – Direct*

1    Q    And please, if you need to refer to that file -- here's my

2    question to you.  Can you please tell the members of the jury

3    when did Mr. Waskowski first come to your office for physical

4    therapy?

5    A    He start for -- I think January -- January 7, 2010.

6    Q    Now, for Mr. Waskowski to come to receive physical therapy

7    at your facility, would it be necessary for him to have a

8    prescription from a doctor?

9    A    Yes.  In Michigan it is the law that you need prescription

10   for treating patient.  You need first prescription from the

11   doctor or fellows.

12   Q    Or you wouldn't perform the therapy?

13   A    Yes.

14   Q    Okay.  So he comes to you in January of 2010; is that

15   correct?

16   A    Yes.

17   Q    And if you could tell us, please, when was the last time

18   that he came to your facility?

19   A    The last time he came it was February 17 in 2012.

20   Q    Okay.  For all of that time period when Mr. Waskowski came

21   to your office to receive physical therapy, did he always have

22   doctor prescriptions?

23   A    Yes.

24   Q    Were those prescriptions always from the same doctor or

25   from different doctors?

*Lodzinski – Direct*

1    A    No, from different doctors.

2    Q    And could you please look at your file and tell the ladies

3    and gentlemen of the jury who those doctors were that wrote

4    these prescriptions?

5    A    After accident, he saw first Dr. Wietrzykowski.

6    Q    Wietrzykowski?

7    A    Wietrzykowski.  His office is in Hamtramck.

8         THE COURT:  Okay, just hold on a second.  How do you

9    spell his name?

10        THE WITNESS:  W-i-e-t-r-z-y-k-o-w-s-k-i, Matthew,

11   M-a-t-t-h-e-w.

12   BY MR. TEMROWSKI:

13   Q    So was that the first prescription that you had from Dr.

14   Wietrzykowski?

15   A    Yes.  It was for his prescription.

16   Q    Okay.  And for how long was that for?

17   A    This -- you know, sometimes on the script doctor write,

18   "You have treatment for four weeks, three times a week."

19   Sometimes write -- didn't write any time, you know, how long.

20        But one prescription without any signature is value

21   (sic) for four weeks.  But if I send evaluation to doctor and

22   my recommendation is that frequence and duration will be three

23   times a week for eight weeks, and doctor signs this, this means

24   this prescription together with evaluation is a value (sic) for

25   eight weeks.

*Lodzinski – Direct*

1   Q    Okay.  So you indicated you had other prescriptions from

2   other doctors for Mr. Waskowski to attend physical therapy?

3   A    Yes.  On the end of the treatment, for the first

4   prescription, Mr. Waskowski went to Dr. Glowacki who is

5   orthopedic surgeon and he receive from him new prescription for

6   the -- usually doctor writes six weeks, something like that.

7   Q    Okay.  And in addition to Dr. Wietrzykowski and Glowacki,

8   do you have other doctors that wrote prescriptions?

9   A    It's one doctor, Dr. Nerga, N-e-r-g-a, Alicja Nerga.  She

10  wrote -- I think he saw her in June 2010.

11  Q    So you had scripts from actually three different

12  physicians?

13  A    Yes.

14  Q    Now, when Mr. Waskowski first came to you with the

15  prescription from Dr. Wietrzykowski, did you have an

16  opportunity to get any information from Mr. Waskowski about a

17  car accident?

18  A    Yes.  Usually, you know, when somebody coming for physical

19  therapy, licensed physical therapy, do evaluation.  And it's a

20  form, like a SOAP form, subjective, objective, assessment and

21  treatment.  In subjective, we just ask patient what's

22  happening, why are you having pain and problems, et cetera.

23          So he said that he had car accident on December 23rd.

24  He was the driver.  His car was hit from left back side.  When

25  he was standing on the red lights.  When he was hit, the car

*Lodzinski – Direct*

1    would spin around and, you know, was threw away on the grass.

2         Since this time the patient complains some pain, some

3    discomfort.  You see -- oh, what he said here was transfer to

4    hospital.  In hospital, x-ray was done.  He received some

5    medication.  And you know, he was discharged from the hospital

6    from there and went back home.

7         Since this time he complained of the neck pain, lower

8    back pain and left shoulder pain.  This is main problems when

9    we start therapy.  He has problem with the headaches, stiffness

10   neck, back.  Because -- yes, pain and aggravated, he was seen

11   by Dr. -- he has been seen by Dr. Wietrzykowski on January 07,

12   so this was like two weeks after accident.

13   Q    Okay.  I'm going to show you what I've had marked as

14   Plaintiff's Exhibit E, which is a document from your file, and

15   ask if you could look at that and tell the jury what that

16   document is?

17   A    This was right on the end of this year.  We start therapy

18   January 7.  This I wrote on December 20 the same year.  And it

19   was letter to the State Farm Insurance.

20        And I informed that patient has, you know, several

21   problems like cervical sprain, lumbar sprain, left shoulder

22   sprain, herniated disc in L4-L5, herniated disc C4-C5.  And

23   torn rotator cuff.

24   Q    So that is a document that you prepared and sent to State

25   Farm, correct?

34

*Lodzinski – Direct*

1    A     Yes.

2    Q     And that document has a claim number at the top?

3    A     Yes, he has claim number.

4    Q     And did you obtain that information, the claim number, the

5    State Farm information from Mr. Waskowski?

6    A     Oh, yes.  Mr. -- yeah.

7    Q     Now, for the time frame or the time period that you

8    performed physical therapy, your facility, on Mr. Waskowski,

9    did Mr. Waskowski incur a bill at your facility?

10   A     Yes.

11   Q     For your services?

12   A     Yes.

13   Q     And would you please be able to tell the members of the

14   jury for the time frame that he went to physical therapy, what

15   was the total bill for all of the services that you performed?

16   A     Total bill for the patient, he was, you know, two years --

17   it was two years of treatment.  It was around $71,374.

18   Q     And State Farm, it's my understanding, did pay some of the

19   bill; is that correct?

20   A     They pay, but not everything.  You know, on the end of the

21   year in 2011, State Farm sent information that they stop to pay

22   and -- but, you know, patient still coming for therapy for a

23   while.  And outstanding balance for this treatment not paid was

24   $7,641.

25   Q     Okay.  And I had marked as Plaintiff's Exhibit O, a

*Lodzinski – Direct*

1    document again out of your file?

2    A    Yes.

3    Q    And would you just please take a look at that --

4    A    That's correct.

5    Q    And was that the balance that is owed?

6    A    That is balance, $7,641.

7    Q    $7,641.  Okay.  I'll take these two exhibits back.

8              Could you please, Dr. Lodzinski, tell us about your

9    charges, how exactly do you charge for physical therapy?

10   A    In physical therapy, the -- all insurances has different

11   rules, you know.  For instance, if you have a Blue Cross

12   network, they pay me $29 for the visit, but I must pay $30 to

13   the therapist.  But anyway, I treat this patient.  But this is

14   not -- this is Blue Cross Network.

15             Medicare has special rules for modalities for -- they

16   don't pay for heat, for instance.  They pay for electric

17   stimulation, they pay for ultrasound, they pay for manual

18   therapy, massage, this -- and they pay for exercise.  And this

19   is a -- different rules than has Blue Cross.  Each insurance

20   has different rules.

21             The same, like we sent, for instance, bill to other

22   insurance, State Farm, is it average for -- I have this one,

23   how they charge -- how we charge for the heat, for instance.

24   We charge $20.  For the manual therapy, we charge $40 per unit.

25   Unit is 15 minutes, so this is average.

*Lodzinski – Direct*

1          But in our clinic, from my knowledge, I charge twice

2   -- maybe less than charge -- a hospital charge the patient or

3   other, you know, clinics, you know.  I am -- it's meaning the

4   average, the medium, average, you know, for charge insurance,

5   or less than half, you know, 50 percent.

6   Q    Well, Doctor, I think your testimony then just answered my

7   next question.  We've established that Mr. Waskowski has an

8   outstanding bill of $7,641.

9   A    Oh, yes, correct.

10  Q    My question is, were all of the services that you provided

11  to Mr. Waskowski of physical therapy related to injuries that

12  he sustained in the automobile accident of December 23, 2009?

13  A    Yes.

14          MR. HEWSON:  Objection, foundation.  The witness is

15  not qualified to make differential diagnoses.  He can't make

16  that determination, Your Honor, as a matter of law.  There's no

17  foundation for him to say that they're related to the accident

18  or not.  That's outside the scope of his profession.

19          THE COURT:  I didn't understand your objection, the

20  part about differential diagnosis.

21          MR. HEWSON:  Physical therapists are not allowed by

22  statute --

23          THE COURT:  I --

24          MR. HEWSON:  I'm sorry.

25          THE COURT:  Go ahead.

*Lodzinski – Direct*

1        MR. HEWSON:  Physical therapists are not allowed to

2    make diagnoses, in order to --

3        THE COURT:  I understand that.

4        MR. HEWSON:  In order to be able to correlate an

5    event to a particular injury, you have to be able to make a

6    differential diagnosis.  He's not qualified to do that.  That's

7    my point, Your Honor.

8        THE COURT:  And what authority supports that?

9        MR. HEWSON:  The statute, Your Honor.  And if I can

10   have just second, I will present that to you.  I had printed

11   that off earlier this morning.

12       THE WITNESS:  And this (indicating).

13       MR. TEMROWSKI:  Your Honor, Dr. Lodzinski has a job

14   description from the Michigan Civil Service --

15       THE COURT:  Okay, okay.

16       All right.  The plaintiff has established that -- or

17   the witness has established that the treatment that he provided

18   to the plaintiff was at the -- pursuant to prescriptions from a

19   physician, and therefore, there's sufficient foundation to tell

20   us whether or not the treatment, in his mind, in his opinion,

21   is related to an automobile accident sustained on --

22       MR. HEWSON:  December 23, 2009.

23       THE COURT:  And that he was given this treatment as a

24   result of a directive from the physician.

25       MR. TEMROWSKI:  Can I reask --

*Lodzinski – Direct*

1        THE COURT:  There was no authority for the objection

2   by the defense provided.  Go ahead.

3   BY MR. TEMROWSKI:

4   Q    So Doctor, in your -- were all the services that you

5   provided at physical therapy to Mr. Waskowski directly related

6   to injuries that he sustained in the automobile collision of

7   December 23, 2009?

8        THE COURT:  You know what, you can ask him whether

9   they were at the direction and related to the prescriptions

10  provided by certain physicians.

11       MR. TEMROWSKI:  Okay.

12  BY MR. TEMROWSKI:

13  Q    Dr. Lodzinski, were all of the services that you provided

14  in physical therapy --

15       THE COURT:  Okay, I've got to step back, because you

16  didn't even -- I still don't know -- there's been no foundation

17  as to his education, training and experience.  So (a), there's

18  that foundational issue whether or not he can give such an

19  opinion, because all I know is that he has a Ph.D from some

20  city in Poland.  I don't even know what university he got his

21  Ph.D. from, or where he trained or where he interned, but

22  whatever.

23       Members of the jury, as to this physical therapy

24  treatment provided by this witness as being related to the

25  accident, all right, up to this point, any testimony that he

*Lodzinski – Direct*

1    has provided that it was, is to be disregarded by you, okay?

2    Are you with me so far?

3         But the fact that he provided this physical therapy,

4    the nature of the physical therapy, and whatever the amount is

5    pursuant to an order by some physician, whether it is Dr.

6    Glowacki or Dr. Wietrzykowski can be answered and obviously can

7    be considered by you.

8         But the fact that this physical therapy, he's

9    testified -- you can accept that the treatment he provided is

10   at the direction of these physicians, okay, and the amount,

11   which I believe he's testified to.

12        But whether or not his physical therapy is related at

13   this point to the accident, there hasn't been a foundation.

14   There hasn't been enough in the record to establish that it

15   was, through this witness.  A little bit confusing, but maybe

16   as the trial goes on, it will clear up.  Okay.

17        MR. TEMROWSKI:  Do you want me to question him about

18   his education then?

19        THE COURT:  It's up to you.

20        MR. HEWSON:  Your Honor, if I might -- I don't mean

21   to interrupt.  If I might approach, I can hand you a copy of

22   the statute.  I had it under the wrong page.

23        THE COURT:  Well, I don't think I need it right now,

24   because I think I've addressed your issue, have I not?

25        MR. HEWSON:  Yes, sir.  Thank you.

*Lodzinski – Direct*

1    BY MR. TEMROWSKI:

2    Q    Dr. Lodzinski, what universities did you attend in Poland?

3    A    I attend as far as –– the Academy of Physical Education in

4    Warsaw.  I finish in '68.  The same, I graduate from there with

5    a Master's Degree.  Ph.D, I did similar, it was the same,

6    Academy of Physical Education in Wroclaw when they had rehab

7    problem –– rehab program and I did this Ph.D. degree there.

8    Q    So you have both a Master's Degree and a Ph.D?

9    A    Ph.D –– Master's in Warsaw, Ph.D in Wroclaw.

10   Q    And you are licensed in the State of Michigan?

11   A    But I am licensed in physical therapy in Michigan, so you

12   know, forget about over-education, about this Ph.D.  I am

13   normal licensed physical therapist and I can do everything what

14   doctor recommended.  If I write my initial evaluation and I

15   have a diagnosis, cervical sprain, lumbar sprain and left

16   shoulder sprain, what is beginning, because we didn't know yet

17   that he has rotator cuff, that he has herniated disc for the

18   spinal, for the cervical.  This was the first one.

19        But after, when MRI shows the scar, we know that he

20   has several problems, you know.  But from the beginning, we

21   know, it's like, oh, he has contusion when you come.

22   Contusion.  But contusion, you know, is a start.  But after we

23   will see when we do MRI, x-ray, we –– other doctors check, we

24   will see, "Oh, he has a rotator cuff."  If somebody has rotator

25   cuff, he'll know.  He is unable to move the arm, you know.

*Lodzinski – Direct*

1          Anyway, if he is healing, after a while he has

2    problem.  He has a pain when the weather change.  We know he

3    has problem to play tennis, golf and others, you know.

4    Q    And under the terms of your license that you have as a

5    licensed physical therapist in the State of Michigan, are you

6    allowed to make a diagnosis?

7    A    Yes.  You know, I have this -- this is another

8    information.  I can read this, you know.

9          MR. HEWSON:  Your Honor, I object.  Your Honor, it's

10   M.C.L.A. 333.17801.  I have a copy for my brother counsel and a

11   copy for the Court if I may approach.

12         THE WITNESS:  I have a different information.

13         MR. TEMROWSKI:  Excuse me.  Here's one right here.

14         MR. HEWSON:  And I apologize, Your Honor.

15         And the practice of physical therapy is described in

16   subparagraph (d).  And the last line describes the limitation,

17   indicating that this witness cannot --

18         MR. TEMROWSKI:  I'm sorry.

19         THE COURT:  I see.  Thank you.  Last line of

20   subparagraph (d)?

21         MR. HEWSON:  Subparagraph (d), Your Honor, yes.

22         THE COURT:  Do you wish to withdraw your question or

23   --

24         MR. TEMROWSKI:  I'd like to see --

25         THE COURT:  Objection sustained.

*Lodzinski – Direct*

1       MR. HEWSON:  Thank you.

2       THE COURT:  Unless you have a reply.

3       MR. TEMROWSKI:  No.

4       THE COURT:  Can I see you at the sidebar?

5       (Sidebar conference held on the record and out of

6       the hearing of the jury)

7            THE COURT:  I've never seen anyone try to

8       relate injuries from an automobile accident

9       through a physical therapist.  Usually it's an

10      M.D. and only an M.D.

11           MR. TEMROWSKI:  Okay.

12           THE COURT:  An orthopod, or whatever, so --

13      and I know we have the issue coming up on these --

14      he's got two motions in limine on Glowacki which

15      he's got an uphill road on, okay.  I went through

16      everything.  I'll talk about it a little bit --

17      but he has a motion, a second motion which he just

18      filed that we got at 4:00 yesterday or something.

19           MR. HEWSON:  Day before, I think, Judge,

20      right after the -- in any event, yes.

21           THE COURT:  And where I think he's -- I don't

22      know where he's at on that, but he's objecting --

23      he's going to be objecting to a witness about

24      bringing in some medical billings.

25           MR. TEMROWSKI:  Oh, the MRI?

*Lodzinski – Direct*

1        MR. HEWSON:  From Oakland MRI?  Because

2        there's no one to testify as to the fact that the

3        MRI is related to the accident?

4        THE COURT:  You know, he may -- the best you

5        can probably do is get that conditionally

6        admitted, assuming you can wrap it up.  That's

7        assuming that some physician is going to testify,

8        I assume Glowacki, that he ordered those --

9        MR. TEMROWSKI:  No, Glowacki didn't.

10       MR. HEWSON:  Not that one.

11       MR. TEMROWSKI:  Dr. Zamorano did.

12       THE COURT:  Okay.  But is that -- is there

13       going to be any testimony through any physician,

14       M.D., that those MRIs and all the rest or -- were

15       related to the accident --

16       MR. TEMROWSKI:  Well, my client is going to

17       testify that he was referred to Dr. Zamorano and

18       it was Dr. Zamorano that referred him for the MRI.

19       THE COURT:  That's fine and dandy, but how do

20       you get in that this testing was related to the

21       accident?  Think about it.

