1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3   JAROSLAW WASKOWSKI,

4                      Plaintiff,

5       -v-                        Case No. 11-13036

6   STATE FARM MUTUAL AUTOMOBILE
    INSURANCE COMPANY,
7
    _____ Defendant./
8
                      **JURY TRIAL - DAY TWO**
9                   **BEFORE HON. SEAN F. COX**
                    United States District Judge
10                     257 U.S. Courthouse
                   231 West Lafayette Boulevard
11                     Detroit, Michigan 48226

12                **(Thursday, November 29, 2012)**

13  APPEARANCES:        LEE ROY H. TEMROWSKI, ESQUIRE
                        Appearing on behalf of the Plaintiff.
14
                        JAMES F. HEWSON, ESQUIRE
15                      Appearing on behalf of the Defendant.

16  COURT REPORTER:     MARIE METCALF, CVR, CM
                        Federal Official Court Reporter
17                      257 U.S. Courthouse
                        231 W. Lafayette Boulevard
18                      Detroit, Michigan 48226
                        metcalf_court@msn.com
19

20

21

22

23

24

25

1          **TABLE OF CONTENTS**

2    **PROCEEDINGS – Thursday, November 29, 2012**                    **PAGE**:

3    **WITNESSES CALLED BY PLAINTIFF:**

4    **KAMILA WASKOWSKA**

5    DIRECT EXAMINATION BY MR. TEMROWSKI.....................    6

6    CROSS–EXAMINATION BY MR. HEWSON.........................   21

7    REDIRECT EXAMINATION BY MR. TEMROWSKI...................   46

8    RECROSS–EXAMINATION BY MR. HEWSON.......................   49

9    **STEFAN GLOWACKI, M.D.**

10   VIDEOTAPED DEPOSITION PLAYED............................   51

11   **DR. ANTONI LUDZINSKI (RECALLED)**

12   REDIRECT EXAMINATION BY MR. TEMROWSKI...................   57

13   RECROSS–EXAMINATION BY MR. HEWSON.......................   60

14   REDIRECT EXAMINATION BY MR. TEMROWSKI...................   63

15

16   **EXHIBITS**:                                              **REC'D**:

17   (None offered).

18

19

20

21

22

23

24

25

*Waskowski v. State Farm*

1              Detroit, Michigan

2              Thursday, November 29, 2012

3              At about 8:31 a.m.

4                   *   *   *

5         DEPUTY COURT CLERK:  All rise.  The United States

6    District Court is in session, the Honorable Sean Cox

7    presiding.  Please be seated.

8         The Court calls case number 11-13036, Jaroslaw

9    Waskowski versus State Farm Mutual Automobile Insurance

10   Company.

11        Counsel, your appearances for the record, please?

12        MR. TEMROWSKI:  Good morning, Your Honor.  Lee

13   Temrowski appearing on behalf of the plaintiff.

14        MR. HEWSON:  May it please the Court, James Hewson

15   appearing on behalf of State Farm.

16        THE COURT:  Good morning.

17        Are you ready to proceed with the trial?

18        MR. TEMROWSKI:  Yes, Your Honor.

19        MR. HEWSON:  Yes, sir.

20        THE COURT:  And the next witness is -- I understand

21   it's not going to be Dr. Glowacki by way of videotape.  It's

22   going to be Kamila Waskowska.

23        MR. TEMROWSKI:  Your Honor, just one other thing.

24   Evidently, Dr. Lodzinski who testified yesterday and who

25   testified that he has a doctorate degree --

*Waskowski v. State Farm*

```
 1              THE COURT:  Okay.

 2              MR. TEMROWSKI:  -- was so upset that he's produced

 3    his diploma, and because it's from Poland, a notarized

 4    transcription of it.

 5              And I would like to have this introduced into

 6    evidence to confirm that he does have a doctorate degree.

 7              MR. HEWSON:  Your Honor, I requested that document

 8    at that time that I took his deposition.  It's not on the

 9    exhibit list.  I can't cross-examine him on that document.

10    And I can't cross-examine the person who interpreted it.  I

11    don't think there's sufficient foundation.  And --

12              THE COURT:  Well, right now there's -- as we speak

13    right now, there isn't foundation, but if you lay a

14    foundation, you know, it will probably come in.

15              MR. TEMROWSKI:  Okay.  I'll need to call him back

16    then.

17              THE COURT:  That would probably be the easiest way

18    to do it.

19              MR. HEWSON:  Could I at least see the document,

20    Judge?

21              MR. TEMROWSKI:  Oh, absolutely.

22              MR. HEWSON:  I certainly would like to question

23    whoever it was that translated this document.  It's a

24    photocopy -- well, Your Honor, I'll reserve that.

25              THE COURT:  Well, you know what, Mr. Hewson, you
```

*Waskowski v. State Farm*

1    raised the issue.  You told the jury that he didn't have a

2    diploma, he wasn't a Ph.D.  You raised the issue attacking his

3    credibility.  So if he lays a foundation, he being the

4    plaintiff, it's probably going to come in.

5              MR. HEWSON:  Yes, sir.

6              THE COURT:  Okay.

7              MR. TEMROWSKI:  Get the first witness?

8              THE COURT:  Yes.

9              MR. TEMROWSKI:  Okay.

10             THE COURT:  Okay.

11             DEPUTY COURT CLERK:  All rise for the jury.

12             (Jury in at 8:36 a.m.)

13             DEPUTY COURT CLERK:  Please be seated.

14             THE COURT:  Members of the jury, good morning.

15             THE JURY:  Good morning.

16             THE COURT:  We're going to continue with the trial

17   right now.  But as I understand, we're going to hear from Mr.

18   Waskowski's daughter Kamila and then we're going to hear and

19   see the videotape of Dr. Glowacki.  Is that how we are going

20   to proceed?

21             MR. TEMROWSKI:  Yes, Your Honor.

22             THE COURT:  Okay, very good.  Your next witness?

23             MR. TEMROWSKI:  Okay.  Plaintiff next calls Kamila

24   Waskowska.

25             THE COURT:  Could you come up here and could you

*Waskowska – Direct*

1    give us your full name, please?

2              THE WITNESS:  My name is Kamila Waskowska.

3              THE COURT:  Tell us how you spell your first name?

4              THE WITNESS:  K-a-m-i-l-a.  The last name is

5    W-a-s-k-o-w-s-k-a.

6              THE COURT:  Could you raise your right hand?

7              **KAMILA WASKOWSKA, PLAINTIFF'S WITNESS, SWORN**

8                      **DIRECT EXAMINATION**

9    BY MR. TEMROWSKI:

10   Q    Kamila, good morning.

11   A    Good morning.

12   Q    Would you please tell the jury what your name is?

13   A    My name is Kamila Waskowska.

14   Q    And where do you live at?

15   A    I live in Warren, Michigan.

16   Q    And what is your relationship to Mr. Waskowski, the

17   plaintiff in this case?

18   A    He's my father.

19   Q    And when did you and your father come to this country?

20   A    It was around nine years ago.

21   Q    And at the present time are you employed?

22   A    Yes, I am.

23   Q    And would you tell the jury where you work at?

24   A    I work at Sally's Beauty Supply as an assistant store

25   manager.

*Waskowska – Direct*

1    Q     And do you go to school at all?

2    A     No, I do not.

3    Q     Now, I would like to draw your attention to the

4    automobile collision of December 23rd, 2009.

5    A     Okay.

6    Q     Do you recall that date?

7    A     Yes, I do.

8    Q     And first of all, were you present when this collision

9    occurred?

10   A     No, I was not.

11   Q     And how did you find out that your father had been

12   involved in an automobile collision?

13   A     There was customers coming into the work where I was

14   working at the time saying that there was a car accident.  And

15   then I received a phone call that my father was -- that one of

16   the people that were involved in the car accident.

17   Q     And at the time this collision actually took place --

18   where did it take place?

19   A     It was in the crossing of 15 and Dequindre.

20   Q     And where were you working at that time?

21   A     I was at the American-Polish Culture Center at the 15 and

22   Dequindre.

23   Q     And what type of work did you do there?

24   A     I was a waitress.

25   Q     So people come in, you get a phone call.  What did you

*Waskowska – Direct*

1    do?

2    A    I left work and I went to the scene of the accident.

3    Q    And when you arrived at the scene of the accident, what

4    did you personally observe?

5    A    I seen cars -- there was a car in the middle, right on

6    the intersection.  There was another one that was on Dequindre

7    and then I seen my father's car in the parking lot of the

8    florist shop.

9    Q    And did you have an opportunity to observe if there was

10   any damage to your father's vehicle?

11   A    Yes, I did.

12   Q    And please tell the jury what you observed?

13   A    I seen the damage to the front of the car, there was a

14   bumper missing.  The -- and then the car was just on the side

15   of the road.

16   Q    And was your father at the scene?

17   A    Yes, he was.

18   Q    And did you have an opportunity to observe him?

19   A    Yes, I did.

20   Q    What did you observe upon looking at your father?

21   A    He was in shock.  He didn't remember exactly what

22   happened during the car accident.  He just wanted to know

23   exactly what has happened a couple of minutes ago, so he

24   needed an explanation.

25   Q    And did you talk to your father about the collision?

*Waskowska – Direct*

1    A    Yes, I did.  I tried to ask him what happened, how the

2    accident occurred.  He goes, like, "I really don't remember.

3    I just remember being in a lane and then ending up on the side

4    of the parking lot."

