1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3   JAROSLAW WASKOWSKI,

4                        Plaintiff,

5      -v-                         Case No. 11-13036

6   STATE FARM MUTUAL AUTOMOBILE
    INSURANCE COMPANY,
7
                         Defendant./
8   _____

                    **JURY TRIAL – DAY THREE**
9                   **BEFORE HON. SEAN F. COX**
                    United States District Judge
10                      257 U.S. Courthouse
                    231 West Lafayette Boulevard
11                    Detroit, Michigan 48226

12                  **(Monday, December 3, 2012)**

13  APPEARANCES:         LEE ROY H. TEMROWSKI, ESQUIRE
                         Appearing on behalf of the Plaintiff.
14
                         JAMES F. HEWSON, ESQUIRE
15                       Appearing on behalf of the Defendant.

16  COURT REPORTER:      MARIE METCALF, CVR, CM
                         Federal Official Court Reporter
17                       257 U.S. Courthouse
                         231 W. Lafayette Boulevard
18                       Detroit, Michigan 48226
                         metcalf_court@msn.com
19
    INTERPRETER:         TINA FILARSKA
20

21

22

23

24

25

## <u>TABLE OF CONTENTS</u>

**PROCEEDINGS – Monday, December 3, 2012**                          <u>PAGE</u>:

**<u>WITNESSES CALLED BY PLAINTIFF:</u>**

**CHERYL KUCHARSKI**

DIRECT EXAMINATION BY MR. TEMROWSKI......................    6

CROSS-EXAMINATION BY MR. HEWSON..........................   29

REDIRECT EXAMINATION BY MR. TEMROWSKI....................   40

RECROSS-EXAMINATION BY MR. HEWSON........................   47

**TERRI ANN PAGE**

DIRECT EXAMINATION BY MR. TEMROWSKI......................   51

CROSS-EXAMINATION BY MR. HEWSON..........................   96

REDIRECT EXAMINATION BY MR. TEMROWSKI....................  100

**JAROSLAW WASKOWSKI**

DIRECT EXAMINATION BY MR. TEMROWSKI......................  102

**<u>EXHIBITS</u>:**                                               <u>REC'D</u>:

PLAINTIFF'S EXHIBITS F, N, J.............................    5

DEFENDANT'S EXHIBIT NO. 6................................    6

JOINT EXHIBIT NOS. 1, 2, 3, 4, 5........................    6

DEFENDANT'S EXHIBIT NOS. 2, 2-A.........................   36

DEFENDANT'S EXHIBIT NO. 8...............................   69

*Waskowski v. State Farm*

1          Detroit, Michigan

2          Monday, December 3, 2012

3          At about 8:40 a.m.

4                    *   *   *

5          DEPUTY COURT CLERK:  All rise.  The United States

6    District Court is in session, the Honorable Sean Cox

7    presiding.  Please be seated.

8          The Court calls case number 11-13036, Jaroslaw

9    Waskowski versus State Farm Mutual Automobile Insurance

10   Company.

11         Counsel, we need your appearances for the record,

12   please?

13         MR. TEMROWSKI:  Good morning, Your Honor.  Lee

14   Temrowski appearing on behalf of the plaintiff.

15         THE COURT:  Good morning.

16         MR. HEWSON:  May it please the Court, James Hewson

17   appearing on behalf of State Farm.

18         THE COURT:  Good morning.

19         Are we ready for the jury?

20         MR. TEMROWSKI:  Yes, Your Honor.

21         THE COURT:  And our first witness is going to be --

22         MR. HEWSON:  Cheryl Kucharski is here, Your Honor.

23   Terry Page is stuck in traffic on 75.  She'll be here right

24   after Cheryl.

25         THE COURT:  Great.  Let's deal with the exhibits

*Waskowski v. State Farm*

1    right when the jury comes in, okay.  Remember, left over from

2    last Thursday.

3              MR. HEWSON:  Your Honor, while we are waiting, I

4    have a videographer on call for 11:00 this morning.  I don't

5    know how fast we're going to progress, but if I have to play

6    my depositions, they should be here about 11:00.

7              THE COURT:  Excellent.  Thank you.

8              DEPUTY COURT CLERK:  All rise for the jury.

9              (Jury in at about 8:41 a.m.)

10             DEPUTY COURT CLERK:  Please be seated.

11             THE COURT:  Members of the jury, good morning.

12             THE JURY:  Good morning.

13             THE COURT:  How was your weekend?

14             THE JURY:  Good.

15             THE COURT:  Too short, I agree.

16             We are going to continue with the trial with the

17   plaintiff's presentation of his proofs to you.  But before we

18   hear from the next witness, which I believe is Cheryl

19   Kucharski -- she's one of the claims adjusters; is that right?

20             MR. TEMROWSKI:  Yes Your Honor.

21             THE COURT:  There's going to be a motion regarding

22   certain exhibits?

23             MR. TEMROWSKI:  Yes Your Honor.  Plaintiff moves to

24   admit Exhibit F, Dr. Glowacki's --

25             THE COURT:  Disability certificates.

*Waskowski v. State Farm*

1          MR. TEMROWSKI:  -- disability certificates.

2          THE COURT:  And outstanding bills from Glowacki.

3          MR. TEMROWSKI:  Okay, that's F.  That's N, the

4    outstanding bills from Dr. Glowacki.

5          THE COURT:  Right.

6          MR. TEMROWSKI:  Exhibit J, which is the physician

7    assessment of attendant care.

8          THE COURT:  J is the deposition exhibits from

9    Glowacki.

10          MR. TEMROWSKI:  Right, which includes that, and the

11   Beaumont Hospital bone scan, the Oakland MRIs, the Macomb

12   MRIs, Dr. Glowacki's prescription for physical therapy, Dr.

13   Glowacki's curriculum vitae and the narrative reports authored

14   by Dr. Glowacki.

15          THE COURT:  Any objection to the motion, Mr. Hewson?

16          MR. HEWSON:  No.

17          THE COURT:  All right.  F, N and J are received.

18          Okay.  Mr. Hewson, you have a motion regarding

19   Defendant's Six; is that correct?

20          MR. HEWSON:  Yes, Your Honor.  I move for the

21   admission of Defendant's Exhibit six.  And that's the

22   physician assessment that was marked separately for Dr.

23   Glowacki.

24          And I believe, Your Honor, that I would move for the

25   admission of Joint Exhibits One through Five, as we had

*Waskowski v. State Farm*

1    discussed last week and those exhibits should be admitted as

2    well.

3              MR. TEMROWSKI:  I have no objection.  And somehow I

4    ended up with Exhibit Four.

5              MR. HEWSON:  Okay.

6              MR. TEMROWSKI:  I'm not sure how.

7              THE COURT:  Okay.  So is that Oakland MRI report

8    March 24, 2011?

9              MR. HEWSON:  Yes, Your Honor, it is.

10             THE COURT:  Okay.  Defendant's Six is received, as

11   well as Joint Exhibits One, which is the William Beaumont bone

12   scan report, J-Two, which is the Macomb MRI center report

13   dated March 18, 2010, Joint Three, Macomb Center report April

14   15, 2010, and then Joint Four, Oakland MRI report dated

15   March 24, 2011 and then J-Five which is Dr. Glowacki's

16   narrative reports of January 13, 2010 to January 20, 2011.

17             MR. HEWSON:  Thank you, Your Honor.

18             THE COURT:  Our next witness?

19             MR. HEWSON:  May I get Ms. Kucharski?

20             MR. TEMROWSKI:  Could you just see if Ms. Page is

21   here, because I would prefer to start with Ms. Page?

22             MR. HEWSON:  Okay.

23             THE COURT:  But she's tied up in traffic as I

24   understand.

25             MR. TEMROWSKI:  Right.

*Waskowski v. State Farm*

1          MR. HEWSON:  Ms. Page is not here yet.  Ms.

2     Kucharski is, Your Honor.

3          MR. TEMROWSKI:  We'll start with her then.

4          THE COURT:  Cold you come on up and give your full

5     name to our court reporter?

6          **CHERYL KUCHARSKI, PLAINTIFF'S WITNESS, SWORN**

7                    **DIRECT EXAMINATION**

8     BY MR. TEMROWSKI:

9     Q    Ms. Kucharski, good morning.

10    A    Good morning.

11    Q    Would you please tell the jury your name and where you're

12    employed at?

13    A    My name is Cheryl Kucharski and I work with State Farm

14    insurance.

15    Q    And in what capacity?

16    A    As a claim representative.

17    Q    And were you one of the claim representatives assigned to

18    handle Mr. Waskowski's claim?

19    A    Yes, I was.

20    Q    And did you work on that claim?

21    A    Yes, I did.

22    Q    Now, you were subpoenaed to be here today, correct?

23    A    That's my understanding, yes.

24    Q    And this trial began last week and you are the claims

25    representative for State Farm that handled Mr. Waskowski's

*Kucharski – Direct*

1    claim, correct?

2    A     One of them, yes.

3    Q     Is there any particular reason that you were not here for

4    the first three days of trial last week?

5                MR. HEWSON:  I'm going to object as to relevance,

6    Your Honor.  What difference does that make?  How does that

7    add to his case?

8                MR. TEMROWSKI:  I'm just asking if there is any

9    particular reason.

10                THE COURT:  Sustained.

11                MR. HEWSON:  Thank you.

12   BY MR. TEMROWSKI:

13   Q     Now, the subpoena that you were issued, served to be here

14   today requested that you bring the complete PIP file?

15                MR. HEWSON:  Your Honor, I'm going to object.  We

16   discussed this matter in chambers.

17                THE COURT:  We's okay so far.

18                MR. HEWSON:  Yes, sir.

19   BY MR. TEMROWSKI:

20   Q     Is that right?

21   A     That's my understanding.  I haven't reviewed it

22   personally.

23   Q     You have not reviewed it personally?

24   A     The subpoena, I have not reviewed the subpoena

25   personally.

*Kucharski – Direct*

1    Q    Okay.  I want you to assume that it does require you to

2    bring the complete PIP file that you worked on with you here

3    today.

4    A    Okay.

5    Q    It's my understanding you don't have that?

6    A    I did not bring it.

7    Q    Okay.  My question to you then is, since you are one of

8    the claims adjusters assigned to handle Mr. Waskowski's claim,

9    have you read the PIP file?

10   A    Yes, I have.

11   Q    And are you familiar with it?

12   A    Yes, I am.

13   Q    And will you please explain to the ladies and gentlemen

14   of the jury what exactly is a PIP file?

15   A    A personal injury protection file is a file that contains

16   information that pertains to an injured party's claim as a

17   result of the motor vehicle accident.

18   Q    And would you agree with me, since you are one of the

19   claims adjusters assigned to handle Mr. Waskowski's claim,

20   that every single piece of paper contained within that PIP

21   file is important?

22   A    I would agree to some extent, some things more important

23   than others.

24   Q    And when a claims adjuster handles a claim for a claimant

25   like Mr. Waskowski and documents arrive in the PIP file, you

*Kucharski – Direct*

1    review them, don't you?

2    A    Yes.

3    Q    And you review all of them?

4    A    Yes.

5    Q    And you rely upon those in making your decision and your

6    determination as to how to properly process, and handle and

7    proceed with the claim, correct?

8    A    Yes.

9    Q    Now, for starters, if I could ask you this, how many

10   adjusters from State Farm actually handled Mr. Waskowski's

11   claim?

12   A    To my knowledge, their were three claim representatives.

13   Q    And would you please name all three of them?

14   A    Chris Holme, Terri Page, and myself, Cheryl Kucharski.

15   Q    Okay.  And to keep a time line and the chronology of

16   events, this automobile collision that is the subject at

17   issue, occurred on December 23, 2009, correct?

18   A    I believe that's correct.

19   Q    And of three adjusters that State Farm had to handle

20   Mr. Waskowski's claim, where do you fit in?

21   A    I was the third.

22   Q    The third one, okay.

23         And first of all, could you please explain to us why

24   did three different adjusters handle Mr. Waskowski's claim?

25   A    I believe the initial transfer in adjusters happened

*Kucharski – Direct*

1    because of an employee transfer out of our office.

2    Q    Okay.  That would explain one.

3    A    Uh-huh.  And when I took over handling of Mr. Waskowski's

4    claim, it was to address a particular issue happening on the

5    file at the time.

6    Q    And what exactly is that particular issue that was

7    handling (sic) at the time?

8    A    We were looking at the policies and practices involved

9    with one of the doctors that Mr. Waskowski had seen for

10   treatment.

11   Q    And am I correct that Terri Page was the adjuster before

12   you?

13   A    That's right.

14   Q    And you took over after her?

15   A    Yeah.

16   Q    Now, after you took over handling Mr. Waskowski's claim,

17   did you review the file?

18   A    Yes, I did.

19   Q    And you knew exactly what was going on with the file,

20   didn't you?

21   A    I reviewed everything that was within the claim file at

22   the time.

23   Q    And once Ms. Kucharski took over handling that claim

24   file, nobody else had any other involvement in the handling of

25   the claim, but you?

*Kucharski - Direct*

1    A    No other claim representatives.

2    Q    Right.

3    A    There was management involvement.

4    Q    And again, to keep our time nice and neat, the automobile

5    collision occurred on December 23, 2009, correct?

6    A    Yes.

7    Q    And Ms. Kucharski, that's you, you take over the handling

8    of the claim on April 14, 2011, don't you?

9    A    I believe that's correct.

10   Q    And, in fact, because I have the claim file here, once

11   you became the new adjuster and you were aware of all the

12   progress that had happened up to the point of you getting

13   involved, the first thing that you did was write Mr. Waskowski

14   a letter, telling him that you were the new claims adjustor,

15   didn't you?

16   A    That did happen.

17   Q    And, Ms. Kucharski, now that you are the new claims

18   adjuster taking over from Terri Page and now handling Mr.

19   Waskowski's claim, what is the very first thing that you did

20   as the new claims adjuster taking over the handling of the

21   claim?

22   A    I reviewed the contents of the claim file and sent the

23   reassignment letter that you referenced to Mr. Waskowski.

24   Q    Okay, that's correct.  What's the very next thing that

25   you did?

*Kucharski – Direct*

1    A    Specifically, I don't know what you're referring to.

2    Q    Well, let me show you a document out of the claim file.

3    And you just take a look at that and let me know when you have

4    reviewed it?

5    A    I know what this is.

6    Q    Okay.  Ms. Kucharski, isn't it true that once you took

7    over as the new claims adjuster handling Mr. Waskowski's file,

8    that the very first thing that you did was to write

9    Mr. Waskowski a letter telling him that he should go to the

10   federal government and collect Social Security disability

11   benefits?  Is that true?

12   A    That's not exactly what that letter says, but it is a

13   letter in reference to Social Security disability benefits.

14   Q    Okay.  And isn't it true that you wanted Mr. Waskowski,

15   instead of collecting benefits from State Farm, you wanted him

16   to go to the federal government and start collecting Social

17   Security disability?

18           MR. HEWSON:  Your Honor, I object.  How is this

19   relevant?  It has nothing to do with his burden of proof.

20           MR. TEMROWSKI:  Your Honor, I think its very

21   relevant.

22           THE COURT:  The same thought in my mind.

23           MR. TEMROWSKI:  Pardon me?

24           THE COURT:  I have the same thought as Mr. Hewson.

25   I don't understand how it's relevant.

*Kucharski – Direct*

1           MR. TEMROWSKI:  Okay.

2    BY MR. TEMROWSKI:

3    Q    But that's what you did?

4           MR. HEWSON:  Your Honor, I'm sorry.  You ruled in my

5    favor and he asked that question again.

6           THE COURT:  Right.

7           MR. HEWSON:  Thank you.

8    BY MR. TEMROWSKI:

9    Q    And, Ms. Kucharski, you knew once you took over as the

10   new claims adjuster handling the file, you knew very well that

11   Mr. Waskowski had been getting medical care, medical treatment

12   for his injuries, didn't you?

13   A    I saw the bills in the claim file, yes.

14   Q    And you knew that he had a bill with Dr. Glowacki, didn't

15   you?

16   A    Several.

17   Q    And you knew that he had a bill with Oakland MRI, didn't

18   you?

19   A    I did.

20   Q    And you knew that he had a bill with Euro Rehab, didn't

21   you?

22   A    Yes.

23   Q    Because, in fact, once you took over as the new claims

24   adjuster handling the Waskowski file, the first thing you did

25   was write to Dr. Glowacki, to Oakland MRI and to Euro Rehab,

*Kucharski – Direct*

1   telling them that the matter is under investigation, correct?

2   A    I did.

3   Q    Now, regarding Mr. Waskowski's claim for wage loss

4   benefits, you knew that Mr. Waskowski was employed, didn't

5   you?  Didn't you know that?

6   A    Yes.

7   Q    And you also knew that Terri Page, who was the adjuster

8   before you that was handling the claim, you knew that she

9   contacted Mr. Waskowski's employer, Yes Express, correct?

10  A    I believe she did.  I don't know if she spoke with them

11  verbally or did so in writing.

12  Q    And you know that there is a form that you claims

13  adjusters use called a wage salary and verification form when

14  a person makes a wage loss claim?

15  A    Yes.

16  Q    And you also knew, because you reviewed the file, that

17  Ms. Page the adjuster before you contacted Yes Express and

18  that the employer completed that form, didn't you?

19  A    Yes.

20  Q    And that was in the file, right?

21  A    I believe so.

22  Q    And you also know that Terri Page, prior to your

23  involvement, after having his employer complete that form and

24  getting his employment records from Yes Express, that Terri

25  Page, at least up until March of 2011, was paying Mr.

*Kucharski – Direct*

1    Waskowski his wage loss claim, you knew that, didn't you?

2    A    Yes, I did.

3    Q    But then you come along, Ms. Kucharski, and what do you

4    do as the new claims adjuster handling the claim?  Regarding

5    the wage loss?

6    A    I requested additional information based on my review of

7    the claim file.

8    Q    Right.  And you wrote Mr. Waskowski this letter dated

9    May 5, 2011.  You can take a look at that because it is in the

10   claim file.

11   A    Uh-huh.

12   Q    And please read to the jury that letter that you wrote to

13   Mr. Waskowski regarding his wage loss claim?

14            MR. HEWSON:  Your Honor?

15            THE COURT:  Mr. Temrowski --

16   BY MR. TEMROWSKI:

17   Q    You indicated that you wanted Mr. Waskowski to get

18   additional information regarding his claim?

19   A    Correct.

20   Q    What did you want him to get?

21   A    In my review of Mr. Waskowski's claim file he was being

22   paid wage loss benefits based on a W-2 employee, and, in fact,

23   he was not a W-2 employee of Yes Express.  He was a

24   subcontractor or a self-employed party with them and a 1099

25   employee, which means we didn't have all of the information in

*Kucharski - Direct*

1    our claim file to accurately calculate what, if any, wage loss

2    benefit he might have been entitled to.

3    Q    But, Ms. Kucharski, by the time that you took over in

4    April of 2011, you weren't paying him wages anyway, were you?

5    A    I believe --

6    Q    You had stopped?

7    A    I believe that the wage loss was paid up until the point

8    that I took it over and asked for the additional information.

9    Q    That's your understanding?

10   A    That is my understanding.

11   Q    Okay.  So you write Mr. Waskowski a letter for more

12   information.  You tell the three providers that it's under

13   investigation.  What was your next move?  What did you do next

14   as the third adjuster now handling Mr. Waskowski's claim?

15   A    I also requested additional independent medical

16   evaluations.

17   Q    Well, we'll get to that in a minute.

18   A    Okay.

19   Q    But you did something before that.

20   A    I don't know what you are referring to.

21   Q    Let me show you a letter out of the claims file.

22   A    Sure.

23   Q    You hired a private investigator, didn't you?

24   A    Yes.

25   Q    You hired a private investigator to investigate Mr.

*Kucharski – Direct*

1    Waskowski, correct?

2    A    We requested surveillance, yes.

3    Q    And a company called Asset Control Services?

4    A    Yes.

5    Q    And you had an agreement with them about their fee to

6    investigate Mr. Waskowski, didn't you?

7            MR. HEWSON:  Your Honor, honestly we are now into

8    that point that that I had talked about before.  This is not on the

9    exhibit list and he's testifying as to what he says is in the

10   file.

