1                   UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MICHIGAN
2                      SOUTHERN DIVISION

3   JAROSLAW WASKOWSKI,

4                Plaintiff,

5      -v-                Case No. 11-13036

6   STATE FARM MUTUAL AUTOMOBILE
   INSURANCE COMPANY,

7

                 Defendant./
8   _____

**JURY TRIAL – DAY SIX**
9           **BEFORE HON. SEAN F. COX**
          United States District Judge
10             257 U.S. Courthouse
        231 West Lafayette Boulevard
11          Detroit, Michigan 48226

12         **(Thursday, December 6, 2012)**

13   APPEARANCES:      LEE ROY H. TEMROWSKI, ESQUIRE
                    Appearing on behalf of the Plaintiff.
14
                    JAMES F. HEWSON, ESQUIRE
15               Appearing on behalf of the Defendant.

16   COURT REPORTER:   MARIE METCALF, CVR, CM
                    Federal Official Court Reporter
17               257 U.S. Courthouse
                    231 W. Lafayette Boulevard
18               Detroit, Michigan 48226
                    metcalf_court@msn.com
19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**TABLE OF CONTENTS**</u>

**PROCEEDINGS — Thursday, December 6, 2012**                    <u>**PAGE**</u>:

**JURY INSTRUCTIONS**......................................    5

**PLAINTIFF'S CLOSING ARGUMENT**..........................   18

**DEFENDANT'S CLOSING ARGUMENT**..........................   37

**PLAINTIFF'S REBUTTAL ARGUMENT**.........................   63

**JURY VERDICT**..........................................   74

*Waskowski v. State Farm*

1          Detroit, Michigan

2          Thursday, December 6, 2012

3          At about 8:29 a.m.

4                    *   *   *

5          DEPUTY COURT CLERK:  The Court calls case number

6    11-13036, Jaroslaw Waskowski versus State Farm Mutual

7    Automobile Insurance Company.  Appearances, please.

8          MR. TEMROWSKI:  Good morning, Your Honor.  Lee

9    Temrowski appearing on behalf of plaintiff.

10         MR. HEWSON:  May it please the Court, James Hewson

11   appearing on behalf of State Farm.

12         THE COURT:  Okay.  We have an issue with one of the

13   jurors.  Juror number four, Mr. Russell Brown, he's the

14   gentleman with the beard, you may recall, gray hair.  He

15   apparently is on his way to the doctor.  Apparently he has a

16   history of blood clots.  He's having difficulty in his lower

17   legs and he's not going to be with us today.  So I was

18   wondering if we could proceed without him.  We do have seven

19   remaining members of the panel.

20         MR. HEWSON:  I don't have any objection to that,

21   Your Honor.

22         MR. TEMROWSKI:  No objection, Your Honor.

23         THE COURT:  Okay.

24         MR. HEWSON:  Your Honor, can I ask, will it be then

25   five out of seven or --

*Waskowski v. State Farm*

1        THE COURT:  No.

2        MR. TEMROWSKI:  Or six out of seven?

3        THE COURT:  Six out of seven.

4        MR. TEMROWSKI:  That's fine, Your Honor.

5        MR. HEWSON:  Thank you.

6        THE COURT:  You want six out of seven, right?

7        MR. TEMROWSKI:  Yes.

8        MR. HEWSON:  Yes, sir.

9        THE COURT:  And Mr. Temrowski, how much time do you

10   need to close and for rebuttal?

11       MR. TEMROWSKI:  If I could ask for an hour for

12   closing, but I'll try to be shorter, and then ten minutes for

13   rebuttal.

14       THE COURT:  Okay.  And Mr. Hewson?

15       MR. HEWSON:  Your Honor, if I could have a maximum

16   of 40 minutes, that will do for me.

17       THE COURT:  Okay.

18       DEPUTY COURT CLERK:  All rise for the jury.

19       (Jury in at 8:33 a.m.)

20       DEPUTY COURT CLERK:  Please be seated.

21       THE COURT:  Members of the jury, good morning.

22       THE JURY:  Good morning.

23       THE COURT:  All that remains as you know from

24   yesterday is for you to hear the jury instructions.  And of

25   course, the jury instructions are the law that applies to

*Jury Instructions*

1   this case, the closing arguments, and then start your

2   deliberations.

3           And we have prepared a jury instruction packet for

4   you that you can read as I'm reading the jury instructions to

5   you, as well as the verdict form.  And again, the jury

6   instructions are the law that applies to this case.

7           Remember, as jurors, you decide the facts of the

8   case.  You decide what happened.  And then you make your

9   decision as to the facts of the case, as to what happened,

10  coupled with the law as I give it to you in the jury

11  instructions, and that way, in that manner, you reach your

12  verdict, you make your decision.  Right?  Do all of you

13  understand?

14          THE JURY:  Yes.

15          THE COURT:  And Mr. Brown, juror number four, is

16  sick.  And he won't be able to continue with us in this trial

17  and I have excused him from further jury service.  He's got

18  some medical issues, so he's not going to be able to

19  continue.  Okay?  All right.  Are you ready to start?  All

20  right.  Start at page two.

21          Members of the Jury, the evidence and argument in

22  this case have been completed, and I will now instruct you as

23  to the law.  Faithful performance by you of your duties is

24  vital to the administration of justice.  The law you are to

25  apply in this case is contained in these instructions and it

*Jury Instructions*

1    is your duty to follow them.  You must consider them as a

2    whole and not pick one or some instructions and disregard

3    others. Following my instructions, you will go to the jury

4    room and deliberate and decide on your verdict.

5         It is your duty to determine the facts from evidence

6    received in open court.  You are to apply the law to the

7    facts, and in this way, decide the case.  Sympathy must not

8    influence your decision, nor should your decision be

9    influenced by prejudice regarding race, sex, religion,

10   national origin, age, handicap or any other factor irrelevant

11   to the rights of the parties.

12        The evidence you are to consider consists of the

13   testimony of witnesses and exhibits offered and received.

14   The admission of evidence in court is governed by rules of

15   law.  From time to time it has been my duty as Judge to rule

16   on the admissibility of the evidence.  You must not concern

17   yourselves with the reasons for these rulings and you must

18   not consider any exhibit to which an objection was sustained

19   or any testimony or exhibit which was ordered stricken.

20        Arguments, statements and remarks of attorneys are

21   not evidence and you should disregard anything said by an

22   attorney which is not supported by evidence or by your own

23   general knowledge and experience.  However, an admission of a

24   fact by an attorney is binding on his client.

25        The corporation defendant in this case is entitled

*Jury Instructions*

1    to the same fair and unprejudiced treatment as an individual

2    would be under like circumstances, and it is your duty to

3    decide this case with the same impartiality you would use in

4    deciding a case between individuals.

5         I have not meant to indicate any opinion as to the

6    facts by my rulings, conduct or remarks during the trial.

7    But if you think I have, you should disregard it, because you

8    are the sole judges of the facts.

9         In determining whether any fact has been proved, you

10   shall consider all of the evidence bearing on that fact

11   without regard to which party produced the evidence.

12        It is not necessary that every fact be proven

13   directly by a witness or an exhibit.  A fact may be proved

14   indirectly by other facts or circumstances from which it

15   usually and reasonably follows according to the common

16   experience and observation of mankind.  This is called

17   circumstantial evidence, which you are to consider along with

18   the other evidence in the case.

19        You have a right to consider all the evidence in the

20   light of your own general knowledge and experience in the

21   affairs of life and to take into account whether any

22   particular evidence seems reasonable and probable.  However,

23   if you have any personal knowledge of any particular fact in

24   this case, such knowledge may not be used as evidence.

25        If you decide that a witness said something earlier

*Jury Instructions*

1    that is not consistent with what the witness said at this

2    trial, you may consider the earlier statement in deciding

3    whether to believe the witness.  But you may not consider it

4    as proof of the facts in this case.

5          However, there are exceptions.  You may consider an

6    earlier statement as proof of the facts in this case if the

7    statement was made by the plaintiff, the defendant, or an

8    agent, or employee of either party, or the statement was

9    given under oath, subject to the penalty of perjury, at

10   trial, hearing, or in a deposition, or the witness testified

11   during the trial that the earlier statement was true.

12         It has been brought out that an attorney or

13   representative of an attorney has talked with a witness.

14   There is nothing wrong with an attorney or representative of

15   an attorney talking with a witness for the purpose of

16   learning what the witness knows about the case and what the

17   witness's testimony -- excuse me, and what testimony the

18   witness will give.

19         Although you may consider the number of witnesses

20   testifying on one side or the other, when you weigh the

21   evidence as to a particular fact, the number of witnesses

22   alone should not persuade you if the testimony of the lesser

23   number of witnesses is more convincing.

24         During the trial, certain evidence was presented to

25   you by reading or viewing of depositions.  A deposition is a

*Jury Instructions*

1   record of the sworn testimony of parties or witnesses taken

2   before an authorized person.  All parties and their attorneys

3   had the right to be present and to examine and cross-examine

4   the witnesses.  The evidence -- this evidence, excuse me, is

5   entitled to the same consideration as you would give the same

6   testimony had the witnesses testified in open court.

7        The fact that the insurer paid some no-fault

8   benefits is insufficient to prove plaintiff's case.  Evidence

9   of furnishing, promising to pay or offering to pay medical,

10  hospital or similar expenses resulting from an injury is not

11  admissible to prove liability for the injury.

12       Burden of proof.  Everyone with me, page 16?  Am I

13  going too fast?

14       THE JURY:  No.

15       THE COURT:  Okay.  I shall now explain to you the

16  burden of proof which the law places on the parties to

17  establish their respective claims.  When I say that a party

18  has the burden of proof, I mean the evidence must satisfy you

19  that the proposition on which that party has the burden of

20  proof has been established by evidence which outweighs the

21  evidence against it.

22       You must consider all the evidence, regardless of

23  which party produced it.

24       Page 17, no-fault first party benefits action,

25  burden of proof.  In order for the plaintiff to recover

*Jury Instructions*

1   no-fault benefits from the defendant, the plaintiff has the

2   burden of proof in each of the following --

3           A., that plaintiff's injuries arose out of the use

4   of a motor vehicle on December 23, 2009.

5           B., that plaintiff incurred allowable expenses which

6   consist of reasonable charges for reasonably necessary

7   products, services and accommodations for plaintiff's care,

8   recovery or rehabilitation arising from the accident of

9   December 23, 2009.

10          C., that plaintiff suffered a work loss which

11  consists of a loss of income from work the plaintiff would

12  have performed during the first three years after the

13  accident, had he not been injured.

14          D., that the plaintiff reasonably incurred

15  replacement services expenses which consists of expenses

16  during the first three years after the accident to obtain

17  ordinary and necessary services in place of those that

18  plaintiff would have performed for his benefit and the

19  benefit of his dependents.

20          E., that the defendant failed to pay any or all of

21  said benefits.

22          To the extent that plaintiff has met or has not met

23  his burden of proof, you may grant, diminish or deny the

24  claim to benefits according to the methods of computation

25  which I will next describe.

10

*Jury Instructions*

1        If you decide -- excuse me.  If you decided no-fault

2   benefits are owed to the plaintiff, you are instructed to

3   award benefits that have not already been paid by the

4   defendant as follows:

5        A.  Allowable expenses consisting of all reasonable

6   charges incurred or reasonably necessary products, services,

7   and accommodations for the plaintiff's care, recovery or

8   rehabilitation arising out of the accident in question.

9        Work loss benefits consisting of 85 percent of the

10  loss of income from work that the plaintiff would have

11  performed during the first three years after the date of the

12  accident if he had been injured.  Then, in parentheses, total

13  work loss benefits for any 30-day period cannot exceed

14  $4,948.

15       C.  Replacement services expenses not exceeding $20

16  per day reasonably incurred by the plaintiff in obtaining

17  ordinary and necessary services in place of those that -- and

18  the plaintiff not been injured he would have performed during

19  the first three years after the date of the accident, not for

20  income, but for the benefit of himself or of his dependents.

21       Plaintiff is entitled to 12 percent interest on any

22  benefit that -- excuse me.  Plaintiff is entitled to

23  12 percent interest on any benefit you find overdue.

24       Benefits are overdue if they are not paid within 30

25  days after reasonable proof of the fact and the amount of

*Jury Instructions*

1    loss has been provided to the insurance company.  Plaintiff

2    has the burden of proof that he provided reasonable proof of

3    loss and that the defendant failed to pay the claim within 30

4    days.

5         If reasonable proof is not supplied as to the entire

6    claim, you shall award interest as to all benefits for which

7    reasonable proof was supplied.

