```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION


 3
     JAROSLAW WASKOWSKI,
 4
                     Plaintiff,
 5   vs.                              Case No. 11-13036
                                      Honorable Sean F. Cox
 6   STATE FARM MUTUAL AUTOMOBILE
     INSURANCE COMPANY,
 7
                     Defendant.
 8   _____/

 9              JURY TRIAL:  VOLUME 4 OF 6

10            BEFORE THE HONORABLE SEAN F. COX
                  United States District Judge
11           Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
12                     Detroit, Michigan
                  Tuesday, December 4, 2012
13
     APPEARANCES:
14
     For the Plaintiff:        LEE ROY H. TEMROWSKI, JR.
15   Jaroslaw Waskowski        Temrowski & Temrowski
                               45109 Van Dyke Avenue
16                             Utica Michigan 48317
                               586-254-5566
17
     For the Defendant:        JAMES F. HEWSON
18   State Farm Mutual         Hewson & Van Hellemont
     Automobile Insurance      25900 Greenfield Road
19   Company                   Suite 326
                               Oak Park Michigan 48237
20                             248-968-5200

21   Also Present:            TINA FILARSKA
                              Court Interpreter
22
            To obtain a copy of this official transcript, contact:
23         Linda M. Cavanagh, Official Court Reporter
              Theodore Levin United States Courthouse
24          231 West Lafayette Boulevard, Room 235
                   Detroit, Michigan  48226
25        (248) 884-0327 • linda_cavanagh@mied.uscourts.gov
```

TABLE OF CONTENTS

Witnesses                                                          Page

JAROSLAW WASKOWSKI

    Direct Examination Continued by Mr. Temrowski      5
    Cross-Examination by Mr. Hewson                    21
    Redirect Examination by Mr. Temrowski              49
    Recross-Examination by Mr. Hewson                  54

DIRECTED VERDICT MOTION BY MR. HEWSON                  59
ON BEHALF OF DEFENDANT STATE FARM

COURT'S RULING ON DIRECTED VERDICT MOTION             62

EXHIBITS

Identification                          Marked    Received

Plaintiff's Exhibit A,                              57
Police report

Plaintiff's Exhibit B,                              57
Photographs

Plaintiff's Exhibit C,                              57
Vehicle repair estimate

Plaintiff's Exhibit D,                              57
Dr. Donahue's narrative report

Plaintiff's Exhibit K,                              58
Prescription for home modifications

Plaintiff's Exhibit Q,                              57
Certificate of No-Fault Insurance

```
 1              Detroit, Michigan

 2              Tuesday, December 4, 2012

 3                      —  —  —

 4              (Proceedings commenced at 10:27 a.m.)

 5              THE CLERK:  The Court calls Case No. 11-13036,

 6    Jaroslaw Waskowski versus State Farm Mutual Automobile

 7    Insurance Company.  Counsel, your appearances for the record

 8    please.

 9              MR. TEMROWSKI:  Good morning, Your Honor.  Lee

10    Temrowski on behalf of Mr. Waskowski.

11              MR. HEWSON:  May it please the Court, James Hewson

12    appearing on behalf of State Farm.

13              THE COURT:  Good morning everybody.  Ready to

14    proceed?

15              MR. TEMROWSKI:  Yes, Your Honor.

16              MR. HEWSON:  Yes, Your Honor.

17              THE COURT:  Let's bring the jury out.

18              (Whereupon the jury entered the courtroom at

19              10:28 a.m.)

20              THE CLERK:  Please be seated.

21              THE COURT:  Okay.  Good morning.

22              THE JURORS:  Good morning.

23              THE COURT:  How's everybody doing?

24              THE JURORS:  Good.

25              THE COURT:  Good.  We're going to continue with the
```

```
1   trial right now.  We're going to continue with Mr. Temrowski's
2   direct examination of Mr. Waskowski.  You may proceed.
3                   DIRECT EXAMINATION CONTINUED
4   BY MR. TEMROWSKI:
5   Q.   Mr. Waskowski, if you will recall yesterday, you had
6   testified as to all of the doctors' therapy that you had
7   treated with.
8   A.   Yes.
9   Q.   And you told us about the facilities where testing was
10  done.
11  A.   Yes.
12  Q.   We'll pick up from there.
13          As a result of injuries from the December 29th --
14  December 29th -- December 23rd, 2009 motor vehicle accident,
15  because of your injuries, were you prescribed medications and
16  prescriptions?
17          THE INTERPRETER:  Yes, I had.
18  Q.   Please tell us what medications were prescribed and what
19  you took.
20          THE INTERPRETER:  I've got Vicodin, it is a pain
21  killer medication, and Robaxin, I received Robaxin; they are
22  pills which kind of relax my muscles.  I got prescription for
23  physical therapy.
24  Q.   Did you ever take those medications before this automobile
25  collision?
```

1         THE INTERPRETER:  No.

2    Q.   Who prescribed the medications?

3         THE INTERPRETER:  First doctor who prescribed it, it

4    was Dr. Wietrzkowski.  Next, Dr. Glowacki.

5    Q.   Do you continue to take the medications?

6         THE INTERPRETER:  Yes.

7    Q.   Because of your injuries from the December 23rd, 2009

8    motor vehicle collision, because of your injuries, were you

9    required to wear any type of appliances to any part of your

10   body?

11        THE INTERPRETER:  Yes.

12   Q.   Could you tell us what appliances you wore?

13        THE INTERPRETER:  It is appliance for a neck and, um,

14   kind of corset on the bottom of -- on the lower part of the

15   body, lower back.

16   Q.   A corset?

17        THE INTERPRETER:  Yes.

18   Q.   And how long did you have to wear those appliances for?

19        THE INTERPRETER:  I used to wear it for six, seven

20   months, no stop.  And, um, when I have a stronger pain, I used

21   to -- I wear it.

22   Q.   Do you wear it on an as-needed basis?

23        THE INTERPRETER:  Yes.

24   Q.   Mr. Waskowski, at the time of the December 23rd, 2009

25   motor vehicle collision, were you employed?

```
 1    A.   Yes.

 2    Q.   Where were you employed at and what did you do?

 3         THE INTERPRETER:  I work in the company called Yes

 4    Express.  I used to work as a truck driver.  Um, I work -- I

 5    had, um -- um, car parts in my truck, and it was -- I was truck

 6    driver -- truck driver and the truck had automotive parts.

 7    Q.   How long had you been employed at Yes Express?

 8         THE INTERPRETER:  From May, 2010.

 9    Q.   How many days a week did you work?

10         THE INTERPRETER:  I worked four days a week.

11    Q.   And what were your job duties and responsibilities as a

12    truck driver?

13         THE INTERPRETER:  I had to take care of the truck, do

14    inspection of the truck before -- before I went -- I had to

15    load the truck.

16         Interpreter has to ask a question because of how he

17    described, it's difficult to translate.

18         (Brief pause)

19         Um, I had to load the truck, I had to, um, park at

20    the specific dock to the truck to be loaded and --

21         (Brief pause)

22         MR. HEWSON:  Your Honor, could I just ask that the

23    interpreter tell us what she's asking him before --

24         THE COURT:  Yes.

25         MR. HEWSON:  -- she poses the question?
```

```
 1              THE COURT:  Sure.

 2              MR. HEWSON:  Thank you.

 3              THE INTERPRETER:  Sure.  I -- he listed a few things

 4    and I asked what else because he said I had to load the truck

 5    and so on and, um, park at the dock.

 6              I had to protect the loads.  Um, I had to check if

 7    the trailer is connected right to the truck.  Sometimes I had

 8    to connect the trailer to the truck.  I was driving to the

 9    appointed place, that's where the unloading took place, and it

10    was loaded again.

11    Q.  Did you drive a truck just in Michigan or did you drive

12    around the country?

13              THE INTERPRETER:  I drove across the United States.

14    Q.  As part of your job duties as a truck driver, in addition

15    to driving the truck, did you have to do any lifting, bending

16    or carrying of objects?

17              THE INTERPRETER:  Yes.

18    Q.  And how much could those parts or objects weigh up to?

19              THE INTERPRETER:  Um, one part weighs up to

20    1,000 pounds maximum.

21    Q.  Okay.  And could you tell us please what was your income

22    for working as a truck driver at Yes Express?

23              THE INTERPRETER:  From May 2010, um, until my

24    automotive accident occurred, I had -- I earned about 25,

25    28,000, approximately.
```

1    Q.   Okay.  Is that after deductions?

2            THE INTERPRETER:  No.

3    Q.   Did you provide your income tax returns to Cheryl

4    Kucharski?

5            THE INTERPRETER:  Yes.

6    Q.   And do you have a copy of that with you here?

7            THE INTERPRETER:  Yes.

8    Q.   And is that the document you provided to her regarding

9    your lost wage claim?

10           MR. HEWSON:  Your Honor, could I just ask for a time

11   frame when this occurred?

12           MR. TEMROWSKI:  This is 2009, if you would like to --

13           MR. HEWSON:  No, no, no, I meant -- what I meant was

14   the foundation for when he gave this to Ms. Kucharski, even if

15   it was just or after the litigation.  Thank you.

16   BY MR. TEMROWSKI:

17   Q.   When did you provide this document to Ms. Kucharski?

18           THE INTERPRETER:  I receive a letter from her that

19   they need my, um, income tax.

20   Q.   And did you give them to her?

21           THE INTERPRETER:  Yes.

22           THE COURT:  I think the issue is what time?

23           MR. HEWSON:  Yes, that was it, Your Honor.  Thank

24   you.

25   BY MR. TEMROWSKI:

1   Q.   Okay.

2         THE INTERPRETER:  In 2011.

3   Q.   Okay.  What does your income tax returns for 2009 say your

4   gross income was?

5         THE INTERPRETER:  Forty-three thousand nine hundred

6   ninety-six.

7   Q.   Have you worked at all since the automobile collision of

8   December 23rd, 2009?

9         THE INTERPRETER:  Yes, I work all my life.

10        Interpreter has to verify -- clarify something.  It

11  seems like he didn't understand.  Can you please repeat the

12  question?

13        MR. HEWSON:  Your Honor, I object.  All she can do is

14  translate the answer.  It's -- I don't believe it's her job to

15  decide whether or not that's a correct answer.

16        THE COURT:  That's true.

17        MR. HEWSON:  Thank you.

18  BY MR. TEMROWSKI:

19  Q.   The question is have you worked since the car accident?

20        THE INTERPRETER:  No.

21  Q.   Have doctors disabled you from working?

22        THE INTERPRETER:  Yes.

23  Q.   What doctors?

24        THE INTERPRETER:  Dr. Wietrzkowski and Dr. Glowacki.

25  Q.   Knowing what your job requires you to do as a truck driver

1   at Yes Express and having done that before the car accident, do

2   you feel you could return back to work and do that job?