22       MR. TEMROWSKI:  Okay.

23       THE COURT:  But are these the MRIs that your

24       client -- that the experts reviewed in --

25       MR. TEMROWSKI:  Absolutely they are.

*Lodzinski – Direct*

1          THE COURT:  Stay with me on that.  Well, that

2               may -- but that doesn't mean that you can get them

3               in as a reasonable cost --

4          MR. TEMROWSKI:  Right.

5          THE COURT:  -- and related to the accident.

6          MR. TEMROWSKI:  Dr. Glowacki reviewed them.

7          THE COURT:  But that's a separate issue.

8               That goes to the nature of the injuries.  Okay.

9               Stay with me.  That would go to the nature of the

10              injuries sustained by your client, whether there

11              was trauma or not trauma to the spine, the nerves

12              and whatever.  But as to getting in the bills,

13              these medical billings and expenses for the MRI

14              and whatever else there is, that's a separate

15              issue, a separate foundational issue.  Do you

16              understand what I said?

17         MR. TEMROWSKI:  Yeah.

18         THE COURT:  Okay.

19         (Sidebar conference concluded)

20  BY MR. TEMROWSKI:

21  Q    Dr. Lodzinski, you've testified that you had scripts from

22  three different doctors for Mr. Waskowski, correct?

23  A    Yes.

24  Q    In the course of your providing physical therapy services

25  to Mr. Waskowski, and you have your file with you, did you do

*Lodzinski – Direct*

1    physical therapy evaluations?

2    A    Yes.

3    Q    And is that part and parcel of your practice that you do

4    that?

5    A    Yes.  This is what physical therapy license do, you know.

6    When they see the patient, they evaluate.  They put diagnosis

7    and they decided what we can do with this problem.  It's a plan

8    of care.  And nobody can do on the -- in the office, in the

9    physical therapy office, no assistant, no others.  Only

10   physical therapist.

11          And I signed these papers.  So I decided if he has a

12   problem with a rotator cuff, we do heat, we do stimulation,

13   what we can -- when we put the trigger points which kind of

14   stimulate.  We have ultrasound, we have manual therapy.  And

15   program -- exercise program from the beginning, when he's --

16   fresh contusion or after.  And he has a home exercise program.

17   So this what physical therapy -- all licensed physical

18   therapists.

19   Q    Okay.  And did you send -- as Mr. Waskowski continued to

20   treat with you, would you send your evaluation and progress

21   reports to Dr. Glowacki?

22   A    I sent all documents, you know.  He gave me the script.  I

23   write evaluation.  I send all papers to the doctor, evaluation.

24   Doctor must return this, you know, signed evaluation, so I can

25   treat this.

*Lodzinski – Direct*

1    Q    And you have your file with you here today?

2    A    Yes.

3    Q    Would you pull out the progress report dated July 5th,

4    2011?

5    A    In 2011.  Could you repeat the date?

6    Q    July 5th.

7    A    June --

8    Q    2011?

9    A    I have --

10   Q    Here, take a look at mine.

11   A    Okay.

12   Q    And is that an example of the type of progress reports

13   that you would send to the different doctors?

14   A    Yes.  We sent sometimes short progress report if nothing

15   has changed.  Or we just make a report that we have a progress

16   or we have progress with -- yeah, this is what I send to Dr.

17   Glowacki on June -- July 5th in 2011.

18   Q    And at the bottom of that form, it has a title on page one

19   called "function"?

20   A    Yes.  Function.

21   Q    Would you read to the jury what you wrote about Mr.

22   Waskowski on July -- in July of 2011 regarding his function?

23   A           "The patient has limitation with prolonged standing,

24             Sitting, working on computer.  Has problem with

25             ambulation, including stairs climbing.  Has

*Lodzinski – Direct*

```
 1                 problem with transfer, sit to stand.  Has problem
 2                 with ADLs, living, like dressing, bathing,
 3                 household duties.  And the patient needs help at
 4                 home.  The patient is basically -- do not drive.
 5                 Functional status is related, strongly related to
 6                 pain level.  Patient is unable to make a fist in
 7                 left hand.  Opposition test is negative."
 8   Q    Dr. Lodzinski, for all of the physical therapy services
 9   that you provided to Mr. Waskowski, for the time frame that you
10   told us about, --
11   A    Yes.
12   Q    -- and you've indicated that he has a bill, a balance due?
13   A    Yes.
14   Q    Do you have any indication at all, anywhere, anywhere at
15   all in your records, in your file, anywhere to state that any
16   of these services were provided to Mr. Waskowski other than the
17   car accident of December 23, 2009?
18   A    No.  All, you know, treatment, was related to the car
19   accident.
20            MR. HEWSON:  Your Honor, I would move to strike.  You
21   already sustained that objection.
22            THE COURT:  That's correct.
23            MR. HEWSON:  Thank you.
24            MR. TEMROWSKI:  Thank you.  I have no other
25   questions.
```

48

*Lodzinski – Cross*

1          MR. HEWSON:  Your Honor, if I could go for a little

2     bit, I might need some of the equipment, depending on how the

3     interplay with the witness goes.  I would like to just start

4     normally and then if we need to, I'll ask for a break.

5          THE COURT:  Sure.

6                          **CROSS-EXAMINATION**

7     BY MR. HEWSON:

8     Q    Sir, you don't have a certificate that says you have a

9     Ph.D., do you?

10    A    I don't have a certificate that I have a Ph.D.?

11    Q    That's correct.  You don't, do you?

12    A    I have.

13    Q    But you didn't produce it when I asked you for it at your

14    deposition.

15    A    In my deposition you saw on my wall, you know --

16    Q    Are you talking about this certificate that you gave me?

17    A    I don't know what is this.

18         MR. HEWSON:  May I approach the witness, Your Honor?

19         THE COURT:  Sure.

20         MR. HEWSON:  Thank you.

21    BY MR. HEWSON:

22    Q    Is that the one?

23    A    No.

24    Q    That's what you gave me at the time of your deposition.

25    A    No, I thought you only -- that I'm certified, you know, to

*Lodzinski - Cross*

1    do Electro-Acuscope.  This is only machine, you know, equipment

2    what I use, Electro-Acuscope, Myopulse system.

3    Q    Okay.  Let me ask you this.

4              THE COURT:  Can I -- were you going to move for the

5    admission of E and O, Mr. Temrowski?

6              MR. TEMROWSKI:  Yes.  I'll move for the admission of

7    E and O.

8              THE COURT:  Any objections?

9              MR. HEWSON:  None, Your Honor.  Thank you.

10             THE COURT:  Okay.  E and O are received.

11   BY MR. HEWSON:

12   Q    Well, let me make sure that I have this right.  You came

13   to the United States in 1994, correct?

14   A    No.

15   Q    I'm sorry.  When did you come to the United States?

16   A    In the '90s -- '90, September 1990.

17   Q    September 1990.  And you became a citizen in 2004; is that

18   right?

19   A    Correct.

20   Q    And --

21   A    No, no, no, no, no, no.  No, it isn't.  Ninety-four was

22   the license.

23   Q    Okay.  You became licensed as a physical therapist in the

24   State of Michigan?

25   A    Yes.

*Lodzinski - Cross*

1  Q    Okay.  Now, you never returned to Poland after you got

2  your license in physical therapy here, did you?

3  A    Yeah.  I sometimes went to see my family and I went, you

4  know, in 2002 to pass the exams, to make the Ph.D. degree.

5  Q    What was the topic of your Ph.D thesis, please?

6  A    My Ph.D. was -- topic, I compared the treatment for

7  traditional treatment for the shoulder with an Acuscope.  So

8  this you can -- this certificate for the Acuscope.

9  Q    Okay.  Did you actually --

10 A    Acuscope is -- like I compare it.  You have a Cadillac.

11 In Europe, in Europe, just small cars, you know, over there.

12 Q    Hang on a second, please, if you would?

13       Did you write a thesis -- do you know what a Ph.D.

14 thesis is?

15 A    Yes.  I pass exam.  It's more difficult than the United

16 States to make a Ph.D.

17 Q    Did you get a Ph.D. in the United States?

18 A    Not.

19 Q    And as you -- you did this over the phone with Wroclaw,

20 W-r-o-c-l-a-w, University in Poland.

21 A    What?

22 Q    How did you attend classes there?

23 A    I don't need to attend classes.

24 Q    Right.

25 A    You know, I have --

*Lodzinski - Cross*

1   Q    Right.  What you did was you got a certificate for the

2   Electro-Acuscope and Myopulse from the salesman who sold it to

3   you and then you compared this to something else.

4         What else did you compare it to for your Ph.D.?

5   A    Sir, this is, you know, equipment who help people

6   comparing with a TENS unit.  This is completely different.  It

7   costs, you know, $20,000, not 300 bucks.  And it's a different

8   current.  It's a healing -- it's a healing for almost

9   everything.

10  Q    Sir, you told me on February 21st --

11  A    I hope you have --

12         THE COURT:  Okay.  Just a minute.

13         THE WITNESS:  I hope you have --

14         THE COURT:  No, hold on.

15         THE WITNESS:  Sorry.

16  BY MR. HEWSON:

17  Q    You told me on February 21st, 2012, that your only

18  training in this Acuscope from the Pacific Institute of

19  Bioenergetics was from John Jones, who sold you the first

20  instrument.  And the salesman came and taught you a couple of

21  courses on how to run this machine; was that true?

22  A    Yes, we have a couple courses.  Yes.

23  Q    Okay.  That's all the training you had on this?

24  A    Yes.  I have to training, yes.

25  Q    And you have a doctorate, according to you, from a

*Lodzinski - Cross*

1    university in Poland on the use of this machine, yes?

2    A    Yes.  We comparing this, comparing everything.

3    Q    When I asked you whether or not you had a copy of the

4    document that you had filed for a Ph.D. and whether you

5    presented it, you didn't have a copy of that, did you, your

6    Ph.D thesis?

7    A    I have here.  I have the certificate here.  Why you like

8    discriminate me that I don't have a Ph.D.  Next year, all

9    therapists, you know, must be Ph.D. in Michigan.  In 20 -- in

10   states, you know, you don't need a script for the physical

11   therapy.  And you like to said, you play golf, so you never

12   had, you know, injury --

13            THE COURT:  Wait, wait.  Just a minute.  What's the

14   question?

15            MR. HEWSON:  Your Honor, the last question was --

16            THE COURT:  And pursuant to 611, I'm a little bit

17   confused on the Ph.D. issue.  Does he have a Ph.D. or not?  Or

18   that's apparently the issue you're trying to develop under

19   credibility.

20            MR. HEWSON:  Yes, sir.  That was as far as I was

21   going to go with it, because I had asked -- and just so I'm

22   clear, you don't have any documents with you -- that support

23   that you have a Ph.D.?

24            THE WITNESS:  With me at this moment, you know, I

25   don't know that you question, you know, that I finish my

*Lodzinski - Cross*

1  school, then I can --

2          THE COURT:  So your question right now is, does he

3  have any documents with him --

4          MR. HEWSON:  Yes, sir.

5          THE WITNESS:  So --

6          THE COURT:  -- reflecting that he -- you know, when I

7  speak, everyone else stops speaking.

8          So the question before us right now is, does he have

9  any documents with him right now reflecting that he has a Ph.D.

10  in physical therapy; is that it?

11          MR. HEWSON:  That's correct, Your Honor.

12          THE COURT:  And your answer?

13          THE WITNESS:  In this moment, I don't have, but I can

14  bring tomorrow and give to the lawyer.

15          MR. HEWSON:  Okay.

16  BY MR. HEWSON:

17  Q   Are you a member of the American Physical Therapy

18  Association?

19  A   No.

20  Q   Do you recognize what the American Physical Therapy

21  Association is?

22  A   Yes.

23  Q   They set the rules of standards and ethics, are you aware

24  of that?

25  A   Yeah.

*Lodzinski - Cross*

1    Q    For physical therapists?

2    A    Yes, I know the rules.

3    Q    Whose ethics do you follow, sir?

4    A    I can tell you.  You like discriminate me, but forget

5    about doctorate, okay.

6                MR. HEWSON:  Your Honor, I'm going to move --

7                THE WITNESS:  Forget about Ph.D.  I am licensed

8    physical therapy and you have my license, yes, since '94.  And

9    I am licensed like 90 percent therapy --

10               THE COURT:  Sir, sir.  I think you've answered the

11   question.

12               MR. HEWSON:  Thank you, Your Honor.

13   BY MR. HEWSON:

14   Q    The first physical therapy prescription that came to you

15   indicated that there was a cervical, lumbar and left shoulder

16   strain; is that correct?

17   A    I will check this.  Yes, cervical sprain, lumbar sprain,

18   left shoulder sprain.

19   Q    And in your initial physical therapy evaluation on January

20   7th, 2010, you reported active ranges of motion which are AROM;

21   am I correct?

22   A    Correct.

23   Q    Active range of motion is when the patient performs the

24   maneuver and you look at how many degrees that maneuver

25   presents and then you write that down; am I correct?

*Lodzinski – Cross*

1   A    Correct.

2   Q    And the patient subjectively stops when they say they feel

3   pain; am I right about that?

4   A    Yes.

5   Q    In this case, on January the 7th, 2010, you reported that

6   there was cervical spine rotation to the left of 40 degrees?

7   A    Yes.

8   Q    Which means that Mr. Waskowski, when he first saw you,

9   could move his head to the left about that far; am I right?

10  That's about 40 degrees, right?

11  A    At first, yes.  This is 40 degree.

12  Q    Okay.

13  A    Where is my first evaluation?

14  Q    Well, here, find it.

15       MR. HEWSON:  Your Honor, I have Exhibit Seven.  Your

16  Honor, I have a copy for the Court.

17       THE COURT:  Sure.  What is it?

18       MR. HEWSON:  This is Exhibit Seven.  These are the

19  physical therapy notes from Euro Rehab, physical therapy

20  evaluations.  And I'm going to move for their admission.  I

21  believe that they were stipulated to.

22       THE COURT:  Mr. Temrowski, do you have Defendant's

23  Exhibit Seven in front of you?

24       MR. TEMROWSKI:  Do you have a copy?

25       THE COURT:  You know, the exhibits -- is there a

*Lodzinski - Cross*

1  table right in front there?  All admitted exhibits get kept on

2  the table in front of you.

3          MR. HEWSON:  Yes, sir.

4          THE COURT:  I guess --

5          MR. TEMROWSKI:  I'm not objecting to those.

6          THE COURT:  All right.  So Exhibit Seven is received.

7          MR. HEWSON:  Thank you, Your Honor.

8  BY MR. HEWSON:

9  Q    Sir, in that same document, on page two, you indicated

10 that there was right rotation of approximately 65 degrees,

11 which meant that Mr. Waskowski could look about that far to his

12 right shoulder; am I correct?

13 A    Active range of motion, cervical motion, left 40 degrees,

14 right 65 degrees.

15 Q    Okay.  Stay with me.

16 A    Oh, but --

17 Q    No, no, sir.  I asked you a specific question.

18 A    Yeah, because you said about shoulder, but this is neck.

19 Q    Sir, I'm -- I understand that.  You don't have to

20 understand my point right now.  Please just answer the

21 question.

22          "Right 65 degrees" means that Mr. Waskowski could

23 move his head about that far, correct?

24 A    More or less, yes.

25 Q    All right.

*Lodzinski - Cross*

1    A    On the beginning in the January 7th.

2    Q    Well, I know.  We're going to talk about it.

3              During the course of your treatment, he got so bad

4    that he couldn't move his head at all; isn't that true?  Is

5    that true, yes or no?

6    A    During my treatment?

7    Q    Yes, sir.

8    A    After several months, his progress with cervical spine was

9    worse.  He was more stiffness.  But what's happening now, we

10   didn't find that he has herniated disc and the progress of

11   degeneration begin.

12   Q    He had a degenerative problem, according to you?

13   A    General.  But you see, he was a young guy.  He was 48.

14   Q    Yeah, okay.  Hang on.

15   A    Okay.

16   Q    Upper extremities.  Right was within normal limits, which

17   means he could do everything with his arm that he needed to be

18   able to do, right?

19   A    What we are talking about right?  Yes, correct.

20   Q    Yeah, the left shoulder.  He was able to abduct the left

21   shoulder to 130 degrees?

22   A    Correct.

23   Q    Greater than 90.  He was able to get his arm up --

24   A    Yeah.  He was over 90, yes.

25   Q    Yeah.  And he was able to flex 150 degrees, right?

*Lodzinski - Cross*

1   A    Yes.

2   Q    He lost the ability to do that during the course of your

3   treatment, didn't he?

4   A    Yes.

5   Q    You treated him when he had this -- he had all this motion

6   in his shoulder when you first saw him.

7           By the time you got done with him he couldn't move

8   his left arm at all; am I right?

9   A    Yes.

10  Q    External rotation of 35 degrees in the left shoulder.  He

11  lost that range of motion as well, did he not?

12  A    Correct.

13  Q    Lumbosacral flexion.  The lumbosacral spine is the low

14  back, around the belt area to the top of the buttocks; am I

15  correct?

16  A    Correct.

17  Q    And when you're talking about lumbosacral flexion of 60

18  degrees, he could bend forward about this far?