5    Q    What happened next?

6    A    There was police everywhere.  There was an ambulance over

7    there.  I know I just kept on asking him if he was okay.  He

8    said yeah, but I just know I didn't see he was fine.

9              And then I talked to the police officers.  I tried

10    to find out what has exactly happened.  And what to do now.

11    And I just tried to get the whole situation under control,

12    but --

13    Q    And your father, did he leave by an ambulance?

14    A    No, he did not.

15    Q    How did your father leave the scene of the collision?

16    A    We went home in my car.

17    Q    You went directly home?

18    A    Yes.

19    Q    And what happened once you got back home?

20    A    It was around Christmastime, so we knew the doctors were

21    closed.  Plus, with the language barrier, because of -- he

22    cannot really -- he can speak English, but sometimes he has

23    troubles speaking it and understanding it.  We tried to look

24    for a Polish doctor, but we couldn't find one until after the

25    holidays.

*Waskowska – Direct*

1   Q    And who was that doctor that you found?

2   A    It was Dr. Wietrzykowski.

3   Q    And how exactly did you find Dr. Wietrzykowski?

4   A    I believe we found him on the internet or the Yellow

5   Pages, either/or.

6   Q    And would that have been the first doctor that your

7   father actually went to?

8   A    Yes, he was.

9   Q    And did you go with him to that appointment?

10  A    No, I did not.

11  Q    Do you know how many times your father saw Dr.

12  Wietrzykowski?

13  A    Once.

14  Q    And after that initial visit, did he receive from any

15  other doctors any other medical care and treatment?

16  A    Yes, he did.

17  Q    And with who?

18  A    Dr. Glowacki was the second doctor we seen.

19  Q    And do you know how your father got to Dr. Glowacki?

20  A    Yeah.  We found him on the Yellow Pages.  And then we

21  called and asked him if he spoke Polish and he did.

22  Q    From the date of the automobile collision up to the

23  present time, has your father been continuously treating with

24  doctors for injuries from this automobile collision?

25  A    Yes, he --

*Waskowska – Direct*

1              MR. HEWSON:  I'm going to object, Your Honor,

2    because it calls for a medical conclusion as to the

3    correlation between the injuries and the accident.  No

4    foundation for this witness to testify to that.

5              THE COURT:  Overruled.

6              THE WITNESS:  Yes, he has.

7    BY MR. TEMROWSKI:

8    Q    And have you, Kamila, actually ever gone with your father

9    to any of his doctor appointments?

10   A    Yes, I have.

11   Q    And could you just tell us what doctors have you gone

12   with your father to?

13   A    There was plenty of them.  I know we went to Dr.

14   Glowacki.  I believe I went to see him -- to Dr. Donahue.  Dr.

15   Kalinger (phon.), I believe his last name is.  Plenty of them.

16   I can't remember all the names.  I'm sorry.

17   Q    Okay.  And did you ever accompany or go with your father

18   to any of his physical therapy appointments?

19   A    Yes, I have.

20   Q    Has your father driven a car since this automobile

21   collision occurred?

22   A    No, he has not.

23   Q    So every time since the collision that your father has

24   gone for either medical testing, medical treatment, physical

25   therapy, how has he gotten there?

*Waskowska – Direct*

1   A    It was either me or my sister driving him.

2   Q    Now, Kamila, it's my understanding that you are one of

3   your father's care providers because of injuries he received

4   in this collision; is that correct?

5   A    Yes, I am.

6   Q    And would you please tell the ladies and gentlemen of the

7   jury what type of services have you been providing to your

8   father since he got injured in the automobile collision?

9   A    We've been doing the attendant care and the household

10  care for my dad.

11  Q    And who has been his care providers?

12  A    Me and my sister.

13  Q    And Kamila, do you know the difference between household

14  help services and attendant care services?

15  A    Yes, I do.

16  Q    And would you please explain to the jury what is the

17  difference between those two types of services?

18  A    Household care is anything to do around the house, like

19  mowing the grass, cleaning up the kitchen, the bathrooms,

20  anything that has to do with maintaining of the house.

21       Whereas the attendant care has anything to do with

22  my father, assisting him with the baths, helping him getting

23  dressed, driving him to any doctors.  Just anything to do

24  with his body.

25  Q    And have you, along with your sister, been providing

*Waskowska – Direct*

1    those two types of service to your father since the date of

2    the automobile collision?

3    A    Yes, we have.

4    Q    Do you continue to do that?

5    A    Yes, we do.

6    Q    How many days per week do you perform these services to

7    your father?  And I'll start with the household help.  How

8    many days per week?

9    A    Seven days a week.

10   Q    Regarding the attendant care, how many days per week do

11   you and your sister provide those services to your father?

12   A    Seven days a week.

13   Q    And regarding the attendant care, how many hours per day

14   between you and your sister do you provide those services to

15   your father?

16   A    Twelve hours a day.

17   Q    And could you please explain to the ladies and gentlemen

18   of the jury where did the 12 hours per day come from?

19   A    It was prescribed by, I believe, Dr. Glowacki, to him.

20   Q    Okay.  So there's a doctor's prescription?

21   A    Yes, there is.

22   Q    Now, did you, yourself ever have any personal contact or

23   communication with State Farm?

24   A    I did, yes.

25   Q    And who specifically did you have any communication with

*Waskowska – Direct*

1    at State Farm?

2    A    With Terri Page.

3    Q    And who is Terri Page?

4    A    I believe she's the claims adjuster.

5    Q    Okay.  And what types of contact or communication did you

6    personally have with Terry Page?

7    A    We were receiving letters from her regarding the

8    household care and attendant care and I believe his wage loss

9    as well.

10   Q    And as one of your father's care providers, were you

11   asked by Terri Page at State Farm in order to be compensated

12   for the household help and the attendant care, to document

13   what you were doing and to complete forms for State Farm?

14   A    Yes, we were.

15   Q    And were you provided forms by State Farm to be completed

16   so that you could collect for the household help services and

17   the attendant care services?

18   A    Yes, we were.

19   Q    And did you complete those forms?

20   A    Yes, we did.

21   Q    I'm now going to show you what I've had marked as

22   Plaintiff's Exhibits L and M.

23   A    Okay.

24   Q    Take a look at those, take your time, and please tell the

25   jury what are those documents?

*Waskowska – Direct*

1    A    These are the forms me and my sister filled for the

2    attendant care and the household care.

3    Q    Okay.  And could you please, Miss Kamila, explain to the

4    jury -- you were requested to complete these forms by Terri

5    Page, correct?

6    A    Yes.

7    Q    And you did that?

8    A    Yes.

9    Q    And were those forms, once they were completed, sent to

10   Terri Page?

11   A    Yes, they were.

12   Q    Now, will you please explain to the jury exactly how did

13   you and your sister complete those forms?

14   A    We have uploaded them on a computer just to be easier,

15   because our handwriting is not that really clear.  So we

16   upload them on the computer, and as we were going throughout

17   the day, we were filling in the forms.

18   Q    So if I understand you correct, every day that you and

19   your sister would provide the attendant care and the household

20   help services to your father, you would get on the computer

21   and complete those forms, listing what you were doing,

22   correct?

23   A    Yes, we did.

24   Q    Could you please tell us when did you first start sending

25   these forms to State Farm?

15

*Waskowska – Direct*

1    A    I believe it was like a month after the accident.  We

2    were trying to keep them updated, but the shipping was so

3    expensive, we kind of did them in chunks.

4    Q    Okay.  And after completing these forms and sending them

5    to State Farm, were you, in fact, compensated by State Farm at

6    all for any of these services?

7    A    To a certain point, yes.

8    Q    Okay.  Please explain to the jury to what point from the

9    date of the accident to what point were you compensated?

10   A    I believe it was until October of 2010.

11   Q    Okay.  And then did it stop the payments?

12   A    Yes, they did.

13   Q    And just so we can be clear about all of this, did your

14   father promise to pay you for these two different services

15   that you provided to him?

16   A    Yes, he did.

17   Q    And regarding the household help services, who much did

18   your father promise to pay you?

19   A    For the household, it was $20 a day.

20   Q    For the attendant care services, how much money did your

21   father promise to pay you?

22   A    $15 an hour.

23   Q    And do you have an expectation of payment for those

24   services?

25   A    Yes, I do.

*Waskowska – Direct*

1  Q     Now, you've indicated that State Farm did, in fact, pay

2  for some services up through -- was it through the end of

3  October?

4  A     Yes, it was.

5  Q     Did the payments stop then?

6  A     Yes.

7  Q     After the payments stopped, did you and your sister

8  continue on a daily basis to complete those forms?

9  A     Yes, we did.

10 Q     And did you and your sister, even though the payments

11 stopped and you were completing the forms, did you continue

12 after payment stopped to send those forms to Terri Page at

13 State Farm?

14 A     Yes, we did.

15 Q     And please tell the jury, after the payment stopped, for

16 what period of time did you send the completed forms to Terri

17 Page at State Farm for the household help?

18 A     I believe it was until March of 2011.  I don't know the

19 exact date.

20 Q     But they were sent even though payments had stopped?

21 A     Yes, they have.

22 Q     For the attendant care, did you continue to complete the

23 forms, even though payments had stopped, and send the

24 completed forms to Terri Page at State Farm?

25 A     Yes, we did.

17

*Waskowska – Direct*

1    Q    And for how long a period of time did you do that after

2    the attendant care stopped?