11           MR. TEMROWSKI:  I'm not testifying Your Honor.  I'm

12   asking he what she did --

13           THE COURT:  What was the question?

14   BY MR. TEMROWSKI:

15   Q    The question was, what was the fee that you agreed upon

16   to pay Asset Control Services to do a private surveillance of

17   Mr. Waskowski?

18   A    Specific --

19           THE COURT:  Just a minute.

20           MR. HEWSON:  And I object as to relevance as well.

21   Thank you.

22           THE COURT:  Sustained.

23           MR. HEWSON:  Thank you.

24   BY MR. TEMROWSKI:

25   Q    Did you obtain any undercover surveillance on him?

*Kucharski – Direct*

1  A    I believe there was one day of surveillance done, but

2  there was nothing obtained.

3  Q    Nothing important though, was there?

4  A    I don't believe that they obtained anything on the date

5  that they were out to conduct the surveillance.

6  Q    In other words, you didn't catch him doing anything, did

7  you?

8  A    I don't believe we caught him at all.

9  Q    But that's what you wanted to do?

10  A    Simply trying to observe activity.  It is not an uncommon

11  practice.

12  Q    Now, we'll move on after the private investigator to the

13  IME.  You decided as the third claims adjuster handling

14  Mr. Waskowski's case that you were now going to have a new

15  IME; isn't that true?

16  A    An additional.

17  Q    An additional one.

18        And isn't it true, Ms. Kucharski, that you knew that

19  Terri Page, the adjuster before you that was handling

20  Mr. Waskowski's claim, that she had an independent medical

21  examination done on Mr. Waskowski?

22  A    I was aware of that.

23  Q    And you were aware that that independent medical

24  examination was done by Dr. Endress, correct?

25  A    Yes.

*Kucharski – Direct*

1  Q    Because Dr. Endress's report is in the PIP file, correct?

2  A    Yes.

3  Q    And you were aware that Dr. Endress, at the request of

4  Terri Page, examined Mr. Waskowski in October of 2010,

5  correct?

6  A    Yes.

7  Q    And that he wrote a report to Terri Page, telling her

8  what he found when he examined Mr. Waskowski, correct?

9  A    Yes.

10  Q    And you were aware that Dr. Endress wrote a second report

11  to Terri Page in November of 2010, again telling Terri Page

12  all of the problems that he found when he examined

13  Mr. Waskowski, correct?

14  A    I believe there was a second report.

15  Q    And in that second report, Terri Page asked Dr. Endress

16  some very pointed questions about Mr. Waskowski.

17         Do you remember those questions and do you remember

18  what his answers were?

19  A    Not specifically, I don't.

20  Q    Well, do you remember that Terri Page asked Dr. Endress,

21  the first IME doctor, if Mr. Waskowski was injured in the auto

22  accident?

23         MR. HEWSON:  Your Honor, I object.  The witness has

24  said she doesn't remember.

25         THE COURT:  Where's the foundation?

*Kucharski – Direct*

1          MR. TEMROWSKI:  I'll reask it.

2          MR. HEWSON:  Thank you.

3    BY MR. TEMROWSKI:

4    Q    Do you remember anything about the report, the second

5    report of Dr. Endress in November of 2010, to Terri Page?

6    A    Not specifically, I don't.

7    Q    Well, you did look at the file, didn't you?

8    A    Yes, I did.

9    Q    And you know that she asked him questions?

10   A    Yes, I do.

11   Q    And you know that he answered those questions?

12   A    I believe he did.

13   Q    And don't you think that those questions would be very

14   important in the proper handling of a claim?

15   A    I did review the report and I did take the response into

16   consideration.  However, a period of time had passed since Dr.

17   Endress had the opportunity to evaluate Mr. Waskowski.

18   Q    And you were aware that not only on two locations did Dr.

19   Endress report back to Terri Page, but he did it a third time

20   in February of 2011; you knew that, didn't you?

21   A    I did.

22   Q    And do you know what he stated to Terri Page in February

23   of 2011?

24   A    Not specifically.

25   Q    Is there some reason why you can't remember what he told

*Kucharski – Direct*

1    Terri Page?

2    A    I --

3              MR. HEWSON:  I'm going to object, Your Honor.  Not

4    only is there no foundation, it's argumentative.  "Is their

5    some reason you can't remember?"  I object.

6              MR. TEMROWSKI:  Well, she's the claim adjuster.

7              THE COURT:  Well, apparently she is one of three

8    claims adjusters.

9              MR. HEWSON:  And, Your Honor, may I object as to

10   relevance of this line of questioning, because this isn't a

11   referendum on whether or not claims handling was proper in

12   this case.  That's not the subject matter of this case.  I

13   believe the subject matter is whether or not this individual

14   plaintiff's claims are reasonable and customary, and the

15   charges are reasonable and necessary.

16             MR. TEMROWSKI:  No.  I totally --

17             MR. HEWSON:  And not the claims handling.  That's

18   why I object.

19             THE COURT:  Okay.

20             MR. HEWSON:  Thank you.

21             MR. TEMROWSKI:  No, I told you -- excuse -- Your

22   Honor, with all due respect, I totally disagree.  I think that

23   the way that the claim was handled --

24             THE COURT:  Can I tell you something?

25             MR. TEMROWSKI:  Yes.

*Kucharski – Direct*

1          THE COURT:  I think its relevant for you to ask why

2    he was cut off and it's going to be relevant to Mr. Hewson to

3    have the witness explain why your client was cut off.  That's

4    relevant.  Stay within that.

5          MR. HEWSON:  Thank you, Your Honor.

6    BY MR. TEMROWSKI:

7    Q    So you want a new IME?

8    A    An additional IME.

9    Q    And additional one --

10          But you didn't go back to Dr. Endress, did you?

11   A    I did not.

12   Q    You didn't go back to Dr. Endress and say, "Hey, Doctor

13   you examined Mr. Waskowski back in October of 2010, you wrote

14   Terri Page three letters based upon that exam, let's send

15   Mr. Waskowski back there and see how he is doing now."

16          You didn't do that, did you?

17   A    I did not.

18   Q    You went to a new doctor, didn't you?

19   A    Yes.

20   Q    And you went to Doctor --

21   A    Dr Geiringer.

22   Q    Geiringer, correct.

23          Now, Dr. Geiringer is not an orthopedic doctor, is

24   he?

25   A    No.

*Kucharski – Direct*

1   Q    And you knew that Mr. Waskowski was examined the first

2   time by Dr. Endress, who's an orthopedic surgeon, correct?

3   A    Yes.

4   Q    And you knew that Mr. Waskowski treated with Dr. Donohue

5   who is an orthopedic surgeon?

6   A    I believe he had one office visit with Dr. Donohue that I

7   am aware of.

8   Q    And you knew that Mr. Waskowski treated with Dr.

9   Glowacki, who is an orthopedic surgeon, right?

10  A    Yes.

11  Q    But you didn't go to an orthopedic surgeon.  You went to

12  Dr. Geiringer, who is a --

13  A    He's a physiatrist.

14  Q    A physiatrist, correct.

15       Now, Ms. Kucharski, of all of the doctors out there

16  that you could have sent Mr. Waskowski to, how did you find

17  Dr. Geiringer?

18  A    Dr. Geiringer is available to me as a claim

19  representative at State Farm to conduct independent medical

20  evaluations through an approved vendor.

21  Q    Okay.  And how long have you been a claims adjuster?

22  A    Since March of 2000.

23  Q    And as a claims adjuster for State Farm for that period

24  of time, how many times have you used Dr. Geiringer to do

25  independent medical exams?

*Kucharski – Direct*

1   A    I don't know.

2   Q    You don't know.  Well, was this the first time?

3   A    No, it was not.

4   Q    Ten times?

5   A    Maybe.

6   Q    A hundred times?

7   A    No.

8   Q    You're not sure?

9   A    I don't know the exact number, no.

10  Q    Mr. Waskowski went to that exam, didn't he?

11  A    Yes, he did.

12  Q    And you got a report back from Dr. Geiringer, didn't you?

13  A    Yes.

14  Q    Ms. Kucharski, do you remember what that report said?

15  A    The specifics of that report I can't regurgitate, but in

16  general, I do remember what the report said.

17  Q    You have a better recollection of what that report said

18  than Dr. Endress?

19  A    I do.

20  Q    What did it say?

21  A    Dr. Geiringer, when he evaluated Mr. Waskowski, had

22  difficulty finding objective medical support for his symptoms

23  and complaints.

24  Q    But that's not what Dr. Endress found, did he?

25  A    No, I don't believe so.

*Kucharski – Direct*

1    Q    So it's a different conclusion, let's call it, than Dr.

2    Endress reached, correct?

3    A    I wouldn't go that far, either.

4    Q    You wouldn't go that far, okay.

5         Now, Ms. Kucharski, we've heard about -- or we will

6    hear about a Dr. Quint.  Do you know who he is?

7    A    Yes.

8    Q    And could you please tell us how was it that Mr.

9    Waskowski -- well, he wasn't seen by Dr. Quint, but how did

10   those MRIs find their way to Dr. Quint?

11   A    Well, we requested that Dr. Quint review those MRI films.

12   Q    That was your request, too?

13   A    In conjunction with counsel, yes, it was.

14   Q    Okay.  While you were -- are you still a claims adjuster?

15   A    Yes, I am.

16   Q    And as the claims adjuster for State Farm, are you

17   familiar with what statutory interest is on a no-fault claim

18   that's not paid on time?

19   A    Yes, I am.

20   Q    And could you please tell the jury how that works?

21   A    The no-fault statute allows for interest in the event

22   that a benefit or a bill for services isn't paid within 30

23   days of receipt of all reasonable proof to support the claim.

24   Q    Then the insurance company has to pay 12 percent

25   statutory interest, correct?

*Kucharski – Direct*

1    A     That's correct.

2    Q     And as the third claims adjuster assigned to this case

3    and the current claims adjuster, you are familiar with the

4    payment log that's been done in this case?

5    A     Yes.

6    Q     And isn't it true that as part of the payment log that as

7    this claim has been handled, that interest has been paid

8    because benefits have been late in payment?

9    A     Specifically, I don't know.

10   Q     Well, would you care to take a look at it?

11   A     (Reviews document).

12        Yes, it does appear, $2.54 worth of interest has

13   been paid.

14   Q     Would you agree with me that the conclusions that were

15   reached by Dr. Geiringer, the doctor that you sent

16   Mr. Waskowski to, his conclusions are substantially different

17   than the conclusions reached by Dr. Endress?

18        MR. HEWSON:  Objection, foundation and outside the

19   scope of this witness's expertise.  The Court has already

20   ruled on Dr. Endress's inquiry.  Thank you.

21        THE COURT:  Sustained.

22   BY MR. TEMROWSKI:

23   Q     Is there a reason, Ms. Kucharski, that you didn't send

24   Mr. Waskowski to another doctor to resolve any conflict that

25   there may be?

*Kucharski – Direct*

1    A    I'm sorry, I don't understand your question, in terms of

2    another doctor.

3    Q    You had Dr. Geiringer's report and his findings, correct?

4    A    I did.

5    Q    You had Dr. Endress's report, three reports actually, and

6    his findings, correct?

7    A    Yes, I did.

8    Q    Is there a reason why you didn't say, "Hey, we better

9    send this guy to someone else for another evaluation"?

10   A    Actually, I did request an additional evaluation.

11   Q    You did?

12   A    Yes, I did.

13   Q    And did that take place?

14   A    No, it did not.

15   Q    You are aware that Dr. Glowacki has an outstanding

16   balance that is due; is that right?

17   A    I'm not aware of that.  I assume there is, but

18   specifically what that balance is, I don't know.

19   Q    And that there is a balance owed to Oakland MRI?

20   A    I am aware of that.

21   Q    And that bill has not been paid?

22   A    Not by State Farm.

23   Q    And that there is a bill owed to Dr. Lodzinski and that's

24   not been paid, to Euro Rehab?

25   A    I assume.  But specifically, the amount, I don't know.

*Kucharski – Cross*

1    Q    And currently, you are not paying Mr. Waskowski's wage

2    loss; is that correct?

3    A    That's correct.

4    Q    And currently, you are not paying Mr. Waskowski his

5    attendant care?

6    A    That's correct.

7    Q    And currently, you are not paying Mr. Waskowski his $20 a

8    day household help?

9    A    Correct.

10            MR. TEMROWSKI:  I don't believe of this witness,

11   Your Honor, I have anymore questions.

12            THE COURT:  Okay.  Mr. Hewson, any questions?

13            MR. HEWSON:  Thank you, Your Honor, if I may.

14                       **CROSS–EXAMINATION**

15   BY MR. HEWSON:

16   Q    Good morning, Ms. Kucharski.

17   A    Good morning.

18   Q    You asked for an IME with a neurologist, didn't you?

19   A    I did.

20   Q    That was Dr. Kirschner, right?

21   A    Correct.

22   Q    Was that because of the neurological concerns that could

23   have been present in Mr. Waskowski?

24   A    It was.  In my review of the claim file we attempted to

25   try to rectify or somehow determine what may be causing his

*Kucharski – Cross*

1    subjective complaints.

2    Q    Do you know why the examination of Dr. Kirschner didn't

3    go forward?

4    A    I do.  I believe I do.

5    Q    What was that?

6    A    I believe it was Mr. Temrowski did not allow him to

7    attend.

8    Q    What is your job as a claims adjuster, what are you

9    supposed to do?

10   A    To handle and pay claims in accordance with the Michigan

11   no-fault law.

12   Q    Okay.  Why was it important for you to have a physical

13   medicine and rehabilitation examination by Dr. Geiringer?

14   A    At the time that I took over the claim file, it had been

15   approximately 17 or 18 months since Mr. Waskowski's car

16   accident, and by all accounts within the claim file he was

17   getting worse, not getting better.

18          So we took that approach and I requested permission

19   to do the independent medical examination with a physiatrist

20   which would have offered us a wider scope and a wider

21   opportunity outside of the orthopedic surgery field to look at

22   possible issues or possible treatment.

23   Q    Now, are you a medical person, a trained medical person?

24   A    No, I am not.

25   Q    You rely on experts to provide you with opinions that

*Kucharski - Cross*

1   tell you what you need to know for your claims handling job,

2   right?

3   A    Right.

4   Q    And you also rely on records; am I correct on that?

5   A    Yes.

6   Q    You ask for records, you get records, you analyze and

7   make decisions, correct?

8   A    Yes.

9   Q    You don't actually have any input into the facts

10  themselves.  I mean, you don't create the facts or generate

11  the facts in a claim file, do you?

12  A    No.

13  Q    Now, did you have the opportunity during the claims

14  handling piece of this case to do any discovery depositions or

15  anything like that of Dr. Glowacki or the people at Euro

16  Rehab, did you have an opportunity to do that?

17  A    Yes, we did.

18  Q    Okay.  And that's after the litigation started, right?

19  A    That's right.

20  Q    Before the litigation though, when you were handling the

21  file, that is not available to you, correct?

22  A    No, it's not.

23  Q    Dr. Glowacki's deposition couldn't be taken, for example?

24  A    No.

25  Q    And was there any mention in your review of the claim

*Kucharski - Cross*

1    file by Dr. Glowacki that he thought that EMGs were lousy

2    tests and shouldn't be relied on?  Did you see any of that in

3    any of his reports?

4    A    In any of his medical records?

5    Q    Right.

6    A    No.

7    Q    Did he ever tell you in any of his medical reports as

8    you're reviewing them, that the bone scan had been read by a

9    stupid or incompetent doctor?

10   A    No.

11   Q    Was there any reference by him in his medical reports to

12   you that functional capacity evaluations have no merit in

13   evaluating patients; did he say that to you?

14   A    No, he did not.

15   Q    In his reports, did he ever tell you that he would

16   continue to treat Mr. Waskowski whether the treatments worked

17   or not, as long as that person kept treating with him?

18   A    Of course not.

19   Q    Was there any report from Dr. Glowacki to you that he was

20   making up the time for attendant care and reporting that so

21   that the people who were giving the attendant care could get

22   paid; did he tell you that anywhere?

23   A    No.

24   Q    Is there any way for you to have known any of that

25   information I just asked you about, assuming that Dr. Glowacki

*Kucharski - Cross*

1    testified to all that?  Could you have known that as a claims

2    adjuster?

3    A    No.

4    Q    You didn't have the opportunity to depose or take a sworn

5    statement from the daughters, Kamila and Margaret, either, did

6    you?

7    A    No, not prior to the litigation.

8    Q    Did you know that Kamila has testified that she didn't --

9    nobody helped her father with bathing for the first six months

10   after the accident?

11   A    From her deposition testimony I am aware of that.

12   Q    Did you know that during the claims handling process?

13   A    No.

14   Q    Would that information have changed any of the claims

15   handling in your opinion?

16   A    Yes.

17   Q    Why?

18   A    It would have been more information to evaluate at the

19   time that those benefits were submitted and those requests

20   were sent in.

21   Q    And, in fact, State Farm was paying for that attendant

22   care that wasn't being done according to Kamila, right?

23   A    We accepted it at face value and we did make those

24   payments.

25   Q    You didn't have the statement from Mr. Waskowski either,

*Kucharski - Cross*

1   his testimony in his deposition, until after the lawsuit

2   started, did you?

3   A    That's right.

4   Q    You didn't know that he testified that he didn't need

5   bathing after the first six months after the accident, did

6   you?

7   A    No.

8   Q    Did you know -- did he ever present to you this list, a

9   list of the payments he had made to his daughters for

10  attendant care?

11  A    No, no.

12  Q    Did he ever present to you a calendar that he claimed he

13  kept, itemizing the times for the daughters' performance of

14  services?

15  A    No.

16  Q    Did you ever get the wage loss information or the

17  follow-up information that you wanted?

18  A    I did not.

19  Q    Could you explain to the jury why that's of a concern?  I

20  wanted to make sure that I understood that.

21  A    Payments of wage loss benefits for a W-2 employee account

22  for all of the expenses an employee may have.  A self-employed

23  or a subcontracted person may be eligible from their taxes to

24  deduct expenses or to pay other benefits that may adjust their

25  actual income, essentially to lower that income.

*Kucharski - Cross*

1          It's not just as easy as getting your W-2 at the end

2     of the year, "This is how much I made, these are what I report

3     on my tax returns."  It's more complicated than that.

4          And we needed those tax returns for his historical

5     income information in order to see what types of deductions

6     that he took or other things that we needed to take into

7     consideration in calculating his wage loss.

8     Q    And actually, you asked him for his income tax returns

9     too, I believe, did you not?

10    A    Yes.

11    Q    Did you ever get those from him before the litigation?

12    A    No, not when I asked him.

13         MR. HEWSON:  Your Honor, may I have just a moment to

14    grab an exhibit?

15         THE COURT:  Sure.

16         MR. HEWSON:  Thank you.

17         Your Honor, I would indicate that Defendant's

18    Exhibit Two is plaintiff's answers to State Farm's request for

19    the first production of documents.  It's on the exhibit list.

20    And I would move its admission first of all at this particular

21    point.

22         THE COURT:  Okay.  Any objection to Exhibit Two?

23         MR. TEMROWSKI:  Can I see it?

24         MR. HEWSON:  Oh, sure.  And it includes this.

25         MR. TEMROWSKI:  (Reviews document).

*Kucharski - Cross*

1          MR. HEWSON:  I just pulled this out.  I'm going to

2    separately mark that one.

3          As Mr.  Temrowski is looking at that, Your Honor,

4    would it be in accord with the Court's procedure if I mark

5    this Exhibit as Two-A, because it's a subpart of Two, but I

6    want to be able to refer to it individually.

7          THE COURT:  Well, if Two is received, then i don't

8    think there will be an issue to marking it Two-A.

9          MR. HEWSON:  Thank you, Your Honor.

10          MR. TEMROWSKI:  I have no objections to these.

11          THE COURT:  All right, Exhibit Two is received, as

12    well as Two-A.

13          MR. HEWSON:  Thank you, Your Honor.  I have to mark

14    Two-A on the back, Your Honor.  If I may I approach the

15    witness, please?

16          THE COURT:  Sure.

17          MR. HEWSON:  Thank you, sir.

18    BY MR. HEWSON:

19    Q    Let me just show you that document.  Can you tell the

20    jury, for 2009, for the whole year, what Mr. Waskowski's

21    income was?

22    A    Are you referencing line 31?

23    Q    Yes.

24    A    $25,933.

25    Q    And that particular document -- and I'm sorry.  These are

*Kucharski – Cross*

1    the other two pages of that particular document.