8         Your verdict will be for the plaintiff as to --

9    excuse me.  Your verdict will be for the plaintiff as to

10   interest on those benefits for which he has met his burden of

11   proof.  Your verdict will be for the defendant as for

12   interest on those benefits for which plaintiff failed to meet

13   his burden of proof.

14        When you go to the jury room after closing

15   arguments, your deliberations should be conducted in a

16   businesslike manner.  You should first select a foreperson.

17   She or he should see to it that the discussions go forward in

18   an orderly fashion and that each juror has a full opportunity

19   to discuss the issues.

20        When at least -- everyone have a pen?  When at least

21   six of you -- when at least six of you agree upon a verdict,

22   it will be received as your verdict.  In your deliberations,

23   you should weigh the evidence with an open mind and

24   consider -- and in consideration for each other's opinions.

25        If differences of opinion arise, you should discuss

*Jury Instructions*

1    them in a spirit of fairness and frankness.  You should

2    express not only your opinion, but also the facts and reasons

3    upon which you base it.

4         In the course of your deliberations, do not hesitate

5    to re-examine your own views and change your opinion if you

6    are convinced that it is wrong.  However, none of you should

7    surrender your own honest conviction as to the weight and

8    effect of the evidence or lack of evidence solely because of

9    the opinion of your fellow jurors or for the mere purpose of

10   returning a verdict.

11        If you wish to communicate with me or examine the

12   exhibits while you are deliberating, please have your

13   foreperson write a note and give it to our bailiff, which

14   will be either Mr. Viau or Ms. McCoy, okay?

15        Mr. Temrowski, are you satisfied with the reading of

16   the jury instructions?

17        MR. TEMROWSKI:  Yes your honor.

18        THE COURT:  Mr. Hewson?

19        MR. HEWSON:  Your Honor I believe the last page,

20   page 21, needs to be shared with the jury, unless I missed

21   it.

22        THE COURT:  I apologize.  All right.  Sorry.

23        Page 21.  During your deliberations and before you

24   reach a verdict, you must not disclose anything about your

25   discussions to others outside the jury room, not even how

*Jury Instructions*

1   your voting stands.  Therefore, until you reach a verdict, do

2   not disclose that information even in the courtroom.  I'm

3   sorry for missing that.

4        MR. HEWSON:  Thank you, Your Honor.  I appreciate

5   it.  I'm satisfied with the delivery of the instructions.

6        THE COURT:  Mr. Temrowski, are you satisfied with

7   the reading of the instructions?

8        MR. TEMROWSKI:  Yes, Your Honor.

9        THE COURT:  All right.  Next item, verdict form.

10  Everyone got the verdict form?

11       THE JURY:  Yes.

12       THE COURT:  Okay.  You're going to make six

13  decisions, okay?

14       The first question posed to you is, "Did the

15  plaintiff sustain an accident, accidental bodily injury?"

16       And you're going to have to decide whether that's

17  yes or no.

18       If your answer is no, you will not answer any

19  further questions and the foreperson will sign the verdict

20  form and tell our clerk that you have reached a verdict.

21  Okay?

22       But if your answer is yes, you're going to proceed

23  to question number two, "Did the plaintiff's accidental

24  bodily injury arise out of the ownership, operation,

25  maintenance or use of a motor vehicle, as a motor vehicle on

*Waskowski v. State Farm*

1    December 23, 2009?"

2            Again, you're going to answer that question yes or

3    no.

4            If you answer yes, you will proceed to the next

5    question.

6            If your answer is no, you won't answer any further

7    questions, okay?

8            Then question number three, "Were allowable expenses

9    incurred by or on behalf of the plaintiff arising out of the

10    accidental bodily injury referred to in question number two?"

11            And then you can see where you've got, "allowable

12    expenses consists of all reasonable charges for reasonably

13    necessary products, services, and accommodation for the

14    plaintiff's care, recovery or rehabilitation."

15            And of course you are going to make a decision,

16    you're going to answer that question either yes or no.

17            "If your answer is yes, what is the amount of the

18    allowable expenses owed to the plaintiff?  Include only

19    expenses not already paid by the defendant."

20            Then you'll move to question four, work loss.  "Did

21    the plaintiff sustain work loss arising out of the accidental

22    bodily injury referred to in question number two?"

23            Then underneath that question, there's an

24    explanation as to work loss.  Then you're going to make a

25    decision, either yes or no.  Everyone with me so far?

*Waskowski v. State Farm*

1          THE JURY:  Yes.

2          THE COURT:  Page three, part B of that question, "If

3    your answer is yes, what is the amount of work loss owed to

4    the plaintiff?"

5          And then it notes, "only work loss not already paid

6    by the defendant," and you make a decision.

7          Then we move on to replacement services, expenses.

8    Question number five, "Were replacement service expenses

9    incurred by or on behalf of plaintiff arising out of the

10   accidental bodily injury referred to in question number two?"

11         Then you have an explanation of replacement services

12   on the verdict form, and then you're going to make a decision

13   yes or no.

14         Then we move to B.  "If your answer is yes, what is

15   the amount of replacement service expenses owed to the

16   plaintiff?  Include only replacement service expenses not

17   already paid by the defendant."

18         That leaves us with question number four -- sorry,

19   page four, question number six, "Was payment for any of the

20   expenses or losses to which the plaintiff was entitled

21   overdue?"

22         And there's an explanation underneath that and then

23   you're going to make a decision, yes or no.

24         And then you have the part B, "If your answer is

25   yes, what is the amount of the interest owed to the plaintiff

*Waskowski v. State Farm*

1    on overdue benefits?"  And it says, "Include only interest

2    not already paid by the defendant."  And then you make a

3    decision there, okay?

4           Then when you've made your decision, you've reached

5    a verdict, the foreperson will sign and date the verdict form

6    in pen.  This is always done in pen, not a pencil, all right?

7    And then the foreperson will write a note, hit the buzzer or

8    knock on the door and pass your note that you have a verdict

9    either to Jesse or Jen.  Does everyone understand?

10           THE JURY:  Yes.

11           THE COURT:  Any questions?

12           THE JURY:  No.

13           THE COURT:  Mr. Temrowski, are you satisfied with

14    the review of the verdict form?

15           MR. TEMROWSKI:  Yes, Your Honor.

16           THE COURT:  Mr. Hewson?

17           MR. HEWSON:  Yes, Your Honor.  Thank you.

18           THE COURT:  Mr. Temrowski, are you ready to start

19    with your closing?

20           MR. TEMROWSKI:  Yes, Your Honor.

21           THE COURT:  Are you all set up or do you need a

22    couple of minutes?

23           MR. TEMROWSKI:  I just need to move these, but other

24    than that, I'm set up.

25           THE COURT:  Okay.  Mr. Hewson, feel free to move

*Plaintiff's Closing Argument*

1    around if you wish.

2            MR. HEWSON:  Thank you, Your Honor.  I was going to

3    ask the Court's permission.  Thank you.

4            MR. TEMROWSKI:  Well, first of all, good morning.

5            THE JURY:  Good morning.

6            MR. TEMROWSKI:  And the first thing I would like to

7    say is, on behalf of Mr. Waskowski and myself, we would like

8    to thank each of you for your service as a juror in this

9    case.  We understand that you had other commitments, work,

10   and that it was a sacrifice to be here, and we appreciate

11   your service.

12           And I have tried my very best since plaintiff does

13   have the burden of proof to present the evidence in a clear

14   fashion and as rapidly as possible, keeping in mind that

15   plaintiff does have the burden of proof in the case.

16           As Judge Cox indicated, you now have a decision to

17   make based upon the evidence that you heard from the witness

18   stand and what we have we've had marked as exhibits.  You now

19   have to take that evidence, apply it to law that you just

20   heard, and answer those questions on that verdict form.

21           I am absolutely, 100 percent convinced that if you

22   truly do that, that if you apply the facts in this case to

23   the law, I'm positively convinced that your verdict will be

24   for the plaintiff, Mr. Waskowski, in this case.

25           I'd like to just quickly begin by reiterating a

*Plaintiff's Closing Argument*

1   recap of what this entire lawsuit was for.  This lawsuit,

2   again, is for first party no-fault benefits.

3          Mr. Waskowski was obligated to have insurance on his

4   car when this collision occurred and he did, with State Farm.

5   Mr. Waskowski paid for this insurance.  He had been a

6   faithful customer of State Farm for years.  You heard him

7   testify to that.  This isn't a case where he's asking for

8   something for nothing.  He paid for this policy of insurance.

9          The benefits, again, that are being asked in this

10  lawsuit are five benefits.  Medicals, which are a lifetime

11  benefit, attendant care, which is a lifetime benefit,

12  prescription expenses, which is a lifetime benefit, wage

13  loss, which has a three-year cap on it, and the $20 a day

14  household help, which like the wage loss, has a three-year

15  cap on it.  And that will be up, literally, in a few days

16  since the accident happened on December 23, 2009.

17         These are the benefits that are at issue, these are

18  the benefits that he requested.  And because there was a

19  termination of those benefits, this lawsuit that brings us

20  all here together was filed by Mr. Waskowski against State

21  Farm.

22         The issue then becomes why were these benefits

23  terminated in the first place?  That should be our first

24  question, why were they terminated?

25         Well, here is what we know about the accident.  We

*Plaintiff's Closing Argument*

1    know that an accident occurred.  We know that Mr. Waskowski

2    was injured.  We know that he was employed and off work

3    because of his injuries.  We know that he was treating with

4    many doctors.  We know that he was attending physical

5    therapy.  We know he was taking prescription medications.  We

6    know that he had objective diagnostic testing, MRIs.  We know

7    that his treating physicians were authoring disability

8    certificates for the attendant care, the wages, and the

9    household help.

10          We know that all of the forms that State Farm

11   required and requested were being completed and being

12   returned back to them by the care providers and by his

13   treating doctors.

14          We know that all of the things that Mr. Waskowski

15   was supposed to do were being done.  You heard that testimony

16   from all of the witnesses that were presented at this trial.

17          Here then, using this graph, is what happened.  The

18   date of the accident was 12/23/09.  We know from the

19   testimony that you heard here, that on November 20, 2010,

20   that was the date through which defendant paid the household

21   help and the attendant care and then it stopped.

22          We know that the first independent medical

23   examination with Dr. Endress was on October 25, 2010.  And we

24   know that Dr. Endress, after Mr. Waskowski was asked by State

25   Farm to go to him, which he did, and he was examined by Dr.

*Plaintiff's Closing Argument*

1   Endress, we know that Dr. Endress created three reports dated

2   October 25, 2010, November 16, 2010 and February 18, 2011.

3           And Dr. Endress sent those reports to Terri Page.

4   We know that.  Dr. Endress writes State Farm three letters on

5   each of these dates and here is what Dr. Endress reported to

6   Terri Page when he wrote back to her.

7           Mr. Waskowski was injured in the automobile

8   accident.  He had herniated discs in his neck and back.  He

9   had a torn left rotator cuff.  He has objective findings.  He

10  needs to continue therapy.  He cannot return to work.  He

11  needs to continue taking the pain medications.  He needs

12  household help and his treatment is appropriate.  That's what

13  Dr. Endress said to Terri Page.

14          We then also know using this timeline that on March

15  2, 2011, is the date through which the defendant paid Mr.

16  Waskowski his wage loss.  We then know that in July of 2011

17  that is the date of the second IME with Dr. Geiringer.  And

18  of course on that date Dr. Geiringer writes there's no

19  injury, there's no objective findings and that Mr. Waskowski

20  is a malingerer.

21          And then of course we've got on January 25, 2012,

22  Dr. Quint, who doesn't examine Mr. Waskowski, but simply

23  looks at the films, does not -- he opines that it's

24  degenerative only, but does not give an opinion as to whether

25  or not Mr. Waskowski was injured.

*Plaintiff's Closing Argument*

1           So this graph outlines the dates, the important

2    dates, and what happened on those dates.

3           Now, at this trial, before I go any further, I think

4    that it's important to mention that it was the plaintiff who

5    subpoenaed Terry Page to be here, the claims adjuster, and it

6    was the plaintiff who subpoenaed Cheryl Kucharski to be here.

7    And it was the plaintiff who introduced into evidence these

8    reports from Dr. Endress.

9           I believe that Dr. Endress is the smoking gun to

10   this whole case, Dr. Endress' reports.  And I'm sure you by

11   now have asked yourself this important question, again using

12   this timeline, if Dr. Endress writes these three reports to

13   Terri Page on these dates, and he gives these findings back

14   to her, why in the world would State Farm, given the findings

15   of Dr. Endress, ever stop Mr. Waskowski's wage loss benefits

16   on March 7, 2011 when their own doctor, Dr. Endress, who

17   examined Mr. Waskowski, wrote to Terri Page and said he can't

18   work.  Shouldn't they at least have paid the wage loss up

19   until the time of the exam with Dr. Geiringer in July?  But

20   they didn't do that.