3          THE INTERPRETER:  No.

4   Q.  Mr. Waskowski, did you incur household help expenses and

5   attendant care expenses?  Go that far?

6          MR. HEWSON:  Your Honor, I only object because the

7   word incur has a legal meaning that the Court will share with

8   the jury.  To the extent it calls for a legal conclusion, I

9   object.

10         MR. TEMROWSKI:  I'll rephrase it.

11         THE COURT:  Sure.

12  BY MR. TEMROWSKI:

13  Q.  Mr. Waskowski, because of injuries from the auto accident

14  of December 23rd, 2009, ask him that, did you receive help from

15  anyone performing attendant care and household chores for you?

16         THE INTERPRETER:  Yes, my daughters did that.

17  Q.  Did your daughters provide both of those services to you?

18         THE INTERPRETER:  Yes.

19  Q.  Do you know the difference between household help and

20  attendant care?

21         THE INTERPRETER:  Yes.

22  Q.  Please describe what household help services your

23  daughters performed for you following the car accident.

24         THE INTERPRETER:  They are doing all the chores which

25  I used to do before the accident.  Um, they walk the dogs out,

Jury Trial:  Volume 4 • December 4, 2012

1    they clean the house, they clean the kitchen, they do the

2    laundry, they mow the grass, they do snow removal.

3    Q.  Because of your injuries from the car accident, are you

4    capable of doing those things now?

5            THE INTERPRETER:  No.

6    Q.  What attendant care services did they provide to you?

7            THE INTERPRETER:  Um, they help me, um, to do, um,

8    shower.  They help me to do the food.  They help me to get

9    dressed.  They help me to sit down.  They help me to get up in

10   the morning.  They help me to take medicine every day.

11   Q.  Are you able to do those things for yourself or do you

12   need their assistance?

13           THE INTERPRETER:  I need help.

14   Q.  Did any of your treating doctors write prescriptions for

15   you to receive household help and attendant care?

16           THE INTERPRETER:  Yes, Dr. Wietrzkowski and Dr.

17   Glowacki.

18   Q.  Regarding the household help services that your daughters

19   performed for you, when did they start?

20           THE INTERPRETER:  Practically the same day when the

21   auto accident -- when the vehicle accident occurred.

22   Q.  Do they continue to perform those services for you?

23           THE INTERPRETER:  Yes.

24   Q.  How many days per week?

25           THE INTERPRETER:  Seven days a week.

1   Q.  Did you pay them for these services or did you promise to

2   pay them for these services?

3        THE INTERPRETER:  Bashi I paid, Pashi I just promised

4   that I would.

5   Q.  How much did you promise for the household services?

6        THE INTERPRETER:  Twenty dollars a day.

7   Q.  For the attendant care, did you pay your daughters for

8   these services or did you promise to pay them for these

9   services?

10        THE INTERPRETER:  Bashi I paid, Pashi I promised.

11  Q.  How much did you promise to pay your daughter for the

12  attendant care services that they provided to you?

13        THE INTERPRETER:  Fifteen dollars per hour.

14  Q.  How did you arrive at that number, at that amount?

15        THE INTERPRETER:  Um, after the accident, when we

16  went to the -- to my agent, he told us that such an amount --

17  such an amount is, um -- is usually for this kind of service.

18  Q.  And who is your agent?

19        THE INTERPRETER:  David Rutger.

20  Q.  How many days per week do your daughters perform the

21  attendant care services for you?

22        THE INTERPRETER:  Seven days a week.

23  Q.  How many hours per day?

24        THE INTERPRETER:  Twelve or more.

25  Q.  Is that based upon doctor prescriptions?

1        THE INTERPRETER:  Yes.

2   Q.  Did your daughters keep track of the household help and

3   attendant care services that they performed daily for you?

4        MR. HEWSON:  Objection, foundation as to what the

5   daughters did, Your Honor.  That would be hearsay.  He asked

6   him what the daughters did, how the daughters kept track or

7   what they were doing.  I'm asking --

8        THE COURT:  He said did your daughters keep track?

9        MR. HEWSON:  And I'm objecting because of lack of

10  foundation.

11       THE COURT:  Overruled.

12  BY MR. TEMROWSKI:

13  Q.  Go ahead, Mr. Waskowski.

14       THE INTERPRETER:  Yes, they write it in the computer.

15  Every day they make notes of what they're doing.

16  Q.  Were those documents sent and submitted to State Farm?

17       THE INTERPRETER:  Yes.

18  Q.  Mr. Waskowski, did State Farm, in fact, pay you some

19  no-fault benefits?

20       THE INTERPRETER:  Um, they used to pay until

21  November, 2010.

22  Q.  What no-fault benefits did State Farm stop paying you in

23  November of 2010?

24       THE INTERPRETER:  Attendant care and household help.

25  Q.  Okay.  Did State Farm pay you wage loss benefits?

```
 1              THE INTERPRETER:  They paid until March of 2011.
 2   Q.  How much did State Farm pay you each month for wage loss
 3   benefits?
 4              THE INTERPRETER:  Two thousand nine hundred eighty
 5   dollars and eighty cents.
 6   Q.  Mr. Waskowski, did State Farm ask you to attend an
 7   examination with a doctor that they picked?
 8              THE INTERPRETER:  Yes.
 9   Q.  When did State Farm first ask you to go see one of their
10   doctors?
11              THE COURT:  Can I interrupt both of you at side-bar?
12              (Whereupon a brief discussion was held off the
13              record)
14              THE INTERPRETER:  It was October the 1st, 2010 I got
15   a letter from State Farm telling me that I'm supposed to go to
16   the doctor.
17   Q.  Did you go to the doctor?
18              THE INTERPRETER:  Yes.
19   Q.  What's the doctor's name?
20              THE INTERPRETER:  Dr. Endress.
21   Q.  How many times did you see Dr. Endress?
22              THE INTERPRETER:  Once.
23   Q.  After the examination with Dr. Endress, were you asked to
24   see another doctor?
25              THE INTERPRETER:  Yes.
```

1    Q.   Who was the second doctor that you were asked to see?

2         THE INTERPRETER:  I don't remember his name.

3    Q.   Do you remember when it was?

4         THE INTERPREETER:  Where?

5    Q.   When, when?

6         THE INTERPRETER:  In 2011.

7    Q.   Okay.  Did you go to that examination?

8         THE INTERPRETER:  No.

9    Q.   Now, Mr. Waskowski, are you -- we need to clarify this

10   now, we need to clarify this.

11        MR. HEWSON:  Your Honor, I'm going to object if he's

12   going to try to impeach his own witness.

13        THE COURT:  Just -- just let's just step back and

14   relax.  Go ahead and ask your question.

15   BY MR. TEMROWSKI:

16   Q.   Okay.

17        THE INTERPRETER:  He would like to add, he said he

18   stated, "I didn't went to because the transportation was not

19   provided."

20   BY MR. TEMROWSKI:

21   Q.   Okay.  Is that the doctor that you heard Ms. Kucharski

22   talk about yesterday that she wanted you to go see and she said

23   I told you not to go?

24        THE INTERPRETER:  No.

25   Q.   Mr. Waskowski, how many doctors did you actually go to at

```
 1    the request of State Farm that examined you?

 2               THE INTERPRETER:  Two.

 3    Q.  Was there a doctor in between that Ms. Kucharski wanted

 4    you to go to and the transportation didn't show up?

 5               MR. HEWSON:  Your Honor, I'm going to object.  It's

 6    leading.

 7               THE COURT:  Overruled.

 8               THE INTERPRETER:  Yes, Dr. George, I don't remember

 9    exactly the last name.

10    BY MR. TEMROWSKI:

11    Q.  Did I ever tell you not to go to a doctor's examination?

12               THE INTERPRETER:  No.

13    Q.  Mr. Waskowski, in this lawsuit, in a federal courtroom,

14    are you claiming that State Farm Mutual Automobile Insurance

15    Company owes you any outstanding first-party no-fault benefits?

16               THE INTERPRETER:  Yes.

17    Q.  Let's start with medical bills.  Do you have outstanding

18    medical bills related to treatment to the December 23rd, 2009

19    motor vehicle accident?

20               THE INTERPRETER:  No.

21    Q.  No.  No.

22               THE INTERPRETER:  Can you rephrase the question?

23    Q.  Do you -- let's do this real slow.  Do you presently have

24    any outstanding medical bills related to injuries from the

25    December 23rd, 2009 motor vehicle accident?
```

1              THE INTERPRETER:  Yes.

2    Q.   What are they?

3              MR. HEWSON:  Your Honor, I'm going to object.  The

4    witness is looking at a piece of paper.  Could I at least see

5    that, see if it's an exhibit?

6              MR. TEMROWSKI:  It's not an exhibit.

7              MR. HEWSON:  May I see it?

8              MR. TEMROWSKI:  Yes, you may.

9              MR. HEWSON:  Thank you.

10             (Brief pause)

11             MR. HEWSON:  Your Honor, this is not an exhibit.  Um,

12   could I just ask for foundation then of how this gentleman

13   knows what he's about to testify to as to these bills?

14             THE COURT:  Well, I think -- I think he's probably

15   going to be reviewing something probably to refresh his

16   recollection.

17             MR. TEMROWSKI:  Exactly, Your Honor.  I'll be more

18   than happy to lay a foundation with Mr. Waskowski.

19   BY MR. TEMROWSKI:

20   Q.   Mr. Waskowski, please tell us what -- what -- what is this

21   binder that you have with you in court here today, what is

22   that?

23             THE INTERPRETER:  They are all my bills regarding the

24   accident.

25   Q.   Is that -- is that a document that you've been maintaining

1  and keeping track of since the very beginning of this matter?

2          THE INTERPRETER:  Yes.

3  Q.  And are these copies of documents that you've received and

4  kept track of from State Farm?

5          THE INTERPRETER:  Yes.

6  Q.  And regarding the document that you were just referring

7  to, Mr. Waskowski, did you, sir, prepare that document?

8          THE INTERPRETER:  Yes, this particular document I

9  produced on the basis of all documents which I received from

10  the State Farm.

11  Q.  Okay.  And do you need to look at what you prepared to

12  refresh your memory to answer these questions?

13          THE INTERPRETER:  Yes.

14  Q.  Okay.  What are your outstanding medical bills?

15          MR. HEWSON:  Your Honor, I object.  We've already

16  admitted into evidence Exhibits 1, 2 and 3 for the defendant

17  relative to the request for the production of documents and

18  interrogatories.  This document, that binder were requested and

19  they were never produced during the course of discovery and

20  were not supplemented.  I have never seen that binder or those

21  documents at all and I asked for them over a year-and-a-half

22  ago, or a year ago.  I object to the foundation for this

23  question.