19  A    A little more.

20  Q    He could do more?

21  A    Yes, like this from the beginning.  It was January '07.

22  Q    Sure.

23  A    Yes, correct.

24  Q    And he could flex his left hip 120 degrees and his right

25  hip 135?

*Lodzinski - Cross*

1  A     Yeah.

2  Q     Which meant that he could raise his legs that far, am I

3  correct, the relationship?

4  A     No.   When he was sitting, he rise over 90 degrees, you

5  know, easy.

6  Q     Over 90 degrees?

7  A     One-twenty.   Left side was lower than the right, yes.

8  Q     Easy, as of January 7th, 2010?

9  A     When we start therapy, yes.

10  Q     When you first saw him he could do all of those things,

11  yes?

12  A     Yes.

13  Q     Now, in that report, you indicate that the short-term

14  goals -- let me straighten this out -- as a physical therapist,

15  you have an obligation to set goals for an individual, correct?

16  A     Correct.

17  Q     And you set short-term goals and long-term goals for these

18  people; am I correct?

19  A     Yes.

20  Q     And what you do, as you say, he starts off, let's just

21  say, with 150 degrees of flexion and I want him to get to 180

22  degrees of flexion, right?

23  A     Yes.

24  Q     I want a 30-degree improvement, right?

25  A     Yes.

*Lodzinski - Cross*

1  Q    And that's how you're able to tell, for example, this

2  jury, that as you're doing your therapies he's getting better,

3  right?

4  A    Yes.

5  Q    And if he's not getting better, you shouldn't keep doing

6  the same thing, should you?

7  A    And that is problem.

8  Q    It is a problem.  You're not supposed to do the same

9  things if the person's not getting better?

10  A    This mean what he lacked in -- okay.

11  Q    Right?

12  A    No.

13  Q    Oh, okay.  So you're going to keep doing the same thing

14  that's making him worse; am I right?

15  A    No.

16  Q    You're going to keep doing the same thing that doesn't get

17  him better; am I right?

18  A    Yeah, yeah, I'm right.  I did everything to make him, you

19  know, to be not dependent person.

20  Q    Actually, sir, as regards to Mr. Waskowski, you told this

21  jury that you don't get paid enough by Blue Cross and you don't

22  get paid enough by Medicare, but this was a no-fault case and

23  you knew you could charge whatever you wanted, didn't you?

24  A    I only give some examples, you know, what different

25  insurance charge for and pay for.

*Lodzinski - Cross*

1    Q     And you knew --

2    A     I was paid like 90 percent for the -- from State Farm, but

3    outstanding -- but I get $7,000.

4    Q     You made more money off of Mr. Waskowski, and continued to

5    treat him for two and-a-half years, than you make off any of

6    your Medicare or any of your Blue Cross patients; isn't that

7    true?

8    A     Of course, you know this.  This is -- you know, this is

9    rules, you know.  We're paid different, you know, amount, for

10   car accident and for health insurance.

11   Q     You have an interest in keeping Mr. Waskowski coming to

12   your clinic, don't you?

13   A     No.

14   Q     No?  So when did you cut him off from treatment and tell

15   him your treatment wasn't working anymore?

16   A     He was cut first time on the end, November 11, I think.

17   But he returned -- he returned on January 12th, because, you

18   know, he start to feel worse.

19   Q     He started to feel worse?

20   A     Yes.

21   Q     You never discontinued the treatments?

22   A     Yeah, I discontinue.

23   Q     That was Dr. Glowacki?

24   A     I discontinue, but anyway, doctors -- all doctors

25   recommended to continue therapy, because he needs therapy today

*Lodzinski - Cross*

1   and all of his life, you know.

2   Q   Okay.  The short term goals that you established January

3   the 7th, 2010, decreased pain, so he improved transfer ADLs?

4   A   Yes.

5   Q   Okay.  You didn't tell us, or the jury who can't read the

6   record and find out, how you were supposed to do that or how

7   many ranges -- degrees of range of motion were supposed to be

8   improved, did you?  It doesn't say that, does it?

9   A   You concentrate now, that if I just write, you know,

10  improve range of motion five degrees?

11  Q   Uh-huh?

12  A   But it doesn't mean that he's functional status.  It's

13  repaired.  Functional status will be -- you know, he's sick

14  person.

15  Q   I understand.

16  A   Okay.

17  Q   But the question before you is this.

18  A   Okay.  I repair him 15 percent, you know, to bend the

19  lower back, but his muscles are weak --

20          MR. HEWSON:  Your Honor, I'm trying to be patient.

21          THE COURT:  Give me the question again.

22          MR. HEWSON:  All I had asked him was whether or not

23  that particular short-term goal included any degrees of range

24  of motion improvement.  That's all I asked.

25          THE COURT:  Okay.  Stay with his question.

*Lodzinski - Cross*

1            THE WITNESS:  You see, I didn't write it, but I write

2      functional status for him.  What I am more interested that he

3      formed -- you know, he improved five degrees.

4      BY MR. HEWSON:

5      Q    The second short-term goal you said was increased active

6      ranges of motion, AROM; am I correct?

7      A    Oh, yes.  This is my goal.

8      Q    All right.  That means that those active ranges of motion

9      that you established on January the 7th, the movement of the

10     neck, the movement of the arms, the movement of the shoulder,

11     the movement of the hips and the legs, you wanted to increase

12     those active ranges; am I correct?

13     A    This is my goal.

14     Q    Increased strength, that --

15     A    Yes.

16     Q    -- was your third goal?

17            And improved ambulation, which means walking, that

18     was your fourth goal; am I correct?

19     A    Yes.  Ambulation is walking.

20     Q    Now, do me a favor, and in your physical therapy progress

21     report of March 2, 2010, in the middle of it, you said,

22            "Since he was referraled (sic) to me for initial

23            evaluation and treatments with above diagnosis, he

24            made good progress."

25     Was that a true statement?

64

*Lodzinski - Cross*

1    A    Yes.  I -- he made good progress.

2    Q    Pain in the lumbar and cervical range decreased to five,

3    six, out of ten, right?

4    A    Yes.

5    Q    Muscle spasm discomfort decreased to moderate level?

6    A    Yes.

7    Q    Active range of motion increased in the cervical spine,

8    the shoulder and the lumbosacral spine to moderate functional

9    status?

10   A    Yes.

11   Q    Did you report that?

12   A    Yes.

13   Q    Was it true?

14   A    Yes.

15   Q    This is what you were telling Dr. Glowacki, he's gotten

16   better in all these areas; am I right?

17   A    When he was coming to therapy he's -- after therapy he's

18   much better.

19   Q    Strength in --

20   A    Much better and -- because the muscles was so tight.  And

21   after therapy, after this Acuscope treatment and other

22   stimulation, massage, creams, heat, his tender (sic) in the

23   muscles decrease.  So he's able to rise (sic) arm higher, you

24   know.  He's more relaxed and pain decrease, why I write this.

25   Q    That's right.  You're telling the doctor he was better.

Lodzinski - Cross

1    A    But you see, doctor -- you know, I have -- doctor has all

2    information that you see.

3    Q    Wait, wait, wait.  Am I correct in my understanding that

4    this report says that he is better in March of 2010?

5    A    Oh, yes.

6    Q    And that his ADLs, his activities of daily living, --

7    A    Correct.

8    Q    -- his capacity increased to moderate difficulty.  He was

9    better and could take -- do more things around the house, yes?

10   A    But it was beginning of treatment.  Yes.

11   Q    But you said he needs more treatment and the doctor signed

12   off, right?

13   A    Yes.

14   Q    Look at your report of April 6, 2010.

15   A    Uh-huh.

16   Q    Page two,

17            "Since he was referraled (sic) to me for initial

18            evaluation, he made good progress with PT."

19   A    Yes.

20   Q    Then,

21            "The pain in his neck, back and shoulders

22            decreased.  The muscle spasm and the discomfort

23            decreased.  The active range of motion in his

24            neck, shoulder and lumbosacral spine increased to

25            moderate level."

*Lodzinski - Cross*

1              How much active range of motion did Mr. Waskowski

2    have in his left shoulder on April 6, 2010?

3    A    How much in his degrees?

4    Q    How much?

5    A    How much?  You like degrees only.  You don't like to know

6    that he rise and touch, you know, toes or clean his back, you

7    know?  You have nothing to really think about this.  You like

8    correct degrees.  Sometimes, you know, he can rise arms, but

9    he's unable to lift nothing in his house, because his strength

10   is so -- he is weak person, so --

11   Q    What I'm asking you right now is --

12   A    Okay.  You don't have degrees exactly, but he -- the pains

13   decrease, but his functional status, transfer, dressing,

14   bathing, chores are related to pain level.

15              And when I decreased this pain after therapy, he feel

16   much better.  But next day you see everything back to normal,

17   you know.  He was stiff and he has still similar problem.

18   Q    Then he hasn't reached his goals?

19   A    He's not reaching, no.

20   Q    Okay.

21   A    He reached his short-term goals slightly to -- a bit

22   later, but --

23   Q    Well, wait.  But you said in this report that he reached

24   his goals, he reached his short-term goals.

25   A    Short-term.

*Lodzinski - Cross*

1    Q    Well, did he reach his short-term goals or not?

2    A    He reached his short-term goals, yeah.

3    Q    So he's got more range of motion in his shoulder?

4    A    That is not 180 degrees.  He's only, you know, the same

5    level, moderate level.

6    Q    Okay.  So he should still be at 150 degrees?

7    A    Yeah, but this is -- you know, long-term goals.

8    Short-term is a little --

9    Q    So he should still be at 135 degrees of abduction?

10   A    Yeah.

11   Q    Maybe a little better, maybe 140, right?

12   A    Why -- maybe for you can be what -- you don't believe me

13   nothing, you know.  He -- this gentleman, you forget one thing.

14   He has stiff neck and we -- you forget about this.  Thirty

15   degrees this, 40 degrees this side and he was unable to lay on

16   side on the bed.

17          We need a special bed for him to treat with a hole

18   for the head or if he was unable to lay more than half an hour

19   in the bed, I transfer him to the chair, special chair, you

20   know, like you see in the airport, when he's -- you know, when

21   we do treatment when he's not laying on the stomach, you know,

22   so --

23   Q    Take a look at your report of July 5, 2011.  We're now

24   going to jump forward to the last of the records I have.

25   A    Which date?

*Lodzinski - Cross*

1    Q    July 5, 2011.

2    A    July 5, 2011.  Oh, yes.

3    Q    So now we're about 18 months post your first visit, right,

4    July of 2011, from January of 2010, about 18 months.  Do you

5    agree?

6              In your progress note to Dr. Glowacki, and apparently

7    to State Farm, you say,

8              "Mr. Waskowski has been treated in our facility

9              for his neck, shoulder and back problem.  He has

10             gained improvement with physical therapy

11             treatments.  He has reached his short-term and

12             some of his long-term goals."

13   Was that a true statement?

14   A    Yes.

15   Q    It was.  Which of his long-term goals did he reach?

16   A    His ambulation was better.

17   Q    He could walk?

18   A    He can walk.  He had not been using wheelchair now.

19   Q    Okay.  Did he ever use a wheelchair?

20   A    But with --

21   Q    Did he ever use a wheelchair, sir; yes or no?

22   A    He's not using wheelchair, but my goal is to prevent him

23   to don't use the wheelchair, yes?

24   Q    Did he ever use a cane?

25   A    He was using sometimes cane.

*Lodzinski - Cross*

1    Q    Was he ever using a walker?

2    A    No.

3    Q    What other long-term goals did he improve in?

4    A    Okay.  Long-term goals.  We start from the beginning,

5    first evaluation.  Long-term goals.  Decrease pain so he can

6    walk more steady and safe.  Increase strength to improve stairs

7    climbing, increase range of motion, ADLs, dressing, bathing,

8    household duty.  Restore the patient functional activity.

9    Educate the problem with a home exercise program.  Increase

10   tolerance for sitting, standing and driving.

11   Q    Which of those goals do you think, as of July of 2011, he

12   actually accomplished?

13   A    All his functional status was related to pain level.  When

14   the pain level, you know, aggravated, he was unable to do

15   nothing.

16   Q    So when you say it's related to the pain level, he would

17   say, "I can't do that because I hurt," and that would be the

18   only way of knowing that, right?

19   A    For my knowledge, he is on Vicodin all the time, so, you

20   know, I don't know what kind -- more drugs that he's using for

21   decrease the pain.

22   Q    He was mechanically able to do the exercises, he was

23   mechanically able to do those things that you wanted him to do;

24   is that not correct?

25   A    As well -- very little.

*Lodzinski - Cross*

1    Q    Very little?

2    A    Very little.

3    Q    He couldn't hardly do the physical therapy?

4    A    I know he can't do physical therapy, but exercise was

5    done.  With some you can.  You see, you just write only

6    functional and status, but you know, on this progress report

7    from 7/05/11.

8              Subject -- patient came to me and said,

9              "The patient states today, basically no new

10             complaints, you know, from the past.  Still the

11             same problem, discomfort, pain, muscle spasm,

12             cervical-lumbar area in left shoulder is still

13             present.  He state since the accident he's not the

14             same person.  He has a headache, he has stiff

15             back, stiff neck.  He reports sleeping

16             disturbance.  And patient complain numbness and

17             tingling sensation in arm.  She was unable to hold

18             his left arm -- the -- he's unable to make a

19             fist."

20   Q    That was the first time that that showed up, in all of

21   your records?

22   A    No first time.  During this, you know, you have reports

23   all the time in the function.  Chief complaints -- you must

24   remember you just read only my briefly progress report that I

25   found out that he made some progress.

*Lodzinski – Cross*

1           But on the end of the year, when we start therapy,

2   something happen that the patient, you know, went back to the

3   situation from the beginning or maybe worse than beginning --

4   Q    So what happened?

5   A    What's happened?

6   Q    What happened?

7   A    What's happened, herniated disc was found on MRI, yes?

8   Q    Those were herniated at the end of the year?

9   A    If you say, but I don't remember now the dates, you know,

10  when he had this.

11  Q    All right.  Then fine.

12  A    But it's mean it happened.  This herniated disc is coming

13  because he had the MRI?  No.  He has this injury on the

14  December -- and from this time started degeneration of his

15  nerves and connection to the muscles, you know.

16  Q    Then there was nothing you could --

17  A    He was weaker, weaker, weaker.

18  Q    Sir, you --

19  A    And my goal was to prevent --

20          MR. HEWSON:  Your Honor, please?  This is not

21  responsive to any question.

22          THE COURT:  Okay.  We've got to keep it question,

23  answer, question, answer.

24          THE WITNESS:  Okay.

25          MR. HEWSON:  Thank you.

*Lodzinski - Cross*

1    BY MR. HEWSON:

2    Q    He's getting worse while you're treating him, right?  Is

3    he getting worse while you're treating him, sir, yes or no?

4    A    The -- his healing present was tough, you know.  He was

5    like little -- this may be -- he's not worse, but how I say?  I

6    prevent him to don't lose anymore strength because the

7    situation when you have this problems, you know.

8    Q    So when you say that he has made good progress moving

9    forward with the physical therapy and that he has improved in

10   these reports, that is not true, is it?  It's not true, is it,

11   yes or no?

12   A    He made -- he made progress with some --

13   Q    Yes, sir.  Finish, please.

14   A    -- range of motion, some strength, but he don't lose, you

15   know.  It means he's not a -- dependent, he's not in a

16   wheelchair now.

17   Q    That's not what you said in the -- it's not what you said

18   in any of your reports.

19   A    No, I didn't write it, but the goal was like that.

20   Q    But you didn't say that in any of your reports, he's

21   holding his own.  You reported that he was progressing every

22   single time, didn't you?

23   A    After treatment, he was progressive all the time.

24   Q    Thanks.

25        MR. HEWSON:  Your Honor, I have nothing further of

*Lodzinski - Redirect*

1    this witness.  Thank you very much.

2              THE COURT:  Redirect?

3              MR. TEMROWSKI:  Very briefly.

4                    **REDIRECT EXAMINATION**

5    BY MR. TEMROWSKI:

6    Q    I just want to make sure we're clear on one thing.

7              Do you or don't you have a Ph.D. degree?

8    A    Yes.

9    Q    Okay.  From where?

10   A    In Poland, in Wroclaw, in 202 (sic).

11   Q    Okay.  And when Mr. Hewson was showing you a certificate

12   that was about some machine, could you just explain what that

13   is for?

14   A    This certificate is for the equipment calling

15   Electro-Acuscope Myopulse system.  This is more sophisticated

16   equipment and you can use like -- you know, somebody send you

17   and you can use because you know physical therapy or something,

18   no.

19             You need some special -- no, he basically teach us

20   how is this, because you are working with a trigger points.

21   Somebody who is familiar with the trigger point, you stimulate

22   the trigger points and use different currents, different

23   frequency and different -- you know, how it's working.

24             It's different when the -- is different when you

25   treat the patient with problems, for instance, with

*Lodzinski – Redirect*

1    circulation, so you use lower intensity, lower frequency and

2    different -- if you use the muscles and nerves, you use higher

3    and longer.

4         And if you use this Electro-Acuscope, so you can find

5    really on the -- and you see in the computer that it's really

6    healing process.  It's not the same like you have a TENS unit,

7    so somebody can sell and you can keep this in home and put some

8    electrodes on.  Because you must know where to put the

9    electrodes, exactly, you know which point.  You can put in

10   motor points, you can put acupuncture points and you can put in

11   trigger points.