3    A    I believe it was the same time.  I think this went till

4    April, though, of 2011.

5    Q    But no payments were being received?

6    A    No, they have not been.

7    Q    Did you then stop sending in the forms to Terri Page?

8    A    Yes, we did.

9    Q    And would you just explain to the jury why did you stop?

10   A    We were just -- we didn't have enough money to send the

11   package.  And we just said, "Why are they -- if they're not

12   paying us, why should we sent the forms in?"

13   Q    Okay.  However, did you and your sister still continue to

14   perform household help services and attendant care to your

15   father?

16   A    Yes, we have.

17   Q    And did you still continue on a daily basis to keep track

18   of what you were doing?

19   A    Yes, we have.

20   Q    And recently, have you downloaded or printed those forms

21   --

22   A    Yes.

23   Q    -- up to the present date?

24   A    Yes.

25   Q    And have those forms also been provided to State Farm?

*Waskowska – Direct*

1    A    Yes.

2    Q    Regarding the household help services, would you just

3    please explain to the jury specifically -- and you can look at

4    the exhibits if you need to.

5    A    Okay.

6    Q    Just tell the jury, please, what types of household help

7    services did you perform for your father if he couldn't do it?

8    A    We did taking out the trash, we did cleaning the

9    bathrooms, the kitchen.  We --

10            THE COURT:  Go a little bit slower, okay?  Slow

11   down.

12            THE WITNESS:  I'm sorry.  We cleaned the kitchen, we

13   cleaned the bathrooms, we walked the dogs, we changed the

14   linens.  We dust and mop the floors.  We have three dogs, so

15   there's dog hair everywhere.  We did the laundry, the dusting,

16   all the things that need to be done around the house -- home,

17   so it doesn't look like there's nobody living there.

18   Q    And that's regarding the household help services,

19   correct?

20   A    Yes.

21   Q    Did you perform those types of services for your father

22   before this automobile collision occurred?

23   A    No, I have not.

24   Q    Did your father -- was your father capable of doing those

25   things for himself before this automobile collision occurred?

*Waskowska – Direct*

1    A    Yes, he was.

2    Q    Regarding the attendant care services, would you please

3    tell the jury what type of attendant care services did you

4    provide your father?

5    A    We helped with getting in and out of bed, helped with the

6    dressing.  We assisted with the showering and washing.  We did

7    the massages prescribed -- not prescribed, but said to do by

8    his physical therapy.  We prepared his meals.  We did his

9    medications.  We did everything that he needed to be done

10   around him.

11   Q    And did you have to perform those types of services to

12   your father before the December 23rd, 2009 motor vehicle

13   collision?

14   A    No, we did not.

15   Q    Was your father, before December 23rd, 2009, capable of

16   doing those things for himself that you just told us about?

17   A    Yes, he was.

18   Q    Keeping in mind that we know you're not a doctor, --

19   A    Right.

20   Q    -- but you are a care provider, --

21   A    Right.

22   Q    -- could you just please tell us in your own words, what

23   are your father's problems because of this automobile

24   collision?

25   A    He has problems with his back, his shoulder.  He has

*Waskowska – Cross*

1   tingling in his arm, in his left arm, so his left arm is a

2   little bit weaker than his right one.  And then his shoulder

3   hurts, like I said, his back.  He has problems with just even

4   standing up for longer periods of time.

5   Q    Did your father have any of those problems before

6   December 23rd, 2009?

7   A    No, he did not.

8   Q    To your knowledge, before December 23rd, 2009, did your

9   father treat with a doctor for any of those types of problems?

10  A    No, he didn't.

11          MR. TEMROWSKI:  Thank you.  I have nothing else.

12          THE COURT:  Okay.  Mr. Hewson?

13          MR. HEWSON:  Thank you, Your Honor.

14                        **CROSS-EXAMINATION**

15  BY MR. HEWSON:

16  Q    Ms. Waskowska, you got a letter from State Farm that said

17  -- or actually your father got a letter from State Farm

18  indicating that he was entitled to certain first-party

19  no-fault benefits right after this accident, right?

20  A    I believe so, yes.

21  Q    Yeah.  State Farm wrote and said you're entitled to these

22  things and you have to provide documentation in order to get

23  payment for certain benefits.  That's generally what they told

24  you in letters, correct?

25  A    Right.

*Waskowska - Cross*

1   Q    And they supplied you with the documents that they wanted

2   you to provide, correct?

3   A    Yes.

4   Q    And you understood that those documents were supposed to

5   be accurate, to tell State Farm this is what I'm doing and

6   this is why you should be paying me?

7   A    Correct.

8   Q    So when you fill out those attendant care forms which are

9   Exhibit L, I believe --

10  A    Yes.

11  Q    I'm sorry.  The household services forms, which are

12  Exhibit L, you would go through and honestly put on there the

13  times that the services were performed and the nature of the

14  service that was performed; am I correct?

15  A    Yes.

16  Q    And then you would sign them?

17  A    Yeah.

18  Q    Your sister didn't sign those forms for household

19  services until approximately March of 2010.  Only you signed

20  them?

21  A    I believe so, yes.

22  Q    And so when the form comes in and it's only got your

23  signature on it, it looks like you did all the work, right?

24  A    Correct.

25  Q    And your sister, you said, was participating in putting

*Waskowska – Cross*

1    this information in every day?

2    A    Yes.

3    Q    But she didn't sign those forms to attest to that

4    information; am I correct?

5    A    Yes.

6    Q    Now, can you tell us from the period of December 2009 to

7    March of 2010, how much you were paid from your father for

8    those services that you signed those forms for?

9    A    I honestly don't remember.

10   Q    Okay.  What would you do when he would give you -- did he

11   actually give you money for those services?

12   A    Yes.

13   Q    What did you do with that money?

14   A    We covered his bills that he had coming into his house,

15   like the water bill --

16   Q    Okay.  Let me make sure I understand.  At the beginning

17   of the claim, he was getting wage loss payments from State

18   Farm as well?

19   A    Right.

20   Q    That replaced his income?

21   A    Right.

22   Q    His medical bills were all being paid?

23   A    Correct.

24   Q    His physical therapy was all being paid?

25   A    I believe so, yes.

*Waskowska – Cross*

```
 1   Q     And you were giving him the money that you supposedly
 2   earned to cover his bills as well?
 3   A     Yes, I was.
 4   Q     Did your sister do the same thing?
 5   A     I believe so.
 6   Q     Now, you're working at Sally Beauty Supply now; is that
 7   correct?
 8   A     Yes.
 9   Q     Do you punch a clock?
10   A     Uh-huh.
11   Q     How much do they pay you an hour?
12   A     Right now I get $9.69 an hour.
13   Q     $9.69 an hour?
14   A     Uh-huh.
15   Q     Is that a fair wage?
16   A     It's okay, yeah.
17   Q     Do you have any medical training?
18   A     No, I do not.
19   Q     Have you had any medical training since the time of your
20   father's accident to now?
21   A     Just his massages.  That's about it.
22   Q     So if you stay home to do services at $12 or $15 an hour,
23   it obviously makes more money for you than your job?
24   A     Correct.
25   Q     How did you come up with a half an hour to take out the
```

*Waskowska - Cross*

1   garbage?

2   A    Well, there's garbage from the whole week.  There's cans.

3   So we have to also pick up, like, after the dogs, the waste

4   from the backyard.  But we have to take out all the garbage.

5   There's garbage -- I mean, there's bags of it.

6   Q    But you lived there at the time?

7   A    I did.

8   Q    Your sister lived there at the time?

9   A    She did.

10  Q    You charged $20 to State Farm to take out the garbage for

11  half an hour on that day?

12  A    Correct.

13  Q    And is that reasonable to you?

14  A    I mean, it has to be done.

15  Q    Is it reasonable to you?

16  A    I assume so.

17  Q    Would you have had to take out your own garbage?

18  A    Yes.

19  Q    Did you and your sister do any chores around the house

20  before your father was involved in the accident?

21  A    No, we did not.

22  Q    He did the dusting?

23  A    He did the dusting.

24  Q    He did all the laundry?

25  A    Yes, he did.

*Waskowska - Cross*

1    Q    He did all the cooking?

2    A    We did our own laundry, but yeah, he did all the -- he

3    did cooking.  We're a Polish family.  We love to eat.  I mean,

4    all the Polish cooking, that takes time.

5    Q    Sure.  You and your sister didn't do anything around the

6    house other than your own laundry?

7    A    Correct.

8    Q    Make your own beds?

9    A    Yep.

10   Q    He did everything else?

11   A    He did.

12   Q    Because you know if he didn't do those things and you

13   were doing them before the accident, you don't get paid for

14   them, right?  You understand that?

15   A    I do.

16   Q    So now you're telling the jury that he was dusting the

17   house a couple times a week?

18   A    But it --

19   Q    And vacuuming and doing all the laundry?

20   A    Yes, he was.

21   Q    If he was doing it by himself, why did it take you and

22   your sister to do it after the accident?  If he was capable of

23   taking care of the household on his own --

24   A    Right.

25   Q    -- and work full time, --

26

*Waskowska - Cross*

1   A     Right.

2   Q     -- why is it that it took you and your sister, the two of

3   you, to do this now that he was hurt?

4   A     I don't understand.  I'm sorry.

5   Q     You've told the jury that he did all the chores around

6   the house except your laundry?

7   A     Right.

8   Q     But now you're telling the jury it took the two of you to

9   do what he used to do by himself?

10  A     Correct.

11  Q     Why was that?

12  A     At the time of his car accident, I was pregnant, so I

13  really couldn't do a lot.  I had gestational diabetes when I

14  was pregnant, so I had to poke my fingers.  I had watch what I

15  eat and all that.