2              I'm sorry, Your Honor.  Excuse me one second.

3              THE COURT:  Take your time.

4    BY MR. HEWSON:

5    Q    Do you have the second page of that return?

6    A    Yes.

7    Q    All right.

8    A    Page one and page two.

9    Q    Yes, thank you.

10             Now, am I correct that when you're calculating wage

11   loss for the period of a year, you would divide that number by

12   the number of months, correct?

13   A    Roughly, yes.

14   Q    And then there's a factor that's applied in wage loss,

15   you reduce it by 15 percent for taxes, right?

16   A    Correct.

17   Q    Do you remember what the original calculation was based

18   on for wage loss?

19   A    Honestly, I think there were some pay stubs or something

20   like that early on in the claim file that were extrapolated

21   from.

22   Q    All right.  Do you remember whether or not that wage loss

23   calculation involved a whole year as opposed to six months?

24   A    It did not.

25   Q    Thank you.  Now, why didn't you pay?  As the Judge

*Kucharski – Cross*

1   suggested, why didn't you pay Mr. Waskowski once you took over

2   the file?

3   A    When I took over the claim file and reviewed the wage

4   loss portion of the claim, I believed it was a very good

5   possibility that wage loss benefits had been significantly

6   overpaid, and to continue to make an overpayment was not in

7   the best interest of State Farm or Mr. Waskowski.

8   Q    Thank you.  What about Dr. Glowacki, how did Dr.

9   Geiringer's report impact you in your decision not to pay him?

10  A    Based on the information in the claim file and the

11  information in Dr. Geiringer's report, the decision was made

12  to no longer consider Dr. Glowacki's treatment, because we

13  couldn't determine that it was reasonably necessary as a

14  result of the motor vehicle accident.

15  Q    What, if any, part does it play in your decision-making

16  that Dr. Glowacki would continue to prescribe treatments that

17  aren't working as long as the patient is treating with him.

18  Does that add anything into your equation?

19  A    It does.

20  Q    And what is that, please?

21  A    When we get a claim in and we are reviewing medical

22  records from a medical provider, we have to take that at face

23  value and we have to handle the claim based on the information

24  that we have.

25           It's disturbing that a doctor would admit that at a

*Kucharski – Cross*

1    later date because we rely on that information.

2    Q    What, if any, impact does it have on your analysis as the

3    claims handler in this case that the subject matter of the

4    attendant care, the hours for the attendant care, is made up?

5    Does that impact this reasonable and necessary approach?

6    A    Absolutely.

7    Q    Tell the jury why?

8    A    Again, we paid attendant care benefits and replacement

9    services benefits on the claim at face value as they were

10   presented, Mr. Waskowski claimed his injury and his benefits

11   being incurred company.  We paid those.

12           And to find out at a later date that they weren't

13   presented accurately and there were inconsistencies in the

14   Doctor's testimony, and in the care providers' testimony and

15   in Mr. Waskowski's testimony, is again very disturbing from

16   the standpoint of trying to do the right thing and pay what we

17   owe on an injury claim.

18   Q    The replacement services claim and the household services

19   claim, if there are inconsistencies in that claim as well, and

20   I'm not going to waste your time going through them, but I

21   want you to assume for the sake of this question that there

22   are additional inconsistencies.  How does that impact the

23   claims process?  How does that affect your ability to properly

24   deal with an insured?

25   A    We can't trust the information that's coming in.  We

*Kucharski – Redirect*

1    don't know if the information presented is accurate or if the

2    services were actually incurred.

3    Q    Now, there has been additional information since the

4    lawsuit started that you didn't have during the claims

5    process; am I correct?

6    A    Yes.

7    Q    Has any of that information encouraged you to change your

8    opinion that any part of Mr. Waskowski's claim should be paid?

9    A    I believe that State Farm overpaid the claim,

10   significantly.

11   Q    Thank you.

12           MR. TEMROWSKI:  Your Honor, I have nothing further

13   of the witness.

14           THE COURT:  Redirect.

15           MR. TEMROWSKI:  Yes.

16                    **REDIRECT EXAMINATION**

17   BY MR. TEMROWSKI:

18   Q    I have a few questions based upon what you just testified

19   to.  But just so that we're clear, by the time you took over

20   as the third claims adjuster handling this claim, by the time

21   you took over, the wage loss benefit to Mr. Waskowski had

22   stopped, correct?

23   A    No.  I believe I am the one that stopped paying the wage

24   loss benefit, pending the information that I sent that letter

25   requesting.

*Kucharski – Redirect*

1   Q    And you didn't pay one penny in wages to Mr. Waskowski?

2   A    I did not issue any checks for wage loss.

3   Q    Okay.  And the attendant care had stopped by the time you

4   took over?

5   A    Yes, it had.

6   Q    And you didn't pay one penny in attendant care to Mr.

7   Waskowski?

8   A    No, I did not.

9   Q    And the $20 a day household help had stopped?

10  A    Yeah.  I believe it had, yes.

11  Q    And you didn't cut one check for household services to

12  Mr. Waskowski?

13  A    No, I didn't.

14        MR. HEWSON:  Your Honor, I'm going to object.  This

15  is outside of the scope of my questioning.

16        THE COURT:  Give me the question again.

17  BY MR. TEMROWSKI:

18  Q    Regarding the $20 a day household help, those payments

19  had stopped, correct?

20  A    Yes.

21  Q    And you didn't cut one check for that $20 a day to

22  Mr. Waskowski?

23  A    No.  I don't believe so.

24  Q    Now, you testified a couple of times a moment ago that

25  you were of the strong conviction that Mr. Waskowski was

*Kucharski – Redirect*

1   overpaid for wages; is that right?

2   A    I believed at the time I took the claim over that that

3   was a possibility, yes.

4   Q    Well, what does that say about Ms. Page?

5            MR. HEWSON:  I am going to object.  That is

6   certainly outside the scope and I believe it calls for

7   speculation.

8            THE COURT:  I don't believe there were any questions

9   asked about Ms. Page.

10  BY MR. TEMROWSKI:

11  Q    Isn't it true that Ms. Page contacted Yes Express and

12  obtained the wage and salary verification form?

13  A    Yes, it is.

14  Q    You didn't do that?

15  A    No.

16  Q    All you did when you took over, is you wanted to see his

17  income tax returns?

18  A    No, I made a phone call to Yes Express as well and I

19  spoke with them.

20  Q    Oh, you made a phone call.  What documents did you go and

21  get though, from Yes Express?

22  A    I didn't need any from Yes Express.

23  Q    Because you already had them, correct?

24  A    There was information in the claim file from Yes Express.

25  Q    And then you wanted income tax records, correct?

*Kucharski – Redirect*

1   A    That's correct.

2   Q    And then you come to the conclusion, "Oh, Mr. Waskowski

3   was overpaid," correct?

4   A    I believe he was at the time I took over the claim file.

5   Q    Now, you also testified about a Dr. Kirschner.  Remember

6   I asked you and then Mr. Hewson talked about it, about, "Well,

7   maybe we should get another opinion?"

8   A    Yes.

9   Q    Dr. Kirschner's name came up?

10  A    Yes.

11  Q    And didn't I hear you testify a minute ago that it was

12  Mr. Temrowski who put the kibosh on Mr. Waskowski going to Dr.

13  Kirschner?

14  A    I said I believed that to be the case.

15  Q    I believed.  Are you sure about that, ma'am?

16  A    No.  That's what I believe.

17  Q    You believe.  Isn't it true that the reason Mr. Waskowski

18  didn't go to Dr. Kirschner is because we told you that he

19  needed transportation, and the ride didn't show up and he was

20  there waiting for over an hour, and that's why he didn't go to

21  Dr. Kirschner?

22          MR. HEWSON:  Your Honor, I'm going to object that

23  this gentleman is testifying, at best.

24          THE COURT:  I think so.

25          MR. HEWSON:  I move to strike.

<em>Kucharski - Redirect</em>

1    BY MR. TEMROWSKI:

2    Q    You don't know why he didn't go, do you?

3    A    I have my belief as to why he didn't go.

4    Q    Okay.  Mr. Hewson asked you a question that went like

5    this.  "Ms. Kucharski, Mr. Waskowski never gave you a list

6    once he did get paid attendant care, showing what he paid his

7    care provider daughters?"

8         Do you remember that question?

9    A    Yes.

10   Q    And your answer was, "Oh, yes, Mr. Hewson, that's right.

11   He never showed me a list showing what he paid the daughters."

12        Ma'am, as an expert, as a claims adjuster handling

13   no-fault claims from injured individuals, is there some law

14   that I don't know about that the claimant has to tell you how

15   he pays the care providers?

16   A    No.

17   Q    Then why did you want a list like that?

18   A    I don't --

19        MR. HEWSON:  Your Honor, I'm going to object.  Does

20   he have to yell at the witness?  I mean, seriously.

21        THE COURT:  Your voice is slightly raised.

22   BY MR. TEMROWSKI:

23   Q    Then why did you ask for a list like that?

24   A    I don't believe that I did.

25   Q    Now, the other question you were asked, "Is Dr. Glowacki

44

*Kucharski – Redirect*

1   making up a number of hours for attendant care?"

2          Do you remember that?

3   A    I do.

4   Q    Now, Ms. Kucharski, as a claims adjuster handling a

5   claim -- and you deal with attendant's care all the time,

6   don't you?

7   A    Frequently.

8   Q    Frequently.  You deal with it on a lot of claims that are

9   made, correct?

10  A    Yeah, we do.

11  Q    Can you, Ms. Kucharski, please explain to me and to all

12  of us, when a treating physician writes a script for attendant

13  care -- which you like them to do, don't you?

14  A    We request a prescription and additional information

15  supporting that, yes.

16  Q    Even though, under the no-fault statute, a script is not

17  a mandatory requirement, is it?

18  A    It is not specifically listed as a requirement, no.

19  Q    But you like to have it, right?

20  A    We do.

21  Q    And in the case of Mr. Waskowski, he had the scripts,

22  correct?

23  A    He did.

24  Q    And he had a doctor stating the number of hours per day,

25  correct?

*Kucharski – Redirect*

1   A    He did.

2   Q    Could you please explain to all of us how does a doctor

3   arrive at how many hours a day a patient should receive

4   attendant care?

5           MR. HEWSON:  I'm going to object as to foundation,

6   Your Honor.  I believe it calls for speculation.

7           THE COURT:  Well, how does the doctor arrive.

8           MR. TEMROWSKI:  At coming to the decision as to how

9   many hours per day to prescribed attendant care.

10          THE COURT:  Right now there's not enough foundation

11  for her to answer that question.

12          MR. HEWSON:  Thank you.

13  BY MR. TEMROWSKI:

14  Q    Do you know how a doctor arrives at the number of hours?

15  A    No, I don't.

16  Q    Do you know of any book or medical authority that states

17  that for a certain injury a person should receive x amount of

18  hours per day attendant care?

19  A    No.

20  Q    Do you leave it to the discretion of the physician as to

21  how many hours per day to prescribe?

22  A    We obviously have no control over what the physicians

23  prescribes.

24  Q    And physicians prescribe different hours all the time,

25  don't they?

*Kucharski - Recross*

```
 1   A    They do.

 2   Q    Thank you.  I have nothing else.

 3             MR. HEWSON:  One limited thing, Judge.

 4             THE COURT:  Sure, go ahead.

 5             MR. HEWSON:  Thank you.

 6                    RECROSS-EXAMINATION

 7   BY MR. HEWSON:

 8   Q    I believe it's Exhibit Three.  My brother counsel asked

 9   you a moment ago whether or not usually in a PIP claim,

10   Mr. Waskowski has to account for how he pays the money.

11             Do you remember that question?

12   A    Uh-huh.

13   Q    Is that a yes?

14   A    Yes, I do.  Yes.

15   Q    Now, the litigation however, involved asking those very

16   questions, were you aware of that?

17   A    Yes, vaguely.

18   Q    May I approach the witness, Your Honor?

19             THE COURT:  For what purpose?

20             MR. HEWSON:  I just wanted to show her Exhibit Three

21   relative to the issue of providing calendars and the documents

22   regarding the payment of the daughters which is what counsel

23   asked her about.

24             THE COURT:  Okay.  Go ahead.

25             MR. HEWSON:  Thank you.
```

*Kucharski - Recross*

1    BY MR. HEWSON:

2    Q    Very briefly, in this lawsuit Mr. Waskowski was asked

3    about his testimony in question number one?

4    A    Uh-huh.

5    Q    Where he said he had calendars that broke down where the

6    -- which of the doctors did which of the services; is that

7    right?

8    A    Yes.

9    Q    He, to the best of your knowledge, never produced that

10   calendar; am I correct?

11   A    That's right.

12   Q    Even in this lawsuit?

13   A    Correct.

14   Q    The second question involved the payments to the doctors.

15   He testified that he kept a log of the payments to the

16   daughters, right?

17   A    Yes.

18   Q    In this lawsuit or at any time to you, has Mr. Waskowski

19   produced that document?

20   A    No, he has not.

21        MR. HEWSON:  Thank you.  I have nothing else.  Thank

22   you very much.

23        MR. TEMROWSKI:  Nothing else.

24        THE COURT:  Okay.  Thank you very much.  You may

25   step down.

*Waskowski v. State Farm*

1          MR. HEWSON:  May the witness be excused, Your Honor?

2          THE COURT:  Mr. Temrowski?

3          MR. TEMROWSKI:  Fine with me.

4          THE COURT:  Okay.

5          MR. HEWSON:  May I check for Ms. Page in the

6   hallway?

7          THE COURT:  Sure.

8          (Brief pause in proceedings)

9          MR. HEWSON:  Your Honor, Ms. Page has requested that

10  she be allowed to use the restroom before she testifies.

11          THE COURT:  Sure.

12          MR. HEWSON:  Can we take just a two-minute break, so

13  she can do that?

14          THE COURT:  Yes.  Members of the jury, how about if

15  we just take a quick five-minute break.  I'll just have you

16  return to the jury room and stretch, and then we'll bring you

17  right back out.

18          COURT CLERK:  All rise for the jury.

19          (Jury out at 9:42 a.m.)

20          THE COURT:  So it's going to be Ms. Page and then?

21          MR. TEMROWSKI:  Mr. Waskowski.

22          THE COURT:  And is that it?

23          MR. TEMROWSKI:  That's it.

24          MR. HEWSON:  Okay.  Your Honor, I'm going to take a

25  moment and make sure then -- obviously I have a Rule 50 motion

*Waskowski v. State Farm*

1   to suggest to the Court at the break of the plaintiff's case

2   and then I will be ready to present Dr. Quint.

3            THE COURT:  Okay.  Great.

4            MR. HEWSON:  Thank you.

5            (Court in recess at 9:43 a.m.)

6            (Court in session at 9:55 a.m.)

7            DEPUTY COURT CLERK:  Court is back in session.

8   Please be seated.

9            THE COURT:  Okay.  Are we ready for our next witness

10  and the jury?

11           MR. HEWSON:  Yes, Your Honor.  Thank you.

12           MR. TEMROWSKI:  Yes.

13           DEPUTY COURT CLERK:  All rise for the jury.

14           (Jury in at 9:56 a.m.)

15           DEPUTY COURT CLERK:  Please be seated.

16           THE COURT:  Okay.  Our next witness is going to be?

17           MR. TEMROWSKI:  Plaintiff's next witness is Terri

18  Page.

19           THE COURT:  Okay.  Ms. Page, could you come up and

20  give your full name to our court reporter right there?

21           **TERRI ANN PAGE, PLAINTIFF'S WITNESS, SWORN**

22                      **DIRECT EXAMINATION**

23  BY MR. TEMROWSKI:

24  Q     Good morning.

25  A     Hello.

*Page – Direct*

1    Q    Please tell the jury your name?

2    A    Terri Ann Page.

3    Q    And what is your occupation?

4    A    I'm an injury claim rep at State Farm.

5    Q    And could you please tell us what does an injury claim

6    rep do?

7    A    It pretty much entails paying claims according to the

8    no-fault law, making sure we pay what we owe, not what we

9    don't, gathering information in the form of reports.

10   Sometimes we have to talk to experts on -- to get additional

11   information and that sort of thing.

12   Q    And how long have you been a claims rep?

13   A    Probably about eight years.

14   Q    And could you please tell us what training you've had to

15   be a claims rep for State Farm?

16   A    I've had mostly on the job training.  I did some job

17   shadowing.  We had some classes, like on the no fault law,

18   things like that.  Sometimes we have an accountant come in and

19   work with us and -- but it's pretty much just mostly

20   on-the-job training.

21   Q    And do you feel that you're competent to do this job?

22   A    I do.

23   Q    I subpoenaed you to be here today, correct?

24   A    Pardon me?

25   Q    I issued a subpoena for you to be here today, correct?

*Page – Direct*

1    A     I believe so.  I was told to be here by my attorney.

2    Q     Okay.  And it's my understanding that you're one of

3    several claims reps that have handled Mr. Waskowski's file; is

4    that right?

5    A     Yes.

6    Q     And could you please tell us how many different claims

7    reps have handled this file?

8    A     No.

9    Q     No?

10   A     No.

11   Q     No, you don't know or --

12   A     No, I can't tell you how many have handled it.  I don't

13   know.

14   Q     Well, could you tell us this?  When did your involvement

15   in this case start and when did it stop?

16   A     My involvement, I believe, was -- began about February of

17   2010 and ended about April of 2011.

18   Q     Okay.  And are you, Ms. Page, familiar with Mr.

19   Waskowski's claim file?

20   A     I'm familiar with the parts I worked.

21   Q     Oh, the parts you worked on.

22         And as to those parts, you are familiar, right?

23   A     Yes.

24   Q     And would you agree with me that every piece of paper

25   that's in Mr. Waskowski's claim file is important?

*Page – Direct*

1  A    No, because there's blank pieces of paper in some of the

2  files, so --

3  Q    There's what?

4  A    Sometimes there's a blank piece of paper in the files, so

5  I don't know that that's important.

6  Q    Well, ma'am, aside from a blank piece of paper, would you

7  agree with me that every piece of paper, other than a blank

8  piece of paper is important?

9  A    I can't say for sure.  I can't say every single piece of

10  paper for sure is important.  It depends on what you're

11  looking at.

12  Q    Well, can you give me some examples then of what kind of

13  papers that would be in a claims file that aren't important?

14  A    All the blank pieces of paper I just mentioned to you.

15  Q    Ms. Page, I think we all can agree on that.

16  A    Sometimes we get wrong addresses that are returned to us,

17  those sorts of things.

18  Q    Other than that, would you agree that everything else is

19  important?

20  A    I would have to see the whole claims file.  I can't say

21  every single piece of paper in that file that you're holding

22  right there is important.  I don't know.

23  Q    Did you review this file in preparation for coming here

24  today?

25  A    I reviewed parts of it, yes.

*Page – Direct*

1  Q    Okay.  What parts did you review?

2  A    What I covered with my attorney.

3  Q    What parts were those?

4  A    The parts -- mostly what I worked on, and we talked about

5  some depositions that took place.

6  Q    And they're not part of the claim file, correct?

7  A    When deps have been put into the claim file.

8  Q    Depositions have been put into the claim file?  Is that

9  what you're saying?

10  A    Yes.

11  Q    What makes you say that?

12  A    You filed suit, so the deps are in the claim file.

13  Q    Okay.  Ms. Page, as a well-versed claims adjuster for

14  State Farm for eight years, are you familiar with the Michigan

15  no-fault act?

16  A    I'm familiar with it.

17  Q    How familiar are you with it?

18  A    I'm familiar enough to work files.

19  Q    Okay.  And, Ms. Page, let's see if you and I can agree on

20  a few things.

21        In this case, Mr. Waskowski is making five claims

22  against State Farm, okay?

23  A    Okay.

24  Q    And we'll start with the first one.  It's called medical

25  bills, all right?

*Page – Direct*

1   A    Okay.

2   Q    If a person like Mr. Waskowski is injured in an

3   automobile collision, isn't it true that regardless of fault,

4   the injured person makes a claim with their own car insurance

5   company to collect their no-fault benefits?

6   A    Are you asking if that's true?

7   Q    Yes.

8   A    They can, yeah.

9   Q    They can?  They can or they have to?

10  A    I can't make them do it.  If they want to file a claim,

11  that's up to them.

12  Q    Okay.  And, Ms. Page, isn't it also true that medical

13  benefits under the Michigan no-fault act are a lifetime

14  benefit that an injured person's entitled to?