21          The question, ladies and gentlemen of the jury, then

22   really becomes, why, if State Farm wasn't paying, why did

23   they want a second independent medical exam with Dr.

24   Geiringer?  Why did they want a second exam?

25          And the reason, ladies and gentlemen, State Farm

*Plaintiff's Closing Argument*

1    wanted the second exam with Dr. Geiringer is because we had a

2    new claims adjuster take over the file, Ms. Kucharski.

3          What does Ms. Kucharski, the new claims adjuster, do

4    when she takes over the file?  Well, I'll tell you what she

5    did and you heard her testify to this.  She writes to all of

6    the treating doctors who were sending their bills for payment

7    into State Farm, "Oh, Doctor, this matter is under

8    investigation."  She recalculates Mr. Waskowski's wage loss

9    claim, that at least some of it had been paid by the first

10   adjuster Terri Page, and she recalculates it to her own

11   configurations.

12         She also hires a private investigator to try and get

13   him on video doing something, which of course they didn't do.

14   And if all of that isn't enough, she then writes a letter to

15   Mr. Waskowski and asks him to get on Social Security, go

16   collect Social Security disability benefits.

17         But most importantly, of all the things that

18   Ms. Kucharski did, it was to get that second IME with Dr.

19   Geiringer.  And do you want to know why?  Because they didn't

20   like what the first IME doctor was saying.  She went doctor

21   shopping.  Because one, two, three strikes, Dr. Endress,

22   you're out.  We're getting somebody else.  That's what she

23   did.

24         Now, knowing all of this that we have talked about,

25   what has State Farm done at this trial?  Well, I'll tell you

*Plaintiff's Closing Argument*

1    what they have done.  They have tried to divert your

2    attention from the real issue that you should be focusing on

3    at this trial and they've tried to divert your attention by

4    creating a smoke screen, and throwing red herrings at you on

5    these little side issues, instead of what the focus should

6    be, is how did they handle the claim?  How did they handle

7    the claim?  They fumbled the football, so what they are

8    trying to do is divert your attention to all of these side

9    issues.

10          I suggest to you that the reason they are doing this

11   is because State Farm knows very well that this was not a

12   minor automobile collision.  They know that there was

13   extensive damage done to Mr. Waskowski's car.  They know that

14   Mr. Waskowski was treating and that Dr. Glowacki had sent Mr.

15   Waskowski to go get multiple second opinions, who all

16   happened to agree with Dr. Glowacki.

17          They knew that all of the MRI testing of the neck,

18   the back and the left shoulder, at not one, but two different

19   MRI facilities, was all abnormal and showed very serious

20   injuries to Mr. Waskowski.

21          They knew that he was still off work.  They knew

22   that Dr. Glowacki had authored multiple, many, many -- and

23   you can look at them -- disability certificates.  They knew

24   that he wore appliances to his neck and back.  They knew that

25   his care providers were documenting.  I've never in my career

*Plaintiff's Closing Argument*

1    seen care providers document like this.  I've never seen

2    that, meticulous documentation of the care that they were

3    giving to him.

4         They knew that they had no video surveillance.  They

5    knew that they didn't even have one, not even one little

6    sheet of paper to show you about Mr. Waskowski having any of

7    these problems before.  He has absolutely no prior medical

8    treatment for a neck, back, or shoulder, or ribs or a

9    sternum, nothing.  They knew he had no prior litigation

10   history.

11        So that is why they have created these smoke screens

12   to divert your attention from the focus where it should be

13   about how they handled the claim.  Now, as to these smoke

14   screens that they've tried to bring up, there is a valid

15   explanation for all of them.

16        And I would just like to quickly reiterate to you

17   the themes that we have heard at this trial, the attacks upon

18   Mr. Waskowski, and the doctors and all of them.  And let me

19   just briefly comment on those.

20        One of the themes that you've heard brought up by

21   State Farm is -- and at least I heard it for the first time

22   at this trial, "Oh, Mr. Waskowski, yes we were paying you

23   wage loss, but you know what, we were overpaying you."

24        Overpaying him, when his employer completed the

25   form, the verification form like he was supposed to?  Terri

*Plaintiff's Closing Argument*

1    Page got all the records.  Mr. Waskowski gives them his

2    income tax records and they have the audacity to say, "We've

3    overpaid him"?

4            Well, you know what, if that's true, and Mr.

5    Waskowski, I asked him that, "Mr. Waskowski, did they ever

6    ask for any of the money back?

7            No.

8            Did they ever file a counterclaim against you, which

9    they could have done in this lawsuit?

10           No."

11           It's a smoke screen.

12           The other smoke screen you heard, "Mr. Waskowski,

13   did Dr. Wietrzykowski, the first doctor that you go to, also,

14   like Glowacki, prescribe attendant care?

15           Yes, he did, Mr. Temrowski."

16           And then they show you the form where it says, "no."

17   And you can take the exhibits back.  Flip the page over and

18   he prescribes six to eight hours per day attendant care.

19           The other smoke screen that they've tried to come up

20   with is about Kamila and the bathing.  Well, what you have to

21   keep in mind is that Mr. Waskowski had not one, but two care

22   providers, Margaret and Kamila.

23           Kamila was pregnant at the time of the accident, and

24   during that period of time it was the other daughter,

25   Margaret, who was doing those types of things for Mr.

*Plaintiff's Closing Argument*

1   Waskowski.

2        The other issue you have heard is, "Well, why didn't

3   you continue -- why didn't you continue to send these

4   voluminous forms to State Farm?"

5        And you heard the testimony again of the care

6   providers, State Farm, after you stopped paying, after you

7   stopped paying the attendant care and the household help for

8   four months, the care providers continued to send in the

9   forms to the claims adjuster, and for six months after the

10  cutoff, continued to send in the forms for the attendant

11  care, and as they testified, what's the point?

12       However, and you also heard from the witness stand,

13  they continued daily to keep track of it.  And then in

14  November of this year went to the computer, printed it all

15  out and gave it to State Farm.  Here it all is.  Well, has

16  State Farm paid?  Of course not.

17       Another smoke screen that you heard.  Oh, Dr.

18  Glowacki made up the number of hours for attendant care.

19       Well, you know what, it probably was a poor choice

20  of words, but I distinctly remember yesterday sitting right

21  there watching the video deposition of Dr. Quint when

22  Mr. Hewson asked him this question, "And Dr. Quint, what

23  findings did you come up with?"  Oh, that's a bad question.

24  You know, folks, yeah, of course a doctor makes up the number

25  of hours.  It's the determination that the doctor makes to

*Plaintiff's Closing Argument*

1    decide how many hours per day to prescribe attendant care.

2    So again, what you've got is another play on words.

3           Then of course we have, "How far could he lift his

4    arm?"  And Dr. Glowacki gave you an answer and Dr. Lodzinski

5    perhaps gave a slightly different answer.  But please keep in

6    mind that report is after Mr. Waskowski has had the therapy

7    done.  Of course he should have a little bit more mobility in

8    the arm.

9           And then of course, another theme that we've heard

10   is, "Well, why haven't we heard from Dr. Zamorano and Dr.

11   Donahue?"

12          Well, do you want me to tell you why we haven't

13   heard from Dr. Zamorano and Dr. Donahue?  First of all,

14   ladies and gentlemen of the jury, Mr. Waskowski only went

15   there one time to Zamorano at the request of Glowacki for a

16   second opinion, and one time to Donahue, a one-time visit.

17   Mr. Waskowski doesn't have a bill with them.  And why would I

18   go take the deposition that you would have had to sit through

19   another four or six hours of depositions when Dr. Zamorano

20   and Dr. Donahue say the exact same thing that Dr. Glowacki

21   did?  It would be repetitive and the same thing over and

22   over.  And you can take a look at their exhibits.  They

23   totally agree with Dr. Glowacki.

24          Judge Cox has given you the verdict form.  And he

25   went through it with you, so I am not going to do that again.

*Plaintiff's Closing Argument*

1    But the first question that you're going to have to answer on

2    this form is, "Did that the plaintiff, Mr. Waskowski, sustain

3    an accidental bodily injury?"

4        And the second question is, "Did the plaintiff's

5    accidental bodily injury arise out of the ownership of the

6    motor vehicle?"

7        How are you going to decide that question?  You're

8    going to decide, because if you put "no" to either one of

9    these two questions, he gets the goose egg.  It's over.  You

10   don't go any further.

11       So how are you going to decide that question?  Well,

12   I'll start in reverse order.  The second one is easy.  There

13   wasn't one scintilla of evidence presented, not a piece of

14   paper to show that this man's injury came from anything but

15   this car accident.  There were no prior medical records or

16   anything.  So obviously, if he was injured, it came from this

17   automobile accident.

18       So how are you going to make that determination as

19   to whether or not he was injured?  Well, I suggest to you,

20   and again, you've got to base it upon the evidence, I put Mr.

21   Waskowski up on the stand and he told you he was injured.

22       I put his two daughters, care providers, on the

23   stand and they told you he was injured.

24       I took the deposition of Dr. Glowacki and I don't

25   know how he could talk any clearer, how much clearer could

*Plaintiff's Closing Argument*

1    have made it to you that Mr. Waskowski was injured?

2           I brought in Dr. Lodzinski.  He said he was injured.

3           You can look at all of the -- Donahue and Zamorano,

4    look at the MRIs.  He was injured.

5           So what is there to counter that?  What is there to

6    counter that?  Well, who were the two witnesses for the

7    defendant?  Quint and Geiringer.  But ladies and gentlemen of

8    the jury, I asked Dr. Quint -- now, remember, he never

9    examined Waskowski.  All he did was look at films.  I asked

10   Dr. Quint what I consider to be a very, very, very important

11   question and I am going to read it to you because you heard

12   it yesterday.

13          "Q   What I'd like to know, Doctor, about your

14              testimony here today is, are you giving any

15              testimony to this jury as to your opinion as to

16              whether or not Mr. Waskowski was injured in the

17              automobile collision of December 23, 2009?"

18   And his answer,

19          "No, I am not."

20   You can take this and put it right there.  He's not giving

21   you an opinion.  He's not giving you an opinion on anything.

22   He never examined him.  So who's left?  Who's left?  Because

23   he's not giving you an opinion.  He made it very clear.

24          Dr. Geiringer.  That's the only guy left.  Dr.

25   Geiringer is a hired gun.  Dr. Geiringer makes a side income,

30

*Plaintiff's Closing Argument*

 1   if you do the math, based upon what he said, doing during a

 2   side job, these IMEs, $400,000 a year just doing IMEs.

 3          Dr. Geiringer is the only witness that they've got

 4   at all about this question on the verdict form about injury.

 5   And, of course, Dr. Geiringer doesn't think Mr. Waskowski was

 6   injured.  His diagnosis is malingerer.

 7          And at Dr. Geiringer's deposition, I asked him --

 8   I'm real careful, I was real careful to ask the question.

 9          "Did you look at all these other doctor reports?

10          Did you look at Glowacki, do you agree with him?

11          No.

12          Do you agree with Dr. Zamorano?

13          No.

14          Do you agree with Michael -- Dr. Michael Donahue,

15          orthopedic surgeon?

16          No.

17          Do you agree with Dr. Lodzinski?

18          No.

19          He examined plaintiff and you don't know?

20          He's not injured.

21   And then I asked him this question, "Dr. Geiringer, there's

22   one other doctor I'd like to ask you about, Dr. Endress.  Dr.

23   Endress reached certain findings, Dr. Geiringer.  Dr. Endress

24   was an IME doctor like you, Dr. Geiringer.  Do you agree with

25   him?"

*Plaintiff's Closing Argument*

1          And just so I can be accurate, here is his

2     deposition, question and answer.

3          "Q   So you don't agree with Dr. Endress who

4          performed an independent medical examination on

5          him?

6          A    I do not."

7     If you were to ask me -- when you go back to deliberate, if

8     you were to ask me, these are all important exhibits.  Here's

9     the one I want you to look at, please, Exhibit R.  Exhibit R

10    is the smoking gun.  This is the one they don't want you to

11    see, because this is their own doctor saying he's injured,

12    that he's got the herniated discs, that it's from the

13    accident, that he needs to keep treating, that he needs to

14    keep taking the medication.  Look at it, that he needs the

15    household help.

16         And they didn't like that and they went to Dr.

17    Geiringer.  And they're very clever.  They went to Dr.

18    Geiringer so that he could say there's no injury.  Do you

19    want to know why?  Because if they can get you to believe Dr.