24          MR. TEMROWSKI:  This binder is simply what he's been

25  keeping track of and this document he prepared to answer these

1   questions.

2           THE COURT:  Um, why don't we have a side-bar.

3           (Whereupon a brief discussion was held off the

4           record)

5   BY MR. TEMROWSKI:

6   Q.  Mr. Waskowski, do you know what your outstanding medical

7   bills are?

8           THE INTERPRETER:  Yes.

9   Q.  What are they?

10          THE INTERPRETER:  About 40,000.

11  Q.  And what is the breakdown for that?  How does it break

12  down, a total of 40,000, how does it break down?

13          THE INTERPRETER:  Um, I've got all the letters from

14  the medical institutions and, um, the letters stating that, um,

15  State Farm haven't paid, um, the amount and, um, I summarize

16  all the -- all the bills together.

17  Q.  Okay.  And how does the $40,000 break down, who -- who --

18  to who do you owe money to?

19          THE INTERPRETER:  I owe Oakland MRI about 29,000.

20  Can I use it?

21  Q.  Yes, if you need that to refresh your memory.

22          THE WITNESS:  Oakland MRI, 29,240; Dr. Glowacki,

23  $3,200; and Euro Rehab, 7,641.

24  Q.  Thank you.

25          THE COURT:  Euro is how much?

```
 1              THE WITNEWSS:  Euro?

 2              THE COURT:  Yes.

 3              THE WITNESS:  Seven thousand six hundred forty-one.

 4              THE COURT:  All right.  And you said Dr. Glowacki is

 5   what, 3,000?

 6              THE WITNESS:  Three thousand two hundred.

 7              THE COURT:  And then Oakland MRI is what?

 8              THE WITNESS:  Twenty-nine thousand two hundred forty.

 9              THE INTERPRETER:  Twenty-nine thousand two hundred

10   forty.

11   BY MR. TEMROWSKI:

12   Q.  Mr. Waskowski, do you have an outstanding prescription

13   expense?

14              THE INTERPRETER:  Yes.

15   Q.  How much?

16   A.  One hundred eight.

17   Q.  One hundred eight dollars?

18   A.  Yes.

19   Q.  Mr. Waskowski, do you have an outstanding wage loss claim

20   that State Farm owes you?

21              THE INTERPRETER:  Yes.

22   Q.  How much is that?

23   A.  Sixty-one thousand eighty-four dollars and eighty cents.

24   Q.  Mr. Waskowski, is that calculated at the rate that State

25   Farm was paying you per month before they cut you off?
```

1          THE INTERPRETER:  Yes.

2   Q.   Mr. Waskowski, do you have an outstanding household help

3   claim?

4          THE INTERPRETER:  Yes.

5   Q.   How much is that?

6   A.   Thirteen thousand nine hundred plus 1,900 different.

7   Q.   And what is the $1,900 difference?

8          THE INTERPRETER:  It is the difference between --

9   because State Farm at some period paid $10 per hour -- per day,

10  not 20.

11  Q.   Okay.  And if you add the $13,900 to the $1,900

12  difference, what is your total household help claim?

13  A.   Fifteen thousand eight hundred.

14  Q.   Mr. Waskowski, do you have an outstanding attendant care

15  claim?

16         THE INTERPRETER:  Yes.

17  Q.   How much is that?

18  A.   One hundred thirty-two thousand nine hundred thousand --

19  nine hundred eighty-six dollars.

20  Q.   And Mr. Waskowski, how did you arrive at that figure?

21         THE INTERPRETER:  State Farm stopped paying me 21st

22  of November 2010 until the 26th of November 2012; it is

23  695 days.

24  Q.   Mr. Waskowski, could you please tell the ladies and

25  gentlemen of the jury, because -- go that far -- Mr. Waskowski,

1    could you please tell the ladies and gentlemen of the jury,

2    because of your injuries from the December 23rd, 2009 motor

3    vehicle accident, what are your present complaints?

4            THE INTERPRETER:  Do you mean I'm out of money?

5    Q.  No, we've covered that.  I mean how do you feel?

6            THE INTERPRETER:  I am a completely different person

7    than before the accident here.  I'm dependent on my daughters.

8    Before the accident I was able to do everything by myself.  I

9    took care of my family.  Right now the roles changed.

10   Q.  Take a minute if you need to.

11           THE INTERPRETER:  I am as a child.  I cannot even

12   speak.

13   Q.  Mr. Waskowski, I know this is very difficult for you, I

14   know that.  Take your time.  But I feel that it's very

15   important for you to tell the jury in our proofs the problems

16   that you're having, so take your time and do the best you can

17   to tell us.

18           THE INTERPRETER:  At this moment I feel pain moving.

19   When I move around, I feel pain.  Without the painkillers

20   medicine, practically I cannot move around.  I'm not able to

21   take care of myself.

22   Q.  Mr. Waskowski, here's my last question.  You are suing

23   your old car insurance company, State Farm, for your no-fault

24   benefits.  You testified that you were insured with State Farm

25   for many years before the automobile accident.  How do you feel

1    about how your claim was handled?

2              MR. HEWSON:  Your Honor, I'm going to object.  That

3    has no relevance whatsoever in this.  This is an economic

4    damages claim.

5              THE COURT:  It's not relevant.

6              MR. HEWSON:  Thank you.

7              MR. TEMROWSKI:  Then I have no further questions of

8    Mr. Waskowski.

9              THE COURT:  Thank you very much.  Mr. Hewson?

10              MR. HEWSON:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12    BY MR. HEWSON:

13    Q.  Mr. Waskowski, you understand what it means to tell the

14    truth, right?

15              THE INTERPRETER:  Yes.

16    Q.  And you understand what it means to be under oath, is that

17    right?

18              THE INTERPRETER:  Yes.

19              MR. HEWSON:  I'm technologically challenged, Your

20    Honor.  Hang on.  Let me see if I can do this right.  I just --

21    would you put the screen up for me.  I apologize, Your Honor.

22              THE COURT:  No problem.

23              MR. HEWSON:  It will just take a second.  I'm going

24    to use the Elmo so that the jury can see what I'm talking about

25    because this gentleman doesn't speak English.  Okay.  Let's see

```
1    if I can do this and not mess it up.  Oh, I can.  Very good.
2    Thank you.  Thanks, Mark.  Now you're getting tricky on me.
3    I'm sorry, Your Honor,.  There we go.  That will be better.  We
4    can zoom in.
5    BY MR. HEWSON:
6    Q.  All right.  Mr. Waskowski, can you read English?
7            THE INTERPRETER:  Partially.
8    Q.  So, for example, your daughters didn't go to work with you
9    when you worked at Yes Express; you went in and applied on your
10   own and wrote out the application, right?
11           THE INTERPRETER:  Yes.
12   Q.  Yes.  And you didn't take them to work with you, so you
13   could speak to the people that you were working with and the
14   people at the locations that you drove to, you were able to
15   speak English with them?
16   A.  Yes.
17   Q.  Yes.  Now, you just answered my question that I posed to
18   you in English before the interpreter finished translating,
19   didn't you?
20           THE INTERPRETER:  Yes, I understand, but my English
21   is limited, it's basic; it's enough to communicate.
22   Q.  All right.  Mr. Temrowski asked you how you came up with
23   $15 a day as the rate to pay your daughters for attendant care.
24   Do you remember that question?
25           MR. TEMROWSKI:  I'll object.  That's not what the
```

1    question or the answer was.

2              MR. HEWSON:  Actually it was.

3              THE COURT:  Okay.  Go ahead.  The jury will recall.

4              MR. HEWSON:  Thank you.

5    BY MR. HEWSON:

6    Q.  Do you remember that?

7              THE INTERPRETER:  Yes.

8    Q.  Do you remember telling this jury that it was an agent

9    from State Farm that told you $15 an hour was the right charge,

10   do you remember that?

11             THE INTERPRETER:  Yes.

12   Q.  Do you remember when I deposed you December the 28th, 2011

13   that I said to you if I ask you a question and you answer it,

14   I'm going to assume you understood me and you answered me

15   truthfully.  I said is that fair and you said yes.  Do you

16   remember being asked that question and giving that answer?

17             THE INTERPRETER:  Yes.

18             MR. HEWSON:  Your Honor, page 62, lines five through

19   eight of Mr. Waskowski's deposition testimony.

20   BY MR. HEWSON:

21   Q.  Sir, I asked you a specific question -- oops -- "How did

22   you arrive at $15 per hour as the price to pay your daughters

23   for helping you with personal care?"  And your answer under

24   oath on December 28th, 2011 was, "When the insurance stopped

25   paying me, then I went to my attorney and he told me the prices

1    that should be paid."  Was that true when you said it to me?

2          THE INTERPRETER:  Confirmed.

3    Q.  Does that mean yes, that's what you told me under oath on

4    that day?

5          THE INTERPRETER:  Yes, he confirmed what the agent

6    said, that my daughters supposed to have $15 per hour.

7    Q.  Okay.  Why didn't you tell me that?  Why didn't you say

8    that under oath at your deposition?

9          THE INTERPRETER:  Um, I -- I only wanted to say that

10   my attorney confirmed the $15 per hour, but the question was

11   who told me there, who told me that.

12   Q.  Yes.  We had an interpreter present for your deposition,

13   sir, didn't we?

14         THE INTERPRETER:  Yes.

15   Q.  Sir, when did you put together this binder that you've

16   been putting together for the whole trial, when did you do

17   that?

18         THE INTERPRETER:  This binder I kept since I got

19   first letter from the State Farm.

20         MR. HEWSON:  On page 44, Your Honor, of the

21   deposition of 12-28-2012.

22   BY MR. HEWSON:

23   Q.  Sir, I asked you a question, "Do you know what your

24   outstanding medical bills amount to?"  And you said, "For my

25   medicals?"  And I said, "Yes."  You said, "I might say I don't

```
1    know what the exact numbers are or the amount."  You didn't

2    have -- or did you have that binder with you put together

3    before your deposition?

4              THE INTERPRETER:  I didn't have it with me; it was at

5    home.

6    Q.  And you never produced that binder or any of those

7    documents during this whole litigation, did you?

8              THE INTERPRETER:  He's asking did I -- he's asking

9    did I, um, prepare it particularly for today?

10   Q.  Yes.

11             THE INTERPRETER:  No.

12   Q.  Did you ever -- did you ever send it to State Farm?

13             THE INTERPRETER:  What did I send to State Farm?

14   Q.  That book.

15             THE INTERPRETER:  No.

16   Q.  Thank you.

17             MR. HEWSON:  Excuse me.  There isn't a question, Your

18   Honor.  Can I ask that we wait until --

19             THE COURT:  Sure.

20             MR. HEWSON:  Thank you.

21   BY MR. HEWSON:

22   Q.  Sir, I want to ask you about your wage loss claim.  Did

23   you do the calculations for the wage loss claim you want the

24   jury to pay you, $61,084.80, did you do that yourself,

25   calculate it?
```

 1                 THE INTERPRETER:  Yes, on the basis of --

 2                 THE WITNESS:  Wage loss calculation worksheet.

 3                 THE INTERPRETER:  On the basis of wage loss

 4     calculation work sheet.