12        And if you like to receive the goal, you see like he

13   has a problem with the shoulder, rotator cuff here, if somebody

14   has rotator cuff here, then he knows, you know, that this is a

15   lot of problems, you know, and the long time for the six

16   months' minimum rehab here.  And you never go back to --

17        THE COURT:  I kind of think he's outside the scope of

18   your question, or correct me if I'm wrong.

19        MR. TEMROWSKI:  Okay.  No, no.

20   BY MR. TEMROWSKI:

21   Q    And, Doctor, that certificate that -- you're right.

22   A    Yeah.

23        THE COURT:  Go ahead.

24   BY MR. TEMROWSKI:

25   Q    That certificate that Mr. Hewson -- that's not your Ph.D.

75

*Lodzinski - Redirect*

1   there?

2   A     No.  This is certificate, you know, when the gentleman

3   coming and then he passes several courses for this, working

4   with this Acuscope, you know.

5   Q     And you indicated that you don't have your Ph.D. degree

6   here with you today.  Where is it?

7   A     Where is it?  Some is in my library and my -- some, you

8   know, is in my wallet, you know, the pictures, you know, that I

9   pass the exam and the --

10  Q     And lastly, these progress reports and these written

11  evaluations that we've been talking about here today that

12  you've got your file with you, that you indicated that you

13  would send to the doctors and to State Farm; is that right, the

14  progress --

15  A     I sent to the doctors, you know, are the ones, you know, I

16  make the reports, you know, for requests that I think Mr.

17  Waskowski -- so I sent this to -- actually the status on the

18  December 2010, how he's feeling, what is going on.

19  Q     And in those, they said that he was making progress?

20  A     Because he's making progress.  You know, for some, it's

21  not everything that he make progress like he's ready to go back

22  to work, you know, but he's -- still you see some progress with

23  the -- you know, without physical therapist, you know, he was

24  -- he will be unable to walk, unable to stand up.  And it's so

25  -- I still mean that he make progress.  But his situation, one

*Lodzinski - Redirect*

1    day, he feels better, one worse.

2              And we see when doctor, for my knowledge, when the

3    situation was that it's not really better for doctors, you

4    know, when he reads my reports and find out for his doctor's

5    evaluation, he send him for MRI, one MRI, second MRI, third

6    MRI, --

7              MR. HEWSON:  Your Honor, can I object to the

8    narrative, please?

9              THE WITNESS:  -- test for neurologist, test for

10   others.

11             THE COURT:  Mr. Temrowski --

12             MR. HEWSON:  And I think we're outside the scope of

13   cross-examination.

14             THE WITNESS:  And you find out finally --

15             THE COURT:  Just a minute.

16             THE WITNESS:  You find out --

17             THE COURT:  Sir, sir.

18             THE WITNESS:  Yes?

19             THE COURT:  Hold it a minute.

20             THE WITNESS:  Okay.

21   BY MR. TEMROWSKI:

22   Q    And, Doctor, last question.  You indicated that when Mr.

23   Waskowski came for therapy you used for him a special chair and

24   a table with a hole on it?

25   A    Yes.

*Lodzinski - Redirect*

1    Q    Why was that?

2    A    His situation here, when he came to the clinic, and he was

3    unable to move his head, he's unable to lay flat on this table

4    with the head bent like 90 degrees, so you need a special chair

5    -- a special, you know, chair -- a massage chair where there's

6    a hole for the head.

7            So in this -- in this bed he can spend half an hour

8    sometimes, 45 minutes.  But when he's tired, I remove his from

9    the bed and he's sitting on the chair when his arm laying, you

10   know, in front of him.  He has a -- like support from the head.

11   You can sit in special chair, like a -- so -- in a special

12   massage or in airports, you see, because somebody does the

13   relaxation massage.

14           MR. TEMROWSKI:  Doctor, thank you.  I have no other

15   questions.

16           THE COURT:  Redirect?

17           MR. HEWSON:  No, Your Honor.  Thank you very much.

18           THE COURT:  Sir, thank you very much.  You may step

19   down.

20           THE WITNESS:  Thank you.

21           THE COURT:  Before you do so, members of the jury,

22   we're going to give you your morning break right now, okay?

23   And it'll be about 20 minutes, so we'll probably be calling you

24   back out at 11:00.

25           DEPUTY COURT CLERK:  All rise.

*Lodzinski – Redirect*

1          (Jury out at 10:40 a.m.)

2          DEPUTY COURT CLERK:  Please be seated.

3          THE COURT:  Okay.

4          MR. HEWSON:  Your Honor, if the next witness is from

5    Oakland Physical Therapy, can we take that up before the jury

6    comes back in -- or Oakland MRI?

7          THE COURT:  Well, motions in limine I do before we

8    start the trial in the morning.  I would actually prefer to

9    have it done before the trial starts, but obviously it wasn't

10   the case with these last two motions.  So I was planning on

11   doing it sometime between one and two.

12         MR. HEWSON:  I think if Oakland MRI comes in, then

13   I'll just make the foundational objection, Your Honor.  That's

14   the next one.

15         THE COURT:  Were you going to bring in --

16         MR. TEMROWSKI:  Yes.  I have the biller for Oakland

17   MRI present.

18         THE COURT:  So that's your next witness?

19         MR. TEMROWSKI:  Yes.

20         THE COURT:  Okay.  All right.  I guess I've got to

21   deal with these two motions, which I didn't want to do right

22   now, because I have other issues to deal with, but I will deal

23   with them.

24         Give me a minute.

25         MR. HEWSON:  Yes, sir.

79

*Waskowski v. State Farm*

1          (Court in recess at 10:42 a.m.)

2          (Court in session at 10:44 p.m.)

3          THE COURT:  All right.  Dr. Stephan Glowacki?

4          MR. HEWSON:  Yes, Your Honor.  I can briefly address

5     it if I may?

6          Dr. Glowacki never gave his opinion to a reasonable

7     degree of medical certainty as to any of the diagnoses.  He

8     also indicated in response to my brother counsel's question of

9     what Mr. Waskowski's problems were, he said it was

10    post-traumatic stress disorder.

11         THE COURT:  Just hold it a second, hold a second.

12         MR. HEWSON:  I'm sorry.

13         THE COURT:  All right.  You filed an emergency motion

14    on November 26th to allow me to allow you to file, as I

15    understood, a late motion in limine.

16         And if you look at your motion, we dealt with -- the

17    whole motion dealt with the attendant care issue, the documents

18    issue, the late document issue.  And we had a subsequent

19    conference call, okay?

20         MR. HEWSON:  Yes, sir.

21         THE COURT:  And there's one little paragraph,

22    paragraph six, that talks about -- paragraph six just mentions

23    -- the bulk of it deals with the attendant care issue, the

24    documents issue and the itemized damage issue.  Paragraph six,

25    you know -- now the transcript of the testimony of the

*Waskowski v. State Farm*

 1  plaintiff's sole medical expert was received on November 20,

 2  2012.  The expert list is finalized, along with the proposed

 3  joint -- the issues in this case need to be resolved by a

 4  motion prior to appealing the -- a jury.  I didn't certainly

 5  see in there where you -- one of the motions you were going to

 6  do was to challenge Dr. Glowacki.

 7          Then later on that day, I get --

 8          MR. HEWSON:  I apologize if I made it confusing, Your

 9  Honor.

10          THE COURT:  Just let me finish.

11          MR. HEWSON:  Sure.

12          THE COURT:  I've got the floor.

13          A 16-page motion to strike Glowacki, and then I get

14  attached his, I believe 122-page transcript --

15          MR. HEWSON:  I believe that's what it was, Judge.

16          THE COURT:  -- from you.

17          And then I've listened to you speak right now and it

18  seems you're challenging the testimony, at least in the start

19  of your oral argument, that certain testimony was not given

20  within a reasonable degree of medical certainty.  Is that

21  right?

22          MR. HEWSON:  Yes, sir.

23          THE COURT:  Do you realize that that challenge is not

24  in the emergency motion and is basically a line in this 17-page

25  or 18-page brief?

*Waskowski v. State Farm*

1      MR. HEWSON:  Your Honor, I think that if I

2  misunderstood the order granting the late motions, I apologize.

3  What I was going to say, certainly that's only one part of it.

4  There's a variety of other reasons that I stated to strike Dr.

5  Glowacki's deposition.  Obviously, I can --

6      THE COURT:  And you don't even challenge -- you don't

7  even use the term, unless I'm wrong, and you've jammed me

8  filing this stuff late, and I'm doing the best I can do, going

9  through all these pages, these motions that you have filed,

10  quote, unquote, on an emergency basis, which quite frankly, are

11  borderline frivolous, in bringing up the argument of -- now,

12  these terms, "beyond a reasonable degree of medical certainty."

13      But I don't see you having that -- using that exact

14  challenge in your motion and brief, which I read very

15  carefully.  You used the term, "within a reasonable degree of

16  scientific certainty," if I recall correctly.

17      MR. HEWSON:  Your Honor, there was -- I can obviate

18  this problem.

19      THE COURT:  No, stay with me.  This is the challenge

20  that you made.

21      MR. HEWSON:  Yes, sir.

22      THE COURT:  The standard is not within a reasonable

23  degree of scientific certainty.  Let me go find it here.

24      MR. HEWSON:  What we were relying on when we made

25  that allegation --

*Waskowski v. State Farm*

1          THE COURT:  Okay.  Just let me --

2          MR. HEWSON:  I'm sorry.

3          THE COURT:  Yes, page 14 of your brief.  Doctor --

4   again, this is such a small portion and now you're bringing it

5   up in argument,

6               "In this manner, Dr. Glowacki's testimony falls

7               woefully short of the requisite standard as set

8               forth above, as evidenced by the transcript of his

9               de bene esse deposition testimony.  Dr. Glowacki

10              never rendered any conclusion that he may have

11              reached within a reasonable degree of scientific

12              certainty."

13  That's not the standard, is it?

14          MR. HEWSON:  I believe the reason that we postured it

15  in that fashion is because of the wording of the federal rules.

16  That's all.

17          When we were talking about him giving his opinion, I

18  assumed that the word "scientific" encompasses the word

19  "medical" under F.R.E. 40102 and 702.

20          THE COURT:  I know.  That's what type of case you

21  have.

22          MR. HEWSON:  Well --

23          THE COURT:  And isn't the issue whether or not the

24  tests he ordered and treatment he provided were reasonably

25  necessary and related to the accident that occurred on December

*Waskowski v. State Farm*

1    23rd?

2                MR. HEWSON:  Yes, sir.

3                THE COURT:  Okay.  Well, doesn't he discuss that in

4    the transcript, at --

5                MR. HEWSON:  No, I understand the Court's point.

6                THE COURT:  -- least in the 188 pages that you asked

7    me to review, which I did?

8                MR. HEWSON:  I understand the Court's point.  I can

9    make the argument from that, Your Honor.  I didn't mean to

10   inconvenience the Court.  I'll withdraw the motion.

11               THE COURT:  Well, you can --

12               MR. HEWSON:  No, no.  I mean, I'm just saying to the

13   Court, I -- the concern that I had with this and with the other

14   motion was very simply that --

15               THE COURT:  Hey, if I missed something from in your

16   motion and my emergency review of this 188-page transcript,

17   which is his deposition transcript, when we get done with his

18   playing the videotape, you can renew the motions.

19               MR. HEWSON:  Yes, sir.

20               THE COURT:  And maybe I missed something.  But I

21   thought I saw -- I thought I saw a foundation laid by -- in the

22   course of the transcript.  It may not have been textbook, but I

23   thought it was there.

24               MR. HEWSON:  Yes, sir.

25               THE COURT:  So, Mr. Temrowski, you're winning so you

*Waskowski v. State Farm*

1    don't need to respond unless you feel compelled to.

2          So I'm going to deny that motion without prejudice

3    and I'm going to move on to the second motion you filed.

4          I just thought it was premature.  I mean, the proofs

5    may go in, they may not go in, but we -- before we even hear

6    from an opening statement, to make this -- to file this type of

7    motion, it's more, I thought akin to some sort of motion for

8    directed verdict.  I did not, quite frankly, understand,

9    because we haven't had -- Mr. Temrowski hasn't had a chance to

10   present his proofs.

11         MR. HEWSON:  And I understand, Your Honor.  The only

12   reason that that motion was brought was because when we finally

13   concluded the final pretrial order on the 21st and I knew who

14   Mr. Temrowski was going to be calling as a witness because of

15   the witness list, I knew that there would be no doctor who

16   would be testifying as to the foundation for the Oakland MRI

17   bill.  That's the only reason and I --

18         THE COURT:  Well, we've got to wait and see.

19         MR. HEWSON:  Yes, sir.  Thank you.

20         THE COURT:  I mean, I -- I don't know.  I think it's

21   premature, so I'll deny it without prejudice.

22         MR. HEWSON:  Thank you, Your Honor.

23         THE COURT:  Okay.

24         MR. HEWSON:  Thank you for your time.

25         THE COURT:  I mean, I appreciate the red flag or

*Waskowski v. State Farm*

1   whatever, but I didn't think, quite frankly, that these -- you

2   had an issue on Monday with all these documents regarding

3   attendant care being thrown at you, but that issue was resolved

4   in the last couple days.  I just didn't see why I was called

5   upon to deal with these very voluminous emergency motions.

6           MR. HEWSON:  And I apologize, Your Honor.

7           THE COURT:  I mean, that's just my thought, but

8   anyway -- okay?

9           MR. HEWSON:  Yes, sir.

10          MR. TEMROWSKI:  Thank you, Judge.

11          MR. HEWSON:  Thank you.

12          THE COURT:  And so actually we've kind of been

13  working on this.  We worked on it late last night and we kind

14  of worked on it early this morning, so I'm actually going to be

15  able to give you a very short written opinion and order on

16  these two motions, okay.

17          MR. HEWSON:  Thank you.  Very good.

18          (Court in recess at 10:56 a.m.)

19          (Court in session at 11:15 a.m.)

20          DEPUTY COURT CLERK:  Please be seated.

21          THE COURT:  Are we ready to proceed?

22          MR. TEMROWSKI:  Yes, Your Honor.

23          MR. HEWSON:  Yes, Your Honor.

24          (Jury in at 11:18 a.m.)

25          THE COURT:  Did everyone have a good break?

*Waskowski v. State Farm*

1          THE JURY:  Yes.

2          THE COURT:  I saw some of you were raiding the snack

3  shop downstairs.

4          Mr. Temrowski, your next witness, please?

5          MR. TEMROWSKI:  Plaintiff's next witness is Victoria

6  Gill.

7          THE COURT:  Could you come up and give us your full

8  name?

9          THE WITNESS:  Victoria Ann Gill.

10          **VICTORIA ANN GILL, PLAINTIFF'S WITNESS, SWORN**

11                     **DIRECT EXAMINATION**

12  BY MR. TEMROWSKI:

13  Q    MS. Gill, good morning.

14  A    Good morning.

15  Q    Would you please tell the ladies and gentlemen of the jury

16  your name and where you are employed at?

17  A    I'm Victoria Ann Gill and I work at Oakland MRI in the

18  capacity of general manager.

19  Q    And as the general manager for Oakland MRI, what do those

20  duties and job responsibilities consist of?

21  A    I have a team that I work with.  We schedule patients, and

22  we get scripts from doctors and we do diagnostic testing.

23  Q    And you have brought with you here today what?

24  A    I have with me Mr. Jaroslaw Waskowski's, excuse me if I'm

25  not pronouncing that correctly, his file that we performed on

*Gill – Direct*

1    March 24th of 2011.

2    Q    And could you please tell the ladies and gentlemen of the

3    jury what is contained within that file?

4    A    Certainly.  On that date we performed a brain MRI.

5              MR. HEWSON:  Your Honor, I'm going to have to object.

6    I don't know that the witness can testify to that.  The

7    fundamental objection though, is these documents are not on the

8    exhibit list.  The only exhibit that is listed or was exchanged

9    is Exhibit P of the plaintiff's presentation, the outstanding

10   bill for Oakland MRI.  The contents of that file is therefore

11   not relevant.

12             THE COURT:  Okay.  Just give me a second.

13             MR. HEWSON:  Yes, sir.

14             THE COURT:  I assume she is the custodian of records

15   for Oakland MRI?

16             MR. TEMROWSKI:  Yes.

17             THE COURT:  Is that where we are going?

18   BY MR. TEMROWSKI:

19   Q    Ma'am, you are the custodian of records for Oakland MRI?

20   A    We keep patient files at our facility.

21             THE COURT:  Okay.  And she's the general manager of

22   the facility?

23             MR. TEMROWSKI:  Yes.

24             THE COURT:  Okay.  Your objection, Mr. Hewson, is

25   what?

*Gill – Direct*

1    MR. HEWSON:  My objection is, Your Honor, I have not

2    seen those documents in the exhibit which is listed as Exhibit

3    P.

4    THE COURT:  Well, if look at Joint Four, which is the

5    Oakland MRI report, I assume that's in the records.

6    MR. HEWSON:  Yes, sir, the Oakland MRI report, I have

7    no objection to that.  And the Plaintiff's Exhibit P is the

8    outstanding bill.