16  Q     Sure.

17  A     Plus, I was at a risk because of my high blood pressure,

18  so I had to be careful what I do.  So she was there to help

19  me.

20  Q     I understand.  And I was going to ask you about that.

21  Your son was born in April of 2010?

22  A     Yes, he was.

23  Q     So at the time of this accident, you were about five

24  months pregnant?

25  A     Yes, I was.

*Waskowska - Cross*

1   Q    And you had told me that there were some -- take a

2   second.  I'm sorry.

3   A    That's okay.

4   Q    This can be nerve wracking, can't it?

5   A    Yeah.

6   Q    You okay?

7   A    Yeah, I'm okay.

8   Q    All right.  You were doing 12 hours a day worth of

9   attendant care for your father when you had gestational

10  diabetes and complications with your blood pressure and you

11  were in an at-risk pregnancy; is that what you're telling the

12  jury?

13  A    I had to do what I had to do to help him.

14  Q    But your sister could have done it?

15  A    She was also working at the time.

16  Q    Okay.  Do you agree with me that the only way that the

17  jury can know what happened on any particular day for these

18  services has got to be on those forms?

19  A    I believe so, yeah.

20  Q    Because you don't remember any particular day, right?

21  A    I mean, I remember days that I did stuff, yeah.  But I

22  won't be able to tell you what was exact that day.

23  Q    And the same thing, that's the reason you filled them out

24  and sent them to State Farm, so that State Farm could know

25  what you did on a particular day, right?

*Waskowska - Cross*

1    A    There was no place for us to put who did what.  And if we

2    were supposed to put who did what, we would have done that if

3    we were asked.

4    Q    Okay.  The issue came up yesterday.  Do you remember at

5    your deposition when you and I spoke the first time and you

6    were in front of the court reporter in Mr. Temrowski's office?

7    A    Yes.

8    Q    And you remember that I said to you, Ms. Waskowska, if I

9    ask you a question that is confusing or unclear, you have to

10   stop me and tell me that so that I can correct the question;

11   do you remember me saying that to you?

12   A    Yes, I do.

13   Q    And you agreed with me, right?

14   A    I did.

15   Q    And then I asked you -- I said, if you answer a question

16   that I ask you, I'm going to assume that you understood me and

17   you answered me truthfully; is that fair, and do you remember

18   what your answer was?

19   A    I said yes.

20   Q    You said it was fair, right?

21   A    Yes.

22   Q    When I was asking you questions about the forms that you

23   had filled out --

24   A    Uh-huh.

25   Q    -- I asked you specific things about what was on those

*Waskowska – Cross*

1    forms; do you remember that?

2    A    Yeah.  I kind of do, yeah.

3    Q    Okay.  Do you remember testifying in that deposition that

4    your father did not need assistance with bathing for the first

5    six months after the accident?

6    A    I do.

7    Q    As a matter of fact, you said that on six separate

8    occasions in the deposition; did you know that?

9    A    No, I did not.

10   Q    Okay.  Do you disagree with that, that that was your

11   position at the time under oath, you swore that your father

12   didn't need assistance in the bath?

13   A    But we were there just to watch him, so he didn't fall or

14   like hurt himself anymore.

15   Q    Okay.  Do you remember that you told me that you didn't

16   start helping him bathe until June when the pain became

17   unbearable according to his report to you?

18   A    I believe I do, yeah.

19   Q    Okay.  Could you take a look at the first form?  As a

20   matter of fact, maybe I can move this along a little bit.

21        I'll make it easy.  These were the forms that you

22   and I had talked about previously.

23        It's part of this exhibit, Your Honor, if I may

24   approach the witness?

25        THE COURT:  Sure.  It's part of Exhibits L and M?

*Waskowska - Cross*

1          MR. HEWSON:  It's actually Exhibit M, Your Honor.

2          THE COURT:  Okay.

3          MR. HEWSON:  And it was Deposition Exhibit Number

4   Four to Ms. Waskowska's deposition.  Let me show it all to

5   you.

6          THE WITNESS:  Thank you.

7          MR. HEWSON:  You're welcome.

8          THE COURT:  I apologize.  So exhibit M that's been

9   admitted into evidence here yesterday was Exhibit Four during

10  the course of --

11         MR. HEWSON:  It's part of Deposition Exhibit Four in

12  her deposition, Your Honor.

13         THE COURT:  Okay.

14         MR. HEWSON:  I'm just using that so she doesn't have

15  to rummage through the paperwork.

16  BY MR. HEWSON:

17  Q    That covers the period December the 27th to what date,

18  please?

19  A    January 2nd, 2010.

20  Q    Okay.  Now, there's no indication for me that you had to

21  take care of your father on the 24th, the 25th or the 26th,

22  the first three days after the accident, right?

23  A    Correct.

24  Q    You didn't take him to a hospital in that period of time?

25  A    No, we did not.  I don't think so.

*Waskowska – Cross*

1   Q    You didn't take him to a doctor's office?

2   A    Not before the 27th, no.

3   Q    Okay.  You understand that there's a variety of emergency

4   rooms within a short distance from your home in Sterling

5   Heights, right?

6   A    I do.

7   Q    St. Joe's West is 19 Mile and Garfield.  And you're at

8   what, where in Sterling Heights?

9   A    Fourteen and Dequindre.

10  Q    Okay.  So we're talking four or five miles away?

11  A    Correct.

12  Q    And there's Beaumont Troy at 19 and Dequindre?

13  A    Yep.

14  Q    It's only a couple of miles away?

15  A    Yes.

16  Q    They have an emergency room?

17  A    Right.

18  Q    He never went to an emergency room, right?

19  A    No, he did not.

20  Q    He had gone to an emergency room after the prior

21  accident; do you remember that?

22  A    I believe so, yeah.

23  Q    And did you go with him to that one to translate for him?

24  A    Yes, I did.

25  Q    This accident, though, there wasn't any of that and you

*Waskowska - Cross*

1   didn't tell the police that your father had been hurt?

2   A    No.

3   Q    Okay.  When we go back to the form which I asked you to

4   look at, --

5   A    Okay.

6   Q    -- there's nothing being done for him the first three

7   days after the accident?

8   A    Correct.

9   Q    Now, when was that form filled out?

10  A    This form was filled daily, so if it was --

11  Q    No, no.  When was it signed, though?

12  A    It was signed on January 2nd, 2010.

13  Q    Okay.  Now you told the jury that you and your sister

14  filled those forms out?

15  A    Right.

16  Q    You did it together?

17  A    Yes, we did.

18  Q    You put on there that you assisted your father with

19  bathing for an hour?

20  A    Yes.

21  Q    That's not true, is it?

22  A    My sister might have.  I don't remember.  We did these

23  forms before.  I didn't know my sister could also be on that

24  form as well.

25  Q    Well, did your sister sign that form?

*Waskowska - Cross*

1    A    No, she did not.

2    Q    So that's got your signature on it?

3    A    Correct.

4    Q    And you told me that your father didn't need to be

5    bathed, have assistance with bathing until June.

6    A    Correct.

7    Q    So on December the 27th you're telling State Farm, and

8    apparently the jury, that you are helping your father bathe,

9    and that's not true?

10   A    I might have not helped him.  But like I said, my sister

11   might have, but I'm the only one that signed the form.

12   Q    Okay.  What's the next date, the 28th?  Did you say that

13   you assisted him with bathing then?

14   A    Yes.

15   Q    That wasn't true?

16   A    It might have -- it was probably between me and my

17   sister.  Just because I signed the form, doesn't mean my

18   sister didn't help me.  She just wasn't on the form.

19   Q    No, no.  You're not understanding me.  You told me that

20   your father didn't need assistance with bathing for six

21   months.  Do you remember that?

22   A    I remember that part, yes.

23   Q    And that was true when you told me that, right?

24   A    Correct.

25   Q    On page 45 of your deposition, you had said that after

*Waskowska - Cross*

1   six months, you told Dr. Glowacki that you were not -- that

2   your father needed help bathing; do you remember that

3   testimony?

4   A    I don't remember that part, no.

5          MR. HEWSON:  May I approach the witness, Your Honor?

6          THE COURT:  Yes.

7   BY MR. HEWSON:

8   Q    Take a look.  I've highlighted the section.

9   A    Okay.  Thank you.

10  Q    You're welcome.

11         Is that when you told Dr. Glowacki that your father

12  needed help bathing?

13  A    I believe so, yeah.

14  Q    Six months later?

15  A    Hold on, let me finish.  I'm sorry.

16  Q    Sure.

17  A    Right.  But just because we told them a couple of months

18  after doesn't mean we weren't helping him before.

19  Q    Okay.  When did you start helping him?

20  A    It was three years ago.  Do you really honestly -- like,

21  how am I supposed to remember all this?  Do you honestly think

22  I remember every single day we helped him?

23  Q    Isn't that why you were filling out the forms, so you

24  wouldn't have to remember?

25  A    Yeah, we were, but --

*Waskowska - Cross*

1   Q     Hang on.  So you're filling out the forms to tell State

2   Farm they should pay you?

3   A     Right.

4   Q     And to tell the jury they should pay you?

5   A     Right.

6   Q     And you can't remember three years ago.  Who could?

7   A     Right.

8   Q     So we have to rely on whether those forms are accurate

9   and truthful, don't we?

10  A     Correct.

11  Q     But they're not accurate and truthful, are they?

12  A     Maybe they're not -- my sister helped me.  I mean, how am

13  I supposed to tell you from this piece of paper here, who was

14  it, me or my sister?