15  A    Yes.

16  Q    Prescription expenses, isn't it equally true that an

17  injured person makes the claim for prescription expenses with

18  their own car insurance company?

19  A    They can.

20  Q    And isn't it true that under the no-fault act, that if

21  those expenses are related to injuries from the automobile

22  accident that those are a lifetime benefit, --

23  A    They can be a part of it.

24  Q    -- like the medicals?

25  A    Yes.  They can be part of it.

*Page – Direct*

1   Q    Okay.  Attendant care, isn't that a benefit that an

2   injured person's entitled to under the Michigan no-fault act?

3   A    Yes.

4   Q    And again, does the injured person make that claim with

5   their own car insurance company?

6   A    They can.

7   Q    And just like the prescriptions and the medicals, isn't

8   that a lifetime benefit?

9        MR. HEWSON:  Your Honor, I need to object.  There's

10   really no contest that the claims that Mr. Waskowski is making

11   are being made under the Michigan no-fault act.  I don't --

12       MR. TEMROWSKI:  Well, Your Honor, may I --

13       MR. HEWSON:  -- believe it's relevant.

14       MR. TEMROWSKI:  May I please state why it is

15   relevant?

16       THE COURT:  Just ask the question.

17       MR. TEMROWSKI:  Continue?

18       THE COURT:  You're okay.

19   BY MR. TEMROWSKI:

20   Q    The $20 a day household help, isn't it also equally true

21   that if a person's injured in an automobile accident, they go

22   to their own car insurance company to make that claim?

23   A    Yes, they can.

24   Q    And they can collect up to $20 per day for services

25   provided by someone to do their household chores, right?

*Page – Direct*

1   A     That's basically it, yes.

2   Q     And isn't it true that that benefit has a three-year cap

3   on it from the date of the automobile collision?

4   A     You're correct.

5   Q     And last, but not least, we come to wage loss benefits.

6   Isn't it equally true that if a person is injured in an

7   automobile collision and they can't work, that they go to

8   their own car insurance company to collect their wage loss

9   benefits?

10   A     You're correct.

11   Q     And isn't it true that just like the $20 per day

12   household help, the wage loss benefit also has a three-year

13   capped time limit on it, correct?

14   A     It does have a three-year statute.

15   Q     The first three are lifetime, the last two I mentioned

16   have a three-year cap, correct?

17   A     The replacement services and wage loss have a three-year

18   cap.

19   Q     Okay.  And, Ms. Page, isn't it true that in the case of

20   Mr. Waskowski, that after he was injured in the December 23,

21   2009 motor vehicle collision, that he came to his own car

22   insurance company, which was State Farm, and that he made

23   those five claims?

24   A     That's correct.

25   Q     And you were the claims adjuster at the beginning,

*Page – Direct*

1   handling those claims, correct?

2   A     No.

3   Q     Who was?

4            THE COURT:  Let's take a break.  I mean, a sidebar.

5            (Sidebar conference held on the record and out of

6            the hearing of the jury)

7               THE COURT:  Now, where you're at in the

8            trial, right, this is your last day?

9               MR. TEMROWSKI:  Yeah.

10              THE COURT:  So I don't know how much time you

11           intend to go on, but you might want to cut to the

12           chase a little bit?

13              MR. TEMROWSKI:  Okay.

14           (Sidebar conference concluded)

15   BY MR. TEMROWSKI:

16   Q    Isn't it true, Ms. Page, that after the collision

17   occurred that Mr. Waskowski reported the claim to State Farm?

18   A    Somebody reported it to State Farm.  I didn't get it at

19   the beginning, but yeah, we have it.

20   Q    And Mr. Waskowski was assigned a claim number, correct?

21   A    Yes.

22   Q    And at the very onset, you wrote Mr. Waskowski a nice

23   letter in January of 2010, explaining to him what his no-fault

24   benefits were, correct?

25   A    I don't think I wrote that letter.

*Page – Direct*

1    Q    Terri Page --

2    A    Let me see if that's the benefits letter.

3         Okay.  Well, this one came from Chris Holme, so

4    that's not me.  And this one came from Chris Holme.  That's

5    not me.

6         And I sent the attendant care letter only, out of

7    these.  So these are not ones I sent.  But this is explaining

8    what attendant care is to him.

9    Q    Okay.  But isn't it true that he got a letter from State

10   Farm explaining what the no-fault benefits are?

11   A    Somebody sent him one, yes.

12   Q    Okay.  Now, as the claims adjuster that got involved in

13   this case, you obtained a copy of the police report and you

14   reviewed that, didn't you?

15   A    Yes, I did.

16   Q    And that's in the claims file, right?

17   A    It is in the claims file.

18   Q    And you actually obtained 34 photographs of the damage

19   that was done to Mr. Waskowski's car because that's in the

20   claims file?

21   A    It's in the claims file.  I was not the one that ordered

22   the photos, but they are in the claims file.

23   Q    Okay.  And you were aware that there's a repair estimate

24   for the damage to Mr. Waskowski's car?

25         MR. HEWSON:  Your Honor, I object.  I don't know

*Page – Direct*

1    what the repairs to the vehicle have to do with this file.

2    It's irrelevant.

3             MR. TEMROWSKI:  The repairs are part of the claim

4    file and they show the severity of the damage that was done to

5    Mr. Waskowski's car.  I think it's extremely --

6             THE COURT:  Go ahead.

7    BY MR. TEMROWSKI:

8    Q    And there's a repair estimate that's in the claims file,

9    correct?

10   A    There is an estimate, yes.

11   Q    And State Farm paid to have the car repaired, correct?

12   A    I don't know.  I don't know the physical damage part of

13   the claim.

14   Q    Okay.  It shows $14,000 --

15            MR. HEWSON:  Your Honor, I'm going to object.  He

16   dealt with this when we had Ms. Kucharski on the stand.

17   You've already advised him relative to the contents of the

18   claim file.

19            THE COURT:  That's right.

20            MR. HEWSON:  Okay.  Thank you.

21   BY MR. TEMROWSKI:

22   Q    Now, we've established that Mr. Waskowski made the five

23   claims that I've talked about with State Farm and you've

24   become the claims adjuster assigned to handling this case,

25   correct?

Page – Direct

1    A     Eventually, yes.

2    Q     And now I'd like to focus on Mr. Waskowski's wage loss

3    claim that he made.  Are you familiar with that?

4    A     Yes.

5    Q     And could you please tell us when a person like Mr.

6    Waskowski is hurt, he's got a job, and he's employed and he

7    can't work and he comes to you, State Farm, to pay his wages

8    loss, which he did, correct?

9    A     Yes.

10   Q     What did you do, as the claims adjuster, to pay him his

11   wage loss benefits?  What did you do?

12   A     When I took over the claim, they had already started --

13   the adjuster ahead of me had already started processing his

14   wage loss claims, so what I did was, I looked at the wage,

15   salary form.  It's just a form we send to the employer, and we

16   send it to the one that they're employed at at the time of the

17   accident, and we ask how much they're making and that sort of

18   thing.

19          And it gives us a basis to calculate their wages.

20   So we have to pay 85 percent of their gross daily wage under

21   the no-fault law.  So once we get that information back from

22   the employer, then we can calculate the wages.  And I looked

23   at what was calculated, and it looked in line with that

24   document.

25   Q     And, in fact, you end a document to Yes Express called a

*Page – Direct*

1   Michigan Motor Vehicle No-Fault Insurance Law Wage, Salary and

2   Benefits Verification Form, correct?

3   A    Somebody sent the wage, salary verification form.  I

4   can't remember if it was me specifically or not.

5   Q    Well, you wrote a letter to Yes Express on February 25,

6   2010, asking for his complete file at Yes Express, didn't you?

7   A    But that wasn't for the wage, salary form.  That was

8   asking for something completely different.

9   Q    You wanted Mr. Waskowski's complete wage loss file,

10  didn't you?

11  A    No.

12          MR. HEWSON:  Your Honor, I'm sorry.

13          THE WITNESS:  I asked for the --

14          MR. HEWSON:  I'm sorry.  This is the same thing.

15  Him reading from documents that can't be introduced into

16  evidence is improper.  He's not asking the witness to refresh

17  her recollection or any of that.  I object.

18          THE COURT:  What's your question again?

19  BY MR. TEMROWSKI:

20  Q    My question was, didn't you request Mr. Waskowski's

21  complete personnel file from Yes Express?

22  A    I requested the complete employment file.

23  Q    The complete -- and did you get that?

24  A    Not to my knowledge.  I can't recall exactly.

25  Q    Oh, you can't recall?  You can't recall?

*Page – Direct*

1   A    I just said I don't recall.

2   Q    Okay.  But you did get the wage and salary verification

3   form?

4   A    Which is what we based her calculation off -- his

5   calculation off from, correct.

6   Q    And you decided to start paying Mr. Waskowski wage loss

7   benefits, correct?

8   A    I did not decide.  It was already being paid prior to me

9   taking over the claim.

10  Q    Okay.  And how much was being paid by State Farm to Mr.

11  Waskowski for his wage loss benefits?

12  A    I don't recall the exact amount.

13  Q    Well, if I show you these documents from State Farm,

14  would this refresh your memory?

15  A    (Reviewing documents).

16        THE COURT:  Perhaps if it's in there, you could show

17  her where it's at?

18        MR. TEMROWSKI:  Absolutely.  Total payment --

19        THE COURT:  Ah, ah, ah.  Just show her where it's

20  at.

21        MR. TEMROWSKI:  Right there (indicating).

22        THE WITNESS:  Well, I looked through all of them

23  because you gave me documents before that weren't mine, so --

24  it looks though -- I looked through, it looks like a pay

25  period of about August 19, 2010, and it looks like the average

*Page – Direct*

1    monthly paid on it was about $2,908.80.

2              MR. TEMROWSKI:  Thank you.

3              THE WITNESS:  You're welcome.

4    BY MR. TEMROWSKI:

5    Q    And you gave that amount to Mr. Waskowski until when?

6    A    I believe it was around November.  I'm not sure of the

7    exact cutoff time.  I can't say for certain.

8    Q    What about if I told you it's through March 7, 2011?

9    Would you disagree with that?

10   A    I would say I'm not sure, like I just said.

11   Q    Okay.  Now, that was his wage loss claim.  You also knew

12   that Mr. Waskowski was treating with doctors, correct?

13   A    Yes.

14   Q    And could you tell us who was the very first doctor that

15   Mr. Waskowski went to?

16   A    I believe it was his primary care physician, but I -- Dr.

17   -- I think it was Dr. -- something that started with an N?

18   Q    Okay.  How about Dr. Wietrzykowski?

19   A    Okay.

20   Q    Okay.  And State Farm sent a questionnaire, a letter to

21   Dr. Wietrzykowski because you wanted to gather information on

22   Mr. Waskowski's injuries, correct?

23   A    The claim rep ahead of me did, yes.

24   Q    The claim rep ahead of you did, and asked Dr.

25   Wietrzykowski some very specific questions about Mr.

*Page – Direct*

1   Waskowski's injury, correct?

2   A    The other claim rep sent a letter to the doctor.

3   Q    Okay.  Because the other claim rep knew that he was

4   making a claim for attendant care and household help, right?

5   A    He either knew or suspected it, so he was probably trying

6   to get a jump on it.

7   Q    Okay.  And, Ms. Page, do you remember what Dr.

8   Wietrzykowski, the very first doctor that treated Mr.

9   Waskowski, what he said about his need for household help and

10  attendant care?

11          MR. HEWSON:  Your Honor, it's hearsay.  And the

12  Court has already ruled on putting in the evidence through in

13  this manner.  I object.

14          MR. TEMROWSKI:  I'm just asking if she knew what he

15  said.

16          THE COURT:  First of all, you have to establish that

17  she saw certain documents from him, which you haven't.

18          MR. TEMROWSKI:  Could I then, Your Honor, pull it

19  out of this file that's been marked as an exhibit?

20          THE COURT:  For what purpose?

21          MR. TEMROWSKI:  To show it to this witness.

22          THE COURT:  And to establish what?

23          MR. TEMROWSKI:  Just establish if she knew what the

24  first doctor said about his need for household --

25          THE COURT:  Whether she reviewed the report?

*Page – Direct*

1           MR. TEMROWSKI:  So she can review the report?

2           THE COURT:  To establish whether she reviewed the

3    report?

4           MR. TEMROWSKI:  Yes.

5           THE COURT:  Okay.

6           MR. TEMROWSKI:  Well, I have a copy of it.  May I

7    show it to the witness?

8           THE COURT:  That's from the previously-admitted

9    exhibits?

10          MR. TEMROWSKI:  Yes.

11          THE COURT:  All right.

12          Could I see both of you at the sidebar?

13          (Sidebar conference held on the record and out of

14          the hearing of the jury)

15              THE COURT:  What are you trying to do with

16          this witness?

17              MR. TEMROWSKI:  I want to see how she --

18              THE COURT:  What are you trying to establish?

19          I mean, these reports are already in evidence.

20          What are you trying to establish, the --

21              MR. TEMROWSKI:  I'm trying to establish that

22          she knew that he prescribed attendant care and

23          household help.

24              MR. HEWSON:  Actually, he didn't, but the

25          exhibit is already in, and that argument can be

*Page – Direct*

1        made from the exhibit.  That was my -- I just

2        don't want to be the one bouncing up and down with

3        all these objections, you know, Your Honor.

4           MR. TEMROWSKI:  I'm trying to establish from

5        her --

6           THE COURT:  Is what?

7           MR. TEMROWSKI:  That he -- the first doctor

8        prescribed attendant care and household help.

9           THE COURT:  I thought that's already been

10       established.

11          MR. TEMROWSKI:  No.  He's disputing that.

12          THE COURT: His records are anyway.

13          MR. HEWSON:  They are.  It's in.

14          MR. TEMROWSKI:  That record's in.  That

15       establishes --

16          THE COURT:  And that establishes attendant

17       care was ordered.

18          MR. TEMROWSKI:  Yes.

19          THE COURT:  Okay.

20          MR. TEMROWSKI:  I'm just asking if she knew

21       about --

22          THE COURT:  You know what, pursuant to Rule

23       611, you've got to cut to the chase.

24          MR. TEMROWSKI:  Okay.

25          THE COURT:  You are, quite frankly, badgering

*Page – Direct*

1              the last --

2                     MR. TEMROWSKI:  Okay.

3                     THE COURT:  Not only this witness, but

4              certainly the prior witness, Ms. Kucharski, so --

5                     MR. TEMROWSKI:  Okay.

6                     THE COURT:  -- let's start focusing on direct

7              questions.

8                     MR. TEMROWSKI:  Okay.

9                     THE COURT:  "Take a look at this.  Does it

10             show x?"

11                    MR. TEMROWSKI:  Okay.

12                    MR. HEWSON:  Thank you, Your Honor.

13             (Sidebar conference concluded)

14    BY MR. TEMROWSKI:

15    Q    Did you review that, Ms. Page?

16    A    I'm still reviewing it.

17             Okay.

18    Q    Does that show that Dr. Wietrzykowski indicated he needs

19    attendant care and household help?

20    A    He answered, "Doctor said 'no.'"  And then he said, "May

21    require assistance with some household chores as listed above,

22    but no attendant care."

23    Q    Oh, really?

24    A    Right there it says, "No."  And then underneath he said,

25    "May need some help with replacement services."

*Page – Direct*

 1              THE COURT:  What exhibit number is that?  It should

 2    be marked.

 3              MR. TEMROWSKI:  This is the last one that you --

 4              MR. HEWSON:  Well, it's not in Exhibit Two.  It's

 5    actually my Exhibit Eight.  And --

 6              THE COURT:  So it's referenced in Exhibit Eight?

 7              MR. HEWSON:  Yes, it is.  I'll move the admission of

 8    Exhibit Eight right now, so that this gentleman can use it.

 9              THE COURT:  Okay.  These records are not in

10    evidence, that you just showed her.

11              MR. TEMROWSKI:  It was a part of that other exhibit.

12    I --

13              MR. HEWSON:  Judge, I'm more than willing to let him

14    use Exhibit Eight.

15              MR. TEMROWSKI:  Okay.  Don't --

16              MR. HEWSON:  This one is marked and has been

17    exchanged --

18              THE COURT:  Okay.

19              MR. TEMROWSKI:  Then I'll use Exhibit Eight.

20              MR. HEWSON:  There you go.

21              THE COURT:  So there's no objection to it being

22    received?

23              MR. HEWSON:  That was mine and he can it.

24              THE COURT:  All right, it's in.

25              MR. TEMROWSKI:  Thank you.

*Page – Direct*

1    BY MR. TEMROWSKI:

2    Q    I'm going to now show you what has been marked as Exhibit

3    Eight.  And when asked for what medical reason did Mr.

4    Waskowski require attendant care, he put "yes."

5            MR. HEWSON:  Your Honor, I'm going to object.  This

6    is not proper cross-examination or the use of that exhibit.

7    He's taking that out of context.  He also --

8            THE COURT:  Okay, okay.

9            MR. HEWSON:  I'm sorry.

10           THE COURT:  The exhibit is in.  It hasn't been

11   limited for any particular purpose.

12           MR. HEWSON:  Yes, sir.

13   BY MR. TEMROWSKI:

14   Q    Did he put "yes" right there?

15   A    Well, it doesn't really answer the question, though.

16   Q    But he put "yes."

17   A    It says, "For what medical reason does Mr. Waskowski

18   require above attendant care services, yes."  But prior to

19   that, he said, "no," so it's --

20   Q    And the next, "How much time per day does Mr. Waskowski

21   require attendant care for each service you've listed?"  He

22   put, "Six to eight hours per day."

23   A    That's what it says.

24   Q    "For how long?"  And he put, "six months."  Is that what

25   it says?

*Page – Direct*

1    A    It disagrees with the question he filled out ahead of it,

2    though.

3    Q    Isn't that what it says, though?

4    A    That is what that says.

5    Q    Now, ms. Page, as the claims rep handling the file, Dr.

6    Glowacki testified in his deposition that in the course of

7    treating Mr. Waskowski, that he authored numerous narrative

8    reports that he sent to State Farm.

9         Did you obtain and receive those?

10   A    I have some of his -- I have his reports, yes.

11   Q    And did you read and review them?

12   A    I read the ones that I was involved with, yes.

13   Q    Dr. Glowacki testified in his deposition that in the

14   course of treating Mr. Waskowski he wrote numerous doctor

15   disability certificates indicating that Mr. Waskowski could

16   not work, he needed 12 hours a day attendant care, seven days

17   a week and household help seven days a week.

18        Did you receive those documents from Dr. Glowacki?

19   A    There's some in the claim file.

20   Q    And did you review them?

21   A    I reviewed the ones I was involved with.

22   Q    Dr. Lodzinski came to this trial and he testified that he

23   provided physical therapy services to Mr. Waskowski based upon

24   numerous physicians who authored a prescription for it.

25        My question to you is, did you receive the

*Page – Direct*

1    evaluations that Dr. Lodzinski testified that he sent to State

2    Farm describing the therapy that Mr. Waskowski was receiving?

3    A    We received physical therapy reports is what we received.

4    Q    And as the adjuster handling the claims file, did you

5    also receive all of the MRI testing that was done at Macomb

6    MRI?

7    A    I have some tests from Macomb MRI.  I don't know if it

8    was all that they ever did.  I have no idea what they did,

9    what all of them were.

10   Q    Well, all of them is an MRI of his neck, an MRI of his

11   back and an MRI of his left shoulder.

12   A    What dates are you referring to?

13   Q    Well, I'll show you this document and see if this

14   refreshes your memory (indicating).

15           MR. HEWSON:  Your Honor, these exhibits are in

16   evidence.  I object to the relevance of asking this witness to

17   identify exhibits that are in evidence.

18           MR. TEMROWSKI:  I'm simply asking if she received

19   them and reviewed them.  That's a fair question.

20           THE COURT:  Do you recall receiving that?

21           THE WITNESS:  The MRI films, Judge?  Yes.  I didn't

22   know what dates he was asking.

23           THE COURT:  I understand that.  I understand that.

24           THE WITNESS:  I want to correct myself.  You're

25   asking did I receive the film?

Page – Direct

1   BY MR. TEMROWSKI:

2   Q    No.

3   A    Or the report?

4   Q    The reports.

5   A    The reports I can say yes, I did review them.

6   Q    Because you never did receive the films, right?

7   A    I don't recall if we received the films or not.  I dealt

8   with the reports.