20    Geiringer and you put "no" to this first question, do you

21    understand it's all over for Mr. Waskowski?  It's over.  He

22    can never -- if you put "no" to this, he can never again go

23    back to them.  Not only will he get nothing now, but he can

24    never go back to State Farm and ask for one more penny if you

25    put "no" to that.

*Plaintiff's Closing Argument*

1    And that's why they needed Dr. Geiringer.  He says

2  he's a malingerer.  Do you know what one of the jury

3  instructions was that you just heard?  That you're to use

4  your common sense.  You saw Mr. Waskowski take that stand.

5  You saw his family.  Does he look like a malingerer to you?

6    And then I've got to ask you the question,

7  malingerer?  To go through all of this on a whim and a prayer

8  that, "Oh, maybe I'll get something out of it"?  Who in their

9  right mind would ever deliberately malinger to go through

10  this?  You would have to have you head examined, as far as

11  I'm concerned.

12    It doesn't make sense.  He hasn't sued before.  He

13  was a hard worker.  He loved his job.  He didn't want to get

14  hurt in this accident.  And he paid for these benefits.  So I

15  hope you put "yes" for one and two.

16    And then we move to the third question on your

17  verdict form which asks, "Were allowable expenses incurred?"

18  Now, just so you understand, for question number three we're

19  dealing with the medical bills, the attendant care and the

20  prescriptions.  These are the three items that are covered

21  under question number three.

22    And for question number three, I would ask you to

23  award Mr. Waskowski $40,641 because those are his outstanding

24  medical bills, which consist of his bill with Dr. Glowacki,

25  the balance due to Euro Rehab and the MRI testing at Oakland

*Plaintiff's Closing Argument*

1    MRI.

2          I would ask you to put $108 for the prescription

3    that he's got that is due and owing, and the attendant care,

4    calculated at 12 hours per day based upon multiple doctor

5    scripts, since the date of cutoff, so it would be from

6    11/21/10 to the present, 12 hours a day, $15 per hour, is

7    $132,996.  That's what I would ask you to put for question

8    number three.

9          As for question number four, did he sustain a work

10   loss, I suggest to you that he does, and that the work loss

11   is $2,908.80 per month, which is what he was being paid,

12   based upon the percentages by State Farm.  We know the date

13   of the cutoff, right here, when they stopped.  So from 3/8/11

14   to the present, it's $61,084.80.  That's the amount that I

15   would ask you to put for his wage loss.

16         As for the replacement services, that's item number

17   five, replacement services are also called household help.

18   And again, if you do the calculation at $20 per day from the

19   date of cutoff to the present is $15,800.

20         The last issue is the interest.  Now, we know from

21   what we heard at trial, that in the past, State Farm was late

22   in paying, because I asked Ms. Kucharski, and they had paid

23   interest in the past.  They're late on all of these benefits.

24   So I would ask you to award statutory interest of the

25   $30,075.57.

*Plaintiff's Closing Argument*

1          That concludes my closing argument.  When this trial

2     began, I stood in front of you and I gave an opening

3     statement, and I told you then what we were asking for.  It's

4     the same figure now.  And all of these items were established

5     through the witnesses that you heard at this trial.

6          In conclusion, this is the smoking gun, Exhibit R,

7     because this is the first IME doctor who agrees with all of

8     his treating physicians.  And three times he wrote this

9     report, his reports to Terri Page.  And they had to get rid

10    of him because he was not giving State Farm what they wanted

11    to hear.

12         I hope that I have -- because we can't ask you -- I

13    hope that I have addressed all of the issues.  I tried to.  I

14    hope that we have presented the case in a straightforward

15    fashion to you.

16         And again, I am absolutely convinced that you're

17    reasonable people, you know, as a collective body, which is

18    certainly better than one person deciding.  If you look at

19    all of this evidence, which is all of the truth, I'm

20    convinced you're going to give a verdict to Mr. Waskowski for

21    that amount.  Thank you, very much.

22         THE COURT:  Thank you, Mr. Temrowski.

23         Mr. Hewson, are you ready to proceed with your

24    closing?

25         MR. HEWSON:  If I could just have one moment of the

*Plaintiff's Closing Argument*

1    Court's time to approach the bench at sidebar, just to

2    address one issue very briefly, before I do my closing?

3              THE COURT:  Sure.

4              MR. HEWSON:  Thank you.

5              (Sidebar conference held on the record and out of the

6              hearing of the jury)

7              MR. HEWSON:  Your Honor, you struck any

8              evidence of the Social Security disability.  You

9              didn't allow them to get into it.  You instructed

10             the jury not to follow it and he sat here and told

11             the jury that Ms. Kucharski told Mr. Waskowski to

12             go and get Social Security disability.  You ruled

13             on that and he commented on it anyway.

14             I believe that -- I don't know how to comment

15             on it in my closing.  I may need a direction from

16             the Court that you had stricken that testimony and

17             that it's improper to argue from it.

18             THE COURT:  Is that what you did during

19             trial?

20             MR. HEWSON:  Yes.

21             THE COURT:  How do I sustain the objection?

22             It's not --

23             MR. HEWSON:  I'll defer to whatever the Court

24             thinks is best.  I just want to make the record.

25             THE COURT:  It would have been nice if you

*Defendant's Closing Argument*

1           would have made the objection during the --

2                 MR. HEWSON:  I hate to do that during

3           closings.

4                 THE COURT:  Is it okay if I just say that the

5           fact that Ms. Kucharski directed Mr. Waskowski to

6           consider Social Security disability.  You are not

7           to consider it all in how you handle the case and

8           --

9                 MR. HEWSON:  That's fine.  That's fine,

10          Judge.  Thanks.

11          (Sidebar conference concluded)

12                THE COURT:  Okay.  Before Mr. Hewson starts with his

13     closing, I have a real short instruction, okay?

14                The fact that Ms. Kucharski may have directed the

15     plaintiff, Mr. Waskowski, to apply for Social Security

16     disability benefits is not relevant to this case, to your

17     evaluation of this case, and you cannot allow that to enter

18     into how you view this case at all.

19                Do all of you understand that?

20                THE JURY:  Yes.

21                THE COURT:  And will you follow my instruction?

22                THE JURY:  Yes.

23                THE COURT:  Are both of you satisfied with the

24     Court's instruction?

25                MR. HEWSON:  Yes, Your Honor, I am.  Thank you.

*Defendant's Closing Argument*

1          MR. TEMROWSKI:  Yes, Your Honor.

2          THE COURT:  Okay.  Mr. Hewson, you may start.

3          MR. HEWSON:  Thank you.

4          Good morning.

5          THE JURY:  Good morning.

6          MR. HEWSON:  Thank's for being here.  You had other

7     things to do.  You swore an oath to come here and do your

8     job.  You have done your duty.

9          And now you have the right to demand that the rest

10    of us do our duties.  You have the right to demand that the

11    people that come in here and ask you for relief and justice

12    come in here and tell you the truth.  You have a right to

13    demand that.

14         You have a right to expect that they will respect

15    the sacrifice you have made in order to demand the justice

16    that they claim they are entitled to.

17         But if they come in here and they violate their

18    oaths and they tell you things that are grossly untrue and

19    they betray what you have done here, they are not entitled to

20    that relief.

21         The entire crux of this case is credibility; who do

22    you believe, how much of what they tell you will you believe,

23    does any of it make any sense in light of what you have been

24    told?  And I submit to you that the plaintiff's case is

25    incredible in a way that is hard to describe.

*Defendant's Closing Argument*

1            But one of the things that -- you have to hold us to

2    what we tell you.  I invited you to do that at the beginning

3    of the case.  And one of the things you were just told is to

4    look at Dr. Endress' report, the smoking gun, and he agrees

5    with Dr. Glowacki and this is the case.  I think that's what

6    you were told, right?

7            And you were told -- I think it's on here

8    (indicating).  I don't know.  I didn't get a chance to see

9    this.  Plaintiff has a torn left rotator cuff.  That's what

10   it said.  That's right there.

11           Look at the exhibit, November 16, 2010.  Oh boy, I

12   don't know if I can get it big enough.  See if I can.  There

13   is no evidence of a frank rotator cuff tear.  That's what it

14   says.  What is this?  That's not the truth.  That's what the

15   evidence says.  This is what the report says.

16           Maybe, maybe, you should pay attention to this

17   report.  Question seven on the report says, "I do not think

18   he needs any attendant care," as of November 16, 2010.

19           If this is the smoking gun, if this is the crux of

20   their case, apparently they're giving up their claim for

21   attendant care, huh?  Because that's not what the Doctor

22   said.

23           Dr. Endress did not have, according to Terri Page,

24   the films of the MRIs.  You know what else he didn't have?

25   He didn't have the Oakland MRI.  The Oakland MRI occurs

*Defendant's Closing Argument*

1    approximately six months after Dr. Endress does his review.

2            Do you remember Dr. Quint's testimony when he said,

3    "The films look the same to me but the reports are

4    different"?

5            The Oakland MRI report, when you look at it and you

6    can and will, says, if I can put my hand on it right here,

7    and hopefully I can get this big enough for you to read it,

8    but you can certainly look at it.  It's Exhibit Five.  There

9    is a couple of copies of it in there.

10           "This report of the current MRI of the cervical

11           spine is significantly different when compared to

12           the previous report.  There is no bulging of the

13           disc at C2, C3 level or spinal stenosis at C4 and

14           C5 levels as described in the previous report.

15           Previously described bilateral foraminal

16           stenosis or narrowing is not confirmed in the

17           current exam, except at C5, bilateral C5

18           neuroforamina and disc herniation at C4, C5."

19   This report directly contradicts what the other the report

20   was.  How are you going to figure it out unless you talk to

21   somebody with the quality of Dr. Quint to say, "What's going

22   on.  We have two separate reports here.  How do we resolve

23   these?  This one criticizes the other one.  How are we

24   supposed to understand?"

25           You go ask a guy like Doug Quint.  A hired gun?  Was

*Defendant's Closing Argument*

1    that phrase used in the same reference as Dr. Quint, who is

2    the chief of neuroradiology at the University of Michigan

3    Hospital, Dr. Quint, whose curriculum vitae, this document

4    which you are entitled to look at, this is what he has done

5    professionally in his career.  Is he worthy of your belief?

6    Does he have the right for you to believe him?  I mean, what

7    else have you got to do?

8         He said there's no traumatic injury to this man's

9    spine.  That's what he said, no traumatic injury to the

10   spine.  He's got degenerative changes, but that's all it is.

11        Who do they have to counter Dr. Quint?  They have

12   Dr. Glowacki.  I'm going to talk about that in just a second.

13        And I wanted to -- I heard my brother counsel say to

14   you, the real question here is why benefits were terminated

15   and how the claim was handled.  Now, if I say something to

16   you that you don't recall or if I say it to you wrong, trust

17   your own memory, but I believe that's what he said to you.

18        And, you know, I was reading the jury instructions,

19   you guys were reading them too.  We were flipping through

20   page by page, and I didn't see a word in these jury

21   instructions that you read that said, "Hey, this is about the

22   claims handling at State Farm" or "This is about whether or

23   not benefits were terminated properly," because that's not

24   what his burden of proof is.

25        His burden of proof is laid out in the case.  And

*Defendant's Closing Argument*

1    the way that his burden of proof has to be communicated by

2    you to us is in that verdict form.  That's where it has to

3    be.

4            And I was looking at the whole situation and trying

5    very hard to concentrate and listen at the same time that I'm

6    writing things down, but if you take a look at your verdict

7    forms, I was taking a look at the last part of the verdict

8    form to start with, interest.  Because I think the demand is

9    for $30,075.57.  Now, interest, as I understand it is

10   calculated at the rate of 12 percent simple, which means you

11   take 12 percent times the amount and you come up with a

12   figure.

13           I did that last night.  I saw what that was.  That's

14   actually 12 percent interest for one year, okay?  The

15   instructions you will see on the form you have stated that

16   the interest begins to get calculated 30 days after State

17   Farm gets proof of the fact of the amount of the loss,

18   reasonable proof, right?

19           Now, didn't my brother counsel tell you and didn't

20   the daughters admit that this stack of documents wasn't

21   submitted until November 19, 2012, that they didn't run these

22   off until the last minute, right?  And we've never seen them

23   before?  These aren't even 30 days old, ladies and gentlemen.

24   These aren't even 30 days old.  If they are not 30 days old,

25   how do you get any interest on, what, $132,996?  You don't.