 5     BY MR. HEWSON:

 6     Q.   I understand that.  But did you actually sit down and

 7     calculate or calculate with your attorney what your actual

 8     claims should be based upon the income tax returns, not what

 9     State Farm was based on but based on the income tax returns?

10                 THE INTERPRETER:  Are you asking me for this amount?

11     Q.   Yes.  Did you use your income tax returns to calculate the

12     amount?

13                 THE INTERPRETER:  State Farm representative gather

14     all the information regarding my salary for my work, Yes

15     Express, and on the base of this he -- he calculated my

16     average, um, monthly salary.

17     Q.   Who did it?

18     A.   Terri Page.

19     Q.   Terri Page.

20                 Did you -- you were here yesterday.  You heard Terri

21     Page say she never got income tax returns from you.  Did you

22     hear that?

23                 THE INTERPRETER:  They were sent, um, for the year

24     2009, 2010 and 2011.

25     Q.   Do you have a letter or any evidence that suggests that

```
 1   you sent these to Ms. Kucharski or Ms. Page prior to the time
 2   they were produced in 2012 in this lawsuit?
 3            THE INTERPRETER:  Perhaps I have.  I don't have -- I
 4   don't know now, but all the documents were sent by UPS so
 5   probably some were sent track of it.
 6   Q.  Okay.  Let me ask you this.  You don't want to be
 7   overpaid, right?
 8            THE INTERPRETER:  No, I don't.
 9   Q.  You only want to be paid what you're entitled to under the
10   Michigan No-Fault Act and your policy of insurance, is that
11   right?
12            THE INTERPRETER:  Yes, what I'm supposed to.
13   Q.  Okay.  According to the income tax returns that you
14   provided, which are marked as part of Exhibit 2 -- Your Honor,
15   let's see if I can do this right -- you have indicated that you
16   took in $43,996 and you received after your deductions 25,933,
17   right?
18            THE INTERPRETER:  Yes.
19   Q.  Okay.  That's what you made for the year, right?
20            THE INTERPRETER:  After deductions.
21   Q.  After deductions.
22            THE INTERPRETER:  Me as a truck driver driving out of
23   state, um, I'm entitled to allowances for the food every day.
24   Q.  Right.  And you deduct --
25            THE INTERPRETER:  So the sum is -- is -- is less than
```

```
 1    for the -- the deduction, the same as every worker who is sent

 2    out of state that working, the employment is paying him for the

 3    food and hotel.

 4    Q.  I understand.  And that wasn't the question.  I did some

 5    arithmetic and I want to know if you will agree with me,

 6    $25,933 is what you actually made in 2009, right?

 7              THE INTERPRETER:  No.

 8    Q.  No.  So the income tax return that you filed is incorrect?

 9              MR. TEMROWSKI:  Your Honor, I'm going to object.  The

10    income tax is what it is.

11              MR. HEWSON:  Well, I understand but I'm just using

12    the number, Your Honor, for his net profit or loss.  His

13    business income is 25,933 and he testified to that.

14              THE COURT:  Right.

15              MR. HEWSON:  I don't understand the objection.  I

16    believe that that --

17              MR. TEMROWSKI:  You're disregarding the $43,000

18    figure arriving at your calculation is how.

19              MR. HEWSON:  Well, I guess the jury can figure that

20    out.

21    BY MR. HEWSON:

22    Q.  My question is were you honest with the IRS?

23              THE INTERPRETER:  Yes.

24    Q.  Okay.  So if you made $25,933 after you paid your expenses

25    and all of that stuff and I divide that by 12 months of the
```

1    year, that's $2,161.08 a month?

2            THE INTERPRETER:  Actually will you repeat, 2000 --

3    Q.  Sure.  It's right there, 2161.08.  If I -- you only get

4    85 percent of that under the No-Fault Act, did you know that?

5            THE INTERPRETER:  Yes.

6    Q.  So the multiple -- the figure then that you would be paid

7    is 1836.92 per month by State Farm, right?

8            THE INTERPRETER:  I don't know.

9    Q.  Okay.  You said -- you told the jury you were getting

10   $2,908.80 per month from State Farm, and you actually

11   remembered that number on your own, right?

12           THE INTERPRETER:  Yes.

13   Q.  And that means, if my numbers are right, that you got an

14   extra $1,071.88 per month for the 15 months you were paid, it

15   was an extra $16,000 you got that State Farm paid you, right?

16   Yes?

17           THE INTERPRETER:  No, I don't understand.  If the

18   State Farm -- State Farm agent calculated my salary on the base

19   of my income.  I didn't give it to him.  He took it by himself,

20   an agent took it by himself from my employer.  So why should I

21   base my calculation on a different calculation if -- from the

22   beginning, State Farm, month-by-month -- it was not a

23   calculation based on one month.  It was calculation done for

24   each month when they paid me.  Okay.  The lower amount of my

25   income tax is -- it's -- the sum is smaller because I have to

1    pay for my food.

2    Q.   Right.

3             THE INTERPRETER:  And I have to provide it.  I have

4    to show it in the income tax.  He's asking if you deduct the

5    food from your income.

6    Q.   Let me ask you this.  You told me a moment ago, sir, that

7    you don't want to be paid more than you're entitled to, right?

8             THE INTERPRETER:  Yes.  But in the situation when I

9    would be employed in the State of Michigan as a driver and I

10   don't go out of state, my income is $43,000.

11   Q.   Did you tell -- forget it.

12            MR. HEWSON:  I'll withdraw it, Your Honor.

13   BY MR. HEWSON:

14   Q.   Sir, yesterday Mr. Temrowski was asking you about this

15   prior accident that you had in July of 2009.  You remember

16   that?

17            THE INTERPRETER:  Yes, I remember.

18   Q.   And you said you weren't injured in that accident?

19            THE INTERPRETER:  No.

20   Q.   You were not.  Why did you stay off work for five days and

21   let State Farm pay you wage loss?

22            THE INTERPRETER:  Somebody called me from State Farm

23   and asked me if I -- if I didn't attend work for a few days

24   because of the accident.  I told him that it took me five days

25   because I went to hospital to check out if everything is okay

1    with me.

2    Q.   So you were hurt?

3          THE INTERPRETER:  Um, nothing really hurt but I

4    wanted to make sure that -- because I'm a truck driver and I

5    leave state, I'm going out of state, so I wanted to make sure

6    that everything is okay with me.

7    Q.   So you took five days worth of wage loss from State Farm

8    in July of 2009 when you weren't hurt?

9          THE INTERPRETER:  I didn't require any payments.  It

10   was all done by phone and the State -- the State Farm agent

11   asked me if the five, six hundred would be okay to have it.  I

12   didn't require it; they told me.

13   Q.   Did you complain about your left shoulder at the emergency

14   room in July of 2009?  Could you just translate that for me

15   please?

16         THE INTERPRETER:  The form he used, it's not

17   translatable.  Small pain.

18   Q.   You had small pain your left shoulder and you told them

19   that at the emergency room, didn't you?

20         THE INTERPRETER:  Yes, because this accident also

21   happened from the left side I was hit.  I don't understand why,

22   if somebody hit me on the left side, why I supposed to complain

23   that right side hurt.

24   Q.   You also -- your attorney asked you about lawsuits.  You

25   sued the person that was involved in the accident with you,

1    right, in this case?

2              THE INTERPRETER:  Do you mean the accident which

3    occurred, December 2009?

4    Q.  Yes.

5              THE INTERPRETER:  Yes.

6    Q.  And you filed suit against State Farm in a separate case

7    for your medical mileage, right?

8              THE INTERPRETER:  For medical mileage?

9    Q.  That's correct.

10             THE INTERPRETER:  But I don't see relevance.

11   Q.  Okay.  Thank you.  Um, did Dr. Wietrzkowski -- excuse me,

12   he said you didn't need any assistance with driving.  Did you

13   know that?

14             THE INTERPRETER:  No.

15   Q.  Okay.  So you didn't see the form in which Dr.

16   Wietrzkowski said he was not restricting you from driving, you

17   never saw that?

18             THE INTERPRETER:  No, I didn't see it.

19   Q.  Did you see -- Mr. Temrowski showed you the police report

20   in this matter.  Do you remember that?

21             THE INTERPRETER:  I remember the report but I don't

22   remember exactly what's in the report.

23   Q.  Okay.  Maybe I can help you.  Whoa, there we go.  The

24   police report says that there's zero injury to you.  You never

25   told anybody you were injured at the scene, did you?

1          THE INTERPRETER:  During the accident?

2    Q.  All right.  Let's do it this way.  The police came to the

3    scene of the accident, yes or no?

4          THE INTERPRETER:  Yes.

5    Q.  And the police got out of their police car and you were

6    out of your car and they tried to talk to you, right?

7          THE INTERPRETER:  Police -- a policeman helped me to

8    get out of my car.

9    Q.  Do you have sufficient English capability to say to the

10   policeman "I'm hurt"?

11         THE INTERPRETER:  Yes, my English is sufficient

12   enough, but this policeman never asked me about it.  I talked

13   to the policeman maybe about for a half of a minute, and he

14   went to the -- the policeman went to the -- another vehicle

15   which was also damaged.

16   Q.  There was an ambulance at the scene, am I right?

17         THE INTERPRETER:  Yes.

18   Q.  Did you ask the ambulance drivers to take you to the

19   hospital?

20         THE INTERPRETER:  The ambulance crew took care of the

21   different people in the different vehicle and nobody asked me.

22   My car was on the different side of the road and it was in the

23   parking of the flower shop and it looked like my vehicle didn't

24   participate in this accident.

25   Q.  The air bag didn't go off, did it?  Did the air bag go

1   off, yes or no?

2           THE INTERPRETER:  So why my medical test show that?

3   Q.  We're going to talk about that, I assure you.  At this

4   particular point I'm asking you whether or not the air bag went

5   off in your car, yes or no please.

6           THE INTERPRETER:  No, it didn't explode.

7   Q.  Your daughters were both at the scene while the police

8   were there, am I right, yes or no?

9           THE INTERPRETER:  Yes, they were.

10  Q.  And the ambulance was there while your daughters were

11  there as well, am I right?

12          THE INTERPRETER:  Yes.

13  Q.  You didn't have your daughters even take you to an

14  emergency room after the police and the ambulance left, did

15  you?