9    What I understood the testimony to entail was that

10   this lady was going to tell us what is in that file, and I have

11   not seen those documents and they have not been presented as

12   exhibits.  They are not on the final pretrial order and they

13   are not on the exhibit list.

14   MR. TEMROWSKI:  Which is fine.  They're --

15   THE COURT:  You know what?  Why don't we --

16   MR. TEMROWSKI:  Well, Your Honor, she is the records

17   custodian and the general manager.

18   THE COURT:  I think it's probably not going to be a

19   big deal.  Where are the records?  They are probably not very

20   extensive?

21   MR. TEMROWSKI:  Not extensive at all.

22   THE COURT:  Okay.  Take a moment and show them to

23   Mr. Hewson.

24   MR. TEMROWSKI:  Absolutely.

25   (Pause in proceedings)

*Gill – Direct*

1        MR. HEWSON:  I'm sorry, Your Honor.  I am going as

2   quick as I can.

3        THE COURT:  That's all right.

4        (Pause in proceedings)

5        THE COURT:  Okay, let's proceed.

6   BY MR. TEMROWSKI:

7   Q    Could you please tell us what's in the file?

8   A    Yes.  On March 24th of 2011, we saw Mr. Waskowski for a

9   brain MRI, a cervical spine MRI, a lumbar spine.  We also did a

10  shoulder MRI.  And we did a cervical and lumbar myelography,

11  which comes with x-rays for that procedure.

12  Q    Now, you're the general manager for Oakland MRI?

13  A    That's correct.

14  Q    And would any of these MRIs have been performed without a

15  prescription?

16  A    No.

17  Q    Is there a prescription in there?

18  A    There is.

19  Q    From who?

20  A    Dr. Zamorano.

21        MR. HEWSON:  I'm going to object.  There's no

22  foundation for that, Your Honor.  Actually, the document I just

23  looked at is not signed by --

24        THE COURT:  Okay.  She's testifying that there is.

25  You will have the opportunity to cross-examine her.

*Gill - Direct*

1         MR. HEWSON:  Thank you.

2    BY MR. TEMROWSKI:

3    Q    And, Ms. Gill, could you look through your files and

4    identify the prescription?

5              THE COURT:  It's Dr. who?

6              MR. TEMROWSKI:  Zamorano, Z-a-m-o-r-a-n-o.

7              THE WITNESS:  Correct.  Dr. Zamorano has scripts of

8    ours.  She refers several patients to us.  And so what I'm

9    looking at currently is a prescription for these MRIs on our

10   pads that we give out to doctors that refer us.  And at the top

11   here is referring doctor's name, Zamorano, from 3-24 of 11.

12   BY MR. TEMROWSKI:

13   Q    And were in fact these MRIs that you've talked about

14   performed on Mr. Waskowski?

15   A    They were.

16   Q    And did Mr. Waskowski incur a bill at your facility as a

17   result of these tests being performed on him?

18   A    Yes, we did submit a bill.

19   Q    I had marked as Plaintiff's Exhibit P a document that I'm

20   going to hand you, and ask if you could just look at that and

21   tell the jury what that is.

22   A    This would be -- we have a billing company that does our

23   billing for us and this would be what came from our billing

24   company.

25   Q    What is the total bill that Mr. Waskowski has at your

*Gill – Direct*

1   facility for these tests?

2   A    We have a summary of $29,240.

3   Q    And that's itemized and broken down on this exhibit P?

4   A    That would be correct.

5   Q    Contained within your files, is there also a lien letter

6   that Mr. Waskowski signed?

7   A    We do have our patients sign liens when they have auto or

8   work comp cases.  And in this case, we did have him sign one as

9   well.

10   Q    And could you just please tell us what is a lien letter?

11   A    It -- we have a patient sign it when the bills are going

12   to possibly be paid by the insurance companies, showing that in

13   good faith that they are going to get these MRIs, but will pay

14   us once that their case settles.

15   Q    Ms. Gill, the bill that we just talked about, the $29,000

16   bill, was this bill submitted for payment from your office to

17   State Farm?

18   A    It was submitted from our billing company.

19   Q    Okay.  And who, could you tell us, was it sent to?

20   A    I don't have it in this file.  But it would have been sent

21   to the insurance company that we had on our record, which would

22   have been -- I'm sorry, just to make sure that it is State

23   Farm.

24   Q    And it wasn't paid, I take it?

25   A    Correct.

*Gill – Direct*

1    Q     Now, lastly, in your file you also have correspondence

2    from the claims adjuster at State Farm to Oakland MRI, don't

3    you?

4    A     We do.

5    Q     Would you tell the jury what that is?

6    A     They had asked us to submit bills for the patient in the

7    form of a CD, which would have had his images on it, and also

8    written reports.

9            We have a rate that we always charge to get those

10   reports, and they basically are $50 per CD and a dollar per

11   copy on the reports.

12           We got a letter back stating that we were asking too

13   much for those reports and that they would be -- they wanted us

14   to show a reason of why we were reasonably charging that

15   amount.

16   Q     So they didn't want to pay you the $50?

17   A     That's correct.

18   Q     And they wrote you a letter?

19   A     Yes.

20   Q     And that's in your file?

21   A     Uh-huh.

22           MR. HEWSON:  Your Honor, I'm going to object.  He's

23   leading the witness and reiterating what she already testified

24   to.

25   BY MR. TEMROWSKI:

                                                                        93

*Gill – Direct*

1  Q    And could you tell the ladies and gentlemen of the jury

2  how did that issue resolve with State Farm?

3  A    With the records?

4  Q    For the CD that they wanted.  You wanted $50?

5  A    Uh-huh.  They sent us -- we had two CDs that we wanted to

6  send with complete images.  They ended up sending us $25 for

7  one CD.

8  Q    Thank you.

9          THE COURT:  I think it's a good idea -- I don't know

10  when you plan to admit -- are you planning to admit Exhibit P?

11          MR. TEMROWSKI:  I move to admit Exhibit P, yes.

12          THE COURT:  Any objection?

13          MR. HEWSON:  Subject to discussions we've had, Your

14  Honor, I have no objection to --

15          THE COURT:  Well, I think it's just the bill.

16          MR. HEWSON:  Just the bill?  I have no objection as

17  to authenticity.  Thank you.

18          THE COURT:  Exhibit P is received -- P, like in Paul.

19          MR. HEWSON:  May I proceed?

20          THE COURT:  Sure.

21          MR. HEWSON:  Thank you very much.

22                      **CROSS-EXAMINATION**

23  BY MR. HEWSON:

24  Q    Ms. Gill, you didn't send the bill to Start Farm yourself?

25  A    I did not.

*Gill - Cross*

1    Q    Who is the billing company, please?

2    A    SRS.

3    Q    Did you say that a cervical and lumbar myelography were

4    performed?

5    A    It is a lumbar and cervical myelography.

6    Q    Do you have a report in that file regarding that?

7    A    It is part of the MRI.  I just read through it in the

8    hallway and it is part of the reports that are in this file.

9         MR. HEWSON:  Well, I think we have a joint exhibit.

10   BY MR. HEWSON:

11   Q    Is that part of the charges?

12   A    It is.

13        MR. HEWSON:  Your Honor, this is Joint Exhibit Four.

14   May I approach the witness?

15        THE COURT:  Sure.

16        MR. HEWSON:  Thank you.

17   BY MR. HEWSON:

18   Q    This is the only exhibit I have.

19   A    Okay.

20   Q    It is the only one that we were presented with.

21   A    Okay.  So this is the cervical spine here that I have in

22   front of me.  If you read down on this exhibit, you will see

23   "myelography demonstrates."  And you have -- this would be the

24   MRI of the cervical spine.  And I believe what you have in

25   front of you is just of the lumbar.

*Gill - Cross*

1   Q     Thank you.

2   A     I'm sorry.  Can I see that for a moment?

3   Q     Sure.  Because there's no lumbar myelography?

4   A     Here you go.

5   Q     I thought this was without contrast.  You don't know what

6   that means though, do you?

7   A     I do.  I do know what contrast is.

8   Q     This is without contrast that I have that's Exhibit Four.

9   Is that what yours says on it?

10  A     Yes, that's correct.

11  Q     Dr. Zamorano did not sign those prescriptions, correct, or

12  do you know?

13  A     It looks to me that this script is written by one person.

14  Now, whether that is her signature, I cannot attest to.

15  Q     So you don't know that.  As a matter of fact, if I looked

16  on there, it looked like somebody named Van Gytson (phon.)?

17  A     Oh, that is her PA.

18  Q     You know that of your personal knowledge?

19  A     Yes.

20  Q     But Dr. Zamorano didn't sign that?

21  A     I can't say whether she signed it or not.  I was not

22  there.

23  Q     Fair enough.  And you can't identify who actually signed

24  it, other than trying to read the name, correct?

25              THE COURT:  We're referring to what?

*Gill - Redirect*

1          MR. HEWSON:  The prescription that Mr. Temrowski

2   referred to in the file, Judge.  He asked if there was a

3   prescription.  This witness testified that it was Dr.

4   Zamorano's prescription.  In fact, we don't know that is the

5   point of my question.

6          THE COURT:  Okay.  The prescription for the MRI,

7   right?

8          MR. HEWSON:  Yes, sir.

9          THE COURT:  Okay.

10          MR. HEWSON:  Very good.  Thank you.

11          THE COURT:  Go ahead.

12          MR. HEWSON:  I have nothing else.

13                    **REDIRECT EXAMINATION**

14   BY MR. TEMROWSKI:

15   Q    Ms. Gill, regarding that prescription, you've testified

16   that your facility works with Dr. Zamorano?

17   A    That's correct.

18   Q    On other cases, correct?

19   A    Yes.

20   Q    Would Oakland MRI have done all of this testing without a

21   valid prescription from Dr. Zamorano?

22          MR. HEWSON:  Objection, foundation.  The witness

23   can't identify the signature on the prescription.

24          THE COURT:  She can tell us what the custom and

25   practice is at her facility.

*Gill – Redirect*

1        MR. HEWSON:  Thank you.

2        THE WITNESS:  Never.

3   BY MR. TEMROWSKI:

4   Q    You never would have?

5   A    No.

6   Q    Thank you.

7        MR. TEMROWSKI:  Nothing else.

8        MR. HEWSON:  I have nothing else.  Thank you, Your

9   Honor.

10       THE COURT:  So is there a motion to admit Joint Four?

11       MR. HEWSON:  Yes, please.

12       MR. TEMROWSKI:  No objection to that.

13       THE COURT:  Okay, it's received.

14       And is the original Joint Four down?

15       MR. HEWSON:  Your Honor, I'm going to put it on the

16   table right now.

17       THE COURT:  And Mr. Temrowski and Mr. Hewson, Exhibit

18   P is being conditionally received as we discussed earlier.

19       MR. HEWSON:  Yes, sir.

20       THE COURT:  Do both of you understand that?

21       MR. TEMROWSKI:  Yes.

22       THE COURT:  Any further questions for the witness?

23       MR. HEWSON:  Not for me, thank you.

24       THE COURT:  All right.  Thank you very much for

25   coming in.

*Gill – Redirect*

1          You might want to create a separate pile for yours

2     and then another separate pile for his.

3          Okay, our next witness?

4          MR. TEMROWSKI:  Your Honor, plaintiff's next witness

5     will be Margaret Jeziorowski.

6          THE COURT:  Okay.

7     **MARGARET A. JEZIOROWSKI, PLAINTIFF'S WITNESS, SWORN**

8                    **DIRECT EXAMINATION**

9     BY MR. TEMROWSKI:

10    Q    Margaret, could you please tell the jury your name and

11    where you live at?

12    A    Margaret A. Jeziorowski, and I live at 2614 Avis Drive

13    South, in Sterling Heights, Michigan.

14    Q    And what is your relationship to Mr. Waskowski?

15    A    He's my father.

16    Q    And how many children are in the family?

17    A    It's me and my sister, and then my sister also has a son.

18    So just me, and my sister and my dad.

19    Q    Very briefly, could you just tell us something about where

20    you were born?

21    A    I was born in Poland.

22    Q    And when did you and your father come to the United

23    States?

24    A    I was 13 at the time.

25    Q    And at the present time are you employed or do you go to

*Jeziorowski – Direct*

1   school?

2   A    Yes.  I am employed at Sally Beauty Supplies in Rochester,

3   Michigan, and I also go to Oakland University in Auburn Hills,

4   Michigan.

5   Q    And who do you live with?

6   A    I live with my father and my husband.

7   Q    Now, I would like to ask you some questions about the

8   automobile collision of December 23, 2009.

9   A    Okay.

10  Q    And I will begin this way.  Were you there when this

11  collision took place?

12  A    No.

13  Q    How did you hear that your father had been in an

14  automobile accident?

15  A    My sister had called me.

16  Q    And where were you at the time?

17  A    I was at a friend's house.

18  Q    And upon hearing about that, could you tell us what you

19  did?

20  A    Yeah.  I got in the car and I went to the scene of the

21  accident.

22  Q    When you arrived at the scene of the accident, who was

23  there and what did you observe?

24  A    My sister was there with my father and there was still

25  police officers.  I think there was an ambulance still, but

*Jeziorowski - Direct*

1    they were leaving as I pulled up, I believe.  And it was -- I

2    mean, I saw the car in the parking lot of a flower shop.  It

3    was like half on the grass and half in the parking lot, so

4    obviously it didn't get there by driving.  It was obvious that

5    the accident had caused it to get there.

6    Q    And you're talking about your father's car?

7    A    Correct.

8    Q    Where exactly was the vehicle?

9    A    It was -- like I said, it was half on the parking lot and

10   half on the grass of the flower shop on the corner of 15 and

11   Dequindre.

12   Q    And what city is that in?

13   A    That's right on the border of Troy and Sterling Heights.

14   Q    Now, upon seeing your father's vehicle there, did you have

15   an opportunity to make any observations of the condition of

16   that vehicle?

17   A    Yeah.  The car got -- I mean, it was damaged on the

18   driver's side front fender and rear fender of the same side.

19   Q    As to that damage, was that damage on your father's

20   vehicle before this collision occurred?

21   A    No.

22   Q    You indicated that your father was there?

23   A    Yes.

24   Q    Did you have an opportunity to speak to him at all?

25   A    Yeah.  I mean, I came up to him and I asked him what

*Jeziorowski - Direct*

1    happened.  And he didn't really answer -- I mean, not really,

2    because he was -- I mean, he wasn't sure what happened.  My

3    sister was the one that really told me what the officer told

4    her that happened.

5    Q    Okay.  How would you describe your father's condition at

6    the scene of the collision?

7    A    I mean, he looked pale.  He was a little sweaty, I would

8    say, not really himself.  I mean, that's pretty much it.  I

9    mean, it was very brief when we were there.  I mean, we went

10   home very soon after I arrived at the scene.

11   Q    Okay.  And this was on December 23, 2009; is that correct?

12   A    Correct, yes.

13   Q    Right before Christmas?

14   A    Yes.

15   Q    Where did you all go once you left the scene?

16   A    We went to our house, the same one I live in right now.

17   Q    And what happened when you got there?

18   A    My dad, I think he just laid down on the couch and watched

19   a movie and fell asleep.  And I was just hanging out, I guess.

20   I was watching TV, so --

21   Q    Now, the following day, how was your father's condition?

22   A    I mean, he didn't seem like himself still.  I mean, I

23   think -- I mean, it was really crazy.  It was Christmas Eve,

24   everybody was kind of at the house, but he really didn't do

25   much.  He pretty much sat on the couch and watched TV.  And he

*Jeziorowski - Direct*

1    didn't seem like himself.  It kind of seemed like he was in

2    pain.  I mean, he hasn't -- I mean, he didn't tell me that day,

3    but it was quite obvious.

4    Q    Now, at some point in time did your father begin to

5    receive medical treatment for any injuries?

6    A    I mean, it was right after Christmas he went to Dr.

7    Wietrzykowski.

8    Q    And do you know what your father's complaints were which

9    led him to go to a doctor?

10   A    Yeah, he complained of headaches, neckache, backache, like

11   side here (indicating) on the ribs.  And he had pain from the

12   seatbelt up here as well.

13   Q    Was the first doctor Dr. Wietrzykowski?

14   A    Yes.

15   Q    And did you go with him to that appointment?

16   A    Yes.

17   Q    How did your father find Dr. Wietrzykowski?

18   A    I think we just looked in the Yellow Pages for Hamtramck

19   or online.  And it seemed that he was Polish, so we kind of

20   picked him by thinking that he would speak it.

21   Q    And on that topic, naturally Polish is your father's first

22   language?

23   A    Correct.

24   Q    When you're at home with your father, do you and your

25   sister speak to him in Polish or in English?

103

*Jeziorowski – Direct*

1    A    Always in Polish.

2    Q    Okay.  So what happened when you went the first time to

3    the first doctor, Dr. Wietrzykowski?  You were there?

4    A    Yes.  We waited, I would say, a good hour and then we went

5    to the examination room and he talked to my dad.  I mean, I was

6    translating.  And I mean, he asked him --

7    Q    He obviously didn't speak Polish?

8    A    Yes, obviously.

9    Q    Okay.

10   A    I had to translate.  And he asked what was wrong and then

11   examined him physically.  He prescribed an x-ray, I believe,

12   some Vicodin and Flexeril, and that was pretty much it.