15  Q     I didn't ask who this -- you or your sister.  I really

16  didn't.

17        The only question I asked you right now is, if your

18  father didn't need help for bathing for six months, why are

19  you asking State Farm to pay you?  You're assisting him for

20  bathing --

21  A     Because he needed it and we gave him the help he needed.

22  Q     Do you remember telling me in your deposition that before

23  the accident when your father took a shower it took him about

24  ten minutes to take it on his own; do you remember testifying

25  to that?

*Waskowska - Cross*

1  A    Yes.

2  Q    Do you remember testifying that after the accident, but

3  before you started to help him, it only took 20 minutes for

4  him to take a shower, he was slower?

5  A    Right.

6  Q    But he took showers by himself --

7  A    Right.

8  Q    -- from the date of the accident until approximately

9  June?

10 A    He was still showing himself.  But that doesn't mean we

11 weren't there handing him stuff.  It doesn't mean we're not

12 turning water for him, giving him a towel.  We were still

13 there present to help him.  It doesn't mean we were showering

14 him.

15 Q    You told me on page 24, and if you would like to look at

16 it, it's there, that your father only took 20 minutes to

17 shower.

18 A    Okay.

19 Q    You were charging State Farm an hour for assisting your

20 father with showering, weren't you?

21        MR. TEMROWSKI:  Well, if I could object.  On page

22 24, it says before the accident.

23        MR. HEWSON:  Your Honor, it's actually 23 and 24.

24 I'll get the transcript back and show it.  I'm not -- pages 23

25 and 24.

*Waskowska - Cross*

1          THE COURT:  Is that all right, Mr. Temrowski?  If

2    Mr. Hewson proceeds like that?

3          MR. TEMROWSKI:  Yeah, that's fine.

4          MR. HEWSON:  I was just trying to move things along,

5    Judge.

6          THE COURT:  We're not in a rush.

7          MR. HEWSON:  Thanks.

8          THE COURT:  Don't worry about me.

9    BY MR. HEWSON:

10   Q    On the bottom of page 23, I've highlighted the section.

11   A    Right.

12   Q    To the top of page 24.  Do you see it?

13   A    Yes.

14   Q    Did I accurately ask you what your answer was in that

15   deposition, under oath?  You said ten minutes before, twenty

16   minutes after the accident, right?

17   A    No.  (Reviewing document).  Correct.

18   Q    It took him 20 minutes to take a shower by himself?

19   A    Right.

20   Q    And you're charging State Farm an hour for that?

21   A    Okay.

22   Q    Is that right, assist with bathing an hour?

23   A    According to the paperwork, yes.

24   Q    Okay.  And that's what you said every single time that

25   these things were filled out, correct?

*Waskowska - Cross*

1    A    Right.

2    Q    So that when you and your sister started filling out

3    those forms together at the time that the event occurred, you

4    knew that it wasn't taking him an hour.  It was taking him 20

5    minutes tops to take a shower; am I right?

6    A    The shower would have been 20 minutes, yes.  But then

7    helping him towel dry himself and all that, it would come up

8    to -- up to an hour, yes.

9    Q    Well, you also charged an hour and 30 minutes for help

10   with bending, standing, walking?

11   A    Correct.

12   Q    Why isn't that included in the shower process?

13   A    No, that's throughout the whole day.  If he's sitting

14   down, if he's standing up.  If he wants to lay down or stand

15   up, that's throughout the whole day.  It's not just in one

16   long period of time.

17   Q    Okay.  Now, you originally testified that you began

18   giving your father massages to his shoulders and his low back

19   right after the accident?

20   A    Correct.

21   Q    And you indicated that on the first form of December 27th

22   and continued through every single document that you

23   presented; am I right?

24   A    Correct.

25   Q    And then you told me in your deposition that you were

39

*Waskowska – Cross*

1    taught how to do that by Euro Rehab?

2    A    Correct.

3    Q    Do you remember that?

4    A    Yes.

5    Q    But your father didn't treat with Euro Rehab until

6    January the 7th, 2010, which was approximately three weeks

7    later.  Are you aware of that?

8    A    Correct.

9    Q    But you were billing for a massage for an hour --

10   A    Right.

11   Q    -- for $12 to $15 for that hour?

12   A    Right.

13   Q    When you hadn't been trained by Euro Rehab.  So that

14   testimony was wrong; am I correct?

15   A    We were still massaging him, even though we were not

16   trained.  It would release his pain.

17   Q    Okay.  So you didn't need the training from Euro Rehab?

18   A    I guess not.

19   Q    You remember testifying, though, in your deposition that

20   Euro Rehab had taught you how to do that?

21   A    They did.

22   Q    Do you know how much per hour you were actually being

23   paid by your father?

24   A    What do you mean?

25   Q    How much money did you actually get per hour for the

*Waskowska – Cross*

1  services you did?

2  A    We were getting $12 an hour.

3  Q    How do you know that?

4  A    From the money he was giving us.  But I don't know

5  exactly.  Because, I mean, the money that I was getting, was

6  helping him with the bills.

7  Q    Okay.  So you don't know how much money you were actually

8  getting per hour?

9  A    I believe so, yeah.  Correct.

10 Q    That is correct?

11 A    Yes.

12 Q    You didn't report any of that money as your wages on your

13 income tax returns, right?

14 A    Correct.

15 Q    Now, you knew that this was -- I think what you had told

16 me was that this was like a job?

17 A    Right, it is like a job.

18 Q    And the money that you earned at Sally's Beauty Supply,

19 you put that on your income tax returns?

20 A    I do.

21 Q    And this would have been money that you were earning from

22 your father, in theory?

23 A    Correct.

24 Q    But you didn't claim that on your income tax returns?

25 A    No.  I had no way of claiming that money.  I had no W2s

*Waskowska – Cross*

1    or anything to put on my taxes.

2    Q    Exactly.  You have no idea how much you were doing those

3    services for, do you?

4    A    I was doing it for $12 an hour, but just because I was

5    receiving that money doesn't mean that all that money was

6    coming into my pocket.

7    Q    That's exactly my point.

8    A    Right.

9    Q    You could have been getting six bucks an hour, eight

10   bucks an hour from your father?  You don't know how much it

11   was?

12   A    I guess not.

13   Q    Now, your father testified -- well, let me ask you this.

14   Do you know if your father ever kept track of how many dollars

15   he was actually paying you?

16   A    I don't know.

17   Q    Do you remember telling me on page 25 of the deposition

18   that it took you five to ten minutes to dress your father,

19   help him get dressed after the accident?

20   A    Correct.

21   Q    How much time did you bill for dressing him on your

22   forms?

23   A    An hour.

24   Q    Now, the last entry on each of those forms, if I'm

25   correct, says, "supervising the injured person"?

*Waskowska – Cross*

1   A    Right.

2   Q    And then you or your sister would put in the number of

3   hours that balanced it out to 12 hours per day, right?

4   A    Correct.

5   Q    So if you went to the physical therapist, you would sit

6   there and you wanted to be paid $12 to $15 an hour for sitting

7   there at the physical therapy office?

8   A    Correct.

9   Q    When he was in the custody of someone else who could take

10  care of him?

11  A    Right.

12  Q    You also would do the same thing when he would go to Dr.

13  Glowacki's office?

14  A    Correct.

15  Q    You wanted to be paid for that, right?

16  A    Correct.

17  Q    And then on top of that, you would want $12 to $15 an

18  hour for the differential, whatever was left for the end of

19  the day, to bring it up to 12 hours, correct?

20  A    Correct.

21  Q    Can you tell me on any of those days what the supervision

22  entailed?

23  A    It's being around him just in case he needs me to get

24  something for him, supervising that he doesn't fall or that he

25  doesn't hurt himself.

*Waskowska – Cross*

1  Q    And you and I have talked about that before as well; do
2  you remember the falling part?
3  A    Briefly, yes.
4  Q    You actually said that in all this period of time he
5  never fell?
6  A    Correct.
7  Q    He has not had a fall?
8  A    Correct.
9  Q    And you couldn't catch him, he's too big?
10 A    I can help him at least not hit the floor as hard.
11 Q    Can you tell the jury which, if any, doctor ever told you
12 that he was fall risk, that there was a risk of his falling?
13 A    No.  I don't think so.
14 Q    Okay.  And Dr. Glowacki, to the best of your knowledge,
15 never prescribed a cane, or a walker, or a wheelchair or any
16 supportive device for your father, right?
17 A    Not that I know of.
18 Q    If you were worried about him falling, why didn't you go
19 get him a cane?
20 A    I never thought of it.
21 Q    Did your father get any better at any time after the
22 accident?
23 A    Not that I know of.
24 Q    Did he ever get any worse?
25 A    He might have.  He had some worse days with the pain.

*Waskowska – Cross*

1    Q    When he took his medications, was he able to dress

2    himself?

3    A    Uh-uh.

4    Q    Are you sure?

5    A    To some point to it, yeah.  He could do some of it.  But

6    we would still have to be there to help him.

7    Q    Why?

8    A    He couldn't lift his arm to a certain point.  It would

9    still cause pain.

10   Q    Okay.  Let me ask you this.  At any time in the time from

11   this accident up to today's date, has your father been able to

12   raise his arm about this high (indicating)?

13   A    No.

14   Q    He never has in your presence?

15   A    Uh-uh.

16   Q    Has he ever been able to raise his arm like this

17   (indicating), to this height?

18   A    No, he has not.

19   Q    In your presence has he ever been able to move his head

20   about this far to the left (indicating)?