9   Q    And as the claims adjuster handling Mr. Waskowski's file,

10  you requested the reports from Dr. Michael Donahue, correct?

11  A    Yes.

12  Q    And did you read and review those?

13  A    Yes.

14  Q    And as the claims adjuster handling the file, did you

15  request the reports from Dr. Zamorano?

16  A    No.

17  Q    You didn't?

18  A    I didn't work with Dr. Zamorano's -- her lawsuit.  I

19  didn't handle that at all.

20  Q    Could you look at that document and just see if that's in

21  the claims file?

22  A    I don't know if this is in the claims file or not.  I

23  said I didn't handle Dr. Zamorano's lawsuit.

24  Q    Would that have been Ms. Kucharski?

25  A    I don't know.

*Page – Direct*

1    Q    Okay.  Ms. Page, you don't --

2    A    Well, it says Ms. Kucharski on it right here, so I guess

3    it's not mine.

4    Q    So it's Ms. Kucharski.  But you don't doubt that this is

5    in the claims file?

6    A    I don't know where it came from.  I didn't write it.

7    Q    I guess your answer would be the same about the Oakland

8    MRI reports, that was after you were off the case?

9    A    When did the Oakland MRI's come in?

10   Q    Would that be Ms. Kucharski also?

11   A    Well, her name is on it, so I would say that's Ms.

12   Kucharski, not me.  Here you go.

13   Q    Is one of the documents from Dr. Glowacki that you

14   requested an attending physician's statement?

15   A    I think there is an -- show me what you're referring to.

16   I know the specific title of the document.

17        Okay.

18   Q    And did you review that?

19   A    I did.

20   Q    And that indicates if he can't work, he needs attendant

21   care and household help?

22   A    Correct.

23   Q    Isn't it true that after you got that document from Dr.

24   Glowacki, that you then wrote him a letter requesting more

25   information and asking some specific questions about the

*Page – Direct*

1    attendant care and the household help?

2    A     Is that the letter?  Okay.

3    Q     And you wrote that to Dr. Glowacki, correct?

4              THE COURT:  What's the date.

5              THE WITNESS:  It's July 29th, 2010.  This is my

6    letter.

7    BY MR. TEMROWSKI:

8    Q     And Dr. Glowacki answered all of your questions, didn't

9    he?

10   A     He wrote something in there.

11   Q     He wrote something in there.

12             THE COURT:  All right.  We're going to give the jury

13   their morning break right now.

14             Okay.  You're going to get a 20-minute break and

15   we'll see you in a little bit, probably at about ten-ish to

16   eleven or five to eleven.  Okay.

17             DEPUTY COURT CLERK:  All rise.

18             (Jury out at 10:32 a.m)

19             DEPUTY COURT CLERK:  Please be seated.

20             THE COURT:  How much more do you have with her?

21             MR. TEMROWSKI:  Fifteen minutes.

22             THE COURT:  Okay.

23             (Court in recess at 10:33 a.m.)

24             (Court in session at 10:58 a.m.)

25             DEPUTY COURT CLERK:  All rise.  United States

*Page – Direct*

1    District Court is back in session.  Please be seated.

2              THE COURT:  It comes to my attention that I probably

3    can't be here until 9:30 tomorrow morning.  So can everyone be

4    here at 9:30 and then we will probably try and start before

5    ten?

6              MR. TEMROWSKI:  Yes, sir.

7              MR. HEWSON:  Yes, sir.

8              THE COURT:  All right.  Ready for the jury?

9              MR. HEWSON:  I was just going to mention --

10             THE COURT:  Oh, sure.

11             MR. HEWSON:  Depending on how long the plaintiff

12   takes, a videographer is here and all I'm going to have is

13   those two deps.  So we should be done tomorrow, Judge.

14             THE COURT:  Yeah, that's what I figured.

15             MR. HEWSON:  Yeah, that's where we should be.

16             THE COURT:  Okay.

17             DEPUTY COURT CLERK:  All rise.

18             (Jury in at 11:00 a.m.)

19             DEPUTY COURT CLERK:  Please be seated.

20             THE COURT:  Ms. Page, could you come back up to the

21   witness chair?

22             And members of the jury, tomorrow I'm going to ask

23   everyone to be upstairs in the jury room at 9:30 in the

24   morning, okay, from 9:30 in the morning.  We're still going to

25   break at one, but I'm going to have you come in a little bit

*Page – Direct*

1    later tomorrow, okay?  Nine-thirty upstairs.

2              Mr. Temrowski, you may continue.

3    BY MR. TEMROWSKI:

4    Q    Ms. Page, we've established that you received Dr.

5    Glowacki's narrative reports, disability certificates,

6    attending physician statement and the questionnaire completed

7    that you sent to him, correct?

8    A    Yes.

9    Q    And in all of those documents, Dr. Glowacki opined that

10   Mr. Waskowski couldn't work, he needed household help and

11   attendant care, correct?

12   A    That's been Dr. Glowacki's contention, yes.

13   Q    Okay.  Isn't it true that you then sent Dr. Glowacki a

14   third request for information in February of 2011?

15   A    I would have to see the letter.

16   Q    And I'll ask if you sent him that letter, asking for more

17   information about Mr. Waskowski's injury, correct?

18   A    Just give me a second to read through it, please?

19   Q    Sure.

20   A    Okay, yeah.  I'm trying to figure out why after 13 months

21   of therapy he's still treating him, what he's doing to help

22   him after 13 months of physical therapy.  I asked him if he

23   followed through on Dr. Donahue, which was his second opinion,

24   if he followed through on giving him those injections that Dr.

25   Donahue had recommended.  So it's basically to get an updated

*Page – Direct*

1    treatment plan and to get some answers on his progress.

2    Q    And did Dr. Glowacki answer all of your questions?

3    A    I would have to read through the narrative report.

4    Q    He wrote you a report, correct --

5    A    He wrote a narrative report back.

6         (Brief pause in proceedings)

7    BY MR. TEMROWSKI:

8    Q    Ms. Page, you're not seeing this report for the first

9    time today --

10   A    Well, you asked me if he answered his questions and I

11   don't -- these questions, and I don't see in here that he did.

12   I'm trying to figure out when I asked him what a current

13   diagnosis is, he tells he's complaining of neck pain, back

14   pain, and left shoulder pain and wrist pain and stiffness, but

15   that's not -- I don't take that as his medical diagnosis.  So

16   to me that wasn't him answering my first question.

17        So then I go on to the second one.  If you're

18   relating anything, I need to know the specific treatment plan

19   because my concern was after 13 months of physical therapy and

20   he continued to prescribe the physical therapy, apparently he

21   wasn't getting any better, so what are you doing to fix that.

22   So I'm --

23   Q    What did Dr. Glowacki say, though --

24        MR. HEWSON:  Your Honor, I believe the witness

25   should be allowed to review the thing -- or review the report

Page – Direct

1    and give the answer.  And counsel is interrupting her in doing

2    that.

3            THE WITNESS:  So it's kind of hard for to work from

4    when he doesn't specifically give me his medical diagnosis.

5    He tells me what this person is complaining of, you know.

6            And I ask him what he's -- what his current

7    treatment plan is, and to give me some dates and some time

8    frames, because I'm trying to narrow down, because when I

9    wrote this letter, we were about 14 months after the accident.

10           He's still getting all this treatment and it doesn't

11   appear he's getting better.  It appears he's getting worse.

12           So I mean, I've got a physical therapist telling me

13   he's making progress, this guy telling me he's not making

14   progress.  He's needing all this attendant care, which should

15   be decreasing if you're getting better.  It's very confusing.

16   But this isn't really answering.

17   Q    What did Dr. Glowacki say about the therapy?

18   A    What part of this do you want me to read?  Do you want me

19   to read some part of it or --

20   Q    Yeah, regarding --

21   A    Well, tell me what you want me to read, because I'm not

22   sure.

23           MR. HEWSON:  Well, Your Honor, you've already ruled

24   on this.  He's asking her --

25           THE COURT:  Well, I --

*Page – Direct*

1          MR. HEWSON:  -- to read from a document that's.  I'm

2     sorry.  You ruled on this.  I object.

3          THE COURT:  Well, I believe this document is in

4     evidence, right?

5          MR. HEWSON:  I honestly have not been shown that

6     document, Judge, and I don't know which one it is.  If it is,

7     then she can look at it, certainly.

8          THE COURT:  Is this in evidence, Mr. Temrowski?

9          MR. TEMROWSKI:  I believe it is, Your Honor.

10          THE COURT:  The report?

11          MR. HEWSON:  Yes.  I'm sorry, Your Honor.  Yes, the

12     report is in evidence.  Thank you.  I didn't know that.  Thank

13     you very much.

14          THE COURT:  Members of the jury, you're probably

15     slightly confused in terms of what's in evidence and what is

16     not in evidence.  The doctor's medical -- these reports are in

17     evidence, Glowacki's reports, his billings are in evidence.

18          However, the claims -- the file, actual claims file,

19     the State Farm claims file is not in evidence.  So that's why

20     it's -- the difficulty.  Now, again, you cannot concern

21     yourself as to why that file is not in evidence, the State

22     Farm file.  Do all of you understand that?

23          THE JURY:  Yes.

24          THE COURT:  So it's just kind of a little bit

25     difficult for you to follow, but that's why it's kind of

Page – Direct

```
 1    disjointed right now.  Okay.  Just take your time and we'll

 2    work through it.

 3    BY MR. TEMROWSKI:

 4    Q    If you could just read, starting with this paragraph, the

 5    word "this"?

 6              COURT REPORTER:  Into the microphone, please, also.

 7              THE COURT:  And this is in response to what

 8    question?

 9              MR. TEMROWSKI:  About the therapy.

10              THE COURT:  What about the therapy?

11              MR. TEMROWSKI:  She asked Dr. Glowacki why he was

12    prescribing the therapy and this is his answer.

13              THE COURT:  Okay.

14    BY MR. TEMROWSKI:

15    Q    Starting with the word "this"?

16    A    Starting with the word "this," it says,

17              "This is all definitely post-traumatic secondary to

18              injury in a car accident.  Because of the neck pain

19              and shoulder pain and because of the herniated disc,

20              he started getting stiffness in all his joints and

21              physical therapy is absolutely essential to keep him

22              at least functional, that at least his joints will

23              keep moving.  It will not cure him, but it will keep

24              him going with mobility.  Unfortunately, there is

25              not anybody able to make a miracle cure to his
```

*Page – Direct*

```
 1            condition.  Even if we do the surgery or epidural
 2            injections, he's going to have pain the rest of his
 3            life and our treatment conservative (sic) is only to
 4            preserve his function at least to the minimum.
 5                 Cure, I do not know of any doctor that could
 6            cure him.  But if you know about anyone who could
 7            cure him except for writing on the paper I will
 8            send him to this doctor to cure him."
 9  Do you want me to keep reading?
10  Q    Now, Ms. Page, after obtaining all of these documents
11  that we just talked about from State Farm, do you agree with
12  me that all attendant care benefits in this case were paid
13  through November 20th, 2010?
14  A    I'm not sure what date they were paid through.  So I
15  guess I can't agree, because I don't know for sure.
16  Q    Well, how come you don't know for sure?
17  A    The dates, the specific date of when the attendant care
18  was paid through, it just wasn't something I reviewed.  So I'm
19  not sure.
20  Q    Okay.  Do you have any reason to doubt me that it was
21  paid through November 20th, 2010?
22            MR. HEWSON:  I'm going to object, Your Honor.  He's
23  testifying.  "Any reason to doubt me" is --
24            THE COURT:  She said she didn't know or didn't
25  recall.  The next step would be if there's a particular
```

*Page – Direct*

1    document that shows when it was terminated --

2    BY MR. TEMROWSKI:

3    Q    Well, do you have any reason to dispute that --

4             THE COURT:  Didn't you just hear what I said?

5    BY MR. TEMROWSKI:

6    Q    Do you know the date the wage loss was paid through?

7    A    I'm not sure.

8    Q    Do you know the date that household --

9             THE COURT:  You know what, lower your voice.

10   BY MR. TEMROWSKI:

11   Q    Do you know the date that household help was paid

12   through?

13   A    I'm not sure.

14   Q    You're not sure?

15   A    That's what I said.

16   Q    And you are the claims adjuster?

17   A    I was one of them.

18   Q    Ms. Page, you then set up Mr. Waskowski for a medical

19   examination, correct?

20   A    Yes.

21   Q    While you were the adjuster handling the case?

22   A    During my time, yes.

23   Q    And tell us, please, why did you set Mr. Waskowski up for

24   an examination?

25   A    Multiple reasons.  By the time I did that, it was --

*Page – Direct*

1    let's see.  His accident was December of 2010, and I think I

2    made that decision around August or September of 2010.

3            And we went through all this physical therapy and by

4    Dr. Glowacki's reports, he's not getting any better.  So here

5    I have a doctor that's rendering treatment over and over and

6    over and also documenting that this person wasn't getting any

7    better.

8            Then I got a physical therapy -- physical therapy

9    reports that say, "Oh, yeah, they're progressing, they're

10   progressing."

11           So I've got the treating doctor, Glowacki, saying

12   one thing.  I've got the physical therapist saying something

13   different.  And then I'm still getting 12 hours of attendant

14   care, you know, eight months into the claim.

15           And typically, when we see somebody getting better,

16   we would expect the attendant care to be decreasing, but it

17   wasn't.  So now I'm thinking all this attendant care of 12

18   hours this late in the claim, he's not getting any better or

19   they're claiming he's not getting any better, that he needs

20   all this help.

21           I've got Dr. Glowacki's records indicating he's not

22   getting better, but yet continues to treat him.  So -- but

23   then the physical therapy reports are coming in saying

24   "getting better."

25           So what I did was, I ordered an independent exam.

*Page – Direct*

1    Sometimes we'll do that if we need help trying to sort things

2    out.  And that's when I ordered that exam, because of that.

3    Q     And you ordered that exam with who?

4    A     I don't remember the vendor.

5    Q     What do you mean, the vendor?

6    A     I'm not sure what vendor it was with.

7    Q     Well, do you remember the doctor?

8    A     Dr. Endress.

9    Q     And did you select Dr. Endress?

10   A     No.

11   Q     Who did?

12   A     I don't know.

13   Q     Well, Ms. Page, you're the claims adjuster?

14            MR. HEWSON:  Your Honor, that's been asked about a

15   dozen times.  I will concede she's the claims adjuster.  I

16   object.  I believe that approach is badgering this witness.

17            MR. TEMROWSKI:  Your Honor, I'm not badgering --

18            THE COURT:  You know what, okay, let's take a step

19   back.  Relax a little bit.

20            All right.  Give us the question again.

21   BY MR. TEMROWSKI:

22   Q     Who referred and asked Mr. Waskowski to go to Dr.

23   Endress?

24   A     I recommend the vendor.  Who they pick for the IME, the

25   doctor they pick, that's up to them.  I think they usually try

*Page – Direct*

1   to pick somebody close, so that the person doesn't have to

2   drive very far.  They pick them.

3              THE COURT:  When you say "vendor," what do you mean

4   by "vendor"?

5              THE WITNESS:  Well, we have a list of vendors that

6   we can use.  And then you pick one of the vendors and they

7   have a whole bunch of doctors under them.  And then I just

8   tell them, like I need an orthopedic doctor, and they pick

9   which one.  And they usually try to pick them by whoever is

10  closest to where that person lives.  So it's pretty much their

11  call, the vendor.

12             THE COURT:  Okay.  And the vendor is what?

13             THE WITNESS:  What do you mean?  Like -- well, they

14  do IMEs.  There's different vendors that do IMEs, independent

15  medical exams.

16             So you just pick one and then they have all these

17  doctors under them with different specialties, and then you

18  tell that vendor that you would like an independent exam with,

19  say, an orthopedic doctor, and they will pick the doctor for

20  you.  So it's pretty much up to them.  And I understand they

21  usually pick somebody that's close by so they don't have to

22  drive very far.

23  BY MR. TEMROWSKI:

24  Q    So we get Dr. Endress, correct?

25  A    Yes.

*Page – Direct*

1   Q    And you felt that it was extremely important to get an

2   independent medical exam to properly handle this claim, didn't

3   you?

4   A    I felt it important to get help sorting this out, yes.

5   Q    And Dr. Endress was asked to examine Mr. Waskowski,

6   correct?

7   A    Yes.

8   Q    And you wrote a letter to Mr. Waskowski asking him to go

9   to this examination, correct?

10  A    Yes.

11  Q    And did he go?

12  A    Yes.

13  Q    And when did he go?

14  A    The exact date I can't recall.  It was either October or

15  November 2010 was the independent exam.

16  Q    And after Dr. Endress examined Mr. Waskowski, did Dr.

17  Endress send you a report?

18  A    Yes, he sent us a report.

19  Q    Us or you?

20  A    He sent it to State Farm and then he addresses it to me,

21  because I'm the one that requested it.  So --

22  Q    And you read that report, didn't you?

23  A    Yes.

24  Q    And you felt that opinion that he would give was very

25  important?

*Page – Direct*

1    A    I felt it important.

2    Q    And I'm going to show you a document and ask if you could

3    identify what that is.

4    A    This is a document dated October 25th, 2010.  It's

5    missing the other part, though.  Do you have the other part to

6    it?

7    Q    Well, what part is missing?

8    A    Well, there's another part from November, so I need that

9    part too.

10              THE COURT:  Is this Endress' report?

11              THE WITNESS:  Yes.

12              THE COURT:  Okay.  Is that in evidence?

13              MR. HEWSON:  No.

14              THE WITNESS:  This is not, Judge, or this?

15              THE COURT:  I guess the report is not in evidence.

16   But you received the report?

17              THE WITNESS:  I did.

18              THE COURT:  Okay.

19              THE WITNESS:  Uh-huh.  I received both of these,

20   though.  This is --

21   BY MR. TEMROWSKI:

22   Q    And what is that second document that I just handed you?

23   A    It's an addendum.  Sometimes if we get -- like after we

24   ordered the initial report, if new information comes in or we

25   have some additional questions to ask, we request an addendum

*Page – Direct*

1    of the doctor.  So that would be what the second report is,

2    and that's dated November 16th, 2010.

3    Q    And did you ask Dr. Endress, the doctor who performed the

4    IME on Mr. Waskowski, questions about the exam and what Dr.

5    Endress' opinions were?

6    A    I did ask some questions, yes.

7    Q    And did you ask him whether or not Mr. Waskowski was

8    injured in the automobile accident?

9    A    I'm going to have to take just a second to look at my

10   questions.

11             MR. HEWSON:  Your Honor, the objection is that this

12   document is not in evidence.  He's asking her to read from the

13   document that is not in evidence.

14             MR. TEMROWSKI:  Your Honor, I'm going to move at

15   this time to have that document admitted into evidence.

16             MR. HEWSON:  And could I ask for the foundation?

17             MR. TEMROWSKI:  The foundation is it's an IME that

18   was done by Dr. Endress at her request.  It's in the PIP file

19   --

20             THE COURT:  You know what?  All right, members of

21   the jury could you please -- I apologize.  I need you to step

22   out of the courtroom for a minute.

23             COURT CLERK:  All rise for the jury.

24             (Jury out at 11:19 a.m.)

25             COURT CLERK:  You may be seated.

Page – Direct

1        THE COURT:  Before you start making some sort of

2   argument in front of the jury about the PIP file, I would like

3   you to recall that you did not list it on your list of

4   exhibits.

5        MR. TEMROWSKI:  I know that.

6        THE COURT:  And, in fact, the first inclination that

7   you were going to use this PIP file was this morning.  And as

8   you went through a process where discovery was to be

9   disclosed, we had a final pretrial conference at which time we

10  indicated what our witnesses were going to be and our list of

11  exhibits.  And then we went through another procedure wherein

12  you were to share exhibit lists with each other, and if you

13  had an objection, you were to -- the parties could argue that

14  objection on the first day of trial.

15       Now, from what I understand, you never disclosed,

16  listed the State Farm PIP file.

17       MR. TEMROWSKI:  Well, Your Honor, this particular

18  exhibit that I'm --

19       THE COURT:  And in chambers, maybe Mr. Hewson should

20  have gotten it on the record, you agreed with him.  Mr. Hewson

21  brought it to my attention that you might be using this PIP

22  file and there's possible attorney/client issues in it.  And

23  you agreed that you would not use the PIP file.