*Defendant's Closing Argument*

1            They told you they haven't submitted any form since

2    May of 2011, and now they're bringing it all up to date?  So

3    how do you get interest on that?  You don't.

4            The wage loss issue they want interest on,

5    Ms. Kucharski and Ms. Page both told you that the reason that

6    they were looking at the wage loss is because they didn't

7    have the income tax returns.  Do you recall that testimony?

8            They said they asked for the income tax returns and

9    they never got them.  And, in fact, the first time I ever saw

10   them is in Exhibit Two, my Exhibit Two, June of 2012, when

11   Mr. Waskowski finally produced his income tax returns.

12           Now, what do they have to counter Ms. Page and

13   Ms. Kucharski?  What they have is this.  They have him, "I

14   sent these to them."  Do you remember that?  That's what he

15   said.

16           "Well, do you have any evidence to support that?  Do

17   you have a letter to support that?

18           Why, no.  No, I don't have any of that, but I sent

19   them.

20           Well, when did you send them in?

21           I don't know."

22   This gentleman is the only proof that he ever sent that tax

23   return in.  This is the same guy that sat here and told you

24   under oath that he called the State Farm agent to find out

25   that attendant care was paid at $15 hour, when he had told me

*Defendant's Closing Argument*

1    in his deposition that he had talked to his attorney.  Do you
2    remember that piece?
3               "How did you arrive at $15 per hour as the price
4               to pay your daughters for helping you with your
5               personal care?
6               When the insurance stopped paying me.  Then I went
7               to my attorney and he told me the prices that
8               should be paid."
9    Do you remember that?
10          And then he said, well, he was covering or agreeing
11   with or something.  His attorney told him that was the same
12   as the agent.
13          But then I refreshed this gentleman's recollection
14   as to when he actually had an attorney.  It wasn't after the
15   claim was denied.  He was at his attorney's office March 15th
16   of 2010 and they sat here and told you that they had not --
17   he did not have representation during that whole period of
18   time.  He did this claim on his own.  It's fabrication.  It's
19   totally made up.  It's not worthy of your belief.
20          This is the man you have to believe when he looks at
21   you and he says, "I sent in the wage loss forms, the tax
22   returns."  He didn't.
23          I looked at the household help claim -- I'm sorry,
24   the attendant care replacement services claim.  When you take
25   a look at those, and you can, and I know there's been a lot

*Defendant's Closing Argument*

1    of talk about this, but when you get to those questions, I'm

2    going to ask you to look at what's actually said on those

3    forms.  We're going to talk about that some more.

4         But if you don't submit the forms for the attendant

5    care and replacement services, and you don't submit the wage

6    loss claim and you don't submit the medical bills, did you

7    hear from anybody when the Oakland MRI bill was sent in?  I

8    didn't.  If you did, please trust your memories, not mine.

9         But who said that that Oakland MRI was related to

10   this accident?  Who told you that?  You didn't hear from Dr.

11   Zamorano whose name is on the thing, and said, you know, let

12   me tell you why I did that.

13        You know, one of the reasons you didn't hear from

14   Dr. Zamorano and they didn't call her is because, do you

15   remember what Dr. Geiringer said when he was looking at Dr.

16   Zamorano's reports?  And it was in Dr. Geiringer's reports.

17   He said that she was charging $2,000 for a $100 item.  He

18   said that she charged $8,000 for a $1,500 EMG of all four

19   limbs.

20        He said that there was no way that a person can have

21   four out of five muscle strength in all four limbs or do an

22   all-four limb EMG and be legitimate.  And she did an unlawful

23   act by selling goods apparently to Mr. Waskowski, out of her

24   office.

25        So why isn't she here to tell you?  I have an idea.

*Defendant's Closing Argument*

1    I would love to have had a chance to have cross-examined her,

2    but see, I don't have the burden of proof.  They have the

3    burden of proof.  So you didn't hear from Dr. Zamorano.  So

4    they want 12 percent interest on a $29,000 MRI bill.

5            This is where you start breaking down what evidence

6    really is.  Now, we're not just talking about, "Oh, it's the

7    big bad insurance company who mishandled the claim and they

8    picked on this poor man and he didn't have a lawyer."

9            Now we're talking about, I swore an oath.  I walked

10   in here, I looked at you, I swore an oath and I am going to

11   tell you the truth.  That's what he says.

12           Now, I look at the replacement services forms.  They

13   are never signed by Margaret.  You can take a look at them.

14   Margaret never signs them.  She says she did them with

15   Kamila.  I don't know.  To get 20 bucks does it take a half

16   hour to take out the garbage?  I mean, your common experience

17   in the ordinary affairs of life is something you can bring to

18   bear on these facts and this law to decide whether you

19   believe these folks.

20           Take a look.  One item, they want $20 for the

21   garbage.  Okay, they want $20 for the garbage.  What did

22   Terri Page say?  Terri Page said, "I don't know.  I don't

23   know what goes on in their house.  I can't call them a liar."

24           Do you remember that testimony?  She said, "I can't

25   call them a liar.  I'm doing trying to do the best I can to

*Defendant's Closing Argument*

1    adjust this claim.  You know, I've got to believe these

2    folks."

3            Imagine if she was put in the position of having

4    this guy every time on her claims.  If she believed -- if she

5    transposed Mr. Waskowski into the rest of her claimants,

6    nobody would ever get paid because you couldn't believe

7    anything they said.  She can't do business like that.  Those

8    two ladies can't to business like that.  State Farm can't do

9    business like that.  You have to believe someone for a while,

10   until they prove or give you a reason that you can't believe

11   them.  And now we have that reason.

12           You know, the other thing, too, I was thinking about

13   this this morning, what advantage you have, and I guess I

14   have too, is Dr. Endress, all the rest of these doctors,

15   don't have the ability to cross-examine these people and see

16   whether or not they believe them and whether or not they're

17   telling you the truth.  They don't have that.  They take them

18   on their word.

19           Terri Page takes them on their word.  They say, "Oh,

20   yeah, we've got discs in the neck.  We've got discs in the

21   low back."

22           Where's the symptomatology that goes along with

23   them?  That's a real problem.  You can look in there.  Dr.

24   Broder did an EMG, you know, that lousy test that just lines

25   the pockets of the doctors.  Dr. Broder did an EMG and found

*Defendant's Closing Argument*

1    nothing wrong, other than carpal tunnel syndrome possibly in

2    the left wrist.  Nothing in the arm, nothing in the shoulder,

3    nothing in the hands, nothing in the legs, nothing, no

4    findings to show that there's any disc involvement.  You can

5    read the report.  It's perfectly normal.

6         So how do you get where we're going now?  In order

7    to have wage loss, you've got to be deprived of the ability

8    to work because of your injuries from the accident.

9         Dr. Wietrzykowski said, "I'm not going to disable

10   this gentleman from driving."  That's what it said.  You can

11   take a look at it.  I'm not making that up.  I'm not making

12   any of that up.

13        But this then, this wage loss claim, you can do the

14   arithmetic.  I thought it was pretty simple arithmetic myself

15   and I have made mistakes before.  Sister Agatha would be

16   brokenhearted if I screwed up the mathematics of this.

17        But this attempt to say that my income tax returns

18   don't say that I earned $25,933, and they're in evidence, is

19   preposterous.  That's what it says.  That's my income.  You

20   divide the income, you multiplied it by 85 percent, which is

21   what your jury instruction form says, he's paying $2,908.80.

22   He's been overpaid $1,071 a month, $16,000.

23        In spite of the simple arithmetic, ladies and

24   gentlemen, does he change his claim and say, "You know,

25   you're right.  Mr. Hewson, sister Agatha would be proud.

*Defendant's Closing Argument*

1    You've got these -- it should have been, you know, $1836, all

2    I really want is $1836.  That's what I really want."

3          Because didn't he tell you, I don't want anything

4    more than that I am entitled to be paid.  I think he looked

5    at you and said that.  Well, that's not even close to the

6    truth.  He wants a heck of a lot more than he's entitled to

7    be paid, assuming he's injured enough not to work.

8          And my brother counsel posed the question to you,

9    "Why didn't they ask for the money back?"

10          You know, we -- the only thing you get to look at is

11   the evidence in this case.  That's all you get to look it.

12   But take a look at those jury instructions again.  I believe

13   the Judge told you that the prior payment of any benefits

14   doesn't mean that State Farm has agreed that it's liable for

15   anything, because they didn't.

16          The fact -- if the Judge had said to you, "You know

17   what, the fact that they paid before, the fact that they

18   didn't ask for the money back, that means they win," then I

19   wouldn't be standing here talking to you.  That's not what it

20   means.

21          Because up until the time of this trial, up until

22   the time that Mr. Waskowski took the stand, there was no way,

23   no way to establish just how much he was going to

24   misrepresent and how much was going to sit here and tell you

25   things under oath that are patently untrue.One of the

*Defendant's Closing Argument*

1    things -- there's little things.  There's always little

2    things in a trial.  It's such a dynamic proceeding.  Things

3    are happening.  And if you're telling a lie, you can't cover

4    all the pieces of a lie.  You know, parts of it stick out.

5    It's like trying to squeeze Jell-O.  One of the things, when

6    we were watching Dr. Quint, who I -- I love the guy just

7    because he's like a teacher, he makes me sound like I know

8    what I am talking about.  But when I'm watching Dr. Quint --

9    and I ask you if you remember this. Do you remember when he

10   talked about the incremental x-rays that were done in March

11   of 2011?  He said there were incremental x-rays that involved

12   various positions of the head.  Do you remember that he

13   talked about that?  And he did this (indicating).  He was

14   sitting there and he said they take one with his neck fully

15   down and they take one with his head fully back.  That's what

16   he said.  And it didn't dawn on me until I was looking at and

17   going, "He can't move his head.  He can't move his neck."  He

18   sat here and told you he can't move his head at all.

19          And yet, when they took these x-rays, when he didn't

20   think anybody was looking, when he didn't think the why all

21   the way through, he was able to do this (indicating) and he

22   was able to do this.  Huh, I wonder how they did that?  When

23   he didn't know that it was going to be reported, he did this

24   on January the 7th of 2010.  When he didn't know it was going

25   to come to this trial, he did this in January of 2010 with

*Defendant's Closing Argument*

1    his physical therapist.  And his physical therapist sat

2    here -- I know it must have looked a little silly for me to

3    be walking around and doing this.  The point was, he sat here

4    and told you -- he looked right at you and he said, "I

5    couldn't move my arm at all.  Physical therapist as wrong."

6           How can that be true?  Well, maybe the physical

7    therapist is wrong.  Maybe he is -- maybe it's been this way

8    the whole time.  Maybe he just can't move his arm.

9           But I suggest to you that's not true.  I suggest to

10   you it's not true.  When you look at -- when you look at his

11   presentation, just observing him and what he can do, there's

12   never been any question that he had a gait problem or that he

13   fell.  But with all the shuffling around the -- you know, the

14   walking and hanging on to things, why don't you get a cane?

15   Why don't you get a cane, why don't you get a walker, why

16   don't you get something?  Why don't you turn to your doctor

17   and say, "I need something to help me stabilize"?  Well, wait

18   a minute, if I do that, then I don't have an excuse to ask

19   State Farm to continue to pay for my daughters to walk me

20   around if I have a cane or I have a walker.  I won't have an

21   excuse."

22          Now, bathing yourself.  Now, I don't know, I was

23   thinking about the shower thing and washing your back and I

24   was trying to figure out, if you don't have a -- I mean, a

25   normal person, how do you wash the middle of your back?  I

*Defendant's Closing Argument*

1    mean, I can't reach it.  Maybe other, more flexible folks

2    can, but I can't do it.

3           But he wants his daughters to be paid for washing

4    his back.  And I tried not to bring that up too much with

5    Kamila.  I mean, that one just troubled me, it really did.

6    And this idea that he's showing in his underwear and his

7    daughters are showering him is -- but they brought it up.

8    They brought it up.

9           And it occurred to me, and this is another one of

10   those things where I just went, "Okay, they're embarrassed

11   because he's in his underwear.  You don't want to see your

12   father naked.  I can certainly understand that."  But if

13   you're -- if he's telling the truth and he can't bend over

14   and he can't move his arm, and he can't -- how is he getting

15   his underwear on in the first place?  How is he doing that?

16   I can't get over far enough to pull my underwear up so I am

17   not embarrassed, but I can't stand in there and wash my feet

18   and my legs in the shower?

19          Ladies and gentlemen, it's a fabrication.  It's a

20   complete fabrication.  Mr. Waskowski told us that he bathed

21   himself after six months.  You said that on the screen.  As a

22   matter of fact, he denied that when he was sitting here,

23   because he was under oath at the time of his testimony.  And

24   here it is, page 37, I asked him.