16          THE INTERPRETER:  It happened the day before

17  Christmas and for us Polish people it's a specific day, an

18  important day.

19  Q.  Okay.  I don't understand.  Is it your understanding that

20  emergency rooms are closed on Chris -- actually it's the day

21  before Christmas Eve.  That was December 23rd, right?  He got

22  it, he's got it.  "Tak" means yes, right?

23  A.  Yes.

24  Q.  Okay.  So you know emergency rooms are open.

25          THE INTERPRETER:  Yes, but I were in shock.  I didn't

1    think logically about it.  I was driving to the -- to do

2    shopping in the Polish store.  I wanted to spend Christmas

3    holidays with my family because from the Polish tradition, the

4    Christmas holidays take three days.

5    Q.   Okay.  All right.  Would you agree with me that if you

6    were really hurting that bad, if you couldn't move your left

7    arm, couldn't rotate your head to the left or right, couldn't

8    bend over at all, that would cause you sufficient concern to go

9    to the hospital, can you answer that?

10            THE INTERPRETER:  I thought it would pass away.

11   Q.   Okay.  Now, Dr. Wietrzkowski, when you finally went to see

12   him, indicated that you didn't need attendant care.  Did you

13   know that?

14            THE INTERPRETER:  He stated that I do need it.

15            MR. HEWSON:  It's my Defendant's Exhibit No. 8, Your

16   Honor.  Oops.

17   BY MR. HEWSON:

18   Q.   "Does Mr. Waskowski require any attendant care services

19   such as supervision, assistance with bathing, grooming,

20   dressing, et cetera?"  The answer is, "No.  May require

21   assistance with some household chores as listed above."  He

22   said you didn't need attendant care.

23            THE INTERPRETER:  I haven't seen that document.  I

24   don't know about it.

25   Q.   Okay.  Actually the reason you went to --

```
 1              THE INTERPRETER:  But Dr. Wietrzkowski told me that I

 2    do need attendant care.

 3    Q.  Dr. Wietrzkowski also said in that report that you can

 4    return to work January 23rd, 2010.  Did you know that?

 5              THE INTERPRETER:  It was determined on another visit,

 6    it was the date of another visit.

 7    Q.  Well, you never went back.

 8              THE INTERPRETER:  Yes, because Dr. Wietrzkowski

 9    didn't speak Polish and my English is not sufficient enough to

10    spoke to a doctor -- speak to the doctor about medical

11    measures.

12    Q.  Now, I thought your daughters went to all your medical

13    appointments with you and could interpret Polish to English and

14    English to Polish.  Am I wrong?

15              THE INTERPRETER:  Yes, perhaps, but, um, my

16    daughter -- but I didn't know what kind of medical condition I

17    have and sometimes, you know, this type of translations are not

18    accurate.

19    Q.  Even when your daughters are doing it for you?

20              THE INTERPRETER:  My daughter already forgot Polish,

21    Pashi.  She came to United States at age 13 and they are not --

22    they are not sufficient in medical field vocabulary in Polish.

23    Q.  Actually you found a doctor who would write prescriptions

24    for you for 12 hours a day of attendant care, take you off work

25    permanently and write you all the prescriptions that you
```

1    wanted, that's what you found and that's what you got, am I

2    right?

3              THE INTERPRETER:  I took this doctor from -- I chose

4    this doctor from Yellow Book.  I don't know if Yellow Book

5    indicates if he writes prescription or what he does, I don't

6    know about it.  I just found him in the Yellow Book.

7    Q.   Sir, did you tell the physical therapist the first time

8    you saw him that you couldn't move your left arm?

9              THE INTERPRETER:  Yes.

10   Q.   You told him that you couldn't move it at all, right?

11             THE INTERPRETER:  I have limited mobility.

12             MR. HEWSON:  Your Honor, this is page 39, lines nine

13   through 14.

14   BY MR. HEWSON:

15   Q.   I asked the question, "Sir, you told the physical

16   therapist and showed the physical therapist that you could not

17   move your left arm at all?"  And you said, "Yes.  First before

18   I started physical therapy, he performed a test on me, and

19   after the test he realized -- he said what kind of treatment,

20   what kind of exercises I can do."  You told him and you showed

21   him, according to your testimony, that you couldn't raise your

22   left arm at all, right?

23             THE INTERPRETER:  I -- do I have to read this?

24   Q.   No, just ask him.

25             THE INTERPRETER:  Yes, but Pashi was asked so, um,

1   can I just come to the -- to see close?

2   Q.  No, you don't have to.  My question is very simple.

3           THE INTERPRETER:  Yes.  What's your question?

4   Q.  Did you tell the physical therapist that you couldn't move

5   your left arm at all?

6           THE INTERPRETER:  Yes, I told him that I have limited

7   mobility.

8   Q.  All right.  You sat here in the courtroom when the

9   physical therapist testified as to how far you could move your

10  arm.  Were you here for that?

11          THE INTERPRETER:  I haven't shown anything.

12  Q.  Were you here though?

13          THE INTERPRETER:  Yes, I was there.

14  Q.  And the physical therapist said you could move your arm,

15  left arm, this high, was that true?

16          THE INTERPRETER:  Um, I don't know what physical

17  therapist stated in the report.  I am a patient.

18  Q.  Okay.  Well, when you first went to see the physical

19  therapist, could you raise your arm this high?

20          THE INTERPRETER:  No.

21  Q.  So when you saw the physical therapist the first time,

22  could you raise your elbow like this and bend your arm?

23  A.  No.

24          THE INTERPRETER:  I demonstrated during my deposition

25  how high I can lift my arm.

1    Q.   I remember that.

2    A.   Yeah.

3    Q.   But my question was -- I know.  But my question was you're

4    telling this jury under your oath that you couldn't do those

5    two maneuvers that the physical therapist said you could do,

6    right?

7              THE INTERPRETER:  No, I cannot move.

8    Q.   Okay.  Why did you go to a doctor at all?

9              THE INTERPRETER:  Because I felt really bad.

10   Q.   What did you expect to get out of a doctor's visit?

11             THE INTERPRETER:  I don't know.  I didn't know then.

12   Q.   You didn't know.  You didn't go to a doctor to get better?

13             THE INTERPRETER:  Yes, but I am a patient and I don't

14   know what doctor will do.

15   Q.   Okay.  Why didn't you go to U of M or Saint John's or

16   Beaumont or somewhere when you didn't get better, let's say,

17   after just a year, why didn't you go somewhere else?

18             THE INTERPRETER:  Because after last auto accident in

19   July, I was waiting five hours in emergency room to see a

20   doctor to do the basic check-up, and I went to the doctor on

21   the appointment and I didn't have to wait.

22   Q.   So it was a question -- sir, you weren't doing anything

23   anyway according to you, right?  You were totally disabled and

24   completely didn't have anything else to do because you're so

25   hurt.

```
 1              THE INTERPRETER:  Yes.

 2    Q.  But you couldn't wait?

 3              THE INTERPRETER:  After the accident, I couldn't do

 4    anything during rest of the Christmas.  All the preparation for

 5    Christmas did by my daughters.

 6    Q.   Okay.  There's been some testimony about a second opinion

 7    from Dr. Donahue.  Did you ever do what Dr. Donahue suggested?

 8              THE INTERPRETER:  No.

 9    Q.  Did you review the forms that your daughters were filling

10    out for attendant care before they sent them in?

11              THE INTERPRETER:  No, it's not my job to do so.  They

12    know what they are doing so they put the notes.

13    Q.  How long did it take them to bathe you when they were

14    bathing you?

15              THE INTERPRETER:  It's the bath, there are different

16    days.

17    Q.   How long?

18              THE INTERPRETER:  They're about the same time.

19    Q.   Well, they billed State Farm the same time every time they

20    bathed you, did you know that?

21              THE INTERPRETER:  Yes.  But my shower also -- my,

22    um -- my bath also includes shaving and grooming, to dry, to

23    get dressed, undressed, dressed.  But you asked how long the

24    shower takes, um, and the shower, my understanding is exact

25    time when I am under -- in the shower.
```

1   Q.  You're right-handed, correct?  You can't shave with your

2   right hand?

3           THE INTERPRETER:  Yes, but they help me, my daughters

4   help me with that.

5   Q.  You were unable to bathe yourself for six months after the

6   accident, is that true?

7           THE INTERPRETER:  I take a shower every day, but

8   after the accident -- I am a man, even father is ashamed of, so

9   I try to do the shower myself, but I couldn't do it.  That's

10  why my daughters help me.

11  Q.  On December 28th, 2011 --

12          MR. HEWSON:  Your Honor, this is page 37 of the

13  deposition --

14  BY MR. HEWSON:

15  Q.  -- I asked you, "Are you any better?"  And you said,

16  "Yes."

17          THE INTERPRETER:  Yes.

18  Q.  "What can you do for yourself?"  And you said, "What can I

19  do?"  I said, "Yes."  And you said, "Sit down.  Sometimes, with

20  the help of other persons, stand up."  I said, "That's it?"

21  You said, "Go to the restroom moving."  And I asked you, "Can

22  you bathe yourself?"  And you said, "Yes."  Is that true?

23          THE INTERPRETER:  Take a bath, yes, which means

24  sitting in the bathtub, not to take a shower.

25  Q.  Okay.  So you could sit in the bath by yourself and clean

1   your body in the bath by yourself, yes?

2           THE INTERPRETER:  Somebody has to help me to sit

3   down.

4   Q.  But you could -- was that true, you could bathe yourself,

5   yes or no?

6           THE INTERPRETER:  No, I cannot do it by myself.  I

7   need to have help during the bath.  I have to -- how can I do

8   it with right hand?

9   Q.  Did you say that?  Just tell us -- did you say that?  Were

10  you -- did you intend to tell the truth in December the 28th of

11  2011 when I asked you that question?

12          THE INTERPRETER:  I tried to tell all the truth but,

13  um, sometimes the questions are prepared this way.  Then

14  sometimes I -- person doesn't know how to answer it, what to

15  say.

16  Q.  Oh.  Do you remember if I said to you at the beginning of

17  your deposition, "If I ask you a question" --

18          THE INTERPRETER:  One second.  Yes?

19          MR. HEWSON:  Let me just put it up.  Your Honor, page

20  seven, lines nine through 13.

21  BY MR. HEWSON:

22  Q.  I said to you, sir, "If I ask you a question that you

23  don't know the answer to, I want you to feel free to tell us

24  you don't know.  I don't want you to guess, all right?"

25          I also asked you, "If I ask you" -- or told you, "If

1    I ask you a question that is confusing or unclear, I need you

2    to stop us, tell us that, and we'll rephrase it and have it

3    reinterpreted so you do understand it, is that all right?"  And

4    you said, "That's good."