13   Q    Did your father ever go back to Dr. Wietrzykowski?

14   A    No.

15   Q    Who did he go to?

16   A    He went to Dr. Glowacki.

17   Q    And could you please tell the ladies and gentlemen of the

18   jury why did he make that switch?

19   A    We looked on Yellow Pages for Polish doctors and Dr.

20   Glowacki came up.  He's also an orthopedic physician.  And we

21   had called the office to doublecheck that he spoke Polish, so

22   that's where we ended up going.

23   Q    And did he?

24   A    Yes.

25   Q    Your father's first appointment with Dr. Glowacki, did you

*Jeziorowski – Direct*

1  go with him to that appointment?

2  A    Yes.

3  Q    And could you tell us what happened at that doctor's

4  appointment?

5  A    We had to fill out some paperwork.  Then we went into --

6  or he went into the examination room with Dr. Glowacki.

7  Obviously they talked in Polish.  So they had a conversation

8  about his complaints, and he did a physical examination on him

9  as well.

10       And then I think we went into the office that he has

11  and he filled out a report and wrote some prescriptions for him

12  as well, for an MRI.  I think he did physical therapy, maybe

13  some medication.  I'm not sure.  I don't remember exactly what

14  he wrote down.

15  Q    Let me just ask you this.  Before this collision occurred,

16  was your father employed?

17  A    Yes.

18  Q    And please tell the jury, where did he work and what kind

19  of work did he do?

20  A    He was a semi-truck driver for Yes Express down in

21  Dearborn, I believe.

22  Q    Has your father driven a car since the accident?

23  A    No, sir.

24  Q    And when your father goes to therapy, and to doctor

25  appointments and for medical testing in different facilities,

*Jeziorowski – Direct*

1    how does he get there?

2    A    Either myself or my sister drive him.

3    Q    Okay.  And has that been the case since the very first

4    time with Dr. Wietrzykowski, right up to the present time?

5    A    Correct.

6    Q    And is your father still treating with doctors as of

7    today?

8    A    Yeah, he --

9    Q    Not this very minute, but up to the present time?

10   A    Yeah.  He sees Dr. Glowacki once a month right now.

11   Q    And is it still true that he's not driving a car?

12   A    Yes.  He doesn't drive at all.

13   Q    And do you know why he won't drive a car?

14          MR. HEWSON:  I'm going to object, Your Honor.  I

15   think that's hearsay.  His expression outside the presence of

16   the courtroom would be hearsay.

17          MR. TEMROWSKI:  Well, Your Honor, my question was,

18   do you know.

19          THE COURT:  Okay, go ahead.

20   BY MR. TEMROWSKI:

21   Q    Do you know why your father won't drive a car?

22   A    Well, first of all he's scared.  He had two accidents in

23   2011 and he's just scared that he's going to have another one.

24   But also, he has back pain, and shoulder pain and limited

25   motion in his left hand, so he's not physically able to drive a

*Jeziorowski – Direct*

1    car.

2    Q    Okay.  Your father was involved in an accident before the

3    December 23, 2011 accident; is that correct?

4    A    Correct.

5    Q    And do you know anything about that accident?

6    A    Yeah.  He was coming back from work and he got hit by a

7    drunk driver.  And he went to a hospital afterwards and the

8    doctor said he was fine.  He had some testing done.  And State

9    Farm replaced the car and he was just fine.  He went back to

10   work.

11   Q    And other than that one time going to a hospital, did your

12   father have any doctor visits after that?

13   A    No.

14   Q    Did your father have any physical therapy after that?

15   A    No.

16   Q    Did your father, other than a few days, miss time from

17   work?

18   A    No.

19   Q    Did your father have any MRI testing after that first

20   accident?

21   A    No.

22   Q    Did he have any bone scans or x-rays?

23   A    No.

24   Q    Regarding the December 23, 2009 motor vehicle accident,

25   was your father's vehicle insured?

*Jeziorowski – Direct*

1    A    Yes.

2    Q    With who?

3    A    State Farm.

4    Q    And did your father, following the accident, report this

5    collision to State Farm?

6    A    Yes, sir.

7         MR. HEWSON:  Your Honor, I'm going to object.  This

8    really is hearsay.  The witness will be here to testify.  And I

9    don't think there's a foundation for this witness to testify.

10        MR. TEMROWSKI:  Well, can I lay the foundation then?

11        THE COURT:  Go ahead.

12        MR. TEMROWSKI:  Go ahead.

13   BY MR. TEMROWSKI:

14   Q    Who contacted State Farm?

15   A    I believe it was myself or my sister.

16   Q    And could you just tell all of us why would either you or

17   your sister have done it?

18   A    Because my father doesn't speak English very well.

19   Q    Okay.  And how did you contact State Farm?

20   A    We contacted the claims Department and customer service.

21   Q    Okay.  And did you tell them he was in an accident?

22   A    Yes.

23   Q    Did you get a claim number?

24   A    Yes.

25   Q    And what happened then?

*Jeziorowski – Direct*

1    A    They sent us like paperwork and we saw our agent, I think

2    once to pick it up, because I think they faxed it to him or

3    something like that.  And he had to explain to us the process

4    and how it all worked with the injuries and things that he

5    needed.

6    Q    That is your father's State Farm agent?

7    A    Correct.

8    Q    Let me ask you this question.  Obviously, now I'm your

9    father's attorney?

10   A    Yes.

11   Q    My question to you is, after the collision took place, did

12   myself or any attorney at all have any involvement in the

13   claims that your father made to State Farm for his no-fault

14   benefits or did your family and your father handle all of that

15   yourself?

16   A    No, I handled it all myself.

17   Q    There was no attorney involvement whatsoever?

18   A    No, sir.

19   Q    Did you at any time ever speak to a claims adjuster at

20   State Farm?

21   A    I might have.  I mean, that was almost three years ago.  I

22   don't remember.

23   Q    Okay.  Did your father make claims with State Farm for

24   no-fault benefits?

25   A    Yes.

*Jeziorowski – Direct*

1  Q    Did your father make claims with State Farm for attendant

2  care and household help benefits?

3  A    Yes.

4  Q    And do you know what those two different benefits are?

5  A    Yes.

6  Q    And could you please tell us what is your understanding of

7  what is household help benefits and what is attendant care

8  benefits?

9  A    Household help is things that -- like chores around the

10  house that he had done before the accident, but he's unable to

11  do right now.  And basically, that's replacing those services

12  for him.

13         Attendant care is helping him physically, meaning

14  anything that has to do with his person, driving him around,

15  supervising, feeding him, bathing him, all of the things that

16  have to do with things that he can not do right now that he

17  needs help with personally, as a physical body.

18  Q    Okay.  Did your father, through either yourself or your

19  sister, make a claim with State Farm for those benefits?

20  A    Yes.

21  Q    And were you and your sister your father's two care

22  providers for both of those benefits?

23  A    Yes.

24  Q    And were you and your sister asked by State Farm to

25  complete forms so that those two separate claims could be made

*Jeziorowski – Direct*

1    for your father?

2    A    Yes.

3    Q    And let's start this way.  Who provided you with those

4    forms?

5    A    It was either the agent or the claims adjuster.

6    Q    Okay.  I'm now going to hand you what I had marked as

7    Plaintiff's Exhibits L and M.

8    A    Okay.

9    Q    Please take a look at those documents and tell me what

10   those are?

11   A    These are the forms we had filled out for State Farm for

12   attendant care services and household services.

13   Q    And could you separate them first of all?

14   A    Sure.

15   Q    Is it a fair statement for me to make that for the two

16   claims that we're talking about, the household help and the

17   attendant care, that the forms are different?

18   A    Yes.

19   Q    Okay.  And how are they different?

20   A    For the attendant care, you have to list everything you do

21   and the amount of time that it takes you.  And then you do --

22   we do 12 hours a day because there's so much he's prescribed by

23   Dr. Glowacki, and that's listed for every single day

24   differently.  And each form is a week long and then on the

25   bottom you just date it and put down some of your personal

*Jeziorowski – Direct*

1    information and sign it.

2              And then the household help is just per day.  And it

3    says a flat rate charge and then you just write down what you

4    did that particular day and how long it took you.

5    Q    So they're two completely different forms?

6    A    Yes.

7    Q    Now, regarding each of those sets of forms, household help

8    and attendant care, did your father have prescriptions from a

9    doctor stating that your father required and needed those two

10   different types of services?

11   A    Yes, sir.

12   Q    Regarding the attendant care services, could you please

13   tell the members of the jury how many hours per day did the

14   doctor prescribe attendant care for your father?

15             MR. HEWSON:  Your Honor, I -- I'll withdraw it.  I'm

16   sorry, go ahead.  I'm sorry.

17             THE WITNESS:  He prescribed 12 hours a day, seven

18   days a week.

19   BY MR. TEMROWSKI:

20   Q    What about for the household help?

21   A    It was seven days a week and it's just a flat rate of

22   however it takes you to do a certain thing, but it's seven days

23   a week for the household help as well.

24   Q    Okay.  Now, who were the two care providers, you and your

25   sister?

*Jeziorowski – Direct*

1  A    Correct.

2  Q    And were you and your sister paid for these services or

3  was a promise made to be paid for these services?

4  A    Both.

5  Q    Okay.  Explain.

6  A    We -- our father promised us to -- that he would pay us

7  for these services and until he was receiving money from State

8  Farm for theses services he was paying us.

9  Q    Now, let's start with the household help.

10  A    Okay.

11  Q    How much did your father promise to pay you and your

12  sister for the household help services that you performed for

13  him?

14  A    He promised to pay us exactly what State Farm had promised

15  to pay him, which is $20 a day.

16  Q    Twenty dollars per day?

17  A    Yes.

18  Q    And for the 12 hours a day attendant care, how much did

19  your father promise to pay you and your sister for providing 12

20  hours a day attendant care to him?

21  A    He said that he would pay us $15 an hour.

22  Q    And do you know how he arrived at that figure?

23  A    Yeah.

24         MR. HEWSON:  I'm going to object, Your Honor.  That's

25  hearsay.  It certainly is.  How he arrived at that figure has

113

*Jeziorowski – Direct*

1    got to be hearsay.

2              THE COURT:  If she stated what he told her, that

3    would be hearsay.

4              MR. HEWSON:  Yes, sir.

5              MR. TEMROWSKI:  Right.

6              THE COURT:  So right now the question is not hearsay.

7              MR. HEWSON:  Thank you.

8    BY MR. TEMROWSKI:

9    Q    Do you know how your father arrived at that figure?

10   A    Yeah, when we went to go see --

11             THE COURT:  The question is, do you know, and your

12   answer to that question is what?

13             THE WITNESS:  I know, yes.

14   BY MR. TEMROWSKI:

15   Q    You do know?

16   A    Yes.

17   Q    These forms that were provided to you by State Farm were

18   completed by who?

19   A    My sister and myself.

20   Q    And is that true for both sets of forms?

21   A    Correct.

22   Q    Okay.  And were these forms, once they were completed by

23   you, sent for payment to the claims adjuster at State Farm?

24   A    Yes.  Up until, I believe, for the household help it was

25   March of 2011 and then for attendant care, May of 2011.

*Jeziorowski – Direct*

1    Q    How often were these forms --

2            THE COURT:  Mr. Temrowski, I apologize.  I'm taking

3    notes, so I -- the forms were sent to State Farm for attendant

4    care until when?

5            THE WITNESS:  Attendant care until May.

6            THE COURT:  May of what year?

7            THE WITNESS:  Of 2011.

8            THE COURT:  And then how about for household help?

9            THE WITNESS:  I believe it was March or April.

10           THE COURT:  Of 2011?

11           THE WITNESS:  Correct.

12           THE COURT:  Okay.  I'm sorry for the interruption.

13    Go ahead.

14    BY MR. TEMROWSKI:

15    Q    And just so we're clear that that's the time frame that

16    these forms were sent in to State --

17    A    Yes.

18    Q    The completed forms?

19    A    Yes.

20    Q    Okay.  And how often would you complete these forms and

21    send them in to State Farm?

22    A    The forms were completed on a daily basis, but we would

23    send them in about every month.

24    Q    And did you, in fact, receive any payment from State Farm

25    for either of these two claims that were made?

*Jeziorowski – Direct*

1   A    Yeah.  We received payment from –– up until, I believe,

2   November of 2010 and then we continued to send them the forms,

3   but we weren't receiving any payment.

4   Q    Now, is that true for both of the claims?

5   A    Correct.

6   Q    That you received payment from State Farm up through

7   November of 2010?

8   A    Correct.

9   Q    Was that the last payment from State Farm?

10  A    Yes.

11  Q    For both claims?

12  A    Yes.

13  Q    The household help and the attendant care?

14  A    I believe so, yes.

15  Q    But if I understand your testimony correctly, that even

16  though State Farm paid up through the date of November 2010,

17  that both you and your sister continued to fill out those forms

18  daily?

19  A    Yes.

20  Q    And at least up until May of the following year, sent them

21  in to State Farm?

22  A    Yes.

23  Q    But you were not being paid for that time frame?

24  A    No, sir.

25  Q    Okay.  After the last time in May of 2011 when you stopped

*Jeziorowski – Direct*

1    sending the forms in, could you just tell the members of the

2    jury why did you and your sister stop sending forms in?

3    A    We sent the forms in four months after they stopped paying

4    for household help and six months after they stopped paying for

5    attendant care.  And we didn't even receive a letter from them

6    saying that they received them and they weren't going to pay us

7    or -- there was no response from them at all.  So it became

8    kind of pointless.

9    Q    So you stopped?

10   A    Yes.

11   Q    Did you and your sister, for both the attendant care and

12   the household help, after you stopped sending the forms in and

13   you weren't getting paid, did you continue to keep track of the

14   services that you were providing to your father?

15   A    Yes, sir.

16   Q    And have you done that every day, right up to the present

17   date?

18   A    Correct.

19   Q    And did you recently print those completed forms?

20   A    Yes, sir.

21   Q    Okay.  Tell us when you did that.

22   A    I believe it was earlier this month or sometime last month

23   that we had printed them out and we sent them in to State Farm

24   or Mr. Hewson.  I'm not sure.

25   Q    Okay.  Now, you continued to send the forms in up until

*Jeziorowski – Direct*

1    May of 2011?

2    A    Correct.

3    Q    But you continued to keep track of what you were doing?

4    A    Yes.

5    Q    How would you do that?

6    A    We would keep filling the forms out.

7    Q    And how, though, by hand or --

8    A    No, on the computer, and we saved them on the hard drive,

9    computer, whatever you want to call it.

10   Q    Okay.  And when you recently printed those forms, did

11   those forms accurately show day by day, day by day, every

12   service that you did for your father for both the household

13   help and the attendant care?

14   A    Yes, sir.

15   Q    However, when you recently signed those documents were

16   they signed just on the same date by all of your sister -- by

17   yourself and your sister?

18   A    Yes.

19   Q    So you printed them, signed them and sent them in?

20   A    Correct.

21         MR. HEWSON:  Your Honor, I object.  It's leading.  I

22   tried to let that go, but this is leading and it's asked and

23   answered.

24         THE COURT:  You know, it is really -- okay, it is

25   leading.  So kind of back off.

*Jeziorowski – Direct*

1           MR. TEMROWSKI:  Okay.

2           MR. HEWSON:  Thank you.

3    BY MR. TEMROWSKI:

4    Q    Do you know what the last date was that you received

5    payment from State Farm for the household help?

6    A    Like I said, I think it was in November of 2010.  I don't

7    remember the exact date.

8    Q    If I told you November 20th, would you disagree with it?

9    A    No.  Like I said, I'm not sure.  It's sometime in

10   November.

11   Q    Are you claiming that you want payment from November 21,

12   2010, up to the present date?

13   A    Yes, sir.

14   Q    Did you provide the services?

15   A    Yes, sir.

16   Q    Now, regarding the payments that you did receive from

17   State Farm, you were asking for $20 a day?

18   A    Yes.

19   Q    Were all of the payments that you received from the claims

20   adjuster at the rate of $20 per day?

21   A    No, sir.

22   Q    And could you tell us how many of the payments were less

23   than $20 per day?

24   A    I mean, it was a good couple of months I believe.  I'm not

25   exactly sure how long, but there was I think 50 percent less

*Jeziorowski – Direct*

1    than what we started off at.

2    Q    And do you know what the total difference is that you were

3    shorted in the time that State Farm was paying for the

4    household help?

5    A    I'm not sure.  I don't remember.

6    Q    If I suggested it's --

7         MR. HEWSON:  Your Honor, I'm going to object.  That's

8    clearly leading.

9         THE COURT:  That would be definitely leading.

10        MR. HEWSON:  Thank you, sir.

11        MR. TEMROWSKI:  Okay.

12   BY MR. TEMROWSKI:

13   Q    Regarding the attendant care payments that you received,

14   what was the promise that you received from your father to be

15   paid for the attendant care services that you performed for

16   him?

17   A    He told us that he would pay us $15 an hour as soon as, I

18   mean, State Farm pays him.

19   Q    And you indicated that, in fact, State Farm did pay up

20   until November, correct?

21   A    Correct.

22   Q    At what rate was State Farm -- when they were paying the

23   attendant care, at what rate were they paying?