21   A    Not that I've seen.

22   Q    In your presence has he ever, at any time since the

23   accident, been able to move his head about that far to the

24   right (indicating)?

25   A    I believe to some point, but I don't know if that far.

*Waskowska – Redirect*

1    Q    Okay.  In the period of time that you've observed your

2    father since this accident, has he been able to bend over,

3    say, about this far (indicating)?

4    A    Uh-uh.

5    Q    Hasn't been able to do that?

6    A    I don't think so, no.

7    Q    Not at all?

8    A    I don't think so.

9    Q    So if Mr. Lodzinski testified that he could do all of

10   those things on January the 7th, 2010 to the same degrees that

11   I showed you, would he be wrong?

12   A    I'm in no place to say that.

13   Q    Would you be wrong?

14   A    I might.  I don't have the medical training.  I can't

15   tell you a hundred percent if that's right or not.

16   Q    But your testimony to the jury is, you never saw your

17   father be able to do the things I just showed you?

18   A    Correct.

19            MR. HEWSON:  Thank you very much.

20            Your Honor, I have nothing further.

21            THE COURT:  Okay.  Redirect.

22                    **REDIRECT EXAMINATION**

23   BY MR. TEMROWSKI:

24   Q    Dr. Lodzinski did testify to that.  Were you present when

25   Dr. Lodzinski was performing that exam on your father?

46

*Waskowska - Redirect*

1    A     I don't believe so, no.

2    Q     And do you know under what circumstances it was that Dr.

3    Lodzinski was helping your father or examining him, that your

4    father could lift or bend to those degrees?

5    A     No, I do not.

6    Q     Regarding the forms that you filled out and the questions

7    that you were asked about bathing, and the showering, and that

8    type of thing, --

9    A     Yeah.

10   Q     -- when you and your sister completed these forms, what

11   exactly did you put down on those forms?  Take a look at them.

12   When it came to bathing and showering, what were the words

13   that you used?

14   A     We did assist with bathing and then assist with

15   dressing/undressing.

16   Q     Okay.  You used the word "assist," correct?

17   A     Correct.

18   Q     Were you actually in the shower with your father, in the

19   bathtub doing the actual bathing?

20   A     No, I was not.

21   Q     You were assisting him?

22   A     Yes, I was.

23   Q     And regarding the claim that you're making for the $20 a

24   day, the household help, --

25   A     Yeah.

*Waskowska - Redirect*

1   Q     -- you're just making a claim -- your sister and you were

2   the two care providers, correct?

3   A     Correct.

4   Q     You're a team?

5   A     Correct.

6   Q     You're only asking State Farm to pay one $20 bill per

7   day, correct?

8   A     Correct.

9   Q     Not a $20 to you and --

10          MR. HEWSON:  Your Honor, this is leading.  I object.

11          THE COURT:  Well, the last question would not be

12   leading.  The prior question would be.

13   BY MR. TEMROWSKI:

14   Q     Is your request of State Farm for the household services,

15   one $20 bill per day?

16   A     Yes, it is.

17   Q     And last question.  Regarding those forms and your

18   indication of showering, how many showers a day would your

19   father take?

20   A     One.

21   Q     Would he ever sometimes take two?

22   A     He might have.  I don't recall.  I can't remember.

23          MR. TEMROWSKI:  Thank you.  I have nothing else.

24          THE COURT:  Recross?

25          MR. HEWSON:  Please, Your Honor.

*Waskowska – Recross*

1                          **RECROSS–EXAMINATION**

2    **BY MR. HEWSON:**

3    Q    Ms. Waskowska, I really didn't want to get into this, but

4    you've just told the jury that "assist with bathing," you

5    weren't in the shower with your father?

6    A    No, I wasn't.

7    Q    Did you wash his back?

8    A    Yeah, but that doesn't mean I was in the actual tub with

9    him.

10   Q    Did you wash his feet?

11   A    Yes, but that's --

12   Q    Did you wash his hair?

13   A    I might have, yes, but that still doesn't mean I was

14   inside of the bathtub with him.

15   Q    Well, where were you?  I mean, he's in the shower when

16   this is happening, right?

17   A    Correct.

18   Q    And he's wearing his underwear.  Is that what you

19   testified to previously?

20   A    Yes.

21   Q    And you're washing his back, his hair, his feet and then

22   you're drying him off?

23   A    Correct.

24   Q    And you said that took an hour?

25   A    Correct.

*Waskowska - Recross*

1    Q     It only took him 20 minutes, right?

2    A     Correct.

3    Q     With your help it took an hour?

4    A     Correct.

5              MR. HEWSON:  I have nothing else.  Thank you.

6              MR. TEMROWSKI:  No other questions.

7              THE COURT:  Okay.  Thank you very much.  You may

8    step down.

9              THE WITNESS:  Thank you.

10             THE COURT:  So are we going to -- is the next step

11   the videotape?

12             MR. TEMROWSKI:  Could I just have one minute?

13             THE COURT:  Sure.

14             MR. HEWSON:  May I retrieve my deposition, Your

15   Honor?

16             THE COURT:  Yes.

17             MR. HEWSON:  Thank you.

18             MR. TEMROWSKI:  Your Honor, the plaintiff's next

19   witness is Dr. Glowacki, by way of video deposition.

20             THE COURT:  Are we all set to play?

21             MR. TEMROWSKI:  Yes.

22             THE COURT:  Great.

23             MR. HEWSON:  Your Honor, would the Court have any

24   objection if I move over here so that I can watch the video as

25   well?

*Waskowski v. State Farm*

1          THE COURT:  That's fine.

2          MR. HEWSON:  Thank you.

3          THE COURT:  Is it okay if we excuse the court

4     reporter and you file -- it's my understanding that you have a

5     transcript to file; is that correct?

6          MR. HEWSON:  That is correct, Your Honor.  I

7     stipulate that the court reporter can be excused.

8          MR. TEMROWSKI:  And I stipulate.  And I am now

9     filing the transcript with the court reporter.

10          MR. HEWSON:  I believe there's only one thing with

11     that transcript.  We've got to make sure that that section

12     that we've removed comes out of the original.

13          MR. TEMROWSKI:  Okay.

14          MR. HEWSON:  Okay.

15          THE COURT:  Okay.  Members of the jury, if at any

16     time you can't hear or see, just raise your hand, okay?

17     **STEFAN GLOWACKI, M.D., PLAINTIFF'S WITNESS, VIA VIDEOTAPED**

18                          **DEPOSITION**

19          (Videotaped deposition played for the jury)

20          THE COURT:  Jesse, can you just have the jury go in

21     the jury room for a quick minute?

22          COURT CLERK:  All rise for the jury.

23          (Jury out at 10:22 a.m.)

24          THE COURT:  Okay.  I thought the transcript had been

25     cleaned and that there were no objections, that they had been

*Waskowski v. State Farm*

1    all removed?

2              MR. HEWSON:  Your Honor, the discussion I had with

3    Mr. Temrowski is that he just wanted to play the dep all the

4    way through.

5              THE COURT:  Oh, is that how you guys want to

6    proceed?

7              MR. TEMROWSKI:  Yes.

8              MR. HEWSON:  Yes, sir.

9              THE COURT:  All right.  But just so there's no

10   objections for me to rule on; is that correct?

11             MR. HEWSON:  No, sir, there are not.

12             MR. TEMROWSKI:  No.  That's right.

13             THE COURT:  And there's one part in the transcript

14   being filed that's being redacted, right?

15             MR. TEMROWSKI:  That's been taken out.

16             MR. HEWSON:  Your Honor, it's page -- it's lines 24

17   and 25 on page 45, and lines one through nine on page 46, and

18   we agree to that as well.

19             THE COURT:  Okay.  Do you have that?

20             MR. TEMROWSKI:  Yes.

21             THE COURT:  Okay, great.  I just want to make sure

22   we're all set with that.

23             MR. HEWSON:  I understand, Your Honor.  Yes, sir.

24             THE COURT:  If that's how you want to proceed,

25   that's how we'll proceed.  So we're -- let's go for about

*Waskowski v. State Farm*

1    another ten or fifteen minutes and then figure out a good

2    point to break for our morning --

3              MR. HEWSON:  Actually -- probably, Your Honor, we're

4    at page 36.  We will -- cross-exam starts at page 48, so we

5    only have 12 pages to the break if that would be the

6    convenient time for the Court?

7              THE COURT:  Yeah.  We'll break at the start of the

8    cross.

9              MR. HEWSON:  Then it's about 15 minutes.

10             THE COURT:  Okay, great.

11             MR. HEWSON:  Thank you.

12             DEPUTY COURT CLERK:  All rise.

13             (Jury in at 10:26 a.m.)

14             DEPUTY COURT CLERK:  Please be seated.

15             THE COURT:  Members of the jury, what we're going to

16   do is we're going to go on for probably another 15 minutes,

17   which will conclude Mr. Temrowski's direct examination of Dr.

18   Glowacki.

19             And then we're going to give you your morning break

20   which again will last about twenty minutes.  And then when

21   come back we will start with Mr. Hewson's cross-examination of

22   the doctor.  Okay?

23             (Videotaped deposition of Dr. Stefan Glowacki

24             continued for the jury)

25             THE COURT:  Okay.  Members of the jury, we're going

53

*Waskowski v. State Farm*

1    to give you your morning break.  It's a quarter to eleven and

2    we will probably bring you up around five after eleven, okay?