24       MR. TEMROWSKI:  Your Honor, this particular exhibit,

25  though, that I'm referring to --

*Page – Direct*

1              THE COURT:  Which contains a medical record.

2              MR. TEMROWSKI:  No.  This is my Exhibit R, exhibits

3    to deposition of Dr. Geiringer.

4              MR. HEWSON:  Your Honor, we haven't even argued that

5    issue yet.  But it's a question of foundation for this

6    witness.  He's trying to use the PIP claim and Dr. Geiringer

7    hasn't been --

8              THE COURT:  Exhibit R is not in evidence.

9              MR. TEMROWSKI:  No, but I'm going to move to have it

10   admitted into evidence.

11             THE COURT:  It's not in evidence now and he's

12   objecting to it.

13             MR. HEWSON:  Yes, sir.  There's no foundation.

14             MR. TEMROWSKI:  Well, then, perhaps we should argue

15   that issue.  But this --

16             THE COURT:  There's no issue to argue.  It's not in

17   evidence.

18             MR. TEMROWSKI:  Your Honor, this is a document that

19   --

20             THE COURT:  How many times?  Did you hear me?

21             Let's bring the jury back.

22             MR. TEMROWSKI:  So I can't ask any questions about

23   this?

24             THE COURT:  Sir, you heard my ruling.

25             MR. TEMROWSKI:  Your Honor, I just don't think

*Page – Direct*

1    that's fair, though.

2              THE COURT:  Sir, it's not fair?

3              MR. TEMROWSKI:  Your Honor, this is a part of the --

4              THE COURT:  You know what, don't debate me, Mr.

5    Temrowski.  Respect my decisions and my ruling.  I think I've

6    been pretty flexible in allowing both of you to try your

7    cases.  Maybe I should be paying a little bit more attention

8    now -- not attention, but --

9              DEPUTY COURT CLERK:  All set?

10             THE COURT:  Yeah.

11             DEPUTY COURT CLERK:  All rise.

12             (Jury in at 11:22 a.m.)

13             DEPUTY COURT CLERK:  Please be seated.

14   BY MR. TEMROWSKI:

15   Q    Ms. Page, after Mr. Waskowski went to Dr. -- or Dr.

16   Endress, did you receive any reports back from him?

17   A    I did.

18   Q    And did you rely upon those reports?

19   A    I read over them and considered them when I reviewed the

20   claim.

21   Q    And did Dr. Endress have opinions regarding the wage loss

22   claim that Mr. Waskowski was making and his ability to work?

23             MR. HEWSON:  Your Honor, I thought the Court just

24   ruled on this.  I object.

25             THE COURT:  Not relevant, no foundation.

Page – Direct

1    BY MR. TEMROWSKI:

2    Q    What did you do after you received the reports from Dr.

3    Endress?

4    A    Reviewed them.

5    Q    And then what?

6    A    Reviewed the documentation in the claim file, along with

7    that report to try to get a picture of everything that was

8    going on with it.

9    Q    And did you pay any claims after that?

10   A    After what?

11   Q    Getting the reports back from Dr. Endress.

12   A    I told you, I'm not sure of the date that the claims were

13   stopped paying.  I don't know.

14   Q    What claims were paid while you were handling the file?

15   A    Well, the first one that comes to mind is about $57,000

16   in attendant care.

17   Q    At what rate?

18   A    I believe it was $13 an hour for 12 hours a day.

19   Q    That's what you believed you were paying?

20   A    That's what I was paying.

21   Q    $15 per hour?

22   A    I did not say $15.  I said $13 per hour.

23   Q    Or $13 per hour.

24        And what was the request that was made by Mr.

25   Waskowski?

*Page – Direct*

1    A     What do you mean, what request are you talking about?

2    Q     How much was he asking State Farm to pay the care

3    providers for the attendant care?

4    A     He didn't ask me how much.

5    Q     He ever told you a specific amount?

6    A     Not that I recall, no.

7    Q     Did you receive the completed forms back from his care

8    providers?

9    A     Completed forms for what?

10   Q     For household help.

11   A     Household help meaning like help around -- chores,

12   replacement services; is that what you're referring to?

13   Q     Yes.  Replacement services is called household help,

14   correct?

15   A     It's called replacement services.

16   Q     And did you receive the completed forms from his care

17   providers?

18   A     For the replacement services, I'm trying to recall.  I

19   can't say for certain if we did or not.

20   Q     Well, could I show you what's been marked as an exhibit

21   --

22   A     Sure.

23   Q     -- previously?

24   A     Yes.

25   Q     And you don't recall if you ever received these forms?

*Page – Direct*

1    A    But those are not the ones from his care –- those aren't

2    the ones from his doctor.  Those are the ones that the house

3    -- that the family filled out.

4    Q    That's what I asked you, if you received the completed

5    forms from the care providers?

6    A    What –- my understanding was, were you receiving the

7    forms from the doctors.  We did receive some replacement

8    services forms and those I do recall.  Some of those.  I don't

9    know if I've gotten all of those when I was working the claim

10   or not.  But we did get some, yes.

11   Q    And you got them for both attendant care and household

12   help, correct?

13   A    Yes.

14   Q    Are you the adjuster currently handling the claim?

15   A    No.

16   Q    And who is?

17   A    Cheryl Kucharski.

18   Q    Do you have any involvement whatsoever now in the

19   handling of this claim?

20   A    No.

21          MR. TEMROWSKI:  Thank you.  I have nothing else.

22          THE WITNESS:  Thank you.

23          THE COURT:  Mr. Hewson?

24          MR. HEWSON:  Yes, Your Honor.  Thank you.

25                          **CROSS–EXAMINATION**

*Page – Direct*

1   BY MR. HEWSON:

2   Q    How are you doing?

3   A    I'm good.

4   Q    Good.

5        The last contact you would have had with the file

6   would have been April of 2011, correct?

7   A    That is correct.

8   Q    You sent out a request for an examination by Dr. Endress

9   in 2010; is that right?

10  A    Yes.

11  Q    You wouldn't have had an opportunity to have the Oakland

12  MRI from March of 2011, would you?

13  A    No.

14  Q    And you never saw that report during your claims file

15  handling?

16  A    No, I did not.

17  Q    You didn't send that to Dr. Endress, did you?

18  A    No, I didn't have it.

19  Q    Did you have the MRI films anywhere in your file?

20  A    No.

21  Q    And therefore, you didn't have the opportunity to send

22  those either; am I right?

23  A    No, he wouldn't have gotten them.

24  Q    All right.  Now, you mentioned something about Dr.

25  Donahue's second opinion, some injection therapy that was

*Page – Direct*

1    recommended, right?

2    A    Yes.

3    Q    And I believe Mr. Temrowski asked you to read from Dr.

4    Glowacki's report and he said the injections -- he wasn't

5    going to do them, right?

6    A    Correct.

7    Q    Did you ever get any bills for any injections from anyone

8    for Mr. Waskowski?

9    A    No.

10   Q    Did you ever get any -- while you were handling the claim

11   file, did you ever get any reports from the physical

12   therapist, for example, that they were doing left shoulder

13   physical therapy?

14   A    No.

15   Q    How much reliance do you have to place on the

16   representations on an attendant care form?

17   A    I have to take their word that that's what they did.  I

18   can't --

19   Q    And why do you do that?

20   A    Well, we assume people are honest.  And even if you're

21   questioning something, you give them the benefit of the doubt.

22           So basically, when we get these forms in, we don't

23   -- you know, even though it seems weird that they're spending

24   30 minutes every day taking the garbage out, I don't know,

25   maybe they do that at their house, but -- so you just -- you

*Page – Direct*

1    take their word for it pretty much.

2    Q    You paid those benefits that were presented to you during

3    your claims handling, right?

4    A    Yes.

5    Q    Now, since the litigation started, you had a chance to

6    read some of these depositions that you said were in the claim

7    file; am I right?

8    A    Correct.

9    Q    If you had known that there was no -- that Kamilla had

10   testified in this case when you were handling the file that

11   Mr. Waskowski didn't need any help showering during the first

12   six months, would you have paid that claim?

13   A    No.

14   Q    If you had known that Dr. Glowacki was making up the

15   contents of the attendant care reports, the hours, would you

16   have paid that claim?

17   A    No, absolutely not.

18   Q    If you had known that Dr. Glowacki would continue to

19   order therapies that weren't working for a patient as long as

20   they treated with him, would you have paid them?

21   A    No.

22   Q    Would you tell the jury about how many pending was --

23   your pending file count was at about the time you were

24   handling this file?

25   A    In excess of 200 claims.

*Page – Direct*

1  Q    And during the time that you handled the claim, you paid

2  all of the benefits that were presented to you believing they

3  were reasonable and necessary; is that right?

4  A    Yeah, I had -- I mean, even though there was so much

5  conflicting information, listening to their own doctor, Dr.

6  Glowacki, telling me that they still need it.  And even if I'm

7  questioning it, because the physical therapist is like, "Hey,

8  look, they're getting better," I can't call him a liar and not

9  pay it, so I continued to pay it.

10 Q    And if you knew then what you know now, would you have

11 paid this claim?

12 A    No.  At this point, I just -- I look back on it and I

13 almost feel like I was taken advantage of.  I paid, and paid

14 and paid even though we had Dr. Glowacki's testimony saying he

15 just made up the amount of attendant care time.  He was going

16 to continue to treat this gentleman even though he's not

17 getting better, as long as the gentleman keeps coming to him.

18         I have read the deps of the care providers.  And

19 even one of the daughters said he could bathe himself for the

20 first six months, but then after that he couldn't --

21         THE COURT:  Let's keep it in a question-answer

22 format.

23         MR. HEWSON:  Yes, Your Honor.

24         THE WITNESS:  You know, it's just --

25         MR. HEWSON:  Wait for a question.

*Page – Redirect*

1          THE WITNESS:  -- confusing.

2          MR. HEWSON:  I understand.

3          I have your answer.

4          Your Honor, thank you.  I have nothing further of

5     the witness.

6          THE COURT:  Okay.  Any other further questions for

7     Ms. Page?

8                    **REDIRECT EXAMINATION**

9     BY MR. TEMROWSKI:

10    Q    Just one.  Regarding the claim that was made in this case

11    for the attendant care of 12 hours per day, do you agree that

12    a doctor has the discretion to authorize the number of hours

13    per day that the doctor feels the patient needs it?

14    A    Not when he admits he made it up, no.

15    Q    Well, how would a doctor, other than thinking of a number

16    of hours, how else would a doctor come up with a number of

17    hours?

18          MR. HEWSON:  Objection, foundation, Your Honor.

19          THE COURT:  Mr. Hewson has a point as to foundation.

20    BY MR. TEMROWSKI:

21    Q    Do you know how a doctor would arrive at the number of

22    hours?

23    A    I can tell you what I've seen in the past happen.  I'm

24    not the doctor, so I'm not going to guess what he specifically

25    does, but I can tell you what I've seen from other doctors.

Page - Redirect

```
 1    Q    Well, on the different claim files that you've handled,

 2    isn't it true that the number of hours is different?  It's on

 3    a per patient basis, it's not the same for every patient?

 4    A    It can vary, but I think a lot of them order, you know,

 5    like an OT eval, go in the house and say, you know, this sort

 6    of help may be needed.  You can give a grab bar to pick

 7    something up or you know, they can do OT evals, functional

 8    capacity evaluations, all sorts of things like that, if

 9    they're not sure of the exact amount or --

10              THE COURT:  When you say "OT" what do you mean?

11              THE WITNESS:  I'm sorry.  That means occupational

12    therapy, physical therapist.  They handle like, you know,

13    helping you get dressed.  They can go in and do a home eval.

14    Can they get dressed, or can they bathe themselves or maybe

15    they can bathe themselves if we just get them an extended

16    shower brush or maybe a bench to sit on, you know, and they

17    can totally bathe themselves, those sorts of things.

18              So some doctors will do that.  And that's what I've

19    seen in a lot of files, if they're not quite sure how much

20    help they need.

21    BY MR. TEMROWSKI:

22    Q    Ms. Page, can an occupational therapist write a

23    prescription for attendant care or --

24              MR. HEWSON:  Your Honor --

25              MR. TEMROWSKI:  -- or does it need to be a
```

*Waskowski – Direct*

1   physician?

2            MR. HEWSON:  I don't see how this is within the

3   purview of this witness's testimony.  I object to foundation.

4            THE COURT:  Overruled.

5            THE WITNESS:  The prescriptions, I –– they can write

6   recommendations is my understanding, but the doctor's the one

7   that has to write the prescription for the occupational

8   evaluation.  Or the occupational therapy.

9            MR. TEMROWSKI:  Thank you.

10           THE WITNESS:  You're welcome.

11           MR. HEWSON:  Nothing else.  Thank you, Your Honor.

12           THE COURT:  All right.  Ms. Page, thank you very

13   much.

14           Okay.  Next witness?

15           MR. TEMROWSKI:  The next witness is Mr. Waskowski,

16   and we need an interpreter.

17           THE COURT:  Mr. Waskowski, could you give us your

18   full name, please?

19           THE WITNESS:  Jaroslaw Waskowski.

20                   **JAROSLAW WASKOWSKI, PLAINTIFF, SWORN**

21                          **DIRECT EXAMINATION**

22   BY MR. TEMROWSKI:

23   Q   Mr. Waskowski, could you please tell the ladies and

24   gentlemen of the jury your name?

25   A   My name is Jaroslaw Waskowski.

*Waskowski - Direct*

1    Q    And, Mr. Waskowski, where do you live at?

2    A    I live in 2614 Avis Drive.

3    Q    And how old are you --

4         COURT REPORTER:  Pull the microphone right up to

5    your mouth, please, right up to it.

6         MR. TEMROWSKI:  Is this okay?

7         COURT REPORTER:  Thank you.

8    BY MR. TEMROWSKI:

9    Q    And Mr. Waskowski, how old are you at the present time?

10   A    Forty-nine.

11   Q    And you have two daughters?

12   A    Yes.

13   Q    And could you tell us what their names are?

14   A    Kamila and Margaret.

15   Q    And, Mr. Waskowski, you're obviously from another

16   country?

17   A    Yes.

18   Q    Could you please tell us what country you were born in?

19   A    In Poland.

20   Q    And when did you come to the United States?

21   A    Nine years ago.

22   Q    And when you lived and grew up in Poland, Mr. Waskowski,

23   could you just tell the ladies and gentlemen of the jury

24   something about your educational background and what you're

25   employment was while in Poland?

*Waskowski – Direct*

1    A     I graduate mechanical college.

2              (Brief discussion held off the record)

3              INTERPRETER:  He's asking if he can speak Polish so

4    it would be easier for him.

5              THE COURT:  You know what, we need Jen.

6              COURT REPORTER:  If you're interpreting into

7    English, please speak into the microphone.

8              INTERPRETER:  Okay.

9              THE COURT:  We have to swear you in first since

10   you're going to be interpreting what he has to say.

11             COURT REPORTER:  Speak up nice and loud and you can

12   pull the microphone back and forth very easily.  Thank you.

13             THE COURT:  We're going to need -- Ms. Filarska is

14   going to be interpreting, so we need to swear her in.

15             DEPUTY COURT CLERK:  Okay.  Can we please have you

16   raise your right hand to be sworn?  And it's Polish?  Is that

17   what you're interpreting from?

18             THE COURT:  Yes.

19             **TINA FILARSKA, POLISH INTERPRETER, SWORN**

20   BY MR. TEMROWSKI:

21   Q    Mr. Waskowski, did you finish telling us about your

22   education and employment history while in Poland?

23   A     I graduate university.  He has a specialization as a

24   technician in construction machinery.

25   Q    Mr. Waskowski, when you came to the United States, did

*Waskowski – Direct*

1   you know any English at all?

2   A    No.

3   Q    And all of the English that you know, did you learn it

4   when you came to this country?

5   A    Yes, by himself.

6   Q    And Mr. Waskowski, have you become a citizen of the

7   United States?

8   A    Yes.

9   Q    And could you tell the ladies and gentlemen of the jury

10  when you did that?

11  A    In December 2011.

12  Q    Mr. Waskowski, I would like to draw your attention to the

13  automobile collision of December 23, 2009.  And do you recall

14  that date?

15  A    Yes.

16  Q    Were you driving a motor vehicle on that date?

17  A    Yes.

18  Q    And was your motor vehicle insured at the time of the

19  collision with State Farm?

20  A    Yes.

21  Q    And I'm going to show you Plaintiff's Exhibit Q and just

22  ask if you could identify what that is, sir?

23  A    Yes.

24  Q    And what is that?

25  A    It's a certificate of insurance.

*Waskowski – Direct*

1   Q    And, Mr. Waskowski, before December 23rd, 2009, for how

2   long a period of time had you been insured with State Farm?

3   A    Since I came to United States.

4   Q    Do you recall the automobile collision of December 23rd,

5   2009?

6   A    Partially of the collision, yes.

7   Q    And could you tell us, please, what kind of a motor

8   vehicle you were driving on that date?

9   A    I was driving Mazda 6.

10   Q    And were you the owner of that vehicle?

11   A    Yes.

12   Q    And, Mr. Waskowski, where exactly did this automobile

13   collision occur at?

14   A    The cross-section Dequindre Avenue and 15 Mile Road.

15   Q    And do you know what city that's in?

16   A    It's on the border of Sterling Heights and Troy.

17   Q    Mr. Waskowski, tell us, please, how did the automobile

18   collision occur?

19   A    I was driving to the Polish store on -- to purchase last

20   items for Christmas.  I stand in the middle line, as a third

21   or fourth.  I wanted to turn left from Dequindre to 15 Mile,

22   west.

23       At some point I noticed that mini-van is driving

24   straight forward to me.  In the moment when he hit my car, I

25   lost conscious.  I was unconscious.  It came to me when I

*Waskowski – Direct*

1  landed up on the parking lot of the flower shop on the other

2  side of road.  I don't remember what happened to me.  I only

3  remember the moment when the police officer came.  He asked me

4  few questions and he left.

5           After, my daughter Kamilla came and then Margaret

6  came.  I didn't know what my daughters did, but I think they

7  called some help for car towing.  And the moment when the car

8  was towed away, my girls took me home.

9  Q    And, Mr. Waskowski, were you wearing a seat belt at the

10  time of the wreck?

11  A    Yes.

12  Q    Did your seat belt -- was it equipped with a shoulder

13  harness?

14  A    No.

15  Q    And how many cars were involved in this collision?

16  A    After all, my daughters told me that four --

17           MR. HEWSON:  I'm sorry.  I know we want to move this

18  long, but that's hearsay.  What his daughters told him is

19  clearly hearsay.  I object.

20           THE COURT:  It would be hearsay.

21           MR. HEWSON:  Thank you.

22  BY MR. TEMROWSKI:

23  Q    You indicated that the police arrived, Mr. Waskowski?

24  A    Yes.

25  Q    And I'm going to show you what I've had marked as

*Waskowski – Direct*

1   Plaintiff's Exhibit A.

2          And is that the police report?

3   A    Yes.

4   Q    And does your name appear on that police report?

5   A    Yes.

6   Q    And does this police report accurately depict and

7   describe how the collision occurred?

8   A    Yes.

9   Q    Mr. Waskowski, was your car drivable after the collision?

10  A    No.

11  Q    Did it have to be towed from the scene?

12  A    Yes.

13  Q    And was there damage done to your motor vehicle because

14  of the crash?

15  A    Yes.

16  Q    And could you please tell the members of the jury where

17  the damage was to your motor vehicle?

18  A    From the left side.

19          INTERPRETER:  He said particular car names, I --

20  part of the car which I'm not sure about.  He said left side

21  bumper, he said fender, hood --

22          MR. HEWSON:  Your Honor, could we approach side bar,

23  please?  Considering the trouble the interpreter appears to be

24  having translating, I would like to address an issue with the

25  Court outside the hearing of the jury.

*Waskowski – Direct*

1           THE COURT:  Okay.

2           MR. HEWSON:  Thank you.

3           (Sidebar conference held on the record and outside

4           the hearing of the jury)

5               MR. HEWSON:  She doesn't appear to understand

6           him.  I'm listening to what she is telling us.

7           She doesn't appear to understand him.  I don't

8           know how you can continue like that.  She actually

9           said, I don't know what he just said.

10              MR. TEMROWSKI:  Your Honor, she's from a

11          licensed agency.  I don't know her.

12              THE COURT:  Did she say she I didn't

13          understand what he just said?