25          "Are you any better?

52

*Defendant's Closing Argument*

1           Yeah.

2           What can you do for yourself?  Can you bathe

3           yourself?

4           Yes.

5           Have you been able to bathe yourself since the

6           accident happened?

7           At the beginning, no.

8           How long were you unable to bathe yourself?

9           Around six months.

10          Do you take baths, do you take a shower?

11          Yes, shower.

12          Why couldn't you take a shower?"

13   He takes a shower.

14          Did he say to you that he could get in the bathtub

15   and sit down and bathe himself?  Isn't that the excuse he

16   tried to give you, "I can sit in the bathtub and bathe

17   myself, but I prefer to take a shower."  I think that's what

18   he said.  "I couldn't bathe myself for six months."  That's

19   what he told you.

20          What did Kamila tell us?

21          "Was your father able to bathe himself?

22          Yes, but he says it caused him pain.

23          Did he tell you where?

24          Around the shoulder area.  But it took him a

25          longer time to do it normally.

*Defendant's Closing Argument*

1          How long would that be?

2          I want to say it would have been about 20 minutes

3          or so.

4          Is that a longer time?  Is that what you're

5          telling me, a normal period of time would have

6          been ten minutes?

7          Before the accident, yes.  I'm sorry -- before the

8          accident, yes, it took him about 20 minutes.

9          After the accident, yes.

10         That was by himself?  Yes.

11         If you were filling out the forms with your sister

12         every day, and you're putting things in as they're

13         actually being done, how is it that you come to a

14         mistake of that nature, six months he was able to

15         bathe himself in ten minutes before the accident,

16         20 minutes after?"

17    And now they want to be paid for an hour.  Kamila admitted --

18    "I couldn't have done it."  And by the way, this new theory

19    that Margaret is now the only one doing it, she doesn't sign

20    the forms, any of those forms until March of 2010.

21         This is not true.  It's just not true.  And they

22    should have told us that before or maybe Margaret should have

23    told you, "I bathed him for the first six months all by

24    myself and Kamila never did."  That's not true.  That's just

25    not true.

*Defendant's Closing Argument*

1          The other thing -- I'm watching my time.  The other

2     thing here is that this attendant care payment that they

3     want, this $15 or $12 or $13 an hour, there's a word that the

4     Judge gave you, the word is incurred.  Did you understand

5     that the daughters were telling you about how the money was

6     supposed to have been paid?

7          Do you believe that they were actually receiving any

8     money for this at all?  I suggest to you that it is not

9     worthy of your belief.  They both testified that he would get

10    some money, he would give them some money and that they would

11    give it back to him to pay bills.  Now, that's my

12    recollection of the testimony.

13         He never refuted that.  He never said that wasn't

14    the way it was.  What was really amazing was that he had told

15    us on pages 62 and 67 of his deposition, and you can see it

16    in the interrogatory -- I'm sorry, the request for production

17    of documents, which is Exhibit Three.

18         I sent him these -- this is what we do in court.

19    He's obliged to answer these, answer these and produce

20    documents.  It's simple enough, request for production of

21    documents, tell us what you're doing.

22         I asked him, "Please provide a copy of all the

23    documents reflecting payments to your daughters which you

24    claim to have kept at home on a piece of paper on pages 67

25    and 68 of your deposition."

*Defendant's Closing Argument*

1          That's what he told us.  He said, "I am presently

2    unable to locate this document.  I will keep looking for it.

3    And if I find it, I will immediately send it to you."

4          On December the 28th of 2011, he testified that he

5    had this document that showed how much he actually paid his

6    daughters.  That's what he said under oath. I have this

7    document, I kept this document.  We've never seen it.  And

8    it's his job to give it.  We've never seen it.

9          Has he really incurred an attendant care

10   responsibility?  Does he owe them any money?  Are they going

11   to sue him if he doesn't pay them?  They don't even know how

12   much the claim was.  They don't even know how many hours that

13   they worked.  They don't know how many dollars were involved.

14   It it's like a job, you reported his income.  Neither of them

15   did that.

16         And I'm willing to bet that everybody that works and

17   has a job knows what their pay is, you know how much you're

18   owed.  I'm pretty sure.  I always know enough to look at my

19   paycheck and say, "Huh, that's the right amount."  None of

20   them know, because all the money went back to him.  This is

21   just a cash cow for him to move forward and to try and take

22   benefits he's not entitled to.  And he is not shy about that.

23         He told you that in the July 9th accident, he was

24   not hurt.  And even though it was only five days worth of

25   benefits, he took five days worth of wage loss for that last

*Defendant's Closing Argument*

1  accident when he knew he wasn't entitled to it.

2  You know, there's that old joke.  We know who you

3  are, now we're just talking, negotiating price.  That's

4  exactly the situation that we have here, whether it's five

5  days or the remaining two and-a-half years.  He's asking for

6  things he's not entitled to.

7  There is zero injuries on the police report.  There

8  is no ambulance.  Do you believe that if he had been hurt, he

9  wouldn't have asked for help?  I suggest to you that's

10 incredible.  He went to the emergency room after the July

11 accident.  He didn't go this time.  And, you know, he told

12 you, he looked at you and he told you that the reason he

13 didn't go is because Christmas is a three-day Polish holiday

14 and you don't miss that kind of thing.

15 Now, I understand the holidays are important, but

16 thank God he didn't have a heart attack, you know?  Would you

17 have stayed home for that?  No.  He doesn't go to a doctor

18 for six days, six days.

19 So what evidence do you have that he was injured in

20 this accident?  Dr. Wietrzykowski gave him the benefit of the

21 doubt at the beginning.  He did.  He says he doesn't need any

22 attendant care.  And you can look at the form.  Please do.

23 It's Defendant's Exhibit 8.  He gave him the benefit of the

24 doubt.

25 But all they really have is Dr. Glowacki and you saw

*Defendant's Closing Argument*

1    that testimony.  And you know, I suggested to you in opening

2    statement that it was obnoxious, and it was.  And he's just

3    an old pro.  You know, if he hollers at me, and he refuses to

4    answer the questions, and he insults all of you, and he

5    carries on the way that he did, and he crosses himself and

6    says I'm going to go get drunk, and he curses and does all

7    those things, he's doing his best to avoid having to answer

8    the real questions that he continually refused to answer

9    until the end.

10            And once he was pinned down, what did he finally

11   say?  "I made up those hours.  I made them up."  You saw it.

12   The other thing that was so amazing to me was that he

13   actually sat there and said, "I will continue to write

14   prescriptions for treatments that don't work as long as the

15   patient comes to me.  And I will write the orders that are

16   necessary for people to collect insurance benefits."  That's

17   what he said.

18            Is he worthy of your belief?  Because he is the

19   lynchpin of their case.  If you don't believe him, if you

20   don't believe that diagnosis, there is no evidence of an

21   injury.  And that's the first question and the second

22   question and you should answer it no.

23            Dr. Geiringer is a board certified physical medicine

24   rehabilitation specialist.  And you want to compare him to

25   Dr. Glowacki?  You want to call him names, call him a hired

*Defendant's Closing Argument*

1    gun, make fun of him, talk about how much money he makes?

2         Take a look at his curriculum vitae.  Did he explain

3    to you why he thought Mr. Waskowski was a malingerer?  We

4    talked about it at the beginning.  This gentleman has been

5    sitting with his back and his hips at a 90 degree angle in

6    this chair the whole trial.  There is no difference between

7    this and laying down and doing this.

8         He couldn't lift his legs five degrees when Dr.

9    Geiringer tested him, but when he was sitting on the side of

10   the table, he could get his legs to 80 degrees.  You can't

11   have it both ways.

12        There is no medical condition known that explains

13   numbness in the entire left arm.  There is none.  Have they

14   told you what that was?  Did Dr. Glowacki explain any of that

15   to you?  Did Dr. Glowacki even diagnose numbness of the

16   entire left arm?  He did not.

17        Malingering is a strong word.  It really is.  It's

18   faking, it's faking.  It's intending to do that.  But how

19   else do you explain not being able to move your head when

20   your own physical therapist says you can move your head.  How

21   do you explain this (indicating) and this maneuver, when he

22   says he says he can't do it at all?

23        How do you explain the physical therapist

24   continuous, repetitious, "He's getting better, he's reached

25   his short-term goals and some of his long-term goals," which

*Defendant's Closing Argument*

1    is what he's told Terri Page through the entire case, and yet

2    he can't even move?  If none of those things can be believed,

3    how do you find that there's an injury.

4         You know, Dr. Geiringer said an interesting thing,

5    among a lot of things.  But one of the interesting things he

6    said was, you know, he probably got banged around in the

7    accident.  You know, he probably got bumped around and shaken

8    up a little bit, and the doctor is trying to give him the

9    benefit of the doubt.

10        And everybody has been trying to give him the

11   benefit of the doubt, but nobody has had the experience of

12   this trial.  Nobody has had the ability to watch him testify.

13   Nobody has had the ability to watch him claim he couldn't

14   understand English when I asked him that question about

15   bathing himself.  "I didn't know what you meant by 'can you

16   bathe yourself?'"

17        Having had the ability to perceive what happened in

18   this trial, I suggest to you there is no evidence upon which

19   to say there is an injury.  He has not told you the truth.

20   When you go back to the jury room, take a look at the verdict

21   form.  If you are convinced as I am that there is no injury

22   here, say no.  On the first question, say no, sign the form,

23   turn it back in.

24        Because Mr. Temrowski and I agree on one thing, this

25   has got to come to an end.  The only way to tell Mr.

*Defendant's Closing Argument*

1    Waskowski that you can't come in here and do this, that you

2    can't try and pull this off, is to tell him we know you

3    didn't have an injury, we know that the doctors gave you the

4    benefit of the doubt, we know that these people tried to help

5    you.

6            And the last point is this, if he really was hurt,

7    if he was, why would you continue to treat, and treat and

8    treat for something that never helped you?

9            They want to talk about these second opinions.

10   Yesterday, for the first time, he sat here and the one

11   question I asked him and said, "I didn't know Dr. Donahue had

12   recommended another course of treatment.  I didn't know that.

13   Dr. Glowacki never told me."

14           The day before he said something completely

15   different, but that's what he said to you yesterday.  Why

16   wouldn't he go and try this injection therapy if he was

17   really hurt?  Why wouldn't he follow Dr. Endress' advice?

18   They had a copy of the reports.

19           Why wouldn't you go get that done?  Go have Dr.

20   Glowacki give you an injection in the neck, in the low back

21   if you're really that hurt?  Because that's going to hurt,

22   because it's a real treatment.  Because it's not a hot pack

23   on your neck and somebody rubbing your shoulders or washing

24   your back.  It's going to a place and getting a therapy that

25   could help you.  But if you do that and you're not hurt, it's

*Defendant's Closing Argument*

1     going to hurt.

2            In your ordinary experience in the ordinary affairs

3     of life, with all the medical facilities that are available

4     and all the people that are around, and all these other

5     recommendations that they're trying to wave around, wouldn't

6     you do something if you couldn't move your head and you

7     couldn't lift your arm?

8            I think that Mr. Waskowski should be held to the

9     same standard as the rest of us.  You go out, you try and get

10    better.  You don't try and maximize.  Car accidents when I

11    was a kid were always considered like, "Oh, man, that's

12    really bad."

13           This one, this isn't really bad for him.  This is

14    the opportunity to make money he's not entitled to make.  And

15    to come in here and try and convince you that he is injured

16    when he is not -- I want to thank you for your time.

17           Now, I know this will disappoint you greatly, but I

18    only get to speak to you once.  Mr. Temrowski gets to get up

19    and tell you why he thinks I'm crazy, or wrong or making

20    things up or I guess, throwing red herrings at you and

21    creating smoke screens.

22           And the hardest things for a lawyer to do is shut

23    up, I've got to tell you.  You know, I have been told on

24    occasion that I do my best work with my mouth closed.  And

25    I'm about to try and do my best work.

*Plaintiff's Rebuttal Argument*

1          But thank you sincerely for all the time you've put

2    in, and your patience in being here, and looking at all of

3    these exhibits and listening to all of these things.  And I

4    know that the oath you took, you took seriously and I know

5    you will do justice.  And I thank you for your time.

6          Thank you, Your Honor.

7          THE COURT:  Thank you very much.  Mr. Temrowski,

8    rebuttal.

9          MR. TEMROWSKI:  I'd start by saying that I totally

10   disagree with Mr. Hewson that a gentleman like Mr. Waskowski

11   would go through all of this just to make money or the hope

12   of making money.  Money for what?  His wage loss benefit is

13   over in a couple of days.  His $20 a day benefit is up in a

14   couple of days.  The three-year time limit is up.  He's got

15   nothing to gain out of the medical bills.