5           THE INTERPRETER:  Yes, I remember this.  But I also

6    remember that my daughter had to -- had to correct interpreter

7    because some mistakes.

8    Q.  Let me ask you this.  Tell us what was so complicated

9    about the question, "Can you bathe yourself?"

10          THE INTERPRETER:  It's not complicated questions, but

11   for me it's a difference between taking a shower and taking a

12   bath.

13   Q.  All right.  "Have you been able to bathe yourself since

14   the accident happened at the beginning?"  "No."  "How long were

15   you unable to bathe yourself?"  "Around six months."  And I

16   asked you if you take baths or do you shower?  You said, "Yes,

17   shower."  You didn't tell me you were taking baths, did you?

18          THE INTERPRETER:  I don't know what to say.

19   Q.  I understand.

20          THE INTERPRETER:  I know -- I know that -- I know the

21   fact that my daughters always help me.  They were with me all

22   the time.  When I'm taking a shower, I try to do as much as

23   possible by myself but they are helping me.  They are not

24   bathing me but they are helping me.

25   Q.  Did you ever ask Dr. Glowacki to prescribe for you

```
 1   anything that would help you bathe or shower by yourself?
 2            THE INTERPRETER:  Yes, I did ask.
 3   Q.   What did he give you?
 4            THE INTERPRETER:  He suggested some kind of railing.
 5   Q.   When?
 6            THE INTERPRETER:  Um, now, in 2012.
 7   Q.   So you didn't ask him in 2010 or 2011 and you didn't ask
 8   him up until the time of trial to help you get yourself bathed
 9   instead of involving your daughters in that, right?
10            THE INTERPRETER:  Back then I felt much better.  I
11   had a physical therapy and which helped me to maintain the
12   mobility and I could do much more than I can do right now.
13   Q.   Back then when you were treating at Euro Rehab, you felt
14   well enough to shower yourself, yes?  Yes?
15            THE INTERPRETER:  Not hundred percent.
16   Q.   Well, 80 percent?
17            THE INTERPRETER:  It's difficult to state.
18   Q.   Difficult to state.
19            You didn't need -- you didn't need your daughters
20   helping you bathe for an hour every day when you were going to
21   physical therapy, according to your own testimony, isn't that
22   true?
23            THE INTERPRETER:  I need my daughters to help me
24   every day with basics and I don't know how much time it would
25   take.  I don't have a stopper or some kind of specific watch to
```

1   measure the time.

2   Q.   Your daughter Kamila said that before the accident it took

3   you ten minutes to take a shower, is that true?

4          THE INTERPRETER:   It depends on the day; 10,

5   15 minutes.

6   Q.   She said after the accident you bathed yourself and

7   showered yourself for six months and it only took you

8   20 minutes to do that.

9          THE INTERPRETER:   No, it's not true.

10  Q.   So what Kamila testified to was not true?

11         THE INTERPRETER:   I don't know what she testified.

12  Q.   You were sitting here.

13         THE INTERPRETER:   But she --

14  Q.   Wait.

15         THE INTERPRETER:   Twenty minutes is just a shower,

16  but preparation, shaving.

17  Q.   She said you didn't need any help for six months.  Was she

18  wrong about that too?

19         THE INTERPRETER:   I did need help during the time.

20  Q.   And for six months?

21         THE INTERPRETER:   From the exact moment of the

22  accident until today.

23  Q.   Do you have any idea why Kamila billed State Farm at least

24  an hour for bathing you in the first six months after the

25  accident when she didn't believe that you were being bathed in

1    that time?

2            THE INTERPRETER:  I don't understand the question.

3    Q.  Okay.  Thanks.

4            MR. HEWSON:  Thank you, Your Honor.  I have nothing

5    else.

6            THE COURT:  Redirect?

7            MR. TEMROWSKI:  Very briefly.  Could you leave that

8    on please?

9            MR. HEWSON:  Sure.

10           MR. TEMROWSKI:  And if I could please see Exhibit 8

11   and that police report.

12           MR. HEWSON:  Sure.  I think you have the police

13   report but I'll give you the one I was using.

14           MR. TEMROWSKI:  Okay.  And that first document, the

15   deposition about the $15 per hour.

16           MR. HEWSON:  Sure.  Hang on.

17           MR. TEMROWSKI:  Take your time.

18           MR. HEWSON:  Here's Exhibit 8 and there's the police

19   report, there you go.  I didn't know I was going to clerk for

20   you today.

21           MR. TEMROWSKI:  Well, I just want to be accurate.

22           MR. HEWSON:  That's great.  Me too.  Here we go.

23           MR. TEMROWSKI:  Okay.  Thanks.

24           MR. HEWSON:  You're welcome.

25                        REDIRECT EXAMINATION

1   BY MR. TEMROWSKI:

2   Q.   Mr. Waskowski, you were asked a question about how you

3   arrived at the $15 per hour that you promised for the attendant

4   care -- I'm going too fast?

5             THE INTERPRETER:  Yes.

6             Yes.

7   Q.   And you testified that the State Farm agent provided you

8   with that dollar amount?

9             THE INTERPRETER:  Yes, together with the first form

10  to apply.

11  Q.   And Mr. Hewson questioned you about your testimony from

12  your deposition which we have up here, and it states, "When the

13  insurance stopped paying me, then I went to my attorney and he

14  told me the prices that should be paid," right?

15            THE INTERPRETER:  He confirmed.

16  Q.   Right.  Because you didn't have an attorney when you first

17  made these claims with State Farm, did you?

18            THE INTERPRETER:  No, I didn't have any.

19  Q.   And you saw the attorney who confirmed it when the

20  insurance stopped paying, is that right?

21            THE INTERPRETER:  Yes, I went to see a lawyer in

22  March 2011 when -- or maybe February 2011 when the insurance

23  company stopped to pay my wages.

24  Q.   Regarding that binder that Mr. Hewson asked you about, you

25  indicated to him what's in it.  And Mr. Hewson asked you why

1    didn't you send those documents to State Farm.  Are the

2    documents that you have in that binder the documents that you

3    received from State Farm?

4            THE INTERPRETER:  Yes, they are all documents which I

5    received from State Farm so why -- why do I supposed to send

6    the documents to State Farm if I received them from State Farm?

7    Q.  Next question, about your wage loss and the calculations,

8    you provided your income tax returns to State Farm, didn't you?

9            MR. HEWSON:  Objection, leading, Your Honor.

10           THE COURT:  It is leading.

11   BY MR. TEMROWSKI:

12   Q.  Did you -- did you provide your income tax returns to

13   State Farm?

14           THE INTERPRETER:  Yes, I mailed it to State Farm.

15   Q.  And they paid you wage loss, correct?

16           THE INTERPRETER:  Yes.

17   Q.  If State Farm's contention now is true, that they somehow

18   overpaid you wage loss benefits, did State Farm ever ask for

19   any of the money back from you?

20           THE INTERPRETER:  No.

21   Q.  When the accident occurred, were you alone in the car?

22           MR. HEWSON:  Objection.  This is outside the scope,

23   Your Honor.

24           MR. TEMROWSKI:  No, no, I'm -- it will be within the

25   scope.

```
 1              THE COURT:  Well, the fact -- the question that

 2      you've asked is outside the scope.

 3              MR. HEWSON:  Thank you.

 4      BY MR. TEMROWSKI:

 5      Q.  Remember you were asked questions about that police

 6      report?

 7              THE INTERPRETER:  Yes.

 8      Q.  And you were asked if -- because it says zero injury on

 9      that report, and you testified that the officer never asked you

10      if you were injured.

11              THE INTERPRETER:  He didn't ask.

12      Q.  So if it says zero injury, that would be incorrect?

13              MR. HEWSON:  Your Honor, I'm going to object.  It's

14      argumentative and leading.

15              THE COURT:  The objection is what?

16              MR. HEWSON:  I'm sorry, Your Honor.  I couldn't see

17      by the screen.  It's argumentative and leading.  He's telling

18      the witness what the police officer meant when he put that on

19      there.

20              THE COURT:  It would be leading.

21              MR. HEWSON:  Thank you.

22      BY MR. TEMROWSKI:

23      Q.  You were asked questions about why you stopped treating

24      with Dr. Wietrzkowski, because he didn't speak Polish?

25              THE INTERPRETER:  Yes.
```

1    Q.   Your testimony was he didn't and I sought out a doctor

2    that did.  And Mr. Hewson asked you, well, why didn't your

3    daughters serve as interpreters?  Was it your decision to

4    switch doctors because you -- you felt more comfortable

5    speaking to your doctor in Polish?

6         THE INTERPRETER:  Yes, it was my decision.  And

7    before the first -- before we made the first appointment for

8    the visit, we asked the question if the doctor speaks Polish.

9    Q.   And you were asked about why you saw Dr. Glowacki.  And

10   Mr. Hewson said, "Oh, Mr. Waskowski, you sought him out because

11   you knew he would disable you and write scripts."  Had you ever

12   been to Dr. Glowacki before?