24   A    It was about $12 an hour.

25   Q    There's two care providers?

*Jeziorowski – Direct*

1   A      Yes, sir.

2   Q      Yourself and your sister?

3   A      Correct.

4   Q      Could you just explain to us for these two different

5   services, the household help and the attendant care, how did it

6   work as to who would do what one day?  How did it work?

7   A      I mean, we just kind of split it.  It's -- well, whenever

8   -- some days, you know, I have the whole entire day off, so I

9   would do everything.  And some days I have a half-day and then

10  she will come back and switch me out and do -- finish the rest

11  of the day off with my father.  So we shared the

12  responsibilities.

13  Q      Do you have an expectation of payment for the services

14  that you provided to your father, and specifically, do you have

15  an expectation of payment for the attendant care services that

16  you provided and for the household help services that you

17  provided?

18  A      Yes, sir.

19  Q      How is your father -- what is his physical condition like

20  at the present time?

21  A      He has back pain, neck pain.  His arm, he can't really

22  move it.  He can't make a fist with his left hand.  He can't

23  really walk around.  He can't cook his own food.  He can't

24  bathe himself.  He can't get dressed by himself.  It's harsh.

25            MR. TEMROWSKI:  Thank you.  I don't believe I have

*Jeziorowski – Direct*

1   any other questions.

2          THE COURT:  Okay.  Mr. Hewson?

3          MR. HEWSON:  Thank you, Your Honor.

4                    **CROSS–EXAMINATION**

5   BY MR. HEWSON:

6   Q    Ms. Jeziorowski, did you help your father fill out the

7   answers to interrogatories in this case?

8   A    I believe so, yes, sir.

9   Q    And did you help him fill out the documents that were

10  requested in this case, provide those documents?

11  A    I believe so, sir.

12  Q    Let me show you what I have marked as Exhibit One and I

13  believe is stipulated to, Your Honor.

14          Here's your copy.

15          THE COURT:  So you're moving for --

16          MR. HEWSON:  The admission of Exhibit One, Your

17  Honor, which is plaintiff's answers to State Farm's

18  interrogatories.

19          THE COURT:  Any objection?

20          MR. TEMROWSKI:  No.

21          THE COURT:  All right, Exhibit One is received.

22          MR. HEWSON:  May I approach the witness, Your Honor?

23          THE COURT:  Yes.

24          MR. HEWSON:  Thank you.

25  BY MR. HEWSON:

*Jeziorowski - Cross*

1    Q    Whose handwriting is that, if you know?

2    A    I'm not sure.  I don't know.

3    Q    Did you help provide these answers?

4    A    Yes.

5    Q    And they're supposed to be under oath, am I correct?

6    A    I believe so, yes, sir.

7    Q    And in interrogatory number five, the question was,

8         "Please set forth the specific days, dates and

9         times that Kamila Waskowski provided attendant

10        care to you."

11   That is your sister Kamila; am I right?

12   A    Correct.

13   Q    There is no specific number of days that Kamila provided

14   services because under answer four, no one told you that you

15   had to tell who did what services when?

16   A    Correct.  The forms that State Farm had sent me don't have

17   a specification to say who did what when.

18   Q    Okay.  The jury can look at those.

19        But under number six, you were asked how many hours

20   of attendant care were provided by you?

21   A    Correct.

22   Q    And you don't know, do you?

23   A    No, I don't know.

24   Q    And your sister wasn't able to provide that information

25   either; am I correct?

*Jeziorowski - Cross*

1    A    No, sir.  I could give you total hours for the both of us,

2    but I cannot tell you how many hours each of us did

3    individually.

4    Q    Well -- and I understand that.  But the forms that my

5    brother counsel gave me that are sitting up there do not

6    specify who did what on what particular day; am I right?

7    A    No, sir.

8    Q    Tell me when it was that you began assisting your father

9    with bathing.

10   A    I believe it was either Christmas Eve or Christmas Day.

11   Q    Did you talk to your sister about that?

12   A    I mean, it was Christmas.  We were all at the house.  Yes,

13   we talked about it.

14   Q    Did you bathe him on Christmas Eve or did your sister?

15   A    I don't remember.  That was almost three years ago.

16   Q    Well, did you have a chance to read Kamilla's testimony in

17   this case?

18   A    I don't believe so, no, sir.

19   Q    Have you talked to her about the fact that she's testified

20   that your father didn't need assistance with bathing for six

21   months after the accident, did you know that?

22   A    No, I didn't know that.

23   Q    Did you know that your father has testified in this case

24   that he needed bathing for six months and didn't need it after

25   that, did you know that?

*Jeziorowski - Cross*

1    A    No, sir.

2    Q    Have you read either of the transcripts in this matter?

3    A    Maybe I briefed through them, but I haven't read them in

4    depth, no.

5    Q    All right.  The reason I ask is because from the time you

6    begin filling out those forms and sending them in to State Farm

7    for payment, you indicated that you had been bathing your

8    father, right?

9    A    Yes.

10   Q    Could you tell us, before he ever treated with anyone,

11   before he went to Dr. Glowacki, before he went to the physical

12   therapist, could he move his left arm?

13   A    Are you talking before or after the accident?

14   Q    After the accident.

15   A    No, sir.

16   Q    He could not move it at all?

17   A    I mean, I'm not saying he couldn't move it at all, but he

18   had limited motion.

19   Q    Well, could you tell the jury how limited that motion was,

20   please?

21   A    I mean, it's usually up to this (indicating), when you

22   flexion and then maybe this much (indicating) when you go

23   outwards.  And it varies on days, too.  He has bad days and

24   good days.

25   Q    Well, let me ask you this.  Well, on the good days, he can

*Jeziorowski - Cross*

1   take care of himself?

2   A    No, sir.

3   Q    So what difference does it make if it's a good day or a

4   bad day?

5   A    Because he has more motion on a good day than he does on a

6   bad day.

7   Q    Okay.  Were you with him the first time he went to see

8   Mr. Lodzinski, the physical therapist?

9   A    Yes, sir.

10  Q    Did you see your father raise his arm about this high

11  (indicating) during the testing at the physical therapy

12  location?

13  A    No, I didn't.

14  Q    Did you see your father abduct his arm about that high

15  (indicating)?

16  A    No, sir.

17  Q    That would be contrary to your observation of your father

18  if he was, in fact, able to do this and this (indicating), the

19  first time he saw Mr. Lodzinski on January 7, 2010, that would

20  be contrary to your observation; am I right?

21  A    I wasn't in the room when he was examining him, sir.

22  Q    But it would be contrary to the rest of your observations

23  of your father, because you said he couldn't move his arm --

24  A    Yes.

25  Q    -- after the accident?

*Jeziorowski - Cross*

```
1    A    Yes.

2    Q    Could he move his head from side to side?

3    A    Limited.  It was a limited motion.

4    Q    How much limited?

5    A    Maybe this much and this much (indicating).

6    Q    Okay.  So it wouldn't have been anything as dramatic as

7    that or that (indicating)?

8    A    No, sir.

9    Q    You couldn't do that?

10   A    No, sir.

11   Q    Not from the time of the accident forward?

12   A    No, sir.

13   Q    That must have caused you a great deal of concern for your

14   father; am I right?

15   A    Yes.

16   Q    You didn't take him to the hospital?

17   A    No, sir.

18   Q    You didn't take him from the scene of the accident to any

19   medical professional on December the 23rd?

20   A    I mean that decision isn't up to me.  I'm his daughter.

21   I'm not his --

22   Q    Okay.  But you have been his care provider, you said, from

23   the date of the accident, because he couldn't take care of

24   himself, right?

25   A    Yes, but I can't make decisions for him.
```

127

*Jeziorowski – Cross*

1    Q    Okay.  He went to the doctors after -- do you want a

2    minute?

3    A    Can I have a tissue?

4    Q    Sure.  May I approach the witness, Your Honor?

5            THE COURT:  Sure.

6            MR. HEWSON:  Thank you.

7            THE COURT:  Do you have water?

8            THE WITNESS:  Thank you.  Sorry.

9            MR. HEWSON:  No, you're fine.

10   BY MR. HEWSON:

11   Q    Your father, you said, went to the hospital from the scene

12   of the accident and that was prior to the one of December 23,

13   2009?

14   A    It wasn't from the scene of the accident.

15   Q    When did he go to the hospital?

16   A    I believe it was a day after, two days after.

17   Q    Okay.  He didn't go to any hospital in this particular

18   case, other than for testing; is that right?

19   A    Correct.

20   Q    Now, did you ever keep track of how much money your father

21   paid you?

22   A    No, sir.

23   Q    Now, I want to make sure that I understand this.  The

24   checks did not come to you?

25   A    No.

*Jeziorowski - Cross*

1   Q      They came to him?

2   A      Correct.

3   Q      And if I understood your prior testimony correctly, he

4   would give you some amount of money?

5   A      Yes.

6   Q      And you and your sister would split it?

7   A      Yes.

8   Q      And then you would give it back to him?

9   A      I would pay bills with it, yes.

10  Q      Let me finish.  You would give it back to him and then he

11  would put it in the account and pay bills, his bills from that,

12  bills for the house; am I right?

13  A      Yes, sir.

14  Q      So was that income to you or did he just keep the money?

15  A      I don't know how to answer that.  I mean, he wouldn't just

16  keep the money.  I would give him money to pay bills.

17  Q      How much did he give you -- when the checks would come in

18  from State Farm, how much did he give you?

19  A      I don't know how much.  The checks varied.  Some of them

20  were for four weeks, some of them were for five weeks, some of

21  them were for a longer period of time.  So depending on how

22  much the check was, that's how much I would receive.

23  Q      Your father testified -- and let me show you what I've

24  marked as Exhibit Three.

25              MR. HEWSON:  May I approach again, Your Honor?

129

*Jeziorowski - Cross*

1              THE COURT:  Sure.

2       BY MR. HEWSON:

3       Q    This is Defendant's Exhibit Three.

4              And we asked the question, number two on the second

5       page, your father had testified on page 67 and 68 of his

6       deposition that he kept track of the payments that he made to

7       you and your sister.

8              And his answer was, "I am presently unable to locate

9       this document.  I will keep looking for it and if I find it I

10      will immediately send it to you."

11             Did you ever see the document on which the payments

12      to you were supposed to have been registered, so we know how

13      much you were paid?

14      A    No, sir.

15      Q    Do you know if you were receiving $12 an hour from your

16      father for these payments?

17      A    I'm pretty sure I was, yes.

18      Q    But you don't know what the figures were, right?

19      A    I mean, I don't remember.  No, sir.

20      Q    And you don't know how many hours in any particular week

21      you were actually providing those services; it would vary?

22      A    Yes.

23      Q    Now, on the forms that you prepared, and again I don't

24      have a copy here to work from.

25             If I may I approach the witness, Judge?

*Jeziorowski - Cross*

1              THE COURT:  Sure.

2    BY MR. HEWSON:

3    Q    Do you know --

4    A    Which date are you looking for?

5    Q    Well, let me just ask you a foundational question first.

6              Do you know if Exhibit L includes all of those

7    documents that you just printed up for us last week and gave it

8    to us on November 19th?  Do you know that?

9    A    Yeah, it should include those.

10   Q    All of those should be in there?

11             THE COURT:  I do not have Exhibit L as being admitted

12   into evidence.  Is there going to be a motion for it to be

13   admitted?

14             MR. HEWSON:  I don't have any objection to it, Your

15   Honor.

16             THE COURT:  Just a question.  There may or may not be

17   a motion.  I just --

18             MR. TEMROWSKI:  I move to admit the two exhibits, L

19   and M.

20             THE COURT:  All right.  Is there any objection?

21             MR. HEWSON:  No, Your Honor, there is not.

22             THE COURT:  They are received.

23             MR. HEWSON:  Thank you.

24   BY MR. HEWSON:

25   Q    If you could take a look -- the easiest one is May 22,

*Jeziorowski - Cross*

1    2011 to May 28, 2011.

2            Would you take a look at that form, please?

3    A    Sure.

4    Q    Do you have it in front of you?

5    A    Yes.

6    Q    All right.  Now, turn to the second page.  There appears

7    to be a signature under the typed names of Kamila Waskowski and

8    Malgorzata Waskowski.

9            Malgorzata is the Polish version of Margaret; am I

10   right?

11   A    Correct.

12   Q    There appears to be signatures on those pages, correct?

13   A    Yes, sir.

14   Q    Can you tell the jury when those were signed?

15   A    When I printed out the forms.

16   Q    And when did you print out the forms?

17   A    Earlier this month or end of last month.

18   Q    And you agree with me that the date on the form is

19   5-28-2011?

20   A    Yes, sir.

21   Q    And that is not the date on which it was signed; is that

22   true?

23   A    No, sir.

24   Q    The same is true for all the rest of the documents from

25   May 22, 2011 until the last one in the package I have is

*Jeziorowski - Cross*

1   10-13-2001, they were not signed on those dates?

2   A    No, they were completed on those dates.

3   Q    Now, on the May 22nd entry, just choosing the May 22nd

4   entry, there's an indication that you assisted your father with

5   bathing for an hour?

6   A    Correct.

7   Q    Do you know who did that on that day?

8   A    I don't know.

9   Q    Why does it take an hour to bathe him?

10  A    Because he needs to get in the shower, and he needs help

11  with that, and standing up in the shower, he has to -- I have

12  to wash his back, his hair, condition it, I pretty much wash

13  almost all of him.

14  Q    He can't use his right arm for any of that?

15  A    No, sir.

16  Q    And he certainly can't raise his arm this high

17  (indicating)?

18  A    No, sir.

19  Q    Did you ever keep track of how long it took your father to

20  shower before the accident?

21  A    No, sir.

22  Q    Were you aware of the fact that your sister testified it

23  took about ten minutes before the accident?

24  A    No.

25  Q    And on his own, it took 20 minutes after the accident and

133

*Jeziorowski – Cross*

1    not an hour?

2    A    I don't know.

3    Q    Okay.  Assisted with dressing and undressing.

4         Can he dress himself at all?

5    A    Right now?

6    Q    Yeah?

7    A    No, sir.

8    Q    Could he dress himself in May of 2011?

9    A    No, sir.

10   Q    Not at all?

11   A    No, sir.

12   Q    Administering his medications?

13   A    Yes.

14   Q    He couldn't take his own medications?

15   A    Well, they're in the childproof containers, so I mean,

16   most people use two hands to use that and he doesn't have the

17   strength in his left hand to open that.

18   Q    And that took a half an hour?

19   A    He gets medication more than once a day, sir.

20   Q    You told State Farm and you're telling the jury it took a

21   half an hour to do that?

22   A    Like I have mentioned, it takes more than -- I mean, it's

23   more than one time.  He takes medication multiple times a day.

24   Q    You have here, "preparing meals for the injured person,

25   two hours"?

134

*Jeziorowski - Cross*

1   A    Yes, sir.

2   Q    "Help with bending, standing and walking, an hour and 30

3   minutes"?

4   A    Yes, sir.

5   Q    How do you help him bend?

6   A    I mean, this was -- this form didn't really tell exactly

7   the things that we were supposed to do, like how to write them

8   down or what was the options to write them down.  So we just

9   kind of had to make up how to explain the things that we were

10  doing for him.

11  Q    Well, tell me --

12  A    By "bending, standing and walking," we mean getting up,

13  sitting down, walking around, getting up the stairs, getting

14  down the stairs, things like that.

15  Q    So he can't do that on his own?

16  A    No, sir.

17  Q    So you physically lift him out of a chair?

18  A    I help him get up out of a chair, yes, sir.

19  Q    He's not able to do that on his own?

20  A    No, sir.

21  Q    Under any circumstances he needs assistance?

22  A    I mean, we have pretty big couches at the house.

23  Q    So if he stands up here in the courtroom and walks in and

24  out by himself, that would be contrary to what you observe in

25  your house, right?

*Jeziorowski - Cross*

1   A    I mean, he's holding onto the benches.  I mean, I've seen

2   him walk in and out of here, so obviously he needs some help

3   with balancing and stuff like that.

4   Q    Okay.  Has anybody treated him for a balance disorder that

5   you're aware of?

6   A    Not that I'm aware of, sir.

7   Q    Massage for an hour, who did the massage?

8   A    Either myself or my sister.

9   Q    And then help with daily exercises three times a day,

10  right?

11  A    Yes, sir.

12  Q    That's basically watching him do his exercises?

13  A    No.  I mean, it is supervision in a way, but he does need

14  to either lay down or sit down or get up for different

15  exercises.  It's not --

16  Q    So he is able to do those, in spite of his physical

17  inabilities?

18  A    Well, I mean they're exercises.  It's as far as he can do

19  it.  It's not forcing him to do anything, sir.

20  Q    And then to fill in the balance of the 12 hours, and I'm

21  just using May 22, 2011 as an example, in order to fill in and

22  get the benefit for the full 12 hours, you've written down

23  "supervising the injured person"?

24  A    Well, if he's sitting down and watching a movie on the

25  couch, that's supervising if I'm giving him his time and he's

136

*Jeziorowski - Cross*

1   prescribed 12 hours.  That's not something I just made up.

2   Q    No, no.  I'm just saying if what you're telling the jury

3   is that you want to be paid $12 to $15 an hour, something like

4   that for the time that your father is watching television, am I

5   right?

6   A    Yeah, I guess.

7   Q    You want to be paid for the time just to watch him?

8   A    Well, I'm giving him this time -- or I'm giving him my

9   time.