3              So again, you may not discuss this case, correct?

4              THE JURY:  Yes.

5              DEPUTY COURT CLERK:  All rise.

6              THE WITNESS:  (Jury out at 10:45 a.m.)

7              DEPUTY COURT CLERK:  Please be seated.

8              MR. HEWSON:  Five after eleven, Your Honor?

9              THE COURT:  Yes.

10             MR. HEWSON:  Thank you, sir.

11             THE COURT:  Did you work out the issue with Ms. --

12             MR. HEWSON:  Ms. Page and Ms. Kucharski?

13             THE COURT:  Right.

14             MR. HEWSON:  I believe Ms. Kucharski can be here.  I

15   know that Ms. Page can be here on Monday.

16             THE COURT:  Okay.

17             MR. HEWSON:  But I think we -- I believe Mr.

18   Temrowski told us yesterday that this will fill up the day

19   with his client.

20             MR. TEMROWSKI:  Monday, Judge, is good for both of

21   them.  That's fine.

22             THE COURT:  All right.  So can we dismiss your

23   motion?

24             MR. HEWSON:  Yes, sir.

25             THE COURT:  Okay.

*Waskowski v. State Farm*

1            MR. HEWSON:  That's fine.  That's the only reason I

2   filed it ecause I couldn't get him here today.  Thank you very

3   much.

4            THE COURT:  All right.  How long will the rest of

5   the dep last, just approximately?  No big deal.

6            MR. TEMROWSKI:  It's 120 pages long and we've played

7   48 pages, so --

8            You said what, about an hour and --

9            MR. TEMROWSKI:  An hour and fifteen left.

10           MR. HEWSON:  An hour and fifteen.

11           (Court in recess at 10:48 a.m.)

12           (Court in session at 11:13 a.m.)

13           DEPUTY COURT CLERK:  United States District Court is

14   in session.  Please be seated.

15           MR. TEMROWSKI:  Your Honor, if I could just address

16   one issue to the Court?

17           THE COURT:  Sure.

18           MR. TEMROWSKI:  Dr. Lodzinski is back.  And I know

19   that this is going to take another hour and 20 minutes or so.

20   It's the Court's -- whatever the Court states.  Could we put

21   Dr. Lodzinski on now or should we wait until this is done?

22           MR. HEWSON:  Your Honor, it doesn't make any

23   difference to me.  I just want a copy of the document.

24           THE COURT:  You should have it by now.

25           MR. HEWSON:  No, he hasn't given it to me.  I got a

*Waskowski v. State Farm*

1    chance to look at it just a moment ago.  I didn't know Dr.

2    Lodzinski was going to come in today.  That's all.  I just

3    need a copy of the document.

4         MR. TEMROWSKI:  Can the Court make a copy?

5         THE COURT:  Sure.

6         MR. TEMROWSKI:  Now, then?

7         MR. HEWSON:  Your Honor, if that's all right with

8    the Court, it's fine with me.

9         THE COURT:  All right.  That's okay.

10        MR. TEMROWSKI:  Actually, here's a copy of the

11   original diploma, but you need a copy of the English

12   translation, which is notarized.

13        THE COURT:  Well, he probably wants a copy of the

14   original diploma, too.

15        MR. TEMROWSKI:  That is a copy.

16        THE COURT:  Okay, so you're giving him a copy.

17        MR. HEWSON:  Yeah, that's what he's just done.

18        (Brief pause in proceedings)

19        THE COURT:  Are we ready for the jury?

20        MR. HEWSON:  Your Honor, I believe I am.

21        MR. TEMROWSKI:  Ready, Your Honor.

22        THE COURT:  All right.  Let's bring the jury out.

23        And Dr. Lodzinski, could you come back up?  And,

24   sir, you're still under oath from yesterday, okay?

25        THE WITNESS:  Yes.

*Lodzinski - Redirect*

1          THE COURT:  So why don't we have you sit in the

2     witness chair there for a minute.  Which will probably

3     surprise the jury when they walk out.

4          Can you see where you're at, Mr. Hewson?

5          MR. HEWSON:  Yes, Your Honor, I can.  I'll just sit

6     on that chair.  This won't take long.

7          DEPUTY COURT CLERK:  All rise.

8          (Jury in at 11:23 a.m.)

9          DEPUTY COURT CLERK:  Please be seated.

10          THE COURT:  Members of the jury, as you can see,

11     we're not going to immediately proceed into continuing with

12     the videotape of Dr. Glowacki.

13          We're going to take a short break from that video

14     dep and Mr. Temrowski is going to recall Dr. Lodzinski and he

15     has a couple questions for him.  And then you might find that

16     Mr. Hewson has a couple of questions for him as well.

17          You may proceed.

18          THE WITNESS:  Thank you.

19      **DR. ANTONI LODZINSKI, PLAINTIFF'S WITNESS, RECALLED,**

20                    **PREVIOUSLY SWORN**

21                  **REDIRECT EXAMINATION**

22     BY MR. TEMROWSKI:

23     Q     Doctor, welcome back.

24     A     I was not ready for -- anyway.

25     Q     Doctor, yesterday you testified that you have a doctorate

*Lodzinski - Redirect*

1   degree, a Ph.D. Degree; is that correct?

2   A   Yes.

3   Q   And you testified that you obtained that in Poland?

4   A   In Poland, in Wroclaw, yes.  In Academy of Physical

5   Education in Wroclaw.

6   Q   Okay.  Could you please tell the ladies and gentleman of

7   the jury what did you bring with you to court today?

8   A   I bring, you know, diploma, what they give me.  It's not

9   -- looks like that.  You put this on the wall.  This is the

10  title, the name of the work, and that you have a title of

11  doctor.  Briefly explain you how is a different --

12          THE COURT:  Why don't we stay within the scope of

13  the question.

14          THE WITNESS:  Okay.

15          MR. HEWSON:  Thank you, Your Honor.

16  BY MR. TEMROWSKI:

17  Q   So you brought your degree with you?

18  A   And I brought my degree.  I brought my work, you know,

19  this --

20  Q   You brought your thesis?

21  A   Yeah, all work what I done.

22  Q   And all of that is in Polish, correct?

23  A   No -- this is in Polish, yes.

24  Q   Okay.  And you also brought with you the document where

25  you had your degree translated from Polish into English?

*Lodzinski – Redirect*

1   A    Yes.  This is translating (sic) diploma.

2   Q    And that is a certification that's notarized, stating in

3   English what your diploma says in Polish?

4   A    Yes.

5   Q    And that's been notarized, correct?

6   A    Yes.

7   Q    And where did you get that done?

8   A    This was done, you know, yesterday, because I was, you

9   know, very upset that somebody discriminate me that I am not

10  Ph.D.  I was working a couple of years for that.  I did not

11  ask this gentleman if he's from Harvard, Stanford, from where

12  in --

13           THE COURT:  Okay.  Let's stay with the question.

14           THE WITNESS:  Okay.

15  BY MR. TEMROWSKI:

16  Q    So Doctor, is that written confirmation that you do have

17  a Ph.D., a doctorate --

18           MR. HEWSON:  Objection, leading.

19           THE WITNESS:  Yes, it's a copy by notary.

20           THE COURT:  Wait, wait.

21           MR. HEWSON:  Objection.  He's leading the witness.

22           THE COURT:  Okay.  You know what, just do me a

23  favor.

24           THE WITNESS:  Sorry.

25           THE COURT:  Sit back and just wait.  I'm sorry.  I

*Lodzinski - Recross*

1    missed the question.

2    BY MR. TEMROWSKI:

3    Q    Is that your doctorate degree?

4    A    Yes.

5             MR. TEMROWSKI:  I have no other questions.

6             THE COURT:  Okay.

7             MR. HEWSON:  May I cross-examine, Your Honor?

8             THE COURT:  Sure.

9             MR. HEWSON:  Thank you, sir.

10                       **RECROSS-EXAMINATION**

11   BY MR. HEWSON:

12   Q    Sir, why didn't you produce this document when I was

13   there for your deposition over a year ago?  Why didn't you

14   produce the document when I asked about your Ph.D. thesis and

15   this -- well, I only have a copy, but the original?  Why

16   didn't you produce it then?

17   A    No, sir.  You asked me for -- only for license from the

18   state, if I remember.

19   Q    Well, you didn't produce this at any time prior to

20   today's date; am I correct?

21   A    I don't need this.

22   Q    Did you tell the jury yesterday that they don't have to

23   worry about your Ph.D., because you're a licensed physical

24   therapist?

25   A    I tell that you can -- you know, I am physical therapist

*Lodzinski - Recross*

1    and doesn't matter if I am Ph.D.  I'm licensed physical

2    therapy and I treat this patient like a therapist, not Ph.D.

3    or professor.

4    Q    Let me make sure I understand.  You got licensed in the

5    State of Michigan in 1994 and --

6    A    Yes, correct.

7    Q    I'm sorry.  And you lived in the State of Michigan

8    through that entire period of time?

9    A    Yes.

10   Q    And this document is dated, according to your

11   translation, October 22nd, 2003, right?

12   A    This document is --

13   Q    This document, your translation says --

14   A    202, 202.

15   Q    -- that you got this in October of 2003.

16   A    202.

17   Q    Look on the form.

18   A    Translation is 202.

19   Q    Wroclaw, October 22, 2003.  Do you know when you got

20   this?

21   A    Listen, I have exam in 202.

22        MR. HEWSON:  May I approach the witness just to show

23   him, Your Honor?  I'm not trying to debate with him.  I just

24   want to show him where it is on the document.