14              MR. HEWSON:  She said, "He said something

15          about --"

16              MR. TEMROWSKI:  Well, because he's mumbling.

17          It's not with the interpretation.

18              MR. HEWSON:  She said, "He said something

19          about a fender.  I didn't understand."  That's

20          what I thought she just said.  And if I'm wrong --

21          but I'm pretty sure I'm right.

22          (Sidebar conference concluded)

23          THE COURT:  Ms. Filarska, are you able to understand

24  what the plaintiff is saying to you?

25              INTERPRETER:  Yes.

*Waskowski – Direct*

1          (Sidebar conference held on the record and out of

2          the hearing of the jury.

3              MR. HEWSON:  Obviously the Court is alerted

4          to it.  If it comes up again, I'll raise it again.

5          Thank you.

6          (Sidebar conference concluded)

7              THE COURT:  We need to speak up okay?  Mr.

8    Waskowski, you need to speak up as well, so the interpreter

9    can hear what you're saying.

10             THE WITNESS:  Okay.

11   BY MR. TEMROWSKI:

12   Q    Okay.  I believe he was describing the damage that was

13   done to the vehicle.

14   A    Yes.

15   Q    Okay.  Mr. Waskowski, did you finish describing all of

16   the damage that was done to the various parts of the car?

17   A    No.

18   Q    Please continue and finish.

19   A    Left front suspension, back bumper, and left back

20   quarter.

21   Q    Were photos taken of your car?

22   A    Yes.

23   Q    And I'm going to hand you Plaintiff's Exhibit B and ask

24   if you could indicate if those photos accurately depict the

25   damage that was done to your vehicle as a result of this

*Waskowski – Direct*

1    collision.

2              MR. HEWSON:  What exhibit?

3              MR. TEMROWSKI:  B.

4              INTERPRETER:  The first left picture when he holds

5    it horizontal, he said it's left quarter, without bumper, and

6    back lamp, without back lamp, left door -- I'm not sure if

7    they are front or back.

8              I cannot recognize the third picture.  I don't know

9    what it shows.

10             The fourth represent the right side of the vehicle.

11             The fifth picture shows damage of suspension.

12             Sixth picture is showing damage of the frame.

13             The left picture shows the right side of the

14   vehicle.  It shows that it was not damaged.

15             Next picture shows that back left quarter.

16             The next picture shows damage in electrical and

17   suspension.

18             Next picture shows damage of the back of the car.

19   And I think it will be the back of the car.

20   BY MR. TEMROWSKI:

21   Q    Mr. Waskowski, when the impact occurred between the

22   vehicle that struck your vehicle and your car, if you can

23   recall, what happened to your body inside of the car on the

24   impact?

25   A    At the moment the accident happened, I must hit my head

*Waskowski – Direct*

1  with the part of the car.  I lost conscious.  I was conscious

2  again when I ended up on the second part of the road -- on the

3  second side of the road, on the parking on the front of the

4  flower shop.

5  Q    And is that where your car ended up at after the impact?

6  A    Yes.

7  Q    Would you be able the tell us in distance, the feet, how

8  far from the point of impact was it to the point where your

9  car ended up in that parking lot?

10  A    I don't know how many feet, but they were two lines.

11  Third line to turn.  Small strip of loam between sidewalk and

12  road.  Sidewalk, grass and big of distance -- big distance of

13  16, 18 foot.  And next was parking.

14  Q    And, sir, were you able to exit the vehicle by yourself?

15  A    I don't remember.

16  Q    And at the scene of the collision, were you feeling or

17  experiencing pain to any part of your body?

18  A    When I get out of the car, I felt pain in my neck, left

19  side, left hand and back.

20  Q    And was an ambulance called to the scene?

21  A    Ambulance came, but nobody from the ambulance crew came

22  to me.

23  Q    Did you leave the scene in an ambulance or by some other

24  means?

25  A    My daughters took me home.

*Waskowski – Direct*

1    Q    What happened when you got home?

2    A    I laid down.

3    Q    Okay.  Now, Mr. Waskowski, could you tell us when and

4    where was the first time following the motor vehicle collision

5    that you sought medical care or treatment for any injuries

6    from the automobile accident?

7    A    After Christmas, I went to see Dr. Wietrzykowski.

8    Q    And how is it that you went to Dr. Wietrzykowski?  Had

9    you ever been to him before?

10   A    No.  I've never been in his office prior time.

11   Q    And how did you find him -- how did you get his name to

12   go to him?

13   A    I don't remember exactly, but from yellow book or from

14   internet.

15   Q    And do you recall the first day that you saw Dr.

16   Wietrzykowski?

17   A    Yes.

18   Q    What date was that?

19   A    27 of December 2009.

20   Q    And, sir, when you went and saw Dr. Wietrzykowski, did

21   you tell him that you were injured in an automobile collision?

22   A    Yes.

23   Q    Did you tell him what physical problems and complaints

24   you were having that first time that you went there?

25   A    Yes.

*Waskowski – Direct*

1    Q    And what did you tell him, what parts of your body were

2    bothering you?

3    A    I had a pain in this area, neck, hand, arm and back, left

4    side.

5    Q    And could you tell us, please, what did Dr. Wietrzykowski

6    do for you on that occasion, how did he treat you for these

7    injuries?

8    A    Well, did he recommend it?

9    Q    Yes.

10   A    After that, he ordered x-ray.  He gave me prescription

11   for Vicodin and Robaxin.  And he gave me prescription for

12   physical therapy.

13   Q    Did you tell Dr. Wietrzykowski that you were employed?

14   A    Yes.

15   Q    Did Dr. Wietrzykowski disable you from work?

16   A    Yes.

17   Q    Did Dr. Wietrzykowski advise you that you needed an

18   attendant's care and household help?

19           MR. HEWSON:  Your Honor, I'm going to object.  I'm

20   going to object.  This is hearsay.  I'm letting it go, but

21   this is hearsay, asking the doctor --

22           THE COURT:  It would be hearsay.

23           MR. HEWSON:  Thank you.

24           INTERPRETER:  He's asking if he's supposed to answer

25   or not.

*Waskowski – Direct*

 1  BY MR. TEMROWSKI:

 2  Q    Could you tell us please, where did you go to have the

 3  x-rays done?

 4  A    One of my daughters took me to the hospital in Warren

 5  between Van Dyke and 13 Mile, somewhere in this area.

 6  Q    And did you have them done?

 7  A    Yes.

 8  Q    Okay.  You indicated that Dr. Wietrzykowski said you

 9  should attend physical therapy; is that correct?

10  A    Yes.

11  Q    Did you then schedule a physical therapy appointment?

12  A    Yes.

13  Q    And where did you schedule that?

14  A    Hamtramck Euro Rehab.

15  Q    Now, after that first visit to Dr. Wietrzykowski, did you

16  ever return back to him for medical treatment for injuries

17  from the automobile accident?

18  A    No.

19  Q    And is there a reason that you didn't go back to Dr.

20  Wietrzykowski?

21  A    Yes.

22  Q    What is that reason?

23  A    Because I prefer to speak Polish.  It's easier to

24  communicate for me.  But Dr. Wietrzykowski didn't spoke

25  Polish, even though his last name is Polish.  So I wanted to

*Waskowski – Direct*

1    found a doctor who speaks Polish.

2    Q    And before we get to that doctor, you indicated that you

3    went to Euro Rehab in Hamtramck?

4    A    Yes.

5    Q    Again, how did you get to Euro Rehab?

6    A    It's on the main street in Hamtramck and it is a city

7    which had a lot of Polish people live there.  I tried to found

8    physical therapy office where Polish will be spoken.

9    Q    And was Polish spoken at Euro Rehab?

10   A    Yes.

11   Q    Did you communicate with Dr. Lodzinski in Polish?

12   A    Yes.

13   Q    And the physical therapists, did they also speak Polish?

14   A    Yes.

15   Q    You indicated that you then wanted to seek out another

16   doctor?

17   A    Yes.

18   Q    And who is the next doctor that you saw after Dr.

19   Wietrzykowski?

20   A    Dr. Glowacki.

21   Q    And could you tell the ladies and gentlemen of the jury,

22   please, how did you get his name?

23   A    I look through internet or yellow pages.

24   Q    Did Dr. Glowacki speak Polish?

25   A    Yes.

*Waskowski – Direct*

1    Q    Do you recall, sir, when was the first date that you went

2    to Dr. Glowacki's office?

3    A    I don't remember exactly the date, but it was January.

4    Q    And when you saw Dr. Glowacki for the first time, did you

5    tell him about the automobile collision?

6    A    Yes.

7    Q    And could you tell us, please, what did you tell Dr.

8    Glowacki were your physical problems that brought you to go

9    see him?

10   A    I repeat the same thing which I told Dr. Wietrzykowski.

11   Do I have to list exactly?

12   Q    Well, it was the same physical complaints that you told

13   Dr. Wietrzykowski, correct?

14   A    Yes.

15   Q    Starting with that first visit in January of 2010 with

16   Dr. Glowacki, right up to the present date, has Dr. Glowacki

17   been your main treating physician for injuries that you

18   received in the automobile accident of December 23, 2010?

19   A    Yes.

20   Q    Have you continued to treat on a regular basis since

21   January 2010 with Dr. Glowacki for injuries from the

22   automobile accident of December 23, 2009?

23          INTERPRETER:  I'm sorry.  I lost the beginning of

24   the question.

25   BY MR. TEMROWSKI:

*Waskowski – Direct*

1   Q    Okay.  Have you continued to treat with Dr. Glowacki

2   continuously since your first visit in January of 2010?

3   A    Yes.

4   Q    Right up to the present date?

5   A    Yes.

6   Q    For the injuries from the automobile accident of December

7   23, 2009?

8   A    Yes.

9   Q    I'd like to ask you this question, Mr. Waskowski.  Before

10  the automobile collision of December 23, 2009, before, had you

11  ever, before December 23, 2009, ever treated with an

12  orthopedic doctor?

13  A    No.

14  Q    Before December 23, 2009, in your lifetime, had you ever

15  received physical therapy?

16  A    No.

17  Q    Before December 23, 2009, had you ever, ever undergone

18  any type of MRI testing of any kind at all?

19  A    No.

20  Q    Before December 23, 2009, had you ever undergone a bone

21  scan?

22  A    No.

23  Q    Before December 23, 2009, in your lifetime, had you ever

24  once treated with any kind of a doctor at all for a neck

25  injury, for a neck problem?

*Waskowski – Direct*

1   A    No.

2   Q    Before December 23, 2009, had you ever once in your

3   lifetime treated with a doctor for a back problem?

4   A    No.

5   Q    Before December 23, 2009, in your lifetime, had you ever

6   treated with a doctor for a left shoulder problem?

7   A    No.

8   Q    Before December 23, 2009, in your lifetime, had you ever

9   treated with a doctor for ribs or a sternum problem?

10   A    No.

11   Q    Now, Mr. Waskowski, before the December 23, 2009 motor

12   vehicle collision which brings us all here today, isn't it

13   true that you were asked by State Farm in interrogatories and

14   at your deposition if you had ever been involved in an

15   accident before December 23, 2009?

16          INTERPRETER:  He is asking -- are you asking for the

17   December 23, 2009, if he had accident?

18          MR. TEMROWSKI:  Before.

19          THE WITNESS:  Yes, I had.

20   BY MR. TEMROWSKI:

21   Q    Okay.  And when you were asked that question by State

22   Farm, what was your answer to them?

23   A    I had accident in July 2009.

24   Q    And were you driving a car on that date?

25   A    Yes.

*Waskowski – Direct*

1    Q    And was your car insured on that date?

2    A    Yes.

3    Q    And who was it insured with?

4    A    State Farm.

5    Q    And could you just tell us how that accident happened?

6    A    I was coming back from work between twelve and one a.m.

7    I stopped at the red light at the intersection of Wayne and

8    Michigan.  And the moment when the lights turned green, I

9    started, and from left side, young drunk driver who was

10   driving very fast, he hit my car on the back left side.

11   Q    And as a result of that accident, did you get any medical

12   treatment?

13   A    No.

14   Q    And as a result of that accident, did you miss some time

15   from work?

16   A    Yes, about four or five days.

17   Q    And did you make a claim at all for that July 2009

18   accident with State Farm?

19   A    Claim was for the car.

20   Q    And did State Farm pay anything else other than for the

21   damage to your car?

22   A    Yes, they paid for five days to be absent in work.

23   Q    Was that it?

24   A    Yes.

25   Q    You didn't file any lawsuit against them, did you?

*Waskowski – Direct*

1           MR. HEWSON:  Your Honor, he's leading the witness

2    and I don't understand the relevance from the prior accident.

3           MR. TEMROWSKI:  Well, it's for purposes of just

4    accuracy.

5           THE COURT:  Accuracy as to what?

6           MR. TEMROWSKI:  He was asked about it in the course

7    of this lawsuit at his deposition and we're just pointing

8    everything out, Judge.

9           THE COURT:  Objection sustained.

10          MR. HEWSON:  Thank you.  Your Honor, could I indulge

11   the Court to use the restroom?  I apologize for the

12   interruption.  I think I've had too much water this morning.

13          THE COURT:  Sure, okay.  We can take a five-minute

14   break for everyone.

15          So, Jesse, you want to take the jury back?  And then

16   we'll bring them back out in about five minutes.

17          COURT CLERK:  All rise for the jury.

18          (Jury out and Court in recess at 12:23 p.m.)

19          (Court in session at 12:33 p.m.)

20          COURT CLERK:  All rise for the jury.

21          (Jury in at 12:34 p.m.)

22          COURT CLERK:  You may be seated.

23          THE COURT:  All right, you may proceed.

24   BY MR. TEMROWSKI:

25   Q    I think we left off this way.  Mr. Waskowski, before

*Waskowski – Direct*

1    December 23, 2009, had you ever sued anyone before?

2    A    No.

3    Q    Okay.  Now, going back to Dr. Glowacki, after he examined

4    you on that first occasion, did Dr. Glowacki advise you that

5    because of your complaints he wanted you to have any testing

6    done, medical testing?

7    A    Yes.

8    Q    And what type of testing was asked for?

9    A    Bone scan.

10   Q    Okay.  And did you have a prescription to have that done?

11   A    Yes.

12   Q    And where was the bone scan performed?

13   A    At the beginning of 2010.

14   Q    Where at?

15   A    Dequindre and 19 Mile, Beaumont Hospital.

16   Q    And in addition to that, did Dr. Glowacki write

17   prescriptions for MRIs?

18   A    Yes.

19   Q    And to what parts of your body were prescriptions written

20   to have the MRIs done?

21   A    I had three MRIs; neck, lower part of back and left

22   shoulder.

23   Q    And where were those first three MRIs done at?

24   A    Nineteen Mile and Schoenherr.

25   Q    Do you know the name of that facility?

*Waskowski – Direct*

1    A    As I remember correctly, it's Macomb MRI or something

2    like that.

3    Q    Now, Mr. Waskowski, when Dr. Glowacki wrote those

4    prescriptions for you to have an MRI done of your left

5    shoulder, your neck and your back, did Dr. Glowacki instruct

6    you to go to any particular facility or did he give you the

7    prescriptions and say, "Here, Mr. Waskowski, go and have these

8    done"?

9            MR. HEWSON:  Your Honor, I object to the compound

10   question, please, and the leading nature of the second half of

11   the question.

12           THE COURT:  Overruled.

13           MR. HEWSON:  Thank you.

14           THE COURT:  You can answer.

15           THE WITNESS:  He gave me only prescription.  He told

16   me I have to do MRI and he didn't specific -- he didn't tell

17   me specifically where to go.

18   BY MR. TEMROWSKI:

19   Q    And did you, in fact, have those MRIs done?

20   A    Yes.

21   Q    Did Dr. Glowacki write a prescription for you to attend

22   physical therapy?

23   A    Yes.

24   Q    And based on that prescription, did you attend?

25   A    Yes.

*Waskowski – Direct*

1  Q    And again, did Dr. Glowacki tell you any particular

2  therapy clinic to go to or did he leave that up to you?

3  A    I had chosen before going to Dr. Glowacki a physical

4  therapy facility in Hamtramck, Euro Therapy -- Euro Rehab.

5  Q    And, sir, while we're on the topic of physical therapy,

6  could you please tell the ladies and gentlemen of the jury the

7  names of all of the different physical therapy facilities that

8  you went to because of injuries from this automobile accident?

9  A    I was looking for physical therapy office in Sterling

10 Heights, but nobody spoke Polish.  After that, I found

11 Hamtramck physical therapy facility and I learned that they

12 have another facility on the border of Sterling Heights and

13 Troy, on Dequindre.

14 Q    Could you tell us, please, when did you first start

15 physical therapy and when did you stop?

16 A    As I remember correctly, I started in January 2010.

17 Beginning of 2011 and 2012 I were at the physical therapy.

18 Q    And is that the last time that you attended therapy?

19 A    Beginning of the year 2012.

20 Q    And, sir, when you were attending physical therapy, could

21 you tell us the frequency that you were going to therapy, in

22 other words, how many times per week?

23 A    Three times a week.

24 Q    Now, Mr. Waskowski, during the time that you treated with

25 Dr. Glowacki, which you've indicated is up to the present

*Waskowski – Direct*

1    time, for these injuries, did Dr. Glowacki, in the course of

2    treating you, refer you to any other physicians?

3    A    Yes.

4    Q    And could you tell us, please, the names of all of the

5    doctors that Dr. Glowacki referred you to?

6    A    Dr. Donahue, Dr. Zamorano.  I went once to Dr. Nerga.  I

7    don't remember more.

8    Q    Okay.  Let's start with Dr. Donahue.  Did, at the

9    referral of Dr. Glowacki, you go see Dr. Donahue?

10   A    Yes.

11   Q    And how many times did you see Dr. Donahue?

12   A    Once.

13   Q    And do you recall when that was?

14   A    In 2010, after summer.

15   Q    And did you tell Dr. Donahue that you were involved in

16   this automobile collision?

17   A    Yes.

18   Q    Did you tell him what your injuries were?

19   A    Yes.

20   Q    And were those all of the same things that you told to

21   Dr. Wietrzykowski and to Dr. Glowacki?

22   A    Yes.

23   Q    Did you see Dr. Donahue for any reason at all,

24   whatsoever, other than for injuries from this automobile

25   collision on 12/23/09?

*Waskowski – Direct*

1    A    No.

2    Q    Dr. Zamorano, did you see Dr. Zamorano?

3    A    Yes.

4    Q    Do you recall when you saw Dr. Zamorano?

5    A    In 2011.

6    Q    And did you tell Dr. Zamorano that you were injured in

7    this automobile collision?

8    A    Yes.

9    Q    Did you tell Dr. Zamorano the exact same thing that you

10   told Dr. Wietrzykowski, Dr. Glowacki and Dr. Donahue?

11   A    Yes.

12   Q    Were you seeing Dr. Zamorano for anything except for

13   injuries from the automobile accident?

14   A    No.

15   Q    Did Dr. Zamorano make recommendations to you for medical

16   testing?

17   A    Yes.

18   Q    What type of testing did Dr. Zamorano want you to have?

19   A    X-rays, MRI, test of nerves.

20   Q    And did Dr. Zamorano write a prescription for that?

21   A    Yes.

22   Q    And did you have that testing done?

23   A    Yes.

24   Q    Where did you have the testing done at?

25   A    As I remember it correctly, Rochester and some mile.  I

*Waskowski - Direct*

1    don't remember exact address.

2    Q    Do you know the name of that facility?

3    A    Oakland MRI.

4    Q    Mr. Waskowski, did you only go to the Oakland MRI because

5    Dr. Zamorano wrote a script for you to go?

6    A    Yes.

7    Q    And did you, in fact, have the x-rays and the MRI testing

8    done at that facility?

9    A    Yes.

10   Q    And was that MRI testing to your neck -- well, you tell

11   me, to what parts of your body?

12   A    Head, neck, left shoulder and lower back part.

13   Q    Now, you also mentioned that Dr. Glowacki referred you to

14   a Dr. Nerga?

15   A    Nerga, yes.

16   Q    Is that correct?

17   A    Yes.

18   Q    And at his recommendation, did you go see Dr. Nerga?

19   A    Yes.

20   Q    And do you know what kind of doctor Dr. Nerga is?

21   A    No.

22   Q    How many times did you go to Dr. Nerga?

23   A    Once.

24   Q    Now, Mr. Waskowski, have we now talked about all of the

25   doctors, all of the physical therapy facilities and all of the

*Waskowski – Direct*

1    medical testing facilities that you went to because of

2    injuries from the automobile accident of December 23, 2009?