16          For the attendant care, care that goes -- money

17   that's supposed to go to his daughters?  Why would someone, a

18   sane, rational person go through all of this for that?  It

19   just doesn't make sense at all.

20          Now, as for Mr. Hewson's comments about Dr.

21   Glowacki, I watched his deposition just like you did.  And I

22   came away with a totally different impression of Dr.

23   Glowacki.  Dr. Glowacki has been -- he's a practicing doctor.

24   He's not a teacher, he's not a professor.  He has been an

25   orthopedic surgeon, as he told you, since 1960.  He has

*Plaintiff's Rebuttal Argument*

1    performed thousand of surgeries, laminectomies.  He treats

2    people.  He told you about how many patients he had seen that

3    day.

4            Dr. Quint isn't an orthopedic doctor.  He doesn't

5    treat people.  Dr. Geiringer isn't an orthopedic doctor.

6    Most of his practice is spent examining patients.

7            Dr. Glowacki is a real treating doctor, who you can

8    tell he didn't want to give that deposition, because he

9    doesn't do that.  He treats people.

10           Mr. Hewson talked about a cane or a walker.  I can

11   assure you, ladies and gentleman, that if Mr. Waskowski would

12   have come to this trial using a cane or a walker, we never

13   would have heard the end of it, that he's a fabricator, that

14   he's a faker, why has he got it.  You can't win with these

15   people.  No matter what you do, they've got a comeback for

16   everything.

17           The forms.  I'll go back to that.  He says they

18   weren't incurred.  You're rational individuals.  If the care

19   providers were cut off on this date and for four months are

20   keeping these records and sending them in to State Farm for

21   the household help, and for six months sending these records

22   in and aren't getting paid, why would you continue to send it

23   in?

24           And State Farm's argument, "But we didn't know Mr.

25   Waskowski was claiming that," are you kidding me?  They knew

*Plaintiff's Rebuttal Argument*

1    what his claims were.  They absolutely knew what his claims

2    were.

3           Dr. Quint, we talked about him.  And you will recall

4    what I asked Dr. Quint,

5           "Doctor, are you giving this jury any professional

6           medical opinion as to whether or not Mr. Waskowski

7           was injured?"

8    His answer was quite adamantly,

9           "No, I am not."

10   Now, if he would have answered my question to you, "Oh, yes,

11   Mr. Temrowski, I'm giving you an opinion about his injuries,"

12   that would be a different story.

13          But that wasn't his answer.  He did not give you an

14   opinion as to whether or not he was injured, and that's the

15   first question on your verdict form.

16          Mr. Hewson just told you that Mr. Waskowski's whole

17   case rests on Dr. Glowacki.  No, it doesn't, no, it doesn't.

18   And what was obviously quiet and silent for Mr. Hewson when

19   he gave his closing argument to you was these exhibits, the

20   MRIs, nobody talked about them.

21          You can read as well as I can.  Dr. Glowacki didn't

22   do these.  These were done at two different facilities.  Take

23   them back there, and as a collective body, look at what these

24   results are.  And you're going to tell me that this gentleman

25   wasn't injured in this automobile collision?  You can read

*Plaintiff's Rebuttal Argument*

1   for yourself what the diagnosis is.  I can read it.

2   Herniated discs, both places say the same thing.

3          And if that isn't enough, look at this exhibit from

4   Dr. Donahue, which is in here, and you'll recall that Dr.

5   Donahue, Mr. Waskowski went to -- well, it's in here

6   somewhere.  Dr. Donahue's report.  Read what he says when he

7   examined Mr. Waskowski and read what he thinks about the

8   MRIs.

9          So it's not true to say that plaintiff's case just

10  rests on Dr. Glowacki.  All of the doctors, even Dr. Endress.

11  And again, I just want to point out to you, if these are the

12  findings that Dr. Endress -- look at Exhibit R -- came up

13  with, what was State Farm's basis for not paying the wage

14  loss when Dr. Endress said he couldn't work?

15         Why at least, why at least wouldn't State Farm pay

16  up until July of 2011, when Waskowski goes to Dr. Geiringer?

17  Because the doctor he asked him to go to said he couldn't

18  work and needed the household help.  Why weren't they at

19  least paying up to that point?  But they didn't.

20         My time is up?

21         THE COURT:  No.  You'll be given a note that tells

22  you how much time you have left.

23         MR. TEMROWSKI:  As I've told you before, more than

24  anything on the face of this earth, State Farm wants you to

25  put "no" to that first question.  And the reason they want

*Plaintiff's Rebuttal Argument*

1    you to put "no" -- they know he was injured, these documents

2    show he was injured.  But if you put "no" to question number

3    one, they are done with Mr. Waskowski, bye-bye.  They never

4    have to pay him another penny.  They know that he's entitled

5    to these benefits, but they're banking on, hoping that you

6    will fall for all of that and put "no," so they don't have to

7    fulfill their obligation that Mr. Waskowski paid for.  Let's

8    not forget that.  He paid for these benefits.

9          Ladies and gentlemen, again, thank you very much for

10   your time and just please go back there and look at those

11   exhibits and I'm absolutely convinced you'll agree that Mr.

12   Waskowski is entitled to these benefits.  Thank you.

13         THE COURT:  Thank you, Mr. Temrowski.

14         All right.  Members of the jury, you've heard the

15   jury instructions, you've heard the closing arguments.  I'm

16   now directing you to go to the jury room and start your

17   deliberations.

18         Your first duty, your first obligation will be to

19   select your foreperson.  After you've selected your

20   foreperson, we will hand in this folder which has the

21   original verdict form and the original jury instructions.

22   That goes to the foreperson, okay?

23         After you have selected your foreperson, I'm going

24   to have you leave all your notes and your jury instructions

25   on the chair.  Take the notes back with you, but leave your

*Waskowski v. State Farm*

1    jury instructions on the chair.

2           After you have selected your foreperson and we

3    receive notice that you have selected your foreperson, we're

4    going to give you your individual jury instruction packets to

5    bring back to the jury room, okay?

6           Right here, we prepared an exhibit list.  And this

7    exhibit list has all the exhibits admitted during the course

8    of the trial.  And the exhibit list will go on the exhibit

9    table, which is right here.  So all the exhibits that have

10   been admitted into evidence are right here in front of you.

11   So we will get them all organized for you, in order.  So the

12   exhibit list will be right here if you want it and then all

13   the exhibits are on this table.

14          If you wish any or all the exhibits -- or any

15   particular exhibit, or series of exhibits or all the

16   exhibits, if you want to look at them, review them, study

17   them while you're deliberating, just write us a note.  We'll

18   give you whatever you want, okay?

19          So I guess we have one more -- Mr. Viau and Ms.

20   McCoy would you raise your right hand?  Do you solemnly swear

21   that you will keep all members sworn upon this panel in some

22   private and convenient place, and that you will permit no one

23   to communicate with them, nor communicate with them yourself,

24   except to inquire if they have agreed upon a verdict until

25   discharged by this Court, so help you God?

*Waskowski v. State Farm*

1          DEPUTY COURT CLERK:  I do.

2          COURT CLERK:  Yes.

3          THE COURT:  Okay.  So just follow Ms. McCoy back

4     into the jury room and you are to start your deliberations.

5     Again, first duty, first obligation is select your

6     foreperson.

7          DEPUTY COURT CLERK:  All rise.

8          (Jury out at 10:27 a.m.)

9          DEPUTY COURT CLERK:  Please be seated.

10          THE COURT:  So how about if we put joint exhibits

11     right here in order, plaintiff's exhibits right here in one

12     pile in order and then defendant's exhibits in another pile,

13     all in order, okay?

14          MR. TEMROWSKI:  Yes, sir.

15          MR. HEWSON:  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you.  Can you just

17     stick around for about ten minutes?  Because I figure we're

18     going to get a note regarding the foreperson.  And then when

19     I get the note, I'll ask you if it's okay to give them the

20     jury instruction packet, okay.

21          MR. HEWSON:  Okay.  I'm not going anywhere.

22          THE COURT:  Okay.

23          (Court in recess at 10:29 a.m.)

24          (Court in session at 10:36 a.m.)

25          DEPUTY COURT CLERK:  The Court recalls the matter of

*Waskowski v. State Farm*

1    Jaroslaw Waskowski versus State Farm Mutual Automobile

2    Insurance Company, case number 11-13036.

3            THE COURT:  Okay.  Got a question from the jury.  It

4    says -- as you know, they selected a foreperson.  Their next

5    question is, "Per page 20, should it be four instead of six?"

6    And --

7            MR. HEWSON:  The number of jurors to make the

8    determination?

9            THE COURT:  Yeah, it should be six, not four.

10           MR. HEWSON:  Yes.

11           MR. TEMROWSKI:  Correct.

12           THE COURT:  I don't know where they came up with the

13    number four.

14           MR. HEWSON:  I believe the only instruction, Judge,

15    might have said six of eight, but that was the only number

16    that's ever been mentioned at all.

17           THE COURT:  Right, right.  So it's six of seven.

18    Right?

19           MR. HEWSON:  Right.

20           MR. TEMROWSKI:  Right.

21           THE COURT:  Okay.  Let's bring them out and we'll

22    instruct them.  Oh, where's your client?

23           MR. TEMROWSKI:  Oh, he went to have a smoke.

24           THE COURT:  Okay.  We can't --

25           DEPUTY COURT CLERK:  I'll wait.

*Waskowski v. State Farm*

1           THE COURT:  Okay.  Let me know when he gets back.

2      He needs to get rid of his cigarette and come back.  Okay?

3           MR. TEMROWSKI:  Okay.

4           (Court in recess at 10:38 a.m.)

5           (Court in session at 10:49 a.m.)

6           DEPUTY COURT CLERK:  United States District Court is

7      back in session.  Please be seated.

8           THE COURT:  All right.  Jesse, could you get the

9      jury, please?

10          COURT CLERK:  All rise for the jury.

11          (Jury in at 10:50 a.m.)

12          COURT CLERK:  You may be seated.

13          THE COURT:  Let me deal with the note you sent at

14     10:35.  It reads, "Per page 20," which would be of the jury

15     instruction packet, you asked, "Should it be four instead of

16     six."

17          There are seven of you, okay, so when six of you

18     agree, when six of you agree, you've reached a verdict.

19     Okay?  So you don't need seven out of seven.  What you need

20     is six out of seven.  It's not four out of seven.  It's six

21     out of seven.  Okay.  Everyone understand?

22          Mr. Temrowski, you satisfied?

23          MR. TEMROWSKI:  Yes, Your Honor.

24          THE COURT:  Mr. Hewson?

25          MR. HEWSON:  Yes, sir, thank you.

*Waskowski v. State Farm*

1          THE COURT:  And I guess we have another note?  Oh,

2     absolutely.

3          It reads, "We would like the list of exhibits,

4     please."  And we will give that and bring it right in after

5     you return to the jury room, okay?  So with that thought,

6     please continue with your deliberations.

7          COURT CLERK:  All rise for the jury.

8          (Jury out at 10:52 a.m.)

9          COURT CLERK:  You may be seated.

10         (Court in recess at 10:53 a.m.)

11         (Court in session at 11:10 a.m.)

12         THE COURT:  All right.  We have a note from the jury

13    that the jury would like to see the following; J1, 2, 3, 4,

14    Plaintiff's A, B, C, D, L, and M and R.

15         Any objection if we give those documents to the

16    jury, those exhibits?

17         MR. TEMROWSKI:  No, Your Honor.

18         MR. HEWSON:  No objection.

19         THE COURT:  And do I have those exhibits in front of

20    me right now?

21         MR. HEWSON:  Yes, sir.

22         MR. TEMROWSKI:  Yes.

23         THE COURT:  Okay.

24         (Court in recess at 11:11 a.m.)

25         (Court in session at 11:24 a.m.)

*Waskowski v. State Farm*

1          THE COURT:  Can we go on the record real quick?  We

2    have a note from the jury that they wish Exhibits 5 and 8,

3    which are defendant's exhibits.  Can we give them to the

4    jury?

5          MR. HEWSON:  Yes, sir.

6          MR. TEMROWSKI:  Yes, Your Honor.

7          (Court in recess at 11:25 a.m.)

8          (Court in session at 2:23 p.m.)

9          THE COURT:  Just received another note from the

10   jury.  They want Exhibits N, O and P.