13        THE INTERPRETER:  No, I never visited.  Before the

14   accident I never went to any doctor, I was never sick, besides

15   this one-time check-up after the accident which took place in

16   July 2009.

17   Q.   And then Mr. Hewson asked you, well, if you weren't

18   getting any better, why didn't you go to U of M or Saint John

19   Hospital?  Isn't it true that your treating doctor, Dr.

20   Glowacki -- isn't it true that your treating doctor, Dr.

21   Glowacki, did, in fact, send you for two second opinions to Dr.

22   Zammerano and Dr. Donahue?  Dr. Zammerano and Dr. Donahue?

23        THE INTERPRETER:  Dr. Zammerano confirmed --

24        MR. HEWSON:  Your Honor, I'm going to object to what

25   Dr. Zammerano said.  She's not a witness in this matter.  It's

```
 1   hearsay.
 2              THE INTERPRETER:  I'm just interpreting.
 3              THE COURT:  It is hearsay.  It wasn't a question that
 4   you asked.
 5   BY MR. TEMROWSKI:
 6   Q.  No.  The question was didn't Dr. Glowacki send you for two
 7   second opinions to Dr. Zammerano and Dr. Donahue?
 8              THE INTERPRETER:  Yes, Dr. Glowacki sent me to get a
 9   second opinion from Dr. Zammerano and Dr. Donahue.
10   Q.  And then do you remember you testified about Dr.
11   Wietrzkowski also prescribing attendant care, remember that?
12              THE INTERPRETER:  Yes.
13   Q.  And Mr. Hewson put a part of Dr. Wietrzkowski's record up
14   to show you?  And on the next page, actually page four, it
15   says, "For what medical reason does Mr. Waskowski require the
16   above attendant care services?"  Answer, "Yes."  "And how much
17   time per day does Mr. Waskowski require attendant care for each
18   service you have listed?"  "Six to eight hours per day."
19   Correct?
20   A.  Yes, it's correct.
21   Q.  And then lastly, you were asked about bathing and Kamila
22   and whether or not Kamila may or may not have bathed you.
23   Weren't your two daughters working as a care provider team?
24              THE INTERPRETER:  Yes, they, um -- they switched.
25   Q.  So if Kamila didn't do it, Margaret would do it?
```

```
 1              MR. HEWSON:  Your Honor, I'm going to object.  That's
 2   leading.
 3   BY MR. TEMROWSKI:
 4   Q.   So if Kamila wouldn't do it, who would do it?
 5              THE INTERPRETER:  Margaret.
 6   Q.   Thank you.  I have nothing else.
 7              THE COURT:  Okay.  Recross?
 8              MR. HEWSON:  One very specific thing.
 9                        RECROSS-EXAMINATION
10   BY MR. HEWSON:
11   Q.   Sir, did you tell this jury a moment ago that you didn't
12   see Mr. Temrowski until 2011?
13              THE INTERPRETER:  Would you repeat the name, last
14   name?
15   Q.   Mr. Temrowski?
16              THE INTERPRETER:  I apologize, it's just a long day.
17   Q.   I understand.  Let me redo it.
18              MR. HEWSON:  Yes please.
19   Q.   That's fine.  Did you tell Mr. Temrowski that you did not
20   see him until 2011?
21              THE INTERPRETER:  Yes.
22   Q.   You billed State Farm for mileage to see Mr. Temrowski
23   March 15th of 2010.  Did you know that?
24              MR. TEMROWSKI:  Well, Your Honor, first I'm going to
25   object because mileage is not --
```

```
 1              THE COURT:  That's not the issue.

 2              MR. TEMROWSKI:  That is not the issue in this case.

 3              THE COURT:  No, no, no, that's not the issue behind

 4      the question.

 5              MR. HEWSON:  That's correct.

 6              THE COURT:  Goes to credibility.

 7              MR. HEWSON:  Thank you.

 8              May I approach the witness briefly, Your Honor?  I

 9      just want to show him this document.

10              THE COURT:  To refresh his recollection?

11              MR. HEWSON:  Yes.

12      BY MR. HEWSON:

13      Q.  That's your signature.  Says March 15th, 2010 you went to

14      Mr. Temrowski's office.  You had Mr. Temrowski on this file

15      within three months after the accident happened, didn't you?

16              THE INTERPRETER:  Mr. Temrowski -- Mr. Temrowski took

17      care of the legal -- can you repeat it?  Mr. Temrowski was

18      leading a case.

19      Q.  Let me ask it this way and the answer is yes or no.  He

20      was your lawyer in March of 2010?

21              THE INTERPRETER:  He was needing lawyer for the first

22      time.

23              THE COURT:  It's really a direct question.

24              MR. HEWSON:  Thank you, Your Honor.

25              THE COURT:  Ask it again.
```

```
 1    BY MR. HEWSON:

 2    Q.  No, was Mr. Temrowski your lawyer in March of 2010, yes or

 3    no?

 4            THE INTERPRETER:  2010?

 5    Q.  Yes, ma'am.

 6            THE INTERPRETER:  Yes, because --

 7    Q.  The answer was yes?

 8            THE INTERPRETER:  -- because of different legal case.

 9            MR. HEWSON:  Okay.  Thank you, Your Honor, for your

10    time I have nothing further.

11            THE COURT:  Okay.

12            MR. TEMROWSKI:  Your Honor, I feel I need to clarify.

13            THE COURT:  No.  I mean you -- the issue was brought

14    up during your examination and he asked questions on it.  All

15    right.  You may step down.  There's no re-redirect.  Thank you

16    very much.  You may step down.

17            (Whereupon the witness was excused at 12:43 p.m.)

18            okay.

19            THE COURT:  Any other witnesses?

20            MR. TEMROWSKI:  No other witnesses.

21            THE COURT:  Does the plaintiff rest?

22            MR. TEMROWSKI:  Well, before resting, I'd like to

23    move for the admission of --

24            THE COURT:  Sure.

25            MR. TEMROWSKI:  -- exhibits.  Plaintiff's Exhibit A,
```

 1    which is the police report; Exhibit B, which is the photos from

 2    the car, Exhibit Q which is the Certificate of No-Fault

 3    Insurance; Exhibit D, which is Dr. Donahue's narrative report;

 4    and then Exhibit C, which is the repair estimate to the

 5    vehicle.

 6            MR. HEWSON:  If those are the Plaintiff's Exhibits,

 7    Your Honor, I'll withdraw my objection to Exhibit C.

 8            THE COURT:  All right.  So there's no objection to

 9    Plaintiff's A, B, C and D?

10            MR. HEWSON:  Correct.

11            THE COURT:  As well as Q.

12            MR. HEWSON:  None for Q, Judge.

13            THE COURT:  All right.  And is that the extent of

14    your motion?

15            MR. TEMROWSKI:  Yes.

16            THE COURT:  All right.  Plaintiff's motion as to A,

17    B, C, D and Q is granted.

18            So there's no motion as to K or R, is that correct?

19            MR. HEWSON:  That's correct.

20            MR. TEMROWSKI:  Well, then I'll move for the

21    admission of K also.

22            MR. HEWSON:  Your Honor, I objected at the time.  I

23    don't believe there's any foundation from the testimony as to

24    that particular prescription, but the Court heard Dr.

25    Glowacki's testimony and there is no claim for damages for home

```
 1    modifications.  I don't see the relevance.  That's why I
 2    objected in the first place.
 3              MR. TEMROWSKI:  Well, there is no claim for home
 4    modifications, that's true.  But the question was asked if Dr.
 5    Glowacki ever prescribed home modifications, and Mr.
 6    Waskowski -- Waskowski indicated that he did this year, which
 7    is verified by this.
 8              MR. HEWSON:  That's why I objected, Your Honor.  It's
 9    not relevant.  There's no claim for it.
10              THE COURT:  Yeah, there's no claim for it, but I
11    could just see overall it may be relevant.
12              MR. HEWSON:  Yes, sir.
13              MR. TEMROWSKI:  Okay.  Thank you.
14              THE COURT:  All right.  So it's received.  Okay.
15              Does the plaintiff rest?
16              MR. TEMROWSKI:  Yes, Your Honor.
17              THE COURT:  All right.  I need you to go back in the
18    jury room for a quick minute, okay?
19              THE CLERK:  All rise.
20              THE COURT:  And when I call you out, I'm going to
21    pose this question to Mr. Hewson.  I'm going to ask Mr. Hewson,
22    do you wish to present a case on behalf of State Farm?  He has
23    two options, he may present a case or he may not, okay?
24              (Whereupon the jury was excused at 12:47 p.m.)
25              THE CLERK:  Please be seated.
```

```
 1              THE COURT:  I assume you have a motion.

 2              MR. HEWSON:  I do, Your Honor.

 3              THE COURT:  Okay.  Let me -- oh, I have it here.  And

 4    it's oral?

 5              MR. HEWSON:  Yes, Your Honor.

 6              THE COURT:  It's not written?

 7              MR. HEWSON:  No, sir.

 8              THE COURT:  Okay.

 9              MR. HEWSON:  It's supported by the trial brief, which

10    I know the Court has read.  But it basically breaks down as

11    simply as I can make it, first of all, the Oakland MRI bill is

12    not supported by any competent medical evidence related to the

13    automobile accident.  Dr. Zammerano is the doctor that ordered

14    that.

15              THE COURT:  What about the testimony of Dr. Glowacki?

16    And, of course, the standard is is that if, under Rule 50, the

17    parties have been fully heard on an issue during a jury trial

18    and the Court finds that a reasonable jury would not have a

19    legally sufficient evidentiary basis to find for the party on

20    that issue, the Court may obviously grant a motion for

21    judgment.

22              And, of course, the issue is the directed verdict may

23    only be granted if, after viewing the evidence in the light

24    most favorable to the party opposing the verdict, directed

25    verdict, of course I would imagine is the plaintiff, reasonable
```

1    minds cannot differ on the question of material facts.  And, of

2    course, the issue is -- would be whether or not claim for

3    first-party benefits that have been made in this case are

4    reasonably necessary.

5            MR. HEWSON:  Yes, sir.  Very briefly, nowhere in Dr.

6    Glowacki's testimony did he say that that second MRI was

7    reasonable, necessary or ordered by him and, in fact, his claim

8    was that it showed healing for Mr. Waskowski.

9            THE COURT:  So your motion is limited only to the

10   second MRI?

11           MR. HEWSON:  Yes.  At this particular point -- well,

12   yes, Your Honor -- you know, I understand.  The only thing -- I

13   had wanted to include Dr. Glowacki's testimony but I could see

14   where the Court would say, well, we're going to let the jury do

15   it, although my major concern with him is when he says to

16   the -- to Your Honor and to the jury that, "I make up the

17   contents of those reports and that I continue to treat, whether

18   the person needs it or not or whether it's doing good or not as

19   long as it keeps showing up," I suggest to the Court that it

20   will call upon the jury to speculate as to whether or not his

21   charges and his treatments and ordered treatments are

22   reasonable, necessary and the charges are reasonable and

23   customary.  So there are two parts to that.

24           The Oakland MRI I think is pretty obvious, but the --

25   the one with Dr. Glowacki is a bit more complex and I concede

1   that, except you saw him testify.  You saw the approach that he

2   took and the things that he said to this jury relative to the

3   way in which he fashioned his treatment protocol, and I submit

4   that it will require them to speculate at best to find a way to

5   relate his treatments to the injuries in this accident.

6           Thank you.

7           THE COURT:  So you're challenging the plaintiff's

8   whole case?

9           MR. HEWSON:  I'm challenging Dr. Glowacki, yes, I am,

10  and I guess that underlines the entire case, that's true, Your

11  Honor.

12          THE COURT:  Okay.

13          MR. HEWSON:  Thank you.

14          MR. TEMROWSKI:  Well --

15          THE COURT:  Better to quit while you're ahead.

16          MR. TEMROWSKI:  I won't say a word.

17          THE COURT:  All right.  Okay.  Dr. Glowacki testified

18  that there's a herniated disk at L4, L5, herniated disk of the

19  cervical spine, fractured sternum.  They reviewed the Oakland

20  MRI and the Macomb MRI records.  He has disabled the plaintiff

21  from the time of the accident up to the present time.  He

22  stated that all the changes that he viewed on the Macomb and

23  Oakland MRI reports and films are the result of trauma.

24          He told us that his professional opinion is that his

25  services were reasonably necessary from the automobile

 1   accident.  Physical therapy was reasonably necessary from the

 2   automobile accident.  Household assistance was reasonably

 3   necessary because of the automobile accident.  The attendant

 4   care was reasonably necessary because of the automobile

 5   accident and that -- that he prescribed physical -- sorry,

 6   attendant care 12 hours a day, seven days a week; that the

 7   plaintiff is disabled from work.