10  Q    But you are giving him that time because Dr. Glowacki said

11  you could, right?  If it was ten hours or six hours, you would

12  have been billing for the full period of time, whatever that

13  hours was -- that was the number of hours; am I right?

14  A    I'm sorry.  I don't understand what you're asking.

15  Q    You're filling in the hours.  Every time that you put

16  "supervising" in there, it's the balance of the time necessary

17  to bring it up to 12 hours, isn't it?

18  A    Yeah.  I mean, it's not like I just sit there at home with

19  him for 12 hours.  I'm there for other than those 12 hours I'm

20  with him.

21  Q    Now, there was a six-month period of time -- well, let's

22  see.

23          Your sister had her baby in April of 2010?

24  A    Yes.

25  Q    And she had moved out of your father's home, correct?

*Jeziorowski - Cross*

1    A    Yes, sir.

2    Q    And you had moved out of your father's home?

3    A    Yes, sir.

4    Q    And how long were you gone from the house?

5    A    I mean, I was back and forth.  I would stay at the house

6    still sometimes, and I mean, it wasn't like I just wasn't

7    there.

8    Q    I'm sorry.  Had you previously told me that you moved in

9    with your sister for six months?

10   A    I was -- I did move in with my sister, but I was still

11   staying at my father's house occasionally or -- I mean, most --

12   some times.  I mean, I wasn't there all the time like I am now,

13   but I certainly was there sometimes, other than the 12 hours.

14   Q    When you were living at your sister's house?

15   A    Yes, sir.

16   Q    And she was in the last months of her pregnancy, and when

17   the baby was born your father was spending a lot of time at

18   home alone, right?

19   A    What do you mean?

20   Q    Well, you weren't there, your sister wasn't there, she's

21   taking care of a new baby, right?

22   A    My sister had her baby before she had moved out.

23   Q    Okay.  April 2010?

24   A    Yes, sir.

25   Q    When did she move out?

*Jeziorowski – Cross*

1    A    I believe it was end of May or June.

2    Q    May or June of 2010, and stayed out until the end of the

3    year?

4    A    Yeah.

5    Q    Yes?

6    A    Yeah.

7    Q    Same thing for you?

8    A    I'm not sure when that six-month period was that I wasn't,

9    like, legally living with my father, but I'm not sure it was in

10   2010.  Actually, I don't think it was in 2010 at all.

11   Q    Okay.  Let me make sure I understand.

12        Right now, you're not certain whether or not you had

13   actually moved out for six months in 2010?

14   A    No.  I had moved out.  I just don't know if it was right

15   when my sister had the baby.  I don't believe it was right when

16   she had the baby.  It must have been later that year, maybe

17   going on to 2011.  I'm not sure.

18   Q    The fact of the matter is, for whatever period of time

19   that was, your father was alone when you and your sister

20   weren't there?

21   A    Correct.

22   Q    And in that six-month period of time, whenever that was,

23   there were no medical emergencies that he underwent, were

24   there?

25   A    No, sir.

*Jeziorowski – Cross*

1  Q    There was no falls that were reported to you; am I
2  correct?
3  A    No, sir.
4  Q    And if he had to get up and go to the bathroom when you
5  and your sister weren't there, he would go to the bathroom.  He
6  would walk around the house, he would adjust his clothes; am I
7  correct?
8  A    I don't know.  I mean --
9  Q    You're not suggesting to the jury that in the period of
10 time that you weren't there, that he was just sitting in the
11 chair all day for the remaining 12 hours of the day, are you?
12 Or are you?
13 A    I mean, he's only up about 15 hours a day, so that leaves
14 him three hours of being awake.  So if I was leaving for the
15 night, even if I was there for more than 12 hours, I would put
16 him to bed and I would make sure that he would go to the
17 bathroom before I left.
18 Q    In this period of time, did you notice that your father
19 was getting worse physically?
20 A    I'm sorry.  What was the question?
21 Q    In the period of time that you were billing for attendant
22 care, did you notice that your father was getting worse?
23 A    I mean, yeah, especially after he wasn't doing physical
24 therapy anymore.
25 Q    And did you suggest to your father at any particular time

*Jeziorowski – Cross*

1   that he stop treating with Dr. Glowacki or that he stop

2   treating with Mr. Lodzinski for physical therapy because it was

3   getting him worse?

4   A    No, sir.

5   Q    Do you know how many hours you are actually claiming from

6   this jury, how many hours of service for yourself?

7   A    I don't know.

8   Q    Do you know how many dollars, total aggregate dollars that

9   you're claiming from this jury?

10  A    I don't know the total amount, no.

11  Q    If the jury, in its wisdom, were to refuse to pay your

12  claim, this portion of the claim, do you intend to sue your

13  father for that money?

14  A    I don't know.

15  Q    Do you think you would actually do that?

16  A    I don't know.  I'm not in that in that situation.  I don't

17  know.

18          MR. HEWSON:  Thank you.  I have nothing further.

19          THE COURT:  Okay.  Redirect?

20                    **REDIRECT EXAMINATION**

21  BY MR. TEMROWSKI:

22  Q    Regarding -- Defendant's Exhibit Number One that you were

23  asked about --

24  A    I'm sorry, which one is that?

25  Q    I'm going to show it to you.

*Jeziorowski – Redirect*

1    THE COURT:  I don't have recorded that Exhibit One

2  and Three were moved into evidence.  Maybe I missed it, but I

3  don't have it recorded.

4    MR. HEWSON:  Your Honor, I apologize if I forgot it.

5  I would move the admission of Exhibits One and Three and I do

6  not think there's an objection to them.  Thank you.

7    THE COURT:  Mr. Temrowski, do you have an objection

8  to admission of One and Three of defendant's?

9    MR. TEMROWSKI:  No objection.

10    THE COURT:  All right.  They are received.

11    MR. HEWSON:  Thank you.

12  BY MR. TEMROWSKI:

13  Q    Now, regarding Defendant's Exhibit Number One, I just want

14  to clarify what you were asked about.

15    What is the exhibit called?  Do you have that there?

16  What is that exhibit called?

17  A    This one?

18  Q    Yes.  What is that exhibit called?

19  A    It says, "State Farm's interrogatories to plaintiff."

20  Q    To plaintiff?

21  A    Yes.

22  Q    And would you agree with me that he's the plaintiff?

23  A    Yes, sir.

24  Q    You're not the plaintiff?

25  A    No, sir.

*Jeziorowski – Redirect*

1   Q    And would you agree with me that these are the plaintiff's

2   answers to State Farm's questions?

3   A    Yes, sir.

4   Q    Questions to Mr. Waskowski?

5   A    Yes, sir.

6   Q    And you were asked about question number four.  I'm going

7   to read you the question and would you read what the answer is?

8   A    Sure, sir.

9   Q    State Farm's question number four,

10              "Please set forth the exact number of hours of

11              attendant care you were provided by Kamila

12              Waskowski."

13  What's your father's answer to that?

14  A    It says,

15              "My claim for attendant care is 12 hours a day,

16              seven days a week, based upon both my need for

17              attendant care and doctor's prescription.  State

18              Farm never told me or my care providers that we

19              needed to separate the hours provided to me by my

20              care providers.  So we never did.  My care

21              providers completed all of the forms that State

22              Farm requested and they were all sent to the

23              adjuster.  My care providers filled out the form

24              as requested by State Farm.  Therefore, I cannot

25              accurately answer this specific question, but only

*Jeziorowski – Redirect*

1          tell you I was provided a -- "

2     I'm sorry, I can't read that.

3     Q     Total.

4     A     I'm sorry, a --

5          "Total of 12 hours daily attendant care."

6          MR. TEMROWSKI:  Thank you.  No other questions.

7          THE COURT:  Recross?

8          MR. HEWSON:  Very briefly, Your Honor.

9                    **RECROSS-EXAMINATION**

10    BY MR. HEWSON:

11    Q     The date on that document, ma'am, is what?  The signature

12    page I think is the last page of the exhibit.

13    A     I think it says 5-31-12?

14    Q     Five-31-12?

15    A     Correct.

16    Q     From 5-31-12 up until today's date, having recognized that

17    those questions were asked of you, that is, how much time did

18    you do, how much time did your sister do, how much were both of

19    you paid, did you ever break that down from that date forward

20    --

21    A     No, sir.

22    Q     -- as to how many hours you continued to do that, even

23    once you knew the question was asked?

24    A     No, sir.

25    Q     Thank you very much.  I have nothing else.

*Jeziorowski – Recross*

1           THE COURT:  Thank you, very much.  You may step down.

2           THE WITNESS:  Thank you.

3           THE COURT:  All right.  Our next witness?

4           MR. TEMROWSKI:  Your Honor, since this witness has

5    testified, may she remain in the courtroom?

6           MR. HEWSON:  As long as she doesn't become a rebuttal

7    witness, I have no objection, Your Honor.

8           THE COURT:  Sure.  Will she become a rebuttal

9    witness?

10          MR. TEMROWSKI:  She'll step outside just in case.

11          THE COURT:  Okay.

12          MR. TEMROWSKI:  Your Honor, we have a slight issue.

13          THE COURT:  Do want to approach?

14          (Sidebar conference held on the record and out of

15               the hearing of the jury)

16               MR. TEMROWSKI:  We didn't think it would be

17               so fast.  And to have the interpreter come back

18               today.  And he doesn't want to go without her.

19               And I don't have a videographer here for Dr.

20               Glowacki.

21               MR. HEWSON:  You know, I've got --

22               THE COURT:  Is your guy here?

23               MR. HEWSON:  He's here.

24               THE COURT:  Well, has he got the equipment?

25               MR. HEWSON:  Well, he can go down to the car

*Waskowski v. State Farm*

1          and get the equipment, Judge.

2                    MR. TEMROWSKI:  Well, we can go with him and

3          I can go with Dr. Glowacki next.

4                    THE COURT:  Okay.

5                    MR. HEWSON:  Should I send him down to get

6          the stuff?

7                    THE COURT:  How long will it take to set up?

8                    MR. HEWSON:  Probably ten minutes to get him

9          down and back up.

10                   THE COURT:  Okay.  How long is Glowacki's

11         dep?

12                   MR. HEWSON:  Oh, it's a good two hours.

13                   THE COURT:  Well, we can start rolling with

14         it.

15                   MR. HEWSON:  Okay.  Can we just take a break?

16         I'll go --

17                   THE COURT:  Yeah.

18         (Sidebar conference concluded)

19         THE COURT:  We'll take a little break.  And I think

20    the next witness is going to be -- that you're going to hear

21    from is Dr. Glowacki, by way of a video dep; is that right,

22    gentlemen?

23                   MR. TEMROWSKI:  Yes.

24                   MR. HEWSON:  I'm sorry, Your Honor.  That's correct.

25                   THE COURT:  So we're going to need a few minutes to

*Waskowski v. State Farm*

 1   get set, okay?  So I'm going to have you return to the jury

 2   room.

 3           Or it's like a quarter to one, so maybe it's probably

 4   not a good idea, okay?

 5           You know what, I'm looking at the time and --

 6           MR. HEWSON:  I'm sorry, Your Honor.  I didn't mean to

 7   rush out.  I was going to try and get the videographer.  This

 8   is the gentleman who would play the videos for me, so --

 9           THE COURT:  So it's going to take about ten minutes

10   to get it going, right?

11           VIDEOGRAPHER:  Yes, sir.

12           THE COURT:  So that would put us at five to one, and

13   probably wouldn't be particularly productive, to have five

14   minutes of a two-hour video.

15           MR. TEMROWSKI:  It's about two hours.

16           THE COURT:  Okay.  So I guess we're going to let you

17   go for the day, okay?

18           So again, when you go home, you can't discuss this

19   case, right?

20           THE JURY:  Right.

21           THE COURT:  All right.  So we're going to break for

22   the day and we'll see everyone upstairs at 8:00 tomorrow

23   morning, right?

24           THE JURY:  Yes.

25           DEPUTY COURT CLERK:  All rise.

*Waskowski v. State Farm*

1          (Jury out at 12:43 p.m.)

2          DEPUTY COURT CLERK:  Please be seated.

3          MR. HEWSON:  One quick issue, Judge.  Mr. Temrowski

4    gave me subpoenas for two State Farm witnesses for tomorrow and

5    I can't get them here tomorrow.  I can get them here Monday.

6    This is the first notice I've had.

7          THE COURT:  How do you feel about that?

8          MR. TEMROWSKI:  How do I feel about it?  Your Honor,

9    they knew about this trial for a year.

10          MR. HEWSON:  And so did Mr. Temrowski, and he never

11    asked for these witnesses to be produced.

12          THE COURT:  But they're on the witness list.

13          MR. HEWSON:  One is on the witness list, live.

14    That's what it says, Cheryl Kucharski.  And Terri Page is not

15    listed as a live witness.

16          THE COURT:  Terri Page is on the witness list.

17          MR. HEWSON:  Yes, Your Honor, she is.  If you look at

18    Cheryl Kucharski --

19          THE COURT:  She is there, too.

20          MR. HEWSON:  Yeah.  His indication next to Cheryl

21    Kucharski's name is that she is a live witness.  He doesn't

22    indicate that for Terri Page.  And he never asked her --

23          MR. TEMROWSKI:  Well, wait a minute.

24          MR. HEWSON:  -- before this trial.

25          MR. TEMROWSKI:  For all of them, we didn't put

148

*Waskowski v. State Farm*

1    "live."

2           THE COURT:  Yeah, they don't.  We have already heard

3    from Margaret and there is no "live" designation.  Did you --

4    well, you're going with the video dep, right?

5           MR. TEMROWSKI:  Oh, I'm going to -- absolutely.  I'll

6    go with the video dep.

7           MR. HEWSON:  And then I think he has got the other

8    daughter and Mister.  I think that fills the day.  But all I am

9    suggesting is giving me 24 hour's notice to get a witness here.

10          THE COURT:  Do you really need one or both of them

11   tomorrow?

12          MR. TEMROWSKI:  I would like both.

13          THE COURT:  Okay.  And can you haven't been able to

14   get ahold of them?

15          MR. HEWSON:  Judge, they work out of the Portage

16   office of State Farm.  They're in Kalamazoo.

17          THE COURT:  Okay.

18          MR. HEWSON:  I mean, I'm not saying I wouldn't call

19   them, but I haven't had -- for example, Terri Page, I haven't

20   sat down with her and discussed what her testimony would be or

21   any of those things because I didn't know she was going to be

22   called, seriously.  You know, we have been together a lot in

23   the last month and-a-half and this was the first request I've

24   had to produce them.

25          THE COURT:  Well, before we broke, you wanted to call

149

*Waskowski v. State Farm*

1    your client as the next witness, but the translator was not

2    here.

3            MR. TEMROWSKI:  Right.

4            THE COURT:  And then we were going to go to the dep

5    of Glowacki which is going to take about two hours.  So how

6    important is it to your presentation of the case to have these

7    two witnesses here --

8            MR. TEMROWSKI:  Tomorrow?

9            THE COURT:  Yeah.

10           MR. TEMROWSKI:  Oh, I don't care if they're --

11   probably they -- I wouldn't even get to them tomorrow.

12           THE COURT:  Okay.  Do you have witnesses after you

13   get done with your client?

14           MR. TEMROWSKI:  I have the video, my client and the

15   daughter, three.

16           THE COURT:  Okay.  Well, I don't want to run out of

17   witnesses.  That's the thing.

18           MR. HEWSON:  I understand, Judge.  I will see if I

19   can get one of them here.

20           THE COURT:  Let's just work with each other.  I mean,

21   hopefully it can work out and -- let's just see if we can work

22   an arrangement that works for everybody, without making things

23   too difficult for anybody, okay?

24           MR. HEWSON:  Yes.

25           MR. TEMROWSKI:  Okay.

*Waskowski v. State Farm*

1              MR. HEWSON:  Can I leave the marked exhibits here,

2     Your Honor?  I mean, these are the ones we haven't introduced

3     yet.  I just don't want to have to package them back up, if

4     that's all right?  Or does the Court to require the table?

5              THE COURT:  That's the problem.  I have three

6     criminal sentencings this afternoon.  Do you want to set them

7     over there on, say, the first bench?

8              MR. HEWSON:  You know, Judge, we'll just put them

9     back in the box.  It's okay.

10              THE COURT:  Okay.

11              MR. HEWSON:  But thank you.

12              MR. TEMROWSKI:  So today we need to move all this?

13              THE COURT:  Yeah.  All you need to do, if you want,

14     just put it on the bench behind you.

15              MR. TEMROWSKI:  Okay.

16              (Court in recess at 12:48 p.m.)

17                             *      *      *

18

19

20

21

22

23

24

25

*Waskowski v. State Farm*

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    **C E R T I F I C A T I O N**

15            I, Marie J. Metcalf, Official Court Reporter for the

16    United States District Court, Eastern District of Michigan,

17    Southern Division, appointed pursuant to the provisions of

18    Title 28, United States Code, Section 753, do hereby certify

19    that the foregoing is a correct transcript of the proceedings

20    in the above-entitled cause on the date hereinbefore set

21    forth.

22            I do further certify that the foregoing transcript

23    has been prepared by me or under my direction.

24    s\Marie J. Metcalf                        08-31-13

25    Marie J. Metcalf, CVR, CM                 (Date)