25        THE WITNESS:  They send me -- they send me this

*Lodzinski - Recross*

1    paper.  They send me 203, but I pass exam in --

2              THE COURT:  Remember when we had a conversation

3    yesterday where when I speak, everyone stops?  Do you remember

4    that?  Sir, do you remember that?

5              THE WITNESS:  Yeah.

6              THE COURT:  So when I speak, what happens?  We all

7    stop.

8              All right.  I thought the issue was whether or not

9    he has a Ph.D.

10             MR. HEWSON:  And I'm trying to get to that, Judge.

11   I just want to make sure --

12             THE COURT:  And he says he does and he produced a

13   document here today.

14             MR. HEWSON:  Okay.

15             THE COURT:  So what's the debate?

16   BY MR. HEWSON:

17   Q    Well, the question to me is, did you go to Poland to

18   defend your dissertation?

19   A    Yes.

20   Q    When did you do that?

21   A    One week before exam.

22   Q    When was that?

23   A    It was end of October -- September, end of September 202.

24   Q    All right.  And you went back to Wroclaw for that?

25   A    And after exam I'm back, you know, two, three days later.

*Lodzinski - Redirect*

1    Q    Why did it take them a year, if you know, to issue this

2    certificate?

3    A    They sent me this certificate.

4    Q    A year later?

5    A    Later.  Like you said, the -- I pass exam.  Exam, the

6    review board, professor this, professor this, professor this

7    from Wroclaw sent the second, 203.

8    Q    And it was from the Department of Physical Education,

9    correct?

10   A    Yes.

11          MR. HEWSON:  Thank you.  I have nothing else, Your

12   Honor.

13          THE COURT:  Mr. Temrowski?

14                    **REDIRECT EXAMINATION**

15   BY MR. TEMROWSKI:

16   Q    Dr. Lodzinski, does it clearly say on this translation,

17          "The title bestowed upon him by the faculty of

18          Physical Education, Department of Academy of

19          Physical Education, Wroclaw, on October 10th of

20          2002"?

21   A    Yes.  This was exam.  But paper they sent me, this is the

22   date on the bottom of it, "Wroclaw 22nd --"

23          THE COURT:  Okay.

24          THE WITNESS:  October 203, but exam was 202 --

25          MR. TEMROWSKI:  Thank you.  Thank you.  No other

*Lodzinski – Redirect*

1    questions.

2             MR. HEWSON:  Thank you, Your Honor.  I have nothing

3    further.

4             THE COURT:  Sir, you're excused.  Thank you very

5    much for returning today.

6             THE WITNESS:  Sorry about that, Your Honor.  I'm

7    little upset.

8             Anyway, can I say something?

9             THE COURT:  No.

10            Okay, let's continue with the video.

11            (Videotaped deposition of Stefan Glowacki, M.D., was

12            continued and concluded for the jury)

13            THE COURT:  Okay.  I understand your next witness

14   will be Mr. Waskowski; is that correct?

15            MR. TEMROWSKI:  Yes, Your Honor.

16            THE COURT:  Okay.  And it's about a quarter to one

17   right now.  You probably might want to wait until Monday

18   morning to start?  Or not?

19            MR. TEMROWSKI:  No, that's fine.  But if we do that,

20   then I would start with the claims adjusters.

21            THE COURT:  Okay.

22            MR. TEMROWSKI:  Instead of Mr. Waskowski.

23            THE COURT:  All right.  So anyway, that's as far as

24   we're going to go today.  There's no sense in starting the

25   plaintiff now with only 15 minutes left on our day.  And then

*Waskowski v. State Farm*

1   of course we'll be taking a three-day break and I just think

2   it's not particularly productive.

3           So with that, I'm going to let you go for the day

4   and we'll see everyone upstairs in the fifth floor jury room

5   at 8:00 Monday morning.  And again, you can't discuss this

6   case, correct?

7           THE JURY:  Yes.

8           THE COURT:  And of course, you understand you cannot

9   conduct any type of independent research, correct?  You can't

10  go online, start looking up these different medical terms and

11  issues.  Do all of you understand that?

12          THE JURY:  Yes.

13          THE COURT:  Because when we got together last

14  Tuesday, we agreed that the only thing that you would decide

15  this case, solely, solely, is on what you see and hear in this

16  courtroom only, correct?

17          THE JURY:  Yes.

18          THE COURT:  All right.  We'll see everyone Monday

19  morning.

20          DEPUTY COURT CLERK:  All rise for the jury.

21          (Jury out at 12:46 p.m.)

22          DEPUTY COURT CLERK:  Please be seated.

23          THE COURT:  I didn't time it, but it seemed like it

24  was longer than two hours.

25          MR. HEWSON:  The delays -- excuse me, Your Honor.  I

*Waskowski v. State Farm*

1    think we were looking at -- I know I was looking at the number

2    of pages.  I usually look at a minute a page.  So 120 pages in

3    the dep.  I had forgotten about the extensive periods of dead

4    air when the witness was doing whatever he was doing.  I

5    apologize for that confusion.  That's where it came from, from

6    my point of view.

7              THE COURT:  Okay.  Anything else?

8              Oh, you needed to move --

9              MR. TEMROWSKI:  Should I move now for the --

10             THE COURT:  Well, we need the jury.  What exhibits

11    were you planning on moving?  F, N?

12             MR. TEMROWSKI:  N.  F, which is Dr. Glowacki's

13    disability certificates.

14             THE COURT:  N?

15             MR. TEMROWSKI:  N, correct.  N, which is the

16    outstanding bills for Dr. Glowacki.  And then J, which are the

17    deposition exhibits of Dr. Glowacki, which consist of his

18    narrative reports, his CV, his prescription for physical

19    therapy, the Macomb MRIs, the Oakland MRIs, the Beaumont bone

20    scan, and the State Farm Physician Assessment of Attendant

21    Care Certificate.

22             MR. HEWSON:  And, Your Honor, just for

23    clarification, I believe that the MRIs themselves were part of

24    the joint exhibit package.

25             THE COURT:  The Macomb -- well, let's stick with the

*Waskowski v. State Farm*

1    motion.  Any objection to the motion as to Exhibits F, N, and

2    J?

3              MR. HEWSON:  If I can just have a quick look?

4              THE COURT:  Sure.

5              MR. HEWSON:  The only reason I raise it, Your Honor,

6    is -- then we should probably delete Exhibits Two and -- Joint

7    Exhibits Two and Three from the list.

8              THE COURT:  You can still -- you can have them as

9    separate exhibits as well.  I don't see any reason why you

10   can't do that.  It might make it easier for the jury.  It

11   might make it easier in your closing arguments.

12             MR. HEWSON:  I understand.

13             THE COURT:  It might make it easier when you're --

14   for witnesses who testify later, for the jury to follow.

15             MR. HEWSON:  Yes.  I have no objection to my brother

16   counsel's motion to admit those exhibits.  They're accurate.

17             THE COURT:  Okay.  And then was it your intent --

18   and of course, Mr. Temrowski, we have to wait until Monday

19   morning to actually -- you're going to have to make the motion

20   in front of the jury.

21             MR. TEMROWSKI:  Okay.

22             THE COURT:  And then, were there exhibits that you

23   wish to have -- to be received from this deposition?  I think,

24   possibly on your exhibit list you have six?

25             MR. HEWSON:  Yes, Your Honor.  I think -- well, the

*Waskowski v. State Farm*

1   one -- let me just take a quick look at this.

2              THE COURT:  Yeah, no rush.

3              MR. HEWSON:  Yes.  My Exhibit Six, Your Honor.

4              THE COURT:  Uh-huh.

5              MR. HEWSON:  And I believe this would -- it would be

6   the proper time to ask the Court to consider Joint Exhibits

7   Number One, which we discussed during the deposition --

8              THE COURT:  I have an idea about the joint exhibits

9   just from your exhibit list.

10             MR. HEWSON:  Yes, sir.  So my exhibit list is my

11  Exhibit Number Six and I would move its admission.

12             THE COURT:  Okay.  Is there going to be any

13  objection to that?

14             MR. TEMROWSKI:  No.

15             THE COURT:  And then my thought, first thing Monday

16  morning as well, if it's agreeable to both of you, then why

17  don't first thing Monday morning we just move for the joint

18  exhibits?

19             MR. HEWSON:  Yes, Your Honor.

20             MR. TEMROWSKI:  That's fine.

21             THE COURT:  Okay.  Since there is absolutely no

22  issue with those joint exhibits as I understand.

23             MR. HEWSON:  Correct.

24             MR. TEMROWSKI:  That's fine.

25             THE COURT:  All right.  We'll see you Monday

*Waskowski v. State Farm*

1    morning.

2              MR. HEWSON:  Thank you, Judge.

3              MR. TEMROWSKI:  Have a great weekend.

4              THE COURT:  You too.

5              (Court in recess at 12:52 p.m.)

6                         *    *    *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Waskowski v. State Farm*

1

2

3

4

5

6

7

8

9

10

11

12

13

14                    **C E R T I F I C A T I O N**

15          I, Marie J. Metcalf, Official Court Reporter for the

16  United States District Court, Eastern District of Michigan,

17  Southern Division, appointed pursuant to the provisions of

18  Title 28, United States Code, Section 753, do hereby certify

19  that the foregoing is a correct transcript of the proceedings

20  in the above-entitled cause on the date hereinbefore set

21  forth.

22          I do further certify that the foregoing transcript

23  has been prepared by me or under my direction.

24  s\Marie J. Metcalf                          08-31-13

25  Marie J. Metcalf, CVR, CM                   (Date)