3    Have we covered everybody?

4    A    I listed all of them, besides those who I was referred by

5    State Farm.

6    Q    Okay.  Well, we'll talk about those in a moment.  But we

7    have covered everybody that was what we'd call a treating

8    doctor for you, as opposed to an independent examiner?

9    A    Yes.

10   Q    Now, Mr. Waskowski --

11            THE COURT:  You know, it's about ten to one.  Can we

12   break for the day?

13            MR. TEMROWSKI:  Gladly, yes.

14            THE COURT:  Okay.  We will -- you're free to go.

15   Again, you can't discuss the case, right?

16            THE JURY:  Right.

17            THE COURT:  Okay.  And we'll see everybody upstairs

18   at 9:30 tomorrow morning, 9:30 tomorrow morning, okay?  Thank

19   you.

20            COURT CLERK:  All rise for the jury.

21            (Jury out at 12:52 p.m.)

22            COURT CLERK:  You may be seated.

23            THE COURT:  So where are we with the plaintiff?  Mr.

24   Temrowski, how much more time?

25            MR. TEMROWSKI:  I guess, to be honest, an hour or

*Waskowski v. State Farm*

1    less.

2              THE COURT:  Okay.  But you realize you told me it

3    was going to take two days to present your proofs, and this is

4    the end of the third day, right?

5              MR. TEMROWSKI:  Yes.

6              THE COURT:  And when we got together originally, we

7    put all this on the record.  Remember I said I'll give you as

8    much time as you want, but at the end of the time that you've

9    given me, if you're not done, I don't care where you're at,

10   you're done.

11             MR. TEMROWSKI:  Judge, how about 45 minutes and I'll

12   be done?

13             THE COURT:  I'm just -- do you remember us having

14   that discussion?

15             MR. TEMROWSKI:  I'm sure we did, yes.

16             THE COURT:  Okay.  So we're looking at you having an

17   hour.  Can you wrap it up in an hour tomorrow?

18             MR. TEMROWSKI:  Yes.

19             THE COURT:  And then I've got to believe Mr.

20   Hewson's going to be about an hour or so?

21             MR. HEWSON:  It wouldn't be any longer than that,

22   Judge.  I try to keep it pretty straightforward.

23             THE COURT:  Where are we on the jury instructions

24   and verdict form?

25             MR. TEMROWSKI:  Well, I'll take the easier one

*Waskowski v. State Farm*

1   first, the verdict form, Your Honor.  I've looked at the one

2   that I proposed and the one that Mr. Hewson proposes, and

3   they're identical, I believe, with the exception of in Mr.

4   Hewson's questions four and five, which I am objecting to.

5              THE COURT:  What about the other -- have you talked

6   about a jury instruction packet?

7              MR. TEMROWSKI:  No, we haven't, but I really don't

8   think we have a --

9              THE COURT:  Okay.  This is how I work, is that I

10  tell a jury a certain amount of time the trial's going to take

11  during voir dire, right, and that's based upon what you tell

12  me.  I usually pad it.

13             So I'm having a real concern right now that this

14  trial is going to go longer than I told the jury it was going

15  to be.  Because basically, I'm giving you -- it looks like

16  you're going to take a day and-a-half longer than you told me

17  you were going to take, which is significant.

18             So what I need you two to do is spend some time and

19  work out these issues so that we aren't delaying the trial

20  even more, okay?

21             So I've got a bench meeting and then I've got a

22  rules committee meeting, so I should be back about three.  So

23  why don't you take this time and work these things out, okay?

24             MR. HEWSON:  Yes, sir.  Should we report back to

25  you, Your Honor, at 3:00 here?

*Waskowski v. State Farm*

1        THE COURT:  Yeah.  I mean, the courtroom should be

2   open, you know.

3        MR. TEMROWSKI:  Well, Judge, I don't think it'll

4   take us two hours to work these two things out.

5        THE COURT:  Like I said, you're not ready right now

6   for me.  And I explained that I have a meeting at 1:00 and a

7   meeting at 2:00.  So I'm telling you I'll be back here at

8   three.  That means I want you back at three, and hopefully

9   we'll have an agreement on all these issues, with respect to

10  jury instructions and a verdict form, so that perhaps tomorrow

11  or first thing Thursday, I can roll with the jury instructions

12  without delaying the trial, okay?

13        MR. HEWSON:  Yes, sir.

14        (Court in recess at 12:58 p.m.)

15        (Court in session at 3:18 p.m.)

16        THE COURT:  Recalling Waskowski versus State Farm.

17        I directed the parties to meet and discuss jury

18  instructions.  Now, with respect to jury instructions, correct

19  me if I'm wrong, you are in agreement on all the jury

20  instructions, except that defendant wishes special jury

21  instruction number one, which was filed with the original jury

22  instructions, and defense wishes -- sorry, the plaintiff

23  wishes 6.01, failure to produce?

24        MR. HEWSON:  Correct.

25        THE COURT:  And failure to produce what?

*Waskowski v. State Farm*

1          MR. TEMROWSKI:  Failure to produce the -- either the
2    reports --
3          THE COURT:  But what reports?
4          MR. TEMROWSKI:  The IME reports and letters authored
5    by Dr. Endress.
6          THE COURT:  IME reports of --
7          MR. TEMROWSKI:  Dr. Endress.
8          THE COURT:  Endress.
9          Besides the verdict form, are those the only issues
10   with respect to jury instructions?
11         MR. TEMROWSKI:  Yes.
12         MR. HEWSON:  Yes, sir.
13         THE COURT:  Okay.  And then with respect to the
14   verdict form, do you have a full verdict form, Mr. Temrowski?
15         MR. TEMROWSKI:  Yes.
16         THE COURT:  So this is defendant's verdict form that
17   I have in front of me?
18         MR. HEWSON:  Yes, sir, that's it.
19         THE COURT:  And, Mr. Temrowski, you object to what,
20   questions four and five you said?
21         MR. TEMROWSKI:  Four and five.  I've prepared a
22   short dissertation is to why I object to those.  Could I --
23         THE COURT:  Not yet, no.
24         MR. TEMROWSKI:  Okay.
25         THE COURT:  Have you talked about the special --

*Waskowski v. State Farm*

1   defendant's special instruction?

2          MR. HEWSON:  Your Honor, yes, I --

3          THE COURT:  No.  I mean, have the two of you

4   discussed it?

5          MR. TEMROWSKI:  Oh, now we're on the special jury

6   instruction?  Do you have that?

7          THE COURT:  Okay.  Sorry.

8          Mr. Hewson, what do you object to in plaintiff's

9   proposed verdict form?

10         MR. HEWSON:  Only that I believe it's deficient as

11  to those two questions.  Other than that, it's the standard --

12  I have the same exact questions and wording, right out of the

13  Michigan special jury instructions.  So the only difference

14  between the two of them is questions four and five.

15         THE COURT:  In your jury instructions, Mr.

16  Temrowski, where do you make the claim for attendant care,

17  which question?

18         MR. TEMROWSKI:  Judge, I don't think on the standard

19  verdict form there is a specific question for attendant care.

20         MR. HEWSON:  In the standard there is not, I agree.

21  The reason I put that in there is the biggest part of this

22  claim is attendant care by far.  So I agree that I

23  supplemented with questions four and five.

24         THE COURT:  Do you have the standard first part of

25  your verdict form?

*Waskowski v. State Farm*

1      MR. HEWSON:  I do not have that with me, Judge.  I

2    believe though, that it's --

3      MR. TEMROWSKI:  That's it.

4      MR. HEWSON:  It actually is --

5      THE COURT:  My preference would be not to deviate

6    from the standard because the standard is the standard.  Why

7    would we be deviating from the standard verdict form in a

8    first party case?

9      MR. HEWSON:  The only reason I was requesting it,

10   Your Honor, was because of the concentration on the attendant

11   care, and as you say, there is no specific question for

12   attendant care.  That was the only reason I asked for it.

13      But Mr. Temrowski's version of the verdict form is

14   the standard without any changes.  That is true.  I stipulate

15   to that.

16      THE COURT:  Let's go off the record for a minute.

17      (Discussion off record)

18      THE COURT:  Okay, we're back on the record.

19      The parties have agreed on all the jury

20   instructions; is that correct?

21      MR. HEWSON:  Yes, Your Honor.

22      MR. TEMROWSKI:  Yes.

23      THE COURT:  And that we're going to use the

24   plaintiff's proposed jury verdict form; am I correct, which I

25   have in my right hand?

*Waskowski v. State Farm*

1          MR. HEWSON:  Yes, Your Honor, that's correct.

2          MR. TEMROWSKI:  Yes.

3          THE COURT:  And the defendant has edited special --

4   defendant has edited a special instruction.  It will read,

5          "The fact that the plaintiff --"

6   sorry.

7          "The fact that the insurer paid some no-fault

8          benefits is insufficient to prove plaintiff's

9          case.  Evidence of furnishing, promising to pay or

10         offering to pay medical, hospital or other similar

11         expenses resulting from an injury is not

12         admissible to prove liability for the injury."

13         MR. HEWSON:  And the other is just a citation.  That

14  is correct, Your Honor.

15         THE COURT:  The citation would go out?

16         MR. HEWSON:  Yes, sir.  I agree with that edit.

17         THE COURT:  Great.

18         MR. TEMROWSKI:  And then we've got the --

19         THE COURT:  Okay.  Are we in agreement on the --

20         MR. TEMROWSKI:  Yes.

21         THE COURT:  -- special verdict form.  Sorry.

22  Special -- defendant's special requested jury instruction

23  number one?

24         MR. TEMROWSKI:  Yes.

25         THE COURT:  Okay.

*Waskowski v. State Farm*

1          MR. TEMROWSKI:  But then we have my issue about

2    standard jury instruction 6.01.  And 6.01 is the failure to

3    produce evidence or a witness, and in this particular case,

4    it's the witness and the evidence, the reports that Dr.

5    Endress authored.

6          And we know from earlier today that Mr. Hewson was

7    making an objection to those, which really, Judge, leads to my

8    other issue that goes hand in hand with this.  And I would

9    like to explain.  It was my humble understanding that when

10   this trial began, that --

11         THE COURT:  Well, help me out.  You want 6.01,

12   failure to produce -- let me go get 6.01.

13         MR. TEMROWSKI:  Yes.

14         (Brief pause in proceedings)

15         THE COURT:  Okay.

16         MR. TEMROWSKI:  Judge, why I think this has become

17   an issue is because earlier today when I had the claims

18   adjuster, Ms. Page, up on the witness stand and I tried to

19   question her about the IME that she set up with Dr. Endress

20   and about the reports and the letters that he wrote back to

21   State Farm, Mr. Hewson was objecting.

22         THE COURT:  Right.

23         MR. TEMROWSKI:  Well, Judge, again, it was my

24   understanding when this trail began last week that this Court

25   entered a joint final pretrial order that Mr. Hewson signed,

*Waskowski v. State Farm*

1    and I signed and that you signed.  And it was my understanding

2    that this was an order of the Court.  And in this joint final

3    pretrial order that was entered is --

4              THE COURT:  You know what, it was entered after

5    trial was started, because it was presented just when the

6    trial started.  It was very late.  And I think that Mr. Hewson

7    had an issue about getting you to review and sign the order.

8              MR. TEMROWSKI:  Oh, okay.  But in any event, Judge,

9    it lists plaintiff's exhibits and Exhibit Number One is the

10   plaintiff's PIP file.  It's clearly stated as an exhibit that

11   I listed --

12             THE COURT:  Right.

13             MR. TEMROWSKI:  -- and as an order of the Court.

14   And if you look at Mr. Hewson's exhibits, his first exhibit is

15   pertinent portions of the plaintiff's claim file.  So it was

16   my understanding that the PIP file was an exhibit in this

17   case.

18             THE COURT:  Well, I asked you that.  Okay, go ahead.

19             MR. TEMROWSKI:  And --

20             THE COURT:  No.  Mr. Hewson, you were getting up.

21             MR. HEWSON:  Your Honor, we sat down -- the Court's

22   order was that we were supposed to go through and create an

23   exhibit list, meet jointly and do that.  We did that.

24             Mr. Temrowski didn't put anything on there about the

25   claims file.  We went through that -- I typed it up in my

*Waskowski v. State Farm*

1    office.  I'm the one who filed it for the Court.  And yes, it

2    was on the order.  I agree.

3           The order wasn't prepared until at the time -- or

4    actually after the exhibit list was performed.  Now, it

5    isn't -- the claims file itself is not the foundation for the

6    admission of the doctor's report in any event.  It's not a

7    business record of State Farm.

8           But be that as it may, why isn't it on the exhibit

9    list?  That's my question.  We listed all these things.  I

10   even stipulated to putting in his MRIs and the reports of Dr.

11   Glowacki.  I put all that stuff in by stipulation to joint

12   exhibits.

13          And now he wants to put in Dr. Endress' report in

14   this other claim file.  I don't know what's in those

15   documents.  He never subpoenaed my claim file during

16   discovery.

17          THE COURT:  Okay, this is an issue.  For the first

18   time now, after these witnesses have been -- I had to drag you

19   kicking and screaming to get this pretrial order in to me and

20   it didn't get into me until after the trial started and that

21   was because Mr. Hewson told me or called -- if I recall

22   correctly, he said he couldn't get you to sign it until just

23   when the -- they agreed to review it just when the trial

24   started.

25          So apparently the PIP file is noted as an exhibit on

*Waskowski v. State Farm*

1    the pretrial order, one of plaintiff's exhibits.

2            MR. HEWSON:  Yes, Your Honor.

3            THE COURT:  Okay.  And I'm just finding that out

4    that out now.

5            MR. HEWSON:  I understand.  I was working off the

6    exhibit list.

7            THE COURT:  And how come you didn't bring that to my

8    attention, Mr. Temrowski, when these witnesses were being

9    examined -- the claims adjusters were being examined and

10   cross-examined this morning and said, "Hey, Judge, you know

11   what, that PIP file is on my exhibit list that I filed with

12   the pretrial"?

13           You're bringing it up to me now at 20 to four on a

14   day after your proofs should have been completed in this case.

15   While these witnesses were here in court, available to be

16   examined and cross-examined, why didn't you bring up, "Hey,

17   Judge, the PIP file was listed in the pretrial order"?

18           Rather, we spent time discussing this morning the

19   fact that it wasn't on any exhibit list filed by you and you

20   agreed with that statement on the record.

21           MR. TEMROWSKI:  It was an honest oversight on my

22   part.

23           THE COURT:  Right.

24           MR. TEMROWSKI:  That's the only explanation that I

25   can give.

*Waskowski v. State Farm*

1          THE COURT:  So what am I supposed to do about this?

2          MR. TEMROWSKI:  Well, I can tell you -- or ask you.

3          THE COURT:  You want me to give a jury instruction

4    under 6.01 for your failure to bring an issue to my attention?

5          MR. TEMROWSKI:  No.  But I just do want to point out

6    that on this -- because we're talking, you see, about two

7    different documents here.  We're talking about this joint

8    final pretrial order and then this document that Mr. Hewson

9    prepared about the exhibits that you --

10          THE COURT:  Really, you shouldn't even be -- you

11    were so dilatory in complying with the request to file that

12    order, it didn't get filed until after the trial started.  I

13    think it was filed after we actually picked a jury.

14          DEPUTY COURT CLERK:  I think it was submitted just

15    right before, I believe.  I would have to check, but right

16    before.  But it actually got on the docket after.

17          MR. TEMROWSKI:  But, Judge, I do have Dr. Endress'

18    reports marked on this exhibit list as R.

19          THE COURT:  But they haven't been received into

20    evidence.

21          MR. TEMROWSKI:  No.

22          THE COURT:  They had not been received into evidence

23    at the time these two witnesses, Kucharski and Page, were

24    being examined and cross-examined.

25          MR. TEMROWSKI:  Right.  But plaintiff is not done

*Waskowski v. State Farm*

1   with his proofs yet.  And I do wish to ask Mr. Waskowski about

2   those reports and, Judge, here's why.

3           THE COURT:  What are you doing now?  What does this

4   have to do about a request under 6.01?

5           MR. TEMROWSKI:  Well, because Mr. Hewson wants his

6   cake and eat it, too.

7           THE COURT:  You know what, cut to the chase.  So I

8   take it you don't want jury instruction -- you don't want me

9   to give jury instruction 6.01?  Because I thought we were

10  talking about the jury instructions here.

11          MR. TEMROWSKI:  No, I do want you to give that.

12          THE COURT:  Okay, why?

13          MR. TEMROWSKI:  Because Mr. Hewson does not want Dr.

14  Endress' reports to come in.  He doesn't want them to.  And

15  he's doing everything he can to object to them and they are a

16  critical -- they are the pivotal, critical apex in this entire

17  case, because it was based on that IME that State Farm sent

18  him to.  It was a --

19          THE COURT:  I think -- can I'll tell you something?

20  I have people waiting in other conferences as you know.  I'm

21  fitting you in here because I thought you were in agreement on

22  the jury instructions prior.

23          If you want 6.01, then you file a written motion

24  telling me why you want 6.01, with authorities to support it.

25          MR. TEMROWSKI:  Okay.

*Waskowski v. State Farm*

1            THE COURT:  And I want it filed by 8:00 tomorrow

2       morning.

3            MR. TEMROWSKI:  Okay.

4            MR. HEWSON:  Your Honor, and I'll reply.  Thank you.

5            MR. TEMROWSKI:  But I still would like to question

6       Mr. Waskowski about Dr. Endress' report.

7            MR. HEWSON:  Judge, how do you ask that question of

8       a lay witness?

9            THE COURT:  You know what, about about I -- trials

10      are dynamic.

11           MR. HEWSON:  Yes, sir.

12           THE COURT:  Well, we'll see how it plays out.  I

13      mean, the question has to be relevant and it has to call for

14      to call for admissible evidence.

15           MR. TEMROWSKI:  But, Judge, would you agree that

16      evidence can be admitted for purposes other than the truth of

17      the matter asserted?

18           THE COURT:  You're debating me?

19           MR. TEMROWSKI:  No, I'm not debating you.

20           THE COURT:  Did you hear what I just said?  I'm

21      giving you the opportunity to -- I'm giving you the

22      opportunity, if you want it, to seek to get this information

23      before the jury through your plaintiff.  Then ask the question

24      and we will see whether or not it's relevant and whether or

25      not a proper foundation has been laid.  And it will be up to

*Waskowski v. State Farm*

 1    Mr. Hewson, to let me -- if he has a problem with the
 2    question, I'm sure he will object.  If not, we'll just see how
 3    it goes.
 4                MR. TEMROWSKI:  Okay.
 5                MR. HEWSON:  Thank you, Your Honor.
 6                THE COURT:  Thank you.
 7                Could someone prepare a complete list of jury
 8    instructions for me?
 9                MR. HEWSON:  Yes, sir.
10                THE COURT:  Start at chapter two, all the way
11    through.
12                MR. HEWSON:  Yes, sir.
13                THE COURT:  Each jury instruction is on a separate
14    page.  And as you know, each one of the jurors gets their own
15    copy.
16                MR. HEWSON:  Yes, sir.
17                THE COURT:  If I get a good clean copy, I can --
18    just give me what you have agreed upon here today and then
19    I'll prepare for the jury and we'll deal with 6.01 sometime
20    tomorrow.
21                MR. HEWSON:  Yes, sir.  I will bring copies for --
22                THE COURT:  I just need one good one and we'll make
23    the copies here.
24                MR. HEWSON:  Oh, all right.  Very good.
25                THE COURT:  Thank you.

*Waskowski v. State Farm*

1        (Court in recess at 3:45 p.m.)

2                          *       *       *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

**C E R T I F I C A T I O N**

15      I, Marie J. Metcalf, Official Court Reporter for the

16  United States District Court, Eastern District of Michigan,

17  Southern Division, appointed pursuant to the provisions of

18  Title 28, United States Code, Section 753, do hereby certify

19  that the foregoing is a correct transcript of the proceedings

20  in the above-entitled cause on the date hereinbefore set

21  forth.

22      I do further certify that the foregoing transcript

23  has been prepared by me or under my direction.

24  s\Marie J. Metcalf                          09-06-13

25  Marie J. Metcalf, CVR, CM                    (Date)