11         MR. HEWSON:  N, O, and P is Glowacki, Euro-Rehab and

12   Oakland MRI.

13         MR. TEMROWSKI:  P, O, -- N, O, and P?

14         MR. HEWSON:  Yes.  N is Glowacki, O is Euro-Rehab

15   and P is Oakland MRI.

16         MR. TEMROWSKI:  This is P.  This is O.  What's N?

17         MR. HEWSON:  N is Glowacki's bill.  There it is; is

18   that it?

19         MR. TEMROWSKI:  I'm a little nervous.

20         (Court in recess at 2:24 p.m.)

21         (Court in session at 3:23 p.m.)

22         DEPUTY COURT CLERK:  United States District Court is

23   in session.  Please be seated.  It recalls case number

24   11-13036, Jaroslaw Waskowski versus State Farm Mutual

25   Automobile Insurance Company.

*Waskowski v. State Farm*

```
 1          THE COURT:  Good afternoon.  Could I have your
 2   appearances again, please?
 3          MR. TEMROWSKI:  Good afternoon, Your Honor.  Lee
 4   Temrowski appearing on behalf of the plaintiff.
 5          MR. HEWSON:  May it please the Court, James Hewson
 6   appearing on behalf of State Farm.
 7          THE COURT:  We have a note from the jury that the
 8   jury has reached a verdict.  Is the plaintiff ready to
 9   receive the verdict?
10          MR. TEMROWSKI:  Yes, Your Honor.
11          THE COURT:  Defense?
12          MR. HEWSON:  Yes, Your Honor.  Thank you.
13          THE COURT:  All right.  Let's bring the jury out.
14          DEPUTY COURT CLERK:  All rise for the jury.
15          (Jury in at 3:25 p.m)
16          DEPUTY COURT CLERK:  Please be seated.
17          THE COURT:  All right.  Will the foreperson please
18   rise?
19          JUROR SEAT ONE:  (Complies).
20          THE COURT:  Has the jury agreed upon a verdict?
21          JUROR SEAT ONE:  Yes, we have, Your Honor.
22          THE COURT:  Could you please hand the verdict form
23   to our clerk?
24          JUROR SEAT ONE:  (Complies).
25          THE COURT:  Okay.  In the matter of Jaroslaw
```

*Waskowski v. State Farm*

1    Waskowski versus State Farm, the jury finds as follows.  With

2    respect to question number one, did the plaintiff sustain an

3    accidental bodily injury?  The jury answers the question "Y"

4    which I assume is yes?

5              JUROR SEAT ONE:  Yes.

6              THE COURT:  Okay.  Question number two, did the --

7    Mr. Foreperson, is "Y" yes?

8              JUROR SEAT ONE:  Yes.

9              THE COURT:  Okay.  Question number two, did the

10   plaintiff's accidental bodily injury arise out of the

11   ownership, operation, maintenance or use of a motor vehicle

12   as a motor vehicle on December 23rd, 2009?  The jury answers

13   "yes."

14             Allowable expenses, question number three.  Were

15   allowable expenses incurred by or on behalf of the plaintiff

16   arising out of the accidental bodily injury referred to in

17   question number two?  The jury answers that question "yes."

18             Part B, if your answer is yes, what is the amount of

19   allowable expenses owed to the plaintiff?  The jury answers

20   "zero."

21             Work loss, question number four.  Did the plaintiff

22   sustain work loss arising out of the accidental bodily injury

23   referred to in question number two?  The jury answers that

24   question as "yes."

25             B, if your answer is yes, what is the amount of work

*Waskowski v. State Farm*

1    loss owed to the plaintiff?  The jury answers "zero."

2             Replacement services, question number five.  Were

3    replacement services incurred by or on behalf of the

4    plaintiff arising out of the accidental bodily injury

5    referred to in question number two?  The jury answers that

6    question "yes."

7             Part B.  If your answer is yes, what is the amount

8    of replacement service expenses owed to the plaintiff?  The

9    jury answers "zero."

10            Okay.  Question number six, what was the payment for

11   any of the expenses or losses to which the plaintiff was

12   entitled overdue?

13            The jury answers that question "N," no.  All right.

14   I'm going to hand the verdict form back to the foreperson and

15   ask the foreperson to sign your name legibly, okay, and date

16   it.

17            JUROR SEAT ONE:  (Complies).

18            DEPUTY COURT CLERK:  I need you to date that.

19            JUROR SEAT ONE:  Oh, I'm sorry.

20            THE COURT:  Just relax.

21            Okay.  And that's the verdict of the jury.

22            Mr. Temrowski, do you wish to have the jury polled?

23            MR. TEMROWSKI:  Yes, Your Honor.

24            THE COURT:  Okay.  Right now, Ms. McCoy is going to

25   swear you in and then she's going to ask you as a group if

*Waskowski v. State Farm*

1   this is your verdict, okay?  And then after she is done with

2   that, she is going to ask each of you individually whether or

3   not this is, in fact, your verdict.

4          DEPUTY COURT CLERK:  Okay.  May I please have the

5   members of the jury now stand and raise your right hand to be

6   sworn?

7          (Jury panel sworn)

8          DEPUTY COURT CLERK:  Thank you.  You can be seated.

9          As to question number one of the verdict form, did

10  the plaintiff sustain an accidental bodily injury, the answer

11  is yes.

12          Members of the jury, is that your verdict?

13          JURORS:  (Affirmative verbal response)

14          DEPUTY COURT CLERK:  Question number two, did the

15  plaintiff's accidental bodily injury arise out of the

16  ownership, operation, maintenance or use of a motor vehicle

17  as a motor vehicle on December 23rd, 2009.  The answer is

18  yes.

19          Members of the jury, is that your verdict?

20          JURORS:  (Affirmative verbal response).

21          DEPUTY COURT CLERK:  Question number three.  Were

22  allowable expenses incurred by or on behalf of the plaintiff

23  arising out of the accidental bodily injury referred to in

24  question number two?  The answer is yes.

25          Members of the jury, is that your verdict?

*Waskowski v. State Farm*

1          JURORS:  (Affirmative verbal response).

2          DEPUTY COURT CLERK:  Question 3B, if your answer is

3    yes, what is the amount of allowable expenses owed to the

4    plaintiff?  The amount is zero.

5          Members of the jury, is that your verdict?

6          JURORS:  (Affirmative verbal response).

7          DEPUTY COURT CLERK:  Question number four.  Did the

8    plaintiff sustain the work loss arising out of the accidental

9    bodily injury referred to in question number two?  The answer

10   is yes.

11         Members of the jury, is that your verdict?

12         JURORS:  (Affirmative verbal response).

13         DEPUTY COURT CLERK:  Question number 4B, if the

14   answer is yes, what is the amount of work loss owed to the

15   plaintiff?  The amount is zero.

16         Members of the jury, is that your verdict?

17         JURORS:  (Affirmative verbal response).

18         DEPUTY COURT CLERK:  Question number five, were

19   replacement services expenses incurred by or on behalf of the

20   plaintiff arising out of the accidental bodily injury

21   referred to in question number two?  The answer is yes.

22         Members of the jury, is that your verdict?

23         JURORS:  (Affirmative verbal response).

24         DEPUTY COURT CLERK:  And question number 5B, if your

25   answer is yes, what is the amount of replacement services

*Waskowski v. State Farm*

1    expenses owed to the plaintiff, the amount is zero.

2              Members of the jury, is that your verdict?

3              JURORS:  (Affirmative verbal response).

4              DEPUTY COURT CLERK:  Question number six, was

5    payment for any of the expenses or losses to which the

6    plaintiff was entitled overdue?  The answer is no.

7              Members of the jury, is that your verdict?

8              JURORS:  (Affirmative verbal response).

9              DEPUTY COURT CLERK:  Juror in seat number one, as

10   you heard me read the verdict, was that and is that your

11   verdict?

12             JUROR SEAT ONE:  Yes.

13             DEPUTY COURT CLERK:  Juror in seat number two, as

14   you heard me read the verdict, was that and is that your

15   verdict?

16             JUROR SEAT TWO:  Yes.

17             DEPUTY COURT CLERK:  Juror in seat number three, as

18   you heard me read the verdict, was that and is that your

19   verdict?

20             JUROR SEAT THREE:  No.

21             DEPUTY COURT CLERK:  Juror in seat number five, as

22   you heard me read the verdict, was that and is that your

23   verdict?

24             JUROR SEAT FIVE:  Yes.

25             DEPUTY COURT CLERK:  Juror in seat number six, as

*Waskowski v. State Farm*

1  you heard me read the verdict, was that and is that your

2  verdict?

3          JUROR SEAT SIX:  Yes.

4          DEPUTY COURT CLERK:  Juror in seat number seven, as

5  you heard me read the verdict, was that and is that your

6  verdict?

7          JUROR SEAT SEVEN:  Yes.

8          DEPUTY COURT CLERK:  And juror in seat number eight,

9  as you heard me read the verdict, was that and is that your

10 verdict?

11         JUROR SEAT EIGHT:  Yes.

12         DEPUTY COURT CLERK:  Thank you.

13         THE COURT:  All right.  Mr. Temrowski, are you

14 satisfied with the polling of the jury?

15         MR. TEMROWSKI:  Yes, Your Honor.

16         THE COURT:  Mr. Hewson, are you satisfied with the

17 polling of the jury?

18         MR. HEWSON:  Yes, Your Honor.  Thank you.

19         THE COURT:  Mr. Temrowski, may the Court excuse the

20 jury?

21         MR. TEMROWSKI:  Yes, Your Honor.

22         THE COURT:  Mr. Hewson, may the Court excuse the

23 jury?

24         MR. HEWSON:  Yes, sir.

25         THE COURT:  All right.  Members of the jury, you are

*Waskowski v. State Farm*

1    excused from further service with us.  Thank you very much

2    for being with us for a week -- over a week.  You were good

3    to work with.  You were also on time.

4         And during the course of the trial, you know, I look

5    at you several times during the course of the trial, and all

6    of you were paying attention, taking good notes or taking

7    notes and really paying attention.

8         And all of us appreciate that.  That's all the

9    system really asks you is to pay attention, listen to the

10   evidence, consider the evidence and then make a decision.

11        So anyway, you're excused.  I'm going to ask you to

12   go back in the jury room and I'll be in there in a moment to

13   speak with you.  Okay?

14             DEPUTY COURT CLERK:  All rise for the jury.

15             (Jury out at 3:34 p.m.)

16             DEPUTY COURT CLERK:  Please be seated.

17             THE COURT:  Okay.  Mr. Temrowski, any other issues?

18             MR. TEMROWSKI:  Your Honor, could I get a copy of

19   that verdict form?

20             THE COURT:  Before I let the jury go, have you got

21   any issues with it?

22             MR. TEMROWSKI:  No.

23             THE COURT:  Okay.

24             MR. HEWSON:  I have no issues, Your Honor.  Thank

25   you.

*Waskowski v. State Farm*

1          THE COURT:  Before we go, why don't make -- here, do

2     you want to take a look at the verdict form and make sure

3     you're satisfied?

4          Do you want to see it before I let the jury go?  I'm

5     okay with it if you want --

6          MR. TEMROWSKI:  It's okay.

7          THE COURT:  Okay.  And we will get you a copy, Mr.

8     Hewson.

9          MR. HEWSON:  Yes.  Thank you.

10         THE COURT:  Okay, anything else?

11         MR. TEMROWSKI:  No, Your Honor.

12         MR. HEWSON:  Does the Court have a preference as to

13    whether or not the jurors -- invite the jurors --

14         THE COURT:  I'll see what they want to do.

15         MR. HEWSON:  Yes, sir.

16         THE COURT:  But before you go, and what we're going

17    to do right now is make sure you take your original exhibits

18    with you.  Who wants the joint exhibits?

19         MR. HEWSON:  I put them together.  If it's all right

20    with the Court and Mr. Temrowski, I'll take possession of

21    those as well.

22         THE COURT:  Okay.  So we'll give that to you right

23    now.

24         MR. HEWSON:  Okay.

25         (Court in recess at 3:36 p.m.)

*Waskowski v. State Farm*

1                    *    *    *

2

3

4

5

6

7

8

9

10

11

12

13

14            **C E R T I F I C A T I O N**

15          I, Marie J. Metcalf, Official Court Reporter for the

16   United States District Court, Eastern District of Michigan,

17   Southern Division, appointed pursuant to the provisions of

18   Title 28, United States Code, Section 753, do hereby certify

19   that the foregoing is a correct transcript of the proceedings

20   in the above-entitled cause on the date hereinbefore set

21   forth.

22          I do further certify that the foregoing transcript

23   has been prepared by me or under my direction.

24   s\Marie J. Metcalf                          09-09-13

25   Marie J. Metcalf, CVR, CM                   (Date)