 8          Now, I don't specifically recall -- again, I don't

 9   specifically recall, that he testified that the Oakland MRI was

10   reasonably necessary because that was not really -- as I

11   reviewed the trial brief, that was not specifically mentioned

12   or I would have paid much closer attention to that particular

13   issue as to solely whether the Oakland MRI was reasonably

14   necessary.

15          However, he did testify that the medical treatment

16   and prescriptions that the plaintiff received were medically

17   necessary as a result of the automobile accident, and the

18   plaintiff did sustain these injuries in an automobile accident

19   December 23rd, 2009.  Therefore, I'm going to deny the Rule 50

20   motion.

21          MR. HEWSON:  Thank you, Your Honor.

22          MR. TEMROWSKI:  Thank you.

23          THE COURT:  Okay.  Can we get some testimony -- how

24   long is the video?

25          MR. HEWSON:  Dr. Quint is how long, Mark?

```
 1             THE WITNESS:  Fifty minutes.
 2             MR. HEWSON:  It's 50 minutes, Your Honor, 5-0.
 3    Whatever the Court's preference is, I'm ready to go.  And Dr.
 4    Geiringer is about two hours and I should be done by noon.
 5             THE COURT:  Okay.
 6             MR. TEMROWSKI:  Your Honor, of course I'll do
 7    whatever you want to do, but at 2:00 o'clock, because I did
 8    think that we were stopping at 1:00 o'clock today, I have a
 9    court-ordered facilitation hearing that was originally set for
10    1:00 o'clock.  Because I thought we would be done by 1:00, I
11    moved it to 2:00.
12             THE COURT:  Plaintiff's case has gone two days over
13    from what you told me as to how long it was going to last.  So
14    I cut you slack one day and now it's a second full day over the
15    time that you've told me, which creates issues and problems in
16    my docket.
17             MR. TEMROWSKI:  Well, I don't want to upset Your
18    Honor --
19             THE COURT:  I'm not upset.  I'm just trying.
20             MR. TEMROWSKI:  No, no.
21             THE COURT:  I'm just trying to think my way through
22    this.  All right.  It's my understanding that you've -- are in
23    agreement on the jury instructions, is that correct?  That's
24    what I was --
25             MR. TEMROWSKI:  Correct, Your Honor.
```

```
 1          MR. HEWSON:  Correct, Your Honor.  Those are done.

 2          MR. TEMROWSKI:  Yes.

 3          THE COURT:  Okay.

 4          MR. TEMROWSKI:  Yes.

 5          THE COURT:  So before you leave today, just --

 6   there's a jury instruction packet.  Just take a look at it and

 7   make sure this is the agreement, as well as the verdict form.

 8          MR. HEWSON:  Yes, sir.

 9          MR. TEMROWSKI:  Yes, sir.

10          THE COURT:  Don't leave until that's been resolved.

11          So we'll bring the jury back and we'll tell them that

12   we've got a break for the day.

13          MR. TEMROWSKI:  Thank you.

14          (Whereupon the jury entered the courtroom at

15          12:57 p.m.)

16          THE CLERK:  Please be seated.

17          THE COURT:  Okay.  Mr. Hewson, do you wish to present

18   a case on behalf of State Farm?

19          MR. HEWSON:  Yes, Your Honor, thank you.  I will.

20          THE COURT:  Okay.  That will start tomorrow at 8:30

21   in the morning, okay?  So I'm going to need everyone back

22   upstairs at 8:00 o'clock tomorrow morning, okay?

23          And as I understand, correct me if I'm wrong, you're

24   going to have two witnesses, is that true?

25          MR. HEWSON:  That is correct.
```

```
 1              THE COURT:  You believe you're going to have two

 2    witnesses but things change.

 3              MR. HEWSON:  Yes, sir.

 4              THE COURT:  And who are those two witnesses?

 5              MR. HEWSON:  We've got Dr. Quint and Dr. Geiringer

 6    and I may have Ms. Page come back.

 7              THE COURT:  And Dr. Quint and Dr. Geiringer will be

 8    by way of?

 9              MR. HEWSON:  By deposition, Your Honor.

10              THE COURT:  And is Quint going to be the first one or

11    Geiringer?

12              MR. HEWSON:  Dr. Quint will be the first witness,

13    he's 50 minutes in that deposition, and I believe Dr. Geiringer

14    is two hours.

15              THE COURT:  Okay.

16              MR. HEWSON:  I'm going to take a few of the

17    objections out, but I think that will be what the extent of the

18    time is.

19              THE COURT:  Very good.  Did you have a question?

20              JUROR IN SEAT NO. 2:  No, no, I'm sorry, Judge.

21              THE COURT:  Do you have a question?

22              JUROR IN SEAT NO. 1:  I do.

23              THE COURT:  Why don't you write me a note.

24              JUROR IN SEAT NO. 1:  Okay.

25              (Brief pause)
```

```
 1              THE COURT:  What's that?

 2              JUROR IN SEAT NO. 1:  My writing.

 3              THE COURT:  She can read mine.

 4         Great question.  The question is, "Will we conclude

 5    at 1:00 o'clock p.m. or go into closing statements?"  My

 6    thought is that probably do -- we'll probably do closings

 7    Thursday morning, okay?  We'll finish with the proofs tomorrow.

 8              JUROR IN SEAT NO. 1:  Okay.

 9              THE COURT:  Okay.  Which is the presentation.  So Mr.

10    Temrowski does have the opportunity for rebuttal when Mr.

11    Hewson gets done.  So no, we're not going to go in the

12    afternoon, okay?  But on Thursday, plan on -- you're going to

13    be in deliberations on Thursday.  Remember when we first got

14    together last week I told you once you go into deliberations,

15    it's all day, okay?  All right.

16              JUROR IN SEAT NO. 1:  Okay.

17              THE COURT:  And that will probably -- I would assume

18    you're going to be in deliberations later on Thursday morning,

19    okay?

20              JUROR IN SEAT NO. 1:  Okay.

21              THE COURT:  All right.

22              JUROR IN SEAT NO. 1:  Thank you.

23              JUROR NO. 4:  I have an additional question.  What

24    about -- does Friday count?

25              THE COURT:  Yeah.
```

```
1              JUROR IN SEAT NO. 4:  Okay.

2              THE COURT:  Your three-day weekends are over.  Okay.

3    See everybody tomorrow.

4              THE CLERK:  All rise.

5              (Whereupon the jury was excused at 1:00 p.m.)

6              THE CLERK:  Please be seated.

7              Okay.  I have your proposed jury instructions.  I

8    would ask both of you to take this time to review them very

9    carefully to make sure these are the jury instructions that you

10   wish to have read to the jury.  I do not see a verdict form in

11   there.

12             MR. HEWSON:  There was -- we were doing the standard

13   verdict form, Judge.

14             THE COURT:  Okay.  Well, it needs a caption, have a

15   caption of the case.

16             MR. HEWSON:  Oh, okay.  There's one that says

17   "Plaintiff's Proposed Verdict Form" on it.

18             THE COURT:  We're going to have to have a -- I

19   understand this is an agreed-upon verdict form, but this needs

20   to be presented to the jury so the word "proposed" needs to

21   be --

22             MR. HEWSON:  I'll take care of that, Judge.

23             THE COURT:  But also you're going to have to fix --

24   in the body it has "he/she."

25             MR. HEWSON:  I'll fix that.
```

```
 1              MR. TEMROWSKI:  You'll take care of that?

 2              MR. HEWSON:  I'll take care of that.

 3              THE COURT:  So Mr. Temrowski and Mr. Hewson, when you

 4    have finished your review -- and again, I caution you to review

 5    the jury instruction packet very carefully that you've agreed

 6    upon as well as the verdict form -- when you have finished that

 7    review, if you will let me know and we will place that on the

 8    record.

 9              MR. HEWSON:  Yes, sir.

10              THE COURT:  And do you have the special instruction?

11    I didn't see that.

12              MR. HEWSON:  That was the one that we had on the

13    table here?

14              THE COURT:  Yeah.

15              MR. HEWSON:  I'll retype that one, Judge, to take

16    that line out.

17              We agree on this?

18              MR. TEMROWSKI:  Right.

19              MR. HEWSON:  Okay.  We agree.

20              (Brief pause at 1:05 p.m.)

21              (Proceedings resumed at 1:10 p.m.)

22              THE CLERK:  Court's back in session.

23              And Mr. Hewson, you can go ahead and file that, file

24    those documents.

25              MR. HEWSON:  File them both electronically?
```

```
 1            THE CLERK:  Yes.

 2            MR. HEWSON:  I will take care of that when I get

 3   back.

 4            THE COURT:  Okay.  So I have the jury instructions

 5   that you wish me to read the jury in this folder right here?

 6            MR. TEMROWSKI:  Yes, sir.

 7            MR. HEWSON:  Yes, sir.

 8            THE COURT:  And as I understand, 701 has been taken

 9   out, so you do not want a theory of the parties read to the

10   jury, is that correct?

11            MR. TEMROWSKI:  Yes, Your Honor.

12            MR. HEWSON:  That is correct, Your Honor.

13            THE COURT:  And do we have a verdict form?

14            MR. HEWSON:  I -- what I had spoken to the Court

15   staff was I'm going to retype the verdict form and retype the

16   special requested instruction and E-file those and bring hard

17   copies in the morning.

18            MR. TEMROWSKI:  That's fine.

19            THE COURT:  Okay.  All right.  Thank you.  See you

20   tomorrow morning.

21            MR. HEWSON:  Thanks, Judge.

22            MR. TEMROWSKI:  Thank you very much.

23            THE COURT:  So I take it you're withdrawing your

24   request for 601?

25            MR. TEMROWSKI:  Yes, Your Honor.
```

Jury Trial:  Volume 4 • December 4, 2012

70

1          THE COURT:  Okay.  Very good.

2          MR. HEWSON:  Thank you, sir.

3          (Court in recess at 1:12 p.m.)

4          (Whereupon proceedings in the above-entitled matter

5          were adjourned to Wednesday, December 5, 2012)

6                          —  —  —

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 70 comprise a full, true and correct transcript taken

7    in the matter of Jaroslaw Waskowski vs. State Farm Mutual

8    Automobile Insurance Company, Case No. 11-13036, on Tuesday,

9    December 4, 2012.

10

11

12                      s/Linda M. Cavanagh
                     Linda M. Cavanagh, CSR 131, RPR, CM, CRR
13                   Federal Official Court Reporter
                     United States District Court
14                   Eastern District of Michigan

15

16

17   Date: September 18, 2013
     Detroit, Michigan
18

19

20

21

22

23

24

25